**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **LEROY WILLIAMS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.:** |
| | * | **2:06-cv-658-ID** |
| **STATE OF ALABAMA DEPT. OF** | * | |
| **TRANSPORTATION, et. al.** | * | |
| | * | |
| **Defendant.** | * | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This lawsuit concerns the rejection of Leroy Williams, an African-American male, during his probationary period by the Alabama Department of Transportation (ALDOT) after he was promoted to Transportation Technologist.  As set froth below, Mr. Williams was discriminated against due to his race and in retaliation for protected activity.

I.     **STATEMENT OF MATERIAL FACTS**

     A.     **Mr. Williams Had An No Disciplinary Actions And Was Considered An Exceeds Standards Employee Prior to His Promotion To Transportation Technologist.**

Mr. Williams  began work with the Alabama Department of Transportation in 1993. Px E. During the twelve years prior to his promotion to Transportation Technologist[1] in 2005,  Mr. Williams had usually received ratings of "exceeds standards" or "consistently exceeds standards" on his evaluations as an Engineering Assistant, the feeder class for Transportation Technologist. Dx

_____

[1]This classification was previously named Civil Engineer or Civil Engineer I/II.

1

F; Dx G; Px D.   Teresa Barksdale, one of his supervisors just before his promotion stated that he, "does not hesitate to ask questions or request assistance. Leroy is very cooperative with his co-workers." Dx Z at Bates 34.  Gary Beasley, Mr. Williams' supervisor prior to Ms. Barksdale stated:

> Williams has years of experience and gathers data, as a rodman, quickly and accurately. He wastes very little energy getting unnecessary data. He helps me train new employees and is very capable operating our total station instrument. He can always be counted on to give a good days work.
>
> Mr. Williams has very few weaknesses.

Dx Z at bates 32.   During his entire twelve years of employment with ALDOT prior to his promotion to Transportation Technologist Mr. Williams had never received any disciplinary action and had never been marked as non-compliant with the punctuality requirement.  Less than three months after his promotion to as one of the first African-American Transportation Technologists in the Design Burea of ALDOT, Mr. Williams was removed from this classification for alleged "continual excessive tardiness" and "insubordination."  Dx X.  ("This action is being taken because of your continual excessive tardiness and repeated insubordination.").  As shown below, these allegations are factually false.

> **B.     Mr. Williams Was Found Qualified for the Transportation Technologist Classification By the State Personnel Under State of the Art Selection Procedures**

The Transportation Technologist classification is the first classification within the engineering line of progression at ALDOT with supervisory responsibilities. *See* Dx AA ("Employees might supervise lower level assistants in the completion of duties').   The Transportation Technologist had no African-Americans prior to the filing of the *Reynolds v.*

2

*Alabama Department of Transportation* and the first appointments of any significant numbers of

African-Americans to that classification occurred in 1998 and 1999 under court supervised rounds

of appointments where hundreds and hundreds of appointments were approved *en mass* by the Court

based after the defendants had failed to develop the validated selection procedures that were required

under the *Reynolds* Consent Decree.  Px B at 33-34 and C at 20-22 and 78-79.  In 2005, ALDOT

began making the first appointments under the newly validated examinations and selection

procedures.  PX H.  Mr. Williams was among the first African-Americans appointed to

Transportation Technologist in the Design Bureau under these new validated procedures.  Px H; Px

B at 33-36.  According to Don Arkle, who is currently the  assistant chief engineer over policy and

planning, the "department considered those to be state of the art examinations and the best  possible

way to select candidates for the transportation technologist position." Px B at 12.   As set forth in

the State Personnel Department job announcement:

> The total exam time is approximately 7 1/2 hours, however
> candidates will be at the exam site for a longer period of time.  The
> Transportation Technologist- Analysis and Planning Option
> examination consists of four different components: 1) Plan Reading
> Exercise, 2) Technical Reading and Writing Exercise, 3) Role-Play
> Exercise and 4) Scheduling Exercise.   The Plan Reading Exercise
> requires the candidate to review a set of instructions and roadway
> plan sheets and then respond to questions about the plan.   The
> Technical Reading and Writing Exercise requires the candidate to
> review instructions, a technical manual, and data related to the
> manual in order to prepare a written response to the inquiry.  The
> Role-Play Exercise requires the candidate to meet with an individual
> during a video-taped session in order to discuss a problem situation.
> The Scheduling Exercise requires the candidate to serve in the role of
> a Transportation Technologist in the Analysis & Planning option and
> complete a work schedule, assigning employees to specific projects
> and tasks.

Dx. AA.

Under the state merit system, once an applicant passes the minimum qualifications and takes

3

an examination he is placed on the register for that classification and the top ten scores for a geographic area are then  placed on a certificate of eligibles and ALDOT must select from those ten persons. Px B at 13-14.  Mr. Lewis had one of the top ten scores for Montgomery at the time of his selection and was placed on a certificate of eligibles.  Px F.  ALDOT was then **forced** to hire Mr. Williams as he was the only candidate among the top ten who said that they were available as all other candidates either said they did not want to work in that location ("L"code ) or had already received an appointment to the classification ("H" code).  *Compare* Px. F to Px. B at 15-16.   Mr. Williams was appointed to the Transportation Technologist classification to position number 1736405 on May 14, 2005.  Px. F.

**C.     Mr. Williams Was Improperly Placed Under the Supervision of Another Transportation Technologist Who Admits To Racial Prejudice**

Mr. Williams was then placed under the "supervision" of Tommy Lewis.  Mr. Lewis is the individual who reprimanded Mr. Williams for his alleged "excessive tardiness" and "insubordination."  As will be shown below, Mr. Lewis was in the same merit system classification as Mr. Williams at the time he "supervised" Mr. Williams and should have had no authority to reprimand him.  Mr. Lewis first came to ALDOT when he received a personal phone call from  Ray Bass because Mr. Bass knew Mr. Lewis' father. Px. B at 11.   Ray Bass was appointed Highway Director under George Wallace and was found in the *Reynolds* litigation to have threatened to fire Johnny Reynolds if he asked a white woman for a date.  *Reynolds v. Alabama Dep't of Transportation,* 4 F.Supp.2d 1068, 1077 ( M.D. Ala. 1998).  Mr. Bass was also found to have known of and tolerated the use of racial slurs throughout ALDOT and the Design Burea. *Id*. at 1080.  Mr. Lewis admitted in his deposition that he uses racial slurs when not at work and that he has called an

African-American "nigger" when not at work.  Px. C at 76.

Mr. Lewis admitted that he had "heard through the crews" that Mr. Lewis was a class member in the *Reynolds* case. Px. C at 56.   Mr. Lewis also admitted that he believed the *Reynolds* case had held up his personal promotions for many years. Px. C at 19-20.  Mr. Williams has testified and written that within the first week that he was promoted to Transportation Technologist he had a conversation with Mr.  Lewis where Mr. Lewis stated that Mr. Williams had received his promotion due to the *Reynolds* lawsuit and that Mr. Williams had received a promotion and a raise while he had only received a promotion. Px. A t 93-95; Dx. Z at Bates 26.   Mr. Lewis denied any such conversation stating instead that he "congratulated" Mr. Williams because they had both gotten a promotion.  Px. C at 25-26.  Mr. Lewis testified that when he "supervised" Mr. Williams he had just been promoted to the Transportation Technologist Senior classification and the Party Crew Chief.  Px. C at 24 and 28.

ALDOT's documents show that Mr. Lewis is not telling the truth.  Mr. Williams was appointed to the Transportation Technologist position on May 14, 2005.  Px. F.  He was demoted back to the Engineering Assistant classification (class code 20115) and transferred away from Mr. Lewis in September 2005. Dx. X; Px E.  The defendants' own documents show that Mr. Lewis was not promoted to Transportation Technologist Sr. (code 20482) until February 2006– nearly nine months after Mr. Williams was promoted to Transportation Technologist (code 20481) and that during the entire time he "supervised" Mr. Williams, Mr. Lewis held the same merit system classification.  Px. R; Px N; Px Q.  Mr. Arkle admitted that a Transportation Technologist should be supervised by a Transportation Technologist Senior and that members of the same classification should not supervise each other.  Px. B at 10-11.

The defendants documents show that Mr. Lewis was placed on the Transportation Technologist Senior register on April 27, 2005 with a score of 8.39.  Px. N at 3.  Out of 161 candidates who have been placed on the Transportation Senior register since the defendants developed validated examinations, Mr. Lewis scored 160th. Px S.  Mr. Lewis was placed into the Field Crew Chief position on on "out-of-classification" basis – in other words he was placed into the position without competition and without having gone through the state merit system.  Out of classification assignments were restricted by Article XV of the *Reynolds* Consent Decree.  Px. X. In January 2000, the *Reynolds* Court entered a consent contempt order wherein ALDOT agreed that "Use of out of classification assignments is to be eliminated by March 30, 2000.  Thereafter, duties or positions may be assigned on an out of classification basis only when necessary on a temporary or emergency basis."  Px. Y.  Under the Contempt Order, out-of-class assignments required the approval of the Transportation Director. *Id.*  The person requesting that Mr. Lewis be placed into that out-of-classification assignment was William Adams.  Mr. William Adams is the leader of  a group of non-class members--consisting predominantly of white employees of the department, and now commonly referred to as the 'Adams intervenors'–who intervened in the *Reynolds* case to challenge relief sought for the African-American class.  *Reynolds v. Alabama Dep't of Transportation,* 4 F.Supp.2d 1068, 1080 ( M.D. Ala. 1998)(attached as Px Z); Px B at 53-54.  Px C at 49.  Mr. Lewis out-of-class assignment was not approved by the Director until July 11, 2005– several months after Mr. Lewis began to "supervise" Mr. Williams.  Px. O at 3.  Mr. Lewis stayed in that out-of-class position until ALDOT was finally able to reach him on a certificate of eligibles in February 2006. The out-of-classification request also shows that Mr. Adams failed to consider anyone else for the position– even though there were available African-Americans for the position. Px. O at 3; Px. W.

6

On the portion of the form that lists "candidates considered for out-of-classification assignment," Mr. Adams listed "none." Px O at 3.[2]

The defendants' documents also support Mr. Williams' claim that Mr. Lewis complained that Mr. Williams got a promotion and a raise while Mr. Lewis got only a "promotion." Mr. Lewis received no compensation for his out-of-classification assignment. In accepting the assignment, Mr. Lewis agreed not to seek additional compensation. "It has been explained and I understand that I am being requested to perform these tasks freely and voluntarily without change of status, classification, salary or benefits." Px. O at 4. In making the request for the out of class assignment, Mr. Adams stated as the reason that "registers were not available." Px. O at 2. The reason that registers were allegedly not available was the *Reynolds* litigation.

Mr. Williams testified that in addition to complaining that Mr. Williams had gotten his position through the *Reynolds* lawsuit, Mr. Lewis immediately began to yell at him in front of the persons Mr. Williams was supposed to supervise and that he would belittle him in front of employees and countermand his orders. Px. A at 92-97. Mr. Lewis denied ever yelling at Mr. Williams. Px C at 74.

The defendants' documents also show that Mr. Lewis was not truthful when asked if Mr. Williams had accused him of being prejudiced:

> Q.    But he never accused you of being prejudice?

---

[2]Mr. Lewis was appointed over an African-American with a higher score on the examination, Lawrence Brown. Px. R. Under the *Reynolds* Consent Decree, the defendants must state the reason for selections. On the selection form for Mr. Lewis, the defendants state that he was chosen for his "twenty-three years location surveying experience." Px. T. Lawrence Brown, the African-American with a higher score on the examination has 28 years of surveying experience with ALDOT. Px. W. Mr. Brown scored the same as Mr. Lewis on the structured oral interview for the position. *Compare* Px. U *with* Px V.

A.    No.

Q.    Can you identify Plaintiff's Exhibit 2 which has been previously marked as Defendant's Exhibit 9 to the deposition of Leroy Williams?

A.    Yes, I wrote this.

Q.    If you would, turn to Roman Numeral one which is on the third page.

A.    (Complied.)

Q.    Have you had a chance to read that?

A.    Yes.

Q.    And by P-R-E-J-U-D-G-E-S, is that how you -- that's how you spelled prejudice?

A.    I think I misspelled it.  I'm not sure.

Q.    And in that statement, in that counseling statement you stated under little letter "A" accusing me of being prejudice will not be tolerated. So in this counseling session you did accuse or did say that Mr. Williams had accused you of being prejudice; correct?

A.    Yes, I did.

Q.    And just a few moments ago you told me he never accused you of being prejudice, which is it?

A.    He -- he didn't -- you asked me -- did you say racial?

Q.    No.  I asked you if he accused you of being prejudice?

A.    I misunderstood you.  What's on the paper is correct.

Q.    How did that make you feel, Mr. Lewis, when he accused you of being prejudice?

A.    I don't know 'cause I'm not. I mean --

8

> Q.     Have you ever used any racial slurs, Mr. Lewis?
>
> A.     Not that I remember at work, no.
>
> Q.     So you have used racial slurs not at work; correct?
>
> A.     I would say yes.
>
> Q.     Have you used the word "nigger" not at work?
>
> A.     Yeah.  Yes.
>
> Q.     Have you called African-American's nigger when not at work?  You're under oath, Mr. Lewis.
>
> A.     Probably have, yeah.

Px C at 74-76.  In another document, Mr. Lewis went to Mr. Williams crew to question them about the allegations of harassment made by Mr. Williams.  Px. M.  It is clear from that document that Mr. Williams crew felt that Mr. Williams was being treated unfairly and differently from other supervisors:

> Mr. Jones on the Monday the 15th of August I held a crew meeting before the crew went out to the field. Present was Leroy Williams, Field Supervisor, Transportation Technician, Channin Grantham, EA-II/III, Rodney Sanders, EA-I, Robbie Jones, EA-1 and Michael Crowe EA-1.
>
> I started the meeting informing the crew that some very serious charges had been brought against me. They were that I had been harassing and degrading Mr. Williams in front of the crew on a regular basis. I asked each member of the crew one by one if they had seen this happen.
>
> Mr. Sanders spoke first and he explained that he thought that I was holding Mr. Williams to too high of a standard for a new supervisor. He understood that I had been a supervisor for some time and he thought I should not expect as much as out of Leroy because he was

9

> a new supervisor. Nothing was said about me harassing or degrading Mr. Williams.
>
> Ms. Jones told me, I feel the same was as Mr. Sanders I feel like you should not expect quite so much out of Mr. Williams because he was a new supervisor.
>
> I explained that I understood their concerns but the question was "Have you seen me harass or degrade Mr. Williams at any time" They both told me, "No" they had not seen me do that.
>
> I asked Mr. Crowe. He replied "No" I have not seen that. I then turned to Mr. Grantham he also told me he had not seen that take place.
>
> Later that day I drove to Tuscaloosa where Mr. Austin was working. I explained the charges that were brought against me. He told me he had never seen me treat Mr. Williams in that manner.

No ALDOT official, other than Mr. Lewis, the person accused of prejudice and harassment ever met with the members of Mr. Williams crew. Indeed, it appears that Mr. Jones, Mr. Lewis supervisor, instructed Mr. Lewis to make this "investigation." Dx U at 2. "I instructed Tommy to have a meeting with his crew as soon as possible and see if this was accurate."

### D.    William Adams, the Leader of the White Intervenors In The *Reynolds* Class Action Recommended Mr. Williams "Rollback" To Don Arkle Who Has Been Found Guilty of Racial Discrimination

In the same document where it is shown that the alleged harasser and discriminator is told to investigate Mr. Williams allegations, Mr. Jones informs Mr. William Adams, the leader of the Adams intervenors in the *Reynolds* case, that "Tommy said that Leroy has threatened to get a lawyer." Dx U. Four days after that memo was written, Mr. Adams sent a memorandum to Don Arkle, the Design Bureau Chief, recommending that Mr. Williams be demoted from his

10

Transportation Technologist Position.  Dx. V.

On that very same day, Mr. Arkle concurred with the demotion.  Dx. V.  In his deposition, Mr. Arkle admitted that he never did any investigation of the facts, that he never met with Mr. Williams, and that he never bothered to look at Mr. Williams personnel file to see that he had never before had any disciplinary problems or any allegations of insubordination or tardiness.  Px. B at 22-28.  Mr. Arkle also confirmed that Mr. Williams was not demoted for his work performance but for the alleged "continual excessive tardiness" and insubordination.  Px. B at 29.  Mr. Arkle also admitted that he was not even aware that Mr. Lewis was also a Transportation Technologist and had not been appointed to the Transportation Technologist Senior classification and was "reprimanding" someone in his own classification.  Px. B at 23.  Mr. Arkle then admitted that he did not even consider the possibility of any bias on the part of  Mr. Adams- the leader of the group who intervened in the *Reynolds* case to oppose relief to the African-American class. Px B at 23.

Judge Thompson has previously found Mr. Arkle guilty of discrimination and failing to investigate claims of discrimination by African-Americans and of retaliating against them for making such claims.  *Reynolds v. Alabama Dep't of Transportation,* 4 F.Supp.2d 1068, 1088 ( M.D. Ala. 1998). ("It is undisputed that two of three prima-facie factors have been satisfied.  Reynolds suffered an adverse employment action--he was suspended without pay.  In addition, while Arkle did not list Reynolds's participation in the  department's grievance procedure as a reason for Reynolds's suspension, Arkle stated at the 1996 trial that this was, in fact, a motivating reason.") Don Arkle had recommended that Mr. Reynolds be suspended for asking a white employee if the employee had called him a "nigger" as had been suggested by another employee which then led the white employee to threaten the life of the other white employee.  Judge Thompson also found:

11

> Lett, Jordan, and Wiggins were not the only supervisors who knew that racial slurs were used in Roadway Design but failed to act. Arkle admitted that he was aware of the racial tensions, but he did nothing. Indeed, Smith reported to Arkle on several occasions that supervisors, such as Lett and Jordan, were using racial slurs, and Arkle did nothing. Fowler, Bass, and Butts all knew that racial slurs were regularly used in Roadway Design, but each did nothing. Although Arkle testified that the department's policy was to investigate any claim involving a racial slur--with or without corroboration--Arkle himself undermined this policy when he failed to respond to Smith's complaints in any way.

*Reynolds v. Alabama Dep't of Transportation,* 4 F.Supp.2d 1068, 1080 ( M.D. Ala. 1998).

Judge Thompson then concluded:

> In conclusion, the Transportation Department suspended Reynolds because of his race and in retaliation for protected conduct, in violation of Title VII. Others in the Transportation Department, not Reynolds, are guilty of violations of the department's racial harassment policy. Director Butts, Chief Engineer Bass, **Design Bureau Chief Arkle**, Roadway Design Engineer Bush, Assistant Roadway Design Engineer Reese, Section Leader Wiggins, Squad Leader Lett, and Squad Leader Jordan, have all violated the department's racial harassment policy. Although aware of both isolated and widespread instances of the use of the word "nigger," they failed to take any corrective measure. Moreover, because they failed to take corrective measure, they set the stage for--that is, they created the environment that led to--the racial strife that spawned this litigation. If anyone deserves suspension, they do. Indeed, until they assume the responsibility placed on them by federal law and the orders of this court to enforce the Transportation Department's racial harassment policy aggressively and expansively, they will continue to have incidents similar to, if not worse than, that involving Reynolds, Scott, and Lett.

*Reynolds v. Alabama Dep't of Transportation,* 4 F.Supp.2d 1068, 1090 ( M.D. Ala. 1998)(emphasis added). When asked if Judge Thompson had made such a finding, Mr. Arkle responded:

> A.    I -- I can't recall what Judge Thompson ordered or ruled.

Q.    So you don't remember what Judge Thompson said you had done wrong in his opinion?

A.    No, I don't recall.

Q.    Do you recall anything about what Judge Thompson said in that opinion?

A.    I believe he ruled in favor of Mr. Reynolds.

Q.    Did he also rule that you had knowingly allowed the use of racial slurs throughout the design bureau?

A.    No.

Q.    You're saying he did not find that you knowingly allowed it and that there was common usage throughout the design bureau?

A.    No, I don't recall him ruling that.

Px. B at 50-52 (objections omitted)

### E.  The Alleged Reasons For Mr. Williams Demotion are Pretextual.

Having established the obvious bias of the decision makers, we now turn to the actual conduct for which Mr. Williams was demoted.  As set forth in Mr. Arkle's memorandum, Mr. Williams was demoted for alleged "continual excessive tardiness" and "insubordination."  Dx X. Mr. Lewis, who is also only a Transportation Technologist, identified the following four instances of "continual excessive tardiness":

Occasion One: On Wednesday, June 1, 2005 you reported to the parking lot in Montgomery at 5:05 a.m. which was 5 minutes late.  At that time I informed you that being tardy was unacceptable. This was a verbal warning.

Occasion Two: The very next day I instructed the crew to meet in the parking lot of the motel where everyone was staying in Auburn.  You did not report at that location and I had to be told by another crew member where you were.  That in itself is an

13

infraction because you did not do as instructed. All other crew members reported just as I had instructed. I told you on that day you were late, because you were not where I told you to be at 7:00 a.m. I explained if you were late again you would be subjected to disciplinary actions. This was a second verbal warning.

Occasion Three: On Monday, June 20th you did not arrive at the office Tuscaloosa until 7:30 a.m. You called me that day and told me your stomach was bothering you. Even though you told me you were sick you went on out and worked the rest of the day like there wasn't anything wrong. I explained to you the importance of being on time to set an example for the crew members you supervise. This was a third verbal warning and a pattern had developed.

Occasion Four: And now on Monday July 25th, you did not report to the office here in Tuscaloosa until 7:14 a.m. You did not notify me even as I talked with you on the Southern Linc BEFORE 7:00 a.m. That in its self is grounds for a Reprimand. I am mystified as to why you did not mention to me that you were going to be late because you should have been very aware that being tardy is not acceptable.

Dx.

Mr. Williams denies that he was late on the first occasion. Px A at 113. Indeed, Mr. Lewis testified that the start time for Wednesday was 7:00. Px. C at 44. Mr. Lewis had no explanation for why they would have been supposed to be at work at 5:00 on a Wednesday other than he "might have written the day down wrong." Px. C at 59-60. On the second occasion, Mr. Williams testified that he was at the work site on time and that Mr. Lewis never told him to be at the parking lot. Px A at 113-114. Indeed, ALDOT's official attendance policy guidelines states that in order to be on time an employee " should be at their work station" and "not on their way to work or in the parking lot." Dx. M. Thus, it is Mr. Lewis who instructed the crew to violate state policy and not be on the work site by 7:00 a.m but to be in the motel room parking lot. Mr. Lewis admitted that he does not know that Mr. Williams was not at the work site by 7:00 a.m. Px C at 60-61. On the third occasion, Mr. Williams testified that he attempted to take a sick day but that Mr. Lewis refused to give him

14

a sick day even though he had available sick leave and annual leave.  Px. A at 115-116.  Mr.

Williams also testified that he was at work on that day by 7:14 a.m. rather than 7:30 a.m. as stated

by Mr. Lewis.  Mr. Lewis testimony on this topic is simply asinine:

> Q.     So it's your testimony that you never told him that he could --
> that he was not eligible to take a sick day on that day?
>
> A.     No.
>
> Q.     And that he was a supervisor and that he should come to
> work?
>
> A.     I told him, best of my recollection, I said -- best of my
> recollection, I said you need to come on in if you can, but if
> you can't, that's fine.
>
> Q.     So in other words, you did know that he was sick before he
> came into work and even though he came into work sick you
> reprimanded him for being 30 minutes late to work?
>
> A.     Because he did not notify me by seven o'clock like he was
> instructed to like everybody is instructed to.
>
> Q.     But he came in at 7:30 so sometime between seven and 7:30
> you got a phone call by your testimony saying that he was
> sick?
>
> A.     Uh-huh (affirmative response).
>
> Q.     So you reprimanded him because he waited until a couple
> minutes after seven to call you to tell you that he was sick?
>
> A.     Yes, I did.  Because everyone's instructions are if you're sick,
> if you're going to be late, and if  you're not coming in you
> need to call by seven o'clock.
>
> Q.     And is it your testimony that for every employee that you
> supervised including white employees  that those employees
> who do not call you before seven o'clock get a warning or a
> reprimand for not calling before seven o'clock?

A.    They get a warning or a reprimand, yes.

Q.    Every individual who fails to call by seven o'clock, that's your testimony under oath?

A.    That's my testimony.

Q.    And is that the department's policy that any employee who does not call before seven o'clock gets a reprimand?

A.    A warning or a reprimand.

Q.    Is that your testimony?

A.    A warning. We're instructed to make sure they're on time. If they're not on time, they're given a warning or if it's abuse -- if it's an ongoing thing, you know, it happens on a regular basis, yes, reprimand.

Q.    So on this occasion, this was the first time that Mr. Williams had attempted to call in sick while he was under your supervision; correct?

A.    I think it was the first time.

Q.    And it is your testimony under oath that all other employees that you've ever supervised who failed to call in before seven o'clock were given a warning or a reprimand?

A.    To the best of my knowledge, yes.

Px. C at 63-67 (Objections omitted). Again, it is Mr. Lewis, not Mr. Williams, who is violating ALDOT's written policy. ALDOT's Attendance/Punctuality Guidelines states, "If for any reason, an employee will be late or cannot report to work, the supervisor should be notified at the start of the day or as soon as possible." Calling in a few minutes after 7:00 a.m. as Mr. Lewis admits Mr. Williams did is certainly "at the start of the day." Dx M. Mr. Arkle admitted that Mr. Williams should not have been reprimanded if he called in sick:

16

Q.   If an employee calls in and asks for time off and says they're sick, should they be reprimanded for being late when they're told that they can't take a sick day?

A.   I don't think that's what happened here.

Q.   I'm asking my question. Please answer it.

A.   Okay.  If an employee calls in between seven and 7:30 and is sick and needs the day off and they have the sick leave time to use it, they ought to be allowed to use it.

Q.   And why would you call somebody and tell them you're sick if you're planning on coming into work anyway, is that what employees normally do, do they call their boss and say I'm sick and I'm going to come in anyway?

Q.   Have you ever had anybody do that in your experience as a manager --

Q.   -- call you to say I'm sick but I'll be there in a few minutes?

A.   I can't recall an occasion.

Px. B at 46-47.  On the Fourth occasion, Mr. Lewis admits that Mr. Williams called him before 7:00

and that his instructions could have made Mr. Williams late:

Q.   And you state that you talked to him on the Southern Linc before 7 a.m.  Were you giving him instructions about the job, is that why you were talking to him that day?

A.   Yes.

Q.   What were those instructions about?

A.   I don't even remember.

Q.   Is it possible that they were detailed instructions?

A.   They were important instructions if I called him.

Q.   And we've already established that it would have been a good

17

safety policy to pull off the road while you're talking on the phone on detailed instructions, haven't we?

A.   It's a good idea to.

Q.     Is it possible that it's your instructions which caused Mr. Williams to be late that day?

A.   I don't know if they were or not.

Px. C at 68-69.  Mr. Williams testified that he pulled off the side of the road to take Mr. Lewis' instructions, that it was the instructions that made him late and that in any even he arrived by 7:06 a.m or 7:08 a.m. and that he had been behind the carry all carrying all the other workers from Montgomery to Tuscaloosa at the time Mr. Lewis called him.  Px A at 116-117.

Thus, once examined in the light most favorable to the plaintiff, there is no "continual excessive tardiness" as alleged by the defendant.  On the first occasion, Mr. Williams denies he was late.  On the second occasion, he was at the job site by 7:00 a.m. just as ALDOT's guidelines tell him to be.  On the third occasion, he properly asked for time off that should have been available to him.  On the fourth occasion, he was 6 to 8 minutes late and that was due to pulling off the road to take Mr. Lewis' instructions.  Moreover, as shown by the printout from mapquest, the two hours allotted by the defendants to drive from Montgomery to the Tuscaloosa job site was not sufficient.  Mapquest estimates 2 hours and 24 minutes to make that drive.  Dx

We now turn to the alleged insubordination.  Mr. Lewis' admitted that the insubordination referred to Dx 3 which was attached as Ex. 11 to Mr. Williams deposition and Ex. 3 to Mr. Lewis' deposition.  Px. C at 83-84.  Mr. Lewis also admitted that the entire "insubordination" consisted of the following:

18

Q.   Would it be fair to say that the reason you wrote this reprimand was that Mr. Williams walked away from you while you were giving him instructions?

A.   Yes.

Q.    Is it also true that Mr. Williams had -- you had given Mr. Williams instructions, he then asked you to repeat what was said and he went down and sat on a log and listened to you give instructions again; is that correct?

A.   To the best of my recollection, yes, sir.

Q.    Did he ask you if you had any new instructions to give him before he walked away?

A.   I don't remember.

Q.   Is it possible that he may have?

A.   He could have.

Px C at 77-78.

Mr. Lewis also admitted that he had performed Mr. Williams field supervisor job as an Engineering Assistant II/III and that there were no differences between what an EA II/III did (for which Mr. Williams had been receiving "exceeds standards" evaluations" and what a Transportation Technologist did except for supervision:

Q. Mr. Lewis, what, if any, are the differences in the job duties that Mr. Williams would have been performing as a civil engineer I or transportation technologist and those that he would be performing as a engineering assistant other than supervision of employees?

A.    None really.  I mean, you're doing the same work.  You're just responsible for it.  You're responsible for everybody's work instead of just yours.

Q.    So you would be doing the same -- running the same types of

19

equipment, you'd be performing the
same --

A.   Same task.

Q.   -- mathematical calculations, same task, same everything?

A.   Yes.

Q.   Now, I think we've cleared this up on the record but I just want
to make sure.  When you were an engineering assistant II-III, you
were working as a field supervisor and in the same position that Mr.
Williams held as a transportation technologist.  There was a period of
time where you were doing that as an EA II-III and was not out of
classification, that was considered the proper classification for that
job?

A.   I believe that's correct.

Px. C at 90-91.

Mr. Williams, a twelve year employee who had a history of receiving "exceeds standards"

evaluations at virtually the same job duties was then replaced by a white employee Channin

Granthem.  Px. J.  Mr. Granthem was not even on the certificate of eligibles when Mr. Williams was

appointed to his Transportation Technologist position. Px. F.  Mr. Granthem was with ALDOT less

than three years when he was placed into Mr. Williams position.  Px. L.  Moreover, as shown by

ALDOT's own organizational chart, Mr. Granthem is not even required to supervise any employees.

Px K-1.

Mr. Williams is not the only African-American Transportation Technologist to suffer a

"rollback" to their previous classification once they have passed the defendants' "state of the art"

examinations.  Between the time ALDOT began making appointments under the newly validated

examinations and December 31, 2005, there were 30 African-Americans appointed and 99 non-

blacks to the Transportation Technologist classification. Px. G. As shown by Mr. Williams State Personnel Department Records, the state uses a code of "223" when an employee is "rolled back" to their previous classification during their probationary period. Px E. Out of the 30 African-Americans appointed during that time period, 3 were given a code 223 and demoted from Transportation Technologist to Engineering Assistant. Px I. Thus, a full **10%** of the African-Americans who are found qualified by the State Personnel Department and who pass the "state of the art" examinations and who score in the top ten on that examination for their geographical area and who then are selected after a "state of the art" structured oral interview to be Transportation Technologist fail to survive their probationary period with ALDOT. In contrast, out of the 99 non-blacks appointed, not a single  person was coded a "223. In other words, 100% of non-blacks survive their probationary period.

    II    **The Defendants' Motion for Summary Judgment on Mr Williams Racial Discrimination Claims are Due to Be Denied.**

A plaintiff may generally establish a *prima facie* case of race discrimination under Title VII and § 1981, by showing that (1) she is a member of a protected class;  (2) she was terminated; (3) she was qualified for his position; and (4) she was replaced by someone outside of the protected class. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181 (11th Cir. 1984).  However, in cases where an employee has been terminated from a previously held position, the Eleventh Circuit has articulated a modified version of this rule.  *See Rosenfield v. Wellington Leisure Products,* 827 F.2d 1493, 1495, n.2 (11th Cir. 1987); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).   Plaintiff has shown that he is African-American, was qualified for his job (having survived "state of the art" selection procedures and having performed virtually the same job duties

21

as an Engineering Assistant and having received "exceeds standards" evaluations and having been demoted and replaced by a white employee, Channin Granthem who has nine years less experience with ALDOT.

Mr. Williams has also shown that white employees who were also field supervisors and Transportation Technologists in the Design Burea – all under the supervision of Don Arkle, the final decisionmaker, were not demoted or allowed to advance to that classification despite having been tardy, having performance problems and having been insubordinate to supervisors.  Px. A at 137-143.  Indeed, Mr. Granthem, who replaced Mr. Williams in the Transportation Technologist position was not reprimanded by Mr. Lewis for being 20 to 30 minutes late.  Px. A at 143-144.  Mr. Arkle admitted that he could not testify that white employees have always been reprimanded for being five minutes late as was Mr. Williams.  Px. B at 25.  Mr. Lewis also admitted that he has not always reprimanded white employees for being late.  Px. C at 39-43.  He also admitted that he can not remember a single instance where he ever marked anyone down on their evaluation for lack of punctuality as a supervisor.  Px. C at 53.  To say that state employees are routinely disciplined for being five minutes late and that someone should not be a supervisor because they have been fourteen minutes late.  Px. C at 72.  A reasonable jury could certainly infer that such claims are nothing but a pretext for discrimination.

The quantum of proof necessary to defeat a motion for summary judgment when the defendant presents a legitimate, non-discriminatory reason for its decision was discussed by the Eleventh Circuit in *Howard*.  The Eleventh Circuit, interpreting *St. Mary's Honor Center*, stated:

> *St. Mary's* holds that proof that a defendant's articulated reasons are
> false is not proof of intentional discrimination; it is merely evidence
> of intentional discrimination.  However, evidence of intentional

> discrimination is all a plaintiff-appellant needs to defeat a motion for
> summary judgment.  That evidence must be sufficient to create a
> genuine factual issue with respect to the truthfulness of the
> defendant's proffered explanation.

*Howard*, 32 F.3d at 525.  "Under *St. Mary's*, a plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Id.* at 526.  *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997)("Once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law.") Assuming *arguendo* that defendants have articulated a legitimate, non-discriminatory or retaliatory reason for Mr. Williams' demotion, the burden then shifts back to Mr. Williams to demonstrate pretext – "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence.'" *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998)(*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998)).  As the Eleventh Circuit held in *Hairston*:

> The burden to avoid summary judgment is not to show by a
> preponderance of the evidence that the reasons stated were pretext.
> Rather, plaintiff's burden at summary judgment is met by introducing
> evidence that could form the basis for a finding of facts, which when
> taken in the light most favorable to the non-moving party, could allow
> a jury to find by a preponderance of the evidence that the plaintiff has
> established pretext, and that the action taken was in retaliation for
> engaging in the protected activity. Issues of fact and sufficiency of
> evidence are properly reserved for the jury. The only issue to be
> considered by the judge at summary judgment is whether the
> plaintiff's evidence has placed material facts at issue.

*Hairston* at 921. Plaintiff has satisfied that burden here.

    **II**      **The Defendants' Motion For Summary Judgment On Mr. Williams Claims of Retaliation Are Due To Be Denied.**

To prove a *prima facie* case of retaliation through circumstantial evidence, Mr. Williams must show that (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004).

There is no dispute that Mr. Williams engaged in protected activity. First he was a member of the *Reynolds* lawsuit which Mr. Lewis blamed for his own lack of promotion for many years and which was the alleged reason that he was placed in an out of classification position doing the work but not getting paid for it. The defendants documents used for his demotion refer to his complaints of discrimination and his threat to get a lawyer. Dx U and Dx. V. Mr. Williams has also testified that he filed a contemporaneous internal grievance – even though the defendants deny having received it. This issue of fact alone should lead to the denial of summary judgment.

Nor can it be disputed that ALDOT took an adverse action against Mr. Williams when they demoted him from Transportation Technologist and lowered his salary accordingly. Px E.

The law in this Circuit is that to satisfy the causal connection element, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

The simplest way for a plaintiff to prove the causation element of the *prima facie* case of retaliation is through the temporal proximity of his complaints to his termination. "A plaintiff satisfies this [causation] element if [s]he provides sufficient evidence of knowledge of the protected

expression and that there was a close temporal proximity between this awareness and the adverse action." *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1119 (11th Cir.2001) (citation omitted). Here, the *Reynolds* case was ongoing allegedly keeping Mr. Lewis from being promoted and Mr. Adams, the leader of the white intervenors in *Reynolds*, recommended Mr. Williams demotion just four days after being informed that Mr. Williams had threatened to get a lawyer and that Mr. Arkle concurred with that recommendation the same day.  Dx U.

However, Mr. Williams need not rely solely on temporal proximity to establish causation, as there is ample additional evidence of the causal connection between Mr. Williams protected activity and complaints of discrimination and his demotion.

 The complete breakdown of the alleged justification for Mr. Williams demotion gives rise to the inference that Mr. Williams protected activity and his complaints and his demotion were not "completely unrelated."  A reasonable jury could conclude, that Mr. Lewis, Mr. Adams and/or Mr. Arkle were retaliating against Mr. Williams.

## IV.    CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment should be denied, and plaintiff permitted to proceed to trial on his claims of race discrimination and retaliation.


Respectfully submitted,


 Russell W. Adams
Counsel for Plaintiff

25

OF COUNSEL:

WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 30th day of May, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jim R. Ippolito
Andrew Redd
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110


<u>s/ Russell W. Adams</u>
OF COUNSEL