**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **LEROY WILLIAMS,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.:** |
| | * | **2:06-cv-658-ID** |
| **STATE OF ALABAMA DEPT. OF** | * | |
| **TRANSPORTATION, et. al.** | * | |
| | * | |
| **Defendant.** | * | |

**PLAINTIFF'S EVIDENTIARY SUBMISSION IN RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the plaintiff, Leroy Williams, by and through his undersigned counsel, and submit the following evidentiary material in opposition to the Defendants Motion for Summary Judgment:

A.   Excerpts from the deposition of Leroy Willaims taken on February 21, 2007;

B.   Excerpts from the deposition of Don Arkle taken on May 15, 2007;

C.   Excerpts from the deposition of Tommy Lewis taken on May 14, 2007;

D.   Evaluation of Leroy Williams;

E.   SPD Records of Leroy Williams;

F.   Certificate of Eligibles Appointing Leroy Williams to Transportation Technologist Classification;

G.   Request to Fill Transportation Technologist Position;

H.   Transportation Technologist Appointments through December 31, 2005;

I.   SPD Records of African-American Transportation Technologists demoted during probation period;

J.   Certificate of Eligibles Appointing Channin Granthem (Caucasian) to Lewis' Transportation Technologist Position;

K.   Design Bureau Organizational Charts;

L.      SPD records of Granthem;

M.     Memorandum from Tommy Lewis showing Williams' crew thought he was treated differently;

N.      SPD Records of Tommy Lewis;

O.      Tommy Lewis Out of Classification Assignment by William Adams;

P.      Request to Fill Transportation Technologist Transportation Senior Position #2119200 showing vacancy of May 31, 2005;

Q.      Persons Promoted Report for 2/16/06 to 3/15/06;

R.      Certificate of Eligibles Appointing Tommy Lewis to Transportation Technologist effective 2/18/06;

S.      Transportation Technologist Senior exam scores showing Tommy Lewis scoring 160th out of the 161 candidates;

T.      Selection Form for Tommy Lewis to Transportation Technologist Senior;

U.      Tommy Lewis Structural Oral Interview Form;

V.      Lawrence Naro Brown Structural Oral Interview Form;

W.     Lawrence Naro Brown Application;

X.      *Reynolds* Consent Decree;

Y.      *Reynolds* Contempt Order (Doc No. 4284);

Z.      *Reynolds* Opinion dated April 13, 1998 (4 F.Supp.2d 1068)



                        Respectfully submitted,


                        Russell W. Adams
                        Counsel for Plaintiff



OF COUNSEL:

WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203

(205) 314-0500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 30th day of May, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jim R. Ippolito
Andrew Redd
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110


<u>Russell W. Adams</u>
Counsel for Plaintiff

# EXHIBIT A

# LEROY WILLIAMS

## v.

# STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION, et al.

# LEROY WILLIAMS

## February 21, 2007

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**

LEROY WILLIAMS - 2/21/2007

**1**

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LEROY WILLIAMS,

      Plaintiff,

Vs.               CIVIL ACTION NO.
                   2:06-CV-658-ID

STATE OF ALABAMA DEPARTMENT
OF TRANSPORTATION and JOE
McINNES, in his official
capacity as Director of the
State of Alabama Department
of Transportation,

      Defendants.

    *   *   *   *   *

DEPOSITION OF LEROY WILLIAMS,

taken pursuant to notice and stipulation
on behalf of the Defendant, in the offices
of Wiggins, Childs, Quinn & Pantazis, 301
Nineteenth Street North, Birmingham,
Alabama, before Nicole Paulk, Certified
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large, on
February 21, 2007, commencing at 10:16
a.m.

**2**

1          APPEARANCES
2
3  FOR THE PLAINTIFF:
4      Russell W. Adams, Esquire
5      Wiggins, Childs, Quinn &
6      Pantazis, PC
7      301 Nineteenth Street North
8      Birmingham, Alabama 35203
9
10  FOR THE DEFENDANTS:
11     Andrew W. Redd, Esquire
12     Assistant Attorney General
13     Assistant Counsel
14     State of Alabama Department of
15     Transportation
16     1409 Coliseum Boulevard
17     Montgomery, Alabama 36110
18
19
20
21
22
3

**3**

STIPULATIONS

It is stipulated and agreed by
and between counsel representing the
parties that the deposition of LEROY
WILLIAMS may be taken before Nicole Paulk,
Certified Shorthand Reporter and Notary
Public in and for the State of Alabama at
Large, without the formality of a
commission; and all formality with respect
to other procedural requirements is
waived; that objections to questions,
other than objections as to the form of
the questions need not be made at this
time, but may be reserved for a ruling at
such time as the deposition may be offered
in evidence or used for any other purpose
by either party as provided by the Federal
Rules of Civil Procedure.

    *   *   *   *   *

I N D E X

Examination             Page
By Mr. Redd           5

**4**

Defendant's Exhibits       Page
1 - Re-Notice of Deposition     20
2 - Complaint Form, April 1997   43
3 - Complaint Form, October 5, 2000  44
4 - Letter from Don Arkle to Leroy  56
    Williams, May 12, 2005
5 - Position Classification    58
    Questionnaire
6 - EEOC Charge of Discrimination,  72
    September 2005
7 - Letter from Don Arkle to Leroy  74
    Williams, September 1, 2005
8 - Alabama Department of     112
    Transportation Memorandum Re:
    Reprimand for Repeated Tardiness,
    July 26, 2005
9 - Mr. Leroy Williams Work    122
    Performance Counseling Session,
    July 28, 2005
10- Alabama Department of     125
    Transportation Memorandum Re:
    Probationary Performance Concerns,
    July 28, 2005

1 (Pages 1 to 4)

5

| 1 | 11- Alabama Department of          127 |
| 2 | Transportation Memorandum Re: |
| 3 | Reprimand for Insubordination, |
| 4 | August 11, 2005 |
| 5 | 12- Complaint                  133 |
| 6 | * * * * * |
| 7 | LEROY WILLIAMS, of lawful age, |
| 8 | having first been duly sworn, testified as |
| 9 | follows: |
| 10 | EXAMINATION |
| 11 | BY MR. REDD: |
| 12 | Q.   Mr. Williams, I'm Andy Redd.  I represent |
| 13 | the Department of Transportation in the |
| 14 | lawsuit that you have filed.  I'm here |
| 15 | today to take your deposition.  I'll be |
| 16 | asking you questions concerning your case. |
| 17 | If at any time you don't understand my |
| 18 | question, stop me or tell me to rephrase |
| 19 | it or -- you know, just so you'll |
| 20 | understand it, because if you answer, I'm |
| 21 | going to assume that you have fully |
| 22 | understood my question and are answering |
| 23 | forthrightly and with a complete |

7

| 1 | 36111. |
| 2 | Q.   Are you married? |
| 3 | A.   Yes. |
| 4 | Q.   And what is your spouse's name? |
| 5 | A.   Linda Williams. |
| 6 | Q.   How long have you been married? |
| 7 | A.   Approximately 14 years. |
| 8 | Q.   Okay.  Is your wife employed? |
| 9 | A.   Yes. |
| 10 | Q.   Where does she work? |
| 11 | A.   She works as a hair stylist.  I don't know |
| 12 | the person that she works for, but she |
| 13 | works as a hair stylist. |
| 14 | Q.   Okay.  Do you know the shop -- |
| 15 | A.   No. |
| 16 | Q.   -- or the business she works at? |
| 17 | A.   No, I do not. |
| 18 | Q.   Okay.  Have you had any prior marriages? |
| 19 | A.   Yes. |
| 20 | Q.   Okay.  Could you give me the name of any |
| 21 | previous spouses? |
| 22 | A.   Rosa Williams. |
| 23 | Q.   Where does she live, if you know? |

6

| 1 | understanding of what I've asked.  Is that |
| 2 | fair enough? |
| 3 | A.   Yes. |
| 4 | Q.   Okay.  Have you ever given a deposition |
| 5 | before? |
| 6 | A.   Yes, I have. |
| 7 | Q.   Okay.  Let me just start by asking you |
| 8 | your full name. |
| 9 | A.   Leroy Williams. |
| 10 | Q.   Okay.  Any middle name? |
| 11 | A.   No. |
| 12 | Q.   Okay.  And how old are you, sir? |
| 13 | A.   41. |
| 14 | Q.   Okay.  Do you still live over in |
| 15 | BridleBrook? |
| 16 | A.   No, Bridlewood. |
| 17 | Q.   Bridlewood? |
| 18 | A.   Uh-huh. |
| 19 | Q.   Is that still your residence? |
| 20 | A.   Yes. |
| 21 | Q.   Could you give me that complete address, |
| 22 | please? |
| 23 | A.   3723 Bridlewood Drive, Montgomery Alabama, |

8

| 1 | A.   The last that I know of she lived in |
| 2 | Waterbury, Connecticut. |
| 3 | Q.   Do you have any children that are over the |
| 4 | age of 18 years? |
| 5 | A.   Yes. |
| 6 | Q.   Do they live -- well, tell me how many |
| 7 | children you have. |
| 8 | A.   Four. |
| 9 | Q.   Okay.  And what are their names? |
| 10 | A.   Derrico Buchannan, D-E-R-R-I-C-O |
| 11 | B-U-C-H-A-N-N-A-N.  Kaylyn Williams. |
| 12 | Q.   And let me stop you with the first child. |
| 13 | How old is that child? |
| 14 | A.   Derrico is 19.  He will be 20, but he's |
| 15 | 19. |
| 16 | Q.   Okay.  Where does she live? |
| 17 | A.   He lives with my mother. |
| 18 | Q.   And where does she live? |
| 19 | A.   In Auburn, Macon County, Auburn area. |
| 20 | Q.   Okay.  Let's go on to the second child. |
| 21 | A.   Kaylyn lives with her mother. |
| 22 | Q.   Okay.  Is that going to be in Connecticut, |
| 23 | then, Waterbury? |

2 (Pages 5 to 8)

LEROY WILLIAMS - 2/21/2007

9

1    A.   No, this would be in Montgomery.
2    Q.   Okay. Do you know the address?
3    A.   No.
4    Q.   Where does Kaylyn work, if Kaylyn works
5         anywhere?
6    A.   No, she's still in school.
7    Q.   Okay. Third child?
8    A.   Shana Hodges.
9    Q.   Okay. How old is Shana?
10   A.   Shana is 21.
11   Q.   Where does Shana live?
12   A.   Her last known whereabouts are in
13        Tuskegee.
14   Q.   Okay. And is there a fourth child?
15   A.   Yes.
16   Q.   I thought you said four.
17   A.   Yes.
18   Q.   What is that child's name?
19   A.   The fourth child is Shermaine Smith, and
20        he's and he's at the house with me.
21   Q.   Does he work anywhere or is he in school?
22   A.   He originally was working with one of the
23        companies with the Hyundai plant there in

10

1         Montgomery, but he was laid off I think
2         last week.
3    Q.   So presently he's unemployed?
4    A.   Yes.
5    Q.   Okay. Maybe we can go through this
6         quickly, maybe not, but do you have any
7         relatives that -- besides the ones you've
8         already mentioned that live in any of the
9         counties that are within this bracket
10        here, which would comprise the northern
11        division of the middle district of
12        Alabama, federal district court. Just
13        take a minute and look through those
14        counties represented. I think you
15        mentioned your mother lives in Lee County;
16        that would be one.
17   A.   I was looking for Lee on there.
18   Q.   Well, I'm sorry. It's not in there.
19   A.   Yes, I have a few relatives that live --
20   Q.   Okay. Let me start -- you mentioned your
21        mother. Is your father still living?
22   A.   No, he's deceased.
23   Q.   Do you have any brothers that live in any

11

1         of those counties?
2    A.   No.
3    Q.   Either full or by half or step?
4    A.   No.
5    Q.   What about any sisters?
6    A.   No.
7    Q.   Any grandparents?
8    A.   No.
9    Q.   Aunts?
10   A.   No.
11   Q.   Uncles?
12   A.   No.
13   Q.   Okay. Are you presently taking any kind
14        of medication for any reason at all?
15   A.   Yes.
16   Q.   Okay. Tell me what you're taking and for
17        what.
18   A.   Prozac for anxiety.
19   Q.   Okay.
20   A.   Now, I was looking at something here that
21        crossed my attention. Montgomery County
22        is there. You said other than the ones I
23        already --

12

1    Q.   Other than the ones you've already
2         specified --
3    A.   Okay.
4    Q.   -- and those that I asked about.
5    A.   All right.
6    Q.   So you say that you're taking Prozac?
7    A.   Yes.
8    Q.   How long have you been on Prozac?
9    A.   I can't recall right now.
10   Q.   More than a year?
11   A.   Approximately a year.
12   Q.   And who prescribed Prozac for you? What
13        is your doctor's name?
14   A.   I can't pronounce his name. I can't
15        pronounce his name right now.
16   Q.   Take a stab at it.
17   A.   Oblique (phonetic).
18   Q.   Who does he practice with or where is he
19        located?
20   A.   Montgomery County.
21   Q.   Is he with a clinic or a --
22   A.   He's in a clinic.
23   Q.   Where is the clinic located?

3 (Pages 9 to 12)

LEROY WILLIAMS - 2/21/2007

13

1  A.  I don't know the physical address, but
2      it's right down near Baptist South.
3  Q.  Do you know what the doctor's specialty
4      is? Is he a general practitioner, family
5      practitioner?
6  A.  Family.
7  Q.  How long have you seen or used this
8      particular doctor as your doctor or your
9      family's doctor?
10  A.  A few years. The exact, I can't – I
11      don't know.
12  Q.  More than two?
13  A.  I would say two.
14  Q.  Two years?
15  A.  Yes.
16  Q.  Okay. What did you go to this particular
17      doctor for, yourself, for the first time?
18      Why did you go to him?
19  A.  I can't recall.
20  Q.  First time you ever saw him, why were you
21      there? What did you seek him out for?
22  A.  I can't recall.
23  Q.  I'm assuming you're still under this

14

1      doctor's care?
2  A.  Yes.
3  Q.  Do you have any medications on you that
4      would show this doctor's name?
5  A.  Not on me.
6  Q.  Do you have any prescription bottles that
7      would reflect the doctor's name?
8  A.  Not on me.
9  Q.  Okay. Could you advise your attorney as
10      to the name of the physician that you are
11      presently seeing and who prescribed Prozac
12      to you? Would you do that for me?
13  A.  I can't remember his name.
14  Q.  You've got some medicines, though, that
15      you're taking on a regular basis that
16      should have his name on it or the clinic's
17      name. Would you provide that to your
18      attorney so he can get it to me?
19  A.  I will.
20  Q.  Okay. Besides Prozac, are you taking any
21      other kind of medications at all, for any
22      reason?
23  A.  Painkillers.

15

1  Q.  Okay. Do you recall the names of the pain
2      medications that you might be taking?
3  A.  Hydrocodone.
4  Q.  What kind of pain are we talking about?
5  A.  Back, leg.
6  Q.  Is that due to an injury?
7  A.  Yes.
8  Q.  Do you remember when that injury was?
9  A.  2000 -- August of 2002, I want to say.
10      I'm not sure, but I think it was August
11      2002.
12  Q.  Okay. Is this an injury that you had
13      applied for and received some kind of
14      benefits through the State Employees
15      Injury Compensation Trust Fund?
16  A.  It is a workman's comp injury.
17  Q.  Okay. But this was incurred while you
18      were working for the Department of
19      Transportation?
20  A.  Yes.
21  Q.  Okay. Besides the doctor who we can't
22      figure out how to pronounce his name
23      today, have you seen any other physicians

16

1      within the last three years?
2  A.  Yes.
3  Q.  Could you give me their names?
4  A.  Dr. John Dorchak.
5  Q.  And what did you see Dr. Dorchak for?
6  A.  He's my back physician.
7  Q.  Okay. And any other doctors?
8  A.  Yes.
9  Q.  Okay. Could you give me his name?
10  A.  I was -- I had a spider bite. I don't
11      know the doctor's name, but I had to go to
12      the emergency room, that's Baptist East in
13      Montgomery. I had to go there several
14      times, and every time I went there was
15      more than one doctor, so I wouldn't know
16      them.
17  Q.  Okay. But it was not work-related?
18  A.  No.
19  Q.  Okay. How far did you go in school,
20      Mr. Williams?
21  A.  I went to the 12th grade and I took my GED
22      there. And I've had some pre-schooling,
23      college.

4 (Pages 13 to 16)

LEROY WILLIAMS - 2/21/2007

17

1    Q.   Okay. As we're sitting here today, do you
2         know how much coursework you've done
3         beyond the high school level or beyond the
4         GED level?
5    A.   I don't know exactly how much.
6    Q.   Okay. Where did you go to receive any
7         post-GED education?
8    A.   ILS.
9    Q.   What is ILS?
10   A.   Interactive Learning Center, and it was in
11        Atlanta, Georgia.
12   Q.   Okay. When was that?
13   A.   I can't remember the exact dates.
14   Q.   A year will be fine. Do you remember, or
15        close? Before you started work with DOT
16        or after?
17   A.   Before.
18   Q.   Okay. Any other training? Or
19        education -- I'll distinguish that from
20        training. Any other coursework in college
21        or --
22   A.   Job Corps.
23   Q.   Was that before you came to work at DOT?

18

1    A.   Yes.
2    Q.   Okay. Did you ever serve in the military?
3    A.   Yes.
4    Q.   What branch?
5    A.   Army.
6    Q.   When were you in the Army?
7    A.   '93 through '94.
8    Q.   Okay. What was your specialty?
9    A.   Just basic.
10   Q.   Or did you have a specialty? Infantry or
11        --
12   A.   It was infantry, but I was discharged.
13   Q.   Okay. Why were you discharged?
14   A.   I did not make my National Guard -- my
15        National Guard meetings.
16   Q.   Oh, so this was National Guard as opposed
17        to regular Army?
18   A.   Yes.
19   Q.   Okay. So you missed your meetings?
20   A.   Yeah, so I was discharged.
21   Q.   Was that separation from service honorable
22        or general?
3    A.   Dishonorable.

19

1    Q.   Dishonorable?
2    A.   Yeah.
3    Q.   Okay. Which unit were you in?
4    A.   It was -- well, I never did meet, so
5         that's why I was discharged.
6    Q.   Okay. But you knew you were assigned to a
7         particular unit, I'm assuming?
8    A.   The 101 there in -- 101, I think it was.
9    Q.   In Montgomery?
10   A.   Yes, it was in Montgomery.
11   Q.   Okay. Which armory would that have been?
12   A.   Which armory? The one off Southern
13        Boulevard.
14   Q.   Okay. The general headquarters over
15        there?
16   A.   I would have to go back and look at it,
17        see can I find my discharge papers.
18   Q.   Okay. That's fine. I don't need that.
19        Have you seen a copy of the deposition
20        notice in this case? We'll mark this
21        Defendants' Exhibit 1. Were you shown a
22        copy of that or did you receive a copy of
23        that?

20

1              (The referred-to document was
2               marked for identification
3               as  Defendants' Exhibit No.
4               1.)
5    A.   Yes.
6    Q.   Okay. On that deposition notice, it asks
7         you to bring any documents that were
8         subject to Rule 26 disclosure documents.
9         Your attorney has brought me a folder of
10        documents that I think are Bates stamped
11        from 1 through 434, I think. Have you
12        seen these documents? Have you looked
13        through these documents that were
14        furnished to me before?
15   A.   Yes.
16   Q.   Okay. Are these all the documents that
17        you have that concern your case?
18            MR. ADAMS: Object to form. You
19            can answer.
20   A.   They're all that I can recall right now.
21   Q.   Okay. You don't have any personal notes
22        that you've kept or a diary that you may
23        have kept or any other documents that you

5 (Pages 17 to 20)

LEROY  WILLIAMS - 2/21/2007

21

1    may have maintained or given to your
2    attorney besides what's in this stack of
3    material that was furnished to me this
4    morning?
5          MR. ADAMS:  Object to the extent
6          it calls for disclosure of
7          attorney-client
8          communications.  You can
9          answer.
10  Q.   Do you have other documents?
11  A.   That I know of, no.
12  Q.   Okay.  Well, let me backtrack and just ask
13    you, did you keep any personal notes
14    during the course of your employment which
15    would have indicated times when you might
16    have had trouble with your supervisor or
17    times when you may have had trouble at
18    work or times when you thought you might
19    have been harassed or mistreated?  Did you
20    keep any notes contemporaneously with the
21    events?
22  A.   All that I have, I submitted it to my
23    lawyers.

22

1  Q.   Okay.  And were you keeping these notes
2    before you retained counsel?
3  A.   I don't quite understand.
4  Q.   Well, you were keeping these notes as
5    things progressed, correct?
6  A.   Yes.
7  Q.   Something happened, you'd write it down,
8    make a note of it or however you
9    maintained this information?
10  A.   Yes.
11  Q.   Okay.  So you were keeping these notes
12    before you ever retained the services of
13    an attorney, either this lawyer or I think
14    you might have gone to the McPhillips firm
15    at one time.  So before you went to either
16    of them, did you maintain notes of that
17    nature?
18  A.   Yes.
19  Q.   Where are those notes now?
20  A.   Right now basically everything I have
21    would be in that.
22  Q.   Okay.  So there's no notes, memos, diaries
23    or other documents besides what has been

23

1    disclosed to me?
2  A.   I can't recall right now.
3          MR. ADAMS:  There are none being
4          withheld based on privilege.
5          I don't have any that I
6          haven't turned over.
7          MR. REDD:  Okay.
8  Q.   That's all I'm asking.  I just want to
9    make sure I don't see a diary pop up
10    somewhere down the line that I haven't had
11    access to or some little notes that you
12    might have put down on a napkin or
13    something like that, that two months from
14    now I see this note that I have never seen
15    before.  You don't have anything like
16    that, that you know of?
17  A.   Not that I know of right now.
18  Q.   If you do find any notes that you intend
19    to use in your pursuit of this case, will
20    you turn them over to your lawyer so he
21    can make them available to me?
22  A.   I will do my best.
23  Q.   Okay.  Now, besides your attorney here or

24

1    any other attorney you have discussed your
2    case with, have you spoken with any other
3    persons, nonlawyers, about the issues
4    involved in your case?
5  A.   When you say "nonlawyers," that means
6    anybody?
7  Q.   Anybody that you have not retained to
8    represent you.
9  A.   Yes.
10  Q.   Whether it's a coworker or a friend or a
11    relative or anything like that, have you
12    spoken to anybody about your case?
13  A.   Yes.
14  Q.   Can you tell me who you've spoken to about
15    the case?
16  A.   I've spoken to my doctor; I've spoken to
17    my wife; I've spoken to my mother, my
18    brothers, and some coworkers.
19  Q.   What coworkers have you discussed this
20    matter with?
21  A.   I can't recall all of them right now.
22  Q.   Take a stab at it.
23  A.   Well, I talked with my supervisor,

6 (Pages 21 to 24)

LEROY WILLIAMS - 2/21/2007

25

1    Mr. Lewis.
2  Q.  Tommy Lewis?
3  A.  Yes.
4  Q.  Okay.
5  A.  Mr. Jones.
6  Q.  Joe Jones?
7  A.  Yes. And at brief, with Mr. Adams about
8     it.
9  Q.  Okay. What about people that you worked
10    with, crew members or subordinates that
11    were in your crew? Did you discuss your
12    case or your claim with any of the people
13    that you supervised while you were a
14    transportation technologist?
15  A.  There have been some of my coworkers that
16    asked me some questions about my situation
17    there, and I explained to them I really
18    don't know what was going on. They asked
19    me why were -- why are the people being so
20    tight on me, why are they giving me such a
21    hard time.
22  Q.  Okay. And who were those people that
23    asked you?

26

1  A.  Mr. Rodney Sanders.
2  Q.  Sanders?
3  A.  Yes.
4  Q.  Okay.
5  A.  Mr. Crowe. I can't recall his first name
6     right now.
7  Q.  C-R-O-W-E?
8  A.  Yes.
9  Q.  Okay. Who else?
10  A.  Chan Grantham (phonetic); Mr. Dodd Austin;
11    Willy Primus (phonetic); Nero, as we call
12    him, it's Lawrence Brown. And there could
13    be several others, but right now I --
14  Q.  Okay. And all these were people that
15    worked on a crew with you or under your
16    supervision?
17  A.  Well, some of them are.
18  Q.  I recognize some of them as members of
19    your crew, but would those all be people
20    either at an EA level or a transportation
21    technologist level, except for Tommy
22    Lewis, Joe Jones, and Mr. Adams?
3  A.  Mr. Lewis was at a transportation

27

1     technology level also.
2  Q.  Okay. He was your supervisor at the time,
3     though?
4  A.  Mr. Lewis?
5  Q.  Yeah, Tommy Lewis. Okay. I noticed in
6     part of the disclosures that were made --
7     some of the names that you've given me
8     came up on this, but who is Gary Beasley?
9  A.  Gary Beasley is a State employee I met
10    several years ago when I first got there.
11  Q.  DOT employee?
12  A.  Yes.
13  Q.  Does he have any knowledge about your
14    case, this case?
15  A.  He has some knowledge of it, yes.
16  Q.  What knowledge do you think he has or does
17    he have about your case?
18  A.  I will let Gary speak on that.
19  Q.  Well, you've talked to him, haven't you?
20  A.  On the case, I've spoken with him some.
21  Q.  Okay. He's said things to you and you've
22    said things to him, correct?
23  A.  Yes.

28

1  Q.  What did he say to you?
2  A.  I can't recall.
3  Q.  How about Robert Byrd?
4  A.  Mr. Byrd, I've worked on -- he worked on
5     the crew with me.
6  Q.  Okay. Was he one of your subordinates?
7  A.  No, he was a side by side coworker.
8  Q.  Okay. When did you work with Mr. Byrd?
9  A.  I can't recall the years.
10  Q.  Was this before you became a -- and I'm
11    going to use the term TT --
12  A.  Yes.
13  Q.  This was before you became a TT?
14  A.  Yes.
15  Q.  Okay. Did Mr. Byrd work with you or was
16    he on any crews that worked with you after
17    you became a probationary transportation
18    technologist?
19  A.  No.
20  Q.  What information could Mr. Byrd have about
21    your case and your claims about
22    harassment, retaliation, and
23    discrimination after you became a TT?

7 (Pages 25 to 28)

LEROY WILLIAMS - 2/21/2007

29

1  A.  Well, Mr. Byrd was working side by side
2      with me, and he was one of the ones –
3      again, he's another one that asked me why
4      were the people being -- DOT superiors
5      being so harassing to me.
6  Q.  Okay. What time frame are you talking
7      about when Mr. Byrd had that conversation
8      with you?
9  A.  I worked with Mr. Byrd approximately a
10     year, so...
11 Q.  Since you were reverted back to EA?
12 A.  No, this was before I was TT. This was
13     all before the TT --
14 Q.  Okay. And that was my question. What
15     does Mr. Byrd have knowledge of concerning
16     any harassment, intimidation,
17     discrimination, retaliation that you might
18     have received while you were a TT?
19 A.  While I was a TT?
20 Q.  Yeah. Does he have any at all? He wasn't
21     working with you at the time.
22 A.  I wouldn't know if he had any information
23     about it or not.

30

1  Q.  Okay. And Lawrence Brown, is that the
2      Nero Brown?
3  A.  Yes.
4  Q.  Okay. Was he a coworker or a subordinate?
5  A.  Coworker.
6  Q.  Okay. And was he a coworker before you
7      were promoted to TT?
8  A.  Yes.
9  Q.  Okay. Have you worked with -- did you
10     work with him while you were a TT?
11 A.  Yes.
12 Q.  In what capacity? Was he a member of your
13     crew?
14 A.  No, he wasn't a member of my crew, but he
15     was one of the crews that worked a certain
16     project there with me in Talladega. I was
17     the one to have to download his
18     information in the afternoon when they
19     would bring their instrument in.
20 Q.  Okay. So say on any given day, how long
21     would you work in close proximity to
22     Mr. Brown?
23 A.  During an eight-hour job period, we would

31

1      conversate -- conversate over the radios
2      during the day, but it wasn't a few
3      minutes.
4  Q.  Okay. So you weren't working closely with
5      Mr. Brown during that project, were you?
6  A.  We were on the same project.
7  Q.  Okay. But he was not one of your
8      subordinates where you would be in contact
9      with him --
10 A.  No.
11 Q.  -- pretty much the whole day?
12 A.  He was not.
13        MR. ADAMS: You've got to let him
14            finish his question before
15            you answer his question,
16            okay? Listen to what he's
17            asking you. Even if you
18            think you know what he's
19            going to ask, listen to his
20            question.
21        THE WITNESS: Okay.
22 Q.  Do you understand my question? You
23     weren't working in close proximity to

32

1      Mr. Brown the entire day even though you
2      were working on the same project?
3  A.  We worked together on the same project.
4  Q.  What was this project?
5  A.  It was a relocation of a highway there in
6      Talladega.
7  Q.  Okay. But he was working under a
8      different supervisor than you, correct?
9  A.  Yes.
10 Q.  And he was working on other tasks than the
11     task that you were working on, correct?
12 A.  No.
13 Q.  Well, you had a crew that was doing
14     certain things, and he was working on a
15     crew that did certain things, so y'all
16     were not, during the entire eight hours,
17     working together?
18 A.  During the eight hours we were working on
19     the same project doing pretty much the
20     same thing. Nero was a supervisor.
21 Q.  Okay. So he was a supervisor?
22 A.  Yes.
23 Q.  So he had a crew?

8 (Pages 29 to 32)

LEROY WILLIAMS - 2/21/2007

33

1  A.  Yes.
2  Q.  You were a supervisor and had a crew?
3  A.  Yes.
4  Q.  Okay. Who is Willy Garrett?
5  A.  Willy Garrett is a coworker.
6  Q.  Okay. Was he a member of your crew when
7      you were a TT?
8  A.  No.
9  Q.  Was he a coworker before you were promoted
10     to TT?
11  A.  Yes.
12  Q.  Does he have any knowledge of any of your
13     work that was going on while you were a
14     transportation technologist?
15  A.  I wouldn't know.
16  Q.  Okay. Who is Stacy Nichols?
17  A.  Coworker.
18  Q.  Before you became a TT?
19  A.  Yes.
20  Q.  Would Stacy Nichols have any knowledge of
21     any problems or any -- your work ability
22     or work patterns or the work you were
23     performing when you were a TT?

34

1  A.  I can't remember.
2  Q.  Was Stacy Nichols working with you when
3     you were a technologist?
4  A.  Yes.
5  Q.  When?
6  A.  I can't remember the dates, but he was
7     working with me.
8  Q.  As one of your subordinates, or was he
9     working on another crew who happened to be
10    working on the same project?
11  A.  He was working assigned as a data editor
12     to our crew.
13        MR. ADAMS: Andy, you at a good
14          place for a five-second
15          break?
16        MR. REDD: Sure.
17        (Brief recess.)
18  Q.  As we broke, I was --
19        MR. ADAMS: In fact, Andy, I
20          would suggest that we file a
21          joint motion to amend the
22          scheduling order --
         MR. REDD: Yeah. Let's just --

35

1        MR. ADAMS: I'll let you take
2          charge. Since you've got
3          the first deadline, I'll let
4          you --
5        MR. REDD: Yeah, that's fine.
6          I'll work on that so there's
7          a little bit of a breather
8          anyway.
9  Q.  When we broke, I was asking you about some
10    of the names I see listed on the letter
11     from the McPhillips, Shinbaum firm. The
12     last one is Scott Blake. Who is Scott
13     Blake?
14  A.  A coworker.
15  Q.  Was he a coworker of yours before you
16     became a transportation technologist?
17  A.  Yes.
18  Q.  Did you work with him at all while you
19     were a transportation technologist?
20  A.  No.
21  Q.  Would he have any knowledge of your work
22     habits, any problems you might have been
23     having when you were promoted to TT, that

36

1     you know of?
2  A.  He would probably know some.
3  Q.  What would he know?
4  A.  I don't specifically know how much he
5     would know, but I worked with Scott,
6     trained Scott, so he would know.
7  Q.  What would he know, I guess is what I'm
8     driving at?
9  A.  My work abilities, what I'm capable of.
10  Q.  Okay. So he would have seen you working
11    as an EA -- what were you a II/III -- and
12    would know how you were able to perform
13    that particular job?
14  A.  Yes.
15  Q.  Am I right, though, that transportation
16    technologist would have been the first
17    position that you had where you were
18    actually a supervisor of a crew of
19    persons?
20  A.  Yes.
21  Q.  Okay. Besides those people that I've
22    asked you about and those persons who you
23    have already identified, are there any

9 (Pages 33 to 36)

LEROY WILLIAMS - 2/21/2007

37

1   other people that you know of as we sit
2   here today who would have any information
3   concerning your case and your claims
4   against the Department of Transportation?
5   A.   Not that I know of right now.
6   Q.   Okay.  And when did you start work with
7   DOT?
8   A.   I would say August of '93 permanently.
9   Q.   Okay.  What was -- do you remember your
10  first position?  Did you come in as an
11  entry level laborer?
12  A.   Yes.
13  Q.   And what's the steps you've gone through?
14  A.   From a laborer to highway maintenance
15  technician to engineering assistant to
16  engineering assistant II/III, and then
17  transportation technologist.
18  Q.   Okay.  Have you always worked in the
19  Montgomery area?
20  A.   No.
21  Q.   Where did you work besides the Montgomery
22  area?
23  A.   The Lee County area.

38

1   Q.   Okay.  Before you came to work for DOT,
2   who did you work for?
3   A.   I can't recall all the places I've worked
4   for.
5   Q.   Okay.  What kind of -- let me just ask you
6   this:  What kind of work were you involved
7   in before you came to work for DOT?
8   A.   Food service.
9   Q.   Okay.  Any other type work?
10  A.   Construction.
11  Q.   Okay.  What kind of construction did you
12  do?
13  A.   Labor work, as far as foreman and pouring
14  concrete and --
15  Q.   Okay.  So general construction?
16  A.   Yes.
17  Q.   Okay.  And were you ever fired from any of
18  those jobs?
19  A.   No.
20  Q.   Have you ever been involved in any
21  lawsuits besides this one we're dealing
22  with today, either where you were a
23  plaintiff, the one doing the suing, or you

39

1   were a defendant, being sued?
2   A.   With the State?
3   Q.   Any kind?
4   A.   Yes, with the State.
5   Q.   Okay.  What lawsuit are you involved in
6   with the State?  And I'm going to exclude
7   the big Reynolds class action case.  I
8   think you would have been a party member
9   of that one, just by virtue of the nature
10  of the class.  But besides that particular
11  litigation and the one we're dealing with
12  here today, what other lawsuits with the
13  State have you been involved in?
14  A.   I can't recall the name of it right now,
15  but I can get that information and give it
16  to my lawyer.
17  Q.   Okay.  What's the nature of this
18  particular lawsuit you're talking about?
19  A.   Mileage.  Mileage reports, expense
20  accounts.
21  Q.   Okay.  Did you sue to try to get money to
22  compensate you for mileage, or what's the
23  nature of that lawsuit we're talking

40

1   about?
2   A.   Yes, it was compensation for mileage, and
3   I was one of the ones that was in the suit
4   for it.
5   Q.   Okay.  So is this what may be called a
6   class action where more than one person is
7   suing over a particular issue?
8   A.   I don't think it was a class act, but it
9   was four of us that was in it.
10  Q.   Okay.  And this is with the Department of
11  Transportation?
12  A.   Yes.
13  Q.   And what were y'all doing, just trying to
14  get back money you spent on mileage,
15  travel?
16  A.   Yes.
17  Q.   Okay.  When was this; do you know?  How
18  many years ago was this?
19  A.   I can't recall how many years.
20  Q.   More than five?
21  A.   I can't recall.
22  Q.   What job were you performing or what was
23  your job title at the time this suit was

10 (Pages 37 to 40)

LEROY  WILLIAMS - 2/21/2007

41

1    filed?
2    A.    EA.
3    Q.    Where was the suit filed, federal court or
4          state court, if you know?
5    A.    I don't know.
6    Q.    Do you know who the lawyer was who
7          represented you?
8    A.    I can't recall.
9    Q.    Okay.  Do you remember who the other
10         plaintiffs were?  Who were your
11         coplaintiffs?
12   A.    I remember a couple of them.
13   Q.    Okay.  Let me have their names if you can
14         remember.
15   A.    Mr. Harry Walker.
16   Q.    Okay.
17   A.    Mr. Thomas Lewis.
18   Q.    Is that the same Thomas Lewis that was
19         your supervisor?
20   A.    Yes.
21   Q.    Okay.
22   A.    And the last one I can't -- I can't recall
23         his name.  He's no longer with the

42

1          department.
2    Q.    So as you recall sitting here today, it
3          was you and three other people who sued to
4          get some compensation for mileage or
5          travel --
6    A.    Yes.
7    Q.    -- that you thought you were due?
8    A.    Yes.
9    Q.    Okay.  What was the outcome of the case?
10         Did you get paid for your travel?
11   A.    Yes.
12   Q.    Did it go to trial or did it settle?
13   A.    I can't recall.
14   Q.    Did you have to go to court with it?
15   A.    No, I didn't.
16   Q.    Okay.  Does the Department of
17         Transportation have a grievance policy?
18   A.    Yes.
19   Q.    Have you ever taken advantage of the
20         grievance policy?  In other words, have
21         you ever filed a grievance?
22   A.    Yes.
3    Q.    How many grievances do you think you may

43

1          have filed with the department?
2    A.    Approximately two or three.
3    Q.    Two or three, okay.  Looking through the
4          records that I have had at my disposal, I
5          found one grievance that you had filed,
6          appears to be back in 1997.  Let me ask
7          you to look at that, and do you recognize
8          that as a grievance that you filed or a
9          complaint that you filed, looks like in
10         1997?  Does it look familiar to you at
11         all?
12              (The referred-to document was
13               marked for identification
14               as  Defendants' Exhibit No.
15               2.)
16   A.    This is a grievance that I -- that I
17         filed.
18   Q.    Okay.  Do you recall what the result of
19         that grievance was?
20   A.    I can't recall right now.
21   Q.    Okay.  Were not you and a number of other
22         individuals given promotions as a result
23         of this grievance and/or other similar

44

1          grievances during that time?
2    A.    I don't recall a promotion.
3    Q.    Okay.  Take a look at what I've marked as
4          Defendants' Exhibit 3, and I'll just ask
5          you if you recognize that document.
6              (The referred-to document was
7               marked for identification
8               as  Defendants' Exhibit No.
9               3.)
10   A.    Okay.
11   Q.    Okay.  Do you recognize that as a
12         grievance or a complaint that you filed
13         concerning some matter of your job?
14   A.    Complaint.
15   Q.    Okay.  This appears to be signed by you, I
16         think on the second page of the copy that
17         you have, on October 5th, 2000; is that
18         correct?  Take a look at the second page.
19   A.    Yes.
20   Q.    Okay.  Do you recall that being around the
21         time frame that you actually filed this
22         grievance, sometime in 2000?
23   A.    Yes.

11 (Pages 41 to 44)

LEROY WILLIAMS - 2/21/2007

45

1    Q.    Okay. This grievance appears to be --
2          well, Number 7, nature of the complaint,
3          it says Mr. Rotten removed me from the
4          data editor position to the field in
5          retaliation for my attendance and
6          participation in the accelerated
7          university training program and/or special
8          affirmative action training. Was your
9          complaint basically against Mr. Rotten?
10   A.    The complaint -- Mr. Rotten was part of
11         it.
12   Q.    Okay.
13   A.    I was complaining about the department in
14         general along with Mr. Rotten to allow
15         such acts to happen when the court was
16         appointing classes and they weren't to
17         deny classes to gain knowledge.
18   Q.    Okay. Now, under 7(d) it asks you
19         specifically who committed the wrongful
20         act or omission you're complaining about,
21         and your response is William Mac Rotten.
22   A.    Okay.
23   Q.    Are there any other names listed there

46

1          besides Mr. Rotten?
2    A.    None that I recall.
3    Q.    And he was your direct supervisor at the
4          time or over the division or --
5    A.    He was -- he had the position Mr. Adams
6          had.
7    Q.    Okay. Which is -- what's Mr. Adams'
8          position?
9    A.    He was a location supervisor -- location
10         -- over location at that time.
11   Q.    Okay. Besides Mr. Rotten, who do you
12         contend committed wrongful acts or
13         omissions that you complained about in
14         this complaint?
15         MR. ADAMS: Objection to the
16              extent it calls for a legal
17              conclusion. You can answer.
18   Q.    Besides Rotten, who wronged you?
19         MR. ADAMS: Asked and answered.
20         MR. REDD: I haven't heard a real
21              name.
22         MR. ADAMS: He stated the
23              Department of Transportation

47

1          in general.
2    Q.    Is there a specific person besides
3          Mr. Rotten who you claim to have injured
4          you?
5    A.    What was that question again?
6    Q.    Well, I'm just asking you, you've listed
7          -- specifically listed Mac Rotten as a
8          person who committed the wrongful act or
9          omission you were complaining about in
10         this grievance or complaint form. And I'm
11         just asking you if there's any other
12         specific individuals that you can sit here
13         and tell me about today who you claim also
14         wronged you or committed wrongful acts or
15         omissions against you.
16   A.    The department. Other than the
17         department?
18   Q.    Well, the department is not a person; it's
19         an entity. I'm asking you for a specific
20         name of a person.
21   A.    I can't recall right now.
22   Q.    Okay. Fair enough. Does Mr. Rotten still
23         work for the department?

48

1    A.    Not that I know of.
2    Q.    Do you know how long he's been gone from
3          the department?
4    A.    He's retired.
5    Q.    Well, do you have any idea of when he
6          retired?
7    A.    Not right now.
8    Q.    Been more than a couple of years?
9    A.    Yes.
10   Q.    Okay. Besides the two complaints or
11         grievances that I've shown you, can you
12         describe any other grievances that you've
13         filed against any practices or acts of the
14         Department of Transportation since the
15         filing of the grievance that's Exhibit
16         Number 3?
17         MR. ADAMS: Object to the extent
18              that there were documents
19              that reflect other
20              grievances which speak for
21              themselves. You can answer.
22   A.    There are. There are other documents that
23         you have.

12 (Pages 45 to 48)

LEROY WILLIAMS - 2/21/2007

49

1  Q.  Are there any other grievances that you've
2      filed subsequent to the filing of that
3      particular grievance?
4  A.  There are other ones in that -- in that --
5  Q.  Is there another grievance that was filed
6      after that one that you can show me today?
7      Because I only found two in your files,
8      and you've seen both of those, Exhibits 2
9      and 3. I just want to know if there's
10     another grievance in there that I'm not
11     aware of that I haven't found, because I
12     only know of two. And I haven't looked
13     through all of those in depth.
14 A.  You haven't?
15 Q.  Haven't had time. That's an EEOC filing.
16     I'm talking about an internal grievance
17     with the Department of Transportation.
18     I'm aware of the EEOC file. I want to
19     know if you filed an internal grievance
20     besides the two I've given you.
21 A.  I filed a grievance and gave it to
22     Mr. Green.
23 Q.  When?

50

1  A.  Prior to the accident, this last --
2  Q.  Prior to when?
3  A.  The accident. My promotion to TT.
4  Q.  Besides those two that you have in front
5      of you, are you saying that you filed
6      another complaint form, internal
7      grievance, with the Department of
8      Transportation?
9  A.  Yes.
10 Q.  And do you know when that was?
11 A.  I don't know the dates.
12 Q.  Do you have a copy of them?
13 A.  Not in front of me right now.
14 Q.  Did you keep a copy of it?
15 A.  I'm quite sure I did.
16 Q.  Where is the copy located?
17 A.  Right now I don't know.
18 Q.  Did you personally keep a copy for
19     yourself?
20 A.  It could be I did, but I'm not sure where
21     it is.
22 Q.  Well, do you know what became of that
3      particular grievance?

51

1  A.  No, I do not.
2  Q.  A minute ago you told me you had given
3      your lawyer everything you had; now we
4      have a grievance you have not furnished
5      that is subsequent to the only two
6      grievances that are in your file now, so
7      I'm just curious as to where that
8      grievance went to.
9  A.  I don't know, sir. I have to research and
10     see where it is.
11 Q.  Well, would you do that and make sure your
12     lawyer gives me a copy of that particular
13     grievance?
14 A.  I sure will.
15 Q.  What was the nature of that grievance?
16         MR. ADAMS: Let the record
17             reflect the Department of
18             Transportation is the
19             custodian of records for all
20             grievances filed by members
21             of the Reynolds class.
22         MR. REDD: And let the record
23             reflect a search of the

52

1          records has not revealed the
2          grievance that Mr. Williams
3          is referring to.
4  Q.  What was the nature of the grievance, this
5      last grievance that you've disclosed to
6      me?
7  A.  Discrimination.
8  Q.  That's a broad subject. Would you be more
9      specific as to what you mean by
10     discrimination by specifying who
11     discriminated against you and how they
12     discriminated against you and when they
13     discriminated against you?
14 A.  Well, most of the paperwork would be in
15     here, but the discrimination act would be
16     I was denied trainings; I wasn't given
17     adequate time to perform my duties, to
18     learn my duties, when there were other
19     employees, white employees that gained the
20     title TT, was given adequate time and
21     trainings to do their duties and to have
22     success in that position.
23 Q.  And who was not giving you adequate time

13 (Pages 49 to 52)

LEROY WILLIAMS - 2/21/2007

53

1    to get training or perform your duties?
2    Is there a particular person that you
3    are...
4  A.    I would say Mr. Thomas Lewis, Mr. Jones,
5    and Mr. Adams.
6  Q.    Okay. And all of this that you just told
7    me and perhaps more was fully denoted on a
8    form such as this one, a complaint form or
9    a grievance form; is that what you're
10    telling me as we sit here?
11  A.    I handed it over to Mr. Green.
12  Q.    Okay. And you don't recall when that
13    happened?
14  A.    Not the exact dates.
15  Q.    What about the month? Have any idea what
16    month that was?
17  A.    Not right now, I do not.
18  Q.    Did you personally place that in
19    Mr. Green's hand?
20  A.    Yes.
21  Q.    In Mr. Green's office?
22  A.    Yes.
23  Q.    What did Mr. Green say to you when you

54

1    handed that to him, or did he say anything
2    to you?
3  A.    Yes, I can remember some of the things
4    Mr. Green said.
5  Q.    Okay.
6  A.    He looked over the paperwork and he stated
7    that, these people really have it in for
8    you and he don't see any way around this
9    but to go upstairs to Mr. Jones and
10    Mr. Adams and try to plead with them and
11    see would they give me some kind of pity.
12  Q.    Anything else Mr. Green told you?
13  A.    Not that I can recall.
14  Q.    Who is Mr. Green, anyway? What's his
15    function?
16  A.    I don't know his exact title right now.
17  Q.    Well, you knew enough to hand him a
18    grievance. Why did you think that was the
19    person to hand the grievance to?
20  A.    He is something over personnel. I don't
21    know the exact title.
22  Q.    Is he the EEO coordinator?
23  A.    That could be.

55

1  Q.    Okay. You don't know?
2  A.    Not exactly, no.
3  Q.    You just knew to hand him a grievance?
4  A.    Yes.
5  Q.    And did he give you any kind of receipt
6    for that grievance?
7  A.    None that I can recall.
8  Q.    Were you given any kind of a number to
9    annotate what your grievance number was?
10  A.    Not that I recall.
11  Q.    Were you given any kind of indication what
12    would happen to your grievance, would it
13    be heard, would it be set for a hearing or
14    anything of that nature?
15  A.    Not that I recall.
16  Q.    Do you recall being asked about your
17    grievance any time subsequent to you
18    handing it to Mr. Green?
19  A.    Not that I can recall.
20  Q.    Do you know who Sandy Deats (phonetic) is?
21  A.    I could recognize her if I saw her.
22  Q.    Do you recall if Ms. Deats ever contacted
23    you to discuss the grievance that you say

56

1    that you handed to Mr. Green?
2  A.    No.
3  Q.    Let me back up to the second grievance
4    that I handed you, Exhibit 3. How was
5    that grievance resolved?
6  A.    What was the --
7  Q.    The one about Mr. Rotten.
8  A.    After I got through with the classes, I
9    was put back into the data editor's
10    position.
11  Q.    Did you drop that grievance, withdraw it?
12  A.    Yes. We didn't pursue it anymore.
13  Q.    Okay. Now, in May of '05, you were
14    promoted to the position of transportation
15    technologist. That's correct, is it not?
16  A.    Yes.
17  Q.    Let's see. Let me show you this. And I'm
18    sorry for the -- it's the printer. That
19    appears to be a -- is that a letter from
20    Don Arkle to you of May 12, 2005,
21    congratulating you on being promoted?
22        (The referred-to document was
23        marked for identification

14 (Pages 53 to 56)

LEROY WILLIAMS - 2/21/2007

57

1          as  Defendants' Exhibit No.
2          4.)
3   A.   Yes.
4   Q.   Is that going to be correct, your basic
5        starting salary was 1,041.50 biweekly?
6   A.   Yes.
7   Q.   Okay.  And you were to report to your crew
8        assignment at 5:00 a.m. in the northwest
9        parking lot on Monday, May 16, 2005?
10  A.   Yes.
11  Q.   Do you recall that being the day that you
12       actually reported to the position of TT?
13  A.   As far as I know.
14  Q.   Okay.  Northwest parking lot, are we
15       referring to the parking lot at the
16       Department of Transportation complex at
17       1409 Coliseum Boulevard?
18  A.   And what was the question again?
19  Q.   Is that northwest parking lot, is that at
20       1409 Coliseum Boulevard?  I call it the
21       main complex.
22  A.   Yes.
23  Q.   Okay.  And did you report there?

58

1   A.   Yes.
2   Q.   Did you report at 5 o'clock?
3   A.   Yes.
4   Q.   Now, is transportation technologist
5        sometimes called a field supervisor?  Is
6        that part of the title?
7   A.   Not that I can recall.
8   Q.   Have you ever been referred to when you
9        had that job as the field supervisor?
10  A.   I have been referred to as a field
11       supervisor.
12  Q.   While you were a technologist?
13  A.   While I was a technologist, but that
14       wasn't the title.  That wasn't the
15       classification.
16  Q.   Okay.  I'm just looking at Defendants'
17       Exhibit 5.  There's a position
18       classification questionnaire that is in
19       your file, and I just want to ask you if
20       -- and it says -- if you'll bear with me.
21       It says classification and then it says
22       working title, field supervisor.
3        (The referred-to document was

59

1          marked for identification
2          as  Defendants' Exhibit No.
3          5.)
4   A.   Oh, okay.
5   Q.   Is that correct?  I mean, is that --
6   A.   The classification is transportation
7        technologist.
8   Q.   And the working title, I mean, what you're
9        basically called is field supervisor?
10  A.   That one I had was, and several others.
11  Q.   Okay.  So you could be a transportation
12       technologist and not be a field supervisor
13       then?
14  A.   That's correct.
15  Q.   Okay.  Now, this document appears to give
16       a description of your duties, what the job
17       is, things of that nature, does it not?
18  A.   Yes.
19  Q.   And it appears that you reviewed this and
20       signed it on May 25th of '05, by looking
21       at the last page of that document; is that
22       correct?
23  A.   Let me look at it here.  Okay.  Yes.

60

1   Q.   Okay.  So you were aware of your job
2        responsibilities, what they wanted you to
3        do on a daily basis and what the nature of
4        your job was?
5   A.   Yes.
6   Q.   At least by May 25th, correct?
7   A.   On the job title?
8   Q.   Yes.
9   A.   Yes.
10  Q.   And what your duties were?
11  A.   What, I knew what my duties were?
12  Q.   Yes, as described on this form that you
13       signed?
14  A.   Well, at the time, I was -- I read over
15       them, but -- and am aware, but I didn't
16       get a chance to go through all those
17       duties.
18  Q.   Okay.  But at the bottom, you said, I
19       certify I have read the above and verify
20       that it is to the best of my knowledge
21       correct and accurate.  And you signed
22       that, correct?
23  A.   Yes, agreeing to those are the duties that

15 (Pages 57 to 60)

LEROY WILLIAMS - 2/21/2007

61

1    this position would carry.
2  Q.  Do you remember who was on your particular
3    crew when you first started?
4  A.  Yes. When I first started --
5  Q.  I think you've mentioned most of their
6    names already. Sanders? Was Sanders on
7    there?
8  A.  Yes.
9  Q.  Crowe?
10  A.  No. When I first started, no.
11  Q.  Austin?
12  A.  Austin was there.
13  Q.  Granthem?
14  A.  Granthem was there.
15  Q.  Who else?
16  A.  Robby Jones was there.
17  Q.  Robby Jones and who else?
18  A.  Thomas Lewis and I.
19  Q.  Now, Tommy was not on your crew; he was
20    your supervisor; is that right?
21  A.  Well, he was part of that crew also.
22  Q.  Were there other crews, though, that he
23    had supervisory responsibilities over?

62

1  A.  No, just ours.
2  Q.  Okay. So you're telling me that Tommy
3    Lewis was your supervisor -- I'm trying to
4    get the hierarchy of this. Bear with me
5    if you will. There's Tommy Lewis, who is
6    a tech -- transportation tech, correct?
7  A.  Correct.
8  Q.  Then there's you, correct?
9  A.  Correct.
10  Q.  And you supervise a crew of people. How
11    many were in your crew? Was it five or
12    six?
13  A.  Three.
14  Q.  Three? Okay. And Tommy Lewis had no
15    responsibilities other than over you and
16    those people on that crew? Is that what
17    you're saying?
18  A.  Pretty much.
19  Q.  Was there any other crews working on any
20    projects that you were working on that he
21    had supervisory responsibility over?
22  A.  No.
23  Q.  During the entire time that you were a

63

1    transportation tech?
2  A.  During the time I was a transportation
3    tech, I was transferred to a different
4    crew. Tommy was transferred to a
5    different crew, so he supervised someone
6    else.
7  Q.  Okay. Did the work that your crew was
8    performing after you became a tech, was
9    that similar to work that you had
10    previously performed when you were an EA?
11  A.  Yes.
12  Q.  Okay. And you've indicated I think
13    briefly that you were good at your job as
14    an EA, or you think you were good as --
15    did a good job as an EA?
16  A.  To the best of my knowledge, yes.
17  Q.  Okay. Who was your -- immediately before
18    you got promoted to tech, who was your
19    supervisor?
20  A.  Theresa Barksdale (phonetic).
21  Q.  Is Theresa Barksdale black or white?
22  A.  She's white.
23  Q.  Did you have any problems with Theresa

64

1    Barksdale, work problems? Did you get
2    along with her?
3  A.  I had no problems whatsoever.
4  Q.  Okay. Does ALDOT have any policies
5    concerning tardiness, punctuality, and
6    attendance?
7  A.  Yes, they do.
8  Q.  Could you briefly describe what the policy
9    concerning tardiness is?
10  A.  I can't recall them right now, but I know
11    they have a policy.
12  Q.  Okay. So if your job starts at 8 o'clock
13    and you get to work at 8:05, you're late,
14    aren't you?
15  A.  In some cases.
16  Q.  And attendance, you should be on the job
17    unless you have an excuse for not being
18    there, right?
19  A.  That is correct.
20  Q.  And you -- as an employee, you would earn
21    annual leave and sick leave?
22  A.  That's correct.
23  Q.  And there's a call-in policy to determine

16 (Pages 61 to 64)

LEROY WILLIAMS - 2/21/2007

65

1      -- so you can tell your employer if you're
2      going to be sick or be out or whatever?
3  A.   That's correct.
4  Q.   Is there any policy or any requirement as
5      to when you would call your employer if
6      you're going to be out for any reason or
7      late for any reason?
8  A.   I guess that would be under the absence
9      from the job or being sick or --
10  Q.   I guess what I'm asking, is there a time
11      frame from the time your work should start
12      and the time you should call in?
13          MR. ADAMS: Object to form.
14  Q.   That you know of. Do you understand what
15      I'm asking?
16  A.   Sort of.
17  Q.   Okay. I'm just asking you, if you're
18      supposed to be at work at 7 o'clock and
19      you don't call your supervisor until 3 in
20      the afternoon, that's not a good thing,
21      right?
22  A.   No, it's not.
23  Q.   Okay. Is there any minimum time that you

66

1      should call in, though, is what I'm
2      asking.
3  A.   I can't recall right now.
4  Q.   Okay. As an EA or a transportation tech,
5      do you get breaks during your work day?
6  A.   Yes.
7  Q.   Is there any set schedule for breaks or
8      any set time for taking breaks or any
9      amount of time that you can take for a
10      break?
11  A.   I'm not sure of that question.
12  Q.   Okay. I'm familiar with like a morning
13      break, you take 15 minutes; afternoon
14      break, you take 15 minutes. Does that
15      sound familiar to you?
16  A.   Sort of.
17  Q.   Okay. If you take a break, when does your
18      break start, when you leave the work site,
19      or how does that work?
20  A.   Not quite sure.
21  Q.   Okay. What about lunch? Do y'all get
22      lunch breaks?
3  A.   Yes.

67

1  Q.   How long is your lunch break?
2  A.   Supposed to be an hour.
3  Q.   Okay. When does your break start, your
4      lunch break? Say you're working on a
5      site. When technically do you go off the
6      clock to be taking your break?
7  A.   I'm not sure on that one. We have
8      different times.
9  Q.   Okay. Say you're working in the woods
10      somewhere. Does your break start when you
11      get back to your truck, or does it start
12      when you leave the woods?
13  A.   I'm not sure on that one. We've clocked
14      it both ways.
15  Q.   Do y'all get overtime if you work over --
16  A.   No.
17          MR. ADAMS: Object to form.
18  Q.   Do you get compensatory time?
19  A.   There have been some comp time.
20  Q.   Have you ever gotten comp time?
21  A.   Yes.
22  Q.   Okay. When you were an EA, did you have a
23      set daily schedule? In other words, did

68

1      you have a time to come in and a time you
2      would leave, or did it depend on the job?
3  A.   Both.
4  Q.   Okay. Now, I know sometimes you might be
5      required to travel to another area to do
6      your work; is that correct?
7  A.   Correct.
8  Q.   Would your day start when you got to the
9      parking lot in Montgomery to go to that
10      work?
11  A.   It can vary.
12  Q.   Okay. How would it vary?
13  A.   It depends on the supervisor and the one
14      that -- that would schedule time.
15  Q.   Okay. Have there been times when your day
16      would start when you got to a location
17      other than Montgomery? In other words,
18      have you ever been told to meet at a
19      certain place, say in Lee County, all the
20      crew meets there and then you go to work?
21  A.   Not that I recall.
22  Q.   Okay. When you took the job as -- or were
23      promoted to the job as TT, were you given

17 (Pages 65 to 68)

69

1    any instruction as to when you would need
2    to report to work each day?
3  A.   On the assignment sheet.
4  Q.   Is that something that changes from week
5    to week?
6  A.   It changes.
7  Q.   Routinely when would your work day start?
8  A.   Before or now?
9  Q.   When you were a TT.
10  A.   When I was a TT? On Mondays, it
11    supposedly starts at 5 a.m.
12  Q.   Okay. What about Tuesdays?
13  A.   I can't recall the day, Tuesday, when it
14    started, because we were in different
15    areas.
16  Q.   Okay. Would you -- and I'm just trying to
17    understand how the actual work went.
18    Would you come in on, say, a Monday and
19    then go to, say, a location away from
20    Montgomery and stay there and do a job and
21    then come back later in the week?
22  A.   Come back to Montgomery later in the week?
23  Q.   Yeah. I'm just asking you, did you ever

70

1    have overnight -- spend overnights in a
2    hotel or whatever near a job?
3  A.   Mostly when I was a TT, we'd leave on
4    Monday and come back in on Thursdays.
5  Q.   So you're staying away from -- staying
6    out?
7  A.   Yes.
8  Q.   So you would report at 5 generally on a
9    Monday?
10  A.   Yes.
11  Q.   What about -- did you have any
12    instructions -- let's say you're working a
13    job over in maybe Lee County. Would that
14    be somewhere where you might work?
15  A.   Could be.
16  Q.   Okay. And would you have any hours that
17    you would actually report to the job site
18    while you were off on such a location?
19  A.   Yes.
20  Q.   Okay. Do you have an idea of when -- what
21    times you would normally have to report
22    when you were out like that?
23  A.   I would try to report to the job site at

71

1    or before 7.
2  Q.   Okay. Now, during this time, would you be
3    staying in a hotel or whatever on that job
4    site, or did you try to drive to and from
5    your home to job sites?
6  A.   Basically I would stay in the area of the
7    job.
8  Q.   Okay. With the crew?
9  A.   No, not with the crew.
10  Q.   Well, I mean, would they be staying in the
11    area too, or would they commute every day
12    or how did that work?
13  A.   That was left up to -- basically, to them.
14  Q.   Okay. How would you get to and from these
15    job sites that were away from Montgomery?
16  A.   I drove my personal vehicle.
17  Q.   Okay. Was a State vehicle made available
18    for you or others who might be going to
19    that same location?
20  A.   It was available.
21  Q.   Okay. Is there any reason why you chose
22    to take your own vehicle?
23  A.   Yes.

72

1  Q.   And what was that reason?
2  A.   Being in one vehicle out in a crew where
3    you have several different people, so I
4    wanted to have -- afterward activities.
5    So I would rather have my preference of
6    doing what I wanted to do in the
7    afternoons instead of --
8  Q.   Basically personal convenience?
9  A.   Yes.
10  Q.   Did you get mileage for your travel when
11    you took your personal vehicle?
12  A.   Did I get...
13  Q.   Did you get reimbursed for your mileage?
14  A.   No. Not on -- not as a TT.
15  Q.   Okay. And why not?
16  A.   Those privileges are no longer, to my
17    knowledge, existing, unless it's...
18  Q.   Okay. So a vehicle is made available; if
19    you want to use your own car, you do it on
20    your own gas?
21  A.   That's correct.
22  Q.   Okay. Show you Defendants' Exhibit 6 and

18 (Pages 69 to 72)

LEROY WILLIAMS - 2/21/2007

73

1    just ask you if you can identify that
2    document. Do you recognize it?
3        (The referred-to document was
4        marked for identification
5        as Defendants' Exhibit No.
6        6.)
7    A.    Yes.
8    Q.    Is that the EEOC charge of discrimination
9    that you filed back in September of '05?
10   A.    Yes.
11   Q.    Okay. Now, am I correct that when you
12   filed this EEOC you had just been notified
13   that you were being rolled back to the
14   position of EA II/III from the technical
15   -- or the transportation technologist
16   position that you had -- were holding at
17   the time; is that right?
18   A.    Now, what was that question again?
19   Q.    Well, I guess I'm asking you when did you
20   get rolled back?
21   A.    Actually, I don't know when. I just
22   received --
23   Q.    You got a letter from Don Arkle, didn't

74

1    you, telling you that you were going to be
2    rolled back to the EA position; is that
3    right?
4    A.    Did I get a letter telling me that,
5    statements to that or --
6    Q.    Yeah, did you get a letter? I think I've
7    got one here. I'll show it to you and ask
8    you if that's the one you got. Simplest
9    way to do this, make this 7. Take a look
10   at this letter and just tell me if you
11   remember getting this letter from
12   Mr. Arkle telling you that you were going
13   to be rolled back to EA II/III and that
14   you should report to Adenrele --
15   A.    Odutola.
16   Q.    -- Odutola. Do you recognize that?
17       (The referred-to document was
18       marked for identification
19       as Defendants' Exhibit No.
20       7.)
21   A.    I think this was given to me in a package.
22   Q.    Okay. But you remember getting it, right?
3    A.    I remember receiving it.

75

1    Q.    Okay. And that indicated that as of
2    September 3rd, you were going to be an EA
3    again. And on September 9th, by your
4    signature, you filed the EEOC complaint;
5    is that correct?
6    A.    Yes.
7    Q.    Do you know whether or not an employee of
8    the DOT can file a grievance about a
9    reversion back to a previous position?
10   A.    Explain it.
11   Q.    Could you have filed a grievance
12   concerning the rollback to the EA II/III
13   position?
14   A.    Did I file a grievance to --
15   A.    Could you have?
16   A.    For the rollback?
17   Q.    Yeah.
18   A.    Not for the rollback.
19   Q.    Okay.
20   A.    I wouldn't say for the rollback, no.
21   Q.    Okay. That's all I'm asking. Did you
22   know the person named that you were to
23   report to? And I'm not going to try to

76

1    pronounce it.
2    A.    Odutola.
3    Q.    Did you know that person before? Did you
4    ever work for that person before?
5    A.    Yes.
6    Q.    Okay. And are you still working for that
7    person now?
8    A.    Yes.
9    Q.    Okay. Do you have any problems working
10   with that person.
11   A.    No.
12   Q.    But you had worked with this supervisor
13   before?
14   A.    Yes, I'd worked under him.
15   Q.    Black or white?
16   A.    He's black.
17   Q.    Okay. Did you have any problems with this
18   particular supervisor?
19   A.    No.
20   Q.    Just looking at your EEOC complaint --
21   bear with me. I want to go over some of
22   the allegations that you -- if I can find
23   it again. Made three copies and I can't

19 (Pages 73 to 76)

LEROY WILLIAMS - 2/21/2007

77

1  find any of them now.
2      MR. ADAMS: If you've got extra
3          copies, I'd appreciate
4          getting one.
5      MR. REDD: There you go.
6  Q.  Paragraph 1, Page 2 on this particular
7      exhibit. The third sentence you say, upon
8      being promoted, I was not properly trained
9      or given sufficient data and information
10     as necessary to be successful on the job.
11     Okay. I want you to tell me what training
12     that you -- let's start with training.
13     What training do you think that you should
14     have received in order to be successful on
15     the job?
16 A.  In the software department, I should -- I
17     say that I should have been trained in
18     Terramodel.
19 Q.  Okay. So you should have been trained on
20     that. Is that a program or a device
21     that's utilized in the work to input data?
22 A.  It's a program that we utilize to input
23     data and bring it to the -- inside the

78

1  office.
2  Q.  Okay. And had you had any training on or
3      experience with Terramodel when you were
4      working as an EA II/III?
5  A.  I've had some self-training.
6  Q.  Okay. As a data editor, did you -- were
7      you required to or did you use Terramodel
8      at all in the performance of that
9      particular job?
10 A.  Yes.
11 Q.  Okay. So you had some knowledge of
12     Terramodel before you ever came to TT?
13 A.  No training, but I had some knowledge.
14 Q.  Okay. A working knowledge?
15 A.  I would say -- I was sat in front of a
16     data editor's position and told, here it
17     is; do it.
18 Q.  Well, do you believe -- you said you were
19     proficient in your job as an EA II/III.
20     Were you proficient in the ability to use
21     Terramodel as an EA II/III?
22 A.  And that's why I had a complaint about the
23     training.

79

1  Q.  No, answer my question first. Do you
2      believe you were proficient in that as an
3      EA II/III?
4  A.  No.
5  Q.  Okay. So you believe you should have been
6      given training in the software in the use
7      of Terramodel. Okay. That's one
8      training. Is there any other training you
9      think you should have received and did not
10     receive as a TT?
11 A.  Yes. Supervisional training.
12 Q.  What, training on how to be a boss or
13     supervisor?
14 A.  Some experience in it.
15 Q.  Okay. Does the department offer courses
16     in that?
17 A.  The department does not, as far as I know.
18 Q.  Okay. Now, who would you have -- well,
19     let me back up one minute. Let's go back
20     to the Terramodel software training. Who
21     would have given you that training?
22 A.  The Terramodel training?
23 Q.  Uh-huh.

80

1  A.  There have been classes that -- and who
2      would have given it to me, I wouldn't have
3      -- I don't know, but they had classes that
4      -- prior, to white employees that was data
5      editors before I was and during my time
6      that had training in Montgomery and I
7      guess other areas, wherever the training
8      was, but I never was called to one of
9      those trainings.
10 Q.  Do you know any white employees who got
11     Terramodel training?
12 A.  Stacy Nichols, Troy Nichols, Dodd Austin,
13     Robert Harris, Keith Kirkland.
14 Q.  Okay. Anybody else?
15 A.  Yes, it's several others, but I can't
16     think of all of them right now.
17 Q.  Okay. To your knowledge, had any of the
18     people you just named had any training
19     whatsoever or had they worked with
20     Terramodel before they went to this
21     training you indicated that they had?
22 A.  Had they worked with it before?
23 Q.  Yeah.

20 (Pages 77 to 80)

LEROY WILLIAMS - 2/21/2007

| | 81 |
|---|---|
| 1 | A. I don't know. |
| 2 | Q. If you know? |
| 3 | A. I don't know right now. |
| 4 | Q. Okay. So their training might have been |
| 5 | the first time they were associated with |
| 6 | Terramodel at all? |
| 7 | A. I'm not going to say that. I wouldn't |
| 8 | know. |
| 9 | MR. ADAMS: Are you at a spot for |
| 10 | a break? |
| 11 | MR. REDD: Yeah. |
| 12 | (Brief recess.) |
| 13 | Q. When we left, you were giving me the names |
| 14 | of some people that -- some coworkers or |
| 15 | workers who you believe were given |
| 16 | Terramodel training. I can't recall, but |
| 17 | did I ask you when this training was given |
| 18 | to any of the individuals you named? |
| 19 | A. I don't think you asked me that, but I |
| 20 | can't recall. |
| 21 | Q. Was it during the time you were |
| 22 | transportation technologist or before? |
| 23 | A. Before. |

| | 82 |
|---|---|
| 1 | Q. Okay. Does the department give courses on |
| 2 | that? Is that what you're talking about, |
| 3 | an actual sit-down classroom type training |
| 4 | instruction? |
| 5 | A. I know our area department did. |
| 6 | Q. Okay. And do you know how often that's |
| 7 | scheduled? |
| 8 | A. No, I don't know how often. |
| 9 | Q. Is it routinely scheduled or as-needed |
| 10 | scheduled or do you know? |
| 11 | A. I would say as-needed. |
| 12 | Q. Is that type training in a formal |
| 13 | classroom setting usually done one on one, |
| 14 | or is it done as a class where there's |
| 15 | more than one student or person being |
| 16 | instructed? |
| 17 | A. From what I recall, I think it was done as |
| 18 | a class. |
| 19 | Q. Okay. And you indicated too that you |
| 20 | thought you should have gotten some |
| 21 | supervisory training, how to be a |
| 22 | supervisor; is that correct? |
| 3 | A. The title of -- the training in the new |

| | 83 |
|---|---|
| 1 | title. |
| 2 | Q. Okay. But you believe that there should |
| 3 | have been some -- is there a formal class |
| 4 | that the department -- I think I asked you |
| 5 | that already. How would that training be |
| 6 | conducted, by your supervisor? |
| 7 | A. It should have been by my supervisor. |
| 8 | Q. Your immediate supervisor? |
| 9 | A. And the department, both. |
| 10 | Q. Okay. Your immediate supervisor being |
| 11 | Tommy Lewis? |
| 12 | A. Yes. |
| 13 | Q. Do you know how long Tommy Lewis had |
| 14 | actually been a supervisor at the time he |
| 15 | became your supervisor? |
| 16 | A. No, I don't -- I don't know, but I know it |
| 17 | had been quite some years. |
| 18 | Q. So you believe he had been a supervisor a |
| 19 | while before he came to supervise you? |
| 20 | A. Yes. |
| 21 | Q. Okay. Terramodel training, supervisory |
| 22 | training. What other training do you |
| 23 | believe you should have been given but |

| | 84 |
|---|---|
| 1 | were not? |
| 2 | A. There are some -- let's see. Terramodel, |
| 3 | supervision, and just general knowledge |
| 4 | training for that position as far as |
| 5 | having to deal with people and using the |
| 6 | phone different kind of ways and just the |
| 7 | everyday experience I would associate with |
| 8 | the new position. I think that that's |
| 9 | what I'm trying to get at, the actual |
| 10 | training, given the time -- |
| 11 | Q. Well, what you described seems like things |
| 12 | that would not have a formal training |
| 13 | format but would be learned through |
| 14 | experience on the job. |
| 15 | A. Basically. |
| 16 | Q. If at all? |
| 17 | A. Some of it, basically. |
| 18 | Q. Okay. Well, let's stick to things that |
| 19 | you believe you should have had some kind |
| 20 | of formal training on besides Terramodel |
| 21 | and supervisory training. What else? |
| 22 | A. Communication skills. |
| 23 | Q. Okay. Do you believe you had poor |

21 (Pages 81 to 84)

LEROY WILLIAMS - 2/21/2007

85

1  communication skills before you took the
2  job?
3  A.  I know I wasn't trained to communicate
4  with -- as a supervisor.
5  Q.  Well, how does a supervisor communicate?
6  A.  To me, a supervisor should have very --
7  very much knowledge of what he should
8  expect out of his people and the time to
9  get his people trained to get used to
10 their jobs.
11 Q.  Okay.  But the people that you were
12 actually supervising, weren't they EA
13 II/IIIs or EA Is?
14 A.  Both.
15 Q.  Okay.  And that's the job that you had
16 worked at for several, several years
17 before you became a TT, correct?
18 A.  The job that I had worked in.
19 Q.  Yes.  So you knew what an EA -- what was
20 expected of an EA on the job, did you not?
21 A.  That's true.
22 Q.  As you say yourself, you performed your
23 job as an EA well?

87

1  manner, or does that come difficult -- is
2  that difficult for you to do?
3  A.  I feel that I can get my point across to
4  them fairly easily, but in the sense I
5  feel that people have different thoughts
6  different from mine so I can deal with
7  them.
8  Q.  And that's just part of being a human
9  being working a job, isn't it, though?
10 A.  And there's a given time to learn it.
11 Q.  I'm just trying to ask what kind of
12 training would benefit you other than just
13 working with the people.  Some stuff can't
14 be taught, and I'm just wondering what you
15 could have been taught.  If you have good
16 work skills, what else could you be taught
17 that would enhance your job performance?
18 A.  Well, I mean, dealing with -- in a
19 position dealing with people, then I'm set
20 to a higher position, so I would have to
21 communicate with them on a different base
22 than what I would normally do.
23 Q.  Well, you're the boss now, right?

86

1  A.  Exactly.
2  Q.  And proficiently?
3  A.  Yes.
4  Q.  So you knew what was required of the job?
5  A.  Of an EA?
6  Q.  Yes.
7  A.  Yes.
8  Q.  So why would you need training to tell EAs
9  what was expected of them when you had had
10 the job yourself and knew it quite well?
11 A.  Well, that's people then I had to deal
12 with certain circumstances that I wasn't
13 -- could not be aware of.
14 Q.  Okay.  You just -- did you have poor
15 interpersonal skills when you took that
16 job as TT?
17 A.  As an EA II?
18 Q.  No, when you took the job, did you have
19 poor interpersonal skills or communication
20 skills?
21 A.  When you say poor, explain.
22 Q.  I mean are you able to get your point
23 across to people in a relatively easy

88

1  A.  Right, so the boss needs training and time
2  to...
3  Q.  And you just don't think you had enough
4  time to learn the job; is that what you're
5  telling me?
6  A.  Exactly.
7  Q.  Okay.  Not necessarily being trained, but
8  just time to work into the job and be able
9  to --
10 A.  Adjust.
11 Q.  -- feel comfortable with it?
12 A.  Correct.
13 Q.  So it sounds to me like your biggest
14 complaint is that you just weren't given
15 enough time as far as developing the
16 skills and communication skills to be a
17 good supervisor.
18 A.  Time and training.
19 Q.  Okay.  Well, what additional training are
20 we talking about?
21 A.  At the time, I don't know.  I'll just have
22 to...
23 Q.  Okay.  Any other kind of training that you

22 (Pages 85 to 88)

LEROY WILLIAMS - 2/21/2007

89

1     think you did not get that you should have
2     gotten as a transportation technologist,
3     other than what you've already told me?
4 A.  Not right now.
5 Q.  Okay. Did you ask anybody for some
6     additional training?
7 A.  Always.
8 Q.  Who?
9 A.  I asked Mr. Lewis.
10 Q.  What did you ask him to do for you?
11 A.  I asked him for his personal training
12     since he's been in that position longer.
13 Q.  And did he just refuse to give you any
14     help?
15 A.  His response was, you should already know
16     that.
17 Q.  Did he ever tell you that there's some
18     things on that job that because of your
19     prior job experience you shouldn't have to
20     retrain or shouldn't have to be taught to
21     do?
22 A.  He assumed.
23 Q.  But he told you that too, didn't he?

90

1 A.  He assumed.
2 Q.  Well, when I say he told you, I mean he
3     verbally said, Mr. Williams, you ought to
4     know how to do Terramodel or,
5     Mr. Williams, you ought to know how to
6     tell somebody to go do a job and them do
7     it right. Didn't he verbally tell you
8     those kind of things?
9 A.  Mr. Lewis assumed that I should know that.
10     He never took the time to find out.
11 Q.  Okay. Besides Mr. Lewis, who did you
12     request for additional training? Who did
13     you make requests to for additional
14     training?
15 A.  That was the person I talked directly to
16     on most bases.
17 Q.  All I'm asking, was there anybody else?
18 A.  Not that I recall.
19 Q.  Did you ever go over Mr. Lewis's head and
20     try to get somebody else up the
21     supervisory chain to give you any kind of
22     training to help you?
3 A.  Not that I can recall.

91

1 Q.  The next sentence in that EEOC complaint
2     in Paragraph 1, it says, I was constantly
3     subjected to harassment and intimidation
4     by my supervisor. Let's start with the
5     harassment. Can you explain to me what
6     you mean by harassment and who harassed
7     you?
8 A.  Basically, Mr. Lewis was harassive.
9 Q.  Okay. Now, one man's harassment is
10     another man's criticism. Could you be
11     more specific as to what Mr. Lewis did to
12     you or said to you that you consider to be
13     harassment?
14         MR. ADAMS: Object to form. You
15         can answer.
16 Q.  Do you understand my question? Can you
17     give me any specific incidences that
18     involve Mr. Lewis where he harassed you?
19 A.  I'm thinking of it. Can I object not to
20     answer this right now?
21 Q.  No. You've got to answer my question,
22     unless you want to be redeposed, and I
23     don't think any of us wants that.

92

1 A.  Mr. Lewis, on a daily basis when I would
2     get to work, would start yelling and
3     raising his voice in a manner where he
4     tried to upset me and disrupt my work for
5     the day.
6 Q.  What do you mean by yelling? Raising his
7     voice to you?
8 A.  Yes.
9 Q.  What would he say to you when he was
10     yelling?
11 A.  I can't recall right now.
12 Q.  Did he use any racial slurs or anything
13     like that?
14 A.  As a racial slur on that particular deal,
15     I never recall a racial slur.
16 Q.  Has he ever referred to you in any
17     offensive racial tone?
18 A.  He did state to me -- and I think that
19     this was a racist situation, where the law
20     -- we had a conversation, and he stated
21     that he had got his position by experience
22     and taking the test and being pulled off
23     of an established list and not by an

23 (Pages 89 to 92)

LEROY WILLIAMS - 2/21/2007

93

1    appointed position that the Court give you
2    -- that the Court gave you.
3  Q.  And you took that to be racist?
4  A.  Yes, because the lawsuit is about
5    discrimination and racial parts there, and
6    to bring that to my knowledge, he was
7    saying to me that the only reason I got my
8    position was because I was a black in the
9    lawsuit and not because I established
10    myself to a list the same way he did and
11    gained experience the same way he did.
12  Q.  Do you know how long he had been an EA
13    before he was promoted?
14  A.  I can't recall.
15  Q.  How long had you been an EA before you got
16    promoted?
17  A.  To a TT?
18  Q.  Uh-huh.
19  A.  Over ten years.
20  Q.  When was this conversation that you say
21    you had with Mr. Lewis?
22  A.  I can't recall, but it was during the
23    first week of my reporting to his crew.

94

1  Q.  Sometime in May of '05?
2  A.  Yes.
3  Q.  Did he ever make any similar statement to
4    you after that?
5  A.  Has he ever made anything similar?
6  Q.  After the time of this particular incident
7    that you say happened, did he make any
8    other kind of similar comments to you?
9        MR. ADAMS: Object to form.
10  A.  Not that I recall.
11  Q.  Okay. When we were talking about
12    harassment, you mentioned the one, he
13    would yell at you and raising your voice,
14    but you don't remember what he was saying
15    when he was raising his voice. Did he
16    ever yell or raise his voice to anybody
17    else on the crew?
18  A.  Not that I recall.
19  Q.  Nobody?
20  A.  Nobody.
21  Q.  And that's every day?
22  A.  Pretty much every day.
23  Q.  Okay. Besides yelling and raising his

95

1    voice to you, what other kind of
2    harassment were you claiming that was
3    received by you at the hands of Tommy
4    Lewis?
5  A.  My work performance. To me, trying to
6    take away from my work performance is a
7    harassing situation I have to deal with
8    every day.
9  Q.  What do you mean taking away from your
10    work performance?
11  A.  He didn't want to acknowledge me for what
12    I knew or for what -- the ways I did my
13    work. Everybody does their work
14    different. As long as you come up with
15    the same results, I think it's okay.
16    But...
17  Q.  Well, let me ask -- okay. Broach that
18    subject. What about if your supervisor
19    told you how to do a job, would you go
20    about doing it another way even though you
21    had already been instructed on how he
22    wanted it done?
23  A.  If my supervisor told me the way he wanted

96

1    the job done, I would do it that way. But
2    if I found other ways to do it better and
3    get the same results, I would try to refer
4    to my way better because it was more
5    easier for me to understand.
6  Q.  Even if the supervisor told you
7    differently?
8  A.  I won't exactly deny an order from my
9    supervisor if it wasn't dangerous.
10  Q.  Okay. So you're saying that there was no
11    times when Mr. Lewis would tell you how to
12    perform a certain task that he wanted done
13    that you went about doing it in a
14    different fashion?
15  A.  No, I didn't -- didn't do it. If
16    Mr. Lewis showed me how to do a certain
17    task, I would do it his way. But that was
18    the problem; Mr. Lewis wasn't showing me
19    how to do any tasks; he was assuming I
20    already knew how.
21  Q.  So as we sit here today, you basically are
22    saying that Mr. Lewis would -- you would
23    follow his orders and directives on all

24 (Pages 93 to 96)

LEROY WILLIAMS - 2/21/2007

97

1    occasions in the performance of your job?
2  A.    As long as it wasn't life-threatening.
3  Q.    Okay. We were talking about the
4    performance of your job. Was there any
5    other things that he harassed you in the
6    performance of your job?
7  A.    Getting out of -- the way I got other
8    people to work and understand work. He
9    was -- and I felt he would go over -- go
10    behind me and tell them not to do the work
11    the way I was telling them to do it or
12    that it wasn't needed that way. And I was
13    in a new position, and I felt that he
14    should have let me -- as long as it was
15    the right way, he should have left me to
16    do my supervisor position and he should
17    have came to me and shown me the way he
18    would like for me to give out those
19    duties, but instead, he would like
20    belittle me and take me and go over there
21    and tell them how to do the job and
22    wouldn't let me learn and do my part of
23    it.

98

1  Q.    Okay. Let me just make sure I've got your
2    pecking order quite right here.
3  A.    Okay.
4  Q.    Mr. Lewis is your boss on the job?
5  A.    That's correct.
6  Q.    And then you have some other people that
7    you're their boss on the job?
8  A.    That's correct.
9  Q.    And you think it was wrong for Mr. Lewis,
10    who was over you and over those people
11    too, to tell them or give them orders on
12    how he wanted stuff done?
13  A.    I think it was wrong for him to belittle
14    me in front of them.
15  Q.    Well, how did he belittle you other than
16    just telling people to do it a different
17    way? Did he call you names? Did he call
18    you stupid? Did he say, you're dumb; you
19    can't do this job; why are you doing it
20    this way or that? I mean, explain to me
21    what you mean by belittle.
22  A.    He would raise his voice in front of the
3    crew to me on certain acts of the job --

99

1  Q.    Give me an example, if you can, a specific
2    example.
3  A.    Right now I can't think of one.
4  Q.    Go ahead. I'm sorry. I didn't mean to
5    interrupt you. What did you mean by
6    belittle? If you can, be specific.
7  A.    He would try to make me look small in
8    front of my subordinates, and that
9    wouldn't let me have -- gain the respect
10    of my crew as their supervisor.
11  Q.    Okay. Now, what you've given me is a
12    generality. Is there any way you can put
13    some meat on what you just told me so I'll
14    understand what you're talking about?
15    It's one thing to use the word "belittle,"
16    but can you explain what you mean, how he
17    did it, what did he say, what the context
18    of the situation was? Do you understand?
19  A.    For instance, I'm out and overseeing my
20    crew. And they're working, and he steps
21    out and says, Leroy, what are you doing,
22    and starts to yelling and carrying on, and
23    there's no sense, no call for it. And the

100

1    people are looking at -- my crew is
2    looking at -- my subordinates are looking
3    at the situation like what's going on;
4    we're working and you're coming and
5    jumping on this man for no reason. In my
6    way of having things, if he felt that I
7    was -- first of all, he should have came
8    out and tried to oversee what I was doing
9    and what I was getting the crew to do.
10    But instead, he just jumped in the middle
11    and started disrupting everything.
12  Q.    Well, when he would do that, were you
13    doing exactly what he had instructed you
14    to do, or were you doing something the way
15    you thought it ought to be done?
16  A.    He never gave me any instructions of what
17    to do. He has put a job in front of me
18    when I got there and said, this is it; do
19    it.
20  Q.    Well, it sounds to me like when he would
21    come out and yell at them, he was telling
22    them to -- not to do something because it
23    wasn't the way he wanted it done.

25 (Pages 97 to 100)

LEROY WILLIAMS - 2/21/2007

101

1   A.   No, he wasn't yelling at them. He was --
2   Q.   No, he was yelling at you, but they were
3        doing something that he didn't think was
4        being done to his satisfaction, and you're
5        the supervisor, so he's yelling at you,
6        why aren't you doing this right -- I
7        guess. Is that what he was doing?
8   A.   First of all, you'd have to see. I don't
9        -- I don't know. I don't know why he was
10       doing it.
11  Q.   Okay. So any other claims that you have
12       about harassment -- and this is by
13       Mr. Lewis?
14  A.   Yes. I had a certain incident. Mr. Lewis
15       came out on a project in Talladega and he
16       started to belittle me in front of the
17       crew.
18  Q.   Okay. What do you mean by belittle?
19       Explain.
20  A.   Talk down to me.
21  Q.   Well, explain to me what you mean by that.
22            MR. ADAMS: Asked and answered.
23  Q.   In your words. I mean, you're using terms

102

1        and phrases. I'd like to know what the
2        actual action was if you can describe it.
3        Now, if you don't know, that's fine.
4            MR. ADAMS: Object to the extent
5            he's already described that
6            he was yelled at in front of
7            his subordinates for things
8            that he wasn't doing wrong.
9            MR. REDD: And we're on the
10           Talladega project now, and
11           I'd like to know what the
12           specific instance that I'm
13           hearing about was about.
14  A.   Well, I can't recall it right now, but it
15       is inside the paperwork.
16  Q.   So it's belittling you and talking down to
17       you?
18  A.   And trying to create a hostile environment
19       -- or creating a hostile environment.
20  Q.   Well, did you get along with your crew?
21  A.   Yes, I did.
22  Q.   Okay. Any other things that you believe
23       were harassment on the part of Tommy

103

1        Lewis, other than what you've already
2        described?
3   A.   I feel that when a supervisor calls you
4        out and explains what he expects of you
5        and you've done and met all of this
6        expectations, but instead of not meeting
7        his satisfaction of mind, he still has to
8        come up with something or try to create a
9        hostile environment, and then the
10       subordinate sits down and says, okay, this
11       is your floor, so you tell me what you
12       want done so I can get a very good version
13       out of you of the whole situation. And he
14       explains it to me again, and I said, okay,
15       are you done. So he has nothing else to
16       say, and I walk away from the situation.
17       And he says, don't you walk away from me.
18       And I stop immediately, go back -- and
19       it's a log in the woods, and I sit on the
20       log and I specifically tell him, okay,
21       tell me what you want again. Then he
22       explains it again, the same thing. And I
23       respond to him, okay, that's what you just

104

1        told me, and I got a clear idea of what
2        you want, so if there's nothing else, I'm
3        going to go down here and supervise my
4        crew and get this job done. And as I
5        started to walk away again, he said, don't
6        you walk away from me.
7   Q.   Did you continue to walk away?
8   A.   Did I continue to walk away? Not in that
9        sense. I stopped; I got on the phone to
10       call to Mr. Jones or Mr. Adams to let them
11       know that this situation was -- needed
12       some kind of assistance, because I'm -- I
13       actually don't know what Tommy wants done
14       after he just told me two or three times.
15       And I began to go back and do my job, and
16       he said, don't walk away from me. What is
17       he asking me to do?
18  Q.   Did you walk away from him, though?
19  A.   Did I walk away from him?
20  Q.   Uh-huh.
21  A.   No. I walked away from a hostile
22       situation.
23  Q.   You walked away from Tommy Lewis, didn't

26 (Pages 101 to 104)

LEROY  WILLIAMS - 2/21/2007

105

1    you?
2    A.    No.  I walked away from a hostile
3    situation.
4    Q.    Call it what you want, but the hostile
5    situation as you described was Tommy
6    Lewis, so you walked away from Tommy
7    Lewis?  Yes, no?
8    A.    I don't recall walking away from Tommy
9    Lewis.
10   Q.    Okay.  Any other harassment that you can
11   think of?
12   A.    No.
13   Q.    What about intimidation?  How did he
14   intimidate you?
15   A.    I never did anything right.  He never gave
16   me -- and he never -- I was intimidated by
17   me not ever doing anything right and the
18   insistence of me -- of him not ever giving
19   me directives.
20   Q.    Did he ever threaten you?
21   A.    Yes.
22   Q.    Okay.  How?
23   A.    He threatened me in ways that, if you

106

1    don't do this -- you're under a
2    probationary period, and anytime you do
3    not obey these rules, I can get it away
4    from you.
5    Q.    And you were on probation, were you not?
6    A.    But the threat -- yes, I was on probation,
7    but the threat every day, that constant
8    reminder, to me is a threatening act.
9    Q.    Well, any person on probation that doesn't
10   meet up to the standards set forth to them
11   is subject to being removed back to the
12   previous position, are they not?
13   A.    Say it again.
14   Q.    Any person on probation who does not meet
15   up to the standards set forth for the job
16   that they have just received is subject to
17   being reverted back to the previous
18   position?
19   A.    Anyone that's not meeting the standards of
20   their new position is entitled -- or --
21   subject --
22   Q.    Is subject to being reverted back to their
3    previous position.  That's just the nature

107

1    of probation, is it not?
2    A.    That stands that a person is not doing his
3    job.
4    Q.    Or doing the job satisfactorily or doing
5    the job in accordance with the supervision
6    that he's received?
7    A.    But when he's under a certain pressure, it
8    disturbs the whole probationary act.
9    Q.    So there should be no pressure to perform
10   while you're on probation?
11          MR. ADAMS:  Object to form.
12          MR. REDD:  Withdrawn.
13   Q.    Okay.  This harassment and intimidation,
14   before -- well, did you report this to any
15   supervisors above Mr. Lewis?
16   A.    I sure did.
17   Q.    Who?
18   A.    Mr. Jones.
19   Q.    Joe Jones?
20   A.    And Mr. Adams.
21   Q.    And when did you talk to Joe Jones about
22   it?
23   A.    When he brought me in to the counseling

108

1    session, which act out to be a reprimand.
2    Q.    Okay.  And Mr. Adams, when did you talk to
3    him?
4    A.    On the day that I called Mr. Adams from
5    the field when Mr. Lewis was creating a
6    hostile environment.
7    Q.    Other than those two, did you talk to
8    anybody else about it?
9    A.    I didn't feel there was anyone else to
10   talk to.
11   Q.    Okay.  Do you have any -- I notice that
12   you mentioned Mr. Arkle, who is the design
13   bureau chief.  He's the one that gave you
14   the letter that I think is one of the
15   exhibits that we have; is that correct?
16   Or at least it's over his signature?
17   A.    Yes, he's the one that authorized the
18   final acts.
19   Q.    Did you have a personal conversation with
20   him or you just received a letter?
21   A.    Just received the letter.
22   Q.    So you didn't talk to him personally at
23   all?

27 (Pages 105 to 108)

LEROY WILLIAMS - 2/21/2007

109

1  A.  No.
2  Q.  Would he have been the person responsible
3      for training you?
4  A.  Mr. Arkle?
5  Q.  Uh-huh.
6  A.  No.
7  Q.  Did Mr. Arkle harass or intimidate you?
8  A.  I feel that Mr. Arkle should have overseen
9      the situation.
10 Q.  But out in the field, did Mr. Arkle harass
11     or intimidate you at all?
12 A.  He never did come to the field.
13 Q.  And what about -- have you ever known him
14     to use any racial slurs toward you?
15 A.  Excuse me?
16 Q.  Did Mr. Arkle use any racial slurs toward
17     you?
18 A.  I never had a conversation with him.
19 Q.  What about Mr. Jones, was he responsible
20     for training you?
21 A.  Mr. Jones was an overall supervisor, and
22     he should have been responsible for making
23     sure that his employees are trained in

110

1      determining what is right under the laws.
2  Q.  Did you ask Mr. Jones to get you some
3      additional training?
4  A.  I can't recall.
5  Q.  Did Mr. Jones harass or intimidate you?
6  A.  I can't recall.
7  Q.  The last paragraph of the EEOC complaint
8      says, I believe that I was discriminated
9      against because of my race, black, and in
10     retaliation for having filed a previous
11     internal grievance based on race against
12     my supervisor.  Just to be clear, what
13     grievance are we talking about?  It's
14     singular, so I'm asking the question --
15         MR. ADAMS:  Object to form.
16 Q.  -- which grievance are you being
17     retaliated for?
18 A.  I feel I was being retaliated for the
19     Reynolds decree.
20 Q.  Okay.  The consent order in Reynolds?
21 A.  Yes.  I feel --
22 Q.  Of which you are a class member by virtue
23     of the definition of class?

111

1  A.  Yes.
2  Q.  Okay.
3  A.  I feel that partially I could be
4      discriminated against because the
5      grievance I had put in.
6  Q.  The one that you say that you gave to
7      Mr. Green?
8  A.  Yes.
9  Q.  Okay.
10 A.  And that's all I can think of right now.
11 Q.  Okay.  Neither one of the grievances that
12     I set before you that are listed as
13     Exhibits 2 and 3 are the grievances that
14     you refer to in your EEOC complaint?
15         MR. ADAMS:  Object to form.
16 A.  I don't think I referred them into my
17     final --
18 Q.  So those aren't the grievances you're
19     talking about in the EEOC; you're talking
20     about the one whenever that you supposedly
21     gave Mr. Green?
22 A.  I was speaking upon the past and the one I
23     gave to Mr. Green.

112

1  Q.  I'm confused now.  You mentioned the
2      Reynolds consent decree, which encompasses
3      all black employees, basically, of the
4      Department of Transportation, past,
5      present, and future.  Okay.  That's a
6      lawsuit.  And then you refer to the
7      grievance that you say you gave to
8      Mr. Green, and I don't think you remember
9      when.  Are there any other grievances that
10     you say are being used as the basis of
11     retaliation?
12 A.  I can't recall right now.
13 Q.  Okay.  So you're not ruling out these two
14     grievances here that I showed you?
15 A.  No, I'm not going to rule them out.
16 Q.  Okay.  Is it your position that the
17     disciplinary actions that were taken
18     against you were all false and unfounded?
19     And let me show you what I have marked as
20     Defendants' Exhibit 8.  Do you recognize
21     that document?
22         (The referred-to document was
23         marked for identification

28 (Pages 109 to 112)

LEROY WILLIAMS - 2/21/2007

113

1           as  Defendants' Exhibit No.
2           8.)
3    A.    Yes.
4    Q.    Okay.  That appears to be a reprimand for
5          tardiness issued against you by Tommy
6          Lewis; is that right?
7    A.    Yes.
8    Q.    On July 26, 2005, correct?
9    A.    Uh-huh.
10   Q.    And it references four times when you were
11         tardy.  And I'll just ask you.  On
12         Wednesday, June 1, 2005, Mr. Lewis
13         indicated that you got to work at 5:05 and
14         told you that that was unacceptable.  Were
15         you late on June 1, 2005?
16   A.    No, I was not.
17   Q.    Were you there at 5 o'clock?
18   A.    I was.
19   Q.    Occasion 2, on the very next day, June 2,
20         it says that he instructed your crew to
21         meet at the parking lot of the motel where
22         everybody was staying in Auburn and you
23         didn't report to that location and he had

114

1          to be told by another crew member where
2          you were.  Did you not report to that
3          particular location as instructed?
4    A.    I reported to the location of the job site
5          as instructed to.
6    Q.    Are you saying that Mr. Lewis instructed
7          you to report to another location other
8          than the parking lot?
9    A.    No, he said report to the job.
10   Q.    Okay.  So Mr. Lewis just made up the fact
11         that he told everybody to meet at the
12         hotel parking lot?
13   A.    I'm not going to say he made up the fact
14         that he told the other people, but he did
15         not tell me.
16   Q.    Do you know whether or not the other
17         members of the crew reported as they were
18         directed?
19   A.    I don't know.  I called for the carry-all
20         to be at the job site approximately 6:45
21         -- between 6:35 and 6:45.
22   Q.    Second page, on Monday, June 20, you
3          didn't get to the job office at Tuscaloosa

115

1          until 7:30 and you called and told Lewis
2          that your stomach was bothering you and
3          even though you told him that you were
4          sick, you went on to work the rest of the
5          day like there wasn't anything wrong.  Is
6          that factual?
7    A.    No.  On that day I got to Tuscaloosa about
8          7:14 a.m.  I had called Mr. Lewis prior to
9          that to tell him that I was not feeling
10         well that day; I was going to take a sick
11         leave day.  And Mr. Lewis instructed me,
12         well, you know you're on probation.  So
13         he's threatening me with a bad report in a
14         way.  So it would be best for you to come
15         on to work if you don't want any problems,
16         in other words, so...
17   Q.    He threatened you with a bad report in a
18         way.  What do you mean, "in a way"?  Did
19         he say, if you don't come in, you're going
20         to get suspended or written up or anything
21         like that?
22   A.    If you don't come to work, this goes
23         against your probationary appraisal.

116

1    Q.    Did you have sick days available to you?
2    A.    I sure did.
3    Q.    Did you have annual days available to you?
4    A.    I sure did.
5    Q.    Did you ask for either one?
6    A.    I was denied.
7    Q.    He said you couldn't take a sick day?
8    A.    He told me not to take off, period.
9    Q.    And Occasion 4 indicates, on July 25th you
10         didn't report to the office in Tuscaloosa
11         until 7:14, and you didn't notify me as I
12         talked with you on Southern Linc before 7
13         o'clock.  Is that factual?
14   A.    No, it's not.
15   Q.    Okay.
16   A.    To explain that one, on the way to work on
17         Highway 82 between Centerville and
18         Tuscaloosa, Mr. Lewis called me on the
19         Southern Linc cell to give me new
20         directives for that day.  I was behind the
21         carry-all, but I can't write and talk on
22         the phone at the same time, so I pulled to
23         the side of the road and got my notes out.

29 (Pages 113 to 116)

LEROY WILLIAMS - 2/21/2007

117

1     I took a note that day to what he wanted
2     me to do. And when I got through taking
3     my notes, I got back on the road and
4     proceeded to work. When I got to work, it
5     was about 7:06, 7:08, and he called I
6     guess to the office to -- he knew he was
7     making me late by calling me and giving me
8     that information on the phone, but he
9     called to the office and asked Dodd Austin
10    what time I made it to the office. And
11    the carry-all got there about 7 o'clock; I
12    got there about 7:08, and he wrote me up
13    for being late.
14  Q.  But you didn't call him when you knew you
15    weren't going to be there at 7 o'clock,
16    did you?
17  A.  I was talking on the phone with him when
18    he disturbed me.
19  Q.  When you disturbed me?
20  A.  Yes. I was on the way to work.
21  Q.  But you didn't go, I'm going to be about
22    five minutes late, boss, because I had to
23    stop the car and write down what you told

118

1     me. You didn't do that, did you? Well,
2     did you, yes or no?
3  A.  I don't recall.
4  Q.  Did you ever have a discussion with
5    Mr. Lewis regarding your authority to let
6    people off without his approval?
7  A.  Yes, I did.
8  Q.  Did you understand that he was supposed to
9    be notified and people were supposed to
10    have his approval before you let them off?
11  A.  No.
12  Q.  Okay. You didn't understand that was the
13    way he wanted things done?
14  A.  Not exactly, no.
15  Q.  Do you remember letting some of your crew
16    off at 1 o'clock and then telling
17    Mr. Lewis you had let them off at 2
18    o'clock?
19  A.  I remember telling them they could leave
20    before 2 o'clock because they worked
21    through their lunch hour and worked over
22    the prior -- the day before. And on a
23    usual day like that, with Mr. Lewis and

119

1     all the other crews, to get our comp time,
2     instead of putting it on paper, in a way,
3     we were to get off a little earlier so the
4     people could be commended for their time.
5  Q.  Did Mr. Lewis give you permission to allow
6    the people to go early that day?
7  A.  Mr. Lewis wasn't there. I was in charge.
8  Q.  Was Mr. Lewis available by phone?
9  A.  No.
10  Q.  Where was Mr. Lewis?
11  A.  I have no idea.
12  Q.  Did you have a cellular phone, Southern
13    Linc, you could have buzzed him to say,
14    boss, can I let the guys go at 1:45?
15  A.  Not that I recall. He wasn't at work.
16  Q.  Okay. Did Mr. Lewis ever discuss with you
17    the proper procedure for setting radical
18    points around the interchanges?
19  A.  Explain that again.
20  Q.  Do you know what radical points are?
21  A.  I'm familiar with the term.
22  Q.  Okay. Did you ever have a discussion with
23    Mr. Lewis about how you should perform

120

1     that particular function?
2  A.  Not directly.
3  Q.  He never discussed with you how he wanted
4    you to do that particular task?
5  A.  No, he was never there to discuss it.
6  Q.  Okay. Well, where is Mr. Lewis all this
7    time when you're working?
8  A.  He's in the office or somewhere.
9  Q.  Okay. What's he doing?
10  A.  I have no idea.
11  Q.  Has he got other jobs that he did, tasks,
12    functions, crews?
13  A.  I have no idea.
14  Q.  Okay.
15  A.  But I can assure you he wasn't there
16    assisting.
17  Q.  When you first came on the job, did you
18    tell Lewis that you had been a data editor
19    and knew a good bit about Terramodel?
20  A.  I recall telling Mr. Lewis and Mr. Lewis
21    was aware of my prior experience as a data
22    editor. I sat in that position but really
23    was not trained in that position to -- to

30 (Pages 117 to 120)

LEROY WILLIAMS - 2/21/2007

121

```
1       be efficient.
2   Q.  Did you exaggerate how much you knew about
3       Terramodel when you first came on the job?
4   A.  No. I know a good bit about Terramodel.
5   Q.  Okay. Did Mr. Lewis ever have to give you
6       any instructions on how to draw a line on
7       Terramodel or how to load an image file?
8   A.  How to draw a line and load an image file?
9   Q.  Or did you already know how to do that?
10  A.  I knew how to do it in the prior menu. We
11      had updated menus, so I wasn't familiar
12      with it, so I asked Mr. Lewis to assist me
13      to give me a briefing of the new menus
14      that was given to the department that I
15      hadn't seen.
16  Q.  Okay. He showed you how to do that,
17      didn't he?
18  A.  No, he didn't.
19  Q.  Do you know how to subtract and add
20      angles?
21  A.  Yes, I do.
22  Q.  Do you know how to convert a bearing on an
23      azimuth?
```

122

```
1   A.  Yes, I do.
2   Q.  Did you know how to do that before you
3       came to work as a TT?
4   A.  Yes.
5   Q.  Are you proficient in --
6           MR. ADAMS: It's part of the
7               examination.
8           MR. REDD: Well, there was a bar
9               exam too. Had nothing to do
10              with the practice of law.
11  Q.  Are you proficient in math?
12  A.  To my best knowledge.
13  Q.  Yes?
14  A.  To my best knowledge.
15  Q.  Let me ask you if you recognize this
16      document.
17          (The referred-to document was
18              marked for identification
19              as Defendants' Exhibit No.
20              9.)
21  A.  Yes.
22  Q.  Is that a counseling session of July 28,
3       2005 apparently issued by Tommy Lewis
```

123

```
1       Number 9?
2   A.  A reprimand session.
3   Q.  Huh?
4   A.  A reprimand session.
5   Q.  A what?
6   A.  Reprimand.
7   Q.  Okay. I don't see reprimand on here; I
8       see counseling.
9   A.  That's what they gave me in that session.
10  Q.  Okay. Well, Mr. Lewis didn't do it, did
11      he? I mean, this document itself...
12  A.  Say that again.
13  Q.  This document itself does not indicate a
14      reprimand that I can tell. There may be
15      another one.
16  A.  Yes. On this particular -- supposed to
17      have been counseling session; it was
18      issued a reprimand.
19  Q.  Okay. You got a reprimand later, I think,
20      did you not, from Mr. Lewis? Let me show
21      you.
22  A.  I think this one --
23  Q.  10?
```

124

```
1   A.  -- the one that is dated July 26th should
2       go hand in hand with the one that's dated
3       July 28th.
4   Q.  Okay. What I see is another -- it's
5       written as counseling session.
6   A.  Actually, they was going to give me this,
7       I think that day, but they held off giving
8       it to me that day for some odd reason and
9       gave it to me later on.
10  Q.  Okay. But that does not indicate a
11      reprimand at that point in time,
12      Defendants' Exhibit --
13  A.  It states reprimand for I think tardiness.
14  Q.  No, that's not what I'm talking about.
15      I'm talking about the one I think he has
16      in his hand from Tommy Lewis.
17  A.  That should be together. I don't know why
18      they've got it separate, but --
19  Q.  Oh, those are two -- they're the same
20      document?
21  A.  Pretty much.
22          MR. ADAMS: Let the record
23              reflect he's referring to
```

31 (Pages 121 to 124)

125

1      Exhibit 8 and -- have you
2      not marked this one yet?
3      MR. REDD: I haven't marked it,
4      no.
5      MR. ADAMS: Okay.
6      MR. REDD: We'll call it 9, but
7      your testimony is that those
8      two documents were together?
9  A.  Yes.
10 Q.  And Document Number 10, let me ask you if
11     you recognize that document.
12     (The referred-to document was
13     marked for identification
14     as Defendants' Exhibit No.
15     10.)
16 A.  On July the 28th?
17 Q.  Yeah. That appears to be another
18     counseling session that's signed by
19     Mr. Jones.
20 A.  Yes. I'm trying to remember the exact
21     date -- the exact -- what happened on this
22     one.
23 Q.  I guess I'm asking did you get a copy of

126

1      that particular document.
2  A.  I got copies of all -- on this I think was
3      September -- of all these -- September 1st
4      or somewhere in there -- the day before --
5      the week before they demoted me is when I
6      got these pages.
7  Q.  But you met with Jones, correct?
8  A.  Yes.
9  Q.  And you met with Tommy Lewis?
10 A.  Yes.
11 Q.  And y'all -- they went over -- have you
12     had time to review those documents at all?
13 A.  Yes, I've looked over them.
14 Q.  Did they go over those things that are
15     listed? I'm not asking whether you agree
16     with them or not. Did they go over those
17     items that are listed on those papers?
18     MR. ADAMS: Object to form as to
19     the extent of the time they
20     went over it.
21 Q.  Do you understand my question?
22 A.  Yes, I understand.
23 Q.  Did Tommy Lewis go over with you or

127

1      discuss with you those items that are on
2      the paperwork that he prepared?
3  A.  Not that I recall.
4  Q.  Okay. Did Joe Jones go over with you
5      and/or discuss with you those items that
6      are on the document that he signed?
7  A.  Not that I recall, he didn't.
8  Q.  Okay. Show you Defendants' Exhibit 11,
9      ask you if you recognize that document.
10     (The referred-to document was
11     marked for identification
12     as Defendants' Exhibit No.
13     11.)
14 A.  I remember going over this.
15 Q.  Okay. And that's a reprimand for
16     insubordination?
17 A.  Correct.
18 Q.  And although it deals with other items, it
19     also references the hostile situation
20     which you allege occurred between you and
21     Tommy Lewis where you were instructed not
22     to walk away?
23 A.  Yes.

128

1  Q.  Also discusses the fact too that Mr. Lewis
2      had some problems or concerns that your
3      crew was not getting and making the first
4      setup until later than other crews who may
5      be operating and doing similar type jobs.
6      Did he have that discussion with you too?
7  A.  No, he did not have that discussion with
8      me.
9  Q.  He never talked to you about the fact that
10     your crew that you were supervising was
11     late in getting their morning setups done?
12 A.  No. On that day -- August the 11th is
13     supposedly the day he came out into the
14     field, and this is what he wrote up as
15     what happened. But prior to that,
16     Mr. Lewis and them had a meeting on August
17     10th in Montgomery, and he had to take --
18     they took the carry-all that we use at
19     work in the field to the -- he left
20     instructions for me to take it to the
21     division office that day, that morning.
22     So I had to wait for the division
23     supervisor to get there that morning,

32 (Pages 125 to 128)

LEROY  WILLIAMS - 2/21/2007

129

1  which he got there approximately -- about
2  8:30 or so.  And when he got there, then
3  we had to get the other vehicle and
4  transfer all of the other equipment in the
5  vehicle we had to work with that day and
6  leave our vehicle there at the shop to get
7  serviced.  After we got all that situated,
8  it was a little after 8.  And on the way
9  to the field, we usually take a stop,
10  somebody get a biscuit or a drink going to
11  the job.  And we did that little morning
12  stop and went on to the job and proceeded
13  to work around -- I guess we got there
14  around 9 that morning -- and we went into
15  the field.  It took us about 15 minutes or
16  so to walk out there in the field and get
17  set up.  Okay.  That particular day we had
18  a setup, but we didn't have any line or
19  anything cut, so I supervised the crew
20  along with myself to cut the line in the
21  woods so we could have our setups and
22  everything to work off of.  So that took
23  approximately a few hours.  In between

130

1  that time, it started to rain, so on
2  occasion when it rains, we take down our
3  instruments and cover our instruments up
4  until the rain breaks.  Well, that day the
5  rain went throughout the day, so instead
6  of me letting the crew do what they wanted
7  to do, I took the responsibility and took
8  the crew back to the office and proceeded
9  to give them some training on the
10  instruments and electronic equipment so
11  that they can be familiar with that on a
12  daily basis so I wouldn't have to come in
13  and do it every day; I could show somebody
14  else how to move up.  So I took the
15  responsibility to do that the rest of the
16  day.
17  Q.  What instruments did you give them
18  training on?
19  A.  Electronic level and the total station and
20  the computer that -- where we download the
21  information into -- into the Terramodel
22  software.
23  Q.  So you felt proficient in those particular

131

1  skills?
2  A.  Evidently they felt proficient enough, but
3  they state I couldn't do it.
4  Q.  Well, I was just asking you, though, you
5  felt proficient enough in those particular
6  areas to try to train somebody else on how
7  to do it?
8  A.  That was my job.
9  Q.  Okay.  So you didn't need additional
10  training in that.  Okay.  So Mr. Lewis's
11  concern or complaint that it was taking
12  you too long to get set up in the morning
13  was unfounded?
14  A.  Yes, because I don't set up; I supervise.
15  Q.  Well, you're responsible for the setup,
16  though.  Your crew may set it up, but
17  that's on you if it's not done properly
18  and correctly and timely?
19  A.  I would suppose.
20  Q.  Well, if not you, who?
21  A.  The one that's giving the directives, I
22  guess, Mr. Lewis.
23  Q.  Well, first it comes to you and then it

132

1  might come to him.  That's the way it
2  works; it flows up.  If you're not doing
3  your job, it reflects on him; if he's not
4  doing his job, it reflects on his
5  supervisor.  Isn't that the way it works?
6  A.  Sometimes.
7  Q.  If your crew is not doing their job
8  correctly, it starts with you, though,
9  right?
10      MR. ADAMS: Object to form.
11      MR. REDD: Withdrawn.
12  Q.  Did Mr. Lewis ever discuss with you that
13  you should manage your time better with
14  your crew?
15  A.  To me he did not.  He wrote that he did,
16  but to me he did not.
17  Q.  At anytime during your discussion with
18  Mr. Lewis, did you become argumentative
19  with him?
20  A.  When it comes to Mr. Lewis about being
21  argumentative, I spoke my part of the
22  situation, but I was never argumentative
23  about it.

33 (Pages 129 to 132)

LEROY WILLIAMS - 2/21/2007

133

1  Q.  Did you ever raise your voice?
2  A.  Not in an insubordinate way, no.
3  Q.  Did you ever raise your voice to
4      Mr. Lewis?
5  A.  I can't recall.
6  Q.  Going back to previous discussions about
7      the walking away from Mr. Lewis, did I
8      hear you correctly that you told him if he
9      didn't have anything else to say, you were
10     going back to work? Is that basically
11     what you told him?
12 A.  If he didn't have any more directives, I'm
13     going to go down here and finish working.
14 Q.  This is Document Number 12, which I
15     purport to you is a copy of the complaint
16     that we received and were served with in
17     connection with this case. Did you have
18     an opportunity to review and read that
19     complaint before it was actually filed?
20         (The referred-to document was
21         marked for identification as
22         Defendants' Exhibit No. 12.)
23 A.  I read it, yes.

134

1  Q.  Couple of questions. Paragraph 10, under
2      -- it's on the second page. It says, in
3      December 2003, Mr. Williams filed a
4      grievance contending that he had been
5      treated unfairly by his supervisor with
6      respect to job assignments and other
7      issues because of his race. Tell me which
8      grievance we're talking about. Is this
9      the one with Ron Green, or is it one of
10     the other two that are before you today?
11 A.  The grievance that --
12 Q.  That's referenced in your complaint?
13 A.  -- that I spoke upon was partly the one
14     where Mr. Lewis stated to me he didn't
15     feel that I belong in my position because
16     it was given to me because of a lawsuit.
17 Q.  Okay. And that's in December of 2003.
18     Mr. Williams filed a grievance contending
19     he had been treated unfairly by his
20     supervisor with respect to job assignments
21     and other issues because of his race. And
22     you're saying now that that's involving
23     Tommy Lewis?

135

1  A.  I have to go back and look at this date.
2      December 2003.
3  Q.  Do you stand by that date as the date you
4      filed a grievance?
5  A.  I have to look and check, see if we're
6      talking about the same grievance.
7  Q.  I don't know. You tell me. I'm just
8      reading the complaint.
9  A.  I'm basically stating there that inside
10     the grievance that I filed -- and probably
11     -- if I can recall, it's in all of them
12     that I was treated unfairly as far as my
13     race.
14 Q.  Well, do you understand my question,
15     though? This averment in your complaint
16     which you say you reviewed and which is
17     filed with the court, it says in December
18     2003, Mr. Williams filed a grievance
19     contending that he had been treated
20     unfairly by his supervisor. I just want
21     to know what grievance we're talking
22     about. That's the simple question.
23 A.  The grievance of Mr. Reynolds.

136

1  Q.  The lawsuit? Do you understand the
2      difference between a lawsuit and a
3      grievance?
4  A.  The grievance that I filed -- do you have
5      the one I filed --
6  Q.  I have the two grievances that you have
7      filed with the Department of
8      Transportation, sir, right in front of
9      you.
10         MR. ADAMS: Object to form.
11         Object to the extent it's a
12         mischaracterization of
13         what's been filed. It's
14         already been asked and
15         answered.
16         MR. REDD: Well, he can answer my
17         question as to what item --
18         MR. ADAMS: And he's already
19         stated that he's relying on
20         all the grievances that he's
21         filed in his complaint.
22         MR. REDD: So he's changing the
23         nature of his complaint?

34 (Pages 133 to 136)

LEROY WILLIAMS - 2/21/2007

137

1    MR. ADAMS: He's already stated
2        that he contends that he's
3        been retaliated against
4        based on all three of his
5        grievances.
6    MR. REDD: So then Paragraph 10
7        is actually a misquote, a
8        misstatement of fact?
9    MR. ADAMS: It appears that there
10       may be more than one
11       grievance that Mr. Williams
12       is relying upon.
13   Q.   Is that correct, Mr. Williams? Is that
14       your statement?
15   A.   To my best knowledge.
16   Q.   Okay. Paragraph 13 on Page 3, you're
17       talking about similarly situated employees
18       who did not file grievances have not been
19       demoted or disciplined. Can you attach a
20       name to any of the similarly situated
21       employees who had not filed grievances
22       that were treated differently than you?
23   A.   William McKinnon (phonetic).

138

1    Q.   And when you name them, would you please
2        specify their race and the nature of the
3        grievance, if you know, and their job
4        classification?
5    A.   William McKinnon, he's a white male. He
6        was promoted to the job classification
7        that they demoted me from. And as far as
8        my knowledge, they got him through all the
9        steps to become a transportation
10       technologist.
11   Q.   Who was his supervisor?
12   A.   William's supervisor? I don't know at the
13       time.
14   Q.   When was he promoted to TT? Was it the
15       same time you were?
16   A.   He was promoted when I was demoted.
17   Q.   Okay.
18   A.   Mr. Chan Granthem was one of the
19       subordinates that I was training. They
20       temporarily put him into the position that
21       I was demoted from and they recently
22       promoted him to the transportation
3        technologist position. He's a white

139

1        employee.
2    Q.   Okay. Who else?
3    A.   Scott Blake. He's a white employee that
4        was promoted to the transportation
5        technologist position during -- right
6        before the period I was promoted, which I
7        know he had problems, but he was never
8        demoted; he was given the privilege to --
9        of a second chance and some other ways to
10       hold his position.
11   Q.   Let me back up to Granthem. Who was
12       Granthem's supervisor?
13   A.   Who was his supervisor?
14   Q.   Or is?
15   A.   I was his supervisor when I was there.
16   Q.   Who is his supervisor now?
17   A.   I have no idea.
18   Q.   Do you know who Blake's supervisor is?
19   A.   I have no idea now.
20   Q.   Okay. That's three people. Anybody else?
21   A.   There was Stacy Nichols, Troy Nichols,
22       William Dodd Austin, and that's all I can
23       recall right now.

140

1    Q.   And all these people were promoted to the
2        TT position?
3    A.   Yes, they all...
4    Q.   And none of them to your knowledge had
5        filed any kind of grievance?
6    A.   No.
7    Q.   Okay. Let's go on to the next phase of
8        that statement. What white people who
9        have committed similar infractions to you
10       were not demoted or disciplined? Some of
11       these folks?
12   A.   Some of them.
13   Q.   Which ones?
14   A.   I know Scott Blake, Dodd Austin.
15   Q.   Okay.
16   A.   William McKinnon and Chan Granthem -- or
17       Chad. Chad Granthem.
18   Q.   And all of these people have committed
19       these very infractions and were not
20       punished or demoted?
21   A.   That's correct.
22   Q.   Do you know the nature of the disciplinary
23       infractions that Scott Blake committed?

35 (Pages 137 to 140)

LEROY WILLIAMS - 2/21/2007

141

1  A.  Scott needed help on supervising, the same
2      -- some of the same situations I was in.
3  Q.  But that's not a disciplinary infraction,
4      though; that's just a --
5  A.  I was disciplined for it.
6  Q.  Well, you were disciplined for
7      insubordination and tardiness.
8  A.  And I was demoted.
9  Q.  Well, I'm going to ask you this:  Was
10     Scott Blake disciplined or do you know of
11     any disciplinary issue he had for any kind
12     of infractions?
13 A.  I know he argued with his supervisor,
14     Mr. Willy Primus.
15 Q.  Okay.
16 A.  I know he didn't follow Mr. Primus's
17     directives.
18 Q.  And you don't believe he was disciplined
19     for any of that?
20 A.  I know he wasn't.
21 Q.  What about Dodd Austin?
22 A.  Dodd, right now, would call in, and he
23     never got written up for tardiness.

142

1  Q.  He would call in?
2  A.  Yes, he would call in and he wasn't coming
3      that day, on a certain day.  And he would
4      use his time and he was given the
5      privilege to use his time in whatever the
6      situation was.
7  Q.  But that's not truly an infraction, is it?
8      If you call in and you're approved for
9      leave, that's not an infraction?
10 A.  Well, I called in and I was denied
11     approval.  So to me that's an infraction
12     because --
13 Q.  But you understand my point, though.  If
14     you call in -- and even though you say
15     it's unequal treatment to you, but it's
16     not an infraction, is it, with Austin, as
17     long as he called in properly and took
18     leave?
19 A.  Well, I thought I did.
20 Q.  Well, you may have.
21 A.  Okay.
22 Q.  But what he did was not an infraction in
23     the true sense?

143

1  A.  On my write-up it says tardiness, and they
2      wrote me up for it and gave me a reprimand
3      for continuance -- or tardiness of some
4      sort.  So evidently, it is some kind of
5      infraction.
6  Q.  Okay.  So you're saying that when Austin
7      called in and took sick leave, that was an
8      infraction.  What about McKinnon?
9  A.  When McKinnon called in.
10 Q.  Same thing?
11 A.  Yes.
12 Q.  He would call in; they'd let him have
13     leave, but they wouldn't let you have
14     leave when you called in?
15 A.  No.
16 Q.  And Grantham, same kind of thing?
17 A.  Same thing.  Grantham was there when I was
18     there at 5 o'clock in the morning and I
19     had to wait 20 or 30 minutes on Grantham.
20     And I spoke to Tommy about it, but Tommy
21     wouldn't -- Tommy said I've got, you know,
22     he can handle this.
23 Q.  And you're the supervisor?

144

1  A.  And I'm the supervisor.
2  Q.  Could you have written him up?
3  A.  Could I have written him up?
4  Q.  Yeah, Grantham, for being late?
5  A.  I really don't know.
6  Q.  As a supervisor, you don't know?  Okay.
7      Who else besides those four that you've
8      listed white employees were treated
9      differently?  Anybody else?
10 A.  Besides those I listed?
11 Q.  Uh-huh.
12 A.  I can't recall right now.  I'm quite sure
13     there is some more, but I can't recall
14     right now.
15 Q.  If you happen to recall their names, would
16     you tell your lawyer so he can tell me so
17     I'll know?
18 A.  Yes, I will.
19 Q.  Okay.  Have you identified to me all the
20     persons within the Department of
21     Transportation that discriminated against
22     you --
23 A.  That I can recall.

36 (Pages 141 to 144)

LEROY WILLIAMS - 2/21/2007

145

1  Q.  -- because of your race?
2  A.  All that I can recall.
3  Q.  And same question, can you -- have you
4      given me all of the names of the people
5      within the DOT who might have retaliated
6      against you for filing grievances?
7  A.  All that I can remember.
8  Q.  Okay. Part of your request for relief in
9      your complaint, Paragraph 2 under, I think
10     relief, last page, I believe. Do you want
11     to be reinstated? In other words, do you
12     want to be put back as a tech,
13     transportation tech?
14 A.  Technologist?
15 Q.  Yes.
16 A.  Yes, I do. I think I deserve that
17     position or better.
18 Q.  Or better? What do you mean by that?
19 A.  Technologist senior.
20 Q.  Are you qualified at this point in time
21     for that job?
22 A.  I was stated to be qualified for a
23     management position.

146

1  Q.  Are you qualified for that position at
2      this time, yes or no?
3  A.  Yes, I am.
4  Q.  You want back pay. Are you talking about
5      the difference between your TT pay and
6      your present pay?
7      MR. ADAMS: Object to the extent
8          it calls for a legal
9          conclusion. You can answer
10         the question.
11 A.  I need more details on that part.
12 Q.  Well, what's the difference in the pay
13     scale between what you were receiving as a
14     TT and what you received as an EA?
15 A.  What's the difference?
16 Q.  About $25 biweekly?
17 A.  I haven't really sat down and gathered all
18     the differences, but you're in the right
19     percentage.
20 Q.  Okay. Did you get an appraisal this year
21     for your EA II/III?
22 A.  Yes, I did.
3  Q.  And did you get a step raise?

147

1  A.  Yes, I did.
2  Q.  Okay. Do you remember what percentage
3      step raise it was?
4  A.  Exceeds standards.
5  Q.  And did you also get a cost of living
6      increase as other State employees may have
7      gotten this year?
8  A.  Yes, I have.
9  Q.  Okay. You're asking for compensatory
10     damages. What are you asking for by way
11     of compensatory damages?
12 A.  Sort of explain the compensatory.
13 Q.  Well, I don't know. I didn't write it.
14     MR. ADAMS: Object to the extent
15         it calls for a legal
16         conclusion.
17 Q.  You put it down in your complaint. I just
18     want to know what other damages that
19     you're claiming. I think you mentioned
20     lost seniority. Is that something you
21     want? How does that work?
22 A.  We're going to have to work that one out.
23     Because I lost the position; I lost the

148

1      two steps that I gained back then; I lost
2      what was given upon that two step plus a
3      possible -- well, the cost of living plus
4      the -- well, I got the cost of living for
5      what I'm making now, but I didn't get it
6      for what I should have been making back
7      then I would say.
8  Q.  At what point on an evaluation does one
9      become entitled to a raise? Do you
10     understand? What do you have to get on an
11     evaluation in order to get any kind of a
12     raise at all?
13 A.  To get any kind of raise? I don't know
14     exactly right now.
15 Q.  Okay. If you just meet standards, would
16     you get a raise?
17 A.  I'm quite sure you would get a raise on
18     meets standards.
19 Q.  Do you know what percentage of a raise you
20     might get for a meets standards?
21     MR. ADAMS: Object to the form.
22 A.  No, I don't.
23 Q.  And you wouldn't know as far as exceeds

37 (Pages 145 to 148)

LEROY WILLIAMS - 2/21/2007

149

1   standards either, would you?
2   A.   No.
3   Q.   Or consistently exceeds?
4   A.   The consistently exceeds -- the exceeds
5        standards is a different situation because
6        I've always exceeded, so -- pretty much,
7        until my demotion, pretty much on the TT
8        and the -- on the other incident I guess
9        with Mr. Jones, but prior to the TT.
10  Q.   Are you alleging that you've suffered any
11       kind of mental problems because of this
12       demotion, if you want to call it that?
13  A.   Yeah, every day.
14  Q.   Explain to me what mental problems you've
15       been experiencing.
16  A.   I've got high blood pressure, which leads
17       me to try to conceal myself.
18  Q.   How long have you had high blood pressure?
19  A.   How long have I had it?  I've been dealing
20       with it ever since the demotion.
21  Q.   Have you had no history of high blood
22       pressure before you were demoted?
23  A.   None whatsoever.

150

1   Q.   Were you being treated by a physician for
2        any other problems before the demotion?  I
3        think you had back trouble.
4   A.   And that was -- that was all I can recall.
5   Q.   Okay.  But you had no high blood pressure
6        at all?
7   A.   No.
8   Q.   Do you have any history of high blood
9        pressure in your family?
10  A.   I think my mother has high blood pressure.
11       She takes high blood pressure medicine, so
12       I'm quite sure she does.
13  Q.   What about your father?
14  A.   I don't recall him having it.
15  Q.   And what age are you now?  Remind me.
16  A.   I'm 41.
17  Q.   Do you take any kind of medication for
18       high blood pressure?
19  A.   No, not for high blood pressure.  He put
20       me on a medication that --
21  Q.   You're on Prozac, but I mean --
22  A.   Prozac.  He said that the Prozac would
23       keep me calm so my pressure would stay

151

1        normal.
2   Q.   How often do you check your blood
3        pressure?
4   A.   I try to check it three, four times a
5        month.
6   Q.   All right.  When you say high blood
7        pressure, what's your average
8        systolic/diastolic blood pressure when you
9        check it?
10       MR. ADAMS:  Object to form.
11  Q.   Do you understand what I'm asking?
12  A.   Yes, I know what you're asking.
13  Q.   140 over 80; 160 over 80?
14  A.   Higher, but I can't remember exactly.  I
15       know it's higher than that.
16  Q.   When was the last time you checked your
17       blood pressure?
18  A.   About two weeks ago.
19  Q.   What was your reading?
20  A.   I can't recall the exact reading.  It was
21       a little high.
22  Q.   Okay.  Now, this doctor that you're going
23       to that prescribed Prozac for you, I think

152

1        -- I think you said he was a family
2        practitioner?
3   A.   Yes.
4   Q.   Okay.  Are you seeing any mental health
5        specialists?  And by that I mean a
6        psychologist or a psychiatrist or someone
7        who --
8   A.   Not at the time.
9   Q.   Have you ever, since your demotion or
10       during the time that you were a TT, been
11       seen by a psychiatrist or a psychologist?
12  A.   Not that I can recall.
13  Q.   Have you been seen by any other mental
14       health professional?
15  A.   Not that I recall.
16  Q.   Well, you would know if you were going to
17       a shrink, wouldn't you?
18  A.   Yes, I would, I guess.
19  Q.   Or a psychologist too, wouldn't you?
20  A.   A mental institution?
21  Q.   No, a psychologist?
22  A.   I haven't went to anybody.
23  Q.   So the only doctor you've really seen is

38 (Pages 149 to 152)

153

your family practitioner?
2  A.  That's correct, other than the --
3  Q.  Other than your doctors for your back?
4  A.  Yes.
5  Q.  Which is totally unrelated to this
6      particular lawsuit?
7  A.  Right. And the spider bite, which is
8      unrelated to it.
9  Q.  And what are we talking about, loss of
10     benefits and loss of pension? Are you
11     just talking about getting the money added
12     back into your pension fund so it'll
13     increase your pension amount when you
14     retire?
15  A.  Pretty much.
16         MR. REDD: Give me a minute or
17            two.
18         (Brief recess.)
19         MR. REDD: I'm done.
20         MR. ADAMS: No questions.
21
22         (The deposition of LEROY
23            WILLIAMS was concluded at

154

1      approximately 1:11 p.m., on
2      February 21, 2007.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

155

1         * * * * * * * * * * *
2         REPORTER'S CERTIFICATE
3         * * * * * * * * * * *
4
5  STATE OF ALABAMA
6  COUNTY OF MONTGOMERY
7
8         I, Nicole Paulk, Court Reporter
9  and Notary Public in and for the State of
10 Alabama at Large, do hereby certify that
11 the foregoing is a true and accurate
12 transcript of the proceedings as taken
13 stenographically by me at the time and
14 place aforementioned.
15         This 28th day of February 2007.
16
17
         Nicole Paulk
18       Reporter and Notary Public
         State of Alabama at Large
19
20
21
22
23

39 (Pages 153 to 155)

LEROY  WILLIAMS - 2/21/2007

1

| A | | | | |
|---|---|---|---|---|
| **abilities** 36:9 | 124:22 125:5 | 119:5 | 45:16 | 151:11,12 |
| **ability** 33:21 | 126:18 132:10 | **amend** 34:21 | **appraisal** | **asks** 20:6 45:18 |
| 78:20 | 136:10,18 | **amount** 66:9 | 115:23 146:20 | **assigned** 19:6 |
| **able** 36:12 86:22 | 137:1,9 146:7 | 153:13 | **appreciate** 77:3 | 34:11 |
| 88:8 | 147:14 148:21 | **Andrew** 2:11 | **approval** 118:6 | **assignment** 57:8 |
| **absence** 65:8 | 151:10 153:20 | **Andy** 5:12 34:13 | 118:10 142:11 | 69:3 |
| **accelerated** 45:6 | **add** 121:19 | 34:19 | **approved** 142:8 | **assignments** |
| **access** 23:11 | **added** 153:11 | **and/or** 43:23 | **approximately** | 134:6,20 |
| **accident** 50:1,3 | **additional** 88:19 | 45:7 127:5 | 7:7 12:11 29:9 | **assist** 121:12 |
| **accounts** 39:20 | 89:6 90:12,13 | **angles** 121:20 | 43:2 114:20 | **assistance** |
| **accurate** 60:21 | 110:3 131:9 | **annotate** 55:9 | 129:1,23 154:1 | 104:12 |
| 155:11 | **address** 6:21 9:2 | **annual** 64:21 | **April** 4:3 | **assistant** 2:12,13 |
| **acknowledge** | 13:1 | 116:3 | **area** 8:19 37:19 | 37:15,16 |
| 95:11 | **Adenrele** 74:14 | **answer** 5:20 | 37:22,23 68:5 | **assisting** 120:16 |
| **act** 40:8 45:20 | **adequate** 52:17 | 20:19 21:9 | 71:6,11 82:5 | **associate** 84:7 |
| 47:8 52:15 | 52:20,23 | 31:15 46:17 | **areas** 69:15 80:7 | **associated** 81:5 |
| 106:8 107:8 | **Adjust** 88:10 | 48:21 79:1 | 131:6 | **assume** 5:21 |
| 108:1 | **advantage** 42:19 | 91:15,20,21 | **argued** 141:13 | **assumed** 89:22 |
| **action** 1:5 39:7 | **advise** 14:9 | 136:16 146:9 | **argumentative** | 90:1,9 |
| 40:6 45:8 | **affirmative** 45:8 | **answered** 46:19 | 132:18,21,22 | **assuming** 13:23 |
| 102:2 | **aforementioned** | 101:22 136:15 | **Arkle** 4:5,11 | 19:7 96:19 |
| **actions** 112:17 | 155:14 | **answering** 5:22 | 56:20 73:23 | **assure** 120:15 |
| **activities** 72:4,5 | **afternoon** 30:18 | **anxiety** 11:18 | 74:12 108:12 | **as-needed** 82:9 |
| **acts** 45:15 46:12 | 65:20 66:13 | **anybody** 24:6,7 | 109:4,7,8,10 | 82:11 |
| 47:14 48:13 | **afternoons** 72:8 | 24:12 80:14 | 109:16 | **Atlanta** 17:11 |
| 98:23 108:18 | **afterward** 72:5 | 89:5 90:17 | **armory** 19:11 | **attach** 137:19 |
| **actual** 69:17 | **age** 5:7 8:4 | 94:16 108:8 | 19:12 | **attendance** 45:5 |
| 82:3 84:9 | 150:15 | 139:20 144:9 | **Army** 18:5,6,17 | 64:6,16 |
| 102:2 | **ago** 27:10 40:18 | 152:22 | **asked** 6:1 12:4 | **attention** 11:21 |
| **Adams** 2:4 | 51:2 151:18 | **anymore** 56:12 | 25:16,18,23 | **attorney** 2:12 |
| 20:18 21:5 | **agree** 126:15 | **anytime** 106:2 | 29:3 36:22 | 14:9,18 20:9 |
| 23:3 25:7 | **agreed** 3:3 | 132:17 | 46:19 55:16 | 21:2 22:13 |
| 26:22 31:13 | **agreeing** 60:23 | **anyway** 35:8 | 81:19 83:4 | 23:23 24:1 |
| 34:13,19 35:1 | **ahead** 99:4 | 54:14 | 89:9,11 101:22 | **attorney-client** |
| 46:5,7,15,19 | **Alabama** 1:1,7,9 | **apparently** | 117:9 121:12 | 21:7 |
| 46:22 48:17 | 1:19,21 2:8,14 | 122:23 | 136:14 | **Auburn** 8:19,19 |
| 51:16 53:5 | 2:17 3:8 4:13 | **APPEARAN...** | **asking** 5:16 6:7 | 113:22 |
| 54:10 65:13 | 4:20 5:1 6:23 | 2:1 | 23:8 31:17 | **August** 5:4 15:9 |
| 67:17 77:2 | 10:12 155:5,10 | **appears** 43:6 | 35:9 47:6,11 | 15:10 37:8 |
| 81:9 91:14 | 155:18 | 44:15 45:1 | 47:19 65:10,15 | 128:12,16 |
| 94:9 101:22 | **ALDOT** 64:4 | 56:19 59:15,19 | 65:17 66:2 | **Aunts** 11:9 |
| 102:4 104:10 | **allegations** | 113:4 125:17 | 69:23 73:19 | **Austin** 26:10 |
| 107:11,20 | 76:22 | 137:9 | 75:21 90:17 | 61:11,12 80:12 |
| 108:2,4 110:15 | **allege** 127:20 | **applied** 15:13 | 104:17 110:14 | 117:9 139:22 |
| 111:15 122:6 | **alleging** 149:10 | **appointed** 93:1 | 125:23 126:15 | 140:14 141:21 |
| | **allow** 45:14 | **appointing** | 131:4 147:9,10 | 142:16 143:6 |

LEROY WILLIAMS - 2/21/2007

2

| | | | | |
|---|---|---|---|---|
| **authority** 118:5 | 84:15,17 91:8 | **black** 63:21 | **brought** 20:9 | **case** 5:16 19:20 |
| **authorized** | 96:21 112:3 | 76:15,16 93:8 | 107:23 | 20:17 23:19 |
| 108:17 | 133:10 135:9 | 110:9 112:3 | **Brown** 26:12 | 24:2,4,12,15 |
| **available** 23:21 | **basis** 14:15 60:3 | **Blake** 35:12,13 | 30:1,2,22 31:5 | 25:12 27:14,14 |
| 71:17,20 72:19 | 92:1 112:10 | 139:3 140:14 | 32:1 | 27:17,20 28:21 |
| 116:1,3 119:8 | 130:12 | 140:23 141:10 | **Buchannan** 8:10 | 37:3 39:7 42:9 |
| **average** 151:7 | **Bates** 20:10 | **Blake's** 139:18 | **bureau** 108:13 | 133:17 |
| **averment** | **bear** 58:20 62:4 | **blood** 149:16,18 | **business** 7:16 | **cases** 64:15 |
| 135:15 | 76:21 | 149:21 150:5,8 | **buzzed** 119:13 | **cell** 116:19 |
| **aware** 49:11,18 | **bearing** 121:22 | 150:10,11,18 | **Byrd** 28:3,4,8,15 | **cellular** 119:12 |
| 60:1,15 86:13 | **Beasley** 27:8,9 | 150:19 151:2,6 | 28:20 29:1,7,9 | **Center** 17:10 |
| 120:21 | **began** 104:15 | 151:8,17 | 29:15 | **Centerville** |
| **azimuth** 121:23 | **behalf** 1:16 | **boss** 79:12 87:23 | **B-U-C-H-A-N...** | 116:17 |
| **a.m** 1:23 57:8 | **believe** 78:18 | 88:1 98:4,7 | 8:11 | **certain** 30:15 |
| 69:11 115:8 | 79:2,5 81:15 | 117:22 119:14 | | 32:14,15 68:19 |
| | 83:2,18,23 | **bothering** 115:2 | **C** | 86:12 96:12,16 |
| **B** | 84:19,23 | **bottles** 14:6 | **call** 26:11 57:20 | 98:23 101:14 |
| **back** 15:5 16:6 | 102:22 110:8 | **bottom** 60:18 | 65:5,12,19 | 107:7 142:3 |
| 19:16 29:11 | 141:18 145:10 | **Boulevard** 2:16 | 66:1 98:17,17 | **CERTIFICA...** |
| 40:14 43:6 | **belittle** 97:20 | 19:13 57:17,20 | 99:23 104:10 | 155:2 |
| 56:3,9 67:11 | 98:13,15,21 | **bracket** 10:9 | 105:4 117:14 | **Certified** 1:19 |
| 69:21,22 70:4 | 99:6,15 101:16 | **branch** 18:4 | 125:6 141:22 | 3:7 |
| 73:9,13,20 | 101:18 | **break** 34:15 | 142:1,2,8,14 | **certify** 60:19 |
| 74:2,13 75:9 | **belittling** 102:16 | 66:10,13,14,17 | 143:12 149:12 | 155:10 |
| 79:19,19 | **belong** 134:15 | 66:18 67:1,3,4 | **called** 40:5 58:5 | **Chad** 140:17,17 |
| 103:18 104:15 | **benefit** 87:12 | 67:6,10 81:10 | 59:9 80:8 | **chain** 90:21 |
| 106:11,17,22 | **benefits** 15:14 | **breaks** 66:5,7,8 | 108:4 114:19 | **Chan** 26:10 |
| 117:3 130:8 | 153:10 | 66:22 130:4 | 115:1,8 116:18 | 138:18 140:16 |
| 133:6,10 135:1 | **best** 23:22 60:20 | **breather** 35:7 | 117:5,9 142:10 | **chance** 60:16 |
| 139:11 145:12 | 63:16 115:14 | **BridleBrook** | 142:17 143:7,9 | 139:9 |
| 146:4 148:1,6 | 122:12,14 | 6:15 | 143:14 | **changes** 69:4,6 |
| 150:3 153:3,12 | 137:15 | **Bridlewood** 6:16 | **calling** 117:7 | **changing** 136:22 |
| **backtrack** 21:12 | **better** 96:2,4 | 6:17,23 | **calls** 21:6 46:16 | **charge** 4:9 35:2 |
| **bad** 115:13,17 | 132:13 145:17 | **brief** 25:7 34:17 | 103:3 146:8 | 73:8 119:7 |
| **Baptist** 13:2 | 145:18 | 81:12 153:18 | 147:15 | **check** 135:5 |
| 16:12 | **beyond** 17:3,3 | **briefing** 121:13 | **call-in** 64:23 | 151:2,4,9 |
| **bar** 122:8 | **big** 39:7 | **briefly** 63:13 | **calm** 150:23 | **checked** 151:16 |
| **Barksdale** 63:20 | **biggest** 88:13 | 64:8 | **capable** 36:9 | **chief** 108:13 |
| 63:21 64:1 | **Birmingham** | **bring** 20:7 30:19 | **capacity** 1:8 | **child** 8:12,13,20 |
| **base** 87:21 | 1:18 2:8 | 77:23 93:6 | 30:12 | 9:7,14,19 |
| **based** 23:4 | **biscuit** 129:10 | **Broach** 95:17 | **car** 72:20 117:23 | **children** 8:3,7 |
| 110:11 137:4 | **bit** 35:7 120:19 | **broad** 52:8 | **care** 14:1 | **Childs** 1:17 2:5 |
| **bases** 90:16 | 121:4 | **broke** 34:18 | **carry** 61:1 | **child's** 9:18 |
| **basic** 18:9 57:4 | **bite** 16:10 153:7 | 35:9 | **carrying** 99:22 | **chose** 71:21 |
| **basically** 22:20 | **biweekly** 57:5 | **brothers** 10:23 | **carry-all** 114:19 | **circumstances** |
| 45:9 59:9 71:6 | 146:16 | 24:18 | 116:21 117:11 | 86:12 |
| 71:13 72:9 | | | 128:18 | |

LEROY WILLIAMS - 2/21/2007

3

**Civil** 1:5 3:19
**claim** 25:12 47:3
  47:13
**claiming** 95:2
  147:19
**claims** 28:21
  37:3 101:11
**class** 39:7,10
  40:6,8 51:21
  82:14,18 83:3
  110:22,23
**classes** 45:16,17
  56:8 80:1,3
**classification**
  4:7 58:15,18
  58:21 59:6
  138:4,6
**classroom** 82:3
  82:13
**clear** 104:1
  110:12
**clinic** 12:21,22
  12:23
**clinic's** 14:16
**clock** 67:6
**clocked** 67:13
**close** 17:15
  30:21 31:23
**closely** 31:4
**Coliseum** 2:16
  57:17,20
**college** 16:23
  17:20
**come** 37:10 68:1
  69:18,21,22
  70:4 87:1
  95:14 100:21
  103:8 109:12
  115:14,19,22
  130:12 132:1
**comes** 131:23
  132:20
**comfortable**
  88:11
**coming** 100:4
  142:2

**commencing**
  1:22
**commended**
  119:4
**comments** 94:8
**commission**
  3:10
**committed**
  45:19 46:12
  47:8,14 140:9
  140:18,23
**communicate**
  85:3,5 87:21
**communication**
  84:22 85:1
  86:19 88:16
**communicatio...**
  21:8
**commute** 71:11
**comp** 15:16
  67:19,20 119:1
**companies** 9:23
**compensate**
  39:22
**compensation**
  15:15 40:2
  42:4
**compensatory**
  67:18 147:9,11
  147:12
**complained**
  46:13
**complaining**
  45:13,20 47:9
**complaint** 4:3,4
  5:5 43:9 44:12
  44:14 45:2,9
  45:10 46:14
  47:10 50:6
  53:8 75:4
  76:20 78:22
  88:14 91:1
  110:7 111:14
  131:11 133:15
  133:19 134:12
  135:8,15

136:21,23
  145:9 147:17
**complaints**
  48:10
**complete** 5:23
  6:21
**complex** 57:16
  57:21
**comprise** 10:10
**computer**
  130:20
**conceal** 149:17
**concern** 20:17
  131:11
**concerning** 5:16
  29:15 37:3
  44:13 64:5,9
  75:12
**concerns** 4:22
  128:2
**concluded**
  153:23
**conclusion**
  46:17 146:9
  147:16
**concrete** 38:14
**conducted** 83:6
**confused** 112:1
**congratulating**
  56:21
**Connecticut** 8:2
  8:22
**connection**
  133:17
**consent** 110:20
  112:2
**consider** 91:12
**consistently**
  149:3,4
**constant** 106:7
**constantly** 91:2
**construction**
  38:10,11,15
**contact** 31:8
**contacted** 55:22
**contemporane...**

21:20
**contend** 46:12
**contending**
  134:4,18
  135:19
**contends** 137:2
**context** 99:17
**continuance**
  143:3
**continue** 104:7,8
**convenience**
  72:9
**conversate** 31:1
  31:1
**conversation**
  29:7 92:20
  93:20 108:19
  109:18
**convert** 121:22
**coordinator**
  54:22
**copies** 76:23
  77:3 126:2
**coplaintiffs**
  41:11
**copy** 19:19,22
  19:22 44:16
  50:12,14,16,18
  51:12 125:23
  133:15
**Corps** 17:22
**correct** 22:5
  27:22 32:8,11
  44:18 56:15
  57:4 59:5,14
  59:22 60:6,21
  60:22 62:6,7,8
  62:9 64:19,22
  65:3 68:6,7
  72:22 73:11
  75:5 82:22
  85:17 88:12
  98:5,8 108:15
  113:8 126:7
  127:17 137:13
  140:21 153:2

**correctly** 131:18
  132:8 133:8
**cost** 147:5 148:3
  148:4
**counsel** 2:13 3:4
  22:2
**counseling** 4:18
  107:23 122:22
  123:8,17 124:5
  125:18
**counties** 10:9,14
  11:1
**County** 8:19
  10:15 11:21
  12:20 37:23
  68:19 70:13
  155:6
**couple** 41:12
  48:8 134:1
**course** 21:14
**courses** 79:15
  82:1
**coursework**
  17:2,20
**court** 1:1 10:12
  41:3,4 42:14
  45:15 93:1,2
  135:17 155:8
**cover** 130:3
**coworker** 24:10
  28:7 30:4,5,6
  33:5,9,17
  35:14,15
**coworkers** 24:18
  24:19 25:15
  81:14
**create** 102:18
  103:8
**creating** 102:19
  108:5
**crew** 25:10,11
  26:15,19 28:5
  30:13,14 32:13
  32:15,23 33:2
  33:6 34:9,12
  36:18 57:7

61:3,19,21
62:10,11,16
63:4,5,7 68:20
71:8,9 72:2
93:23 94:17
98:23 99:10,20
100:1,9 101:17
102:20 104:4
113:20 114:1
114:17 118:15
128:3,10
129:19 130:6,8
131:16 132:7
132:14
**crews** 28:16
30:15 61:22
62:19 119:1
120:12 128:4
**criticism** 91:10
**crossed** 11:21
**Crowe** 26:5 61:9
**curious** 51:7
**custodian** 51:19
**cut** 129:19,20
**C-R-O-W-E**
26:7

**D**
**D** 3:21
**daily** 60:3 67:23
92:1 130:12
**damages** 147:10
147:11,18
**dangerous** 96:9
**data** 34:11 45:4
56:9 77:9,21
77:23 78:6,16
80:4 120:18,21
**date** 125:21
135:1,3,3
**dated** 124:1,2
**dates** 17:13 34:6
50:11 53:14
**day** 30:20 31:2
31:11 32:1
57:11 66:5
68:8,15 69:2,7

69:13 71:11
92:5 94:21,22
95:8 106:7
108:4 113:19
115:5,7,10,11
116:7,20 117:1
118:22,23
119:6 124:7,8
126:4 128:12
128:13,21
129:5,17 130:4
130:5,13,16
142:3,3 149:13
155:15
**days** 116:1,3
**deadline** 35:3
**deal** 84:5 86:11
87:6 92:14
95:7
**dealing** 38:21
39:11 87:18,19
149:19
**deals** 127:18
**Deats** 55:20,22
**deceased** 10:22
**December** 134:3
134:17 135:2
135:17
**decree** 110:19
112:2
**defendant** 1:16
39:1
**Defendants** 1:10
2:10 19:21
20:3 43:14
44:4,8 57:1
58:16 59:2
72:23 73:5
74:19 112:20
113:1 122:19
124:12 125:14
127:8,12
133:22
**Defendant's** 4:1
**definition**
110:23

**demoted** 126:5
137:19 138:7
138:16,21
139:8 140:10
140:20 141:8
149:22
**demotion** 149:7
149:12,20
150:2 152:9
**denied** 52:16
116:6 142:10
**denoted** 53:7
**deny** 45:17 96:8
**department** 1:7
1:9 2:14 4:13
4:20 5:1,13
15:18 37:4
40:10 42:1,16
43:1 45:13
46:23 47:16,17
47:18,23 48:3
48:14 49:17
50:7 51:17
57:16 77:16
79:15,17 82:1
82:5 83:4,9
112:4 121:14
136:7 144:20
**depend** 68:2
**depends** 68:13
**deposition** 1:13
3:5,16 4:2 5:15
6:4 19:19 20:6
153:22
**depth** 49:13
**Derrico** 8:10,14
**describe** 48:12
64:8 102:2
**described** 60:12
84:11 102:5
103:2 105:5
**description**
59:16
**deserve** 145:16
**design** 108:12
**details** 146:11

**determine** 64:23
**determining**
110:1
**developing**
88:15
**device** 77:20
**diaries** 22:22
**diary** 20:22 23:9
**difference** 136:2
146:5,12,15
**differences**
146:18
**different** 32:8
63:3,5 67:8
69:14 72:3,4
84:6 87:5,6,21
95:14 96:14
98:16 149:5
**differently** 96:7
137:22 144:9
**difficult** 87:1,2
**direct** 46:3
**directed** 114:18
**directives** 96:23
105:19 116:20
131:21 133:12
141:17
**directly** 90:15
120:2
**Director** 1:8
**discharge** 19:17
**discharged**
18:12,13,20
19:5
**disciplinary**
112:17 140:22
141:3,11
**disciplined**
137:19 140:10
141:5,6,10,18
**disclosed** 23:1
52:5
**disclosure** 20:8
21:6
**disclosures** 27:6
**discriminated**

52:11,12,13
110:8 111:4
144:21
**discrimination**
4:9 28:23
29:17 52:7,10
52:15 73:8
93:5
**discuss** 25:11
55:23 119:16
120:5 127:1,5
132:12
**discussed** 24:1
24:19 120:3
**discusses** 128:1
**discussion** 118:4
119:22 128:6,7
132:17
**discussions**
133:6
**Dishonorable**
18:23 19:1
**disposal** 43:4
**disrupt** 92:4
**disrupting**
100:11
**distinguish**
17:19
**district** 1:1,1
10:11,12
**disturbed**
117:18,19
**disturbs** 107:8
**division** 1:2
10:11 46:4
128:21,22
**doctor** 13:8,8,9
13:17 15:21
16:15 24:16
151:22 152:23
**doctors** 16:7
153:3
**doctor's** 12:13
13:3 14:1,4,7
16:11
**document** 20:1

43:12 44:5,6
56:22 58:23
59:15,21 73:2
73:3 74:17
112:21,22
122:16,17
123:11,13
124:20 125:10
125:11,12
126:1 127:6,9
127:10 133:14
133:20
**documents** 20:7
20:8,10,12,13
20:16,23 21:10
22:23 48:18,22
125:8 126:12
**Dodd** 26:10
80:12 117:9
139:22 140:14
141:21,22
**doing** 32:13,19
38:23 40:13
72:7 95:20
96:13 98:19
99:21 100:8,13
100:14 101:3,6
101:7,10 102:8
105:17 107:2,4
107:4 120:9
128:5 132:2,4
132:7
**Don** 4:5,11
56:20 73:23
**Dorchak** 16:4,5
**DOT** 17:15,23
27:11 29:4
37:7 38:1,7
75:8 145:5
**download** 30:17
130:20
**Dr** 16:4,5
**draw** 121:6,8
**drink** 129:10
**drive** 6:23 71:4
**driving** 36:8

**drop** 56:11
**drove** 71:16
**due** 15:6 42:7
**duly** 5:8
**dumb** 98:18
**duties** 52:17,18
52:21 53:1
59:16 60:10,11
60:17,23 97:19
**D-E-R-R-I-C-O**
8:10
_____
**E**
**E** 3:21
**EA** 26:20 29:11
36:11 41:2
63:10,14,15
66:4 67:22
73:14 74:2,13
75:2,12 78:4
75:21 79:3
85:12,13,19,20
85:23 86:5,17
93:12,15
146:14,21
**earlier** 119:3
**early** 119:6
**earn** 64:20
**EAs** 86:8
**easier** 96:5
**easily** 87:4
**East** 16:12
**easy** 86:23
**editor** 34:11
45:4 78:6
120:18,22
**editors** 80:5
**editor's** 56:9
78:16
**education** 17:7
17:19
**EEO** 54:22
**EEOC** 4:9 49:15
49:18 73:8,12
75:4 76:20
91:1 110:7
111:14,19

**efficient** 121:1
**eight** 32:16,18
**eight-hour**
30:23
**either** 3:18 11:3
22:13,15 26:20
38:22 116:5
149:1
**electronic**
130:10,19
**emergency**
16:12
**employed** 7:8
**employee** 27:9
27:11 64:20
75:7 139:1,3
**employees** 15:14
52:19,19 80:4
80:10 109:23
112:3 137:17
137:21 144:8
147:6
**employer** 65:1,5
**employment**
21:14
**encompasses**
112:2
**engineering**
37:15,16
**enhance** 87:17
**entire** 32:1,16
62:23
**entitled** 106:20
148:9
**entity** 47:19
**entry** 37:11
**environment**
102:18,19
103:9 108:6
**equipment**
129:4 130:10
**Esquire** 2:4,11
**established**
92:23 93:9
**evaluation** 148:8
148:11

**events** 21:21
**everybody** 95:13
113:22 114:11
**everyday** 84:7
**evidence** 3:17
**evidently** 131:2
143:4
**exact** 13:10
17:13 53:14
54:16,21
125:20,21
151:20
**exactly** 17:5
55:2 86:1 88:6
96:8 100:13
118:14 148:14
151:14
**exaggerate**
121:2
**exam** 122:9
**examination**
3:22 5:10
122:7
**example** 99:1,2
**exceeded** 149:6
**exceeds** 147:4
148:23 149:3,4
149:4
**exclude** 39:6
**excuse** 64:17
109:15
**exhibit** 19:21
20:3 43:14
44:4,8 48:15
56:4 57:1
58:17 59:2
72:23 73:5
74:19 77:7
112:20 113:1
122:19 124:12
125:1,14 127:8
127:12 133:22
**exhibits** 4:1 49:8
108:15 111:13
**existing** 72:18
**expect** 85:8

**expectations**
103:6
**expected** 85:20
86:9
**expects** 103:4
**expense** 39:19
**experience** 78:3
79:14 84:7,14
89:19 92:21
93:11 120:21
**experiencing**
149:15
**explain** 75:10
86:21 91:5
98:20 99:16
101:19,21
116:16 119:19
147:12 149:14
**explained** 25:17
**explains** 103:4
103:14,22
**extent** 21:5
46:16 48:17
102:4 126:19
136:11 146:7
147:14
**extra** 77:2
_____
**F**
**fact** 34:19
114:10,13
128:1,9 137:8
**factual** 115:6
116:13
**fair** 6:2 47:22
**fairly** 87:4
**false** 112:18
**familiar** 43:10
66:12,15
119:21 121:11
130:11
**family** 13:4,6
150:9 152:1
153:1
**family's** 13:9
**far** 16:19 38:13
57:13 79:17

LEROY WILLIAMS - 2/21/2007

6

| | | | | |
|---|---|---|---|---|
| 84:4 88:15 | 49:15 145:6 | **formal** 82:12 | **generally** 70:8 | 104:15 117:21 |
| 135:12 138:7 | **final** 108:18 | 83:3 84:12,20 | **Georgia** 17:11 | 119:6,14 124:2 |
| 148:23 | 111:17 | **formality** 3:9,10 | **getting** 74:11,22 | 126:14,16,23 |
| **fashion** 96:14 | **find** 19:17 23:18 | **format** 84:13 | 77:4 97:7 | 127:4 133:13 |
| **father** 10:21 | 76:22 77:1 | **forth** 106:10,15 | 100:9 128:3,11 | 135:1 140:7 |
| 150:13 | 90:10 | **forthrightly** | 153:11 | **goes** 115:22 |
| **February** 1:22 | **fine** 17:14 19:18 | 5:23 | **give** 6:21 7:20 | **going** 5:21 8:22 |
| 154:2 155:15 | 35:5 102:3 | **found** 43:5 49:7 | 16:3,9 39:15 | 25:18 28:11 |
| **federal** 3:18 | **finish** 31:14 | 49:11 96:2 | 54:11 55:5 | 31:19 33:13 |
| 10:12 41:3 | 133:13 | **four** 8:8 9:16 | 59:15 82:1 | 39:6 57:4 65:2 |
| **feel** 87:3,5 88:11 | **fired** 38:17 | 40:9 113:10 | 89:13 90:21 | 65:6 71:18 |
| 103:3 108:9 | **firm** 22:14 35:11 | 144:7 151:4 | 91:17 93:1 | 74:1,12 75:2 |
| 109:8 110:18 | **first** 5:8 8:12 | **fourth** 9:14,19 | 97:18 98:11 | 75:23 81:7 |
| 110:21 111:3 | 13:17,20 26:5 | **frame** 29:6 | 99:1 116:19 | 100:3 104:3 |
| 134:15 | 27:10 35:3 | 44:21 65:11 | 119:5 121:5,13 | 112:15 114:13 |
| **feeling** 115:9 | 36:16 37:10 | **friend** 24:10 | 124:6 130:9,17 | 115:10,19 |
| **felt** 97:9,13 | 61:3,4,10 79:1 | **front** 50:4,13 | 153:16 | 117:15,21 |
| 100:6 130:23 | 81:5 93:23 | 78:15 98:14,22 | **given** 6:4 21:1 | 124:6 127:14 |
| 131:2,5 | 100:7 101:8 | 99:8 100:17 | 27:7 30:20 | 129:10 133:6 |
| **field** 45:4 58:5,9 | 120:17 121:3 | 101:16 102:6 | 43:22 49:20 | 133:10,13 |
| 58:10,22 59:9 | 128:3 131:23 | 136:8 | 51:2 52:16,20 | 141:9 147:22 |
| 59:12 108:5 | **five** 40:20 62:11 | **full** 6:8 11:3 | 55:8,11 68:23 | 151:22 152:16 |
| 109:10,12 | 117:22 | **fully** 5:21 53:7 | 74:21 77:9 | **good** 34:13 |
| 128:14,19 | **five-second** | **function** 54:15 | 79:6,21 80:2 | 63:13,14,15 |
| 129:9,15,16 | 34:14 | 120:1 | 81:15,17 83:23 | 65:20 87:15 |
| **figure** 15:22 | **floor** 103:11 | **functions** 120:12 | 84:10 87:10 | 88:17 103:12 |
| **file** 34:20 49:18 | **flows** 132:2 | **fund** 15:15 | 88:14 99:11 | 120:19 121:4 |
| 51:6 58:19 | **folder** 20:9 | 153:12 | 121:14 134:16 | **gotten** 67:20 |
| 75:8,14 121:7 | **folks** 140:11 | **furnished** 20:14 | 139:8 142:4 | 82:20 89:2 |
| 121:8 137:18 | **follow** 96:23 | 21:3 51:4 | 145:4 148:2 | 147:7 |
| **filed** 5:14 41:1,3 | **follows** 5:9 | **future** 112:5 | **gives** 51:12 | **grade** 16:21 |
| 42:21 43:1,5,8 | **Food** 38:8 | | **giving** 25:20 | **grandparents** |
| 43:9,17 44:12 | **foregoing** | _____ | 52:23 81:13 | 11:7 |
| 44:21 48:13 | 155:11 | G | 105:18 117:7 | **Grantham** |
| 49:2,5,19,21 | **foreman** 38:13 | **gain** 45:17 99:9 | 124:7 131:21 | 26:10 |
| 50:5 51:20 | **form** 3:13 4:3,4 | **gained** 52:19 | **go** 8:20 10:5 | **Granthem** 61:13 |
| 73:9,12 75:4 | 20:18 47:10 | 93:11 148:1 | 13:16,18 16:11 | 61:14 138:18 |
| 75:11 110:10 | 50:6 53:8,8,9 | **Garrett** 33:4,5 | 16:13,19 17:6 | 139:11 140:16 |
| 133:19 134:3 | 60:12 65:13 | **Gary** 27:8,9,18 | 19:16 42:12,14 | 140:17 143:16 |
| 134:18 135:4 | 67:17 91:14 | **gas** 72:21 | 54:9 60:16 | 143:17,19 |
| 135:10,17,18 | 94:9 107:11 | **gathered** 146:17 | 67:5 68:9,20 | 144:4 |
| 136:4,5,7,13 | 110:15 111:15 | **GED** 16:21 17:4 | 69:19 76:21 | **Granthem's** |
| 136:21 137:21 | 126:18 132:10 | **general** 2:12 | 77:5 79:19 | 139:12 |
| 140:5 | 136:10 148:21 | 13:4 18:22 | 90:6,19 95:19 | **Green** 49:22 |
| **files** 49:7 | 151:10 | 19:14 38:15 | 97:9,9,20 99:4 | 53:11,23 54:4 |
| **filing** 48:15 49:2 | | 45:14 47:1 | 103:18 104:3 | 54:12,14 55:18 |
| | | 84:3 | | |
| | | **generality** 99:12 | | |

56:1 111:7,21
111:23 112:8
134:9
**Green's** 53:19
53:21
**grievance** 42:17
42:20,21 43:5
43:8,16,19,23
44:12,22 45:1
47:10 48:15
49:3,5,10,16
49:19,21 50:7
50:23 51:4,8
51:13,15 52:2
52:4,5 53:9
54:18,19 55:3
55:6,9,12,17
55:23 56:3,5
56:11 75:8,11
75:14 110:11
110:13,16
111:5 112:7
134:4,8,11,18
135:4,6,10,18
135:21,23
136:3,4 137:11
138:3 140:5
**grievances**
42:23 44:1
48:11,12,20
49:1 51:6,20
111:11,13,18
112:9,14 136:6
136:20 137:5
137:18,21
145:6
**Guard** 18:14,15
18:16
**guess** 36:7 65:8
65:10 73:19
80:7 101:7
117:6 125:23
129:13 131:22
149:8 152:18
**guys** 119:14

_____

**H**

**habits** 35:22
**hair** 7:11,13
**half** 11:3
**hand** 53:19
54:17,19 55:3
124:2,2,16
**handed** 53:11
54:1 56:1,4
**handing** 55:18
**handle** 143:22
**hands** 95:3
**happen** 45:15
55:12 144:15
**happened** 22:7
34:9 53:13
94:7 125:21
128:15
**harass** 109:7,10
110:5
**harassed** 21:19
91:6,18 97:5
**harassing** 29:5
95:7
**harassive** 91:8
**harassment**
28:22 29:16
91:3,5,6,9,13
94:12 95:2
101:12 102:23
105:10 107:13
**hard** 25:21
**Harris** 80:13
**Harry** 41:15
**head** 90:19
**headquarters**
19:14
**health** 152:4,14
**hear** 133:8
**heard** 46:20
55:13
**hearing** 55:13
102:13
**held** 124:7
**help** 89:14 90:22
141:1
**hierarchy** 62:4

**high** 17:3 149:16
149:18,21
150:5,8,10,11
150:18,19
151:6,21
**higher** 87:20
151:14,15
**highway** 32:5
37:14 116:17
**history** 149:21
150:8
**Hodges** 9:8
**hold** 139:10
**holding** 73:16
**home** 71:5
**honorable** 18:21
**hostile** 102:18
102:19 103:9
104:21 105:2,4
108:6 127:19
**hotel** 70:2 71:3
114:12
**hour** 67:2
118:21
**hours** 32:16,18
70:16 129:23
**house** 9:20
**Huh** 123:3
**human** 87:8
**Hydrocodone**
15:3
**Hyundai** 9:23

_____

**I**

**idea** 48:5 53:15
70:20 104:1
119:11 120:10
120:13 139:17
139:19
**identification**
20:2 43:13
44:7 56:23
59:1 73:4
74:18 112:23
122:18 125:13
127:11 133:21
**identified** 36:23

144:19
**identify** 73:1
**II** 86:17
**II/III** 36:11
37:16 73:14
74:13 75:12
78:4,19,21
79:3 146:21
**II/IIIs** 85:13
**ILS** 17:8,9
**image** 121:7,8
**immediate** 83:8
83:10
**immediately**
63:17 103:18
**incidences** 91:17
**incident** 94:6
101:14 149:8
**increase** 147:6
153:13
**incurred** 15:17
**indicate** 123:13
124:10
**indicated** 21:15
63:12 75:1
80:21 82:19
113:13
**indicates** 116:9
**indication** 55:11
**individuals**
43:22 47:12
81:18
**infantry** 18:10
18:12
**information**
22:9 28:20
29:22 30:18
37:2 39:15
77:9 117:8
130:21
**infraction** 141:3
142:7,9,11,16
142:22 143:5,8
**infractions**
140:9,19,23
141:12

**injured** 47:3
**injury** 15:6,8,12
15:15,16
**input** 77:21,22
**inside** 77:23
102:15 135:9
**insistence**
105:18
**instance** 99:19
102:12
**institution**
152:20
**instructed** 82:16
95:21 100:13
113:20 114:3,5
114:6 115:11
127:21
**instruction** 69:1
82:4
**instructions**
70:12 110:16
121:6 128:20
**instrument**
30:19
**instruments**
130:3,3,10,17
**insubordinate**
133:2
**insubordination**
5:3 127:16
141:7
**intend** 23:18
**Interactive**
17:10
**interchanges**
119:18
**internal** 49:16
49:19 50:6
110:11
**interpersonal**
86:15,19
**interrupt** 99:5
**intimidate**
105:14 109:7
109:11 110:5
**intimidated**

LEROY WILLIAMS - 2/21/2007

8

| | | | | |
|---|---|---|---|---|
| 105:16 | 129:11,12 | 140:5 141:11 | 140:22 141:10 | 41:6 51:3,12 |
| **intimidation** | 131:8 132:3,4 | 143:4,16 | 141:13,16,20 | 144:16 |
| 29:16 91:3 | 132:7 134:6,20 | 148:11,13 | 143:21 144:5,6 | **lawyers** 21:23 |
| 105:13 107:13 | 138:3,6 145:21 | 149:11 150:17 | 144:17 147:13 | **leads** 149:16 |
| **involve** 91:18 | **jobs** 38:18 85:10 | **Kirkland** 80:13 | 147:18 148:13 | **learn** 52:18 |
| **involved** 24:4 | 120:11 128:5 | **knew** 19:6 54:17 | 148:19,23 | 87:10 88:4 |
| 38:6,20 39:5 | **Joe** 1:7 25:6 | 55:3 60:11 | 151:12,15 | 97:22 |
| 39:13 | 26:22 107:19 | 85:19 86:4,10 | 152:16 | **learned** 84:13 |
| **involving** | 107:21 127:4 | 95:12 96:20 | **knowledge** | **Learning** 17:10 |
| 134:22 | **John** 16:4 | 117:6,14 | 27:13,15,16 | **leave** 64:21,21 |
| **issue** 40:7 | **joint** 34:21 | 120:19 121:2 | 29:15 33:12,20 | 66:18 67:12 |
| 141:11 | **Jones** 25:5,6 | 121:10 | 35:21 45:17 | 68:2 70:3 |
| **issued** 113:5 | 26:22 53:4 | **know** 5:19 7:11 | 60:20 63:16 | 115:11 118:19 |
| 122:23 123:18 | 54:9 61:16,17 | 7:14,23 8:1 9:2 | 72:18 78:11,13 | 129:6 142:9,18 |
| **issues** 24:3 | 104:10 107:18 | 13:1,3,11 | 78:14 80:17 | 143:7,13,14 |
| 134:7,21 | 107:19,21 | 16:11,15 17:2 | 84:3 85:7 93:6 | **Lee** 10:15,17 |
| **item** 136:17 | 109:19,21 | 17:5 21:11 | 122:12,14 | 37:23 68:19 |
| **items** 126:17 | 110:2,5 125:19 | 23:16,17 25:18 | 137:15 138:8 | 70:13 |
| 127:1,5,18 | 126:7 127:4 | 29:22 31:18 | 140:4 | **left** 71:13 81:13 |
| **it'll** 153:12 | 149:9 | 33:15 36:1,2,3 | **known** 9:12 | 97:15 128:19 |
| | **July** 4:16,19,23 | 36:4,5,6,7,12 | 109:13 | **leg** 15:5 |
| **J** | 113:8 116:9 | 37:1,5 40:17 | | **legal** 46:16 |
| **job** 17:22 30:23 | 122:22 124:1,3 | 41:4,5,6 48:1,2 | **L** | 146:8 147:15 |
| 36:13 40:22,23 | 125:16 | 49:9,12,19 | **Labor** 38:13 | **Leroy** 1:3,13 3:5 |
| 44:13 58:9 | **jumped** 100:10 | 50:10,11,17,22 | **laborer** 37:11,14 | 4:5,11,17 5:7 |
| 59:16 60:1,4,7 | **jumping** 100:5 | 51:9 54:16,21 | **laid** 10:1 | 6:9 99:21 |
| 63:13,15 64:12 | **June** 113:12,15 | 55:1,20 57:13 | **Large** 1:21 3:9 | 153:22 |
| 64:16 65:9 | 113:19 114:22 | 64:10 65:14 | 155:10,18 | **letter** 4:5,11 |
| 68:2,22,23 | | 68:4 73:21 | **late** 64:13 65:7 | 35:10 56:19 |
| 69:20 70:2,13 | **K** | 75:7,22 76:3 | 113:15 117:7 | 73:23 74:4,6 |
| 70:17,23 71:3 | **Kaylyn** 8:11,21 | 79:17 80:3,10 | 117:13,22 | 74:10,11 |
| 71:5,7,15 | 9:4,4 | 81:1,2,3,8 82:5 | 128:11 144:4 | 108:14,20,21 |
| 77:10,15 78:9 | **keep** 21:13,20 | 82:6,8,10 | **law** 92:19 | **letting** 118:15 |
| 78:19 84:14 | 50:14,18 | 83:13,16,16 | 122:10 | 130:6 |
| 85:2,15,18,20 | 150:23 | 85:3 88:21 | **lawful** 5:7 | **let's** 8:20 34:23 |
| 85:23 86:4,10 | **keeping** 22:1,4 | 89:15 90:4,5,9 | **Lawrence** 26:12 | 56:17 70:12 |
| 86:16,18 87:9 | 22:11 | 93:12 101:9,9 | 30:1 | 77:12 79:19 |
| 87:17 88:4,8 | **Keith** 80:13 | 102:1,3,11 | **laws** 110:1 | 84:2,18 91:4 |
| 89:18,19 90:6 | **kept** 20:22,23 | 104:11,13 | **lawsuit** 5:14 | 140:7 |
| 95:19 96:1 | **kind** 11:13 | 114:16,19 | 39:5,18,23 | **level** 17:3,4 |
| 97:1,4,6,21 | 14:21 15:4,13 | 115:12 119:20 | 93:4,9 112:6 | 26:20,21 27:1 |
| 98:4,7,19,23 | 38:5,6,11 39:3 | 121:4,9,19,22 | 134:16 136:1,2 | 37:11 130:19 |
| 100:17 104:4 | 54:11 55:5,8 | 122:2 124:17 | 153:6 | **Lewis** 25:1,2 |
| 104:15 106:15 | 55:11 84:6,19 | 135:7,21 138:3 | **lawsuits** 38:21 | 26:22,23 27:4 |
| 107:3,4,5 | 87:11 88:23 | 138:12 139:7 | 39:12 | 27:5 41:17,18 |
| 114:4,9,20,23 | 90:8,21 94:8 | 139:18 140:14 | **lawyer** 22:13 | 53:4 61:18 |
| 120:17 121:3 | 95:1 104:12 | | 23:20 39:16 | |

83:11,13 89:9
90:9,11 91:8
91:11,18 92:1
93:21 95:4
96:11,16,18,22
98:4,9 101:13
101:14 103:1
104:23 105:6,7
105:9 107:15
108:5 113:6,12
114:6,10 115:1
115:8,11
116:18 118:5
118:17,23
119:5,7,8,10
119:16,23
120:6,18,20,20
121:5,12
122:23 123:10
123:20 124:16
126:9,23
127:21 128:1
128:16 131:22
132:12,18,20
133:4,7 134:14
134:23
**Lewis's** 90:19
131:10
**life-threatening**
97:2
**Linc** 116:12,19
119:13
**Linda** 7:5
**line** 23:10 121:6
121:8 129:18
129:20
**list** 92:23 93:10
**listed** 35:10
45:23 47:6,7
111:12 126:15
126:17 144:8
144:10
**listen** 31:16,19
**litigation** 39:11
**little** 23:11 35:7
119:3 129:8,11

151:21
**live** 6:14 7:23
8:6,16,18 9:11
10:8,19,23
**lived** 8:1
**lives** 8:17,21
10:15
**living** 10:21
147:5 148:3,4
**load** 121:7,8
**located** 12:19,23
50:16
**location** 46:9,9
46:10 68:16
69:19 70:18
71:19 113:23
114:3,4,7
**log** 103:19,20
**long** 7:6 12:8
13:7 30:20
48:2 67:1
83:13 93:12,15
95:14 97:2,14
131:12 142:17
149:18,19
**longer** 41:23
72:17 89:12
**look** 10:13 19:16
43:7,10 44:3
44:18 59:23
74:9 99:7
135:1,5
**looked** 20:12
49:12 54:6
126:13
**looking** 10:17
11:20 43:3
58:16 59:20
76:20 100:1,2
100:2
**looks** 43:9
**loss** 153:9,10
**lost** 147:20,23
147:23 148:1
**lot** 57:9,14,15,19
68:9 113:21

114:8,12
**lunch** 66:21,22
67:1,4 118:21

_____

**M**
**Mac** 45:21 47:7
**Macon** 8:19
**main** 57:21
**maintain** 22:16
**maintained** 21:1
22:9
**maintenance**
37:14
**making** 109:22
117:7 128:3
148:5,6
**male** 138:5
**man** 100:5
**manage** 132:13
**management**
145:23
**manner** 87:1
92:3
**man's** 91:9,10
**mark** 19:20
**marked** 20:2
43:13 44:3,7
56:23 59:1
73:4 74:18
112:19,23
122:18 125:2,3
125:13 127:11
133:21
**marriages** 7:18
**married** 7:2,6
**material** 21:3
**math** 122:11
**matter** 24:20
44:13
**McINNES** 1:8
**McKinnon**
137:23 138:5
140:16 143:8,9
**McPhillips**
22:14 35:11
**mean** 52:9 59:5
59:8 71:10

86:22 87:18
90:2 91:6 92:6
95:9 98:20,21
99:4,5,16
101:18,21,23
115:18 123:11
145:18 150:21
152:5
**means** 24:5
**meat** 99:13
**medication**
11:14 150:17
150:20
**medications**
14:3,21 15:2
**medicine** 150:11
**medicines** 14:14
**meet** 19:4 68:18
106:10,14
113:21 114:11
148:15
**meeting** 103:6
106:19 128:16
**meetings** 18:15
18:19
**meets** 68:20
148:18,20
**member** 30:12
30:14 33:6
39:8 110:22
114:1
**members** 25:10
26:18 51:20
114:17
**Memorandum**
4:14,21 5:2
**memos** 22:22
**mental** 149:11
149:14 152:4
152:13,20
**mentioned** 10:8
10:15,20 61:5
94:12 108:12
112:1 147:19
**menu** 121:10
**menus** 121:11

121:13
**met** 27:9 103:5
126:7,9
**middle** 1:1 6:10
10:11 100:10
**mileage** 39:19
39:19,22 40:2
40:14 42:4
72:11,14
**military** 18:2
**mind** 103:7
**mine** 87:6
**minimum** 65:23
**minute** 10:13
51:2 79:19
153:16
**minutes** 31:3
66:13,14
117:22 129:15
143:19
**mischaracteri...**
136:12
**misquote** 137:7
**missed** 18:19
**misstatement**
137:8
**mistreated**
21:19
**Monday** 57:9
69:18 70:4,9
114:22
**Mondays** 69:10
**money** 39:21
40:14 153:11
**Montgomery**
2:17 6:23 9:1
10:1 11:21
12:20 16:13
19:9,10 37:19
37:21 68:9,17
69:20,22 71:15
80:6 128:17
155:6
**month** 53:15,16
151:5
**months** 23:13

**morning** 21:4
66:12 128:11
128:21,23
129:11,14
131:12 143:18
**motel** 113:21
**mother** 8:17,21
10:15,21 24:17
150:10
**motion** 34:21
**move** 130:14

**N**

**N** 3:21
**name** 6:8,10 7:4
7:20 9:18
12:13,14,15
14:4,7,10,13
14:16,17 15:22
16:9,11 26:5
39:14 41:23
46:21 47:20
137:20 138:1
**named** 75:22
80:18 81:18
**names** 8:9 15:1
16:3 27:7
35:10 41:13
45:23 61:6
81:13 98:17
144:15 145:4
**napkin** 23:12
**National** 18:14
18:15,16
**nature** 22:17
39:9,17,23
45:2 51:15
52:4 55:14
59:17 60:3
106:23 136:23
138:2 140:22
**near** 13:2 70:2
**necessarily** 88:7
**necessary** 77:10
**need** 3:14 19:18
69:1 86:8
131:9 146:11

**needed** 97:12
104:11 141:1
**needs** 88:1
**Neither** 111:11
**Nero** 26:11 30:2
32:20
**never** 19:4 23:14
80:8 90:10
92:15 100:16
105:15,15,16
109:12,18
120:3,5 128:9
132:22 139:7
141:23
**new** 82:23 84:8
97:13 106:20
116:19 121:13
**Nichols** 33:16,20
34:2 80:12,12
139:21,21
**Nicole** 1:19 3:6
155:8,17
**Nineteenth** 1:18
2:7
**nonlawyers** 24:3
24:5
**normal** 151:1
**normally** 70:21
87:22
**North** 1:18 2:7
**northern** 1:2
10:10
**northwest** 57:8
57:14,19
**Notary** 1:20 3:7
155:9,18
**note** 22:8 23:14
117:1
**notes** 20:21
21:13,20 22:1
22:4,11,16,19
22:22 23:11,18
116:23 117:3
**notice** 1:15
19:20 20:6
108:11

**noticed** 27:5
**notified** 73:12
118:9
**notify** 116:11
**number** 43:21
45:2 48:16
55:8,9 123:1
125:10 133:14

**O**

**obey** 106:3
**object** 20:18
21:5 48:17
65:13 67:17
91:14,19 94:9
102:4 107:11
110:15 111:15
126:18 132:10
136:10,11
146:7 147:14
148:21 151:10
**Objection** 46:15
**objections** 3:12
3:13
**Oblique** 12:17
**occasion** 113:19
116:9 130:2
**occasions** 97:1
**occurred** 127:20
**October** 4:4
44:17
**odd** 124:8
**Odutola** 74:15
74:16 76:2
**offensive** 92:17
**offer** 79:15
**offered** 3:16
**office** 53:21 78:1
114:23 116:10
117:6,9,10
120:8 128:21
130:8
**offices** 1:16
**official** 1:8
**Oh** 18:16 59:4
124:19
**okay** 6:4,7,10,12

6:14 7:8,14,18
7:20 8:9,16,20
8:22 9:2,7,9,14
10:5,20 11:13
11:16,19 12:3
13:16 14:9,20
15:1,12,17,21
16:7,9,17,19
17:1,6,12,18
18:2,8,13,19
19:3,6,11,14
19:18 20:6,16
20:21 21:12
22:1,11,22
23:7,23 25:4,9
25:22 26:4,9
26:14 27:2,5
27:21 28:6,8
28:15 29:6,14
30:1,4,6,9,20
31:4,7,16,21
32:7,21 33:4,6
33:16 36:10,21
37:6,9,18 38:1
38:5,9,11,15
38:17 39:5,17
39:21 40:5,10
40:17 41:9,13
41:16,21 42:9
42:16 43:3,18
43:21 44:3,10
44:11,15,20
45:1,12,18,22
46:7,11 47:22
48:10 53:6,12
54:5 55:1
56:13 57:7,14
57:23 58:16
59:4,11,15,23
60:1,18 62:2
62:14 63:7,12
63:17 64:4,12
65:17,23 66:4
66:12,17,21
67:3,9,22 68:4
68:12,15,22

69:12,16 70:16
70:20 71:2,8
71:14,17,21
72:16,19,23
73:11 74:22
75:1,19,21
76:6,9,17
77:11,19 78:2
78:6,11,14
79:5,7,15,18
80:14,17 81:4
82:1,6,19 83:2
83:10,21 84:18
84:23 85:11,15
86:14 88:7,19
88:23 89:5
90:11 91:9
94:11,23 95:15
95:17 96:10
97:3 98:1,3
99:11 101:11
101:18 102:22
103:10,14,20
103:23 105:10
105:22 107:13
108:2,11
110:20 111:2,9
111:11 112:5
112:13,16
113:4 114:10
116:15 118:12
119:16,22
120:6,9,14
121:5,16 123:7
123:10,19
124:4,10 125:5
127:4,8,15
129:17 131:9
131:10 134:17
137:16 138:17
139:2,20 140:7
140:15 141:15
142:21 143:6
144:6,19 145:8
146:20 147:2,9
148:15 150:5

151:22 152:4
**old** 6:12 8:13 9:9
**omission** 45:20
  47:9
**omissions** 46:13
  47:15
**ones** 10:7 11:22
  12:1 29:2 40:3
  49:4 140:13
**operating** 128:5
**opportunity**
  133:18
**opposed** 18:16
**order** 34:22
  77:14 96:8
  98:2 110:20
  148:11
**orders** 96:23
  98:11
**originally** 9:22
**ought** 90:3,5
  100:15
**outcome** 42:9
**overall** 109:21
**overnight** 70:1
**overnights** 70:1
**oversee** 100:8
**overseeing**
  99:19
**overseen** 109:8
**overtime** 67:15
**o'clock** 58:2
  64:12 65:18
  113:17 116:13
  117:11,15
  118:16,18,20
  143:18

_____
          **P**
_____
**package** 74:21
**page** 3:22 4:1
  44:16,18 59:21
  77:6 114:22
  134:2 137:16
  145:10
**pages** 126:6
**paid** 42:10

**pain** 15:1,4
**Painkillers**
  14:23
**Pantazis** 1:17
  2:6
**paper** 119:2
**papers** 19:17
  126:17
**paperwork**
  52:14 54:6
  102:15 127:2
**paragraph** 77:6
  91:2 110:7
  134:1 137:6,16
  145:9
**parking** 57:9,14
  57:15,19 68:9
  113:21 114:8
  114:12
**part** 27:6 45:10
  58:6 61:21
  87:8 97:22
  102:23 122:6
  132:21 145:8
  146:11
**partially** 111:3
**participation**
  45:6
**particular** 13:8
  13:16 19:7
  36:13 39:10,18
  40:7 49:3
  50:23 51:12
  53:2 61:2
  76:18 77:6
  78:9 92:14
  94:6 114:3
  120:1,4 123:16
  126:1 129:17
  130:23 131:5
  153:6
**parties** 3:5
**partly** 134:13
**parts** 93:5
**party** 3:18 39:8
**patterns** 33:22

**Paulk** 1:19 3:6
  155:8,17
**pay** 146:4,5,6,12
**PC** 2:6
**pecking** 98:2
**pension** 153:10
  153:12,13
**people** 25:9,12
  25:19,22 26:14
  26:19 29:4
  36:21 37:1
  42:3 54:7
  62:10,16 72:3
  72:4 80:18
  81:14 84:5
  85:8,9,11
  86:11,23 87:5
  87:13,19 97:8
  98:6,10,16
  100:1 114:14
  118:6,9 119:4
  119:6 139:20
  140:1,8,18
  145:4
**percentage**
  146:19 147:2
  148:19
**perform** 36:12
  52:17 53:1
  96:12 107:9
  119:23
**performance**
  4:18,22 78:8
  87:17 95:5,6
  95:10 97:1,4,6
**performed**
  63:10 85:22
**performing**
  33:23 40:22
  63:8
**period** 30:23
  106:2 116:8
  139:6
**permanently**
  37:8
**permission**

119:5
**person** 7:12 40:6
  47:2,8,18,20
  53:2 54:19
  75:22 76:3,4,7
  76:10 82:15
  90:15 106:9,14
  107:2 109:2
**personal** 20:21
  21:13 71:16
  72:9,12 89:11
  108:19
**personally** 50:18
  53:18 108:22
**personnel** 54:20
**persons** 24:3
  36:19,22
  144:20
**phase** 140:7
**phone** 84:6
  104:9 116:22
  117:8,17 119:8
  119:12
**phonetic** 12:17
  26:10,11 55:20
  63:20 137:23
**phrases** 102:1
**physical** 13:1
**physician** 14:10
  16:6 150:1
**physicians**
  15:23
**pity** 54:11
**place** 34:14
  53:18 68:19
  155:14
**places** 38:3
**plaintiff** 1:4 2:3
  38:23
**plaintiffs** 41:10
**plant** 9:23
**plead** 54:10
**please** 6:22
  138:1
**plus** 148:2,3
**point** 86:22 87:3

124:11 142:13
  145:20 148:8
**points** 119:18,20
**policies** 64:4
**policy** 42:17,20
  64:8,11,23
  65:4
**poor** 84:23
  86:14,19,21
**pop** 23:9
**position** 4:7
  36:17 37:10
  45:4 46:5,8
  52:22 56:10,14
  57:12 58:17
  61:1 73:14,16
  74:2 75:9,13
  78:16 84:4,8
  87:19,20 89:12
  92:21 93:1,8
  97:13,16
  106:12,18,20
  106:23 112:16
  120:22,23
  134:15 138:20
  138:23 139:5
  139:10 140:2
  145:17,23
  146:1 147:23
**possible** 148:3
**post-GED** 17:7
**pouring** 38:13
**practice** 12:18
  122:10
**practices** 48:13
**practitioner**
  13:4,5 152:2
  153:1
**preference** 72:6
**prepared** 127:2
**prescribed**
  12:12 14:11
  151:23
**prescription**
  14:6
**present** 112:5

12

146:6
**presently** 10:3
11:13 14:11
**pressure** 107:7,9
149:16,18,22
150:5,9,10,11
150:18,19,23
151:3,7,8,17
**pretty** 31:11
32:19 62:18
94:22 124:21
149:6,7 153:15
**previous** 7:21
75:9 106:12,17
106:23 110:10
133:6
**previously** 63:10
**pre-schooling**
16:22
**Primus** 26:11
141:14
**Primus's** 141:16
**printer** 56:18
**prior** 7:18 50:1
50:2 80:4
89:19 115:8
118:22 120:21
121:10 128:15
149:9
**privilege** 23:4
139:8 142:5
**privileges** 72:17
**probably** 36:2
135:10
**probation** 106:5
106:6,9,14
107:1,10
115:12
**probationary**
4:22 28:17
106:2 107:8
115:23
**problem** 96:18
**problems** 33:21
35:22 63:23
64:1,3 76:9,17

115:15 128:2
139:7 149:11
149:14 150:2
**procedural** 3:11
**procedure** 3:19
119:17
**proceeded** 117:4
129:12 130:8
**proceedings**
155:12
**professional**
152:14
**proficient** 78:19
78:20 79:2
122:5,11
130:23 131:2,5
**proficiently** 86:2
**program** 45:7
77:20,22
**progressed** 22:5
**project** 30:16
31:5,6 32:2,3,4
32:19 34:10
101:15 102:10
**projects** 62:20
**promoted** 30:7
33:9 35:23
56:14,21 63:18
68:23 77:8
93:13,16 138:6
138:14,16,22
139:4,6 140:1
**promotion** 44:2
50:3
**promotions**
43:22
**pronounce**
12:14,15 15:22
76:1
**proper** 119:17
**properly** 77:8
131:17 142:17
**provide** 14:17
**provided** 3:18
**proximity** 30:21
31:23

**Prozac** 11:18
12:6,8,12
14:11,20
150:21,22,22
151:23
**psychiatrist**
152:6,11
**psychologist**
152:6,11,19,21
**Public** 1:20 3:8
155:9,18
**pulled** 92:22
116:22
**punctuality** 64:5
**punished** 140:20
**purport** 133:15
**purpose** 3:17
**pursuant** 1:15
**pursue** 56:12
**pursuit** 23:19
**put** 23:12 56:9
99:12 100:17
111:5 138:20
145:12 147:17
150:19
**putting** 119:2
**p.m** 154:1

_____
                                 **Q**
**qualified** 145:20
145:22 146:1
**question** 5:18,22
29:14 31:14,15
31:20,22 47:5
57:18 66:11
73:18 79:1
91:16,21
110:14 126:21
135:14,22
136:17 145:3
146:10
**questionnaire**
4:8 58:18
**questions** 3:12
3:14 5:16
25:16 134:1
153:20

**quickly** 10:6
**Quinn** 1:17 2:5
**quite** 22:3 50:15
66:20 83:17
86:10 98:2
144:12 148:17
150:12

_____
                                 **R**
**race** 110:9,11
134:7,21
135:13 138:2
145:1
**racial** 92:12,14
92:15,17 93:5
109:14,16
**racist** 92:19 93:3
**radical** 119:17
119:20
**radios** 31:1
**rain** 130:1,4,5
**rains** 130:2
**raise** 94:16
98:22 133:1,3
146:23 147:3
148:9,12,13,16
148:17,19
**raising** 92:3,6
94:13,15,23
**read** 60:14,19
133:18,23
**reading** 135:8
151:19,20
**real** 46:20
**really** 25:17
54:7 120:22
144:5 146:17
152:23
**reason** 11:14
14:22 65:6,7
71:21 72:1
93:7 100:5
124:8
**recall** 12:9 13:19
13:22 15:1
20:20 23:2
24:21 26:5

28:2,9 38:3
39:14 40:19,21
41:8,22 42:2
42:13 43:18,20
44:2,20 46:2
47:21 53:12
54:13 55:7,10
55:15,16,19,22
57:11 58:7
64:10 66:3
68:21 69:13
81:16,20 82:17
90:18,23 92:11
92:15 93:14,22
94:10,18
102:14 105:8
110:4,6 112:12
118:3 119:15
120:20 127:3,7
133:5 135:11
139:23 144:12
144:13,15,23
145:2 150:4,14
151:20 152:12
152:15
**receipt** 55:5
**receive** 17:6
19:22 79:10
**received** 15:13
29:18 73:22
77:14 79:9
95:3 106:16
107:6 108:20
108:21 133:16
146:14
**receiving** 74:23
146:13
**recess** 34:17
81:12 153:18
**recognize** 26:18
43:7 44:5,11
55:21 73:2
74:16 112:20
122:15 125:11
127:9
**record** 51:16,22

124:22

records 43:4
51:19 52:1
Redd 2:11 3:23
5:11,12 23:7
34:16,23 35:5
46:20 51:22
77:5 81:11
102:9 107:12
122:8 125:3,6
132:11 136:16
136:22 137:6
153:16,19
redeposed 91:22
refer 96:3
111:14 112:6
referenced
134:12
references
113:10 127:19
referred 58:8,10
92:16 111:16
referred-to 20:1
43:12 44:6
56:22 58:23
73:3 74:17
112:22 122:17
125:12 127:10
133:20
referring 52:3
57:15 124:23
reflect 14:7
48:19 51:17,23
124:23
reflects 132:3,4
refuse 89:13
regarding 118:5
regular 14:15
18:17
reimbursed
72:14
reinstated
145:11
relative 24:11
relatively 86:23
relatives 10:7,19

relief 145:8,10
relocation 32:5
relying 136:19
137:12
remember 14:13
15:8 17:13,14
34:1,6 37:9
41:9,12,14
54:3 61:2
74:11,22,23
94:14 112:8
118:15,19
125:20 127:14
145:7 147:2
151:14
Remind 150:15
reminder 106:8
removed 45:3
106:11
Repeated 4:15
rephrase 5:18
report 57:7,23
58:2 69:2 70:8
70:17,21,23
74:14 75:23
107:14 113:23
114:2,7,9
115:13,17
116:10
reported 57:12
114:4,17
Reporter 1:20
3:7 155:8,18
REPORTER'S
155:2
reporting 93:23
reports 39:19
represent 5:12
24:8
represented
10:14 41:7
representing 3:4
reprimand 4:15
5:3 108:1
113:4 123:2,4
123:6,7,14,18

123:19 124:11
124:13 127:15
143:2
request 90:12
145:8
requests 90:13
required 68:5
78:7 86:4
requirement
65:4
requirements
3:11
research 51:9
reserved 3:15
residence 6:19
resolved 56:5
respect 3:10
99:9 134:6,20
respond 103:23
response 45:21
89:15
responsibilities
60:2 61:23
62:15
responsibility
62:21 130:7,15
responsible
109:2,19,22
131:15
rest 115:4
130:15
result 43:18,22
results 95:15
96:3
retained 22:2,12
24:7
retaliated
110:17,18
137:3 145:5
retaliation 28:22
29:17 45:5
110:10 112:11
retire 153:14
retired 48:4,6
retrain 89:20
revealed 52:1

reversion 75:9
reverted 29:11
106:17,22
review 126:12
133:18
reviewed 59:19
135:16
Reynolds 39:7
51:21 110:19
110:20 112:2
135:23
Re-Notice 4:2
right 12:5,9,15
13:2 20:20
22:20 23:2,17
24:21 26:6,13
36:15 37:5
39:14 43:20
47:21 48:7
50:13,17 53:17
54:16 61:20
64:10,18 65:21
66:3 73:17
74:3,22 80:16
81:3 87:23
88:1 89:4 90:7
91:20 92:11
97:15 98:2
99:3 101:6
102:14 105:15
105:17 110:1
111:10 112:12
113:6 132:9
136:8 139:5,23
141:22 144:12
144:14 146:18
148:14 151:6
153:7
road 116:23
117:3
Robby 61:16,17
Robert 28:3
80:13
Rodney 26:1
rollback 75:12
75:16,18,20

rolled 73:13,20
74:2,13
Ron 134:9
room 16:12
Rosa 7:22
Rotten 45:3,9,10
45:14,21 46:1
46:11,18 47:3
47:7,22 56:7
routinely 69:7
82:9
rule 20:8 112:15
rules 3:19 106:3
ruling 3:15
112:13
Russell 2:4

_____
S

salary 57:5
Sanders 26:1,2
61:6,6
Sandy 55:20
sat 78:15 120:22
146:17
satisfaction
101:4 103:7
satisfactorily
107:4
saw 13:20 55:21
saying 50:5
62:17 93:7
94:14 96:10,22
114:6 134:22
143:6
says 45:3 58:20
58:21,21 91:2
99:21 103:10
103:17 110:8
113:20 134:2
135:17 143:1
scale 146:13
schedule 66:7
67:23 68:14
scheduled 82:7
82:9,10
scheduling
34:22

**school** 9:6,21
16:19 17:3
**Scott** 35:12,12
36:5,6 139:3
140:14,23
141:1,10
**search** 51:23
**second** 8:20
44:16,18 56:3
114:22 134:2
139:9
**see** 16:5 19:17
23:9,14 35:10
51:10 54:8,11
56:17 84:2
101:8 123:7,8
124:4 135:5
**seeing** 14:11
152:4
**seek** 13:21
**seen** 13:7 15:23
19:19 20:12
23:14 36:10
49:8 121:15
152:11,13,23
**self-training**
78:5
**senior** 145:19
**seniority** 147:20
**sense** 87:4 99:23
104:9 142:23
**sentence** 77:7
91:1
**separate** 124:18
**separation**
18:21
**September** 4:10
4:12 73:9 75:2
75:3 126:3,3
**serve** 18:2
**served** 133:16
**service** 18:21
38:8
**serviced** 129:7
**services** 22:12
**session** 4:18

108:1 122:22
123:2,4,9,17
124:5 125:18
**set** 55:13 66:7,8
67:23 87:19
106:10,15
111:12 129:17
131:12,14,16
**setting** 82:13
119:17
**settle** 42:12
**setup** 128:4
129:18 131:15
**setups** 128:11
129:21
**Shana** 9:8,9,10
9:11
**sheet** 69:3
**Shermaine** 9:19
**Shinbaum** 35:11
**shop** 7:14 129:6
**Shorthand** 1:20
3:7
**show** 14:4 49:6
56:17 72:23
74:7 112:19
123:20 127:8
130:13
**showed** 96:16
112:14 121:16
**showing** 96:18
**shown** 19:21
48:11 97:17
**shrink** 152:17
**sick** 64:21 65:2,9
115:4,10 116:1
116:7 143:7
**side** 28:7,7 29:1
29:1 116:23
**signature** 75:4
108:16
**signed** 44:15
59:20 60:13,21
125:18 127:6
**similar** 43:23
63:9 94:3,5,8

128:5 140:9
**similarly** 137:17
137:20
**simple** 135:22
**Simplest** 74:8
**singular** 110:14
**sir** 6:12 51:9
136:8
**sisters** 11:5
**sit** 37:1 47:12
53:10 96:21
103:19
**site** 66:18 67:5
70:17,23 71:4
114:4,20
**sites** 71:5,15
**sits** 103:10
**sitting** 17:1 42:2
**situated** 129:7
137:17,20
**situation** 25:16
92:19 95:7
99:18 100:3
103:13,16
104:11,22
105:3,5 109:9
127:19 132:22
142:6 149:5
**situations** 141:2
**sit-down** 82:3
**six** 62:12
**skills** 84:22 85:1
86:15,19,20
87:16 88:16,16
131:1
**slur** 92:14,15
**slurs** 92:12
109:14,16
**small** 99:7
**Smith** 9:19
**software** 77:16
79:6,20 130:22
**somebody** 90:6
90:20 129:10
130:13 131:6
**sorry** 10:18

56:18 99:4
**sort** 65:16 66:16
143:4 147:12
**sound** 66:15
**sounds** 88:13
100:20
**South** 13:2
**Southern** 19:12
116:12,19
119:12
**speak** 27:18
48:20
**speaking** 111:22
**special** 45:7
**specialists** 152:5
**specialty** 13:3
18:8,10
**specific** 47:2,12
47:19 52:9
91:11,17 99:1
99:6 102:12
**specifically** 36:4
45:19 47:7
103:20
**specified** 12:2
**specify** 138:2
**specifying** 52:10
**spend** 70:1
**spent** 40:14
**spider** 16:10
153:7
**spoke** 132:21
134:13 143:20
**spoken** 24:2,12
24:14,16,16,17
27:20
**spot** 81:9
**spouses** 7:21
**spouse's** 7:4
**stab** 12:16 24:22
**stack** 21:2
**Stacy** 33:16,20
34:2 80:12
139:21
**stamped** 20:10
**stand** 135:3

**standards**
106:10,15,19
147:4 148:15
148:18,20
149:1,5
**stands** 107:2
**start** 6:7 10:20
37:6 65:11
66:18 67:3,10
67:11 68:8,16
69:7 77:12
91:4 92:2
**started** 17:15
61:3,4,10
69:14 100:11
101:16 104:5
130:1
**starting** 57:5
**starts** 64:12
69:11 99:22
132:8
**state** 1:7,9,21
2:14 3:8 15:14
27:9 39:2,4,6
39:13 41:4
71:17 92:18
131:3 147:6
155:5,9,18
**stated** 46:22
54:6 92:20
134:14 136:19
137:1 145:22
**statement** 94:3
137:14 140:8
**statements** 74:5
**states** 1:1 124:13
**stating** 135:9
**station** 130:19
**stay** 69:20 71:6
150:23
**staying** 70:5,5
71:3,10 113:22
**stenographica...**
155:13
**step** 11:3 146:23
147:3 148:2

LEROY  WILLIAMS - 2/21/2007

15

steps 37:13
99:20 138:9
148:1
stick 84:18
stipulated 3:3
stipulation 1:15
STIPULATI...
3:1
stomach 115:2
stop 5:18 8:12
103:18 117:23
129:9,12
stopped 104:9
Street 1:18 2:7
student 82:15
stuff 87:13
98:12
stupid 98:18
stylist 7:11,13
subject 20:8
52:8 95:18
106:11,16,21
106:22
subjected 91:3
submitted 21:22
subordinate
30:4 103:10
subordinates
25:10 28:6
31:8 34:8 99:8
100:2 102:7
138:19
subsequent 49:2
51:5 55:17
subtract 121:19
success 52:22
successful 77:10
77:14
sue 39:21
sued 39:1 42:3
suffered 149:10
sufficient 77:9
suggest 34:20
suing 38:23 40:7
suit 40:3,23 41:3
superiors 29:4

supervise 62:10
83:19 104:3
131:14
supervised
25:13 63:5
129:19
supervising
85:12 128:10
141:1
supervision
26:16 84:3
107:5
Supervisional
79:11
supervisor
21:16 24:23
27:2 32:8,20
32:21 33:2
36:18 41:19
46:3,9 58:5,9
58:11,22 59:9
59:12 61:20
62:3 63:19
65:19 68:13
76:12,18 79:13
82:22 83:6,7,8
83:10,14,15,18
85:4,5,6 88:17
91:4 95:18,23
96:6,9 97:16
99:10 101:5
103:3 109:21
110:12 128:23
132:5 134:5,20
135:20 138:11
138:12 139:12
139:13,15,16
139:18 141:13
143:23 144:1,6
supervisors
107:15
supervisory
61:23 62:21
82:21 83:21
84:21 90:21
suppose 131:19

supposed 65:18
67:2 118:8,9
123:16
supposedly
69:11 111:20
128:13
sure 15:10 23:9
34:16 50:15,20
51:11,14 66:11
66:20 67:7,13
98:1 107:16
109:23 116:2,4
144:12 148:17
150:12
suspended
115:20
sworn 5:8
systolic/diasto...
151:8

_____

T
take 5:15 10:13
12:16 24:22
35:1 44:3,18
66:9,13,14,17
71:22 74:9
95:6 97:20
115:10 116:7,8
128:17,20
129:9 130:2
150:17
taken 1:15 3:6
42:19 112:17
155:12
takes 150:11
talk 101:20
107:21 108:2,7
108:10,22
116:21
talked 24:23
27:19 90:15
116:12 128:9
talking 15:4
29:6 39:18,23
49:16 82:2
88:20 94:11
97:3 99:14

102:16 110:13
111:19,19
117:17 124:14
124:15 134:8
135:6,21
137:17 146:4
153:9,11
Talladega 30:16
32:6 101:15
102:10
tardiness 4:15
64:5,9 113:5
124:13 141:7
141:23 143:1,3
tardy 113:11
task 32:11 96:12
96:17 120:4
tasks 32:10
96:19 120:11
taught 87:14,15
87:16 89:20
tech 62:6,6 63:1
63:3,8,18 66:4
145:12,13
technical 73:14
technically 67:5
technician 37:15
technologist
25:14 26:21
28:18 33:14
34:3 35:16,19
36:16 37:17
56:15 58:4,12
58:13 59:7,12
73:15 81:22
89:2 138:10,23
139:5 145:14
145:19
technology 27:1
tell 5:18 8:6
11:16 24:14
47:13 65:1
74:10 77:11
86:8 89:17
90:6,7 96:11
97:10,21 98:11

103:11,20,21
114:15 115:9
120:18 123:14
134:7 135:7
144:16,16
telling 53:10
62:2 74:1,4,12
88:5 97:11
98:16 100:21
118:16,19
120:20
temporarily
138:20
ten 93:19
term 28:11
119:21
terms 101:23
Terramodel
77:18 78:3,7
78:12,21 79:7
79:20,22 80:11
80:20 81:6,16
83:21 84:2,20
90:4 120:19
121:3,4,7
130:21
test 92:22
testified 5:8
testimony 125:7
Theresa 63:20
63:21,23
they'd 143:12
thing 32:20
65:20 99:15
103:22 143:10
143:16,17
things 22:5
27:21,22 32:14
32:15 54:3
59:17 84:11,18
89:18 90:8
97:5 100:6
102:7,22
118:13 126:14
think 10:1,14
15:10 19:8

LEROY  WILLIAMS - 2/21/2007

16

| | | | | |
|---|---|---|---|---|
| 20:10,11 22:13 | 5:17 13:17,20 | **told** 51:2 53:6 | 89:11 90:12,14 | **true** 85:21 |
| 27:16 31:18 | 16:14 22:15 | 54:12 68:18 | 90:22 109:3,20 | 142:23 155:11 |
| 39:8 40:8 | 25:21 27:2 | 78:16 89:3,23 | 110:3 130:9,18 | **truly** 142:7 |
| 42:23 44:16 | 29:6,21 40:23 | 90:2 95:19,23 | 131:10 138:19 | **Trust** 15:15 |
| 54:18 61:5 | 44:1,21 46:4 | 96:6 99:13 | **trainings** 52:16 | **try** 39:21 54:10 |
| 63:12,14 74:6 | 46:10 49:15 | 104:1,14 | 52:21 80:9 | 70:23 71:4 |
| 74:21 77:13 | 52:17,20,23 | 113:14 114:1 | **transcript** | 75:23 90:20 |
| 79:9 80:16 | 55:17 60:14 | 114:11,14 | 155:12 | 96:3 99:7 |
| 81:19 82:17 | 62:23 63:2 | 115:1,3 116:8 | **transfer** 129:4 | 103:8 131:6 |
| 83:4 84:8 88:3 | 65:10,11,12,23 | 117:23 133:8 | **transferred** 63:3 | 149:17 151:4 |
| 89:1 91:23 | 66:8,9 67:18 | 133:11 | 63:4 | **trying** 40:13 |
| 92:18 95:15 | 67:19,20 68:1 | **Tommy** 25:2 | **transportation** | 62:3 69:16 |
| 98:9,13 99:3 | 68:1,14 71:2 | 26:21 27:5 | 1:7,9 2:15 4:14 | 84:9 87:11 |
| 101:3 105:11 | 73:17 80:5 | 61:19 62:2,5 | 4:21 5:2,13 | 95:5 102:18 |
| 108:14 111:10 | 81:5,21 83:14 | 62:14 63:4 | 15:19 25:14 | 125:20 |
| 111:16 112:8 | 84:10 85:8 | 83:11,13 95:3 | 26:20,23 28:17 | **TT** 28:11,13,23 |
| 123:19,22 | 87:10 88:1,4,8 | 102:23 104:13 | 33:14 35:16,19 | 29:12,13,18,19 |
| 124:7,13,15 | 88:15,18,21 | 104:23 105:5,6 | 36:15 37:4,17 | 30:7,10 33:7 |
| 126:2 145:9,16 | 90:10 94:6 | 105:8 113:5 | 40:11 42:17 | 33:10,18,23 |
| 147:19 150:3 | 116:22 117:10 | 122:23 124:16 | 46:23 48:14 | 35:23 50:3 |
| 150:10 151:23 | 119:1,4 120:7 | 126:9,23 | 49:17 50:8 | 52:20 57:12 |
| 152:1 | 124:11 126:12 | 127:21 134:23 | 51:18 56:14 | 68:23 69:9,10 |
| **thinking** 91:19 | 126:19 130:1 | 143:20,20,21 | 57:16 58:4 | 70:3 72:15 |
| **third** 9:7 77:7 | 132:13 138:13 | **tone** 92:17 | 59:6,11 62:6 | 78:12 79:10 |
| **Thomas** 41:17 | 138:15 142:4,5 | **total** 130:19 | 63:1,2 66:4 | 85:17 86:16 |
| 41:18 53:4 | 145:20 146:2 | **totally** 153:5 | 73:15 81:22 | 93:17 122:3 |
| 61:18 | 151:16 152:8 | **train** 131:6 | 89:2 112:4 | 138:14 140:2 |
| **thought** 9:16 | 152:10 155:13 | **trained** 36:6 | 136:8 138:9,22 | 146:5,14 149:7 |
| 21:18 42:7 | **timely** 131:18 | 77:8,17,19 | 139:4 144:21 | 149:9 152:10 |
| 82:20 100:15 | **times** 16:14 | 85:3,9 88:7 | 145:13 | **Tuesday** 69:13 |
| 142:19 | 21:15,17,18 | 109:23 120:23 | **travel** 40:15 | **Tuesdays** 69:12 |
| **thoughts** 87:5 | 67:8 68:15 | **training** 17:18 | 42:5,10 68:5 | **turn** 23:20 |
| **threat** 106:6,7 | 70:21 96:11 | 17:20 45:7,8 | 72:11 | **turned** 23:6 |
| **threaten** 105:20 | 104:14 113:10 | 53:1 77:11,12 | **treated** 134:5,19 | **Tuscaloosa** |
| **threatened** | 151:4 | 77:13 78:2,13 | 135:12,19 | 114:23 115:7 |
| 105:23 115:17 | **title** 40:23 52:20 | 78:23 79:6,8,8 | 137:22 144:8 | 116:10,18 |
| **threatening** | 54:16,21 58:6 | 79:11,12,20,21 | 150:1 | **Tuskegee** 9:13 |
| 106:8 115:13 | 58:14,22 59:8 | 79:22 80:6,7 | **treatment** | **two** 13:12,13,14 |
| **three** 16:1 42:3 | 60:7 82:23 | 80:11,18,21 | 142:15 | 23:13 43:2,3 |
| 43:2,3 62:13 | 83:1 | 81:4,16,17 | **trial** 42:12 | 48:10 49:7,12 |
| 62:14 76:23 | **today** 5:15 15:23 | 82:3,12,21,23 | **tried** 92:4 100:8 | 49:20 50:4 |
| 104:14 137:4 | 17:1 37:2 | 83:5,21,22,22 | **trouble** 21:16,17 | 51:5 104:14 |
| 139:20 151:4 | 38:22 39:12 | 84:4,10,12,20 | 150:3 | 108:7 112:13 |
| **Thursdays** 70:4 | 42:2 47:13 | 84:21 86:8 | **Troy** 80:12 | 124:19 125:8 |
| **tight** 25:20 | 49:6 96:21 | 87:12 88:1,18 | 139:21 | 134:10 136:6 |
| **time** 3:15,16 | 134:10 | 88:19,23 89:6 | **truck** 67:11 | 148:1,2 151:18 |

153:17
**type** 38:9 82:3
  82:12 128:5

___
**U**
**Uh-huh** 6:18
  79:23 93:18
  104:20 109:5
  113:9 144:11
**unacceptable**
  113:14
**Uncles** 11:11
**understand** 5:17
  5:20 22:3
  31:22 65:14
  69:17 91:16
  96:5 97:8
  99:14,18 118:8
  118:12 126:21
  126:22 135:14
  136:1 142:13
  148:10 151:11
**understanding**
  6:1
**understood** 5:22
**unemployed**
  10:3
**unequal** 142:15
**unfairly** 134:5
  134:19 135:12
  135:20
**unfounded**
  112:18 131:13
**unit** 19:3,7
**UNITED** 1:1
**university** 45:7
**unrelated** 153:5
  153:8
**updated** 121:11
**upset** 92:4
**upstairs** 54:9
**use** 23:19 28:11
  72:20 78:7,20
  79:6 92:12
  99:15 109:14
  109:16 128:18
  142:4,5

**usual** 118:23
**usually** 82:13
  129:9
**utilize** 77:22
**utilized** 77:21

___
**V**
**vary** 68:11,12
**vehicle** 71:16,17
  71:22 72:2,12
  72:19 129:3,5
  129:6
**verbally** 90:3,7
**verify** 60:19
**version** 103:12
**virtue** 39:9
  110:22
**voice** 92:3,7
  94:13,15,16
  95:1 98:22
  133:1,3
**Vs** 1:5

___
**W**
**W** 2:4,11
**wait** 128:22
  143:19
**waived** 3:12
**walk** 103:16,17
  104:5,6,7,8,16
  104:18,19
  127:22 129:16
**walked** 104:21
  104:23 105:2,6
**Walker** 41:15
**walking** 105:8
  133:7
**want** 15:9 23:8
  49:9,18 58:19
  72:20 76:21
  77:11 91:22
  95:11 103:12
  103:21 104:2
  105:4 115:15
  135:20 145:10
  145:12 146:4
  147:18,21

149:12
**wanted** 60:2
  72:5,7 95:22
  95:23 96:12
  98:12 100:23
  117:1 118:13
  120:3 130:6
**wants** 91:23
  104:13
**wasn't** 29:20
  30:14 31:2
  52:16 58:14,14
  85:3 86:12
  96:9,18 97:2
  97:12 100:23
  101:1 102:8
  115:5 119:7,15
  120:15 121:11
  141:20 142:2
**Waterbury** 8:2
  8:23
**way** 54:8 74:9
  93:10,11 95:20
  95:23 96:1,4
  96:17 97:7,11
  97:12,15,17
  98:17,20 99:12
  100:6,14,23
  115:14,18,18
  116:16 117:20
  118:13 119:2
  129:8 132:1,5
  133:2 147:10
**ways** 67:14 84:6
  95:12 96:2
  105:23 139:9
**Wednesday**
  113:12
**week** 10:2 69:4,5
  69:17,21,22
  93:23 126:5
**weeks** 151:18
**went** 16:14,21
  22:15 51:8
  69:17 80:20
  96:13 115:4

126:11,20
  129:12,14
  130:5 152:22
**weren't** 31:4,23
  45:16 85:12
  88:14 117:15
**We'll** 19:20
  125:6
**we're** 17:1 38:21
  39:11,23 100:4
  102:9 134:8
  135:5,21
  147:22
**We've** 67:13
**whatsoever** 64:3
  80:19 149:23
**whereabouts**
  9:12
**white** 52:19
  63:21,22 76:15
  80:4,10 138:5
  138:23 139:3
  140:8 144:8
**wife** 7:8 24:17
**Wiggins** 1:17
  2:5
**William** 45:21
  137:23 138:5
  139:22 140:16
**Williams** 1:3,13
  3:6 4:6,12,17
  5:7,12 6:9 7:5
  7:22 8:11
  16:20 52:2
  90:3,5 134:3
  134:18 135:18
  137:11,13
  153:23
**William's**
  138:12
**Willy** 26:11 33:4
  33:5 141:14
**withdraw** 56:11
**Withdrawn**
  107:12 132:11
**withheld** 23:4

**WITNESS**
  31:21
**wondering**
  87:14
**woods** 67:9,12
  103:19 129:21
**word** 99:15
**words** 42:20
  67:23 68:17
  101:23 115:16
  145:11
**work** 4:17 7:10
  9:4,21 17:15
  17:23 21:18
  28:8,15 30:10
  30:21 33:13,21
  33:22,22 35:6
  35:18,21 36:9
  37:6,21 38:1,2
  38:6,7,9,13
  47:23 63:7,9
  64:1,13 65:11
  65:18 66:5,18
  66:19 67:15
  68:6,10,20
  69:2,7,17
  70:14 71:12
  76:4 77:21
  87:16 88:8
  92:2,4 95:5,6
  95:10,13,13
  97:8,8,10
  113:13 115:4
  115:15,22
  116:16 117:4,4
  117:20 119:15
  122:3 128:19
  129:5,13,22
  133:10 147:21
  147:22
**worked** 25:9
  26:15 28:4,4
  28:16 29:9
  30:9,15 32:3
  36:5 37:18
  38:3 76:12,14

LEROY  WILLIAMS - 2/21/2007

18

| | | | | |
|---|---|---|---|---|
| 80:19,22 85:16<br>85:18 118:20<br>118:21<br>**workers** 81:15<br>**working** 9:22<br>15:18 29:1,21<br>31:4,23 32:2,7<br>32:10,11,14,17<br>32:18 34:2,7,9<br>34:10,11 36:10<br>58:22 59:8<br>62:19,20 67:4<br>67:9 70:12<br>76:6,9 78:4,14<br>87:9,13 99:20<br>100:4 120:7<br>133:13<br>**workman's**<br>15:16<br>**works** 7:11,12<br>7:13,16 9:4<br>132:2,5<br>**work-related**<br>16:17<br>**wouldn't** 16:15<br>29:22 33:15<br>75:20 80:2<br>81:7 97:22<br>99:9 130:12<br>143:13,21<br>148:23 152:17<br>152:19<br>**write** 22:7<br>116:21 117:23<br>147:13<br>**write-up** 143:1<br>**written** 115:20<br>124:5 141:23<br>144:2,3<br>**wrong** 98:9,13<br>102:8 115:5<br>**wronged** 46:18<br>47:14<br>**wrongful** 45:19<br>46:12 47:8,14<br>**wrote** 117:12 | 128:14 132:15<br>143:2<br>————<br>**X**<br>**X** 3:21<br>————<br>**Y**<br>**Yeah** 18:20 19:2<br>27:5 29:20<br>34:23 35:5<br>69:23 74:6<br>75:17 80:23<br>81:11 125:11<br>144:4 149:13<br>**year** 12:10,11<br>17:14 29:10<br>146:20 147:7<br>**years** 7:7 8:4<br>13:10,14 16:1<br>27:10 28:9<br>40:18,19 48:8<br>83:17 85:16<br>93:19<br>**yell** 94:13,16<br>100:21<br>**yelled** 102:6<br>**yelling** 92:2,6,10<br>94:23 99:22<br>101:1,2,5<br>**y'all** 32:15 40:13<br>66:21 67:15<br>126:11<br>————<br>**$**<br>**$25** 146:16<br>————<br>**0**<br>**05** 56:13 59:20<br>73:9 94:1<br>————<br>**1**<br>**1** 4:2,12 19:21<br>20:4,11 77:6<br>91:2 113:12,15<br>118:16<br>**1st** 126:3<br>**1,041.50** 57:5 | **1:11** 154:1<br>**1:45** 119:14<br>**10** 4:20 123:23<br>125:10,15<br>134:1 137:6<br>**10th** 128:17<br>**10:16** 1:22<br>**101** 19:8,8<br>**11** 5:1,4 127:8<br>127:13<br>**11th** 128:12<br>**112** 4:13<br>**12** 4:6 5:5 56:20<br>133:14,22<br>**12th** 16:21<br>**122** 4:17<br>**125** 4:20<br>**127** 5:1<br>**13** 137:16<br>**133** 5:5<br>**14** 7:7<br>**140** 151:13<br>**1409** 2:16 57:17<br>57:20<br>**15** 66:13,14<br>129:15<br>**16** 57:9<br>**160** 151:13<br>**18** 8:4<br>**19** 8:14,15<br>**1997** 4:3 43:6,10<br>————<br>**2**<br>**2** 4:3 43:15 49:8<br>77:6 111:13<br>113:19,19<br>118:17,20<br>145:9<br>**2:06-CV-658-ID**<br>1:6<br>**20** 4:2 8:14<br>114:22 143:19<br>**2000** 4:4 15:9<br>44:17,22<br>**2002** 15:9,11<br>**2003** 134:3,17<br>135:2,18 | **2005** 4:6,10,12<br>4:16,19,23 5:4<br>56:20 57:9<br>113:8,12,15<br>122:23<br>**2007** 1:22 154:2<br>155:15<br>**21** 1:22 9:10<br>154:2<br>**25th** 59:20 60:6<br>116:9<br>**26** 4:16 20:8<br>113:8<br>**26th** 124:1<br>**28** 4:19,23<br>122:22<br>**28th** 124:3<br>125:16 155:15<br>————<br>**3**<br>**3** 4:4 44:4,9<br>48:16 49:9<br>56:4 65:19<br>111:13 137:16<br>**3rd** 75:2<br>**30** 143:19<br>**301** 1:17 2:7<br>**35203** 2:8<br>**36110** 2:17<br>**36111** 7:1<br>**3723** 6:23<br>————<br>**4**<br>**4** 4:5 57:2 116:9<br>**41** 6:13 150:16<br>**43** 4:3<br>**434** 20:11<br>**44** 4:4<br>————<br>**5**<br>**5** 3:23 4:4,7 58:2<br>58:17 59:3<br>69:11 70:8<br>113:17 143:18<br>**5th** 44:17<br>**5:00** 57:8<br>**5:05** 113:13 | **56** 4:5<br>**58** 4:7<br>————<br>**6**<br>**6** 4:9 72:23 73:6<br>**6:35** 114:21<br>**6:45** 114:20,21<br>————<br>**7**<br>**7** 4:11 45:2<br>65:18 71:1<br>74:9,20 116:12<br>117:11,15<br>**7(d)** 45:18<br>**7:06** 117:5<br>**7:08** 117:5,12<br>**7:14** 115:8<br>116:11<br>**7:30** 115:1<br>**72** 4:9<br>**74** 4:11<br>————<br>**8**<br>**8** 4:13 64:12<br>112:20 113:2<br>125:1 129:8<br>**8:05** 64:13<br>**8:30** 129:2<br>**80** 151:13,13<br>**82** 116:17<br>————<br>**9**<br>**9** 4:17 122:20<br>123:1 125:6<br>129:14<br>**9th** 75:3<br>**93** 18:7 37:8<br>**94** 18:7 |

# EXHIBIT B

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR
2      THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5  CASE NUMBER:  CV2006:CV-658-JD-DRB
6
7  LEROY WILLIAMS,
8      Plaintiff,
9      vs.
10
11  STATE OF ALABAMA DEPARTMENT OF
12  TRANSPORTATION, et al.,
13      Defendants.
14
15      S T I P U L A T I O N
16      IT IS STIPULATED AND AGREED by
17  and between the parties through their
18  respective counsel, that the deposition
19  of DON ARKLE may be taken before Leslie
20  K. Hartsfield, at the offices of the
21  State of Alabama Department of
22  Transportation, 1409 Coliseum Boulevard,
23  Montgomery, Alabama, 36110,

Page 2

1      DEPOSITION OF DON ARKLE
2  taken on the 15th day of May, 2007.
3      IT IS FURTHER STIPULATED AND
4  AGREED that the signature to and the
5  reading of the deposition by the witness
6  is waived, the deposition to have the
7  same force and effect as if full
8  compliance had been had with all laws
9  and rules of Court relating to the
10  taking of the deposition.
11      IT IS FURTHER STIPULATED AND
12  AGREED that it shall not be necessary
13  for any objections to be made by counsel
14  to any questions except as to the form
15  or leading questions, and that counsel
16  for the parties may make objections and
17  assign grounds at the time of the trial,
18  or at the time said deposition is
19  offered in evidence, or prior thereto.
20      IT IS FURTHER STIPULATED AND
21  AGREED that the notice of filing of the
22  deposition by the Commissioner is
23  waived.

Page 3

1              INDEX
2  EXAMINATION BY:      PAGE NUMBER:
3  Mr. Adams        6
4
5
6  PLAINTIFF'S EXHIBITS:
7  1 - Letter 9-1-05        17
8  2 - Letter 5-12-05        19
9  3 - Reprimand        30
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5  CASE NUMBER:  CV2006:CV-658-JD-DRB
6
7  LEROY WILLIAMS,
8      Plaintiff,
9      vs.
10
11  STATE OF ALABAMA DEPARTMENT OF
12  TRANSPORTATION, et al.,
13      Defendants.
14
15  BEFORE:
16      LESLIE K. HARTSFIELD,
17      Commissioner.
18
19  APPEARANCES:
20      WIGGINS, CHILDS, QUINN &
21  PANTAZIS, by Mr. Russell Adams, The
22  Kress Building, 301 19th Street North,
23  Birmingham, Alabama, 35203, appearing on

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1  behalf of the Plaintiff.
2     STATE OF ALABAMA DEPARTMENT OF
3  TRANSPORTATION, by Mr. Andrew Redd and
4  Mr. Mitch Alton, 1409 Coliseum
5  Boulevard, Montgomery, Alabama, 36110.
6
7           ********
8
9     I, LESLIE K. HARTSFIELD, a Court
10 Reporter of Prattville, Alabama, acting
11 as Commissioner, certify that on this
12 date, as provided by the Federal Rules
13 of Civil Procedure and the foregoing
14 stipulation of counsel, there came
15 before me at the offices of the State of
16 Alabama Department of Transportation,
17 1409 Coliseum Boulevard, Montgomery,
18 Alabama, 36110, beginning at 9:45, a.m.,
19 DON ARKLE, witness in the above cause,
20 for oral examination, whereupon, the
21 following proceedings were had:
22
23

Page 6

1           DON ARKLE
2     being first, duly sworn, was examined
3     and testified as follows:
4
5     THE REPORTER:  Usual
6  stipulations?
7     MR. REDD:  That's fine.
8     MR. ADAMS:  Yes.
9
10 EXAMINATION BY MR. ADAMS:
11    Q.  Mr. Arkle, my name is Rusty
12 Adams.  It's been a while, but we've met
13 before.  I represent the plaintiff in
14 this case, Leroy Williams.  And I
15 believe that you've been deposed
16 numerous times before in the Reynolds
17 case; is that correct?
18    A.  I've been deposed in the
19 Reynolds case, yes.
20    Q.  So you've done it several
21 times and you're familiar with how the
22 process works.  If you need to take a
23 break or anything, just let me know.  If

Page 7

1  I've asked a question, I would ask you
2  to go ahead and answer the question
3  before we take a break.  But other than
4  that, any time you want to take a break,
5  that's fine.  I don't expect this to be
6  very long today.
7           Can you state your full name
8  for the record, please?
9     A.  It's Don Thomas Arkle.
10    Q.  Where do you live,
11 Mr. Arkle?
12    A.  I live at 123 Shady Oak Lane
13 in Prattville, Alabama, 36066.
14    Q.  And how long have you lived
15 at that address?
16    A.  13 years.
17    Q.  And are you married,
18 Mr. Arkle?
19    A.  I am.
20    Q.  And what's your wife's
21 name?
22    A.  Cynthia L. Arkle.
23    Q.  How long have y'all been

Page 8

1  married?
2     A.  26 years.
3     Q.  Is that your first
4  marriage?
5     A.  Yes.
6     Q.  Do you have any children?
7     A.  Yes.
8     Q.  If they're over the age of
9  19, give me their names.
10    A.  Brandon Kenneth Arkle, he's
11 25; Adam Everett Arkle, he's 22; Jordan
12 Thomas Arkle, he's 20; and Leigh Whitney
13 Arkle is 19.
14    Q.  I'd like you to start and
15 give me an overview of your employment
16 history with the DOT and also give me
17 your educational background before you
18 came to DOT.
19    A.  I graduated from Auburn
20 University with a bachelor's degree in
21 civil engineer in 1977.  I immediately
22 went to work for the Department of
23 Transportation as the division traffic

2 (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 9

1  engineer in the first division located
2  in Decatur, Alabama. I worked there for
3  about 3 1/2 years and then transferred
4  to Montgomery to work in the traffic
5  engineering section of the design
6  bureau. Was promoted to assistant state
7  traffic engineer in about 1983. Was
8  promoted to assistant bureau chief in
9  '87.
10     Q.   Assistant bureau chief of
11  the design bureau?
12     A.   Of the design bureau. Then
13  was promoted to design bureau chief in
14  1993. About a year ago, I was made
15  assistant chief engineer over policy and
16  planning.
17     Q.   And that would have been
18  approximately May of 2006?
19     A.   It was March of 2006.
20     Q.   But during the time of
21  Mr. Leroy Williams' employment as a
22  transportation technologist with the
23  department which was in 2005, you were

Page 10

1  the design bureau bureau chief?
2     A.   That is correct.
3     Q.   If you could, Mr. Arkle, I'd
4  like you to give me -- start with the
5  director and come down to say a
6  transportation technologist in the
7  location section of the design bureau
8  and tell me the line of progression, but
9  not line of progression but chain of
10  command from there or up, down, either
11  way you want to do it.
12     A.   Well, I'll do it from the
13  top down. The director supervises the
14  chief engineer who is the top
15  engineering staff position. Beneath the
16  chief engineer is an assistant chief
17  engineer over preconstruction. The
18  assistant below him is the design bureau
19  chief; below him is the location
20  engineer; below him would be the
21  assistant location engineer; from there
22  would be a party chief.
23     Q.   Party chief's classification

Page 11

1  would be?
2     A.   Would be a transportation
3  technologist senior. And then --
4     Q.   Which would also be called
5  at one point civil engineer III-IV?
6     A.   That's correct. And then
7  the field supervisor is the
8  transportation technologist position.
9     Q.   And so the supervisor of the
10  transportation technologist should be a
11  transportation technologist senior;
12  correct?
13     A.   That's -- that's right.
14     Q.   And people of the same
15  classification don't supervise each
16  other; correct?
17     A.   Not at this time.
18     Q.   Mr. Arkle, you have been
19  with the department throughout the time
20  of the Reynolds lawsuit since 1985;
21  correct?
22     A.   Yes.
23     Q.   And you're familiar with the

Page 12

1  fact that the department was required
2  under that consent decree to develop new
3  examinations for each of the job
4  classifications; is that correct?
5     A.   Yes.
6     Q.   And it's also correct that
7  the department has done that for each of
8  the classifications including the
9  transportation technologist
10  classification; correct?
11     A.   That's my understanding,
12  yes.
13     Q.   And it's also true that the
14  department considered those to be state
15  of the art examinations and the best
16  possible way to select candidates for
17  the transportation technologist
18  position?
19     MR. ALTON:  Object to the
20  form.
21     A.   To the best of my
22  understanding, yes.
23     Q.   Did you play any role in the

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1  selection of Leroy Williams to a
2  transportation technologist?
3      A.   Other than signing the
4  appointment papers, I did not interview
5  and select Mr. Williams for the
6  position.
7      Q.   Do you know who did?
8      A.   I believe Joe Jones was
9  the -- I guess I'm not real sure.  It's
10 been a while since all that took
11 place.
12     Q.   I've done this so long that
13 I tend to shortcut things and forget
14 what new lawyers and new judges don't
15 know.  So I want to go in and let you
16 give me an overview of the way the
17 certificate of eligibles process works.
18 And start with how somebody gets on a
19 register and take me through that
20 process, if you could.
21     A.   An employee fills out an
22 application and periodically exams are
23 given.  Employees sit for an exam.  That

Page 14

1  exam will be scored and the employee
2  will then be placed on a register based
3  on his score.  When the department
4  desires to fill a position, they call
5  for a register.  The register is
6  certified, typically given the top ten
7  names.
8      Q.   And that becomes the
9  certificate of eligibles?
10     A.   That's the certificate of
11 eligibles.  The department then has
12 those ten candidates to select from.
13     Q.   And so those ten candidates
14 would be the ten persons who had the
15 highest score for that geographical
16 area; correct?
17     A.   That's -- that's correct.
18     Q.   And so in order to be on the
19 certificate of eligibles in order to be
20 selected, Mr. Williams had to be one of
21 those top ten people; correct?
22     A.   Assumably so.  There is the
23 possibility that nobody in the top ten

Page 15

1  is eligible and that you get a
2  recertification which you might get
3  lower names.  So I can't tell you
4  exactly where Mr. Williams was on the
5  list at the time --
6      Q.   But assuming he was within
7  the top ten of the people who were
8  eligible because they'd been
9  recertified?
10     A.   Yes.
11     Q.   If it had been
12 recertified?
13     A.   Yes.
14     Q.   When a certificate of
15 eligibles is received by the person
16 who's making the appointment, they then
17 send out what are called availability
18 letters; correct?
19     A.   That I think was our process
20 at that time.
21     Q.   And then the persons would
22 return those eligibility letters and say
23 whether they were still interested in

Page 16

1  the position.  And each of those persons
2  on the certificate is then given a code
3  to say whether they're eligible for
4  consideration, such as, if they have
5  declined for location an "L" is put by
6  their name; correct?
7      A.   I believe that's correct,
8  yes.
9      Q.   And at that time, the
10 department also used a code called an
11 "H" code if somebody had been appointed
12 to that classification in another area
13 or another position; correct?
14     A.   Correct.
15     Q.   And if somebody was actually
16 considered for the job, they would be
17 given a "C" by their name; correct?
18     A.   Yes.
19     Q.   And then the person who was
20 appointed is given an "A" code for
21 appointed; correct?
22     A.   Yes.  And there's a "D" for
23 somebody who declined.

4 (Pages 13 to 16)

**FREEDOM COURT REPORTING**

Page 17

1
2       (Plaintiff's Exhibit No. 1 was
3       marked for identification and
4       attached hereto.)
5
6       Q.   Mr. Arkle, I hand you what's
7   been marked as Plaintiff's Exhibit 1,
8   can you identify that document for me?
9       A.   It's a letter dated
10  September 1, 2005 to Mr. Leroy Williams
11  referencing a transportation
12  technologist appointment signed by me.
13      Q.   And I'd ask you to look at
14  that a little closer and tell me is that
15  actually his appointment or where he was
16  demoted from the transportation
17  technologist position.
18      A.   It is -- I don't think
19  demotion is the proper term.  It is --
20  I'll read the first sentence.  This is
21  to inform you that your appointment in
22  the transportation technologist
23  classification that was effective May

Page 18

1   14, 2005 has been terminated as of
2   September 3, 2005.  It was a termination
3   of his appointment.
4       Q.   And that termination of his
5   appointment effectively changed his
6   classification from the higher
7   classification of transportation
8   technologist to the lower classification
9   of engineering assistant II-III;
10  correct?
11      A.   Yes, it 'caused him to
12  revert back to his former
13  classification.
14      Q.   And so you would contend
15  that that is not a demotion?
16      A.   No.
17      Q.   How is that not a
18  demotion?
19      A.   Because he didn't have
20  permanent status as a transportation
21  technologist.
22      Q.   But he had been appointed to
23  that position; correct?

Page 19

1       A.   Yes.
2       Q.   And the state personnel
3   department had changed his
4   classification in the system; correct?
5       A.   Yes.
6       Q.   And he was being paid at the
7   level of a transportation technologist
8   which is higher than the payment to an
9   engineering assistant II-III; correct?
10      A.   That's correct.
11
12      (Plaintiff's Exhibit No. 2 was
13      marked for identification and
14      attached hereto.)
15
16      Q.   Mr. Arkle, I hand you what's
17  been marked as Plaintiff's Exhibit 2.
18  Can you tell me what that is?
19      A.   It is a letter dated May 12,
20  2005 to Mr. Leroy Williams signed by me
21  and it confirms his being selected for
22  the classification of transportation
23  technologist effective May 14, 2005.

Page 20

1       Q.   So in other words, that
2   letter confirms that he was selected and
3   promoted to the classification of
4   transportation technologist?
5       A.   Yes.
6       Q.   And the stated reason for
7   what I will call the demotion of
8   Mr. Williams to -- back to engineering
9   assistant from the transportation
10  technologist position is because of
11  continual excessive tardiness and
12  repeated insubordination; correct?
13      A.   That's correct.
14      Q.   And you were the person who
15  made the final decision that
16  Mr. Williams would be reverted back to
17  his prior classification of engineering
18  assistant; correct?
19      A.   Yes, sir.
20      Q.   Tell me what you did to
21  investigate the allegations of excessive
22  tardiness and repeated insubordination.
23      A.   I had numerous written

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1 reports that documented the activities
2 that were the basis for the
3 recommendation from Mr. Lewis,
4 Mr. Jones, and Mr. Adams. I reviewed
5 those and I can't recall any personal
6 conversations but I may have had
7 personal conversations with Mr. Adams,
8 Mr. Jones.
9     Q.    But you don't know if that's
10 correct?
11     A.    I just don't recall.
12     Q.    Did you have a personal
13 conversation with Mr. Williams?
14     A.    I don't believe so.
15     Q.    So you did not meet with
16 Mr. Williams to get his side of the
17 story or find out if any of these
18 allegations were true or whether he had
19 a different version of the facts?
20     A.    No.
21     Q.    Did you meet with any of
22 Mr. Williams' crew to determine whether
23 any of the allegations were true or

Page 22

1 whether there was any possible problem
2 with his own supervisor Mr. Lewis?
3     A.    No, I did not.
4     Q.    Why?
5     A.    This was a decision on
6 whether or not Mr. Williams should
7 continue in a probationary status and it
8 was the judgment of his supervisor to
9 make that determination.
10     Q.    And that supervisor who
11 initially recommended that or who did
12 the written reprimands and who wrote
13 Mr. Lewis up for excessive tardiness was
14 Tommy Lewis; is that correct?
15     A.    That's correct.
16     Q.    And Mr. Tommy Lewis had only
17 recently become the party chief;
18 correct?
19     A.    I don't recall when
20 Mr. Lewis became party chief.
21     Q.    So you don't know that
22 Mr. Lewis was actually in a probationary
23 period himself or whether he was in a

Page 23

1 full position of a civil engineer III-IV
2 or transportation technologist senior,
3 do you?
4     A.    I don't recall at this time,
5 no.
6     Q.    And do you know that Mr.
7 Lewis wasn't even actually holding that
8 classification but was doing that job
9 out of classification and never even
10 been appointed to the transportation
11 technologist senior position?
12     A.    No, I'm not -- I don't
13 recall that.
14     Q.    So you were not aware that
15 you were taking the word of one civil
16 engineer over another civil engineer,
17 you never bothered to find that out?
18     A.    I -- I was taking the word
19 of Mr. Adams, Mr. Jones, and Mr. Lewis
20 and I have full confidence in their
21 ability to make this type of judgment.
22     Q.    But Mr. Lewis is the one who
23 actually made the allegation of

Page 24

1 tardiness and the allegation of
2 insubordination; correct?
3     A.    Yes, sir.
4     Q.    What is the department's
5 policy on tardiness?
6     A.    We have work rules that
7 pertain to the hours of work and we're
8 expected to adhere to those work
9 hours.
10     Q.    And in your experience with
11 the department, are employees normally
12 given warnings or reprimands for being
13 five minutes late?
14     A.    Yes.
15     Q.    Is that always the case or
16 is some employees not given warnings and
17 reprimands when they're five minutes
18 late?
19     A.    I couldn't -- I couldn't
20 attest to all the cases. But we have
21 had numerous occasions where employees
22 were counseled, reprimanded, and
23 suspended for tardiness.

6 (Pages 21 to 24)

**FREEDOM COURT REPORTING**

Page 25

1    Q.   Have you, yourself, had
2  employees who were five minutes late
3  that you did not reprimand or give
4  warnings to?
5    A.   I suspect there's been a
6  time when an employee has shown up five
7  minutes late and all the rest of the
8  days of their year they're on time and
9  maybe nothing was said.  But unless you
10  got a specific occurrence, I can't -- I
11  can't respond.
12    Q.   But you cannot deny that
13  there's been white employees who have
14  been five minutes late who have not
15  received warnings or reprimands, can
16  you?
17    A.   I cannot say that there's --
18  that's not happened.
19    Q.   And did you bother to look
20  at Mr. Williams' personnel file before
21  you made your decision to remove him
22  from his position of transportation
23  technologist and send him back to the

Page 26

1  classification of engineering
2  assistant?
3    A.   I don't think I did, but I
4  don't recall.
5    Q.   So you were not aware that
6  Mr. Williams was a 12-year employee of
7  the department who had never been
8  reprimanded or even had his evaluation
9  downgraded for punctuality in the 12
10  years of his employment before he went
11  to work for Mr. Lewis?
12    A.   I think what was important
13  in making this decision was his
14  performance during the time of his
15  promotion to determine if he was going
16  to be able to successfully perform that
17  job.
18    Q.   So you don't think that it's
19  important that you have a 12-year
20  employee who had not been written up for
21  tardiness before?
22    A.   If Mr. Lewis -- if Mr.
23  Williams had been written up for

Page 27

1  tardiness before, it didn't bear on this
2  decision.
3    Q.   And that even if he had been
4  written up, it hadn't been on one of his
5  evaluations?
6    A.   Well, I didn't look at his
7  former evaluations because he wasn't
8  being evaluated for the performance he
9  had performed previously in his former
10  job.
11    Q.   And it's important for
12  engineering assistants to be on time as
13  well as it is for civil engineers;
14  correct?
15    A.   It is particularly important
16  for our survey crews to be on time.
17    Q.   And as an engineering
18  assistant, Mr. Williams would have --
19  had been part of survey crews as well,
20  had he not?
21    A.   He had, yes.
22    Q.   And an employee who is
23  allegedly insubordinate as a civil

Page 28

1  engineer would also potentially have
2  problems as an engineering assistant;
3  correct?
4        MR. REDD:  Object to the
5  form.
6    A.   I'm sorry.  Could you repeat
7  the question?
8    Q.   It's also important for
9  engineering assistants to take orders,
10  isn't it?
11    A.   It is important for all
12  employees to follow the directions of
13  their supervisor.
14    Q.   And in fact, a civil
15  engineer should have less supervision
16  than an engineering assistant; correct?
17        MR. REDD:  Object to the
18  form.  You can answer if you have an
19  opinion.
20    A.   I think it would depend on
21  the circumstances.
22    Q.   You don't think that a civil
23  engineer is supposed to have more

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  discretion and authority than an
2  engineering assistant?
3      A.   I think that a civil
4  engineer would have more authority and
5  responsibility than an engineer
6  assistant, yes.
7      Q.   And Mr. Williams was not
8  demoted to engineering assistant because
9  of problems in his actual work
10 performance; correct?
11     A.   There were concerns over his
12 work performance, but the reason for
13 terminating his probation at that time
14 was due to his not following directions
15 and his insubordination.
16     Q.   And in fact it was done
17 three months early before his
18 probationary period even ended; isn't
19 that correct?
20     A.   That's correct.
21     Q.   Did you consult anyone else
22 in making this decision other than
23 Mr. Adams and Mr. Jones?

Page 30

1      A.   I don't recall.
2      Q.   Did you speak with anyone at
3  the state personnel department?
4      A.   I don't believe so.
5      Q.   Did you review the state
6  personnel department rules concerning
7  probationary employees?
8      A.   I don't recall.
9      Q.   So you cannot testify that
10 you did so; correct?
11     A.   No.
12     Q.   What is the department's
13 policy concerning the number of tardies
14 that would require an employee to get
15 marked down on their evaluation?
16     A.   I don't think there is a
17 policy as to the number of tardies
18 before an employee is reprimanded or
19 marked down on their evaluation.
20
21     (Plaintiff's Exhibit No. 3 was
22     marked for identification and
23     attached hereto.)

Page 31

1
2      Q.   What would you consider a
3  pattern of tardiness that would require
4  someone to be marked down on their
5  evaluation?
6      A.   I've not established a
7  number and it may differ depending upon
8  each circumstance.
9      Q.   So it might differ depending
10 on who the employee is?
11     A.   It might differ depending
12 upon what the work function is.
13     Q.   Hand you what's been marked
14 as Plaintiff's Exhibit 3 which has also
15 been marked as Defendant's Exhibit 8 to
16 the deposition of Leroy Williams.  Can
17 you identify that document?
18     A.   This is a memorandum dated
19 July 26, 2005 to Mr. Leroy Williams from
20 Mr. Tommy Lewis referencing reprimand
21 for repeated tardiness.
22     Q.   Is that one of the documents
23 that you relied on in making your

Page 32

1  decision to demote Mr. Williams to
2  engineering assistant?
3      A.   It's been nearly two years
4  since this event took place.  If this
5  was included with the information that
6  was given to me and was likewise
7  transmitted to the personnel bureau,
8  then it would have been something I had
9  read and considered.
10     Q.   Have you ever demoted anyone
11 else from transportation technologist
12 down to an engineering assistant?
13     A.   I can't recall a time when a
14 person appointed transportation
15 technologist that their appointment was
16 terminated during their probationary
17 period.  There have been other cases
18 where an employee was not given
19 permanent status after being appointed
20 and was actually let go.
21     Q.   But you can't think of any
22 other person who's ever been appointed
23 to transportation technologist and was

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 33 |
|---|

1  let go before their probationary period
2  even ended?
3      A.  I can't recall, no.
4      Q.    And can you name any other
5  African-American who was appointed to
6  the transportation technologist position
7  in the design bureau other than
8  Mr. Williams and other than those
9  persons who were appointed under the
10  court-ordered appointments in 1998 and
11  1999 to that position?
12      A.    To a transportation
13  technologist position?
14      Q.    Yes.  Can you name anybody
15  else who's been appointed off of a
16  certificate of eligibles?
17      A.    I'm sure our -- our records
18  would indicate what -- what appointments
19  we've made.  I can't --
20      Q.    Can you name one is the
21  question?
22      A.    I can't recall.
23      Q.    As the bureau chief of the

| Page 34 |
|---|

1  design bureau who's been involved in a
2  lawsuit since 1985 over the fact that
3  there are no African-Americans in upper
4  level positions at the department, can
5  you name a single African-American who's
6  been appointed to transportation
7  technologist?
8      A.    I can't name a single
9  person, African-American or otherwise,
10  that we've appointed from EA to
11  transportation technologist off of a
12  register.  I can't tell you who that
13  would be.  I'm sure we've made numerous
14  appointments.  I can't tell you their
15  names.
16      Q.    But you could name white
17  transportation technologists; correct?
18      A.    That are currently employed
19  with the department?
20      Q.    Yes.  Yes.  In the design
21  bureau.
22      A.    Yes.
23      Q.    And can you name any

| Page 35 |
|---|

1  African-Americans who are transportation
2  technologists?
3      A.    Anna Harris.
4      Q.    Where is Ms. Harris
5  located?
6      A.    In design bureau, roadway
7  design section.
8      Q.    Does Ms. Harris have a
9  college degree in engineering?
10      A.    No, she does not.
11      Q.    Can you name any others?
12      A.    I believe we have an
13  African-American who's working in a
14  survey party who is a transportation
15  technologist classification.
16      Q.    What is that person's
17  name?
18      A.    I just can't recall right
19  now.
20      Q.    But you don't know whether
21  they were appointed off of a certificate
22  of eligibles?
23      A.    No, I don't.

| Page 36 |
|---|

1      Q.    Now, we've talked about the
2  examinations that the department has
3  developed, and assuming that the person
4  who was then appointed to Mr. Lewis -- I
5  mean to Mr. Williams' position was
6  appointed off a certificate of
7  eligibles?
8      A.    Could you repeat the
9  question?
10      Q.    Mr. Lewis was appointed off
11  a certificate of eligibles where he was
12  in the top ten; correct?
13      A.    I'm not --
14      MR. REDD:  Mr. Lewis or Mr.
15  Williams?
16      Q.    I'm sorry.  I keep saying
17  that.  Mr. Williams was appointed to a
18  transportation technologist position
19  from a certificate of eligibles of which
20  he was in the top ten?
21      A.    I believe that is correct,
22  yes.
23      Q.    And assuming that someone

# 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1 else on that same certificate that no
2 one else on that certificate was
3 eligible, when that position became
4 available again whoever the person was
5 that was appointed to the position after
6 Mr. Williams, he would have had a lower
7 score on the examination than did
8 Mr. Williams?
9    A.   I don't know that would be
10 necessarily true.
11    Q.   Why would that not be
12 true?
13    A.   If the examination were
14 given again before we got another
15 register, we'd have a whole different
16 list of names with different scores.
17    Q.   And a different exam?
18    A.   Well, I don't know how the
19 exam changes from one offering to the
20 next.
21    Q.   Assuming they took the same
22 examination, the person who was
23 appointed after Mr. Williams would have

Page 38

1 had a lower score; correct?
2    MR. REDD:  Object to the
3 form.  I think he answered your
4 question.
5    A.   We would not have used the
6 same register, the same certificate of
7 eligibles.
8    Q.   You would have used the same
9 register, just not the same certificate
10 of eligibles?
11    A.   That is correct.
12    Q.   And the answer to my
13 question is that person if he was on the
14 same register would have had a lower
15 score than Mr. Williams on the
16 examination?
17    A.   If the exam had not been
18 reoffered and it was the same register,
19 then potentially a person with a lower
20 score could be appointed.
21    Q.   Now, when an employee has
22 built up sick time and sick leave, what
23 is the department's policy as to how you

Page 39

1 request to use your sick time?
2    A.   You can use your sick time
3 when you are sick or a close family
4 member is sick.  It's -- you're asked to
5 call in to let your supervisor know that
6 you won't be there because you're sick.
7 If it's a case where you're going to
8 have a doctor's appointment, you're
9 expected to tell before that day.
10    Q.   All right.  Let's assume
11 that somebody calls their supervisor
12 between seven and 7:30 in the morning
13 and tells them they're sick for that
14 day, not a doctor's appointment, just
15 sick for that day and they have
16 available sick leave, is there any
17 reason that person shouldn't be allowed
18 to use their sick leave?
19    A.   No, I can't think of a
20 reason.
21    Q.   And if a person calls in
22 between seven and 7:30, they've called
23 in timely for that day; correct?

Page 40

1    A.   If you're assuming a
2 person's work day started at seven
3 o'clock --
4    Q.   Yes.
5    A.   -- I would say that would be
6 reasonable.
7    Q.   I would like you to look at
8 Plaintiff's Exhibit 3, and if you would,
9 look at where it list each occasion of
10 Mr. Williams' alleged tardiness.
11    A.   (Reviewed document.)
12    Q.   There are four occasions
13 listed for Mr. Williams' alleged
14 tardiness; correct?
15    A.   Yes.
16    Q.   And in the first occasion,
17 he was five minutes late; correct?
18    A.   Yes, sir.
19    Q.   And on the second occasion,
20 Mr. Lewis wrote up Mr. Williams because
21 he was not in the parking lot.  Mr.
22 Williams has testified that he went
23 directly to the job site and was at the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 41

1    job prior to seven o'clock.
2        A.    You're saying in reference
3    to occasion one?
4        Q.    Occasion two.  If
5    Mr. Williams was actually on the job
6    site by seven o'clock, was he late?
7        A.    On occasion two,
8    Mr. Williams was instructed to be --
9        Q.    My question was:  Was he
10    late if he was on the job site by seven
11    o'clock, was he late?
12        A.    Well, if you're not where
13    you're supposed to be when you're told
14    to be there, does that not make you
15    late?
16        Q.    If you're on the job site at
17    the time you're supposed to start work,
18    are you late?
19        A.    Yes.
20        Q.    It's your opinion that
21    you're late if you're on the job site
22    prior to the time work is supposed to
23    start?

Page 42

1        A.    It's my opinion that if
2    you're not where you're supposed to be
3    at the time you're told to be there,
4    you're late.
5        Q.    And is it your testimony
6    that a civil engineer for the Department
7    of Transportation should not have the
8    autonomy to decide that he can go
9    directly to a work site?
10        A.    If a supervisor informed an
11    employee to be at a given place at a
12    given time and he chose not to do that,
13    there is a problem.
14        Q.    And what if the employee
15    states that he was never told that and
16    never heard that, would that make a
17    difference to you?  If you can't hear an
18    instruction, you couldn't be
19    insubordinate, can you?
20        A.    My understanding was that
21    Mr. Williams --
22        Q.    Answer my question, Mr.
23    Arkle.  If you don't hear an

Page 43

1    instruction, you can't be insubordinate;
2    correct?
3        MR. REDD:  Object to the
4    form.  Assumes hypothetical.  You can
5    answer if you have an opinion.
6        A.    Okay.  Yes.
7        Q.    And you didn't bother to go
8    ask Mr. Williams his side of the story
9    for him to say that he did not hear the
10    instruction be in the parking lot rather
11    than go to the work site?
12        A.    No, I didn't.
13        Q.    Let's look at occasion
14    three.  Mr. Lewis testified yesterday
15    that Mr. Williams called him sometime
16    between seven and 7:30 to say that he
17    was sick.
18        A.    Excuse me.  Did you say
19    Mr. --
20        Q.    Mr. Lewis.
21        A.    Called Mr. Williams.
22        Q.    Mr. Williams called
23    Mr. Lewis.  Mr. Lewis testified that Mr.

Page 44

1    Williams had called him between seven
2    and 7:30 to tell him that he was sick
3    and Mr. Williams has testified that he
4    was told that he should not use sick
5    leave, that he needed to come on in and
6    that he did that, and according to
7    Mr. Lewis, Mr. Williams was at work by
8    7:30.  Do you think that Mr. Williams
9    should have been reprimanded for being
10    tardy on that occasion?
11        A.    First of all, Mr. Williams
12    was not reprimanded for that one
13    incident, was for occurrences.
14        Q.    That's not my question, Mr.
15    Arkle.  My question was:  Should he have
16    been considered late for that occasion
17    and should this have been one of the
18    repeated incidents of tardiness that you
19    said you relied upon in making your
20    decision to demote Mr. Williams?
21        MR. REDD:  Object to the
22    form.
23        A.    It is my understanding that

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1  Mr. Williams was already on his way to
2  the job site when he called in and said
3  he was late because he was sick.
4      Q.  No, he called in to ask for
5  time off.
6      A.  Between seven and 7:30?
7      Q.  Yes.  And was told that he
8  could not take the day off and came on
9  into work.
10      MR. REDD:  Object to the
11  form.
12      A.  To Tuscaloosa --
13      Q.  They were already in
14  Tuscaloosa.
15      A.  This was Monday.  They were
16  already --
17      Q.  If it's Monday, then it
18  would have been five o'clock report;
19  right?
20      A.  Or to arrive at Tuscaloosa
21  by seven o'clock.  So if Mr. Williams --
22      Q.  If an employee calls in --
23      MR. REDD:  Let him finish.

Page 46

1      Q.  If an employee calls in and
2  asks for time off and says they're sick,
3  should they be reprimanded for being
4  late when they're told that they can't
5  take a sick day?
6      MR. REDD:  Object to the
7  form.
8      A.  I don't think that's what
9  happened here.
10      Q.  I'm asking my question.
11  Please answer it.
12      A.  Okay.  If an employee calls
13  in between seven and 7:30 and is sick
14  and needs the day off and they have the
15  sick leave time to use it, they ought to
16  be allowed to use it.
17      Q.  And why would you call
18  somebody and tell them you're sick if
19  you're planning on coming into work
20  anyway, is that what employees normally
21  do, do they call their boss and say I'm
22  sick and I'm going to come in anyway?
23      MR. REDD:  Object to the

Page 47

1  form.  He can't testify to what another
2  person --
3      Q.  Have you ever had anybody do
4  that in your experience as a manager --
5      MR. REDD:  Object to the
6  form.
7      Q.  -- call you to say I'm sick
8  but I'll be there in a few minutes?
9      A.  I can't recall an
10  occasion.
11      Q.  Let's look at the fourth
12  occasion.  And according to that,
13  Mr. Lewis was 14 minutes late; correct?
14      A.  That's correct.
15      Q.  And both Mr. Lewis and
16  Mr. Williams have testified that on that
17  date Mr. Lewis called Mr. Williams to
18  give him instructions over the radio
19  between seven and 7:30, during that
20  period of time, and Mr. Williams has
21  testified that he pulled off the road to
22  talk to Mr. Lewis to get those
23  instructions.  Would that have been

Page 48

1  something that you think would be
2  important in making a decision as to
3  whether Mr. Lewis -- Mr. Williams was
4  repeatedly tardy to know that he was
5  coming to work and pulled off the road
6  to get instructions from his supervisor
7  and that was one of the factors that led
8  to him being partially 14 minutes late,
9  would that have been something that
10  would have been important to you?
11      A.  I don't think that changed
12  the fact that he was late.
13      Q.  So even if he was actually
14  working pulling off the side of the road
15  to take instructions from his
16  supervisor, that's not an acceptable
17  reason to be late?
18      A.  That only partially
19  contributed to the 14 minutes.  He was
20  still late even without the stopping to
21  take instructions.
22      Q.  Now, let's go back and talk
23  about the four occasions and I just want

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 49

1  to assume a hypothetical. Assume that
2  on the second occasion Mr. Williams was
3  at work on time, had not heard the
4  instruction to be at the parking lot and
5  that on the third occasion he had called
6  in asking for time off, so that those
7  two occasions should not be counted
8  against Mr. Williams. If you look at
9  the other two occasions, Mr. Williams
10 has a total of 19 minutes of being late.
11 Do you consider that a pattern of
12 excessive tardiness that should cost
13 somebody who's a 12-year employee of the
14 department to be demoted from
15 transportation technologist to
16 engineering assistant?
17       MR. REDD: Object to the
18 form of the question. Assumes a
19 hypothetical, not a fact.
20       Q.   You may answer.
21       MR. REDD: If you have an
22 opinion, you may answer.
23       A.   That an employee had two

Page 50

1  occurrences of being tardy for a total
2  of 19 minutes, that would not be reason
3  for as you say being demoted.
4        Q.   Now, you have previously
5  been found by the federal court to have
6  discriminated against Johnny Reynolds in
7  your investigation of his allegations
8  that eventually lead to Mr. Reynolds
9  being suspended for two weeks by the
10 department; is that correct?
11       MR. REDD: Object to the
12 form.
13       A.   I'm not sure I know what
14 you're asking me.
15       Q.   Judge Thompson was critical
16 of your failure to investigate the facts
17 related to Mr. Reynolds' suspension;
18 correct?
19       MR. REDD: Object to the
20 form.
21       A.   I -- I can't recall what
22 Judge Thompson ordered or ruled.
23       Q.   So you don't remember what

Page 51

1  Judge Thompson said you had done wrong
2  in his opinion?
3        MR. REDD: Object to the
4  form.
5        A.   No, I don't recall.
6        Q.   Do you recall anything about
7  what Judge Thompson said in that
8  opinion?
9        MR. REDD: Object to the
10 form. How many pages is that opinion,
11 Rusty?
12       MR. ADAMS: I'm asking if he
13 remembers anything.
14       MR. REDD: 30, 40 pages.
15       A.   I believe he ruled in favor
16 of Mr. Reynolds.
17       Q.   (By Mr. Adams) Did he also
18 rule that you had knowingly allowed the
19 use of racial slurs throughout the
20 design bureau?
21       MR. REDD: Object to the
22 form.
23       A.   No.

Page 52

1        Q.   You're saying he did not
2  find that you knowingly allowed it and
3  that there was common usage throughout
4  the design bureau?
5        A.   No, I don't recall him
6  ruling that.
7        MR. ALTON: What year was
8  that?
9        MR. ADAMS: Opinion speaks
10 for itself. Let's take a five minute
11 break.
12
13       (A brief recess was taken.)
14
15       Q.   (By Mr. Adams) Mr. Arkle, I
16 believe you've already testified that
17 you did not review Mr. Williams'
18 personnel file in making your
19 determination?
20       A.   I believe that's correct.
21       Q.   And that the only documents
22 you had in front of you were memos from
23 Mr. Adams and Mr. Jones and Mr. Lewis;

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1  correct?
2      A.   That's correct.
3      Q.   And I believe you've also
4  stated that you don't know whether you
5  had any conversations with Mr. Adams or
6  Mr. Jones?
7      A.   I just don't -- no, I don't
8  recall.
9      Q.   And since you don't know
10  that you had any conversations, you
11  certainly can't recall any detail of
12  those conversations?
13     A.   That's correct.
14     Q.   And the Mr. Adams that you
15  referred to is Mr. William Adams; is
16  that correct?
17     A.   That's correct.
18     Q.   Is it also correct that Mr.
19  Adams is the lead intervener in the
20  Adams interveners?
21     A.   He is the Adams of the,
22  yeah, Adams interveners.
23     Q.   And the Adams interveners

Page 54

1  are a class of white interveners who've
2  intervened into the Reynolds lawsuit to
3  oppose the race conscious and other
4  remedies proposed by the consent decree;
5  is that correct?
6      A.   That's not my
7  understanding.
8      Q.   What is your
9  understanding?
10     A.   That they are a group of
11  white employees that are -- excuse me, a
12  group of nonblack employees that are
13  looking out for their interests when it
14  comes to promotional opportunities and
15  work rules and whatever else may result
16  from that consent decree.
17     Q.   And it's true that they have
18  opposed any race conscious remedies;
19  correct?
20     A.   I believe they are
21  supportive of race neutral -- all things
22  being race neutral.
23     Q.   And are you, yourself, a

Page 55

1  member of that class?
2      A.   No, I'm not.  Well, I guess
3  I'm ex officio member.  I mean, if they
4  represent the interest of nonblacks, I
5  suppose they would --
6      Q.   Have you ever participated
7  in any planning meetings or any group
8  meetings by the Adams interveners?
9      A.   No.
10     Q.   Did you receive any part of
11  the settlement that was paid to the
12  Adams interveners?
13     A.   No.
14     Q.   Did you consider the
15  possibility that there could be some
16  bias by Mr. Adams against an
17  African-American arising out of the
18  animus created by the Reynolds' lawsuit
19  and Mr. Jones' role in that lawsuit?
20     A.   I've known Mr. Adams and
21  Mr. Jones for, at that time, over ten
22  years and I have never known them to be
23  biased in their judgment.

Page 56

1      Q.   My question to you was:  Did
2  you consider that as a potential
3  possibility when making your
4  determination?
5      A.   Well, I think my answer
6  responded to that.
7      Q.   And that would be no;
8  correct?
9      A.   That would be no.
10     Q.   Mr. Lewis testified
11  yesterday that there were no differences
12  between the civil engineer field
13  supervisor position and the EA position
14  that Mr. Williams went back into other
15  than the supervisory responsibilities.
16  Are you aware of any other differences
17  in the actual job duties other than the
18  supervisory responsibilities?
19     A.   Could you repeat that again?
20  I want to be sure I heard you
21  correctly.
22     Q.   Mr. Lewis testified
23  yesterday that the only difference in

14 (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1  the job duties between the field
2  supervisor position that Mr. Williams
3  held and then the EA position that he
4  would have gone back to would have been
5  the supervisory responsibilities, that
6  he would have done the same job duties
7  in his engineering assistant job. Can
8  you identify any job duties that are not
9  the same?
10      A.  Well, I think to just say
11  that the only difference was a
12  supervisory responsibility is probably
13  an oversimplification of really the
14  differences.
15      Q.  Can you identify --
16      A.  The supervisor has to make
17  decisions. It's a difference between
18  being told what to do and knowing what
19  to tell somebody to do to successfully
20  complete a project. I think that's a
21  significant difference.
22      Q.  Is there any difference in
23  the math skills or any of the actual job

Page 58

1  performance things that you do between
2  the two jobs that you can identify for
3  me?
4      A.  The field supervisor has to
5  know what information he has to collect
6  to perform a successful survey.
7          An engineer assistant only
8  has to carrier out those instructions
9  from that field supervisor. It's all --
10  all the decisions, all of the knowledge
11  is really in the hands of that field
12  supervisor. An engineer assistant may
13  contribute an opinion in that but that's
14  not his role responsibility.
15      Q.  But the actual job duties
16  that he performs, the actual
17  calculations that he performs are the
18  same; correct?
19      A.  I -- I can't attest to what
20  field calculations an EA makes out in
21  the field and a field supervisor
22  makes.
23      Q.  But Mr. Lewis was a field

Page 59

1  supervisor for eight or ten years;
2  correct?
3      A.  I'm sorry. Mr. Lewis?
4      Q.  Yes. Did I say it wrong
5  again?
6      A.  No. I might have thought it
7  wrong. I hope I understand the previous
8  questions the same way. I'm not sure
9  how long Mr. Lewis was a field
10  supervisor.
11      Q.  Did you participate in the
12  appointment of the person who succeeded
13  Mr. Williams in his transportation
14  technologist position?
15      A.  I assume I signed the forms
16  that went to personnel to fill the
17  position.
18      Q.  That would have been your
19  only role?
20      A.  But that would have been my
21  only role.
22      Q.  Earlier you said that it had
23  been the department's process to send

Page 60

1  out the availability letters -- had been
2  their process. Do they no longer send
3  out availability letters?
4      A.  I think it depends on the
5  position and I -- the way we're doing
6  things now is the way any other state
7  department handles filling positions.
8      Q.  So the department no longer
9  interviews everybody on the certificate
10  of eligibles?
11      A.  It's not required.
12      Q.  And they don't do it?
13      A.  I can't attest to everybody
14  in the department but --
15      Q.  But you're aware of
16  instances where people don't interview
17  all the persons on the certificate?
18      A.  Yeah, I can't attest to all
19  that.
20      Q.  But you are aware that that
21  happens; correct?
22      A.  It is my understanding that
23  if you went through a process of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  interviewing everybody, had a recert,
2  you would reinterview folks or if you
3  just interviewed them recently, there
4  may be other circumstances as to why you
5  select somebody without going through
6  the same process we went through under
7  the consent decree.
8       MR. ADAMS:  That's all I
9  have.
10
11
12
13
14     FURTHER DEPONENT SAITH NOT
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

### A

ability 23:21
able 26:16
acceptable 48:16
acting 5:10
activities 21:1
actual 29:9 56:17 57:23 58:15,16
Adam 8:11
Adams 3:3 4:21 6:8,10,12 21:4 21:7 23:19 29:23 51:12,17 52:9,15,23 53:5,14,15,19 53:20,21,22,23 55:8,12,16,19 55:20 61:8
address 7:15
adhere 24:8
African-Amer... 33:5 34:5,9 35:13 55:17
African-Amer... 34:3 35:1
age 8:8
ago 9:14
AGREED 1:16 2:4,12,21
ahead 7:2
al 1:12 4:12
Alabama 1:2,11 1:21,23 4:2,11 4:23 5:2,5,10 5:16,18 7:13 9:2
allegation 23:23 24:1
allegations 20:21 21:18,23 50:7
alleged 40:10,13

allegedly 27:23
allowed 39:17 46:16 51:18 52:2
Alton 5:4 12:19 52:7
Andrew 5:3
animus 55:18
Anna 35:3
answer 7:2 28:18 38:12 42:22 43:5 46:11 49:20,22 56:5
answered 38:3
anybody 33:14 47:3
anyway 46:20 46:22
APPEARAN... 4:19
appearing 4:23
application 13:22
appointed 16:11 16:20,21 18:22 23:10 32:14,19 32:22 33:5,9 33:15 34:6,10 35:21 36:4,6 36:10,17 37:5 37:23 38:20
appointment 13:4 15:16 17:12,15,21 18:3,5 32:15 39:8,14 59:12
appointments 33:10,18 34:14
approximately 9:18
area 14:16 16:12
arising 55:17
Arkle 1:19 2:1

5:19 6:1,11 7:9 7:11,18,22 8:10,11,12,13 10:3 11:18 17:6 19:16 42:23 44:15 52:15
arrive 45:20
art 12:15
asked 7:1 39:4
asking 46:10 49:6 50:14 51:12
asks 46:2
assign 2:17
assistant 9:6,8 9:10,15 10:16 10:18,21 18:9 19:9 20:9,18 26:2 27:18 28:2,16 29:2,6 29:8 32:2,12 49:16 57:7 58:7,12
assistants 27:12 28:9
Assumably 14:22
assume 39:10 49:1,1 59:15
Assumes 43:4 49:18
assuming 15:6 36:3,23 37:21 40:1
attached 17:4 19:14 30:23
attest 24:20 58:19 60:13,18
Auburn 8:19
authority 29:1,4
autonomy 42:8
availability 15:17 60:1,3

available 37:4 39:16
aware 23:14 26:5 56:16 60:15,20
a.m 5:18

### B

bachelor's 8:20
back 18:12 20:8 20:16 25:23 48:22 56:14 57:4
background 8:17
based 14:2
basis 21:2
bear 27:1
beginning 5:18
behalf 5:1
believe 6:15 13:8 16:7 21:14 30:4 35:12 36:21 51:15 52:16,20 53:3 54:20
Beneath 10:15
best 12:15,21
bias 55:16
biased 55:23
Birmingham 4:23
boss 46:21
bother 25:19 43:7
bothered 23:17
Boulevard 1:22 5:5,17
Brandon 8:10
break 6:23 7:3,4 52:11
brief 52:13
Building 4:22
built 38:22

bureau 9:6,8,10 9:11,12,13 10:1,1,7,18 32:7 33:7,23 34:1,21 35:6 51:20 52:4

### C

C 16:17
calculations 58:17,20
call 14:4 20:7 39:5 46:17,21 47:7
called 11:4 15:17 16:10 39:22 43:15,21 43:22 44:1 45:2,4 47:17 49:5
calls 39:11,21 45:22 46:1,12
candidates 12:16 14:12,13
carrier 58:8
case 1:5 4:5 6:14 6:17,19 24:15 39:7
cases 24:20 32:17
cause 5:19
caused 18:11
certainly 53:11
certificate 13:17 14:9,10,19 15:14 16:2 33:16 35:21 36:6,11,19 37:1,2 38:6,9 60:9,17
certified 14:6
certify 5:11
chain 10:9
changed 18:5

# FREEDOM COURT REPORTING

19:3 48:11
**changes** 37:19
**chief** 9:8,10,13
  9:15 10:1,14
  10:16,16,19,22
  22:17,20 33:23
**chief's** 10:23
**children** 8:6
**CHILDS** 4:20
**chose** 42:12
**circumstance**
  31:8
**circumstances**
  28:21 61:4
**civil** 5:13 8:21
  11:5 23:1,15
  23:16 27:13,23
  28:14,22 29:3
  42:6 56:12
**class** 54:1 55:1
**classification**
  10:23 11:15
  12:10 16:12
  17:23 18:6,7,8
  18:13 19:4,22
  20:3,17 23:8,9
  26:1 35:15
**classifications**
  12:4,8
**close** 39:3
**closer** 17:14
**code** 16:2,10,11
  16:20
**Coliseum** 1:22
  5:4,17
**collect** 58:5
**college** 35:9
**come** 10:5 44:5
  46:22
**comes** 54:14
**coming** 46:19
  48:5
**command** 10:10
**Commissioner**

2:22 4:17 5:11
**common** 52:3
**complete** 57:20
**compliance** 2:8
**concerning** 30:6
  30:13
**concerns** 29:11
**confidence**
  23:20
**confirms** 19:21
  20:2
**conscious** 54:3
  54:18
**consent** 12:2
  54:4,16 61:7
**consider** 31:2
  49:11 55:14
  56:2
**consideration**
  16:4
**considered**
  12:14 16:16
  32:9 44:16
**consult** 29:21
**contend** 18:14
**continual** 20:11
**continue** 22:7
**contribute** 58:13
**contributed**
  48:19
**conversation**
  21:13
**conversations**
  21:6,7 53:5,10
  53:12
**correct** 6:17
  10:2 11:6,12
  11:16,21 12:4
  12:6,10 14:16
  14:17,21 15:18
  16:6,7,13,14
  16:17,21 18:10
  18:23 19:4,9
  19:10 20:12,13

20:18 21:10
  22:14,15,18
  24:2 27:14
  28:3,16 29:10
  29:19,20 30:10
  34:17 36:12,21
  38:1,11 39:23
  40:14,17 43:2
  47:13,14 50:10
  50:18 52:20
  53:1,2,13,16
  53:17,18 54:5
  54:19 56:8
  58:18 59:2
  60:21
**correctly** 56:21
**cost** 49:12
**counsel** 1:18
  2:13,15 5:14
**counseled** 24:22
**counted** 49:7
**court** 1:1 2:9 4:1
  5:9 50:5
**court-ordered**
  33:10
**created** 55:18
**crew** 21:22
**crews** 27:16,19
**critical** 50:15
**currently** 34:18
**CV2006:CV-6...**
  1:5 4:5
**Cynthia** 7:22

---
**D**
---
**D** 16:22
**date** 5:12 47:17
**dated** 17:9 19:19
  31:18
**day** 2:2 39:9,14
  39:15,23 40:12
  45:8 46:5,14
**days** 25:8
**Decatur** 9:2

**decide** 42:8
**decision** 20:15
  22:5 25:21
  26:13 27:2
  29:22 32:1
  44:20 48:2
**decisions** 57:17
  58:10
**declined** 16:5,23
**decree** 12:2 54:4
  54:16 61:7
**Defendants** 1:13
  4:13
**Defendant's**
  31:15
**degree** 8:20 35:9
**demote** 32:1
  44:20
**demoted** 17:16
  29:8 32:10
  49:14 50:3
**demotion** 17:19
  18:15,18 20:7
**deny** 25:12
**department**
  1:11,21 4:11
  5:2,16 8:22
  9:23 11:19
  12:1,7,14 14:3
  14:11 16:10
  19:3 24:11
  26:7 30:3,6
  34:4,19 36:2
  42:6 49:14
  50:10 60:7,8
  60:14
**department's**
  24:4 30:12
  38:23 59:23
**depend** 28:20
**depending** 31:7
  31:9,11
**depends** 60:4
**DEPONENT**

61:14
**deposed** 6:15,18
**deposition** 1:18
  2:1,5,6,10,18
  2:22 31:16
**design** 9:5,11,12
  9:13 10:1,7,18
  33:7 34:1,20
  35:6,7 51:20
  52:4
**desires** 14:4
**detail** 53:11
**determination**
  22:9 52:19
  56:4
**determine** 21:22
  26:15
**develop** 12:2
**developed** 36:3
**differ** 31:7,9,11
**difference** 42:17
  56:23 57:11,17
  57:21,22
**differences**
  56:11,16 57:14
**different** 21:19
  37:15,16,17
**directions** 28:12
  29:14
**directly** 40:23
  42:9
**director** 10:5,13
**discretion** 29:1
**discriminated**
  50:6
**DISTRICT** 1:1
  1:2 4:1,2
**division** 1:3 4:3
  8:23 9:1
**doctor's** 39:8,14
**document** 17:8
  31:17 40:11
**documented**
  21:1

documents 31:22 52:21
doing 23:8 60:5
Don 1:19 2:1 5:19 6:1 7:9
DOT 8:16,18
downgraded 26:9
due 29:14
duly 6:2
duties 56:17 57:1,6,8 58:15

**E**

EA 34:10 56:13 57:3 58:20
Earlier 59:22
early 29:17
educational 8:17
effect 2:7
effective 17:23 19:23
effectively 18:5
eight 59:1
either 10:10
eligibility 15:22
eligible 15:1,8 16:3 37:3
eligibles 13:17 14:9,11,19 15:15 33:16 35:22 36:7,11 36:19 38:7,10 60:10
employed 34:18
employee 13:21 14:1 25:6 26:6 26:20 27:22 30:14,18 31:10 32:18 38:21 42:11,14 45:22 46:1,12 49:13 49:23
employees 13:23

24:11,16,21 25:2,13 28:12 30:7 46:20 54:11,12
employment 8:15 9:21 26:10
ended 29:18 33:2
engineer 8:21 9:1,7,15 10:14 10:16,17,20,21 11:5 23:1,16 23:16 28:1,15 28:23 29:4,5 42:6 56:12 58:7,12
engineering 9:5 10:15 18:9 19:9 20:8,17 26:1 27:12,17 28:2,9,16 29:2 29:8 32:2,12 35:9 49:16 57:7
engineers 27:13
established 31:6
et 1:12 4:12
evaluated 27:8
evaluation 26:8 30:15,19 31:5
evaluations 27:5 27:7
event 32:4
eventually 50:8
Everett 8:11
everybody 60:9 60:13 61:1
evidence 2:19
ex 55:3
exactly 15:4
exam 13:23 14:1 37:17,19 38:17
examination 3:2

5:20 6:10 37:7 37:13,22 38:16
examinations 12:3,15 36:2
examined 6:2
exams 13:22
excessive 20:11 20:21 22:13 49:12
excuse 43:18 54:11
Exhibit 17:2,7 19:12,17 30:21 31:14,15 40:8
EXHIBITS 3:6
expect 7:5
expected 24:8 39:9
experience 24:10 47:4

**F**

fact 12:1 28:14 29:16 34:2 48:12 49:19
factors 48:7
facts 21:19 50:16
failure 50:16
familiar 6:21 11:23
family 39:3
favor 51:15
federal 5:12 50:5
field 11:7 56:12 57:1 58:4,9,11 58:20,21,21,23 59:9
file 25:20 52:18
filing 2:21
fill 14:4 59:16
filling 60:7
fills 13:21

final 20:15
find 21:17 23:17 52:2
fine 6:7 7:5
finish 45:23
first 6:2 8:3 9:1 17:20 40:16 44:11
five 24:13,17 25:2,6,14 40:17 45:18 52:10
folks 61:2
follow 28:12
following 5:21 29:14
follows 6:3
force 2:7
foregoing 5:13
forget 13:13
form 2:14 12:20 28:5,18 38:3 43:4 44:22 45:11 46:7 47:1,6 49:18 50:12,20 51:4 51:10,22
former 18:12 27:7,9
forms 59:15
found 50:5
four 40:12 48:23
fourth 47:11
front 52:22
full 2:7 7:7 23:1 23:20
function 31:12
FURTHER 2:3 2:11,20 61:14

**G**

geographical 14:15
give 8:9,15,16

10:4 13:16 25:3 47:18
given 13:23 14:6 16:2,17,20 24:12,16 32:6 32:18 37:14 42:11,12
go 7:2 13:15 32:20 33:1 42:8 43:7,11 48:22
going 26:15 39:7 46:22 61:5
graduated 8:19
grounds 2:17
group 54:10,12 55:7
guess 13:9 55:2

**H**

H 16:11
hand 17:6 19:16 31:13
handles 60:7
hands 58:11
happened 25:18 46:9
happens 60:21
Harris 35:3,4,8
Hartsfield 1:20 4:16 5:9
hear 42:17,23 43:9
heard 42:16 49:3 56:20
held 57:3
hereto 17:4 19:14 30:23
higher 18:6 19:8
highest 14:15
history 8:16
holding 23:7
hope 59:7
hours 24:7,9

**hypothetical**
43:4 49:1,19

**I**

**identification**
17:3 19:13
30:22
**identify** 17:8
31:17 57:8,15
58:2
**III-IV** 11:5 23:1
**II-III** 18:9 19:9
**immediately**
8:21
**important** 26:12
26:19 27:11,15
28:8,11 48:2
48:10
**incident** 44:13
**incidents** 44:18
**included** 32:5
**including** 12:8
**INDEX** 3:1
**indicate** 33:18
**inform** 17:21
**information**
32:5 58:5
**informed** 42:10
**initially** 22:11
**instances** 60:16
**instructed** 41:8
**instruction**
42:18 43:1,10
49:4
**instructions**
47:18,23 48:6
48:15,21 58:8
**insubordinate**
27:23 42:19
43:1
**insubordination**
20:12,22 24:2
29:15
**interest** 55:4

**interested** 15:23
**interests** 54:13
**intervened** 54:2
**intervener** 53:19
**interveners**
53:20,22,23
54:1 55:8,12
**interview** 13:4
60:16
**interviewed**
61:3
**interviewing**
61:1
**interviews** 60:9
**investigate**
20:21 50:16
**investigation**
50:7
**involved** 34:1

**J**

**job** 12:3 16:16
23:8 26:17
27:10 40:23
41:1,5,10,16
41:21 45:2
56:17 57:1,6,7
57:8,23 58:15
**jobs** 58:2
**Joe** 13:8
**Johnny** 50:6
**Jones** 13:8 21:4
21:8 23:19
29:23 52:23
53:6 55:21
**Jordan** 8:11
**Judge** 50:15,22
51:1,7
**judges** 13:14
**judgment** 22:8
23:21 55:23
**July** 31:19

**K**

**K** 1:20 4:16 5:9

**keep** 36:16
**Kenneth** 8:10
**know** 6:23 13:7
13:15 21:9
22:21 23:6
35:20 37:9,18
39:5 48:4
50:13 53:4,9
58:5
**knowing** 57:18
**knowingly**
51:18 52:2
**knowledge**
58:10
**known** 55:20,22
**Kress** 4:22

**L**

**L** 1:15 7:22 16:5
**Lane** 7:12
**late** 24:13,18
25:2,7,14
40:17 41:6,10
41:11,15,18,21
42:4 44:16
45:3 46:4
47:13 48:8,12
48:17,20 49:10
**laws** 2:8
**lawsuit** 11:20
34:2 54:2
55:18,19
**lawyers** 13:14
**lead** 50:8 53:19
**leading** 2:15
**leave** 38:22
39:16,18 44:5
46:15
**led** 48:7
**Leigh** 8:12
**Leroy** 1:7 4:7
6:14 9:21 13:1
17:10 19:20
31:16,19

**Leslie** 1:19 4:16
5:9
**letter** 3:7,8 17:9
19:19 20:2
**letters** 15:18,22
60:1,3
**let's** 39:10 43:13
47:11 48:22
52:10
**level** 19:7 34:4
**Lewis** 21:3 22:2
22:13,14,16,20
22:22 23:7,19
23:22 26:11,22
31:20 36:4,10
36:14 40:20
43:14,20,23,23
44:7 47:13,15
47:17,22 48:3
52:23 56:10,22
58:23 59:3,9
**likewise** 32:6
**line** 10:8,9
**list** 15:5 37:16
40:9
**listed** 40:13
**little** 17:14
**live** 7:10,12
**lived** 7:14
**located** 9:1 35:5
**location** 10:7,19
10:21 16:5
**long** 7:6,14,23
13:12 59:9
**longer** 60:2,8
**look** 17:13 25:19
27:6 40:7,9
43:13 47:11
49:8
**looking** 54:13
**lot** 40:21 43:10
49:4
**lower** 15:3 18:8
37:6 38:1,14

38:19

**M**

**making** 15:16
26:13 29:22
31:23 44:19
48:2 52:18
56:3
**manager** 47:4
**March** 9:19
**marked** 17:3,7
19:13,17 30:15
30:19,22 31:4
31:13,15
**marriage** 8:4
**married** 7:17
8:1
**math** 57:23
**mean** 36:5 55:3
**meet** 21:15,21
**meetings** 55:7,8
**member** 39:4
55:1,3
**memorandum**
31:18
**memos** 52:22
**met** 6:12
**MIDDLE** 1:2
4:2
**minute** 52:10
**minutes** 24:13
24:17 25:2,7
25:14 40:17
47:8,13 48:8
48:19 49:10
50:2
**Mitch** 5:4
**Monday** 45:15
45:17
**Montgomery**
1:23 5:5,17 9:4
**months** 29:17
**morning** 39:12

**N**

# FREEDOM COURT REPORTING

**N** 1:15
**name** 6:11 7:7
  7:21 16:6,17
  33:4,14,20
  34:5,8,16,23
  35:11,17
**names** 8:9 14:7
  15:3 34:15
  37:16
**nearly** 32:3
**necessarily**
  37:10
**necessary** 2:12
**need** 6:22
**needed** 44:5
**needs** 46:14
**neutral** 54:21,22
**never** 23:9,17
  26:7 42:15,16
  55:22
**new** 12:2 13:14
  13:14
**nonblack** 54:12
**nonblacks** 55:4
**normally** 24:11
  46:20
**North** 4:22
**NORTHERN**
  1:3 4:3
**notice** 2:21
**number** 1:5 3:2
  4:5 30:13,17
  31:7
**numerous** 6:16
  20:23 24:21
  34:13

___
**O**

**O** 1:15
**Oak** 7:12
**Object** 12:19
  28:4,17 38:2
  43:3 44:21
  45:10 46:6,23

47:5 49:17
  50:11,19 51:3
  51:9,21
**objections** 2:13
  2:16
**occasion** 40:9,16
  40:19 41:3,4,7
  43:13 44:10,16
  47:10,12 49:2
  49:5
**occasions** 24:21
  40:12 48:23
  49:7,9
**occurrence**
  25:10
**occurrences**
  44:13 50:1
**offered** 2:19
**offering** 37:19
**offices** 1:20 5:15
**officio** 55:3
**Okay** 43:6 46:12
**opinion** 28:19
  41:20 42:1
  43:5 49:22
  51:2,8,10 52:9
  58:13
**opportunities**
  54:14
**oppose** 54:3
**opposed** 54:18
**oral** 5:20
**order** 14:18,19
**ordered** 50:22
**orders** 28:9
**ought** 46:15
**oversimplifica...**
  57:13
**overview** 8:15
  13:16
**o'clock** 40:3
  41:1,6,11
  45:18,21

___
**P**

**P** 1:15
**PAGE** 3:2
**pages** 51:10,14
**paid** 19:6 55:11
**PANTAZIS**
  4:21
**papers** 13:4
**parking** 40:21
  43:10 49:4
**part** 27:19 55:10
**partially** 48:8,18
**participate**
  59:11
**participated**
  55:6
**particularly**
  27:15
**parties** 1:17
  2:16
**party** 10:22,23
  22:17,20 35:14
**pattern** 31:3
  49:11
**payment** 19:8
**people** 11:14
  14:21 15:7
  60:16
**perform** 26:16
  58:6
**performance**
  26:14 27:8
  29:10,12 58:1
**performed** 27:9
**performs** 58:16
  58:17
**period** 22:23
  29:18 32:17
  33:1 47:20
**periodically**
  13:22
**permanent**
  18:20 32:19
**person** 15:15

16:19 20:14
  32:14,22 34:9
  36:3 37:4,22
  38:13,19 39:17
  39:21 47:2
  59:12
**personal** 21:5,7
  21:12
**personnel** 19:2
  25:20 30:3,6
  32:7 52:18
  59:16
**persons** 14:14
  15:21 16:1
  33:9 60:17
**person's** 35:16
  40:2
**pertain** 24:7
**place** 13:11 32:4
  42:11
**placed** 14:2
**plaintiff** 1:8 4:8
  5:1 6:13
**Plaintiff's** 3:6
  17:2,7 19:12
  19:17 30:21
  31:14 40:8
**planning** 9:16
  46:19 55:7
**play** 12:23
**please** 7:8 46:11
**point** 11:5
**policy** 9:15 24:5
  30:13,17 38:23
**position** 10:15
  11:8 12:18
  13:6 14:4 16:1
  16:13 17:17
  18:23 20:10
  23:1,11 25:22
  33:6,11,13
  36:5,18 37:3,5
  56:13,13 57:2
  57:3 59:14,17

60:5
**positions** 34:4
  60:7
**possibility** 14:23
  55:15 56:3
**possible** 12:16
  22:1
**potential** 56:2
**potentially** 28:1
  38:19
**Prattville** 5:10
  7:13
**preconstruction**
  10:17
**previous** 59:7
**previously** 27:9
  50:4
**prior** 2:19 20:17
  41:1,22
**probably** 57:12
**probation** 29:13
**probationary**
  22:7,22 29:18
  30:7 32:16
  33:1
**problem** 22:1
  42:13
**problems** 28:2
  29:9
**Procedure** 5:13
**proceedings**
  5:21
**process** 6:22
  13:17,20 15:19
  59:23 60:2,23
  61:6
**progression**
  10:8,9
**project** 57:20
**promoted** 9:6,8
  9:13 20:3
**promotion**
  26:15
**promotional**

54:14
**proper** 17:19
**proposed** 54:4
**provided** 5:12
**pulled** 47:21
   48:5
**pulling** 48:14
**punctuality** 26:9
**put** 16:5

_____
**Q**
**question** 7:1,2
   28:7 33:21
   36:9 38:4,13
   41:9 42:22
   44:14,15 46:10
   49:18 56:1
**questions** 2:14
   2:15 59:8
**QUINN** 4:20

_____
**R**
**race** 54:3,18,21
   54:22
**racial** 51:19
**radio** 47:18
**read** 17:20 32:9
**reading** 2:5
**real** 13:9
**really** 57:13
   58:11
**reason** 20:6
   29:12 39:17,20
   48:17 50:2
**reasonable** 40:6
**recall** 21:5,11
   22:19 23:4,13
   26:4 30:1,8
   32:13 33:3,22
   35:18 47:9
   50:21 51:5,6
   52:5 53:8,11
**receive** 55:10
**received** 15:15
   25:15

**recert** 61:1
**recertification**
   15:2
**recertified** 15:9
   15:12
**recess** 52:13
**recommendati...**
   21:3
**recommended**
   22:11
**record** 7:8
**records** 33:17
**Redd** 5:3 6:7
   28:4,17 36:14
   38:2 43:3
   44:21 45:10,23
   46:6,23 47:5
   49:17,21 50:11
   50:19 51:3,9
   51:14,21
**reference** 41:2
**referencing**
   17:11 31:20
**referred** 53:15
**register** 13:19
   14:2,5,5 34:12
   37:15 38:6,9
   38:14,18
**reinterview** 61:2
**related** 50:17
**relating** 2:9
**relied** 31:23
   44:19
**remedies** 54:4
   54:18
**remember** 50:23
**remembers**
   51:13
**remove** 25:21
**reoffered** 38:18
**repeat** 28:6 36:8
   56:19
**repeated** 20:12
   20:22 31:21

44:18
**repeatedly** 48:4
**report** 45:18
**Reporter** 5:10
   6:5
**reports** 21:1
**represent** 6:13
   55:4
**reprimand** 3:9
   25:3 31:20
**reprimanded**
   24:22 26:8
   30:18 44:9,12
   46:3
**reprimands**
   22:12 24:12,17
   25:15
**request** 39:1
**require** 30:14
   31:3
**required** 12:1
   60:11
**respective** 1:18
**respond** 25:11
**responded** 56:6
**responsibilities**
   56:15,18 57:5
**responsibility**
   29:5 57:12
   58:14
**rest** 25:7
**result** 54:15
**return** 15:22
**revert** 18:12
**reverted** 20:16
**review** 30:5
   52:17
**reviewed** 21:4
   40:11
**Reynolds** 6:16
   6:19 11:20
   50:6,8,17
   51:16 54:2
   55:18

**right** 11:13
   35:18 39:10
   45:19
**road** 47:21 48:5
   48:14
**roadway** 35:6
**role** 12:23 55:19
   58:14 59:19,21
**rule** 51:18
**ruled** 50:22
   51:15
**rules** 2:9 5:12
   24:6 30:6
   54:15
**ruling** 52:6
**Russell** 4:21
**Rusty** 6:11
   51:11

_____
**S**
**S** 1:15
**SAITH** 61:14
**saying** 36:16
   41:2 52:1
**says** 46:2
**score** 14:3,15
   37:7 38:1,15
   38:20
**scored** 14:1
**scores** 37:16
**second** 40:19
   49:2
**section** 9:5 10:7
   35:7
**select** 12:16 13:5
   14:12 61:5
**selected** 14:20
   19:21 20:2
**selection** 13:1
**send** 15:17
   25:23 59:23
   60:2
**senior** 11:3,11
   23:2,11

**sentence** 17:20
**September**
   17:10 18:2
**settlement** 55:11
**seven** 39:12,22
   40:2 41:1,6,10
   43:16 44:1
   45:6,21 46:13
   47:19
**Shady** 7:12
**shortcut** 13:13
**shown** 25:6
**sick** 38:22,22
   39:1,2,3,4,6,13
   39:15,16,18
   43:17 44:2,4
   45:3 46:2,5,13
   46:15,18,22
   47:7
**side** 21:16 43:8
   48:14
**signature** 2:4
**signed** 17:12
   19:20 59:15
**significant**
   57:21
**signing** 13:3
**single** 34:5,8
**sir** 20:19 24:3
   40:18
**sit** 13:23
**site** 40:23 41:6
   41:10,16,21
   42:9 43:11
   45:2
**skills** 57:23
**slurs** 51:19
**somebody** 13:18
   16:11,15,23
   39:11 46:18
   49:13 57:19
   61:5
**sorry** 28:6 36:16
   59:3

# FREEDOM COURT REPORTING

Page 68

speak 30:2
speaks 52:9
specific 25:10
staff 10:15
start 8:14 10:4
13:18 41:17,23
started 40:2
state 1:11,21
4:11 5:2,15 7:7
9:6 12:14 19:2
30:3,5 60:6
stated 20:6 53:4
states 1:1 4:1
42:15
status 18:20
22:7 32:19
STIPULATED
1:16 2:3,11,20
stipulation 5:14
stipulations 6:6
stopping 48:20
story 21:17 43:8
Street 4:22
succeeded 59:12
successful 58:6
successfully
26:16 57:19
supervise 11:15
supervises 10:13
supervision
28:15
supervisor 11:7
11:9 22:2,8,10
28:13 39:5,11
42:10 48:6,16
56:13 57:2,16
58:4,9,12,21
59:1,10
supervisory
56:15,18 57:5
57:12
supportive
54:21
suppose 55:5

supposed 28:23
41:13,17,22
42:2
sure 13:9 33:17
34:13 50:13
56:20 59:8
survey 27:16,19
35:14 58:6
suspect 25:5
suspended
24:23 50:9
suspension
50:17
sworn 6:2
system 19:4

_____

**T**

T 1:15,15
take 6:22 7:3,4
13:19 28:9
45:8 46:5
48:15,21 52:10
taken 1:19 2:2
52:13
talk 47:22 48:22
talked 36:1
tardies 30:13,17
tardiness 20:11
20:22 22:13
24:1,5,23
26:21 27:1
31:3,21 40:10
40:14 44:18
49:12
tardy 44:10 48:4
50:1
technologist
9:22 10:6 11:3
11:8,10,11
12:9,17 13:2
17:12,17,22
18:8,21 19:7
19:23 20:4,10
23:2,11 25:23

32:11,15,23
33:6,13 34:7
34:11 35:15
36:18 49:15
59:14
technologists
34:17 35:2
tell 10:8 15:3
17:14 19:18
20:20 34:12,14
39:9 44:2
46:18 57:19
tells 39:13
ten 14:6,12,13
14:14,21,23
15:7 36:12,20
55:21 59:1
tend 13:13
term 17:19
terminated 18:1
32:16
terminating
29:13
termination
18:2,4
testified 6:3
40:22 43:14,23
44:3 47:16,21
52:16 56:10,22
testify 30:9 47:1
testimony 42:5
thereto 2:19
they'd 15:8
things 13:13
54:21 58:1
60:6
think 15:19
17:18 26:3,12
26:18 28:20,22
29:3 30:16
32:21 38:3
39:19 44:8
46:8 48:1,11
56:5 57:10,20

60:4
third 49:5
Thomas 7:9
8:12
Thompson
50:15,22 51:1
51:7
thought 59:6
three 29:17
43:14
time 2:17,18 7:4
9:20 11:17,19
15:5,20 16:9
23:4 25:6,8
26:14 27:12,16
29:13 32:13
38:22 39:1,2
41:17,22 42:3
42:12 45:5
46:2,15 47:20
49:3,6 55:21
timely 39:23
times 6:16,21
today 7:6
told 41:13 42:3
42:15 44:4
45:7 46:4
57:18
Tommy 22:14
22:16 31:20
top 10:13,14
14:6,21,23
15:7 36:12,20
total 49:10 50:1
traffic 8:23 9:4,7
transferred 9:3
transmitted
32:7
transportation
1:12,22 4:12
5:3,16 8:23
9:22 10:6 11:2
11:8,10,11
12:9,17 13:2

17:11,16,22
18:7,20 19:7
19:22 20:4,9
23:2,10 25:22
32:11,14,23
33:6,12 34:6
34:11,17 35:1
35:14 36:18
42:7 49:15
59:13
trial 2:17
true 12:13 21:18
21:23 37:10,12
54:17
Tuscaloosa
45:12,14,20
two 32:3 41:4,7
49:7,9,23 50:9
58:2
type 23:21
typically 14:6

_____

**U**

U 1:15
understand 59:7
understanding
12:11,22 42:20
44:23 54:7,9
60:22
UNITED 1:1 4:1
University 8:20
upper 34:3
usage 52:3
use 39:1,2,18
44:4 46:15,16
51:19
Usual 6:5

_____

**V**

version 21:19
vs 1:9 4:9

_____

**W**

waived 2:6,23
want 7:4 10:11

13:15 48:23
56:20
**warnings** 24:12
24:16 25:4,15
**wasn't** 23:7 27:7
**way** 10:11 12:16
13:16 45:1
59:8 60:5,6
**weeks** 50:9
**went** 8:22 26:10
40:22 56:14
59:16 60:23
61:6
**we're** 24:7 60:5
**we've** 6:12 33:19
34:10,13 36:1
**white** 25:13
34:16 54:1,11
**Whitney** 8:12
**who've** 54:1
**wife's** 7:20
**WIGGINS** 4:20
**William** 53:15
**Williams** 1:7 4:7
6:14 9:21 13:1
13:5 14:20
15:4 17:10
19:20 20:8,16
21:13,16,22
22:6 25:20
26:6,23 27:18
29:7 31:16,19
32:1 33:8 36:5
36:15,17 37:6
37:8,23 38:15
40:10,13,20,22
41:5,8 42:21
43:8,15,21,22
44:1,3,7,8,11
44:20 45:1,21
47:16,17,20
48:3 49:2,8,9
52:17 56:14
57:2 59:13

**witness** 2:5 5:19
**word** 23:15,18
**words** 20:1
**work** 8:22 9:4
24:6,7,8 26:11
29:9,12 31:12
40:2 41:17,22
42:9 43:11
44:7 45:9
46:19 48:5
49:3 54:15
**worked** 9:2
**working** 35:13
48:14
**works** 6:22
13:17
**written** 20:23
22:12 26:20,23
27:4
**wrong** 51:1 59:4
59:7
**wrote** 22:12
40:20

**Y**

**yeah** 53:22
60:18
**year** 9:14 25:8
52:7
**years** 7:16 8:2
9:3 26:10 32:3
55:22 59:1
**yesterday** 43:14
56:11,23
**y'all** 7:23

**1**

**1** 3:7 17:2,7,10
**1/2** 9:3
**12** 19:19 26:9
**12-year** 26:6,19
49:13
**123** 7:12
**13** 7:16
**14** 18:1 19:23

47:13 48:8,19
**1409** 1:22 5:4,17
**15th** 2:2
**17** 3:7
**19** 3:8 8:9,13
49:10 50:2
**19th** 4:22
**1977** 8:21
**1983** 9:7
**1985** 11:20 34:2
**1993** 9:14
**1998** 33:10
**1999** 33:11

**2**

**2** 3:8 19:12,17
**20** 8:12
**2005** 9:23 17:10
18:1,2 19:20
19:23 31:19
**2006** 9:18,19
**2007** 2:2
**22** 8:11
**25** 8:11
**26** 8:2 31:19

**3**

**3** 3:9 9:3 18:2
30:21 31:14
40:8
**30** 3:9 51:14
**301** 4:22
**35203** 4:23
**36066** 7:13
**36110** 1:23 5:5
5:18

**4**

**40** 51:14

**5**

**5-12-05** 3:8

**6**

**6** 3:3

**7**

**7:30** 39:12,22
43:16 44:2,8
45:6 46:13
47:19

**8**

**8** 31:15
**87** 9:9

**9**

**9-1-05** 3:7
**9:45** 5:18

# EXHIBIT C

**FREEDOM COURT REPORTING**

|  | Page 1 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT FOR |
| 2 | THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | |
| 5 | CASE NUMBER:  CV2006:CV-658-JD-DRB |
| 6 | |
| 7 | LEROY WILLIAMS, |
| 8 |     Plaintiff, |
| 9 |     vs. |
| 10 | |
| 11 | STATE OF ALABAMA DEPARTMENT OF |
| 12 | TRANSPORTATION, et al., |
| 13 |     Defendants. |
| 14 | |
| 15 |     S T I P U L A T I O N |
| 16 |     IT IS STIPULATED AND AGREED by |
| 17 | and between the parties through their |
| 18 | respective counsel, that the deposition |
| 19 | of THOMAS LEWIS may be taken before |
| 20 | Leslie K. Hartsfield, at the offices of |
| 21 | the State of Alabama Department of |
| 22 | Transportation, 1409 Coliseum Boulevard, |
| 23 | Montgomery, Alabama, 36110, |

|  | Page 3 |
|---|---|
| 1 |     INDEX |
| 2 | EXAMINATION BY:    PAGE NUMBER: |
| 3 | Mr. Adams          6 |
| 4 | |
| 5 | |
| 6 | PLAINTIFF'S EXHIBITS: |
| 7 | 1 - Reprimand 7-26-05    45 |
| 8 | 2 - Counseling session    73 |
| 9 | 3 - Reprimand 8-11-05    77 |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

|  | Page 2 |
|---|---|
| 1 |     DEPOSITION OF THOMAS LEWIS |
| 2 | taken on the 14th day of May, 2007. |
| 3 |     IT IS FURTHER STIPULATED AND |
| 4 | AGREED that the signature to and the |
| 5 | reading of the deposition by the witness |
| 6 | is waived, the deposition to have the |
| 7 | same force and effect as if full |
| 8 | compliance had been had with all laws |
| 9 | and rules of Court relating to the |
| 10 | taking of the deposition. |
| 11 |     IT IS FURTHER STIPULATED AND |
| 12 | AGREED that it shall not be necessary |
| 13 | for any objections to be made by counsel |
| 14 | to any questions except as to the form |
| 15 | or leading questions, and that counsel |
| 16 | for the parties may make objections and |
| 17 | assign grounds at the time of the trial, |
| 18 | or at the time said deposition is |
| 19 | offered in evidence, or prior thereto. |
| 20 |     IT IS FURTHER STIPULATED AND |
| 21 | AGREED that the notice of filing of the |
| 22 | deposition by the Commissioner is |
| 23 | waived. |

|  | Page 4 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | |
| 5 | CASE NUMBER:  CV2006:CV-658-JD-DRB |
| 6 | |
| 7 | LEROY WILLIAMS, |
| 8 |     Plaintiff, |
| 9 |     vs. |
| 10 | |
| 11 | STATE OF ALABAMA DEPARTMENT OF |
| 12 | TRANSPORTATION, et al., |
| 13 |     Defendants. |
| 14 | |
| 15 | BEFORE: |
| 16 |     LESLIE K. HARTSFIELD, |
| 17 |     Commissioner. |
| 18 | |
| 19 | APPEARANCES: |
| 20 |     WIGGINS, CHILDS, QUINN & |
| 21 | PANTAZIS, by Mr. Russell Adams, The |
| 22 | Kress Building, 301 19th Street North, |
| 23 | Birmingham, Alabama, 35203, appearing on |

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1  behalf of the Plaintiff.
2       STATE OF ALABAMA DEPARTMENT OF
3  TRANSPORTATION, by Mr. Andrew Redd and
4  Mr. Mitch Alton, 1409 Coliseum
5  Boulevard, Montgomery, Alabama, 36110.
6
7            ********
8
9       I, LESLIE K. HARTSFIELD, a Court
10  Reporter of Prattville, Alabama, acting
11  as Commissioner, certify that on this
12  date, as provided by the Federal Rules
13  of Civil Procedure and the foregoing
14  stipulation of counsel, there came
15  before me at the offices of the State of
16  Alabama Department of Transportation,
17  1409 Coliseum Boulevard, Montgomery,
18  Alabama, 36110, beginning at 9:25, a.m.,
19  THOMAS LEWIS, witness in the above
20  cause, for oral examination, whereupon,
21  the following proceedings were had:
22
23

Page 6

1       THOMAS LEWIS
2  being first, duly sworn, was examined
3       and testified as follows:
4
5       THE REPORTER:  Usual
6  stipulations?
7       MR. REDD:  That's fine.
8
9  EXAMINATION BY MR. ADAMS:
10       Q.   Mr. Lewis, my name is
11  Russell Adams and I represent the
12  plaintiff in this case, Mr. Leroy
13  Williams.  I will be asking you
14  questions today.  You have just taken an
15  oath to tell the truth.  You understand
16  that you are subject to the penalties of
17  perjury if you fail to tell the truth.
18  We will be fairly informal today.  If
19  you need to take a break or anything
20  like that, let me know.  If you don't
21  understand my question, you let me know;
22  otherwise, I will assume that you
23  understand it and answered it to the

Page 7

1  best of your ability.
2       If you could, state your
3  full name for the record?
4       A.   Thomas Web Lewis.
5       Q.   Where do you live,
6  Mr. Lewis?
7       A.   I live at 4703 County Road
8  11, Airton, Alabama.
9       Q.   What's your Social Security
10  number?
11       A.   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.
12       Q.   How long have you lived at
13  that current address?
14       A.   Three years.  Just got
15  married and moved over there.
16       Q.   What's your wife's name?
17       A.   Rhonda Lewis.
18       Q.   And you said you just got
19  married.  How long have y'all been
20  married?
21       A.   Two years in July -- June.
22       Q.   Is that your first
23  marriage?

Page 8

1       A.   No, second.
2       Q.   What was your first wife's
3  name?
4       A.   Angela, Angela Hinley was
5  her maiden name.
6       Q.   Now, I've seen some funny
7  reactions before, but I don't think I've
8  ever seen anybody have to search to
9  remember the name.
10       MR. REDD:  He's been trying
11  for years to block that out of his mind
12  and you brought it back.
13       Q.   And do you have any
14  children, Mr. Lewis?
15       A.   No.  My wife's got two.
16       Q.   What are their names and
17  their ages?
18       A.   Casey Ketchem and Kim
19  Ketchem.  Casey's 16.  Kim's 10.
20       Q.   Do you have any relatives in
21  Montgomery County, brothers, sisters,
22  parents?
23       A.   No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 9

1    Q.    How long have you lived in
2    Montgomery?
3    A.    I don't live --
4    Q.    I mean --
5    MR. REDD:  Airton.
6    Q.    Wherever you live.
7    A.    Ozark, the Ozark area since
8    '72.
9    Q.    And tell me your educational
10   background.
11   A.    High school, went to school
12   at Airton High School.
13   Q.    When did you graduate?
14   A.    '81.
15   Q.    What did you do after your
16   graduation from high school?
17   A.    Let's see.  I worked at
18   McDonald's for a while.  My parents had
19   a new and used furniture store I worked
20   at for a short period of time.  Went
21   into the National Guard in '81 and did
22   14 years in the Guard.  And then I
23   started work with the state in February

Page 10

1    of '83.
2    Q.    When you were in the guard,
3    what was the highest rank that you
4    achieved?
5    A.    E-5.
6    Q.    And when did you leave the
7    guard?
8    A.    '91.
9    Q.    Why did you leave the
10   guard?
11   A.    I couldn't pass my flight
12   physical, so I got out.
13   Q.    What kind of problem led you
14   not to be able to pass your physical?
15   A.    My back.  I had some back
16   problems.  My weight, weight was one
17   thing too.
18   Q.    Are you on any kind of
19   medicine today?
20   A.    My blood pressure medicine,
21   Avapro.
22   Q.    You're not on any
23   medications that would 'cause you to

Page 11

1    have a memory problem or anything like
2    that?
3    A.    No.
4    Q.    And you said that you went
5    to work for the transportation
6    department in what year?
7    A.    February of '83.
8    Q.    How did you come to work for
9    the transportation department?
10   A.    I got on through Mr. Bass.
11   He actually called me and asked me if I
12   wanted to go to work.  My father worked
13   for the state at that time or had worked
14   for the state and they knew each
15   other.
16   Q.    What was your father's
17   name?
18   A.    Henderson Hyrum Lewis.
19   Q.    What's his middle name?
20   A.    Hyrum.
21   Q.    H-Y or H-I?
22   A.    H-Y.  He's deceased.
23   Q.    And how long did Mr. Lewis

Page 12

1    work for the -- your father work for the
2    transportation department?
3    A.    He had worked -- he retired
4    with 15 years medical retirement.
5    Q.    What was his classification
6    at his -- what part of the state did he
7    work in?
8    A.    He was CE III and he was --
9    Q.    That would be a civil
10   engineer III?
11   A.    Civil engineer III.  And he
12   retired in the sixth -- seventh
13   division.  I think he was working out of
14   the Enterprise district.  I don't really
15   remember.
16   Q.    How did Mr. Bass know your
17   father, do you know?
18   A.    I think they were -- went to
19   school together or they knew each other
20   from way back.
21   Q.    Do you know if they were in
22   any organizations or groups together?
23   A.    No, not that I know of.

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  Q. After you received the phone
2  call from Mr. Bass, what happened?
3  A. Well, reported up here and
4  started -- reported in the building when
5  it was downtown and they put me to work
6  in the location section as a hourly
7  laborer.
8  Q. Let's go back and just get
9  some background on the transportation
10  department and its organizational
11  structure. Can you tell me how the
12  department is organized, divisions and
13  the bureaus and just sort of give me a
14  general rundown of that?
15  A. Well, I guess it'd start at
16  the central office and then would go to
17  the sections, design bureaus, other
18  bureaus and go down to divisions, and
19  from division, it'd go down to district
20  level.
21  Q. There are nine divisions
22  across the state geographically;
23  correct?

Page 14

1  A. Yes.
2  Q. And then approximately how
3  many bureaus are there?
4  A. Bureaus, be honest with you,
5  I don't know for sure. I know the
6  design bureau because that's the only
7  one I worked in. There's --
8  Q. Would it be accurate to say
9  there are 15 to 20 bureaus, something
10  like that?
11  A. I don't know if there's that
12  many bureaus. I'm not sure.
13  Q. And each bureau has a bureau
14  chief; correct?
15  A. Yes.
16  Q. And then who's underneath
17  the bureau chief?
18  A. The bureau chief, then you'd
19  have your section chiefs.
20  Q. You have spent your entire
21  career in the design bureau?
22  A. Yes, sir.
23  Q. And tell me you first became

Page 15

1  an hourly laborer and that was in
2  1990 --
3  A. '83.
4  Q. '83. All right. And then
5  if you could, take me through your
6  progress with the department, tell me
7  when you got promoted, the years, what
8  the job classification was.
9  A. I can --
10  Q. Best you can do.
11  A. All right. About -- I think
12  it was about a year and four or five
13  months later they promoted me to a
14  biweekly laborer. And I started out
15  just cutting bushes and pulling the
16  chain in the survey crew. I guess I was
17  an hourly laborer for a year and a half
18  or so and took the EA I test, engineer
19  assistant I test, passed it, got on the
20  list and got promoted.
21  Q. What year was that?
22  A. Oh, I could not -- I really
23  don't know. I'm not for sure.

Page 16

1  Q. Approximately?
2  A. '85, sometime in '85.
3  Q. All right.
4  A. And I was still doing the
5  same type work, cutting bushes, pulling
6  the chain. Was in '81 -- let's see. I
7  worked shortly after that as -- still as
8  an EA I. It might have been a year. I
9  was transferred to another crew to
10  become a draftsman and I was draftsman
11  until '91. But during that -- excuse
12  me, during that time we went from pen
13  and pencil drafting to computer
14  drafting. That's when we first got the
15  total stations where we were doing
16  everything with a computer, all of our
17  map work and all.
18  In '90 -- it was either '91
19  or '92 I was promoted to an EA II and I
20  was assigned to another crew as a field
21  supervisor.
22  Q. What is a field
23  supervisor?

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    A.    A field supervisor is
2  responsible for all the field duties,
3  making sure the information gets into
4  the office correctly, you take care of
5  your people, make sure everybody is
6  doing what they're supposed to do, you
7  assign work, you make sure that you
8  communicate with your data editor and
9  your party chief to know what you need
10  to do, stuff like that, so you can go
11  out during the day and get progress
12  done.
13    Q.    How long -- how many people
14  did you supervise as a field
15  supervisor?
16    A.    I've done as few as three
17  and as many as five, just depending on
18  how many, I mean, what crew, crew makeup
19  was.
20    Q.    And you said that came at
21  about '91 or '92 that you became a field
22  supervisor?
23    A.    Yes, sir.

Page 18

1    Q.    As an EA II. What was the
2  next thing that happened to you?
3    A.    Let's see. I made EA II. I
4  got off probation and about three months
5  after that I was promoted to an EA III.
6  I'd already taken the EA III test before
7  I was ever promoted to an EA II. I was
8  on both registers and I made EA II and
9  then made my probation, and then shortly
10  after, I was promoted to EA III still as
11  supervisor. I moved to three or four
12  different crews depending on, you know,
13  the need, wherever we -- our crews don't
14  stay the same all the time depending on
15  folks moving out and everything. So I
16  was under several different party chiefs
17  as a field supervisor. That was in '91
18  or '92 when I got promoted to an EA III.
19  And then the --
20    Q.    You were only an EA II for a
21  very short period of time?
22    A.    Yes, very short period.
23    Q.    About how long?

Page 19

1    A.    It was six months promotion
2  and then it was less than six or eight
3  months before I was promoted. That's
4  when the Johnny Reynolds case started up
5  there shortly after and all the
6  promotions and everything was froze for
7  quite a while. So I worked as a
8  supervisor up until '98 as a EA III.
9    Q.    So the Reynolds case you
10  said froze promotions for a period of
11  time?
12    A.    Yes, sir.
13    Q.    So the Reynolds case stopped
14  your own personal promotions for a
15  period of time?
16    A.    Uh-huh (affirmative
17  response).
18    Q.    How long would you say that
19  you were held back because of the
20  Reynolds case?
21    A.    Well, they promoted us and
22  we got reclassified in '89, I think it
23  was, when the Reynolds case is what got

Page 20

1  me promoted.
2    Q.    You mean in '98?
3    A.    '98, yes. And I was
4  promoted to civil engineer, I think, at
5  the time it was called. They had broke
6  down the classifications and it was a
7  civil engineer I-II and civil engineer
8  III-IV and I was promoted to a I-II.
9    Q.    And there were court-
10  supervised appointments in 1998, that's
11  what you were referring to and that's
12  when you got your appointment?
13    A.    I don't think it was -- I
14  don't know if it was called an
15  appointment or not. Yeah, provisional
16  appointment is when we got it.
17    Q.    Those were court-supervised
18  appointments or promotions --
19    A.    Yes, I think so.
20    Q.    -- correct?
21    A.    Yes.
22    Q.    And hundreds and hundreds of
23  people were all promoted at the same

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 21

1  time during that process; correct?
2      A.   I don't know the numbers,
3  but yeah, there were a bunch of them
4  promoted.
5      Q.   And so you became a civil
6  engineer I-II in about 1998.  Then what
7  was the next step?
8      A.   Well, I stayed a I-II until
9  it was two -- two years ago.
10     Q.   Now, actually, it
11 actually -- wasn't it rather than CE I,
12 II, III, IV it was called CE at that
13 period of time and all four of those
14 classifications were combined; isn't
15 that correct?
16     A.   Yeah, it was.  And then they
17 split it --
18     Q.   Split it back out again.
19     A.   -- back out to I-II, III-IV,
20 yes.
21     Q.   When that happened, what
22 happened to you when the classifications
23 were split back out?

Page 22

1      A.   I stayed a I-II because I
2  was a supervisor in that position and
3  that's what the supervisor was
4  classified as.
5      Q.   Are you still a CE I-II
6  today?
7      A.   No, I'm now transportation
8  technologist senior.  They changed the
9  classifications from EAs -- or CEs to
10 transportation technologists in -- I
11 don't know when that was.  I don't know
12 the dates on it.
13     Q.   The civil engineer I-II
14 became a transportation technologist?
15     A.   Uh-huh (affirmative
16 response).
17     Q.   And the CE III-IV became the
18 transportation technologist senior?
19     A.   Correct.
20     Q.   So when did you get promoted
21 to civil engineer III-IV?
22     A.   Two years ago.
23     Q.   And how did that occur?

Page 23

1      A.   Well, I took the test, got
2  on the list, got an interview and got
3  promoted.
4      Q.   Did you know Johnny
5  Reynolds?
6      A.   No.  Knew the name, that was
7  about it.
8      Q.   You never worked with Mr.
9  Reynolds?
10     A.   No.
11     Q.   At the time, tell me what
12 changed in your job duties between the
13 time you were EA II-III as a field
14 supervisor and your appointment to civil
15 engineer I-II or civil engineer at that
16 point in time.
17     A.   That's when I took over --
18 my party chief at the time retired and I
19 took over as acting party chief and took
20 over the responsibilities of the crew,
21 the whole crew, making sure they were
22 doing what they were supposed to, doing
23 payrolls, checking maps, assigning work,

Page 24

1  grading -- well, been grading people,
2  doing evaluations each year.  I'd
3  come -- instead of just being
4  responsible for the field work, I was
5  responsible for the whole crew at that
6  point, field work plus everything that
7  was going on in the office as far as
8  maps and things like that.  That's when
9  I became responsible for the whole --
10 whole crew.
11     Q.   And at the time that you
12 supervised Leroy Williams, what was your
13 job classification?
14     A.   I would just have been
15 promoted to a transportation senior.
16     Q.   So you had already been
17 promoted to transportation senior?
18     A.   Yes.  I believe that's
19 right.  I'm pretty sure that's right.
20     Q.   What role, if any, did you
21 play in Mr. Lewis' -- I'm sorry,
22 Mr. Williams' appointment to
23 transportation technologist?

6  (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.   None.
2    Q.   You were not one of the
3  persons making the decision concerning
4  his promotion?
5    A.   No.
6    Q.   Do you know how he was
7  promoted whether it was through a court
8  order or through --
9    A.   I assumed he took the test
10  and was hired on, promoted through the
11  list like everybody else had been.
12    Q.   Did you ever have any
13  conversations with Mr. Williams
14  concerning his promotion to
15  transportation technologist?
16    A.   Nothing other than
17  congratulating him that he'd been
18  promoted because I got a promotion too
19  and we worked together, not worked
20  together, we'd known each other for a
21  while.
22    Q.   So you never questioned how
23  he was -- how he got promoted or

Page 26

1  suggested it had anything to do with the
2  Reynolds lawsuit?
3    A.   No.  Because the Reynolds
4  lawsuit at that time had already been
5  taken care of.  As far as I knew,
6  everything was being pulled off the
7  registers and being hired like normal.
8    Q.   Did you ever discuss with
9  Mr. Williams whether he got a raise when
10  he was promoted?
11    A.   No.
12    Q.   What were the job
13  differences or job duties -- difference
14  in job duties between what Mr. Williams
15  was doing as a field supervisor and what
16  you did as a field supervisor as an EA
17  II-III while he was a civil engineer
18  I-II?
19    A.   I was not a supervisor.
20  Field supervisor is a II-III.  I was --
21    Q.   There was an engineering
22  assistant II-III classification?
23    A.   Uh-huh (affirmative

Page 27

1  response).
2    Q.   And you were a field
3  supervisor?
4    A.   No.  I was a party chief
5  II-III.
6    Q.   You had earlier told me you
7  were a field supervisor while you were
8  an EA II-III?
9    A.   I -- I made a mistaken if I
10  did because I was -- the only thing I
11  was ever supervisor was a I-II.  I
12  didn't get promoted --
13    Q.   Mr. Lewis, there's a lot of
14  people that aren't going to be familiar
15  with all the shortcuts that you and I
16  know.  When you're talking -- you're
17  saying that you were not a field
18  supervisor as an engineering assistant
19  II-III?
20    A.   No.
21    Q.   But you told me that you
22  supervised people while you were an
23  engineering assistant II-III?

Page 28

1    A.   The crew.  I was over the
2  crew.  I was the party chief.  The
3  supervisor was under me.  I was a field
4  supervisor as a EA or CE I-II at that
5  time.
6    Q.   Take me up the chain again.
7  You got a party chief.
8    A.   The party chief is now a
9  transportation senior which is --
10    Q.   I'm getting really confused
11  here.  When you were an engineering
12  assistant II-III, what was your job
13  title?
14    A.   Engineer assistant -- Oh,
15  I'm sorry.  Engineer assistant II-III, I
16  was a supervisor.  I'm thinking CE
17  II-III.  I'm sorry.
18    Q.   When you were an engineering
19  assistant II-III, you were a field
20  supervisor?
21    A.   Yes.
22    Q.   That's back where we
23  started.

7 (Pages 25 to 28)

**FREEDOM COURT REPORTING**

Page 29

1  A.  Yeah.  I'm sorry.
2  Q.  Went a long way to get
3  there.  So when you were an engineering
4  assistant II-III working as a field
5  supervisor --
6  A.  Yes.
7  Q.  -- and then Mr. Williams
8  after he was promoted to civil engineer
9  which then became a transportation
10  technologist --
11  A.  Yes, sir.
12  Q.  -- I-II, he was also a field
13  supervisor?
14  A.  That's correct.
15  Q.  Were there any differences
16  in his job duties as a field supervisor
17  as a transportation technologist and
18  your job duty as an engineering
19  assistant II-III as a field
20  supervisor?
21  A.  No, sir.  I was responsible
22  for the field work.  I was responsible
23  to make sure the job was done out in the

Page 30

1  field like it was supposed to be done.
2  Q.  And that's the same job that
3  Mr. Williams had when he was promoted to
4  civil engineer I-II which is also called
5  transportation technologist?
6  A.  Correct.
7  Q.  And when Mr. Williams was a
8  engineering assistant II-III prior to
9  his appointment to the transportation
10  technologist, what were his job
11  duties?
12  A.  I do not -- I don't know
13  'cause I wasn't working in the same crew
14  he was working in.
15  Q.  And just for point of
16  clarification, everything that we were
17  talking about for the field supervisor
18  position was while you were engineering
19  assistant II-III?
20  A.  Engineering assistant II-III
21  and a CE I-II.
22  Q.  So for a while while you
23  were civil engineer I-II, you were also

Page 31

1  field supervisor?
2  A.  Correct.
3  Q.  Then you subsequently got
4  appointed to the party chief position?
5  A.  Correct.
6  Q.  At that time, you were a
7  civil engineer III-IV or transportation
8  technologist senior?
9  A.  I was promoted at the same
10  time.  Well, I was working as a party
11  chief -- acting party chief as a
12  transportation technologist which was a
13  CE I-II.
14  Q.  So you were working out of
15  classification --
16  A.  Yes, I was.
17  Q.  -- holding that job?  How
18  long did you hold that job out of
19  classification before you were
20  promoted?
21  A.  Just a couple months,
22  couple, three months, I think.
23  Q.  And how long had that

Page 32

1  position been vacant before you started
2  working in it out of classification?
3  A.  It became vacant when I took
4  over.  Our party chief that I was a
5  supervisor under retired and I took over
6  for that short period of time.
7  Q.  So you took over for two or
8  three months and then at some point were
9  you selected for that position off a
10  certificate of eligibles?
11  A.  Yes, I was.
12  Q.  Did you interview for that
13  position?
14  A.  Yes, I did.
15  Q.  Now, when you were selected
16  for the civil engineer I-II position,
17  was there a vacancy that you filled as a
18  field supervisor or did you stay in the
19  same position that you were -- where
20  you're holding that job as an EA
21  II-III?
22  A.  I was not selected as
23  promoted off the register.  I was

8 (Pages 29 to 32)

**FREEDOM COURT REPORTING**

Page 33

1  visually appointed through the Reynolds
2  case because I was already in -- I was
3  working out of classification as an
4  engineer assistant III at that time.
5      Q.   So you were an engineering
6  assistant.  So when you were doing the
7  job of a field supervisor, you were
8  doing that job out of the
9  classification?
10     A.   Yes, sir.
11     Q.   The whole time you were an
12  engineering assistant II-III from 1993
13  forward until '98 you were holding that
14  job out of classification?
15     A.   Yes, sir.
16     Q.   And so you were actually
17  holding that position.  That was an
18  actual CE I-II position and you were
19  holding it while you were an EA
20  II-III?
21     A.   That -- to best of my
22  knowledge, that's somewhere between the
23  time I took over as supervisor and the

Page 34

1  time that the reclassification came out.
2  Sometime during that time they did a
3  restructure of our organization and they
4  made the supervisor became a -- that
5  classification, a CE classification.
6      Q.   So prior to that, the field
7  supervisor had been an EA level
8  position?
9      A.   II-III.
10     Q.   At least sometimes?
11     A.   At one time it was.
12     Q.   Does the Department of
13  Transportation have an internal
14  communication system, an internal radio
15  or telephone?
16     A.   Yes, sir.
17     Q.   Tell me about that.
18     A.   We use two-way radios out in
19  the field and we got two-way radios in
20  the trucks.  And we also -- we now have
21  the Southern Lincs that we use with
22  telephones on them.
23     Q.   And does the Department of

Page 35

1  Transportation allow people to or do
2  they have a policy concerning talking on
3  the radio while driving?
4      A.   No, not that I know of.
5      Q.   Would it be considered a
6  good practice to pull off the side of
7  the road while you're talking on your
8  phone?
9          MR. REDD:  Object to the
10 form.  He can answer.
11     A.   It would be -- it would
12 probably be safer, but I don't ever pull
13 over unless I got a problem with a
14 signal, you know.
15     Q.   Would you pull over; for
16 example, if you were getting detailed
17 instructions from your supervisor and
18 things you needed to write down, would
19 you pull off the road to do that?
20     A.   I may.
21     Q.   You said that you knew
22 Mr. Williams prior to the time that you
23 began to supervise him.  Tell me how you

Page 36

1  knew Mr. Williams.
2      A.   He had worked in the crews.
3  Well, one of the other crews.  We got
4  seven -- we had seven crews at one time
5  and he was in one of the crews.  Known
6  him from being in the office, seeing him
7  around.  We had worked on a project
8  where we had -- I think we had three
9  crews working on the same project and he
10 was working in one of the crews at the
11 time.  We were all working pretty much
12 together.
13     Q.   And Mr. Williams had been an
14 employee with the department since about
15 1992?
16     A.   I don't really know when he
17 started.
18     Q.   Do you know he'd been an
19 employee for quite a bit of time prior
20 to his promotion to transportation
21 technologist?
22     A.   I knew he had been working
23 with us for a while.

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1  **Q.  Had you ever heard of any**
2  **problems concerning Mr. Williams during**
3  **his previous employment?**
4     A.  No.
5  **Q.  You told me earlier that you**
6  **were responsible for evaluating**
7  **employees; is that correct?**
8     A.  Yes, sir.
9  **Q.  And on the evaluation form,**
10 **there's a series of things that a**
11 **supervisor is supposed to check if**
12 **there's a problem; correct, such as**
13 **attendance?**
14    A.  Yes, sir.
15 **Q.  Punctuality?**
16    A.  Yes, sir.
17 **Q.  Tell me about how you go**
18 **about grading people on that.**
19    A.  If they're late, then they
20 don't meet up to standards as far as I
21 think one time you get a warning, second
22 time -- second time you get a warning,
23 third time you can get wrote up, fourth

Page 38

1  time suspension.  And at any time if
2  they don't do what they're supposed to,
3  I mean, as far as if they don't comply
4  with the rules, then they get a check
5  mark on those tasks.
6  **Q.  And over the years you've**
7  **supervised 20, 30 people; correct,**
8  **different people?**
9     A.  I would imagine that could
10 be close to the number.
11 **Q.  And people are sometimes**
12 **late to work; correct?**
13    A.  Uh-huh (affirmative
14 response).
15 **Q.  Is it your testimony that**
16 **you give somebody a verbal warning every**
17 **single time they're late?  You're under**
18 **oath.**
19    A.  Pretty much so, yes, sir.
20 **Q.  It's your testimony you have**
21 **always throughout your career given**
22 **people a warning even every time they're**
23 **five minutes late to work?**

Page 39

1     A.  Pretty much so unless --
2  **Q.  What does pretty much mean,**
3  **that means you haven't done it every**
4  **time; correct?**
5     A.  If they were under my
6  supervision, I'd talk to them about it
7  and warn them they shouldn't be late.
8  **Q.  And your testimony is you've**
9  **done that every time somebody was five**
10 **minutes late?**
11       MR. REDD:  That's not his
12 testimony.
13       MR. ADAMS:  He can testify
14 to what his testimony is.  Go ahead and
15 answer the question.
16       MR. REDD:  He's already
17 stated.  Go ahead and answer it if you
18 want to answer it again.
19    A.  My testimony, I would talk
20 to them and tell them they shouldn't be
21 late or something.  If they come in late
22 without any explanation, yes.
23 **Q.  And it's your testimony that**

Page 40

1  **some of those people that you have not**
2  **reprimanded when they've been a few**
3  **minutes late have been white?**
4        MR. REDD:  Objection to the
5  form.  You want to qualify what you mean
6  by reprimanded.  It has a different
7  meaning --
8  **Q.  I'll stick with my question.**
9  **Go ahead and answer.**
10    A.  I've never reprimanded
11 anybody for being late on the first
12 time.
13 **Q.  Do you --**
14    A.  Would you repeat the exact
15 question that you just asked me?
16 **Q.  I said is it true that some**
17 **of the people that you have not**
18 **reprimanded when they've been late were**
19 **white?**
20       MR. REDD:  Object to the
21 form.  If you understand the question.
22    A.  Yeah.
23 **Q.  Now --**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1    A.  There's a difference between
2  a reprimand and a warning.  I mean,
3  I've --
4    Q.  Are some of the people that
5  you have not given a warning to when
6  they were late been white?
7    A.  Under -- to my best
8  knowledge if they've been late without a
9  valid excuse, I give them a warning.
10    Q.  Your testimony is that
11  throughout your career you've given
12  people a warning for being five minutes
13  late to work every time they've been
14  late, if they've been late for five
15  minutes, you've given them a warning?
16      MR. REDD:  Object to the
17  form.
18    A.  Without a valid excuse,
19  yes.
20    Q.  And what would be a valid
21  excuse?
22    A.  Something happen on the way
23  to work, flat tire or sick or something

Page 42

1  like that.
2    Q.  Would traffic be a valid
3  excuse?
4    A.  Not really.
5    Q.  So because there was unusual
6  traffic or somebody had an unusual
7  delay, that would not be a valid excuse
8  in your mind --
9      MR. REDD:  Object to the
10  form.
11    Q.  -- for being five minutes
12  late to work?
13      MR. REDD:  Object to the
14  form.
15    A.  Depending on what the delay
16  was.
17    Q.  I just said if there was a
18  traffic problem that caused them to be
19  late?
20    A.  Still depends on the
21  situation.
22    Q.  What would be those factors
23  you would take into account?

Page 43

1    A.  If the whole crew is late
2  driving the state truck or if they were
3  an individual driving to the office.
4  If -- it's different on the week, during
5  the week than it is on Mondays and
6  Thursdays or on Mondays especially.  If
7  you're late getting to the job site on
8  Mondays, we're given a period of time
9  from -- we meet in Montgomery at five
10  o'clock.  And if you do not meet in
11  Montgomery at five, then you're required
12  to be at your office at a certain time.
13  If that truck -- if the truck from the
14  office is there on time and a person
15  drives up on their own and they're not
16  there on time because of traffic, that
17  is not a valid excuse.
18    Q.  What's the difference
19  between Mondays and other days of the
20  week?
21    A.  Mondays we travel from here
22  to our job site and other days we are at
23  the job site staying in a motel close to

Page 44

1  the office.
2    Q.  So for example, on a
3  Wednesday, middle of the week, you
4  wouldn't have a five o'clock report
5  time?
6    A.  No.  Have a seven o'clock
7  report time.  Our work hours are five to
8  five Mondays, seven to five Tuesdays,
9  seven to five Wednesday, and depending
10  on if we've got a three-hour drive time
11  back, it's seven to six or seven to
12  seven.
13    Q.  And is that always the
14  case?
15    A.  It has been for the last
16  four years when we went to the four-day
17  week.
18    Q.  And that was the case during
19  the entire time that Mr. Williams was --
20    A.  Yes.
21    Q.  -- under your supervision
22  that like on a Wednesday he would not be
23  required to be at work until seven

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1 o'clock?
2    A.   Seven o'clock, unless it was
3 the first day of the week, first day of
4 the work week.  The first day of the
5 work week is the day we leave Montgomery
6 at five.
7
8    (Plaintiff's Exhibit No. 1 was
9    marked for identification and
10    attached hereto.)
11
12    Q.   And would that -- that
13 wouldn't be the case on a Wednesday
14 because that would be the third day of
15 the week, that wouldn't be the case on a
16 Wednesday; correct?
17    A.   No, I don't think it would
18 be.
19    Q.   Who's responsible for
20 setting those work hours, who determines
21 what the work hours are?
22    A.   The work hours are
23 determined by the location engineer.

Page 46

1 The assistance engineer, he decides
2 whether -- they decide what hours we
3 work.
4    Q.   And then what are a
5 supervisor's job duties as far as what
6 do they do to determine the hours of an
7 employee, are they responsible for
8 making sure; for example, the employee
9 doesn't get too many overtime hours and
10 adjusting hours like on comp time and
11 things like that?
12    A.   Yes, sir.  We pretty much
13 work 40 hours.  Our section -- our
14 location section, we don't work overtime
15 unless there's something very
16 abnormal.
17    Q.   And it would be within the
18 supervisor's discretion to say you need
19 to work longer or you can go home early
20 on any specific day?
21    A.   We can't let anybody go
22 early.  We're supposed to do 40 hours
23 and supervisor -- I don't even have the

Page 47

1 authority to let somebody just go
2 early.
3    Q.   You don't have the authority
4 to adjust the work schedule; for
5 example, if you finish a job, what
6 happens when you're out in the field and
7 you finish a job, you can let people go
8 or have them stay longer, you don't have
9 authority as a supervisor?
10    A.   No.
11    Q.   What role does the
12 supervisor have over his employees, what
13 authority does he have over those people
14 under him?
15    A.   He -- repeat that one more
16 time.  I want to make sure I've got it
17 right.
18    Q.   What authority does a
19 supervisor have over the people under
20 him, what is his role over those
21 people?
22    A.   He instructs them on task,
23 day-to-day tasks.  He's supposed to

Page 48

1 train these people.  He's supposed to
2 evaluate these people.
3    Q.   And who is your
4 supervisor?
5    A.   My -- my supervisor is
6 Mr. Joey Jones.
7    Q.   What is his job title?
8    A.   Transportation manager.
9    Q.   That's job classification;
10 right?
11    A.   Yes.
12    Q.   What is his job title, his
13 position?
14    A.   He's the assistant location
15 engineer, field.
16    Q.   And then who is Mr. Jones'
17 supervisor?
18    A.   Right now it's Mr. Stan
19 Bennett.  I think he's a PE.
20    Q.   What's his -- he's a
21 professional engineer?
22    A.   Yes.  I'm sorry.
23    Q.   I've been doing it so long I

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  do it too. And I just know other people
2  get confused.
3          What is -- you said right
4  now who was the supervisor before Stan?
5      A.   Mr. Adams, William Adams.
6      Q.   And Mr. William Adams is the
7  same Mr. William Adams who was the
8  leader of a group called the Adams
9  interveners who participated in the
10 Reynolds lawsuit; is that correct?
11     A.   I think so.
12     Q.   When did Mr. Adams cease
13 being the assistant location engineer?
14     A.   He was the location
15 engineer.
16     Q.   I'm sorry. The location
17 engineer?
18     A.   He was promoted last year, I
19 think, maybe.
20     Q.   So at the time that
21 Mr. Williams was your employee and at
22 the time he was demoted, Mr. William
23 Adams would have been the location

Page 50

1  engineer?
2      A.   Correct.
3      Q.   And then who was Mr. Adams'
4  supervisor?
5      A.   I think it was Mr. Don
6  Arkle. I'm not positive. I can't
7  remember.
8      Q.   And Mr. Arkle at that time
9  was the bureau chief of the design
10 bureau; is that correct?
11     A.   I think that's, yes.
12     Q.   And it's the supervisor's
13 role to tell those employees directly
14 under him what to do on a day-to-day
15 basis; correct? In other words,
16 Mr. Adams wouldn't be coming up telling
17 your employees what to do?
18     A.   No.
19     Q.   You would be responsible for
20 telling them what to do?
21     A.   Yes.
22     Q.   And the same would be true
23 for Mr. Williams, he would be

Page 51

1  responsible for telling his employees
2  what to do?
3      A.   Yes.
4      Q.   And telling them how to do
5  their job; correct?
6      A.   Correct, how to do it, train
7  new employees, train them, assign work
8  duties, yes.
9      Q.   And once the supervisor has
10 instructed those employees, his up line
11 supervisor should give that employee the
12 freedom to do the job as he's been
13 instructed to do it?
14     A.   Pretty much. There's
15 situations where that I want things done
16 the way I wanted it done because of time
17 restraints or because I knew that was
18 the best way to do something.
19     Q.   So is it your testimony that
20 you sometimes stepped in and changed the
21 instructions that Mr. Williams had given
22 the employees?
23     A.   Not to the employees, I

Page 52

1  would instruct Mr. Williams to change
2  his method of doing something.
3      Q.   So it's your testimony that
4  you never gave instructions directly to
5  the employees under Mr. Williams'
6  supervision?
7      A.   I don't know if I did or
8  not. I don't remember if I did or not.
9  I may have.
10     Q.   So you don't dispute that
11 you may have done that?
12     A.   No. I could have done that.
13         MR. ADAMS: Let's take a
14 five minute break.
15
16         (A brief recess was taken.)
17
18     Q.   (By Mr. Adams) Mr. Lewis,
19 we talked a little bit about the job
20 evaluations that you're responsible for
21 filling out. Have you ever written
22 anybody up for or given them a checkmark
23 on their evaluation for their

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 53

1 punctuality, any of your employees?
2     A.   I can't really remember if I
3 have or not. It's been -- been doing
4 them for so long.
5     Q.   You can't testify that
6 you've ever marked anybody down for
7 punctuality as a supervisor?
8     A.   I can't say that I have and
9 I can't say that I haven't. I just done
10 so many of them.
11     Q.   You cannot remember a
12 specific example where you've ever done
13 that?
14     A.   Not a specific, no.
15     Q.   How many times would
16 somebody have to be tardy before you
17 would mark it down on their
18 evaluation?
19     A.   Myself, twice if they were
20 without a valid excuse.
21     Q.   So it's your testimony that
22 any time somebody was late twice over
23 their entire six-month period they

Page 54

1 should get a mark down on their
2 evaluation for tardiness?
3     A.   That's my opinion.
4     Q.   How many times have you been
5 late in the last six months?
6     A.   Last six months, zero.
7     Q.   How about in the last five
8 years?
9     A.   Maybe once.
10     Q.   How is your time recorded,
11 Mr. Lewis?
12     A.   How is our hourly time
13 recorded?
14     Q.   Yes.
15     A.   Party chief kept up with it.
16 I keep up with it now myself.
17     Q.   And you write down the exact
18 time everybody shows up for work or how
19 does it happen?
20     A.   No. I just check the clock.
21 When everybody gets there, I look at the
22 clock to make sure they're not late.
23 Most of the time, 99.9 percent of the

Page 55

1 time probably they all come in together
2 because they're all staying at the same
3 place usually. But I've got a clock
4 that I keep an eye on and see when
5 everybody comes in.
6     Q.   But is it actually written
7 down what time people come in?
8     A.   No.
9     Q.   There's no hourly --
10     A.   I keep -- I keep a daily log
11 of stuff and I may write down late
12 today. I know I've seen a calendar with
13 my party chief at one time, I came in
14 right behind another gentleman and he
15 was going over some stuff and on his
16 calendar he had, I forgot who it was,
17 mine was like 7:01 and the next one was
18 7:02. I mean, the party chiefs keep up
19 with that pretty close. And it's one of
20 the things that keep us -- keeps the
21 discipline within the crew. That's a
22 very important matter to us is
23 punctuation -- punctuality.

Page 56

1     Q.   And so that would be an
2 important -- that's important for the
3 engineering assistants as well?
4     A.   That's important for
5 everybody in the crew.
6     Q.   You mentioned that you were
7 familiar with the Reynolds lawsuit. Did
8 you ever discuss the Reynolds lawsuit
9 with Mr. Williams?
10     A.   Not that I remember.
11     Q.   You knew that he was a
12 member of the Reynolds class; correct,
13 and was a member of a lawsuit?
14     A.   I heard he was, yes, sir.
15     Q.   Who did you hear that
16 from?
17     A.   I don't remember. I mean,
18 it was through the crews.
19     Q.   Did you ever have any
20 discussions -- first of all, who was
21 your supervisor?
22     A.   At what --
23     Q.   At the point in time when

14 (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 57

1  you were Mr. Williams' supervisor?
2      A.    Mr. Joe Jones.
3      Q.    Did you ever have any
4  conversations with Mr. Joe Jones
5  concerning the fact that Mr. Williams
6  was a member of the Reynolds lawsuit?
7      A.    No.
8      Q.    Did you ever receive any
9  instructions from Mr. Jones concerning
10 your oversight of Mr. Williams or how
11 you should supervise him?
12     A.    No, nothing other than
13 standard instructions. If you got a new
14 employee, treat him like you're supposed
15 to.
16     Q.    What do you mean by standard
17 instructions, what were you told?
18     A.    You're getting a new
19 employee, he's going to be your
20 supervisor, you know, make sure he does
21 what he's supposed to.
22     Q.    You mean you said he was
23 going to be your supervisor, you mean he

Page 58

1  was going to be your field supervisor?
2      A.    Yes, my field supervisor.
3      Q.    Not actually your personal
4  supervisor --
5      A.    No.
6      Q.    -- but the field supervisor
7  that you were overseeing?
8      A.    Right.
9      Q.    Mr. Lewis, I hand you what's
10 been marked as Plaintiff's Exhibit 1 to
11 your deposition which is previously
12 marked as Defendant's Exhibit 8 to
13 Mr. Williams' deposition.
14     A.    Uh-huh (affirmative
15 response).
16     Q.    Can you identify that
17 document?
18     A.    Yes, I can.
19     Q.    Are you the author of that
20 document?
21     A.    Yes, I am.
22     Q.    And I believe this document
23 documents the four times that

Page 59

1  Mr. Lewis -- I mean that Mr. Williams
2  was allegedly late while he was a
3  transportation technologist; is that
4  correct?
5      A.    Yes.
6      Q.    Going down to the third
7  paragraph, on Wednesday, June 1st, he
8  reported to the parking lot at 5:05
9  which is five minutes late and that was
10 the first incident of his alleged
11 tardiness; is that correct?
12     A.    That's correct.
13     Q.    Now, you had earlier told me
14 that his report time on a Wednesday
15 would be seven o'clock. Do you have any
16 explanation for that discrepancy?
17         MR. REDD:  Object to the
18 form.
19     A.    I think that was the first
20 day of the work week.
21     Q.    Why would Wednesday have
22 been the first day of the work week?
23     A.    I don't -- could have been

Page 60

1  off two days or I may have wrote the
2  wrong date down.
3      Q.    Then we go on to the next
4  occasion which is the very next day, you
5  said that you instructed the crew to
6  meet you in the parking lot of the motel
7  where everyone was staying in Auburn and
8  you go on to say that Mr. Williams did
9  not report to the parking lot. He
10 actually went directly to the job site;
11 is that correct?
12     A.    That's what he said. That's
13 what he told me.
14     Q.    And you have no way of
15 knowing whether he was late that day or
16 not, do you?
17     A.    He wasn't at the motel. He
18 was late as far as I'm concerned because
19 that's where I told him to report to.
20     Q.    And is it your testimony
21 that you told Mr. Williams that
22 directly --
23     A.    Yes.

15  (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 61

1    Q.    -- to his face?  Are you
2  aware that Mr. Williams has denied that
3  he heard you say that?
4    A.    I am now.
5    Q.    And it's your testimony that
6  it is -- that a civil engineer does not
7  have the discretion to determine that he
8  can go to the job site directly on his
9  own?
10    A.    Not after he's been
11  instructed to be somewhere else.
12    Q.    Why would it be unacceptable
13  for him to go directly to the job
14  site?
15    A.    Because we -- I could have
16  had some instructions for him or because
17  that's where he was told to be.  The
18  fact is that's where I told the crew to
19  meet and that's where I expected him.
20    Q.    And it's your testimony that
21  you specifically remember telling
22  Mr. Williams this yourself
23  face-to-face?

Page 62

1    A.    I remember me standing in
2  the doorway.  Mr. Williams sitting at a
3  table just inside the door.  Mr. Rodney
4  Sanders right beside him and someone
5  else was in the room at the same time.
6  And my instructions were, We'll meet
7  here at the parking lot at 7 a.m.
8  tomorrow morning.
9    Q.    Let's go on to the third
10  occasion.  On the third occasion,
11  Mr. Williams called you to say that he
12  was sick and would not be coming into
13  work; isn't that correct?
14    A.    I don't remember if he said
15  he wasn't coming in.  I remember him
16  calling and saying he was sick.
17    Q.    Well, why would he have
18  called you to say he was sick if he was
19  not calling to tell you he wasn't coming
20  in?
21    A.    Well, if he was already
22  late, he could have said I was sick, you
23  know, I'm running late and I'm sick.

Page 63

1  That could have been the reason why he
2  called.
3    Q.    Do you deny that you told
4  Mr. Lewis -- I mean, Mr. Williams that
5  he could not take a sick day?
6    A.    Repeat that, please.
7    Q.    Do you deny that you told
8  Mr. Williams that he could not take a
9  sick day?
10    A.    Yes, I do.
11    Q.    So it's your testimony that
12  you never told him that he could -- that
13  he was not eligible to take a sick day
14  on that day?
15    A.    No.
16    Q.    And that he was a supervisor
17  and that he should come to work?
18    A.    I told him, best of my
19  recollection, I said -- best of my
20  recollection, I said you need to come on
21  in if you can, but if you can't, that's
22  fine.
23    Q.    So in other words, you did

Page 64

1  know that he was sick before he came
2  into work and even though he came into
3  work sick you reprimanded him for being
4  30 minutes late to work?
5    A.    Because he did not notify me
6  by seven o'clock like he was instructed
7  to like everybody is instructed to.
8    Q.    But he came in at 7:30 so
9  sometime between seven and 7:30 you got
10  a phone call by your testimony saying
11  that he was sick?
12    A.    Uh-huh (affirmative
13  response).
14    Q.    So you reprimanded him
15  because he waited until a couple minutes
16  after seven to call you to tell you that
17  he was sick?
18    MR. REDD:  Object to the
19  form.  That's a mischaracterization of
20  his statement.
21    MR. ADAMS:  That's an exact
22  characterization of what he said.
23    MR. REDD:  He said a couple

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1 of minutes. Between seven and 7:30,
2 that's more than a couple of minutes.
3 If you understand the question, you can
4 answer.
5       A.   Yes, I did.  Because
6 everyone's instructions are if you're
7 sick, if you're going to be late, and if
8 you're not coming in you need to call by
9 seven o'clock.
10      Q.   And is it your testimony
11 that for every employee that you
12 supervised including white employees
13 that those employees who do not call you
14 before seven o'clock get a warning or a
15 reprimand for not calling before seven
16 o'clock?
17      A.   They get a warning or a
18 reprimand, yes.
19      Q.   Every individual who fails
20 to call by seven o'clock, that's your
21 testimony under oath?
22      A.   That's my testimony.
23      Q.   And is that the department's

Page 66

1 policy that any employee who does not
2 call before seven o'clock gets a
3 reprimand?
4       MR. REDD:  Object to the
5 form.  He said a warning or a
6 reprimand.
7       A.   A warning or a reprimand.
8       Q.   Is that your testimony?
9       A.   A warning.  We're instructed
10 to make sure they're on time.  If
11 they're not on time, they're given a
12 warning or if it's abuse -- if it's an
13 ongoing thing, you know, it happens on a
14 regular basis, yes, reprimand.
15      Q.   So on this occasion, this
16 was the first time that Mr. Williams had
17 attempted to call in sick while he was
18 under your supervision; correct?
19      A.   I think it was the first
20 time.
21      Q.   And it is your testimony
22 under oath that all other employees that
23 you've ever supervised who failed to

Page 67

1 call in before seven o'clock were given
2 a warning or a reprimand?
3       MR. REDD:  Objection.  Asked
4 and answered.
5       A.   To the best of my knowledge,
6 yes.
7       Q.   Let's go on to the fourth
8 occasion.  This is Monday, July 25th,
9 and according to your statement, he was
10 not supposed to have been at work until
11 seven o'clock; correct?
12      A.   Correct.  He wasn't supposed
13 to be in Tuscaloosa until seven.
14      Q.   And that would have been a
15 day that he would have actually been on
16 site or would have been a day that you
17 were driving to Tuscaloosa?
18      A.   That's the day he drove from
19 Montgomery to Tuscaloosa.
20      Q.   And you state that you
21 talked to him on the Southern Linc
22 before 7 a.m.  Were you giving him
23 instructions about the job, is that why

Page 68

1 you were talking to him that day?
2       A.   Yes.
3       Q.   What were those instructions
4 about?
5       A.   I don't even remember.
6       Q.   Is it possible that they
7 were detailed instructions?
8       A.   They were important
9 instructions if I called him.
10      Q.   And we've already
11 established that it would have been a
12 good safety policy to pull off the road
13 while you're talking on the phone on
14 detailed instructions, haven't we?
15      A.   It's a good idea to.
16      Q.   Is it possible that it's
17 your instructions which caused
18 Mr. Williams to be late that day?
19      A.   I don't know if they were or
20 not.
21      Q.   But it is possible?
22      A.   I don't know if it was
23 possible or not.  Because I wasn't -- my

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

| Page 69 |
|---|

1  statement here shows that it was 14
2  minutes after seven o'clock and I know
3  my instructions weren't -- didn't take
4  14 minutes to take down.
5     **Q.   But you don't remember what**
6  **the instructions were so you don't know**
7  **how long they were?**
8     A.   It was very short
9  instructions.  I remember it was short
10  because I was talking to Mr. Jones at
11  the same time.
12     **Q.   So we have four incidents**
13  **where --**
14     A.   Uh-huh (affirmative
15  response).
16     **Q.   -- Mr. Lewis for his**
17  **supposed repeated tardiness and on the**
18  **first occasion he was five minutes**
19  **late?**
20     A.   Uh-huh (affirmative
21  response).
22     **Q.   On the second occasion, you**
23  **don't know whether he was actually late**

| Page 70 |
|---|

1  or not because he may have been at the
2  job site?
3     A.   He was late.
4     **Q.   But he could have been at**
5  **the job site, yes or no?**
6     A.   He could have been but he
7  was late because he was not where he was
8  supposed to be.
9     **Q.   Let's take that one out of**
10  **the equation because that's the**
11  **hypothetical I want to go with.  And**
12  **occasion three he called in to say he**
13  **was sick but came into work anyway;**
14  **correct?**
15     A.   (Nodded head affirmatively.)
16     **Q.   And on the fourth occasion,**
17  **he was 14 minutes late.  So the second**
18  **and third occasions if you take those**
19  **out of the equation, we have a total of**
20  **19 minutes that Mr. Williams was**
21  **reportedly late for work and that's a**
22  **reason somebody should be demoted from a**
23  **civil engineering position for being 14**

| Page 71 |
|---|

1  minutes late --
2     MR. REDD:  Object to the
3  form.
4     **Q.   -- is that your testimony?**
5     MR. REDD:  Object to the
6  form of the question that that --
7     MR. ADAMS:  That's all you
8  need to say.  You made your objection.
9     MR. REDD:  Mis-
10  characterization of facts of the case.
11     A.   I don't think that's the
12  sole reason or factored into the reason
13  of him being demoted.
14     **Q.   You don't think the reported**
15  **tardiness was one of the factors that**
16  **was cited for his termination or for his**
17  **demotion?**
18     A.   It could have been.
19     **Q.   And in your opinion, should**
20  **14 minutes be a factor in determining**
21  **whether somebody is allowed to be a**
22  **civil engineer or not?**
23     MR. REDD:  Object to the

| Page 72 |
|---|

1  form.
2     A.   In a supervisory role,
3  yes.
4     **Q.   14 minutes should keep them**
5  **from being a supervisor?**
6     MR. REDD:  Object to the
7  form.
8     A.   On a building basis as this
9  was, I would say it would be my opinion
10  that there should be something done.
11     **Q.   Is your testimony that**
12  **something has been done to every white**
13  **employee who was 14 minutes who was in a**
14  **supervisory position?**
15     MR. REDD:  Object to the
16  form.
17     A.   I don't know about that.
18     **Q.   Has every white employee**
19  **that you've ever supervised who's been**
20  **14 minutes late been similarly**
21  **treated?**
22     A.   If they've been time after
23  time, yes.  If we're late too on the

18  (Pages 69 to 72)

## FREEDOM COURT REPORTING

Page 73

1 second occasion, third occasion, yes.
2 It doesn't matter how much late we are.
3     Q.  Do you know of another
4 employee that's ever been demoted
5 because of such 14 minutes of being
6 tardy?
7     A.  I don't know of no employee
8 that has ever been demoted.  I don't
9 know of anybody.
10     Q.  So Mr. Williams is the only
11 person that you're aware of who's ever
12 been demoted?
13         MR. REDD:  Object to the
14 form.
15     A.  In our section.  Can I add
16 to that while I've been working?
17     Q.  Sure.
18
19     (Plaintiff's Exhibit No. 2 was
20     marked for identification and
21     attached hereto.)
22
23     Q.  Did you ever counsel

Page 74

1 Mr. Williams in front of other
2 employees?
3     A.  No, not that I remember.
4     Q.  Did you ever raise your
5 voice to Mr. Williams?
6     A.  No.
7     Q.  Did you ever do that in
8 front of other employees?
9     A.  No.
10     Q.  Did Mr. Williams ever accuse
11 you of being prejudice?
12     A.  He asked me if I was
13 prejudice one time.
14     Q.  But he never accused you of
15 being prejudice?
16     A.  No.
17     Q.  Can you identify Plaintiff's
18 Exhibit 2 which has been previously
19 marked as Defendant's Exhibit 9 to the
20 deposition of Leroy Williams?
21     A.  Yes, I wrote this.
22     Q.  If you would, turn to Roman
23 Numeral one which is on the third page.

Page 75

1     A.  (Complied.)
2     Q.  Have you had a chance to
3 read that?
4     A.  Yes.
5     Q.  And by P-R-E-J-U-D-G-E-S, is
6 that how you -- that's how you spelled
7 prejudice?
8     A.  I think I misspelled it.
9 I'm not sure.
10     Q.  And in that statement, in
11 that counseling statement you stated
12 under little letter "A" accusing me of
13 being prejudice will not be tolerated.
14 So in this counseling session you did
15 accuse or did say that Mr. Williams had
16 accused you of being prejudice;
17 correct?
18     A.  Yes, I did.
19     Q.  And just a few moments ago
20 you told me he never accused you of
21 being prejudice, which is it?
22     A.  He -- he didn't -- you asked
23 me -- did you say racial?

Page 76

1     Q.  No.  I asked you if he
2 accused you of being prejudice?
3     A.  I misunderstood you.  What's
4 on the paper is correct.
5     Q.  How did that make you feel,
6 Mr. Lewis, when he accused you of being
7 prejudice?
8     A.  I don't know 'cause I'm not.
9 I mean --
10     Q.  Have you ever used any
11 racial slurs, Mr. Lewis?
12     A.  Not that I remember at work,
13 no.
14     Q.  So you have used racial
15 slurs not at work; correct?
16     A.  I would say yes.
17     Q.  Have you used the word
18 "nigger" not at work?
19     A.  Yeah.  Yes.
20     Q.  Have you called
21 African-American's nigger when not at
22 work?  You're under oath, Mr. Lewis.
23     A.  Probably have, yeah.

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1
2      (Plaintiff's Exhibit No. 3 was
3      marked for identification and
4      attached hereto.)
5
6      Q.    Mr. Lewis, I hand you what's
7   been marked as Plaintiff's Exhibit 3.
8   Can you identify that document for me?
9      A.    Yes. This is a reprimand I
10  wrote.
11     Q.    That's also been marked as
12  Defendant's Exhibit 11 to the deposition
13  of Leroy Williams; correct?
14     A.    I guess so. I see
15  Defendant's Exhibit 11.
16     Q.    Would it be fair to say that
17  the reason you wrote this reprimand was
18  that Mr. Williams walked away from you
19  while you were giving him
20  instructions?
21     A.    Yes.
22     Q.    Is it also true that
23  Mr. Williams had -- you had given Mr.

Page 78

1   Williams instructions, he then asked you
2   to repeat what was said and he went down
3   and sat on a log and listened to you
4   give instructions again; is that
5   correct?
6      A.    To the best of my
7   recollection, yes, sir.
8      Q.    Did he ask you if you had
9   any new instructions to give him before
10  he walked away?
11     A.    I don't remember.
12     Q.    Is it possible that he may
13  have?
14     A.    He could have.
15     Q.    Prior to the Reynolds
16  lawsuit, were there any
17  African-Americans at the level of
18  transportation technologist or at that
19  time called civil engineer in the design
20  bureau?
21     A.    I don't know if there were
22  or not.
23     Q.    Can you name any?

Page 79

1      MR. REDD:  He said he didn't
2   know.
3      A.    I don't know.
4      Q.    So you can't name any
5   African-Americans who were at the level
6   of civil engineer in the design bureau
7   prior to the Reynolds lawsuit?
8      MR. REDD:  Let's see. When
9   was Reynolds filed, 1980 what?
10     MR. ADAMS:  And he said he
11  was at that department at that point in
12  time. 1985 is when it was filed.
13     A.    There could have been. I
14  just don't know.
15     Q.    Are there any
16  African-Americans who are civil
17  engineers in the design bureau today?
18     A.    Yes.
19     Q.    Who are those individuals?
20     A.    Let's see. Willie Promise,
21  Nero Brown.
22     Q.    What is Mr. Brown's actual
23  name, do you know?

Page 80

1      A.    Lawrence Nero Brown. I'm
2   sorry. Willie Garrett. That's the ones
3   I know of out in the field.
4      Q.    And would it be a correct
5   statement that each of those three
6   individuals was appointed in the 1998
7   time frame to those positions under the
8   court-ordered appointments in
9   Reynolds?
10     A.    I don't know if they were or
11  not. I don't know when they were
12  appointed.
13     Q.    You said that the Reynolds
14  lawsuit had disrupted appointments and
15  that at some point in time there begin
16  to be appointments off the registers; is
17  that correct?
18     MR. REDD:  Object to the
19  form. He said froze. Let's use the
20  right words.
21     A.    Repeat that, please, sir.
22     Q.    You stated that there was a
23  period of time where there weren't any

                              20 (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1 appointments made because of the
2 Reynolds lawsuit; correct?
3     A.    Correct.
4     Q.    And then you stated that at
5 some point in time appointments begin to
6 be made again under the registers; is
7 that correct?
8     A.    At some point in time, yes,
9 I think.
10    Q.    I think earlier you said
11 about two years ago?
12    A.    I don't know if it was two
13 years.  There were appointments -- there
14 were appointments prior to that, I
15 believe.
16    Q.    Under the registers?
17    A.    Yes.
18    Q.    When do you think those
19 begin to occur?
20    A.    I don't know any dates.  I
21 know the Reynolds appointments were from
22 '98 up to a certain point.  I don't know
23 when it was.

Page 82

1     Q.    '99/2000?
2     A.    Might have been.
3     Q.    Are you aware of any
4 African-Americans who have been
5 appointed to the transportation
6 technologist or transportation
7 technologist senior position in the
8 design bureau since the appointments
9 have once again been made under the
10 registers other than Mr. Williams?
11    A.    Yes.
12    Q.    Who's that?
13    A.    Mr. Will Garrett has been
14 appointed to a senior position,
15 transportation technologist senior.
16    Q.    Anybody else?
17    A.    Not that I can think of off
18 the top of my head.
19    Q.    Have you ever selected
20 anyone off of a certificate of
21 eligibles?
22    A.    No.
23    Q.    So you've never -- have you

Page 83

1 ever selected anyone for any positions
2 that you've ever supervised?
3     A.    No.
4     Q.    And the insubordination that
5 Mr. Williams is accused of having
6 committed and that he was demoted for
7 related to this incident that's
8 reflected in Defendant's Exhibit 11 to
9 Mr. Williams' deposition and what has
10 been marked as Plaintiff's Exhibit 3 to
11 your deposition; correct?
12          MR. REDD:  Object to the
13 form.
14    A.    Would you repeat it, please?
15    Q.    The insubordination that
16 Mr. Williams was demoted for, that's
17 what is reflected in this --
18    A.    Yes.
19    Q.    -- document here; correct?
20          MR. REDD:  Object to the
21 form.
22    Q.    And is this the only
23 documentation of any insubordination by

Page 84

1 Mr. Williams that you're aware of?
2     A.    That I'm aware of.
3     Q.    And you would have been the
4 only one -- since he was your employee
5 to supervise, you would have been the
6 one who would have been responsible for
7 that; correct?
8     A.    While he was under my
9 supervision, yes, sir.
10    Q.    And he was under your
11 supervision the entire time he was a
12 transportation technologist?
13    A.    Yes.
14    Q.    Now, you've said that you
15 have heard from other employees that
16 Mr. Williams was a member of the
17 Reynolds class and was a plaintiff in
18 the Reynolds lawsuit.  Had you also
19 heard that he had filed internal
20 grievances against the department?
21    A.    No.
22    Q.    So you were unaware that he
23 had filed any internal grievances?

21 (Pages 81 to 84)

**FREEDOM COURT REPORTING**

Page 85

```
1       A.   Yes.
2       Q.   You were never interviewed
3   or questioned about any of those
4   internal grievances?
5       A.   No.
6       Q.   The position that
7   Mr. Williams was appointed into, the
8   transportation technologist position or
9   the classification and then the actual
10  position of field supervisor, who held
11  that position before Mr. Williams?
12      A.   I did.
13      Q.   And how long was the
14  interval between when you vacated that
15  position and when Mr. Williams was
16  appointed to that position?
17      A.   Four months.  I'm not sure
18  of the exact time, but it was a couple
19  months or so.
20      Q.   Who held that position
21  during the period of time when you
22  vacated it and Mr. Williams was
23  appointed?
```

Page 86

```
1       A.   I think if I'm not bad
2   mistaken Mr. McKinnon was acting.
3       Q.   What's his first name?
4       A.   Bill.  I think that's his
5   first name.  It's what he goes by.
6       Q.   And spell his last name.
7       A.   Sorry.  I don't know how
8   it's spelled.
9       Q.   McKinnon, M-C-K-I-N-N-O-N,
10  is that close?
11      A.   I think so.
12      Q.   Who took over the position
13  after Mr. Williams was demoted?
14          MR. REDD:  Object to the
15  form.
16      A.   I don't remember because
17  before he got demoted I was -- the crews
18  were swapped around again.  I don't
19  really remember who took his position.
20      Q.   You supervise -- today
21  you're supervising that crew, aren't
22  you?
23      A.   No.
```

Page 87

```
1       Q.   Why aren't you supervising
2   that crew now?
3       A.   We had another party chief
4   transfer out.  And can I correct
5   something I've said?
6       Q.   Sure.
7       A.   I was not Mr. Williams'
8   supervisor the entire time.  I think it
9   was, I don't know, a week before he got
10  demoted that the crews all got swapped
11  around.
12      Q.   Now, you were the party
13  chief who was over the field supervisor
14  position that Mr. Williams held?
15      A.   Yes.
16      Q.   And then -- but you only got
17  that position at the same time that
18  Mr. Williams or you were promoted into
19  that position from the field supervisor
20  position; correct?
21      A.   Correct.
22      Q.   And then you were the party
23  chief over that position while
```

Page 88

```
1   Mr. Williams was in it?
2       A.   Correct.
3       Q.   Then Mr. Williams was
4   demoted?
5       A.   No.  Just shortly before he
6   was demoted, a week, maybe two weeks
7   before he was demoted, the crews, they
8   had a shuffling of the crews because the
9   party chief left, had transferred out.
10      Q.   So a different party chief
11  transferred out.  What was his name?
12      A.   Mike Carroll.
13      Q.   And Mr. Carroll's race is --
14  what is Mr. Carroll's race?
15      A.   White.
16      Q.   And Mr. McKinnon's race?
17      A.   He's white.
18      Q.   And so it's your testimony
19  that you don't know who took
20  Mr. Williams' position after he was
21  demoted?
22      A.   I don't remember.
23      Q.   Could it have been
```

22 (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

<table>
<tr><td valign="top" width="50%">

Page 89

1    Mr. McKinnon?
2    A.  It could have but I really
3  don't know. I don't remember.
4    Q.  Did you ever evaluate
5  Mr. Williams while he was a
6  transportation technologist?
7    A.  I think I did an appraisal,
8  a three-month appraisal or we were about
9  to do a three-month appraisal. I don't
10  remember if I did or not.
11    Q.  So you don't know what
12  evaluation you gave him since you don't
13  remember whether you did one or not?
14    A.  No, I don't.
15    MR. ADAMS:  Let's take a
16  couple minutes break and I think I'm
17  done.
18
19    (A brief recess was taken.)
20
21    Q.  (By Mr. Adams) Mr. Lewis,
22  what, if any, are the differences in the
23  job duties that Mr. Williams would have

</td><td valign="top" width="50%">

Page 91

1  field supervisor and in the same
2  position that Mr. Williams held as a
3  transportation technologist.  There was
4  a period of time where you were doing
5  that as an EA II-III and was not out of
6  classification, that was considered the
7  proper classification for that job?
8    A.  I believe that's correct.
9    Q.  So the only difference
10  between the field supervisor position
11  and the engineering assistant position
12  that Mr. Williams went back into would
13  be the supervision of employees?
14    A.  Well, in our section, yes,
15  that would be --
16    Q.  And Mr. Williams went back
17  to working in your section; correct?
18    A.  I don't -- I don't know what
19  section he went to. He was -- I don't
20  know what section he came out of.  He
21  had worked --
22    Q.  By section did you mean
23  location section or what were you

</td></tr>
<tr><td valign="top">

Page 90

1  been performing as a civil engineer I or
2  transportation technologist and those
3  that he would be performing as a
4  engineering assistant other than
5  supervision of employees?
6    A.  None really. I mean, you're
7  doing the same work. You're just
8  responsible for it.  You're responsible
9  for everybody's work instead of just
10  yours.
11    Q.  So you would be doing the
12  same -- running the same types of
13  equipment, you'd be performing the
14  same --
15    A.  Same task.
16    Q.  -- mathematical
17  calculations, same task, same
18  everything?
19    A.  Yes.
20    Q.  Now, I think we've cleared
21  this up on the record but I just want to
22  make sure. When you were an engineering
23  assistant II-III, you were working as a

</td><td valign="top">

Page 92

1  referring to?
2    A.  Yeah, that's what I'm
3  referring to location section. I think
4  he was in the design bureau. But he had
5  worked in the location section for a
6  while.
7    MR. ADAMS:  I don't have any
8  more questions.
9    MR. REDD:  No questions.
10
11
12
13
14    FURTHER DEPONENT SAITH NOT
15
16
17
18
19
20
21
22
23

</td></tr>
</table>

23 (Pages 89 to 92)

**FREEDOM COURT REPORTING**

Page 93

```
 1          CERTIFICATE
 2
 3    STATE OF ALABAMA)
 4    AUTAUGA COUNTY)
 5
 6         I hereby certify that the above
 7    and foregoing deposition was taken down
 8    by me in stenotype and the questions and
 9    answers thereto were transcribed by
10    means of computer-aided transcription,
11    and that the foregoing represents a true
12    and correct transcript of the testimony
13    given by said witness upon said hearing.
14         I further certify that I am
15    neither of counsel, nor of kin to the
16    parties to the action, nor am I in
17    anywise interested in the result of said
18    cause.
19
20
21    _____
22    LESLIE K. HARTSFIELD,
23    COURT REPORTER
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

| A | | | | |
|---|---|---|---|---|
| **ability** 7:1 | **ago** 21:9 22:22 | **appointments** | **aware** 61:2 | **broke** 20:5 |
| **able** 10:14 | 75:19 81:11 | 20:10,18 80:8 | 73:11 82:3 | **brothers** 8:21 |
| **abnormal** 46:16 | **AGREED** 1:16 | 80:14,16 81:1 | 84:1,2 | **brought** 8:12 |
| **abuse** 66:12 | 2:4,12,21 | 81:5,13,14,21 | **a.m** 5:18 62:7 | **Brown** 79:21 |
| **account** 42:23 | **ahead** 39:14,17 | 82:8 | 67:22 | 80:1 |
| **accurate** 14:8 | 40:9 | **appraisal** 89:7,8 | | **Brown's** 79:22 |
| **accuse** 74:10 | **Airton** 7:8 9:5 | 89:9 | **B** | **building** 4:22 |
| 75:15 | 9:12 | **approximately** | **back** 8:12 10:15 | 13:4 72:8 |
| **accused** 74:14 | **al** 1:12 4:12 | 14:2 16:1 | 10:15 12:20 | **bunch** 21:3 |
| 75:16,20 76:2 | **Alabama** 1:2,11 | **area** 9:7 | 13:8 19:19 | **bureau** 14:6,13 |
| 76:6 83:5 | 1:21,23 4:2,11 | **Arkle** 50:6,8 | 21:18,19,23 | 14:13,17,18,21 |
| **accusing** 75:12 | 4:23 5:2,5,10 | **asked** 11:11 | 28:22 44:11 | 50:9,10 78:20 |
| **achieved** 10:4 | 5:16,18 7:8 | 40:15 67:3 | 91:12,16 | 79:6,17 82:8 |
| **acting** 5:10 | 93:3 | 74:12 75:22 | **background** | 92:4 |
| 23:19 31:11 | **alleged** 59:10 | 76:1 78:1 | 9:10 13:9 | **bureaus** 13:13 |
| 86:2 | **allegedly** 59:2 | **asking** 6:13 | **bad** 86:1 | 13:17,18 14:3 |
| **action** 93:16 | **allow** 35:1 | **assign** 2:17 17:7 | **basis** 50:15 | 14:4,9,12 |
| **actual** 33:18 | **allowed** 71:21 | 51:7 | 66:14 72:8 | **bushes** 15:15 |
| 79:22 85:9 | **Alton** 5:4 | **assigned** 16:20 | **Bass** 11:10 | 16:5 |
| **Adams** 3:3 4:21 | **Andrew** 5:3 | **assigning** 23:23 | 12:16 13:2 | |
| 6:9,11 39:13 | **Angela** 8:4,4 | **assistance** 46:1 | **began** 35:23 | **C** |
| 49:5,5,6,7,8,12 | **answer** 35:10 | **assistant** 15:19 | **beginning** 5:18 | **calculations** |
| 49:23 50:3,16 | 39:15,17,18 | 26:22 27:18,23 | **behalf** 5:1 | 90:17 |
| 52:13,18 64:21 | 40:9 65:4 | 28:12,14,15,19 | **believe** 24:18 | **calendar** 55:12 |
| 71:7 79:10 | **answered** 6:23 | 29:4,19 30:8 | 58:22 81:15 | 55:16 |
| 89:15,21 92:7 | 67:4 | 30:19,20 33:4 | 91:8 | **call** 13:2 64:10 |
| **add** 73:15 | **answers** 93:9 | 33:6,12 48:14 | **Bennett** 48:19 | 64:16 65:8,13 |
| **address** 7:13 | **anybody** 8:8 | 49:13 90:4,23 | **best** 7:1 15:10 | 65:20 66:2,17 |
| **adjust** 47:4 | 40:11 46:21 | 91:11 | 33:21 41:7 | 67:1 |
| **adjusting** 46:10 | 52:22 53:6 | **assistants** 56:3 | 51:18 63:18,19 | **called** 11:11 |
| **affirmative** | 73:9 82:16 | **assume** 6:22 | 67:5 78:6 | 20:5,14 21:12 |
| 19:16 22:15 | **anyway** 70:13 | **assumed** 25:9 | **Bill** 86:4 | 30:4 49:8 |
| 26:23 38:13 | **anywise** 93:17 | **attached** 45:10 | **Birmingham** | 62:11,18 63:2 |
| 58:14 64:12 | **APPEARAN...** | 73:21 77:4 | 4:23 | 68:9 70:12 |
| 69:14,20 | 4:19 | **attempted** 66:17 | **bit** 36:19 52:19 | 76:20 78:19 |
| **affirmatively** | **appearing** 4:23 | **attendance** | **biweekly** 15:14 | **calling** 62:16,19 |
| 70:15 | **appointed** 31:4 | 37:13 | **block** 8:11 | 65:15 |
| **African-Amer...** | 33:1 80:6,12 | **Auburn** 60:7 | **blood** 10:20 | **care** 17:4 26:5 |
| 78:17 79:5,16 | 82:5,14 85:7 | **AUTAUGA** | **Boulevard** 1:22 | **career** 14:21 |
| 82:4 | 85:16,23 | 93:4 | 5:5,17 | 38:21 41:11 |
| **African-Amer...** | **appointment** | **author** 58:19 | **break** 6:19 | **Carroll** 88:12 |
| 76:21 | 20:12,15,16 | **authority** 47:1,3 | 52:14 89:16 | **Carroll's** 88:13 |
| **ages** 8:17 | 23:14 24:22 | 47:9,13,18 | **brief** 52:16 | 88:14 |
| | 30:9 | **Avapro** 10:21 | 89:19 | **case** 1:5 4:5 6:12 |

**FREEDOM COURT REPORTING**

19:4,9,13,20
19:23 33:2
44:14,18 45:13
45:15 71:10
**Casey** 8:18
**Casey's** 8:19
**cause** 5:20 10:23
30:13 76:8
93:18
**caused** 42:18
68:17
**CE** 12:8 21:11
21:12 22:5,17
28:4,16 30:21
31:13 33:18
34:5
**cease** 49:12
**central** 13:16
**certain** 43:12
81:22
**certificate** 32:10
82:20 93:1
**certify** 5:11 93:6
93:14
**CEs** 22:9
**chain** 15:16 16:6
28:6
**chance** 75:2
**change** 52:1
**changed** 22:8
23:12 51:20
**characterizati...**
64:22 71:10
**check** 37:11
38:4 54:20
**checking** 23:23
**checkmark**
52:22
**chief** 14:14,17
14:18 17:9
23:18,19 27:4
28:2,7,8 31:4
31:11,11 32:4
50:9 54:15

55:13 87:3,13
87:23 88:9,10
**chiefs** 14:19
18:16 55:18
**children** 8:14
**CHILDS** 4:20
**cited** 71:16
**civil** 5:13 12:9
12:11 20:4,7,7
21:5 22:13,21
23:14,15 26:17
29:8 30:4,23
31:7 32:16
61:6 70:23
71:22 78:19
79:6,16 90:1
**clarification**
30:16
**class** 56:12
84:17
**classification**
12:5 15:8
24:13 26:22
31:15,19 32:2
33:3,9,14 34:5
34:5 48:9 85:9
91:6,7
**classifications**
20:6 21:14,22
22:9
**classified** 22:4
**cleared** 90:20
**clock** 54:20,22
55:3
**close** 38:10
43:23 55:19
86:10
**Coliseum** 1:22
5:4,17
**combined** 21:14
**come** 11:8 24:3
39:21 55:1,7
63:17,20
**comes** 55:5

**coming** 50:16
62:12,15,19
65:8
**Commissioner**
2:22 4:17 5:11
**committed** 83:6
**communicate**
17:8
**communication**
34:14
**comp** 46:10
**compliance** 2:8
**Complied** 75:1
**comply** 38:3
**computer** 16:13
16:16
**computer-aided**
93:10
**concerned** 60:18
**concerning** 25:3
25:14 35:2
37:2 57:5,9
**confused** 28:10
49:2
**congratulating**
25:17
**considered** 35:5
91:6
**conversations**
25:13 57:4
**correct** 13:23
14:14 20:20
21:1,15 22:19
29:14 30:6
31:2,5 37:7,12
38:7,12 39:4
45:16 49:10
50:2,10,15
51:5,6 56:12
59:4,11,12
60:11 62:13
66:18 67:11,12
70:14 75:17
76:4,15 77:13

78:5 80:4,17
81:2,3,7 83:11
83:19 84:7
87:4,20,21
88:2 91:8,17
93:12
**correctly** 17:4
**counsel** 1:18
2:13,15 5:14
73:23 93:15
**counseling** 3:8
75:11,14
**County** 7:7 8:21
93:4
**couple** 31:21,22
64:15,23 65:2
85:18 89:16
**court** 1:1 2:9 4:1
5:9 20:9 25:7
93:23
**court-ordered**
80:8
**court-supervis...**
20:17
**crew** 15:16 16:9
16:20 17:18,18
23:20,21 24:5
24:10 28:1,2
30:13 43:1
55:21 56:5
60:5 61:18
86:21 87:2
**crews** 18:12,13
36:2,3,4,5,9,10
56:18 86:17
87:10 88:7,8
**current** 7:13
**cutting** 15:15
16:5
**CV2006:CV-6...**
1:5 4:5

———— **D** ————
**daily** 55:10

**data** 17:8
**date** 5:12 60:2
**dates** 22:12
81:20
**day** 2:2 17:11
45:3,3,4,5,14
46:20 59:20,22
60:4,15 63:5,9
63:13,14 67:15
67:16,18 68:1
68:18
**days** 43:19,22
60:1
**day-to-day**
47:23 50:14
**deceased** 11:22
**decide** 46:2
**decides** 46:1
**decision** 25:3
**Defendants** 1:13
4:13
**Defendant's**
58:12 74:19
77:12,15 83:8
**delay** 42:7,15
**demoted** 49:22
70:22 71:13
73:4,8,12 83:6
83:16 86:13,17
87:10 88:4,6,7
88:21
**demotion** 71:17
**denied** 61:2
**deny** 63:3,7
**department**
1:11,21 4:11
5:2,16 11:6,9
12:2 13:10,12
15:6 34:12,23
36:14 79:11
84:20
**department's**
65:23
**depending**

**FREEDOM COURT REPORTING**

17:17 18:12,14
42:15 44:9
**depends** 42:20
**DEPONENT**
  92:14
**deposition** 1:18
  2:1,5,6,10,18
  2:22 58:11,13
  74:20 77:12
  83:9,11 93:7
**design** 13:17
  14:6,21 50:9
  78:19 79:6,17
  82:8 92:4
**detailed** 35:16
  68:7,14
**determine** 46:6
  61:7
**determined**
  45:23
**determines**
  45:20
**determining**
  71:20
**difference** 26:13
  41:1 43:18
  91:9
**differences**
  26:13 29:15
  89:22
**different** 18:12
  18:16 38:8
  40:6 43:4
  88:10
**directly** 50:13
  52:4 60:10,22
  61:8,13
**discipline** 55:21
**discrepancy**
  59:16
**discretion** 46:18
  61:7
**discuss** 26:8
  56:8

**discussions**
  56:20
**dispute** 52:10
**disrupted** 80:14
**district** 1:1,2 4:1
  4:2 12:14
  13:19
**division** 1:3 4:3
  12:13 13:19
**divisions** 13:12
  13:18,21
**document** 58:17
  58:20,22 77:8
  83:19
**documentation**
  83:23
**documents**
  58:23
**doing** 16:4,15
  17:6 23:22,22
  24:2 26:15
  33:6,8 48:23
  52:2 53:3 90:7
  90:11 91:4
**Don** 50:5
**door** 62:3
**doorway** 62:2
**downtown** 13:5
**drafting** 16:13
  16:14
**draftsman** 16:10
  16:10
**drive** 44:10
**drives** 43:15
**driving** 35:3
  43:2,3 67:17
**drove** 67:18
**duly** 6:2
**duties** 17:2
  23:12 26:13,14
  29:16 30:11
  46:5 51:8
  89:23
**duty** 29:18

| | E | |
|---|---|---|
**EA** 15:18 16:8
  16:19 18:1,3,5
  18:6,7,8,10,18
  18:20 19:8
  23:13 26:16
  27:8 28:4
  32:20 33:19
  34:7 91:5
**earlier** 27:6 37:5
  59:13 81:10
**early** 46:19,22
  47:2
**EAs** 22:9
**editor** 17:8
**educational** 9:9
**effect** 2:7
**eight** 19:2
**either** 16:18
**eligible** 63:13
**eligibles** 32:10
  82:21
**employee** 36:14
  36:19 46:7,8
  49:21 51:11
  57:14,19 65:11
  66:1 72:13,18
  73:4,7 84:4
**employees** 37:7
  47:12 50:13,17
  51:1,7,10,22
  51:23 52:5
  53:1 65:12,13
  66:22 74:2,8
  84:15 90:5
  91:13
**employment**
  37:3
**engineer** 12:10
  12:11 15:18
  20:4,7,7 21:6
  22:13,21 23:15
  23:15 26:17
  28:14,15 29:8

30:4,23 31:7
  32:16 33:4
  45:23 46:1
  48:15,21 49:13
  49:15,17 50:1
  61:6 71:22
  78:19 79:6
  90:1
**engineering**
  26:21 27:18,23
  28:11,18 29:3
  29:18 30:8,18
  30:20 33:5,12
  56:3 70:23
  90:4,22 91:11
**engineers** 79:17
**Enterprise**
  12:14
**entire** 14:20
  44:19 53:23
  84:11 87:8
**equation** 70:10
  70:19
**equipment**
  90:13
**especially** 43:6
**established**
  68:11
**et** 1:12 4:12
**evaluate** 48:2
  89:4
**evaluating** 37:6
**evaluation** 37:9
  52:23 53:18
  54:2 89:12
**evaluations** 24:2
  52:20
**everybody** 17:5
  25:11 54:18,21
  55:5 56:5 64:7
**everybody's**
  90:9
**everyone's** 65:6
**evidence** 2:19

**exact** 40:14
  54:17 64:21
  85:18
**examination** 3:2
  5:20 6:9
**examined** 6:2
**example** 35:16
  44:2 46:8 47:5
  53:12
**excuse** 16:11
  41:9,18,21
  42:3,7 43:17
  53:20
**Exhibit** 45:8
  58:10,12 73:19
  74:18,19 77:2
  77:7,12,15
  83:8,10
**EXHIBITS** 3:6
**expected** 61:19
**explanation**
  39:22 59:16
**eye** 55:4
**E-5** 10:5

| | F | |
|---|---|---|
**face** 61:1
**face-to-face**
  61:23
**fact** 57:5 61:18
**factor** 71:20
**factored** 71:12
**factors** 42:22
  71:15
**facts** 71:10
**fail** 6:17
**failed** 66:23
**fails** 65:19
**fair** 77:16
**fairly** 6:18
**familiar** 27:14
  56:7
**far** 24:7 26:5
  37:20 38:3

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

46:5 60:18
**father** 11:12
  12:1,17
**father's** 11:16
**February** 9:23
  11:7
**Federal** 5:12
**feel** 76:5
**field** 16:20,22
  17:1,2,14,21
  18:17 23:13
  24:4,6 26:15
  26:16,20 27:2
  27:7,17 28:3
  28:19 29:4,12
  29:16,19,22
  30:1,17 31:1
  32:18 33:7
  34:6,19 47:6
  48:15 58:1,2,6
  80:3 85:10
  87:13,19 91:1
  91:10
**filed** 79:9,12
  84:19,23
**filing** 2:21
**filled** 32:17
**filling** 52:21
**fine** 6:7 63:22
**finish** 47:5,7
**first** 6:2 7:22 8:2
  14:23 16:14
  40:11 45:3,3,4
  56:20 59:10,19
  59:22 66:16,19
  69:18 86:3,5
**five** 15:12 17:17
  38:23 39:9
  41:12,14 42:11
  43:9,11 44:4,7
  44:8,8,9 45:6
  52:14 54:7
  59:9 69:18
**flat** 41:23

**flight** 10:11
**folks** 18:15
**following** 5:21
**follows** 6:3
**force** 2:7
**foregoing** 5:13
  93:7,11
**forgot** 55:16
**form** 2:14 35:10
  37:9 40:5,21
  41:17 42:10,14
  59:18 64:19
  66:5 71:3,6
  72:1,7,16
  73:14 80:19
  83:13,21 86:15
**forward** 33:13
**four** 15:12 18:11
  21:13 44:16
  58:23 69:12
  85:17
**fourth** 37:23
  67:7 70:16
**four-day** 44:16
**frame** 80:7
**freedom** 51:12
**front** 74:1,8
**froze** 19:6,10
  80:19
**full** 2:7 7:3
**funny** 8:6
**furniture** 9:19
**further** 2:3,11
  2:20 92:14
  93:14

_____ G _____
**Garrett** 80:2
  82:13
**general** 13:14
**gentleman** 55:14
**geographically**
  13:22
**getting** 28:10

35:16 43:7
  57:18
**give** 13:13 38:16
  41:9 51:11
  78:4,9
**given** 38:21 41:5
  41:11,15 43:8
  51:21 52:22
  66:11 67:1
  77:23 93:13
**giving** 67:22
  77:19
**go** 11:12 13:8,16
  13:18,19 17:10
  37:17 39:14,17
  40:9 46:19,21
  47:1,7 60:3,8
  61:8,13 62:9
  67:7 70:11
**goes** 86:5
**going** 24:7 27:14
  55:15 57:19,23
  58:1 59:6 65:7
**good** 35:6 68:12
  68:15
**grading** 24:1,1
  37:18
**graduate** 9:13
**graduation** 9:16
**grievances**
  84:20,23 85:4
**grounds** 2:17
**group** 49:8
**groups** 12:22
**guard** 9:21,22
  10:2,7,10
**guess** 13:15
  15:16 77:14

_____ H _____
**half** 15:17
**hand** 58:9 77:6
**happen** 41:22
  54:19

**happened** 13:2
  18:2 21:21,22
**happens** 47:6
  66:13
**Hartsfield** 1:20
  4:16 5:9 93:22
**head** 70:15
  82:18
**hear** 56:15
**heard** 37:1
  56:14 61:3
  84:15,19
**hearing** 93:13
**held** 19:19 85:10
  85:20 87:14
  91:2
**Henderson**
  11:18
**hereto** 45:10
  73:21 77:4
**high** 9:11,12,16
**highest** 10:3
**Hinley** 8:4
**hired** 25:10 26:7
**hold** 31:18
**holding** 31:17
  32:20 33:13,17
  33:19
**home** 46:19
**honest** 14:4
**hourly** 13:6 15:1
  15:17 54:12
  55:9
**hours** 44:7
  45:20,21,22
  46:2,6,9,10,13
  46:22
**hundreds** 20:22
  20:22
**hypothetical**
  70:11
**Hyrum** 11:18,20
**H-I** 11:21
**H-Y** 11:21,22

_____ I _____
**idea** 68:15
**identification**
  45:9 73:20
  77:3
**identify** 58:16
  74:17 77:8
**II** 16:19 18:1,3,7
  18:8,20 21:12
**III** 12:8,10,11
  18:5,6,10,18
  19:8 21:12
  33:4
**III-IV** 20:8
  21:19 22:17,21
  31:7
**II-III** 23:13
  26:17,20,22
  27:5,8,19,23
  28:12,15,17,19
  29:4,19 30:8
  30:19,20 32:21
  33:12,20 34:9
  90:23 91:5
**imagine** 38:9
**important** 55:22
  56:2,2,4 68:8
**incident** 59:10
  83:7
**incidents** 69:12
**including** 65:12
**INDEX** 3:1
**individual** 43:3
  65:19
**individuals**
  79:19 80:6
**informal** 6:18
**information**
  17:3
**inside** 62:3
**instruct** 52:1
**instructed** 51:10
  51:13 60:5
  61:11 64:6,7

**FREEDOM COURT REPORTING**

66:9
**instructions**
35:17 51:21
52:4 57:9,13
57:17 61:16
62:6 65:6
67:23 68:3,7,9
68:14,17 69:3
69:6,9 77:20
78:1,4,9
**instructs** 47:22
**insubordination**
83:4,15,23
**interested** 93:17
**internal** 34:13
34:14 84:19,23
85:4
**interval** 85:14
**interveners** 49:9
**interview** 23:2
32:12
**interviewed**
85:2
**it'd** 13:15,19
**IV** 21:12
**I-II** 20:7,8 21:6
21:8,19 22:1,5
22:13 23:15
26:18 27:11
28:4 29:12
30:4,21,23
31:13 32:16
33:18

___
**J**

**job** 15:8 23:12
24:13 26:12,13
26:14 28:12
29:16,18,23
30:2,10 31:17
31:18 32:20
33:7,8,14 43:7
43:22,23 46:5
47:5,7 48:7,9

48:12 51:5,12
52:19 60:10
61:8,13 67:23
70:2,5 89:23
91:7
**Joe** 57:2,4
**Joey** 48:6
**Johnny** 19:4
23:4
**Jones** 48:6,16
57:2,4,9 69:10
**July** 7:21 67:8
**June** 7:21 59:7

___
**K**

**K** 1:20 4:16 5:9
93:22
**keep** 54:16 55:4
55:10,10,18,20
72:4
**keeps** 55:20
**kept** 54:15
**Ketchem** 8:18
8:19
**Kim** 8:18
**Kim's** 8:19
**kin** 93:15
**kind** 10:13,18
**knew** 11:14
12:19 23:6
26:5 35:21
36:1,22 51:17
56:11
**know** 6:20,21
12:16,17,21,23
14:5,5,11
15:23 17:9
18:12 20:14
21:2 22:11,11
23:4 25:6
27:16 30:12
35:4,14 36:16
36:18 49:1
52:7 55:12

57:20 62:23
64:1 66:13
68:19,22 69:2
69:6,23 72:17
73:3,7,9 76:8
78:21 79:2,3
79:14,23 80:3
80:10,11 81:12
81:20,21,22
86:7 87:9
88:19 89:3,11
91:18,20
**knowing** 60:15
**knowledge**
33:22 41:8
67:5
**known** 25:20
36:5
**Kress** 4:22

___
**L**

**L** 1:15
**laborer** 13:7
15:1,14,17
**late** 37:19 38:12
38:17,23 39:7
39:10,21,21
40:3,11,18
41:6,8,13,14
41:14 42:12,19
43:1,7 53:22
54:5,22 55:11
59:2,9 60:15
60:18 62:22,23
64:4 65:7
68:18 69:19,23
70:3,7,17,21
71:1 72:20,23
73:2
**Lawrence** 80:1
**laws** 2:8
**lawsuit** 26:2,4
49:10 56:7,8
56:13 57:6

78:16 79:7
80:14 81:2
84:18
**leader** 49:8
**leading** 2:15
**leave** 10:6,9 45:5
**led** 10:13
**left** 88:9
**Leroy** 1:7 4:7
6:12 24:12
74:20 77:13
**Leslie** 1:20 4:16
5:9 93:22
**letter** 75:12
**let's** 9:17 13:8
16:6 18:3
52:13 62:9
67:7 70:9 79:8
79:20 80:19
89:15
**level** 13:20 34:7
78:17 79:5
**Lewis** 1:19 2:1
5:19 6:1,10 7:4
7:6,17 8:14
11:18,23 24:21
27:13 52:18
54:11 58:9
59:1 63:4
69:16 76:6,11
76:22 77:6
89:21
**Linc** 67:21
**Lincs** 34:21
**line** 51:10
**list** 15:20 23:2
25:11
**listened** 78:3
**little** 52:19
75:12
**live** 7:5,7 9:3,6
**lived** 7:12 9:1
**location** 13:6
45:23 46:14

48:14 49:13,14
49:16,23 91:23
92:3,5
**log** 55:10 78:3
**long** 7:12,19 9:1
11:23 17:13
18:23 19:18
29:2 31:18,23
48:23 53:4
69:7 85:13
**longer** 46:19
47:8
**look** 54:21
**lot** 27:13 59:8
60:6,9 62:7

___
**M**

**maiden** 8:5
**makeup** 17:18
**making** 17:3
23:21 25:3
46:8
**manager** 48:8
**map** 16:17
**maps** 23:23 24:8
**mark** 38:5 53:17
54:1
**marked** 45:9
53:6 58:10,12
73:20 74:19
77:3,7,11
83:10
**marriage** 7:23
**married** 7:15,19
7:20
**mathematical**
90:16
**matter** 55:22
73:2
**McDonald's**
9:18
**McKinnon** 86:2
86:9 89:1
**McKinnon's**

88:16
**mean** 9:4 17:18
  20:2 38:3 39:2
  40:5 41:2
  55:18 56:17
  57:16,22,23
  59:1 63:4 76:9
  90:6 91:22
**meaning** 40:7
**means** 39:3
  93:10
**medical** 12:4
**medications**
  10:23
**medicine** 10:19
  10:20
**meet** 37:20 43:9
  43:10 60:6
  61:19 62:6
**member** 56:12
  56:13 57:6
  84:16
**memory** 11:1
**mentioned** 56:6
**method** 52:2
**middle** 1:2 4:2
  11:19 44:3
**Mike** 88:12
**mind** 8:11 42:8
**mine** 55:17
**minute** 52:14
**minutes** 38:23
  39:10 40:3
  41:12,15 42:11
  59:9 64:4,15
  65:1,2 69:2,4
  69:18 70:17,20
  71:1,20 72:4
  72:13,20 73:5
  89:16
**Mis** 71:9
**mischaracteri...**
  64:19
**misspelled** 75:8

**mistaken** 27:9
  86:2
**misunderstood**
  76:3
**Mitch** 5:4
**moments** 75:19
**Monday** 67:8
**Mondays** 43:5,6
  43:8,19,21
  44:8
**Montgomery**
  1:23 5:5,17
  8:21 9:2 43:9
  43:11 45:5
  67:19
**months** 15:13
  18:4 19:1,3
  31:21,22 32:8
  54:5,6 85:17
  85:19
**morning** 62:8
**motel** 43:23 60:6
  60:17
**moved** 7:15
  18:11
**moving** 18:15
**M-C-K-I-N-N...**
  86:9

_____
**N**
N 1:15
**name** 6:10 7:3
  7:16 8:3,5,9
  11:17,19 23:6
  78:23 79:4,23
  86:3,5,6 88:11
**names** 8:16
**National** 9:21
**necessary** 2:12
**need** 6:19 17:9
  18:13 46:18
  63:20 65:8
  71:8
**needed** 35:18

**neither** 93:15
**Nero** 79:21 80:1
**never** 23:8 25:22
  40:10 52:4
  63:12 74:14
  75:20 82:23
  85:2
**new** 9:19 51:7
  57:13,18 78:9
**nigger** 76:18,21
**nine** 13:21
**Nodded** 70:15
**normal** 26:7
**North** 4:22
**NORTHERN**
  1:3 4:3
**notice** 2:21
**notify** 64:5
**number** 1:5 3:2
  4:5 7:10 38:10
**numbers** 21:2
**Numeral** 74:23

_____
**O**
O 1:15
**oath** 6:15 38:18
  65:21 66:22
  76:22
**Object** 35:9
  40:20 41:16
  42:9,13 59:17
  64:18 66:4
  71:2,5,23 72:6
  72:15 73:13
  80:18 83:12,20
  86:14
**objection** 40:4
  67:3 71:8
**objections** 2:13
  2:16
**occasion** 60:4
  62:10,10 66:15
  67:8 69:18,22
  70:12,16 73:1

73:1
**occasions** 70:18
**occur** 22:23
  81:19
**offered** 2:19
**office** 13:16 17:4
  24:7 36:6 43:3
  43:12,14 44:1
**offices** 1:20 5:15
**Oh** 15:22 28:14
**once** 51:9 54:9
  82:9
**ones** 80:2
**ongoing** 66:13
**opinion** 54:3
  71:19 72:9
**oral** 5:20
**order** 25:8
**organization**
  34:3
**organizational**
  13:10
**organizations**
  12:22
**organized** 13:12
**overseeing** 58:7
**oversight** 57:10
**overtime** 46:9
  46:14
**Ozark** 9:7,7
**o'clock** 43:10
  44:4,6 45:1,2
  59:15 64:6
  65:9,14,16,20
  66:2 67:1,11
  69:2

_____
**P**
P 1:15
**page** 3:2 74:23
**PANTAZIS**
  4:21
**paper** 76:4
**paragraph** 59:7

**parents** 8:22
  9:18
**parking** 59:8
  60:6,9 62:7
**part** 12:6
**participated**
  49:9
**parties** 1:17
  2:16 93:16
**party** 17:9 18:16
  23:18,19 27:4
  28:2,7,8 31:4
  31:10,11 32:4
  54:15 55:13,18
  87:3,12,22
  88:9,10
**pass** 10:11,14
**passed** 15:19
**payrolls** 23:23
**PE** 48:19
**pen** 16:12
**penalties** 6:16
**pencil** 16:13
**people** 17:5,13
  20:23 24:1
  27:14,22 35:1
  37:18 38:7,8
  38:11,22 40:1
  40:17 41:4,12
  47:7,13,19,21
  48:1,2 49:1
  55:7
**percent** 54:23
**performing** 90:1
  90:3,13
**period** 9:20
  18:21,22 19:10
  19:15 21:13
  32:6 43:8
  53:23 80:23
  85:21 91:4
**perjury** 6:17
**person** 43:14
  73:11

# FREEDOM COURT REPORTING

personal 19:14 58:3
persons 25:3
phone 13:1 35:8 64:10 68:13
physical 10:12 10:14
place 55:3
plaintiff 1:8 4:8 5:1 6:12 84:17
Plaintiff's 3:6 45:8 58:10 73:19 74:17 77:2,7 83:10
play 24:21
please 63:6 80:21 83:14
plus 24:6
point 23:16 24:6 30:15 32:8 56:23 79:11 80:15 81:5,8 81:22
policy 35:2 66:1 68:12
position 22:2 30:18 31:4 32:1,9,13,16 32:19 33:17,18 34:8 48:13 70:23 72:14 82:7,14 85:6,8 85:10,11,15,16 85:20 86:12,19 87:14,17,19,20 87:23 88:20 91:2,10,11
positions 80:7 83:1
positive 50:6
possible 68:6,16 68:21,23 78:12
practice 35:6
Prattville 5:10

prejudice 74:11 74:13,15 75:7 75:13,16,21 76:2,7
pressure 10:20
pretty 24:19 36:11 38:19 39:1,2 46:12 51:14 55:19
previous 37:3
previously 58:11 74:18
prior 2:19 30:8 34:6 35:22 36:19 78:15 79:7 81:14
probably 35:12 55:1 76:23
probation 18:4 18:9
problem 10:13 11:1 35:13 37:12 42:18
problems 10:16 37:2
Procedure 5:13
proceedings 5:21
process 21:1
professional 48:21
progress 15:6 17:11
project 36:7,9
Promise 79:20
promoted 15:7 15:13,20 16:19 18:5,7,10,18 19:3,21 20:1,4 20:8,23 21:4 22:20 23:3 24:15,17 25:7 25:10,18,23 26:10 27:12

29:8 30:3 31:9 31:20 32:23 49:18 87:18
promotion 19:1 25:4,14,18 36:20
promotions 19:6 19:10,14 20:18
proper 91:7
provided 5:12
provisional 20:15
pull 35:6,12,15 35:19 68:12
pulled 26:6
pulling 15:15 16:5
punctuality 37:15 53:1,7 55:23
punctuation 55:23
put 13:5
P-R-E-J-U-D-... 75:5

## Q
qualify 40:5
question 6:21 39:15 40:8,15 40:21 65:3 71:6
questioned 25:22 85:3
questions 2:14 2:15 6:14 92:8 92:9 93:8
QUINN 4:20
quite 19:7 36:19

## R
race 88:13,14,16
racial 75:23 76:11,14
radio 34:14 35:3

radios 34:18,19
raise 26:9 74:4
rank 10:3
reactions 8:7
read 75:3
reading 2:5
really 12:14 15:22 28:10 36:16 42:4 53:2 86:19 89:2 90:6
reason 63:1 70:22 71:12,12 77:17
receive 57:8
received 13:1
recess 52:16 89:19
reclassification 34:1
reclassified 19:22
recollection 63:19,20 78:7
record 7:3 90:21
recorded 54:10 54:13
Redd 5:3 6:7 8:10 9:5 35:9 39:11,16 40:4 40:20 41:16 42:9,13 59:17 64:18,23 66:4 67:3 71:2,5,9 71:23 72:6,15 73:13 79:1,8 80:18 83:12,20 86:14 92:9
referring 20:11 92:1,3
reflected 83:8 83:17
register 32:23
registers 18:8

26:7 80:16 81:6,16 82:10
regular 66:14
related 83:7
relating 2:9
relatives 8:20
remember 8:9 12:15 50:7 52:8 53:2,11 56:10,17 61:21 62:1,14,15 68:5 69:5,9 74:3 76:12 78:11 86:16,19 88:22 89:3,10 89:13
repeat 40:14 47:15 63:6 78:2 80:21 83:14
repeated 69:17
report 44:4,7 59:14 60:9,19
reported 13:3,4 59:8 71:14
reportedly 70:21
Reporter 5:10 6:5 93:23
represent 6:11
represents 93:11
reprimand 3:7,9 41:2 65:15,18 66:3,6,7,14 67:2 77:9,17
reprimanded 40:2,6,10,18 64:3,14
required 43:11 44:23
respective 1:18
response 19:17 22:16 27:1 38:14 58:15

64:13 69:15,21
**responsibilities**
23:20
**responsible** 17:2
24:4,5,9 29:21
29:22 37:6
45:19 46:7
50:19 51:1
52:20 84:6
90:8,8
**restraints** 51:17
**restructure** 34:3
**result** 93:17
**retired** 12:3,12
23:18 32:5
**retirement** 12:4
**Reynolds** 19:4,9
19:13,20,23
23:5,9 26:2,3
33:1 49:10
56:7,8,12 57:6
78:15 79:7,9
80:9,13 81:2
81:21 84:17,18
**Rhonda** 7:17
**right** 15:4,11
16:3 24:19,19
47:17 48:10,18
49:3 55:14
58:8 62:4
80:20
**road** 7:7 35:7,19
68:12
**Rodney** 62:3
**role** 24:20 47:11
47:20 50:13
72:2
**Roman** 74:22
**room** 62:5
**rules** 2:9 5:12
38:4
**rundown** 13:14
**running** 62:23
90:12

**Russell** 4:21
6:11

———— **S** ————

**S** 1:15
**safer** 35:12
**safety** 68:12
**SAITH** 92:14
**Sanders** 62:4
**sat** 78:3
**saying** 27:17
62:16 64:10
**schedule** 47:4
**school** 9:11,11
9:12,16 12:19
**search** 8:8
**second** 8:1 37:21
37:22 69:22
70:17 73:1
**section** 13:6
14:19 46:13,14
73:15 91:14,17
91:19,20,22,23
92:3,5
**sections** 13:17
**Security** 7:9
**see** 9:17 16:6
18:3 55:4
77:14 79:8,20
**seeing** 36:6
**seen** 8:6,8 55:12
**selected** 32:9,15
32:22 82:19
83:1
**senior** 22:8,18
24:15,17 28:9
31:8 82:7,14
82:15
**series** 37:10
**session** 3:8
75:14
**setting** 45:20
**seven** 36:4,4
44:6,8,9,11,11

44:12,23 45:2
59:15 64:6,9
64:16 65:1,9
65:14,15,20
66:2 67:1,11
67:13 69:2
**seventh** 12:12
**short** 9:20 18:21
18:22 32:6
69:8,9
**shortcuts** 27:15
**shortly** 16:7
18:9 19:5 88:5
**shows** 54:18
69:1
**shuffling** 88:8
**sick** 41:23 62:12
62:16,18,22,23
63:5,9,13 64:1
64:3,11,17
65:7 66:17
70:13
**side** 35:6
**signal** 35:14
**signature** 2:4
**similarly** 72:20
**single** 38:17
**sir** 14:22 17:23
19:12 29:11,21
33:10,15 34:16
37:8,14,16
38:19 46:12
56:14 78:7
80:21 84:9
**sisters** 8:21
**site** 43:7,22,23
60:10 61:8,14
67:16 70:2,5
**sitting** 62:2
**situation** 42:21
**situations** 91:13
**six** 19:1,2 44:11
54:5,6
**sixth** 12:12

**six-month** 53:23
**slurs** 76:11,15
**Social** 7:9
**sole** 71:12
**somebody** 38:16
39:9 42:6 47:1
53:16,22 70:22
71:21
**sorry** 24:21
28:15,17 29:1
48:22 49:16
80:2 86:7
**sort** 13:13
**Southern** 34:21
67:21
**specific** 46:20
53:12,14
**specifically**
61:21
**spell** 86:6
**spelled** 75:6
86:8
**spent** 14:20
**split** 21:17,18,23
**Stan** 48:18 49:4
**standard** 57:13
57:16
**standards** 37:20
**standing** 62:1
**start** 13:15
**started** 9:23
13:4 15:14
19:4 28:23
32:1 36:17
**state** 1:11,21
4:11 5:2,15 7:2
9:23 11:13,14
12:6 13:22
43:2 67:20
93:3
**stated** 39:17
75:11 80:22
81:4
**statement** 64:20

67:9 69:1
75:10,11 80:5
**STATES** 1:1 4:1
**stations** 16:15
**stay** 18:14 32:18
47:8
**stayed** 21:8 22:1
**staying** 43:23
55:2 60:7
**stenotype** 93:8
**step** 21:7
**stepped** 51:20
**stick** 40:8
**STIPULATED**
1:16 2:3,11,20
**stipulation** 5:14
**stipulations** 6:6
**stopped** 19:13
**store** 9:19
**Street** 4:22
**structure** 13:11
**stuff** 17:10
55:11,15
**subject** 6:16
**subsequently**
31:3
**suggested** 26:1
**supervise** 17:14
35:23 57:11
84:5 86:20
**supervised**
20:10 24:12
27:22 38:7
65:12 66:23
72:19 83:2
**supervising**
86:21 87:1
**supervision** 39:6
44:21 52:6
66:18 84:9,11
90:5 91:13
**supervisor**
16:21,23 17:1
17:15,22 18:11

18:17 19:8
22:2,3 23:14
26:15,16,19,20
27:3,7,11,18
28:3,4,16,20
29:5,13,16,20
30:17 31:1
32:5,18 33:7
33:23 34:4,7
35:17 37:11
46:23 47:9,12
47:19 48:4,5
48:17 49:4
50:4 51:9,11
53:7 56:21
57:1,20,23
58:1,2,4,6
63:16 72:5
85:10 87:8,13
87:19 91:1,10
**supervisory**
72:2,14
**supervisor's**
46:5,18 50:12
**supposed** 17:6
23:22 30:1
37:11 38:2
46:22 47:23
48:1 57:14,21
67:10,12 69:17
70:8
**sure** 14:5,12
15:23 17:3,5,7
23:21 24:19
29:23 46:8
47:16 54:22
57:20 66:10
73:17 75:9
85:17 87:6
90:22
**survey** 15:16
**suspension** 38:1
**swapped** 86:18
87:10

**sworn** 6:2
**system** 34:14

——— **T** ———

**T** 1:15,15
**table** 62:3
**take** 6:19 15:5
17:4 28:6
42:23 52:13
63:5,8,13 69:3
69:4 70:9,18
89:15
**taken** 1:19 2:2
6:14 18:6 26:5
52:16 89:19
93:7
**talk** 39:6,19
**talked** 52:19
67:21
**talking** 27:16
30:17 35:2,7
68:1,13 69:10
**tardiness** 54:2
59:11 69:17
71:15
**tardy** 53:16 73:6
**task** 47:22 90:15
90:17
**tasks** 38:5 47:23
**technologist**
22:8,14,18
24:23 25:15
29:10,17 30:5
30:10 31:8,12
36:21 59:3
78:18 82:6,7
82:15 84:12
85:8 89:6 90:2
91:3
**technologists**
22:10
**telephone** 34:15
**telephones**
34:22

**tell** 6:15,17 9:9
13:11 14:23
15:6 23:11
34:17 35:23
37:17 39:20
50:13 62:19
64:16
**telling** 50:16,20
51:1,4 61:21
**termination**
71:16
**test** 15:18,19
18:6 23:1 25:9
**testified** 6:3
**testify** 39:13
53:5
**testimony** 38:15
38:20 39:8,12
39:14,19,23
41:10 51:19
52:3 53:21
60:20 61:5,20
63:11 64:10
65:10,21,22
66:8,21 71:4
72:11 88:18
93:12
**thereto** 2:19
93:9
**thing** 10:17 18:2
27:10 66:13
**things** 24:8
35:18 37:10
46:11 51:15
55:20
**think** 8:7 12:13
12:18 15:11
19:22 20:4,13
20:19 31:22
36:8 37:21
45:17 48:19
49:11,19 50:5
50:11 59:19
66:19 71:11,14

75:8 81:9,10
81:18 82:17
86:1,4,11 87:8
89:7,16 90:20
92:3
**thinking** 28:16
**third** 37:23
45:14 59:6
62:9,10 70:18
73:1 74:23
**Thomas** 1:19
2:1 5:19 6:1
7:4
**three** 7:14 17:16
18:4,11 31:22
32:8 36:8
70:12 80:5
**three-hour**
44:10
**three-month**
89:8,9
**Thursdays** 43:6
**time** 2:17,18
9:20 11:13
16:12 18:14,21
19:11,15 20:5
21:1,13 23:11
23:13,16,18
24:11 26:4
28:5 31:6,10
32:6 33:4,11
33:23 34:1,2
34:11 35:22
36:4,11,19
37:21,22,22,23
38:1,1,17,22
39:4,9 40:12
41:13 43:8,12
43:14,16 44:5
44:7,10,19
46:10 47:16
49:20,22 50:8
51:16 53:22
54:10,12,18,23

55:1,7,13
56:23 59:14
62:5 66:10,11
66:16,20 69:11
72:22,23 74:13
78:19 79:12
80:7,15,23
81:5,8 84:11
85:18,21 87:8
87:17 91:4
**times** 53:15 54:4
58:23
**tire** 41:23
**title** 28:13 48:7
48:12
**today** 6:14,18
10:19 22:6
55:12 79:17
86:20
**told** 27:6,21 37:5
57:17 59:13
60:13,19,21
61:17,18 63:3
63:7,12,18
75:20
**tolerated** 75:13
**tomorrow** 62:8
**top** 82:18
**total** 16:15
70:19
**traffic** 42:2,6,18
43:16
**train** 48:1 51:6,7
**transcribed** 93:9
**transcript** 93:12
**transcription**
93:10
**transfer** 87:4
**transferred** 16:9
88:9,11
**transportation**
1:12,22 4:12
5:3,16 11:5,9
12:2 13:9 22:7

22:10,14,18
24:15,17,23
25:15 28:9
29:9,17 30:5,9
31:7,12 34:13
35:1 36:20
48:8 59:3
78:18 82:5,6
82:15 84:12
85:8 89:6 90:2
91:3
travel 43:21
treat 57:14
treated 72:21
trial 2:17
truck 43:2,13,13
trucks 34:20
true 40:16 50:22
77:22 93:11
truth 6:15,17
trying 8:10
Tuesdays 44:8
turn 74:22
Tuscaloosa
67:13,17,19
twice 53:19,22
two 7:21 8:15
21:9,9 22:22
32:7 60:1
81:11,12 88:6
two-way 34:18
34:19
type 16:5
types 90:12

___ U ___

U 1:15
Uh-huh 19:16
22:15 26:23
38:13 58:14
64:12 69:14,20
unacceptable
61:12
unaware 84:22

underneath
14:16
understand 6:15
6:21,23 40:21
65:3
UNITED 1:1 4:1
unusual 42:5,6
use 34:18,21
80:19
Usual 6:5
usually 55:3

___ V ___

vacancy 32:17
vacant 32:1,3
vacated 85:14
85:22
valid 41:9,18,20
42:2,7 43:17
53:20
verbal 38:16
visually 33:1
voice 74:5
vs 1:9 4:9

___ W ___

waited 64:15
waived 2:6,23
walked 77:18
78:10
want 39:18 40:5
47:16 51:15
70:11 90:21
wanted 11:12
51:16
warn 39:7
warning 37:21
37:22 38:16,22
41:2,5,9,12,15
65:14,17 66:5
66:7,9,12 67:2
wasn't 21:11
30:13 60:17
62:15,19 67:12
68:23

way 12:20 29:2
41:22 51:16,18
60:14
Web 7:4
Wednesday 44:3
44:9,22 45:13
45:16 59:7,14
59:21
week 43:4,5,20
44:3,17 45:3,4
45:5,15 59:20
59:22 87:9
88:6
weeks 88:6
weight 10:16,16
went 9:11,20
11:4 12:18
16:12 29:2
44:16 60:10
78:2 91:12,16
91:19
weren't 69:3
80:23
We'll 62:6
we're 43:8 46:22
66:9 72:23
we've 44:10
68:10 90:20
white 40:3,19
41:6 65:12
72:12,18 88:15
88:17
wife's 7:16 8:2
8:15
WIGGINS 4:20
William 49:5,6,7
49:22
Williams 1:7 4:7
6:13 24:12,22
25:13 26:9,14
29:7 30:3,7
35:22 36:1,13
37:2 44:19
49:21 50:23

51:21 52:1,5
56:9 57:1,5,10
58:13 59:1
60:8,21 61:2
61:22 62:2,11
63:4,8 66:16
68:18 70:20
73:10 74:1,5
74:10,20 75:15
77:13,18,23
78:1 82:10
83:5,9,16 84:1
84:16 85:7,11
85:15,22 86:13
87:7,14,18
88:1,3,20 89:5
89:23 91:2,12
91:16
Willie 79:20
80:2
witness 2:5 5:19
93:13
word 76:17
words 50:15
63:23 80:20
work 9:23 11:5
11:8,12 12:1,1
12:7 13:5 16:5
16:17 17:7
23:23 24:4,6
29:22 38:12,23
41:13,23 42:12
44:7,23 45:4,5
45:20,21,22
46:3,13,14,19
47:4 51:7
54:18 59:20,22
62:13 63:17
64:2,3,4 67:10
70:13,21 76:12
76:15,18,22
90:7,9
worked 9:17,19
11:12,13 12:3

14:7 16:7 19:7
23:8 25:19,19
36:2,7 91:21
92:5
working 12:13
29:4 30:13,14
31:10,14 32:2
33:3 36:9,10
36:11,22 73:16
90:23 91:17
wouldn't 44:4
45:13,15 50:16
write 35:18
54:17 55:11
written 52:21
55:6
wrong 60:2
wrote 37:23
60:1 74:21
77:10,17

___ Y ___

yeah 20:15 21:3
21:16 29:1
40:22 76:19,23
92:2
year 11:6 15:12
15:17,21 16:8
24:2 49:18
years 7:14,21
8:11 9:22 12:4
15:7 21:9
22:22 38:6
44:16 54:8
81:11,13
y'all 7:19

___ Z ___

zero 54:6

___ 1 ___

1 3:7 45:8 58:10
1st 59:7
10 8:19
11 7:8 77:12,15

**FREEDOM COURT REPORTING**

83:8
**14** 9:22 69:1,4
  70:17,23 71:20
  72:4,13,20
  73:5
**14th** 2:2
**1409** 1:22 5:4,17
**15** 12:4 14:9
**16** 8:19
**19** 70:20
**19th** 4:22
**1980** 79:9
**1985** 79:12
**1990** 15:2
**1992** 36:15
**1993** 33:12
**1998** 20:10 21:6
  80:6

—————
**2**

**2** 3:8 73:19
  74:18
**20** 14:9 38:7
**2007** 2:2
**25th** 67:8

—————
**3**

**3** 3:9 77:2,7
  83:10
**30** 38:7 64:4
**301** 4:22
**35203** 4:23
**36110** 1:23 5:5
  5:18

—————
**4**

**40** 46:13,22
**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**
  7:11
**45** 3:7
**4703** 7:7

—————
**5**

**5:05** 59:8

—————
**6**

**6** 3:3

—————
**7**

**7** 62:7 67:22
**7-26-05** 3:7
**7:01** 55:17
**7:02** 55:18
**7:30** 64:8,9 65:1
**72** 9:8
**73** 3:8
**77** 3:9

—————
**8**

**8** 58:12
**8-11-05** 3:9
**81** 9:14,21 16:6
**83** 10:1 11:7
  15:3,4
**85** 16:2,2
**89** 19:22

—————
**9**

**9** 74:19
**9:25** 5:18
**90** 16:18
**91** 10:8 16:11,18
  17:21 18:17
**92** 16:19 17:21
  18:18
**98** 19:8 20:2,3
  33:13 81:22
**99.9** 54:23
**99/2000** 82:1

# EXHIBIT D

**Form 13**
**Revised (01/2006)**

# EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
### Personnel Department

Employee Name: <u>LEROY WILLIAMS</u>

Social Security Number: <u>XXX-XX-8026</u>

Agency: <u>012/TRANSPORTATION</u>

Division: <u>0850/DESIGN</u>

Classification: <u>ENGINEERING ASST II/III</u>

Class Code: <u>20115</u> Position #: <u>02118416</u>

Period Covered From: <u>03/01/2006</u> To: <u>03/01/2007</u>

Annual Raise Effective: <u>MAY 2007</u>

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN XXX-XX-3912 | | SSN XXX-XX-2002 |
| *Theresa M Barksdale* | *Leroy Williams* | *Adenrele Odutola* |
| Rater Signature | Employee Signature | Reviewer Signature |
| THERESA M. BARKSDALE | | ADENRELE ODUTOLA |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| 02/09/2007 | 02/09/07 | 2/9/2007 |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

$$\underset{\text{Responsibility Score}}{30.0} - \underset{\text{Disciplinary Score}}{0} = \underset{\text{Performance Appraisal Score}}{30.00}$$

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

---

***WORK HABITS:*** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ___ | _X_ | |
| Punctuality | ___ | _X_ | |
| Cooperation with Coworkers | ___ | _X_ | |
| Compliance with Rules | ___ | _X_ | |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal.   Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                           **Rating**

1. PRODUCES PLAN SHEETS                                                                             3

2. DRAFTS ALIGNMENTS AND GEOMETRY                                                     3

3. PROVIDES SPECIAL DRAWINGS, PROJECT NOTES AND DETAILS               3

4. REVISES PLAN SHEETS                                                                               2

5. REVISES QUANTITIES AND ESTIMATES                                                   4

6. CALCULATES QUANTITIES AND ENTERS ETIMATES                                3

7. READS GUIDELINES AND DESIGN CRITERIA                                            3

8. ATTENDS TRAINING FUNCTIONS AND MEETINGS                                  4

9. PROVIDES CORRESPONDENCE AND MAINTAINS PROJECT FILES            2

10.

**RESPONSIBILITY SCORE:**

| 27 | ÷ | 9 | = | 3.00 | × | 10 | = | 30.00 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below.  Provide the number of disciplinary actions and steps taken with the employee during the appraisal year.  If no disciplinary action has been taken, a "0" should be marked in each block provided.  Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

**DISCIPLINARY SCORE:   This section should include the use of the discipline steps of reprimand, suspension, and demotion only.**   The Disciplinary Score does not include scores for counseling and warnings.  To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period.  If the most severe step was one or more reprimands, the Disciplinary Score will be 7.  If the most severe step was one or more suspensions, the Disciplinary Score will be 17.  If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24.  Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**                    0

**Form 13**
**Revised (06/2005)**

# EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
**Personnel Department**

Employee Name: <u>LEROY WILLIAMS</u>

Social Security Number: <u>423 -80 -8026</u>

Agency: <u>012/TRANSPORTATION</u>

Division: <u>0850/DESIGN</u>

Classification: <u>ENGINEERING ASST II/III</u>

Class Code: <u>20115</u> Position #: <u>02118416</u>

Period Covered From: <u>03/01/2005</u> To: <u>03/01/2006</u>

Annual Raise Effective: <u>MAY 2006</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN <u>420  21  - 3912</u> | | SSN <u>578 - 92 - 2002</u> |
| *Theresa M Barrisdale* | *Leroy Williams* | *signature* |
| Rater Signature | Employee Signature | Reviewer Signature |
| <u>2/28/06</u> | <u>02-28-06</u> | <u>2-28-06</u> |
| Date | Date | Date |
| | | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 27.8 | - | 0. | = | 27.8 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ___ | X | _____ |
| Punctuality | ___ | X | _____ |
| Cooperation with Coworkers | ___ | X | _____ |
| Compliance with Rules | ___ | X | _____ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                   **Rating**

1. PRODUCES PLAN SHEETS                                                              3

2. DRAFTS ALIGNMENTS AND GEOMETRY                                                    2

3. PROVIDES SPECIAL DRAWINGS, PROJECT NOTES AND DETAILS                              3

4. REVISES PLAN SHEETS                                                               3

5. REVISES QUANTITIES AND ESTIMATES                                                  3

6. CALCULATES QUANTITIES AND ENTERS ESTIMATES                                        3

7. READS GUIDELINES AND DESIGN CRITERIA                                              3

8. ATTENDS TRAINING FUNCTIONS AND MEETINGS                                           3

9. PROVIDES CORRESPONDENCE AND MAINTAINS PROJECT FILES                               2

10.

**RESPONSIBILITY SCORE:**

| 25 | ÷ | 9 | = | 2.778 | × | 10 | = | 27.8 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**                      0

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | |
|---|---|
| Number of Steps | |

Employee Name: LEROY WILLIAMS

Social Security Number: 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

Agency: 012/TRANSPORTATION

Division: 0850/DESIGN

Classification: ENGINEERING ASST II/III

Class Code: 20115

Period Covered From: 03/01/2004  To: 03/01/2005

Annual Raise Effective: MAY 2005

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 420 - 21 - 3912 | | SSN 578 92 2002 |
| *Theresa M Barksdale* | *Leroy Williams* | |
| Signature | Signature | Signature |
| 2/18/05 | 02/18/05 | 2/18/05 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 27.8 | – | 0 | = | 27.8 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☐ | ☒ |
| Compliance with Rules | ☒ | ☐ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. PRODUCES PLAN SHEETS | 3 |
| 2. DRAFTS ALIGNMENTS AND GEOMETRY | 3 |
| 3. PROVIDES SPECIAL DRAWINGS, PROJECT NOTES AND DETAILS | 2 |
| 4. REVISES PLAN SHEETS | 3 |
| 5. REVISES QUANTITIES AND ESTIMATES | 3 |
| 6. CALCULATES QUANTITIES AND ENTERS ESTIMATES | 3 |
| 7. READS GUIDELINES AND DESIGN CRITERIA | 3 |
| 8. ATTENDS TRAINING FUNCTIONS AND MEETINGS | 3 |
| 9. PROVIDES CORRESPONDENCE AND MAINTAINS PROJECT FILES | 2 |
| 10. | |

**RESPONSIBILITY SCORE:**

| 2 5 | ÷ | 9 | = | 2.777 | x 10 | = | 27.8 |
|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

WARNING – 2/4/05 – CONFLICT WITH CO-WORKER

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:      0

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps [ ]

Employee Name: LEROY WILLIAMS

Social Security Number: 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

Agency: 012/TRANSPORTATION

Division: 0850/DESIGN

Classification: ENGINEERING ASSISTANT

Class Code: 20116

Period Covered From: 03/01/2002    To:    03/01/2003

Annual Raise Effective:    MAY 2003

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 419 - 94 - 9348 | | SSN 419 - 02 - 4335 |
| *Gary A. Beasley* | *Leroy Williams* | *James M. Cauth* |
| Signature | Signature | Signature |
| FEB. 11, 2003 | 02-11-03 | 02-11-03 |
| Date | Date | Date |
| | | |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 27.50 | – | 0 | = | 27.50 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| [ ] | [ ] | [ ] | [X] | [ ] |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 – 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | [X] | [ ] |
| Punctuality | [X] | [ ] |
| Cooperation with Coworkers | [X] | [ ] |
| Compliance with Rules | [X] | [ ] |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Gathers information so that survey data is gathered with minimal errors. | 3 |
| 2. Operates survey equipment so that daily assignments are completed. | 2 |
| 3. Operates personal computer. | 2 |
| 4. Clears survey lines as directed. | 4 |
| 5. Directs traffic and places traffic control devices. | 3 |
| 6. Maintains survey equipment. | 3 |
| 7. Places target and level rods to gather survey data | 3 |
| 8. Participates in training classes and/or courses. | 2 |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

$$\underline{22} \div \underline{8} = \underline{2.75} \quad x \quad 10 = \underline{27.50}$$

| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:   0

Form 13
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
**Personnel Department**

Number
of Steps

Employee Name: LEROY WILLIAMS

Social Security Number: 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

Agency: 012/TRANSPORTATION

Division: 0850/DESIGN

Classification: ENGINEERING ASSISTANT

Class Code: 20116

Period Covered From: 03/01/2000 To: 03/01/2001

Annual Raise Effective: MAY 2001

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 418 - 08 - 3897 | | SSN 417 - 56 - 0786 |
| *Willku* | *Leroy Williams* | *Scott King* |
| Signature | Signature | Signature |
| Feb. 6, 2001 | Feb. 6, 2001 | Feb. 6, 2001 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 32.5 | − | 0.0 | = | 32.5 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | X | ☐ |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | X | ☐ |
| Punctuality | X | ☐ |
| Cooperation with Coworkers | X | ☐ |
| Compliance with Rules | X | ☐ |

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Gathers Information | 3 |
| 2. Operates Equipment | 3 |
| 3. Operates Computer | 3 |
| 4. Clears Survey Lines | 3 |
| 5. Directs Traffic | 4 |
| 6. Maintains Survey Equipment | 3 |
| 7. Places Target and Level Rods | 3 |
| 8. Participates in Training | 4 |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 26 | ÷ | 8 | = | 3.25 | x | 10 | = | 32.5 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** **This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| Number of Steps |
| --- |
| |

Employee Name: __LEROY WILLIAMS__                    Social Security Number: __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__

Agency: __012/TRANSPORTATION__                         Division: __0850/DESIGN__

Classification: __ENGINEERING ASSISTANT__             Class Code: __20116__

Period Covered From: __03/01/1999__   To: __03/01/2000__   Annual Raise Effective: __MAY 2000__

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
| --- | --- | --- |
| SSN _420_ - _02_ - _2404_ | | SSN _417_ - _56_ - _0786_ |
| _Joh. F. Huckey_ | _Leroy Williams_ | _Geo. D. King_ |
| Signature | Signature | Signature |
| _2-11-00_ | _2-11-00_ | _2-11-2000_ |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate   space.   Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space.   The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 36.25 | − | 0 | = | 36.25 |
| --- | --- | --- | --- | --- |
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |
| --- | --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☒ | ☐ |

---

***WORK HABITS :*** Check the appropriate box for each work habit area.  If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
| --- | --- | --- |
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|----------------|--------|
| 1. Gathers Information | 4 |
| 2. Operates equipment | 3 |
| 3. Operates personal computer | 3 |
| 4. Clears survey lines | 4 |
| 5. Participates in training | 3 |
| 6. Directs traffic and places traffic control | 4 |
| 7. Maintains survey equipment | 4 |
| 8. Places target & level rods | 4 |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 29 | ÷ | 8 | = | 3.625 | x 10 | = | 36.25 |
|----|---|---|---|-------|------|---|-------|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE: This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:  ___0___

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

[ ] Number of Steps

Employee Name: __LEROY WILLIAMS__        Social Security Number: __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__

Agency: __012/TRANSPORTATION__        Division: __0850/DESIGN__

Classification: __ENGINEERING ASSISTANT__        Class Code: __20116__

Period Covered From: __03/01/1998__ To: __03/01/1999__        Annual Raise Effective: __MAY 1999__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN _418_ - _08_ - _3897_ | | SSN _417_ - _56_ - _0786_ |
| _Wilkie_ (signature) | _Leroy William_ (signature) | (signature) |
| Signature | Signature | Signature |
| 2-10-99 | 02-10-99 | 2-10-99 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| __31.25__ | _ | __0__ | = | __31.25__ |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| [ ] | [ ] | [ ] | [X] | [ ] |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | [X] | [ ] |
| Punctuality | [X] | [ ] |
| Cooperation with Coworkers | [X] | [ ] |
| Compliance with Rules | [X] | [ ] |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

Case 2:06-cv-00658-TFM    Document 32-8    Filed 03/30/2007    Page 13 of 42

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

---

| *Responsibility* | *Rating* |
|---|---|
| 1 Gathers information | 3 |
| 2 Operates equipment | 3 |
| 3 Operates personal computer | 3 |
| 4 Clears survey lines | 3 |
| 5 Participates in training | 3 |
| 6 Directs traffic and places traffic control | 3 |
| 7 Maintains survey equipment | 3 |
| 8 Places target and level rods | 4 |
| 9. | |
| 10. | |

---

**RESPONSIBILITY SCORE:**

| 25 | ÷ | 8 | = | 3.125 | x | 10 | = | 31.25 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

---

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

---

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and **suspension only**. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____0_____

STATE OF ALABAMA

PERSONNEL DEPARTMENT

# EMPLOYEE PERFORMANCE APPRAISAL

Form 13
(Rev. 10/87)

(Please read other side before using)

[ ] **Number of Steps**

| | | |
|---|---|---|
| Employee Name: LEROY WILLIAMS | Social Security Number: 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 | HW |
| Class Code: 20111 | Department: TRANSPORTATION | 01 |
| Classification: ENGINEERING ASSISTANT I | Division: DESIGN | 08 |
| Position Number: 02118416 | Period Covered From: 03/01/97 To: 03/01/98 | |
| | Annual Raise Effective: MAY 1998 | |

**WORK HABIT RATINGS:**  Check the appropriate column. Refer to the policies and procedures for your department.
If an Unsatisfactory is given, comments detailing the rating must be provided to the department.

| | Satisfactory | Unsatisfactory | | Work Habit Score | |
|---|---|---|---|---|---|
| Attendance | | X | | 1 X 3.50 = | 3.50 |
| Punctuality | X | | | Unsatisfactory | WORK HABIT |
| Cooperation w/Coworkers | X | | | Ratings | SCORE |
| Compliance with Rules | X | | | | |
| (Standards of Conduct) | | | | | |

**TASK/RESPONSIBILITY RATINGS:**  Use this scale to provide a numerical rating for each of the employee's major work tasks or responsibilities.
Refer to the Position Classification Questionnaire (Form 40) in determining the tasks to be rated.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| RATING | | TASK/RESPONSIBILITY |
|---|---|---|
| 3 | A. | OPERATES equipment |
| 3 | B. | REVIEWS/EDITS survey materials |
| 3 | C. | COMMUNICATES orally |
| 3 | D. | GATHERS information |
| 4 | E. | CLEARS/CUTS survey lines |
| 3 | F. | MAINTAINS equipment |
| 3 | G. | MONITORS/CONTROLS work areas |
| 3 | H. | ATTENDS meetings/training courses |
| | I. | |
| | J. | |
| 25 | | TOTAL OF RATINGS |

**PERFORMANCE APPRAISAL SCORE:**

| 25 | ÷ | 8 | = | 3.13 | x 10 = | 31.3 | — | 3.5 | = | 27.8 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total of Ratings | | Number of Ratings | | Average Task Rating | | Task Rating Score | | Work Habits Score | | Performance Appraisal Score |

**OVERALL APPRAISAL:**  This employee's work:

| [ ] Does Not Meet Standards (5.4 or below) | [ ] Partially Meets Standards (5.5 - 14.9) | [ ] Meets Standards (15.0 - 24.9) | [ ] Exceeds Standards (25.0 - 34.4) | [ ] Consistently Exceeds Standards (34.5 - or above) |
|---|---|---|---|---|

**APPRAISAL SIGNATURES:**

| _[signature]_ | _[signature] Leroy Williams_ | _[signature]_ |
|---|---|---|
| Rating Supervisor | Employee (Denotes discussion not necessarily agreement) | Reviewing Supervisor |
| SSN  418 - 08 - 3897 | | SSN 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 |
| 2-13-98 | 02/13/98 | 2-13-98 |
| Date | Date | Date |

| Date Rater's Comments Attached | Date Employee's Comments Attached | Date Reviewer's Comments Attached |
|---|---|---|

STATE OF ALABAMA
**PERSONNEL DEPARTMENT**

# EMPLOYEE PERFORMANCE APPRAISAL

Form 13
(Rev. 10/87)

(Please read other side before using)

☐ **Number of Steps**

Employee Name: LEROY WILLIAMS
Class Code: 20111
Classification: ENGINEERING ASSISTANT I
Position Number: 02118416

Social Security Number: 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
Department: TRANSPORTATION
Division: DESIGN
Period Covered From: 03/01/95 To: 03/01/96
Annual Raise Effective: MAY 1996

**WORK HABIT RATINGS:** Check the appropriate column. Refer to the policies and procedures for your department.
If an Unsatisfactory is given, comments detailing the rating must be provided to the department.

| | Satisfactory | Unsatisfactory | | Work Habit Score | |
|---|---|---|---|---|---|
| Attendance | X | ____ | | 0 X 3.50 = | 0 |
| Punctuality | X | ____ | | Unsatisfactory | WORK HABIT |
| Cooperation w/Coworkers | X | ____ | | Ratings | SCORE |
| Compliance with Rules | X | ____ | | | |
| (Standards of Conduct) | | | | | |

**TASK/RESPONSIBILITY RATINGS:** Use this scale to provide a numerical rating for each of the employee's major work tasks or responsibilities. Refer to the Position Classification Questionnaire (Form 40) in determining the tasks to be rated.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| RATING | | TASK/RESPONSIBILITY |
|---|---|---|
| 3 | A. | PLACES target rod |
| 2 | B. | OPERATES equipment |
| 3 | C. | RECORDS data |
| 2 | D. | PERFORMS computer operations |
| 3 | E. | ASSISTS Party chief and/or Transitman |
| 3 | F. | MONITORS/CONTROLS work areas |
| 2 | G. | OBTAINS deed and property information |
| | H. | |
| | I. | |
| | J. | |
| 18 | | **TOTAL OF RATINGS** |

**PERFORMANCE APPRAISAL SCORE:**

| 18 | ÷ | 7 | = | 2.57 | x 10 = | 25.7 | – | 0 | = | 25.7 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total of Ratings | | Number of Ratings | | Average Task Rating | | Task Rating Score | | Work Habits Score | | Performance Appraisal Score |

**OVERALL APPRAISAL:** This employee's work:

| [ ] Does Not Meet Standards (5.4 or below) | [ ] Partially Meets Standards (5.5 - 14.9) | [ ] Meets Standards (15.0 - 24.9) | [x] Exceeds Standards (25.0 - 34.4) | [ ] Consistently Exceeds Standards (34.5 - or above) |
|---|---|---|---|---|

**APPRAISAL SIGNATURES:**

| _Will N. K._ | _Leroy William_ | _Joe D. King_ |
|---|---|---|
| Rating Supervisor | Employee (Denotes discussion not necessarily agreement) | Reviewing Supervisor |
| SSN 418 08 3897 | | SSN 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 |
| 2-9-96 | 2-9-96 | 2-9-96 |
| Date | Date | Date |
| Date Rater's Comments Attached | Date Employee's Comments Attached | Date Reviewer's Comments Attached |

STATE OF ALABAMA
PERSONNEL DEPARTMENT

# EMPLOYEE PERFORMANCE APPRAISAL

Form 13
(Rev. 10/87)

(Please read other side before using)

Number of Steps

Employee Name: LEROY WILLIAMS
Class Code: 20111
Classification: ENGINEERING ASSISTANT I
Position Number: 02118416

Social Security Number: 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
Department: TRANSPORTATION
Division: DESIGN
Period Covered From: 03/01/94 To: 03/01/95
Annual Raise Effective: MAY 1995

**WORK HABIT RATINGS:** Check the appropriate column. Refer to the policies and procedures for your department. If an Unsatisfactory is given, comments detailing the rating must be provided to the department.

| | Satisfactory | Unsatisfactory | | Work Habit Score |
|---|---|---|---|---|
| Attendance | X | | 0 X 3.50 = | 0 |
| Punctuality | X | | | WORK HABIT |
| Cooperation w/Coworkers | X | | Unsatisfactory | SCORE |
| Compliance with Rules (Standards of Conduct) | X | | Ratings | |

**TASK/RESPONSIBILITY RATINGS:** Use this scale to provide a numerical rating for each of the employee's major work tasks or responsibilities. Refer to the Position Classification Questionnaire (Form 40) in determining the tasks to be rated.

| 0 Does Not Meet Standards | 1 Partially Meets Standards | 2 Meets Standards | 3 Exceeds Standards | 4 Consistently Exceeds Standards |
|---|---|---|---|---|

| RATING | | TASK/RESPONSIBILITY |
|---|---|---|
| 2 | A. | Places a target rod |
| 2 | B. | Runs/operates several types of equipment |
| 3 | C. | Records data |
| 2 | D. | Performs operations on personal computer |
| 3 | E. | Assists party chief/transitman |
| 3 | F. | Monitors/Controls work areas |
| 3 | G. | Obtains deed info/property owner info |
| | H. | |
| | I. | |
| | J. | |
| 18 | | TOTAL OF RATINGS |

**PERFORMANCE APPRAISAL SCORE:**

| 18 Total of Ratings | 7 Number of Ratings | = 2.57 Average Task Rating | x10 | 25.7 Task Rating Score | 0 Work Habits Score | 25.7 Performance Appraisal Score |
|---|---|---|---|---|---|---|

**OVERALL APPRAISAL:** This employee's work:

[ ] Does Not Meet Standards (5.4 or below)  [ ] Partially Meets Standards (5.5 - 14.9)  [ ] Meets Standards (15.0 - 24.9)  [x] Exceeds Standards (25.0 - 34.4)  [ ] Consistently Exceeds Standards (34.5 or above)

**APPRAISAL SIGNATURES:**

Rating Supervisor
SSN 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
Date 2-17-95

Employee (Denotes discussion not necessarily agreement)
Date 2/17/95

Reviewing Supervisor
SSN 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
Date 2-21-95

Date Rater's Comments Attached   Date Employee's Comments Attached   Date Reviewer's Comments Attached

# EXHIBIT E

**Master Activity Log Records For:**  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

**SPD Data Files**  LEROY WILLIAMS   Race: B   Sex: M

| SSN | Action Date | Class Code | Act | A/D/ept | Dept | Position | Emp Date | Step | T | Probation End | Euc | Svc | Unearned Leave Begin | Unearned Leave End | Lve | Sep Date | Reas | Re-emp Date | Yrs | Srv | Pay Type | Pay Rate | Pay His | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19940402 | 90241 | 0 | 1 | HWY | 1870909 | 19930609 | 0 | 1 | 19941001 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55 | 48 | 4850 04 | 533.60 | 1 | 012 |
| 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 | 19940528 | 90241 | 0 | 66 | HWY | 2118416 | 19930609 | 0 | 2 | 19941001 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55 | 48 | 4850 04 | 533.60 | 1 | 012 |
| 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 | 19940528 | 20111 | 0 | 30 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 04 | 533.60 | 1 | 012 |
| 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 | 19940917 | 20111 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 0 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 04 | 533.60 | 1 | 012 |
| 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 | 19950808 | 20111 | 0 | 140 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 19950808 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 04 | 533.60 | 1 | 012 |
| 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 | 19950911 | 20111 | 0 | 142 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 19950808 | 19951101 | 2 | 0 | 0 | 0 | 85 | 48 | 4850 04 | 576.30 | 1 | 012 |
| 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 | 19960427 | 20111 | 0 | 20 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 04 | 576.30 | 1 | 012 |
| 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 | 19960509 | 20111 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 06 | 605.60 | 1 | 012 |
| 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 | 19960511 | 20111 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 06 | 576.30 | 1 | 012 |
| 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 | 19970510 | 20111 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 08 | 636.70 | 1 | 012 |
| 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 | 19980620 | 20111 | 0 | 43 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4850 10 | 668.70 | 1 | 012 |
| 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 | 19980912 | 20111 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 2 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 48 | 4860 10 | 722.30 | 1 | 012 |
| 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 | 19990327 | 20116 | 0 | 59 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 10 | 722.30 | 1 | 012 |
| 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 | 19990508 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 12 | 758.50 | 1 | 012 |
| 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 | 20000506 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 14 | 796.70 | 1 | 012 |
| 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 | 20000909 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 14 | 812.60 | 1 | 012 |
| 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 | 20010505 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 16 | 853.80 | 1 | 012 |
| 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 | 20010908 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 16 | 870.90 | 1 | 012 |
| 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 | 20020504 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 16 | 893.10 | 1 | 012 |
| 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 | 20020907 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 1 | 00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 17 | 919.90 | 1 | 012 |
| 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 | 20030729 | 20116 | 0 | 204 | HWY | 2118416 | 19930609 | 6 | 1 | 00 | 0 | 0 | 20030729 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 17 | 637.53 | 6 | 012 |
| 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 | 20030804 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 | 1 | 00 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 85 | 51 | 4860 99 | 919.90 | 1 | 012 |
| 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 | 20031113 | 20116 | 0 | 204 | HWY | 2118416 | 19930609 | 6 | 1 | 00 | 0 | 0 | 20031113 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 17 | 618.95 | 6 | 012 |
| 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 | 20031208 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 | 1 | 00 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 85 | 51 | 4860 99 | 618.95 | 1 | 012 |
| 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 | 20031215 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 | 1 | 00 | 0 | 0 | 20031215 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 99 | 919.90 | 6 | 012 |
| 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 | 20040216 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 | 1 | 00 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 85 | 51 | 4860 17 | 919.90 | 1 | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

Master Activity Log Records For:   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

SPD Data Files

LEROY WILLIAMS

Race: B   Sex: M

| SSN | Action Date | Class Code | Occ Act Dept Type | Position | Emp Date | Sub Stat Type | Probation End | Sch Hours | Unearned Leave Begin | Unearned Leave End | Sep Date | Re-emp Date | Reduc Class/Pay | Pay Rate | Agency | Phys dis |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20040220 | 20116 | 0 204 HWY | 2118416 | 19930609 | 6 1 | 00 0 | 0 | 20040220 | 0 | 2 0 | 0 | 51 4860 99 | 618.95 | 012 | 6 |
| 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 | 20040518 | 20116 | 0 205 HWY | 2118416 | 19930609 | 6 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 4860 17 | 919.90 | 012 | |
| 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 | 20040904 | 20115 | 0 263 HWY | 2118416 | 19930609 | 6 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 5460 11 | 919.90 | 012 | |
| 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 | 20050514 | 2015 | 0 23 HWY | 2118416 | 19930609 | 6 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 5460 13 | 966.20 | 012 | |
| 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 | 20050514 | 20481 | 7 34 HWY | 1736405 | 19930609 | 1 | 20051113 00 | 0 | | 0 | 0 | 0 | 51 6972 01 | 1,041.50 | 012 | |
| 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 | 20050903 | 20115 | 0 223 HWY | 2118416 | 19930609 | 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 5460 13 | 1,024.20 | 012 | |
| 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 | 20050903 | 20481 | 7 21 HWY | 1736405 | 19930609 | 1 | 20051113 00 | 0 | | 0 | 0 | 0 | 51 6972 01 | 1,104.00 | 012 | |
| 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 | 20060304 | 2015 | 0 300 HWY | 2118416 | 19930609 | 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 5460 13 | 1,109.60 | 012 | 1 |
| 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 | 20060501 | 2015 | 0 23 HWY | 2118416 | 19930609 | 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 5460 15 | 1,166.40 | 012 | 1 |
| 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 | 20060901 | 20115 | 0 21 HWY | 2118416 | 19930609 | 1 | 00 0 | 0 | | 0 | 0 | 0 | 51 5460 15 | 1,224.70 | 012 | 1 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

# SPD Data Files

Application Records For:   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   LEROY WILLIAMS   Race B   Sex M

| SSN | Class Code | Title | Option | Action Date | Active Code | S Elig | Location 1 | 2 | 3 | 4 | 5 | 6 | 7 | Dept 1 | 2 | 3 | Veteran | Writing Test | Oral | Sup V | Sup | Prf | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20111 | ENGINEERING ASSISTANT I | O | 19921107 | 10 41 17 | 0 0 | 41 | 44 | 51 | 43 | 57 | 26 | 01 | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 90242 | HWY MAINTENANCE TECHN II | 0 | 19930903 | 05 51 17 | 0 91 | 41 | 90 | 26 | 44 | 55 | 51 | | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 90241 | HWY MAINTENANCE TECHN I | 0 | 19931026 | 30 51 17 | 0 90 | 91 | 41 | 44 | 51 | 43 | 89 | | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 90241 | HWY MAINTENANCE TECHN I | 0 | 19931211 | 30 51 17 | 0 91 | 90 | 26 | 44 | 55 | 51 | | | | | | N | 86.61 | 90 | 0 | 0 | 0 | 86.61 | 86.61 | 0 | 0 |
| 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 | 20111 | ENGINEERING ASSISTANT I | 0 | 19990602 | 30 51 17 | 0 95 | 00 | 00 | 00 | 00 | | | | | | | N | 70 | 0 | 0 | 0 | 0 | 70 | 70 | 0 | 0 |
| 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 | 20116 | ENGINEERING ASSISTANT(T) | 0 | 20020214 | 05 51 22 | 0 90 | 91 | 87 | 00 | 00 | 00 | | | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 20483 | TRANSPORTATION MANAGER | 7 | 20020731 | 30 51 17 | 0 90 | 91 | 87 | 00 | 00 | 00 | | | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 20481 | TRANSPORTATION TECHNOL | 7 | 20020731 | 30 51 17 | 0 90 | 91 | 87 | 00 | 00 | 00 | | | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 20480 | CIVIL ENGINEER(T) | 7 | 20040311 | 10 51 17 | 0 90 | 91 | 87 | 00 | 00 | 00 | | | | | | N | 0 | 0 | 0 | 24.44 | 0 | 24.44 | 24.44 | 0 | 0 |
| 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 | 20481 | TRANSPORTATION TECHNOL | 7 | 20060927 | 05 51 17 | 0 41 | 06 | 44 | 57 | 03 | 01 | | | | | | N | 0 | 0 | 0 | 24.44 | 0 | 24.44 | 24.44 | 0 | 0 |
| 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 | 20482 | TRANSPORTATION TECHNLGS | 7 | 20061012 | 23 51 17 | 0 51 | 41 | 06 | 44 | 00 | 00 | | | | | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 20481 | TRANSPORTATION TECHNOL | 7 | | | | | | | | | | | | | | | | | | | | | | | |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

## SPD Data Files

Certificate of Eligibles Records For:   **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**   **LEROY WILLIAMS**   **Race: B   Sex: M**

| SSN | Name | Race | Sex | Class Code | Option | Position Number | Final Action | Final Action Date | Certificate Number | Certified Out Date | Date Placed on Register | Register Date | Type | Grade | County | Dept | Div | Location Preference 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | LEROY WILLIAMS | B | M | 90241 | 0 | 0 | L | 19940114 | 931100172 | 19931118 | 19931025 | 199006 | 1 | 90 | 66 | HWY | 8 | 90 | 91 | 41 | 44 | 51 | 43 | 89 |
| 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 | LEROY WILLIAMS | B | M | 90241 | 0 | 0 | C | 19931229 | 931200120 | 19931207 | 19931025 | 199006 | 1 | 90 | 41 | HWY | 4 | 90 | 91 | 41 | 44 | 51 | 43 | 89 |
| 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 | LEROY WILLIAMS | B | M | 90241 | 0 | 0 | C | 19940216 | 94010164 | 19940113 | 19931025 | 199006 | 1 | 90 | 51 | HWY | 6 | 90 | 91 | 41 | 44 | 51 | 43 | 89 |
| 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 | LEROY WILLIAMS | B | M | 90241 | 0 | 1870909 | A | 19940418 | 940200117 | 19940207 | 19931025 | 199006 | 1 | 90 | 51 | HWY | 55 | 41 | 51 | 44 | 26 | 0 | 0 | 0 |
| 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 | LEROY WILLIAMS | B | M | 20481 | 7 | 1736405 | A | 20050516 | 50100109 | 20050111 | 20030716 | 200402 | 1 | 24.44 | 51 | HWY | 85 | 90 | 91 | 87 | 0 | 0 | 0 | 0 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

# EXHIBIT F

DATE 01/11/2005

CERTIFICATION NUMBER 050100109

# AS SUCH FALLS UNDER THE GUIDELINES OF ARTICLE 7 PARAGRAPH 5 OF THE REYNOLD'S CONSENT DECREE.

DEPARTMENT IDENTIFICATION (DEPT/DIV): 20481 TRANSPORTATION

Y TRANSPORTATION

5. DESIGN

REGISTER TYPE: CONTINUOUS OPEN-COMP

CLASSIFICATION (CODE/TITLE): 51 TRANSPORTATION TECHNOLOGIST

COUNTY: MONTGOMERY   VACANCIES: 3

CLASS OPTION (CODE/TITLE): 7 HIGHWAY DESIGN

EMPLOYMENT TYPE: PERMANENT

METHOD OF CERTIFICATION: 1 PERMANENT

MERIT SYSTEM PLUS TIES

SELECTIVE CERTIFICATION CODE: 050100109

1736405   2100900   2113300

| SSAN | NAME AND ADDRESS | RACE | V.P. | AGE LIMIT | GRADE | SEX/ACT. | POSITION NO. OF APPT. | APPT. DATE |
|---|---|---|---|---|---|---|---|---|
| 92768663 | BLAKE SCOTT J, 16275 SAND CREEK DRIVE, MOUNDVILLE AL 35474 | 1 | | | 65.72 | H | | |
| 12587066 | RODMAN TERRY E, 1714 TRENTON TRAIL, ALEXANDER CITY AL 35010 | 1 | | | 48.40 | H | | |
| 20067157 | DUNN LEWIS E, 1014 ROSEDALE DRIVE, MONTGOMERY AL 36107 | 1 | | | 45.25 | H | | |
| 20868610 | ALMON JASON K, 1325 SAXON CT, MONTGOMERY AL 361173451 | 1 | 5 | | 39.57 | H | | |
| 22006303 | HARRIS ROBERT A, 4010 WILLOW BEND DRIVE, GARDENDALE AL 35071 | 1 | | | 32.01 | H | | |
| 11222290 | MCQUEEN ALFRED L, 6018 PAIGEFIELD CT, MONTGOMERY AL 36116 | 2 | | | 27.97 | L | | |
| 23808026 | WILLIAMS LEROY, 3723 BRIDLEWOOD DR., MONTGOMERY AL 36111 | 2 | | | 24.44 | A | 1736405 $1041.50 | 05/14/ Step 1 |
| 24173976 | MCQUEEN MARLON R, 2105 BRIARWOOD STREET, PRATTVILLE AL 36066 | 2 | | | 22.07 | L | | |
| 19000498 | BURROUGHS RANDELL L, 850 CENTER STREET, MOBILE AL 36610 | 6 | | | 21.88 | L | | |

*** END OF LIST ***

CERTIFIED PERSONNEL DIRECTOR     DATE CERTIFIED: 1/11/05

CERTIFICATION RETURNED-APPOINTING AUTHORITY     DATE RETURNED

# EXHIBIT G

## M E M O R A N D U M

**TO:**      Ronald J. Green
             Executive Assistant Transportation Director
             Bureau Chief, Hiring & Promotions

**FROM:**    Don T. Arkle, Design Bureau Chief

**SUBJECT:**  Request to Fill/Not to Fill Vacant Position

**DATE:**     July 11, 2002

I hereby request to ___fill___ position number ___1736405___, classification
            (fill/not fill)                        (PCQ #)
___Civil Engineer___, option code ___007  Design___, in the ___Design/Location___
   (Name of Position)               (Code Number)                (Bureau/Division)
___Montgomery___. The position became vacant effective ___June 28, 2002___
  (County/County Code)                                  (Date)
The previous incumbent was ___Harrison W. Walker___ ___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___ ___B___ ___M___
                             (Name)          (SSN)     (Race)  (Sex)

*THE CAUSE OF THE VACANCY WAS* (Resignation. Retirement, Transfer. etc.) ___Retirement___.

REASON FOR REQUEST TO FILL POSITION: ___to carry on the mission of the Department___

☐ **CHECK HERE IF THIS IS A REQUEST TO FILL THE VACANCY BY TRANSFER.**

THIS POSITION REQUIRES:  (  ) shift work during evening and night hours  (X) overnight travel

A Form 40 is attached.

*POSITION WILL NOT BE FILLED FOR THE FOLLOWING REASON(S):* _____

It is understood that any requests to fill or not to fill vacated positions must be forwarded to the Hiring and Promotions Bureau within seven (7) days from the occurrence of a retirement, resignation. termination, transfer, profit, or other action resulting in such vacancy.

If no request is made to fill the vacant position, the position number for the associated classification will be abolished.

Attachment

APPROVED: ___Paul Bowlin___
                        Paul Bowlin
                        Transportation Director

DISAPPROVED: _____
                        Paul Bowlin
                      *Transportation Director*

*(Revised 1/2001)*                          DATE: ___7-12-02___

# EXHIBIT H

**SPD Data Files**

Master Activity Log Records For:   20481   TRANSPORTATION TECHNOLOGIST

| SSN | Name | Race | Sex | Action Date | Class Code | Option Code | AD | Dept | Position | Emp Date | Status | Enroll | Probation End | Est Ed | VRe | Sep Date | Re-emp Date | Rec Pos | LP | Pay Rate | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | DIANNE H RHODES | W | F | 20040515 | 20481 | 438 | 34 | HWY | 1730781 | 19910126 | 0 | 1 | 20041114 | 14 | N | 0 | 0 | 1 48 | 'E+0 11 | 1,330.90 | 012 |
| 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 | MICKEY JONES | W | M | 20040529 | 20481 | 438 | 34 | HWY | 1926800 | 19920629 | 0 | 1 | 20041128 | 00 | N | 0 | 0 | 18 | 'E+0 03 | 1,093.60 | 012 |
| 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 | RITA V WILLIAMS | B | F | 20040529 | 20481 | 7 | 34 | HWY | 1735993 | 19930405 | 0 | 1 | 20041128 | 00 | N | 0 | 0 | 9 | 'E+0 03 | 1,093.60 | 012 |
| 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 | SHANNON E STUCKEY | W | M | 20040529 | 20481 | 7 | 34 | HWY | 1734821 | 19930405 | 0 | 1 | 20041128 | 00 | N | 0 | 0 | 49 | 'E+0 03 | 1,093.60 | 012 |
| 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 | JANEL L FRISOLONE | W | F | 20040529 | 20481 | 438 | 34 | HWY | 1925100 | 19911005 | 0 | 1 | 20041128 | 22 | 1 | 0 | 0 | 18 | 'E+0 03 | 1,093.60 | 012 |
| 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 | KEVIN GENE FRAMES | W | M | 20040529 | 20481 | 438 | 34 | HWY | 1911005 | 19911005 | 0 | 1 | 20041128 | 00 | N | 0 | 0 | 49 | 'E+0 11 | 1,093.60 | 012 |
| 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 | NATALIE C HAYNES | W | F | 20040626 | 20481 | 438 | 34 | HWY | 1993608 | 19930608 | 0 | 1 | 20041225 | 00 | N | 0 | 0 | 62 | 'E+0 01 | 1,148.10 | 012 |
| 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 | JEFFERY OWEN WALKER | W | M | 20040626 | 20481 | 438 | 34 | HWY | 2026500 | 19910126 | 0 | 1 | 20041225 | 21 | N | 0 | 0 | 4 | 'E+0 04 | 1,120.60 | 012 |
| 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 | TROY L NICHOLS | W | M | 20040626 | 20481 | 438 | 34 | HWY | 1730521 | 19940627 | 0 | 1 | 20041225 | 00 | N | 0 | 0 | 4 | 'E+0 01 | 1,148.10 | 012 |
| 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 | STACEY C NICHOLS | W | M | 20040626 | 20481 | 7 | 34 | HWY | 2111400 | 19920608 | 0 | 1 | 20041225 | 23 | N | 0 | 0 | 41 | 'E+0 05 | 1,041.50 | 012 |
| 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 | WILLIAM D AUSTIN | W | M | 20040626 | 20481 | 7 | 34 | HWY | 1734373 | 19910909 | 0 | 1 | 20041225 | 22 | N | 0 | 0 | 85 | 'E+0 05 | 1,148.10 | 012 |
| 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 | JASON W WATKINS | W | M | 20040626 | 20481 | 7 | 34 | HWY | 2115900 | 19910126 | 0 | 1 | 20041225 | 22 | N | 0 | 0 | 85 | 'E+0 07 | 1,206.10 | 012 |
| 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 | OMAR ANTHONY ARMSTRONG J | B | M | 20040626 | 20481 | 438 | 34 | HWY | 1730522 | 19921214 | 0 | 1 | 20041225 | 21 | N | 0 | 0 | 62 | 'E+0 05 | 1,330.90 | 012 |
| 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 | STEVEN M GRIFFIN | W | M | 20040724 | 20481 | 7 | 34 | HWY | 1734644 | 19940815 | 0 | 1 | 20041225 | 00 | N | 0 | 0 | 4 | 'E+0 04 | 1,093.60 | 012 |
| 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 | ANDRE THORN | W | M | 20040724 | 20481 | 5 | 34 | HWY | 1735033 | 19921130 | 0 | 1 | 20041225 | 00 | N | 0 | 0 | 57 | 'E+0 04 | 1,120.60 | 012 |
| 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 | PHILIP LANDEL ODOM JR | W | M | 20040724 | 20481 | 7 | 34 | HWY | 2102000 | 19990830 | 0 | 1 | 20050123 | 17 | N | 0 | 0 | 4 | 'E+0 03 | 1,093.60 | 012 |
| 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 | SHARON STEWART | W | M | 20040724 | 20481 | 5 | 34 | HWY | 2104000 | 19911230 | 0 | 1 | 20050123 | 13 | | 0 | 0 | 80 | 'E+0 03 | 1,120.60 | 012 |
| 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 | JON D WATKINS | W | M | 20040807 | 20481 | 5 | 34 | HWY | 1756002 | 19990816 | 0 | 1 | 20050123 | 00 | | 0 | 0 | 85 | 'E+0 11 | 1,148.10 | 012 |
| 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 | ROBERT CLARK | W | M | 20040807 | 20481 | 439 | 34 | HWY | 1844605 | 19910126 | 0 | 1 | 20050206 | 00 | | 0 | 0 | 51 | 'E+0 11 | 1,330.90 | 012 |
| 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 | SANDY A SMITH | W | F | 20040807 | 20481 | 438 | 34 | HWY | 1957000 | 19990802 | 0 | 1 | 20050206 | 13 | N | 0 | 0 | 28 | 'E+0 11 | 1,330.90 | 012 |
| 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 | DANIEL S SANDERS | W | M | 20040807 | 20481 | 438 | 34 | HWY | 1735778 | 19910126 | 0 | 1 | 20050206 | 00 | | 0 | 0 | 64 | 'E+0 01 | 1,041.50 | 012 |
| 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 | GEORGE N KENNEL JR | W | M | 20040807 | 20481 | 439 | 34 | HWY | 1730853 | 19910126 | 0 | 1 | 20050206 | 20 | N | 0 | 0 | 3 | 'E+0 01 | 1,041.50 | 012 |
| 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 | CHARLOTTE A FRANKLIN | W | F | 20040807 | 20481 | 7 | 34 | HWY | 1910126 | 19910126 | 0 | 1 | 20050206 | 23 | N | 0 | 0 | 37 | 'E+0 11 | 1,330.90 | 012 |
| 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 | ROBERT F ESTES | W | M | 20040821 | 20481 | 7 | 34 | HWY | 1907300 | 19930628 | 0 | 1 | 20050206 | 00 | | 0 | 0 | 55 | 'E+0 03 | 1,330.90 | 012 |
| 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 | DOUGLAS S ROBERSON | W | M | 20040821 | 20481 | 34 | 34 | HWY | 1861001 | 19990816 | 0 | 1 | 20050206 | 00 | | 0 | 0 | 49 | 'E+0 02 | 1,067.40 | 012 |
| 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 | TONYA L DAVIS | W | F | 20040821 | 20481 | 6 | 34 | HWY | 1784100 | 19940711 | 0 | 1 | 20050220 | 22 | N | 0 | 0 | 36 | 'E+0 11 | 1,067.40 | 012 |
| | | W | F | 20040821 | 20481 | 6 | 34 | HWY | 1730374 | 19921019 | 0 | 1 | 20050220 | 22 | N | 0 | 0 | 48 | 'E+0 02 | 1,067.40 | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

Master Activity Log Records For:    20481    TRANSPORTATION TECHNOLOGIST

| SSN | Name | Race | Sex | Action Date | Class Code | Occ Pt | AD Opt | Dept | Position | Emp Date | Stat | Sub | Probation End | Entr | Vet | Sep Date | Reason | Re-emp Date | Prev | Svc | Code | Pay Rate | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | JOYCE A LEE | B | F | 20040821 | 20481 | 438 | 34 | HWY | 1833300 | 19921214 | 0 | 1 | 20050220 | 30 | N | 0 | 0 | 0 | 6 | 24 | 'E 0 11 | 1,093.60 | 012 |
| 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 | JOHN A KNIGHTON | W | M | 20040904 | 20481 | 6 | 34 | HWY | 1767201 | 19930405 | 0 | 1 | 20050303 | 13 | 1 | 0 | 0 | 0 | 65 | 51 | 'E 0 03 | 1,093.60 | 012 |
| 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 | JEFFREY S CALHOUN | W | M | 20040904 | 20481 | 438 | 34 | HWY | 1735734 | 19921005 | 0 | 1 | 20050303 | 21 | N | 0 | 0 | 0 | 6 | 6 | 'E 0 03 | 1,093.60 | 012 |
| 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 | MELVIN J WRIGHT | B | M | 20040918 | 20481 | 438 | 34 | HWY | 1734619 | 20030224 | 0 | 1 | 20050303 | 21 | 1 | 0 | 0 | 0 | 60 | 6 | 'E 0 03 | 1,093.60 | 012 |
| 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 | DANIEL S SPARKMAN | W | M | 20040918 | 20481 | 439 | 34 | HWY | 1730788 | 19910126 | 0 | 1 | 20050317 | 17 | N | 0 | 0 | 0 | 1 | 48 | 'E 0 01 | 1,330.90 | 012 |
| 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 | WANDA S ADAMS | W | F | 20040918 | 20481 | 6 | 34 | HWY | 1858402 | 19920113 | 0 | 1 | 20050317 | 13 | N | 0 | 0 | 0 | 7 | 55 | 'E 0 05 | 1,148.10 | 012 |
| 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 | SANDY MARSHAL | W | M | 20040918 | 20481 | 6 | 34 | HWY | 1763700 | 19990816 | 0 | 1 | 20050317 | 00 | | 0 | 0 | 0 | 65 | 51 | 'E 0 01 | 1,041.50 | 012 |
| 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 | RUSSELL W VAUGHN | W | M | 20040918 | 20481 | 6 | 34 | HWY | 1730719 | 19990906 | 0 | 1 | 20050317 | 00 | | 0 | 0 | 0 | 51 | 51 | 'E 0 01 | 1,041.50 | 012 |
| 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 | JIMMY WAYNE CARROLL | W | M | 20041002 | 20481 | 439 | 34 | HWY | 1730720 | 19980914 | 0 | 1 | 20050401 | 17 | N | 0 | 0 | 0 | 70 | 51 | 'E 0 01 | 1,041.50 | 012 |
| 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 | JOHN O WASHINGTON | W | M | 20041002 | 20481 | 6 | 34 | HWY | 1730851 | 19910126 | 0 | 1 | 20050401 | 21 | N | 0 | 0 | 0 | 2 | 17 | 'E 0 11 | 1,330.90 | 012 |
| 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 | DAVID M JOHNSON JR | W | M | 20041002 | 20481 | 439 | 34 | HWY | 1735338 | 19931101 | 0 | 1 | 20050401 | 00 | | 0 | 0 | 0 | 9 | 18 | 'E 0 01 | 1,041.50 | 012 |
| 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 | LILLIE JOSEPHINE BURGESS | W | F | 20041002 | 20481 | 6 | 34 | HWY | 1734387 | 19910126 | 0 | 1 | 20050401 | 17 | N | 0 | 0 | 0 | 65 | 65 | 'E 0 11 | 1,330.90 | 012 |
| 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 | JEFFREY D FLEMING | W | M | 20041002 | 20481 | 6 | 34 | HWY | 1799601 | 19930628 | 0 | 1 | 20050401 | 00 | | 0 | 0 | 0 | 2 | 17 | 'E 0 03 | 1,093.60 | 012 |
| 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 | MARIETTA E JELKS | W | F | 20041016 | 20481 | 438 | 34 | HWY | 1799601 | 19930104 | 0 | 1 | 20050415 | 17 | N | 0 | 0 | 0 | 2 | 17 | 'E 0 03 | 1,093.60 | 012 |
| 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 | BELINDA CHERIE ROBINSON | W | F | 20041016 | 20481 | 438 | 34 | HWY | 1730847 | 19910126 | 0 | 1 | 20050415 | 21 | N | 0 | 0 | 0 | 2 | 17 | 'E 0 03 | 1,093.60 | 012 |
| 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 | RANDAL K ROE | W | M | 20041016 | 20481 | 438 | 34 | HWY | 1799601 | 19930405 | 0 | 1 | 20050415 | 17 | N | 0 | 0 | 0 | 1 | 48 | 'E 0 03 | 1,093.60 | 012 |
| 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 | DERRICK J SIMPSON | W | M | 20041016 | 20481 | 438 | 34 | HWY | 1730846 | 19910126 | 0 | 1 | 20050415 | 20 | 6 | 0 | 0 | 0 | 48 | 17 | 'E 0 11 | 1,330.90 | 012 |
| 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 | JAMES E FOSTER | B | M | 20041016 | 20481 | 438 | 34 | HWY | 1734633 | 19910126 | 0 | 1 | 20050415 | 21 | N | 0 | 0 | 0 | 2 | 39 | 'E 0 11 | 1,148.10 | 012 |
| 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 | ARTHUR BENTLEY ELLIOTT | B | M | 20041016 | 20481 | 439 | 34 | HWY | 1790301 | 19940516 | 0 | 1 | 20050415 | 30 | N | 0 | 0 | 0 | 4 | 8 | 'E 0 04 | 1,120.60 | 012 |
| 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 | JERRY W COOPER | W | M | 20041016 | 20481 | 438 | 34 | HWY | 1730848 | 19930712 | 0 | 1 | 20050415 | 00 | | 0 | 0 | 0 | 2 | 4 | 'E 0 04 | 1,041.50 | 012 |
| 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 | JOSEPH M WHALEY | W | M | 20041030 | 20481 | 438 | 34 | HWY | 1734756 | 19910126 | 0 | 1 | 20050429 | 14 | N | 0 | 0 | 0 | 47 | 47 | 'E 0 03 | 1,093.60 | 012 |
| 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 | D O BECK | W | M | 20041030 | 20481 | 438 | 34 | HWY | 1752500 | 19940404 | 0 | 1 | 20050429 | 00 | | 0 | 0 | 0 | 3 | 3 | 'E 0 03 | 1,093.60 | 012 |
| 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 | GLENN E ARNOLD | W | M | 20041030 | 20481 | 439 | 34 | HWY | 1890502 | 19910126 | 0 | 1 | 20050429 | 13 | N | 0 | 0 | 0 | 51 | 51 | 'E 0 11 | 1,093.60 | 012 |
| 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 | RONNIE N ELLIS | B | M | 20041127 | 20481 | 439 | 34 | HWY | 1809300 | 19940531 | 0 | 1 | 20050526 | 00 | | 0 | 0 | 0 | 13 | 13 | 'E 0 11 | 1,093.60 | 012 |
| 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 | JOEL P OWERS | W | M | 20041127 | 20481 | 7 | 34 | HWY | 1997900 | 19910826 | 0 | 1 | 20050526 | 21 | N | 0 | 0 | 0 | 45 | 45 | 'E 0 08 | 1,237.10 | 012 |
| 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 | ALBIE V BOWERS | I | M | 20041211 | 20481 | 438 | 34 | HWY | 1730911 | 19910126 | 0 | 1 | 20050610 | 13 | N | 0 | 0 | 0 | 7 | 20 | 'E 0 11 | 1,330.90 | 012 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

**SPD Data Files**

**Master Activity Log Records For:   20481   TRANSPORTATION TECHNOLOGIST**

| SSN | Name | Race | Sex | Action Date | Class Code | Option | Op Detail | Position | Emp Date | Sub Type | Probation End | Enter | Reason | Sep Date | Re-emp Date | Review | | Pay Plan | | Pay Rate | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | ANTHONY K HARRIS | B | M | 20041211 | 20481 | 439 | 34 | HWY | 1730423 | 19910126 | 0 | 20050610 | 21 | N | 0 | 0 | 8 | 66 | E-01 | 11 | 1,330.90 | 012 |
| 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 | STEVEN BROCK BECK | W | M | 20041211 | 20481 | 438 | 34 | HWY | 1730897 | 19940801 | 0 | 20050610 | 00 | | 0 | 0 | 7 | 20 | E-01 | 04 | 1,120.60 | 012 |
| 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 | KYLE E GERMAN | W | M | 20041211 | 20481 | 439 | 34 | HWY | 1757300 | 19910126 | 1 | 20050610 | 17 | 1 | 0 | 0 | 70 | 51 | E-01 | 07 | 1,206.10 | 012 |
| 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 | SCOTT J BLAKE | W | M | 20041225 | 20481 | 7 | 34 | HWY | 1743571 | 19980914 | 0 | 20050624 | 00 | | 0 | 0 | 85 | 51 | E-01 | 11 | 1,041.50 | 012 |
| 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 | ROGER A LECUYER | W | M | 20050108 | 20481 | 439 | 34 | HWY | 1735170 | 19910126 | 0 | 20050707 | 13 | N | 0 | 0 | 4 | 15 | E-01 | 11 | 1,330.90 | 012 |
| 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 | JASON KENT ALMON | W | M | 20050122 | 20481 | 7 | 34 | HWY | 1730918 | 19940822 | 0 | 20050721 | 00 | | 0 | 0 | 90 | 51 | E-01 | 11 | 1,041.50 | 012 |
| 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 | WILLIAM E MULLINS | W | M | 20050122 | 20481 | 439 | 34 | HWY | 1997300 | 19990802 | 0 | 20050721 | 22 | N | 0 | 0 | 58 | 58 | E-01 | 04 | 1,120.60 | 012 |
| 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 | JAMES W HAGOOD | W | M | 20050219 | 20481 | 6 | 34 | HWY | 1735780 | 19910126 | 0 | 20050818 | 13 | N | 0 | 0 | 3 | 37 | E-01 | 11 | 1,330.90 | 012 |
| 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 | LEWIS E DUNN | W | M | 20050219 | 20481 | 5 | 34 | HWY | 1730831 | 19920824 | 0 | 20050818 | 20 | 1 | 0 | 0 | 80 | 51 | E-01 | 01 | 1,041.50 | 012 |
| 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 | WILLIAM MICHAEL MOCK | W | M | 20050219 | 20481 | 5 | 34 | HWY | 1735031 | 19990802 | 0 | 20050818 | 00 | N | 0 | 0 | 80 | 51 | E-01 | 01 | 1,041.50 | 012 |
| 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 | RUSSELL LYNN TAYLOR | W | M | 20050305 | 20481 | 439 | 34 | HWY | 1735779 | 19940711 | 0 | 20050904 | 00 | | 0 | 0 | 8 | 37 | E-01 | 01 | 1,041.50 | 012 |
| 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 | LEWIS R WILLIAMSON | W | M | 20050305 | 20481 | 438 | 34 | HWY | 1730834 | 19940222 | 0 | 20050904 | 00 | | 0 | 0 | 70 | 51 | E-01 | 01 | 1,041.50 | 012 |
| 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 | JAMES EDWARD WASHINGTON | B | M | 20050319 | 20481 | 5 | 34 | HWY | 1910126 | 19910126 | 0 | 20051001 | 20 | N | 0 | 0 | 80 | 51 | E-01 | 06 | 1,177.10 | 012 |
| 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 | HERBERT WILLIAMS | B | M | 20050402 | 20481 | 438 | 34 | HWY | 2004600 | 19990802 | 0 | 20051001 | 00 | | 0 | 0 | 37 | 37 | E-01 | 01 | 1,041.50 | 012 |
| 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 | JON MARK ADAMS | W | M | 20050430 | 20481 | 7 | 34 | HWY | 1730989 | 19940627 | 0 | 20051029 | 00 | | 0 | 0 | 6 | 7 | E-01 | 04 | 1,120.60 | 012 |
| 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 | ROBERT A HARRIS | W | M | 20050430 | 20481 | 7 | 34 | HWY | 1730438 | 19910126 | 0 | 20051029 | 13 | N | 0 | 0 | 5 | 63 | E-01 | 11 | 1,330.90 | 012 |
| 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 | ALAN M DAVIS | W | M | 20050430 | 20481 | 7 | 34 | HWY | 2115100 | 19860526 | 0 | 20051029 | 20 | 1 | 0 | 0 | 63 | 51 | E-01 | 11 | 1,330.90 | 012 |
| 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 | VADA T WRENN | W | M | 20050430 | 20481 | 7 | 34 | HWY | 1734574 | 20011105 | 0 | 20051029 | 21 | N | 0 | 0 | 85 | 51 | E-01 | 11 | 1,330.90 | 012 |
| 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 | MELVA J BRADFORD | W | F | 20050430 | 20481 | 7 | 34 | HWY | 2109000 | 19940110 | 0 | 20051029 | 24 | N | 0 | 0 | 85 | 51 | E-01 | 10 | 1,298.50 | 012 |
| 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 | DERICK MCWHORTER | B | M | 20050430 | 20481 | 7 | 34 | HWY | 2103600 | 19940627 | 0 | 20051029 | 00 | | 0 | 0 | 85 | 51 | E-01 | 03 | 1,093.60 | 012 |
| 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 | MICHAEL GILLIS | B | M | 20050430 | 20481 | 7 | 34 | HWY | 2105700 | 19940615 | 0 | 20051029 | 00 | | 0 | 0 | 85 | 51 | E-01 | 01 | 1,041.50 | 012 |
| 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 | RODNEY BARNES | B | M | 20050430 | 20481 | 7 | 34 | HWY | 1730443 | 19940808 | 0 | 20051029 | 00 | | 0 | 0 | 5 | 63 | E-01 | 01 | 1,041.50 | 012 |
| 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 | AVERY V ALLISON | B | M | 20050514 | 20481 | 7 | 34 | HWY | 1730968 | 20021201 | 0 | 20051113 | 00 | | 0 | 0 | 49 | 49 | E-01 | 01 | 1,041.50 | 012 |
| 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 | JEFFERY L HOLLINGSWORTH | B | M | 20050514 | 20481 | 34 | 34 | HWY | 1735788 | 19901126 | 0 | 20051113 | 21 | N | 0 | 0 | 9 | 51 | E-01 | 11 | 1,330.90 | 012 |
| 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 | DENNIS G KING JR | B | M | 20050514 | 20481 | 438 | 438 | HWY | 1955800 | 19921214 | 0 | 20051113 | 20 | N | 0 | 0 | 3 | 37 | E-01 | 11 | 1,041.50 | 012 |
| 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 | TERRY E RODMAN | W | M | 20050514 | 20481 | 34 | 34 | HWY | 2110400 | 20021202 | 0 | 20051113 | 00 | | 0 | 0 | 85 | 51 | E-01 | 01 | 1,041.50 | 012 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

**SPD Data Files**

Master Activity Log Records For:     20481     TRANSPORTATION TECHNOLOGIST

| SSN | Name | Race | Sex | Action Date | Class Code | Opt Code | Position | Emp Date | Stat | Probation End | Vet | Sep Date | Re-emp Date | Yrs Service | | | Pay Rate | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | LEROY WILLIAMS | B | M | 20050514 | 20481 | 7 | 34 HWY | 1736405 | 19930609 0 1 | 20051113 00 | | 0 | 0 | 85 | 51 | H:0:01 | 1,041.50 | 012 |
| 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 | E NELL CLEMMONS | B | M | 20050528 | 20481 | 438 | 34 HWY | 1735701 | 19910126 0 1 | 20051127 20 | N | 0 | 0 | 63 | 51 | H:0:11 | 1,330.90 | 012 |
| 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 | BRENDA G HEARD | W | F | 20050528 | 20481 | 438 | 34 HWY | 1730600 | 19910126 0 1 | 20051127 21 | N | 0 | 0 | 63 | 51 | H:0:11 | 1,330.90 | 012 |
| 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 | JACK HOLIFIELD MCGUIRE | W | M | 20050528 | 20481 | 438 | 34 HWY | 1734722 | 19910126 0 1 | 20051127 13 | N | 0 | 0 | 63 | 37 | H:0:03 | 1,330.90 | 012 |
| 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 | LANESE SHANNELL BOYD | B | F | 20050528 | 20481 | 438 | 34 HWY | 1736392 | 19940321 0 1 | 20051127 00 | | 0 | 0 | 37 | 37 | H:0:03 | 1,093.60 | 012 |
| 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 | CHARLES D HAYS | W | M | 20050528 | 20481 | 438 | 34 HWY | 1734553 | 19910126 0 1 | 20051127 17 | N | 0 | 0 | 63 | 37 | H:0:11 | 1,330.90 | 012 |
| 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 | JERRY R CLANTON | W | M | 20050528 | 20481 | 438 | 34 HWY | 2087800 | 19910126 0 1 | 20051127 13 | N | 0 | 0 | 63 | 37 | H:0:11 | 1,330.90 | 012 |
| 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 | ELBERT T DAVIS JR | B | M | 20050611 | 20481 | 439 | 34 HWY | 1734588 | 20020923 0 1 | 20051210 22 | R | 0 | 0 | 13 | 13 | H:0:01 | 1,041.50 | 012 |
| 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 | PAUL A GORMAN | W | M | 20050625 | 20481 | 439 | 34 HWY | 2077201 | 19910126 0 1 | 20051224 17 | N | 0 | 0 | 49 | 49 | H:0:11 | 1,330.90 | 012 |
| 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 | WILLIAM A BURKE | W | M | 20050625 | 20481 | 6 | 34 HWY | 1924500 | 19910423 0 1 | 20051224 13 | 1 | 0 | 0 | 49 | 49 | H:0:05 | 1,148.10 | 012 |
| 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 | MARK L BARRENTINE | W | M | 20050625 | 20481 | 439 | 34 HWY | 1734487 | 19921207 0 1 | 20051224 17 | N | 0 | 0 | 36 | 13 | H:0:05 | 1,148.10 | 012 |
| 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 | ERIC D HORN | B | M | 20050625 | 20481 | 6 | 34 HWY | 1896201 | 19940822 0 1 | 20051224 00 | | 0 | 0 | 8 | 13 | H:0:01 | 1,041.50 | 012 |
| 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 | SHIRLEY D HARRIS | B | F | 20050625 | 20481 | 438 | 34 HWY | 1962210 | 19930503 0 1 | 20051224 17 | N | 0 | 0 | 13 | 37 | H:0:03 | 1,093.60 | 012 |
| 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 | BRIDGET N HORRISON | B | F | 20050709 | 20481 | 6 | 34 HWY | 1731022 | 20060108 0 1 | 20060108 20 | N | 0 | 0 | 2 | 37 | H:0:03 | 1,093.60 | 012 |
| 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 | CHARLES R CHAMBLESS JR | W | M | 20050723 | 20481 | 438 | 34 HWY | 1731053 | 19930419 0 1 | 20060122 17 | N | 0 | 0 | 9 | 49 | H:0:03 | 1,093.60 | 012 |
| 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 | KAREN CALLOWAY | B | F | 20050723 | 20481 | 6 | 34 HWY | 1731058 | 19910126 0 1 | 20060122 21 | N | 0 | 0 | 65 | 51 | H:0:07 | 1,206.10 | 012 |
| 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 | TOMMY J MASHBURN | W | M | 20050723 | 20481 | 6 | 34 HWY | 1731024 | 19921228 0 1 | 20060122 13 | N | 0 | 0 | 17 | 51 | H:0:05 | 1,148.10 | 012 |
| 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 | RONALD W DUNCAN | W | M | 20050723 | 20481 | 439 | 34 HWY | 1730373 | 19990201 0 1 | 20060122 00 | | 0 | 0 | 2 | 17 | H:0:05 | 1,206.10 | 012 |
| 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 | ALICE R ESTES | W | F | 20050723 | 20481 | 6 | 34 HWY | 1772701 | 19900616 0 1 | 20060122 16 | N | 0 | 0 | 1 | 48 | H:0:01 | 1,041.50 | 012 |
| 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 | JERRY H WALL | W | M | 20050723 | 20481 | 6 | 34 HWY | 1734381 | 19900616 0 1 | 20060122 00 | | 0 | 0 | 65 | 51 | H:0:07 | 1,206.10 | 012 |
| 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 | KELLI B MARSHAL | W | F | 20050723 | 20481 | 6 | 34 HWY | 1774386 | 19920404 0 1 | 20060122 00 | | 0 | 0 | 65 | 51 | H:0:06 | 1,177.10 | 012 |
| 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 | DANE S WIGGINS | W | M | 20050723 | 20481 | 6 | 34 HWY | 2085500 | 20030825 0 1 | 20060122 00 | | 0 | 0 | 63 | 51 | H:0:01 | 1,041.50 | 012 |
| 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 | WILLIAM HENRY GRADICK III | W | M | 20050723 | 20481 | 6 | 34 HWY | 1731030 | 19940801 0 1 | 20060122 00 | | 0 | 0 | 49 | 49 | H:0:01 | 1,041.50 | 012 |
| 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 | WALTER M CARR | B | F | 20050723 | 20481 | 6 | 34 HWY | 1734384 | 19901105 0 1 | 20060122 21 | N | 0 | 0 | 65 | 51 | H:0:07 | 1,206.10 | 012 |
| 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 | JENNIFER K WHITE | W | F | 20050723 | 20481 | 6 | 34 HWY | 1735787 | 19910126 0 1 | 20060122 16 | N | 0 | 0 | 6 | 51 | H:0:04 | 1,120.60 | 012 |
| 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 | EARLIE J DAVIS | B | M | 20050820 | 20481 | 438 | 34 HWY | 1731057 | 19990802 0 1 | 20060219 00 | | 0 | 0 | 4 | 41 | H:0:01 | 1,041.50 | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

Master Activity Log Records For:    20481    TRANSPORTATION TECHNOLOGIST

| SSN | Name | Race | Sex | Action Date | Class Code | Occ | Col | Dept | Position | Emp Date | Stat | Probation End | End | Vet | Sep Date | Re-emp Date | Ret | ? | Prob | Pay Rate | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | MICHAEL G RANEY | W | M | 20050820 | 20481 | 6 | 34 | HWY | 1731525 | 19990816 | 0 | 20060219 | 00 | | 0 | 0 | 65 | 51 | EO:01 | 1,041.50 | 012 |
| 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 | JACQUELINE VINSON | B | F | 20050820 | 20481 | 6 | 34 | HWY | 1731106 | 19920530 | 1 | 20060219 | 13 | N | 0 | 0 | 65 | 51 | EO:07 | 1,206.10 | 012 |
| 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 | HAROLD KEITH DRAKE | W | M | 20050820 | 20481 | 6 | 34 | HWY | 1731524 | 19980928 | 0 | 20060219 | 00 | | 0 | 0 | 65 | 51 | EO:01 | 1,041.50 | 012 |
| 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 | JOHN M WILCOX | W | M | 20050903 | 20481 | 438 | 34 | HWY | 20040816 | 20040816 | 0 | 20060302 | 00 | | 0 | 0 | 26 | | EO:01 | 1,104.00 | 012 |
| 4-98-2937 | THOMAS K HARTLEY | W | M | 20050903 | 20481 | 438 | 34 | HWY | 1730974 | 19910617 | 0 | 20060302 | 39 | N | 0 | 0 | 6 | 51 | EO:11 | 1,410.80 | 012 |
| 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 | JAMES M SIMPSON | W | M | 20050903 | 20481 | 439 | 34 | HWY | 1731103 | 19910126 | 0 | 20060302 | 21 | | 0 | 0 | 48 | | EO:09 | 1,343.40 | 012 |
| 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 | TIMOTHY W WALLACE | W | M | 20050903 | 20481 | 438 | 34 | HWY | 2007300 | 19921102 | 0 | 20060302 | 21 | | 0 | 0 | 37 | | EO:05 | 1,217.00 | 012 |
| 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 | CRAIG LAVON DAVIDSON | W | M | 20050903 | 20481 | 439 | 34 | HWY | 1731104 | 19910126 | 0 | 20060302 | 00 | N | 0 | 0 | 48 | | EO:09 | 1,343.40 | 012 |
| 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 | WANDA M WEAVER | W | F | 20050903 | 20481 | 438 | 34 | HWY | 1920600 | 19910126 | 0 | 20060302 | 17 | N | 0 | 0 | 37 | | EO:11 | 1,410.80 | 012 |
| 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 | ROBERT DEWAYNE BOZEMAN | W | M | 20050903 | 20481 | 6 | 34 | HWY | 1820400 | 19980615 | 0 | 20060302 | 00 | | 0 | 0 | 6 | | EO:01 | 1,104.00 | 012 |
| 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 | BONNIE L BRACKETT | B | F | 20050903 | 20481 | 439 | 34 | HWY | 1735731 | 19940627 | 0 | 20060302 | 22 | N | 0 | 0 | 70 | 51 | EO:01 | 1,104.00 | 012 |
| 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 | MICHAEL E SMITH | W | M | 20050917 | 20481 | 6 | 34 | HWY | 1731081 | 19910126 | 0 | 20060316 | 13 | N | 0 | 0 | 2 | 17 | EO:11 | 1,410.80 | 012 |
| 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 | GLEN E JONES | W | M | 20050917 | 20481 | 438 | 34 | HWY | 1962400 | 19930503 | 0 | 20060316 | 20 | 1 | 0 | 0 | 3 | 37 | EO:01 | 1,104.00 | 012 |
| 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 | MARLON ROMAIN MCQUEEN | B | M | 20050917 | 20481 | 439 | 34 | HWY | 2119801 | 19930517 | 0 | 20060316 | 00 | N | 0 | 0 | 37 | | EO:01 | 1,104.00 | 012 |
| 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 | JACOBY DOUGLAS CHAPMAN | W | M | 20050917 | 20481 | 6 | 34 | HWY | 1731115 | 19940726 | 0 | 20060331 | 00 | | 0 | 0 | 60 | | EO:01 | 1,104.00 | 012 |
| 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 | LAMAR TILLEY | W | M | 20051001 | 20481 | 6 | 34 | HWY | 1731137 | 19920602 | 0 | 20060331 | 22 | 1 | 0 | 0 | 4 | 62 | EO:01 | 1,104.00 | 012 |
| 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 | MARY A ANDERSON | W | F | 20051001 | 20481 | 6 | 34 | HWY | 1731109 | 19910126 | 0 | 20060414 | 13 | N | 0 | 0 | 48 | | EO:07 | 1,278.50 | 012 |
| 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 | JOHN R HERSTON | W | M | 20051015 | 20481 | 439 | 34 | HWY | 1730524 | 19921102 | 0 | 20060428 | 20 | N | 0 | 0 | 16 | | EO:11 | 1,410.80 | 012 |
| 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 | LEE A YELVERTON | W | M | 20051029 | 20481 | 438 | 34 | HWY | 1730911 | 19930322 | 0 | 20060511 | 13 | 1 | 0 | 0 | 40 | | EO:07 | 1,278.50 | 012 |
| 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 | LEE B HATHCOCK | W | M | 20051112 | 20481 | 439 | 34 | HWY | 1731123 | 20030113 | 0 | 20060511 | 22 | N | 0 | 0 | 20 | | EO:01 | 1,217.00 | 012 |
| 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 | DONNA J YERBY | W | F | 20051112 | 20481 | 438 | 34 | HWY | 1734737 | 19921130 | 0 | 20060511 | 17 | N | 0 | 0 | 3 | | EO:10 | 1,376.40 | 012 |
| 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 | SUSAN A HANCOCK | W | F | 20051112 | 20481 | 438 | 34 | HWY | 1731152 | 19910126 | 0 | 20060511 | 16 | N | 0 | 0 | 54 | | EO:02 | 1,131.40 | 012 |
| 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 | JAMES R SHAVER JR | W | M | 20051126 | 20481 | 439 | 34 | HWY | 1731153 | 19980914 | 0 | 20060525 | 00 | | 0 | 0 | 7 | | EO:11 | 1,410.80 | 012 |
| 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 | JOHN WESLEY WILSON JR | W | M | 20051210 | 20481 | 6 | 34 | HWY | 1731119 | 19910126 | 0 | 20060609 | 00 | | 0 | 0 | 20 | 51 | EO:01 | 1,104.00 | 012 |
| 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 | NORMA R EZELL | B | F | 20051210 | 20481 | 7 | 34 | HWY | 1995000 | 19940531 | 0 | 20060609 | 00 | | 0 | 0 | 3 | 37 | EO:01 | 1,104.00 | 012 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

# EXHIBIT I

# SPD Data Files

**Master Activity Log Records For:**  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   JEFFERY L HOLLINGSWORTH   Race: B   Sex: M

| SSN | Action Date | Class Code | Occ | A | Cd | Dept | Position | Emp Date | Stat | Type | Probation End | End | Svc | Unearned Leave Begin | Unearned Leave End | Sep Date | Re-emp Date | R | Yrs | Days | Pay Rate | Pays | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19890103 | 20111 | 0 | 1 | 154 | HWY | 18033012 | 19890103 | 1 |  | 19890702 | 20 | N | 0 | 0 | 0 | 0 | 2 | 17 48 | 04 | 496.40 | 1 |  |
| 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 | 19890712 | 20111 | 0 | 1 |  | HWY | 18033012 | 19890103 | 1 |  | 0 | 20 | N | 0 | 0 | 0 | 0 | 2 | 17 48 | 04 | 496.40 | 1 | 012 |
| 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 | 19890715 | 20111 | 0 | 1 | 24 | HWY | 18033012 | 19890103 | 1 |  | 0 | 20 | N | 0 | 0 | 0 | 0 | 2 | 17 48 | 06 | 521.60 | 1 | 012 |
| 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 | 19900714 | 20111 | 0 | 1 | 24 | HWY | 18033012 | 19890103 | 1 |  | 0 | 20 | N | 0 | 0 | 0 | 0 | 2 | 17 48 | 07 | 534.60 | 1 | 012 |
| 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 | 19900908 | 20111 | 0 | 1 | 23 | HWY | 1803312 | 19890103 | 1 |  | 0 | 20 | N | 0 | 0 | 0 | 0 | 2 | 17 48 | 07 | 574.70 | 1 | 012 |
| 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 | 19901020 | 20111 | 0 | 1 | 34 | HWY | 1803312 | 19890103 | 1 |  | 0 | 20 | N | 0 | 0 | 0 | 0 | 2 | 17 52 | 05 | 604.40 | 1 | 012 |
| 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 | 19901103 | 20112 | 0 | 1 | 30 | HWY | 1808200 | 19890103 | 1 |  | 19910419 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 52 | 05 | 604.40 | 1 | 012 |
| 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 | 19910420 | 20112 | 0 | 1 | 24 | HWY | 1808200 | 19910126 | 1 |  | 19910419 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 52 | 06 | 619.20 | 1 | 012 |
| 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 | 19910615 | 20112 | 0 | 1 | 30 | HWY | 1808200 | 19910126 | 1 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 52 | 06 | 619.20 | 1 | 012 |
| 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 | 19920404 | 20112 | 0 | 1 | 23 | HWY | 18082000 | 19910126 | 1 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 52 | 06 | 650.20 |  | 012 |
| 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 | 19930403 | 20112 | 0 | 1 | 23 | HWY | 1808200 | 19910126 | 1 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 40 52 | 10 | 683.10 | 1 | 012 |
| 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 | 19930710 | 20112 | 0 | 1 | 30 | HWY | 1808200 | 19910126 | 1 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 40 52 | 10 | 683.10 | 1 | 012 |
| 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 | 19940402 | 20113 | 0 | 2 | 33 | HWY | 1808200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 40 52 | 12 | 717.70 | 1 | 012 |
| 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 | 19940723 | 20113 | 0 | 2 | 21 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 40 60 | 06 | 754.20 | 1 | 012 |
| 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 | 19940917 | 20113 | 0 | 2 | 204 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 19950918 | 0 | 0 | 0 | 2 | 17 60 | 06 | 814.50 | 1 | 012 |
| 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 | 19950918 | 2013 | 0 | 2 | 205 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 60 | 99 | 814.50 | 6 | 012 |
| 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 | 19951012 | 2013 | 0 | 2 | 205 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 60 | 06 | 543.00 | 1 | 012 |
| 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 | 19960706 | 2013 | 0 | 2 | 23 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 19960731 | 0 | 0 | 0 | 2 | 17 60 | 06 | 814.50 | 1 | 012 |
| 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 | 19960731 | 2013 | 0 | 2 | 204 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 2 | 0 | 0 | 2 | 17 60 | 08 | 856.30 | 1 | 012 |
| 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 | 19960805 | 2013 | 0 | 2 | 205 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 60 | 08 | 856.30 | 1 | 012 |
| 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 | 19960909 | 2013 | 0 | 2 | 144 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 19960909 | 0 | 0 | 0 | 2 | 17 60 | 08 | 856.30 | 1 | 012 |
| 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 | 19960921 | 2013 | 0 | 2 | 145 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 19960921 | 6 | 0 | 2 | 17 60 | 99 | 570.87 | 6 | 012 |
| 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 | 19970509 | 2013 | 0 | 2 | 205 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 0 | 0 | 2 | 17 60 | 08 | 856.30 | 1 | 012 |
| 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 | 19970705 | 2013 | 0 | 1 | 30 | HWY | 1996200 | 19910126 | 1 |  | 0 | 21 | N | 0 | 0 | 2 | 0 | 2 | 17 60 | 08 | 856.30 | 1 | 012 |
| 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 | 19980523 | 2013 | 0 | 1 | 30 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 2 | 0 | 2 | 17 60 | 09 | 877.70 | 1 | 012 |
| 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 | 19980602 | 20116 | 0 | 1 | 15 | HWY | 1996200 | 19910126 | 2 |  | 0 | 21 | N | 0 | 0 | 2 | 0 | 2 | 42 60 | 09 | 877.70 | 1 | 012 |
| 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 | 19980620 | 20116 | 0 | 0 | 59 | HWY | 1996200 | 19910126 | 0 | 1 | 0 | 21 | N | 0 | 0 | 0 | 0 | 1 | 42 4860 | 21 | 877.70 | 1 | 012 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

## SPD Data Files

**Master Activity Log Records For:  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   JEFFERY L HOLLINGSWORTH   Race: B   Sex: M**

| SSN | Action Date | Class Code | Occ | ADpt | Fam | Position | Emp Date | Stat | Type | Probation End | Svc | Flag | Unearned Leave Begin | Unearned Leave End | Leave | Sep Date | Reason | Re-emp Date | Rcv | Grade | Step Code | Step | Pay Rate | Pays | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19980704 | 20116 | 0 | 23 | HWY | 1996200 | 19910126 | 0 | 0 | | 21 | N | | | | | | | | 42 | 4860 | 23 | 922.30 | | 012 |
| 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 | 19980912 | 20116 | 0 | 21 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | | | | | | | | 42 | 4860 | 23 | 996.10 | | 012 |
| 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 | 19990703 | 20116 | 0 | 23 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | | | | | | | | 42 | 4860 | 25 | 1,045.80 | 1 | 012 |
| 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 | 20000701 | 20116 | 0 | 23 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 42 | 4860 | 25 | 1,098.40 | 1 | 012 |
| 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 | 20000909 | 20116 | 0 | 23 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 42 | 4860 | 27 | 1,120.40 | 1 | 012 |
| 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 | 20000923 | 20116 | 0 | 30 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 42 | 4860 | 27 | 1,120.40 | 1 | 012 |
| 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 | 20010714 | 20116 | 0 | 23 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 45 | 4860 | 29 | 1,177.50 | 1 | 012 |
| 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 | 20010908 | 20116 | 0 | 21 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 45 | 4860 | 29 | 1,201.10 | 1 | 012 |
| 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 | 20020713 | 20116 | 0 | 23 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 45 | 4860 | 30 | 1,230.50 | 1 | 012 |
| 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 | 20020907 | 20116 | 0 | 21 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 45 | 4860 | 30 | 1,267.40 | 1 | 012 |
| 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 | 20040904 | 20015 | 0 | 263 | HWY | 1996200 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 45 | 4860 | 30 | 1,267.40 | 1 | 012 |
| 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 | 20050514 | 20015 | 0 | 30 | HWY | 1735788 | 19910126 | 0 | 1 | | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 45 | 5460 | 24 | 1,330.90 | 1 | 012 |
| 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 | 20050903 | 20481 | 438 | 34 | HWY | 1735788 | 19910126 | 0 | 1 | 20051113 | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 51 | 6972 | 11 | 1,410.80 | 1 | 012 |
| 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 | 20051114 | 20481 | 438 | 21 | HWY | 1735788 | 19910126 | 0 | 1 | 20051113 | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 51 | 6972 | 11 | 1,410.80 | 1 | 012 |
| 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 | 20060214 | 20481 | 438 | 154 | HWY | 1735788 | 19910126 | 0 | 1 | 20060213 | 21 | N | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 51 | 6972 | 11 | 1,410.80 | 1 | 012 |
| 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 | 20060304 | 20481 | 438 | 154 | HWY | 1735788 | 19910126 | 0 | 1 | 20060513 | 21 | O | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 51 | 6972 | 11 | 1,343.40 | 1 | 012 |
| 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 | 20060304 | 20015 | 0 | 223 | HWY | 1731232 | 19910126 | 0 | 1 | 20060513 | 21 | O | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 41 | 5460 | 24 | 1,455.40 | 1 | 012 |
| 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 | 20060304 | 20481 | 438 | 30 | HWY | 1731232 | 19910126 | 0 | 1 | 20060513 | 21 | O | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 41 | 6972 | 11 | 1,410.80 | 1 | 012 |
| 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 | 20060901 | 20015 | 0 | 21 | HWY | 1731232 | 19910126 | 0 | 0 | | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 41 | 5460 | 24 | 1,528.20 | 1 | 012 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

**SPD Data Files**

Master Activity Log Records For:  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

ELBERT T DAVIS JR  Race: B  Sex: M

| SSN | Action Date | Class Code | Cd | Appt | Pos Type | Position | Emp Date | St | Probation End | E | S | V | Unearned Leave Begin | Unearned Leave End | Sep Date | Re-emp Date | Re Y | n0 | nA | nB | nC | Pay Rate | Pays | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19881107 | 90242 | 0 | 1 | HWY | 18362001 | 19881107 | 1 | 19890506 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 03 | 562.20 | 1 | 012 |
| 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 | 19890518 | 90242 | 0 | 154 | HWY | 18362001 | 19881107 | 1 | 0 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 03 | 562.20 | 1 | 012 |
| 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 | 19890520 | 90242 | 0 | 24 | HWY | 18362001 | 19881107 | 1 | 0 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 05 | 590.40 | 1 | 012 |
| 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 | 19900505 | 90242 | 0 | 23 | HWY | 1836201 | 19881107 | 1 | 0 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 07 | 619.80 | 1 | 012 |
| 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 | 19900908 | 90242 | 0 | 21 | HWY | 1836201 | 19881107 | 1 | 0 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 07 | 619.80 | 1 | 012 |
| 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 | 19910223 | 90242 | 0 | 68 | HWY | 2118507 | 19881107 | 1 | 19910822 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 09 | 666.30 | 1 | 012 |
| 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 | 19910223 | 90242 | 0 | 30 | HWY | 2118507 | 19881107 | 1 | 19910822 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 07 | 666.30 | 1 | 012 |
| 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 | 19910223 | 90242 | 0 | 23 | HWY | 2118507 | 19881107 | 1 | 19910822 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 11 | 666.30 | 1 | 012 |
| 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 | 19910504 | 90242 | 0 | 154 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | Y | 0 | 0 | 0 | 0 |  | 6 | 26 | 54 | 09 | 699.90 | 1 | 012 |
| 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 | 19920502 | 20112 | 0 | 23 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 6 | 51 | 52 | 13 | 735.90 | 1 | 012 |
| 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 | 19920502 | 20112 | 0 | 21 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 6 | 51 | 52 | 15 | 735.90 | 1 | 012 |
| 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 | 19930501 | 20112 | 0 | 23 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 51 | 85 | 0 | 14 | 735.90 | 1 | 012 |
| 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 | 19940514 | 20112 | 0 | 23 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 51 | 85 | 52 | 15 | 773.10 | 1 | 012 |
| 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 | 19940917 | 20112 | 0 | 154 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 51 | 85 | 52 | 15 | 834.90 | 1 | 012 |
| 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 | 19960511 | 20112 | 0 | 23 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 51 | 85 | 52 | 17 | 877.70 | 1 | 012 |
| 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 | 19970510 | 20112 | 0 | 23 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 85 | 51 | 52 | 18 | 900.00 | 1 | 012 |
| 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 | 19980620 | 20112 | 0 | 43 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 85 | 51 | 52 | 22 | 900.00 | 1 | 012 |
| 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 | 19980622 | 20116 | 0 | 144 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 19980622 | 0 | 0 | 0 |  | 85 | 51 | 52 | 22 | 900.00 | 1 | 012 |
| 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 | 19980627 | 20116 | 0 | 145 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 19980622 | 19980627 | 0 | 0 |  | 85 | 51 | 52 | 22 | 900.00 | 1 | 012 |
| 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 | 19980704 | 20116 | 0 | 23 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 85 | 51 | 52 | 23 | 922.30 | 1 | 012 |
| 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 | 19980912 | 20116 | 0 | 21 | HWY | 2118507 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 85 | 51 | 52 | 15 | 996.10 | 1 | 012 |
| 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 | 19990317 | 20116 | 0 | 120 | HWY | 0 | 19910126 | 1 | 0 | 22 | 0 | R | 0 | 0 | 19990317 | 0 | Y | 85 | 51 | 52 | 17 | 0.00 | 0 | 012 |
| 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 | 20020923 | 20116 | 0 | 1 | HWY | 1736115 | 20020923 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 85 | 51 | 4860 | 23 | 666.90 | 1 | 012 |
| 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 | 20030323 | 20116 | 0 | 154 | HWY | 1736115 | 20020923 | 1 | 20030322 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 85 | 51 | 4860 | 22 | 666.90 | 1 | 012 |
| 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 | 20030628 | 20116 | 0 | 24 | HWY | 1736115 | 20020923 | 1 | 20030622 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 51 | 49 | 4860 | 04 | 700.80 | 1 | 012 |
| 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 | 20040904 | 20111 | 0 | 263 | HWY | 1736115 | 20020923 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 49 | 49 | 4860 | 06 | 700.80 | 1 | 012 |
| 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 | 20050611 | 20111 | 0 | 23 | HWY | 1736115 | 20020923 | 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 |  | 9 | 49 | 4850 | 08 | 736.80 | 1 | 012 |

Page 1 of 2

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

## SPD Data Files

**Master Activity Log Records For:**   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   **ELBERT T DAVIS JR**   **Race: B  Sex: M**

| SSN | Action Date | Class Code | Occ | Act | Dept | Position | Emp Date | Sub Type | Probation End | Eval code | Sev code | Leave code | Unearned Leave Begin | Unearned Leave End | Leave | Sep Date | Reason | Re-emp Date | Rev | Provider | Prob | reng | Pay Rate | Pays | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20050611 | 20481 | 0 | 439 | 34 HWY | 1734588 | 20020923 | 0 1 | 20051210 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 6972 | 01 | 1,041.50 | 1 | 012 |
| 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 | 20050611 | 20481 | 0 | 439 | 30 HWY | 1734588 | 20020923 | 0 1 | 20051210 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 4850 | 08 | 736.80 | 1 | 012 |
| 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 | 20050903 | 20111 | 0 | 0 | 30 HWY | 1734588 | 20020923 | 0 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 6972 | 01 | 1,104.00 | 1 | 012 |
| 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 | 20051211 | 20481 | 439 | 21 | HWY | 1734588 | 20020923 | 0 1 | 20051210 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 6972 | 01 | 1,104.00 | 1 | 012 |
| 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 | 20060304 | 20481 | 439 | 154 | HWY | 1731264 | 20020923 | 0 1 | 20060310 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 4850 | 08 | 781.00 | 1 | 012 |
| 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 | 20060304 | 20111 | 0 | 223 | HWY | 1731264 | 20020923 | 0 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 4850 | 08 | 846.10 | 1 | 012 |
| 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 | 20060901 | 20111 | 0 | 300 21 | HWY | 1731264 | 20020923 | 0 1 | 0 | 22 | 0 | R | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 13 | 4850 | 08 | 888.40 | 1 | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

## Master Activity Log Records For:  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

**LEROY WILLIAMS**  Race: B  Sex: M

| SSN | Action Date | Class Code | C | Action | Type | Position | Emp Date | St | Probation End | Unearned Leave Begin | Unearned Leave End | Lv | RS | DC | Conv Class | Step | Pay Rate | Pays | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19940402 | 90241 | 0 | 1 | HWY | 1870909 | 19930609 | 1 | 19941001 | 0 | 0 | 0 | 55 | 51 | 48 | 04 | 533.60 | 1 | 012 |
| 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 | 19940528 | 90241 | 0 | 66 | HWY | 2118416 | 19930609 | 1 | 19941001 | 0 | 0 | 0 | 55 | 51 | 48 | 04 | 533.60 | 1 | 012 |
| 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 | 19940528 | 20111 | 0 | 30 | HWY | 2118416 | 19930609 | 1 | 00 | 0 | 0 | 0 | 85 | 51 | 48 | 04 | 533.60 | 1 | 012 |
| 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 | 19940917 | 20111 | 0 | 21 | HWY | 2118416 | 19930609 | 2 | 00 | 0 | 0 | 0 | 85 | 51 | 48 | 04 | 576.30 | 1 | 012 |
| 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 | 19950808 | 20111 | 0 | 140 | HWY | 2118416 | 19930609 | 2 | 00 | 19950808 | 19951101 | 2 | 85 | 51 | 48 | 04 | 576.30 | 1 | 012 |
| 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 | 19950911 | 20111 | 0 | 142 | HWY | 2118416 | 19930609 | 2 | 00 | 0 | 0 | 0 | 85 | 51 | 48 | 04 | 576.30 | 1 | 012 |
| 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 | 19960427 | 20111 | 0 | 20 | HWY | 2118416 | 19930609 | 2 | 00 | 0 | 0 | 0 | 85 | 51 | 4850 | 04 | 576.30 | 1 | 012 |
| 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 | 19960511 | 20111 | 0 | 23 | HWY | 2118416 | 19930609 | 2 | 00 | 0 | 0 | 0 | 85 | 51 | 4850 | 05 | 605.60 | 1 | 012 |
| 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 | 19970510 | 20111 | 0 | 23 | HWY | 2118416 | 19930609 | 2 | 00 | 0 | 0 | 0 | 85 | 51 | 4850 | 06 | 636.70 | 1 | 012 |
| 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 | 19980509 | 20111 | 0 | 43 | HWY | 2118416 | 19930609 | 2 | 00 | 0 | 0 | 0 | 85 | 51 | 4850 | 08 | 668.70 | 1 | 012 |
| 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 | 19980620 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 10 | 668.70 | 1 | 012 |
| 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 | 19980912 | 20116 | 0 | 59 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 10 | 722.30 | 1 | 012 |
| 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 | 19990327 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 10 | 722.30 | 1 | 012 |
| 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 | 19990508 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 12 | 758.50 | 1 | 012 |
| 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 | 20000506 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 14 | 796.70 | 1 | 012 |
| 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 | 20000909 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 14 | 812.60 | 1 | 012 |
| 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 | 20010505 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 14 | 853.80 | 1 | 012 |
| 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 | 20010908 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 16 | 870.90 | 1 | 012 |
| 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 | 20020504 | 20116 | 0 | 23 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 16 | 893.10 | 1 | 012 |
| 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 | 20020907 | 20116 | 0 | 21 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 17 | 919.90 | 1 | 012 |
| 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 | 20030729 | 20116 | 0 | 204 | HWY | 2118416 | 19930609 | 0 | 00 | 20030729 | 0 | 0 | 85 | 51 | 4860 | 99 | 637.53 | 6 | 012 |
| 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 | 20030804 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 0 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 17 | 919.90 | 1 | 012 |
| 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 | 20031113 | 20116 | 0 | 204 | HWY | 2118416 | 19930609 | 0 | 00 | 20031113 | 0 | 2 | 85 | 51 | 4860 | 99 | 618.95 | 6 | 012 |
| 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 | 20031208 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 17 | 919.90 | 1 | 012 |
| 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 | 20031215 | 20116 | 0 | 204 | HWY | 2118416 | 19930609 | 6 | 00 | 20031215 | 0 | 2 | 85 | 51 | 4860 | 99 | 618.95 | 6 | 012 |
| 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 | 20040216 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 | 00 | 0 | 0 | 0 | 85 | 51 | 4860 | 17 | 919.90 | 1 | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

Master Activity Log Records For:    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

SPD Data Files

**LEROY WILLIAMS**    **Race: B  Sex: M**

| SSN | Action Date | Class Code | Occup | ADapt | Position | Emp Date | Status Type | Probation End | Ed cool | sveteran | Unearned Leave Begin | Unearned Leave End | Leave | Sep Date | Reason | Re-emp Date | Rev/Pay | Pay | Pay Rate | Pays | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20040220 | 20116 | 0 | 204 | HWY | 2118416 | 19930609 | 6 1 | 00 | 0 | 20040220 | 0 | 2 | 0 | 0 | 0 | 85 51 | 4860 99 | 618.95 | 6 | 012 |
| 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 | 20040518 | 20116 | 0 | 205 | HWY | 2118416 | 19930609 | 6 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 4860 17 | 919.90 | 1 | 012 |
| 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 | 20040904 | 20116 | 0 | 263 | HWY | 2118416 | 19930609 | 6 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 11 | 919.90 | 1 | 012 |
| 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 | 20050514 | 20115 | 0 | 23 | HWY | 2118416 | 19930609 | 6 0 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 13 | 966.20 | 1 | 012 |
| 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 | 20050514 | 20115 | 7 | 34 | HWY | 1736405 | 19930609 | 0 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 6972 01 | 1,041.50 | 1 | 012 |
| 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 | 20050903 | 20481 | 7 | 21 | HWY | 1736405 | 19930609 | 0 1 | 2005113 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 13 | 1,024.20 | 1 | 012 |
| 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 | 20050903 | 20115 | 0 | 223 | HWY | 2118416 | 19930609 | 0 1 | 2005113 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 6972 01 | 1,104.00 | 1 | 012 |
| 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 | 20050903 | 20115 | 0 | 21 | HWY | 1736405 | 19930609 | 0 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 13 | 1,109.60 | 1 | 012 |
| 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 | 20060304 | 20115 | 0 | 300 | HWY | 2118416 | 19930609 | 0 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 13 | 1,166.40 | 1 | 012 |
| 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 | 20060501 | 20115 | 0 | 23 | HWY | 2118416 | 19930609 | 0 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 15 | 1,224.70 | 1 | 012 |
| 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 | 20060901 | 20115 | 0 | 21 | HWY | 2118416 | 19930609 | 0 1 | 00 | 0 | | 0 | 0 | 0 | 0 | 0 | 85 51 | 5460 15 | | | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

# EXHIBIT J

01/19/2006

**STATE OF ALABAMA**
**Personnel Department**

DEPARTMENT IDENTIFICATION (DEPT/DIV.)

HWY TRANSPORTATION
85 DESIGN

CLASSIFICATION (CODE/TITLE)

20481
TRANSPORTATION TECHNOLOGIST

CLASS OPTION (CODE/TITLE)

7    HIGHWAY DESIGN

00903992

| REGISTER TYPE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CONTINUOUS OPEN COMP 1 PERMANENT | | | | | | | | | |

METHOD OF CERTIFICATION

MERIT SYSTEM PLUS TIES

EMPLOYMENT TYPE

PERMANENT

COUNTY

51 MONTGOMERY

POSITION NUMBERS

1736405  2111400  1855900

VACANCIES

3

SELECTIVE CERTIFICATION CODE

050900398 ML

| SSAN | NAME AND ADDRESS | RACE | V.P. | GRADE | SEX | ACT. | POSITION NO. OF APPT. | APPT. DATE |
|---|---|---|---|---|---|---|---|---|
| 416294533 | GRANTHAM CHANNIN K 898 CO. RD. 208 JACK AL 36346 | 1 | | 25.63 | A | | 1736405 $1,104.00 | 3/4/06 Step 1 |
| 420905211 | GRAY ROBERT E 2843 TROTTERS TRL WETUMPKA AL 36093 | 1 | | 19.14 | H | | 1855900 $1,104.00 | 3/4/06 Step 1 |
| 417023610 | MCKINNON WILLIAM G JR 523 CO. RD. 55 CLANTON AL 35046 | 1 | | 18.93 | A | | 2111400 $1,104.00 | 3/4/06 Step 1 |
| 021460673 | GRESHAM ROBERT 3840 PINE FOREST AVE MONTGOMERY AL 36116 | 2 | 10 | 16:04 L | | | | |
| 417272093 | WHALEY ROBERT E 1958 HWY 10 CLIO AL 36017 | 1 | | 11.75 | A | | | 3/4/06 Step 1 |

*** END OF LIST ***

CERTIFIED PERSONNEL DIRECTOR

DATE CERTIFIED
1/19/06

IMPORTANT: SEE INSTRUCTIONS ON REVERSE SIDE

CERTIFICATION RETURNED APPOINTING AUTHORITY

DATE RETURNED
3/1/06

ORIGINAL

# EXHIBIT K

# K-1

# Design Bureau
# 0850

## as of March 15 2006
run as March 22 2006

---

**Survey Party Chief**
Transportation Technologist
01#55#00
Robert S Whaley
White    M  X  Location

**Senior Survey Technician**
Engineering Asst II/III
01735840
VACANT 04/16/2005
Location

**Field Crew Supv**
Transportation Technologist
01736408
Chassin K Grantham
White    M    Location

# K-2



Design Bureau
0850

as of September 15 2005
run on September 20 2005

# K-3

# Design Bureau
# 0850

# as of September 15 2005
### run on September 20 2005



**K-4**

# Design Bureau
# 0850

## as of July 15 2005
### run on August 01 2005



# K-5

# Design Bureau
# 0850

## as of July 15 2005
### run on August 01 2005

**Asst Location Engr**
Transportation Manager
02318107
Joe E Jones
White    M    X    Location

---

**Location Tech**
Prof Civil Engineer Trainee
01730182
VACANT 10/25/2004
Location
Troy L Nichols
White    M    X    Location

**Survey Party Chief**
Transportation Technolgst-Sr
02111100
VACANT 03/22/2003
X    Location

**Field Crew Supv**
Transportation Technolgst
01730406
Larry Williams
Black    M    Location

**Survey Technician**
Engineering Asst I/II
02115100
VACANT 04/17/2004
Location

**Survey Technician**
Engineering Asst I/II
02115100
VACANT 09/12/2004
Reotley Doe

**Survey Party Chief**
Transportation Technolgst-Sr
02111100
VACANT 09/12/2001
Location

**Survey Technician**
Engineering Asst I/II
01740200
VACANT 09/12/2003
Location

**Survey Technician**
Engineering Asst I/II
02108000
VACANT 04/12/2003
Location

**Data Editor**
Transportation Technolgst
02114900
William D Austin
White    M    X    Location

**Location Tech**
Engineering Asst I/II
01682300
Marlon Demetrius Urquhart
Black    M    Location

**Survey Party Chief**
Transportation Technolgst-Sr
02111000
VACANT 06/01/2005
X    Location

**Field Crew Supv**
Transportation Technolgst
01724300
Thomas W Lewis
White    M    X    Location

**Senior Survey Technician**
Engineering Asst I/II
02116015
Chervoh K Streetham
White    M    Location

**Survey Technician**
Engineering Assistant I
02118300
Roddick J Jones
Black    M    Roseday Doe

**Survey Technician**
Engineering Assistant I
01740612
Rodney J Sanders
Black    M    Location

**Survey Technician**
Engineering Assistant I
02118307
Daniel O Boyd
Black    M    Location

**Survey Technician**
Engineering Assistant I
01730675
Nathaniel R Nicoll
Black    M

**Survey Technician**
Transportation Technolgst
02118002
VACANT 06/28/2004
Location

**Instrument Person**
Transportation Technolgst
02100530
Herman C Harris
White    M    Location

**Field Crew Supv**
Transportation Technolgst
01723000
Lawrence N Brown
White    M    X    Location

**Survey Technician**
Engineering Asst I/II
01740216
Brandon N Ward
White    M    Location

**Survey Technician**
Engineering Assistant I
01730859
Matthew L Anderson
White    M

**Survey Technician**
Engineering Assistant I
VACANT

# K-6

# Design Bureau
## 0850

### as of August 15 2005
run on August 30 2005



# EXHIBIT L

**SPD Data Files**

**Master Activity Log Records For:**    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    CHANNIN K GRANTHAM    Race: W  Sex: M

| SSN | Action Date | Class Code | Occup Type | | | Position | Emp Date | Probation End | Sub Type | Educ | Sev Uncarned Leave Begin | Uncarned Leave End | Sep Date | Re-emp Date | Recl Provisionary Pay cap | | | | Pay Rate | Pay by Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20030825 | 20116 | 0 | 1 | HWY | 2118513 | 20030825 | 20040224 | 00 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 | 08 | 736.80 | 1 012 |
| 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 | 20040306 | 20116 | 0 | 24 | HWY | 2118513 | 20030825 | 0 | 00 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 4860 | 10 | 774.00 | 1 012 |
| 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 | 20040904 | 20115 | 0 | 263 | HWY | 2118513 | 20030825 | 0 | 00 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 5460 | 04 | 774.00 | 1 012 |
| 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 | 20050903 | 20115 | 0 | 21 | HWY | 2118513 | 20030825 | 0 | 00 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 5460 | 04 | 820.40 | 1 012 |
| 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 | 20060304 | 20481 | 7 | 300 | HWY | 1736405 | 20030825 | 20060903 | 1 | 00 | 0 | 0 | 0 | 0 | 85 | 51 | 6972 | 01 | 1,196.00 | 1 012 |
| 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 | 20060304 | 20481 | 7 | 34 | HWY | 1736405 | 20030825 | 20060903 | 1 | 00 | 0 | 0 | 0 | 0 | 85 | 51 | 6972 | 01 | 1,104.00 | 1 012 |
| 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 | 20060304 | 20115 | 0 | 23 | HWY | 2118513 | 20030825 | 0 | 00 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 5460 | 06 | 861.70 | 1 012 |
| 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 | 20060901 | 20481 | 7 | 21 | HWY | 1736405 | 20030825 | 20060903 | 1 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 6972 | 01 | 1,255.80 | 1 012 |
| 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 | 20060916 | 20481 | 7 | 24 | HWY | 1736405 | 20030825 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 85 | 51 | 6972 | 03 | 1,318.60 | 1 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

Application Records For:    **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**    **CHANNIN K GRANTHAM**    **Race W Sex M**

| SSN | Class Code | Title | Opt In | Action Date | Act Code | Location 1 2 3 4 5 6 7 | Department 1 2 3 | Veteran | W Trait Ring | Trait O | Sub Sup | Sub Sup Score | Sub Sup Total | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20116 | ENGINEERING ASSISTANT(T) | n 0 | 20021114 | 30 | 16 17 0 0 94 90 91 | 00 00 00 | N | 97.67 | 0 | 0 | 0 | 0 | 97.67 | 0 | 0 | 0 |
| 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 | 20481 | TRANSPORTATION TECHNOL | 5 | 20050808 | 05 | 16 17 0 0 90 91 94 | 00 00 00 | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 20481 | TRANSPORTATION TECHNOL | 438 | 20050811 | 05 | 16 17 0 0 90 91 94 | 00 00 00 | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | 20481 | TRANSPORTATION TECHNOL | 7 | 20051109 | 30 | 16 17 0 0 90 91 94 | 00 00 00 | N | 0 | 0 | 0 | 0 | 25.63 | 25.63 | 0 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

# SPD Data Files

## Certificate of Eligibles Records For:   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     CHANNIN K GRANTHAM

### Race: W  Sex: M

| SSN | Name | Race | Sex | Class Code | Option | Position Number | Final Action | Final Action Date | Certificate Number | Certified Out Date | Date Placed on Register | Register Date | Type | Grade | County | Dept | Div | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 0 | B | 20030806 | 20040160 | 20030409 | 20030103 | 200102 | 1 | 97.67 | 51 | HWY | 65 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 0 | V | 20030409 | 20040160 | 20030331 | 20030103 | 200102 | 1 | 97.67 | 51 | HWY | 65 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 0 | F | 20030702 | 20500303 | 20030409 | 20030103 | 200102 | 1 | 97.67 | 41 | HWY | 4 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 0 | F | 20030709 | 20500304 | 20030409 | 20030103 | 200102 | 1 | 97.67 | 57 | HWY | 4 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 0 | L | 20030929 | 20700081 | 20030606 | 20030103 | 200102 | 1 | 97.67 | 51 | HWY | 70 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 0 | B | 20030606 | 20700081 | 20030224 | 20030103 | 200102 | 1 | 97.67 | 51 | HWY | 70 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20116 | 0 | 2118513 | A | 20030827 | 30100231 | 20030123 | 20030103 | 200102 | 1 | 97.67 | 51 | HWY | 85 | 94 | 90 | 91 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20481 | 7 | 1736405 | A | 20060306 | 50900398 | 20060119 | 20060110 | 200402 | 1 | 25.63 | 51 | HWY | 85 | 90 | 91 | 94 | 0 | 0 | 0 | 0 |
| 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 | CHANNIN K GRANTHAM | W | M | 20481 | 7 | 0 | D | 20060324 | 60100171 | 20060112 | 20060110 | 200402 | 1 | 25.63 | 51 | HWY | 85 | 90 | 91 | 94 | 0 | 0 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

# EXHIBIT M



# ALABAMA DEPARTMENT OF TRANSPORTATION
*Design Bureau*
1409 Coliseum Boulevard, Montgomery, Alabama 36110
P. O. Box 303050, Montgomery, Alabama 36130-3050
*Phone: 334-242-6178     FAX: 334-269-0826*

*Bob Riley*
*Governor*

*Joe McInnes*
*Transportation Director*

August, 18 2005

## MEMORANDUM

To: Joe E. Jones
     Location Engineer Field

From: Thomas W. Lewis
     Chief of Party

RE: <u>Crew Meeting</u>

Mr. Jones on Monday the 15th of August I held a crew meeting before the crew went out to the field. Present was Leroy Williams, Field Supervisor, Transportation Technician, Channin Grantham, EA-II/III, Rodney Sanders, EA-I, Robbie Jones, EA-I and Michel Crowe EA-I.

I started the meeting informing the crew that some very serious charges had been brought against me. They were that I had been harassing and degrading Mr. Williams in front of the crew on a regular basis. I asked each member of the crew one by one if they had seen this happen.

Mr. Sanders spoke first and he explained that he thought that I was holding Mr. Williams to too high of a standard for a new supervisor. He understood that I had been a supervisor for some time and he thought I should not expect as much out of Leroy because he was a new supervisor. Nothing was said about me harassing or degrading Mr. Williams.

Ms. Jones told me, I feel the same was as Mr. Sanders I feel like you should not expect quite so much out of Mr. Williams because he was a new supervisor.

1

I explained that I understood their concerns but the question was "Have you seen me harass or degrade Mr. Williams at any time". They both told me, "No" they had not seen me do that.

I asked Mr. Crowe. He replied "No" I have not seen that. I then turned to Mr. Grantham he also told me he had not seen that take place.

Later that day I drove to Tuscaloosa where Mr. Austin was working. I explained the charges that were brought against me. He told me he had never seem me treat Mr. Williams in that manner.

Mr. Jones I do not understand why he would accuse me of that in front of you without proof. This bothers me. It makes me think it was all to take the attention away for the real problem; his insubordination. I think with further investigation you will come to the same conclusions.

Thomas W. Lewis
Chief of party

2

# EXHIBIT N

## SPD Data Files

### Master Activity Log Records For: 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     THOMAS W LEWIS     Race: W  Sex: M

| SSN | Action Date | Class Code | Occ | Obj | Dep | Position | Emp Date | Step | Shift Type | Probation End | Hrs | Svc | Unearned Leave Begin | Unearned Leave End | Lve | Sep Date | Re-cmp Date | R1 | R2 | Yrs | Mos | Pay Rate | Pay basis | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19840402 | 90101 | 0 | 9 | HWY | 21103000 | 19840402 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 | 06 | 344.60 | 1 | |
| 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 | 19840915 | 90101 | 0 | 21 | HWY | 21103000 | 19840402 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 | 06 | 379.20 | 1 | |
| 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 | 19850413 | 90101 | 0 | 23 | HWY | 21103000 | 19840402 | 0 | 0 | 0 | 12 | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 | 08 | 398.60 | 1 | |
| 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 | 19850902 | 90101 | 0 | 102 | HWY | 21205000 | 19840402 | 0 | 0 | 19860302 | 13 | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 | 04 | 462.00 | 1 | |
| 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 | 19860315 | 20111 | 0 | 24 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 | 06 | 485.40 | 1 | |
| 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 | 19870314 | 20111 | 0 | 23 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 | 08 | 510.00 | 1 | |
| 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 | 19880312 | 20111 | 0 | 23 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 10 | 535.60 | 1 | |
| 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 | 19880910 | 20111 | 0 | 21 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 12 | 576.00 | 1 | |
| 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 | 19890311 | 20111 | 0 | 23 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 12 | 604.80 | 1 | |
| 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 | 19900310 | 20111 | 0 | 23 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 14 | 635.40 | 1 | |
| 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 | 19900613 | 20111 | 0 | 148 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 19900613 | 19900723 | 7 | 0 | 0 | 0 | 51 | 48 | 14 | 635.40 | 1 | |
| 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 | 19900712 | 20111 | 0 | 156 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 19900613 | 19900723 | 0 | 19900629 | 0 | 0 | 51 | 48 | 14 | 635.40 | 1 | |
| 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 | 19900719 | 20111 | 0 | 156 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 14 | 635.40 | 1 | |
| 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 | 19900719 | 20111 | 0 | 143 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 14 | 635.40 | 1 | |
| 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 | 19900719 | 20111 | 0 | 155 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 19900613 | 19900723 | 0 | 0 | 0 | 0 | 51 | 48 | 14 | 635.40 | 1 | |
| 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 | 19900908 | 20111 | 0 | 21 | HWY | 21205000 | 19840402 | 1 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 14 | 683.10 | 1 | |
| 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 | 19900908 | 20111 | 0 | 34 | HWY | 2028900 | 19840402 | 1 | 19910307 | 0 | 17 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 48 | 14 | 683.10 | 1 | |
| 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 | 19900912 | 20112 | 0 | 34 | HWY | 2028800 | 19840402 | 0 | 19910307 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 52 | 12 | 717.70 | 1 | |
| 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 | 19910309 | 20112 | 0 | 34 | HWY | 2028900 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 52 | 08 | 754.20 | 1 | |
| 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 | 19910727 | 20113 | 0 | 34 | HWY | 2118103 | 19910126 | 1 | 19920126 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 08 | 792.90 | 1 | 012 |
| 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 | 19920208 | 20113 | 0 | 24 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 10 | 833.30 | 1 | 012 |
| 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 | 19930206 | 20113 | 0 | 23 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 12 | 874.60 | 1 | 012 |
| 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 | 19940917 | 20113 | 0 | 21 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 12 | 918.50 | 1 | 012 |
| 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 | 19940205 | 20113 | 0 | 144 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 14 | 992.00 | 1 | 012 |
| 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 | 19950109 | 20113 | 0 | 144 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 19950109 | 19950112 | 6 | 0 | 0 | 0 | 51 | 60 | 14 | 992.00 | 1 | 012 |
| 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 | 19950109 | 20113 | 0 | 145 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 14 | 992.00 | 1 | 012 |
| 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 | 19950112 | 20113 | 0 | 144 | HWY | 2118103 | 19910126 | 1 | 0 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 14 | 992.00 | 1 | 012 |
| 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 | 19960203 | 20113 | 0 | 23 | HWY | 2118103 | 19910126 | 0 | 1 | 17 | 0 | N | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 60 | 16 | 1,042.00 | 1 | 012 |

Page 1 of 2

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

**SPD Data Files**

Master Activity Log Records For:  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          THOMAS W LEWIS          Race: W  Sex: M

| SSN | Action Date | Class Code | Occ | Act Cd | Dept | Position | Emp Date | Status Type | Probation End | Educ | Vet | Unearned Leave Begin | Unearned Leave End | Sep Date | Re-emp Date | | | Pay Rate | Agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 19970201 | 20113 | 0 | 23 | HWY | 2118103 | 19910126 | 0 | | 17 | 0 | | | 0 | 0 | 85 | 51 | 1,095.00 | 012 |
| 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 | 19860620 | 20116 | 0 | 23 | HWY | 2118103 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,095.00 | 012 |
| 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 | 19980815 | 20480 | 0 | 15 | HWY | 1734366 | 19910126 | 0 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,150.00 | 012 |
| 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 | 19980912 | 20480 | 0 | 33 | HWY | 1734366 | 19910126 | 2 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,242.00 | 012 |
| 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 | 19901116 | 20480 | 439 | 170 | HWY | 1734366 | 19910126 | 2 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,242.00 | 012 |
| 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 | 19990327 | 20480 | 439 | 59 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,242.00 | 012 |
| 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 | 19990814 | 20480 | 439 | 23 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,242.00 | 012 |
| 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 | 20000812 | 20480 | 439 | 23 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,304.60 | 012 |
| 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 | 20000814 | 20480 | 439 | 144 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | 20000814 | 0 | 0 | 85 | 51 | 1,369.70 | 012 |
| 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 | 20000826 | 20480 | 439 | 145 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | 20000826 | 0 | 0 | 85 | 51 | 1,369.70 | 012 |
| 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 | 20000909 | 20480 | 439 | 21 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,369.70 | 012 |
| 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 | 20010811 | 20480 | 439 | 23 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,397.10 | 012 |
| 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 | 20010908 | 20480 | 439 | 21 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,431.30 | 012 |
| 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 | 20020810 | 20480 | 439 | 23 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,459.90 | 012 |
| 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 | 20020810 | 20480 | 439 | 21 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,532.00 | 012 |
| 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 | 20020907 | 20480 | 439 | 263 | HWY | 1734366 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,578.30 | 012 |
| 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 | 20040904 | 20481 | 439 | 21 | HWY | 1734366 | 19910126 | 0 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,578.30 | 012 |
| 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 | 20050419 | 20481 | 7 | 170 | HWY | 1910126 | 19910126 | 0 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,578.30 | 012 |
| 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 | 20050806 | 20481 | 7 | 23 | HWY | 1734366 | 19910126 | 0 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,578.30 | 012 |
| 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 | 20050903 | 20481 | 7 | 25 | HWY | 1734366 | 19910126 | 0 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,657.40 | 012 |
| 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 | 20060218 | 20481 | 7 | 34 | HWY | 1910126 | 19910126 | 0 | 20060817 | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,756.80 | 012 |
| 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 | 20060304 | 20482 | 7 | 300 | HWY | 2119200 | 19910126 | 0 | 20060817 | 17 | 0 | N | | 0 | 0 | 85 | 51 | 1,846.30 | 012 |
| 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 | 20060901 | 20482 | 7 | 24 | HWY | 2119200 | 19910126 | 1 | 20060817 | 17 | N | N | | 0 | 0 | 85 | 51 | 2,000.20 | 012 |
| 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 | 20060901 | 20482 | 7 | 21 | HWY | 2119200 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 2,204.80 | 012 |
| 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 | 20060901 | 20482 | 7 | 21 | HWY | 2119200 | 19910126 | 1 | | 17 | 0 | N | | 0 | 0 | 85 | 51 | 2,100.20 | 012 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

## SPD Data Files

Application Records For:    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    THOMAS W LEWIS    Race W Sex M

| SSN | Class Code | Title | O P T | Action Date | A C T I V E C O D E | S E L E | Location 1 2 3 4 5 6 7 | Department 1 2 3 | Veteran | W r i t t e n | O r a l | S u p p | S u p v i s e | P e r f o r m | O t h e r | Final Score OC PR | Final Rank OC PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | 20011 | ENGINEERING ASSISTANT I | 0 | 19831122 | 00 23 13 | 0 | 0 94 92 90 89 86 82 81 | | N | 86.87 | 0 | 0 | 0 | 0 | 0 | 86.87 0 | 0 305 |
| 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 | 20112 | ENGINEERING ASSISTANT I/IT | 0 | 19850417 | 18 23 13 | 0 | 1 95 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 | 0 0 |
| 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 | 20112 | ENGINEERING ASSISTANT I/IT | 0 | 19890617 | 30 23 17 | 0 | 2 95 87 90 91 92 94 82 HWY | | N | 95.16 | 0 | 0 | 0 | 87.08 | 0 | 95.16 94.35 | 0 0 |
| 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 | 20113 | ENGINEERING ASST II(IT) | 0 | 19910112 | 30 23 17 | 0 | 51 00 00 00 00 00 00 | | N | 94.18 | 0 | 0 | 0 | 0 | 0 | 94.18 0 | 0 0 |
| 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 | 20483 | TRANSPORTATION MANAGER | 0 | 20021114 | 12 23 13 | 0 | 51 95 23 00 00 00 00 HWY | | N | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 | 0 0 |
| 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 | 20482 | TRANSPORTATION TECHNLGS | 7 | 20050427 | 30 23 13 | 0 | 95 90 23 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 0 | 8.39 | 8.39 0 | 0 0 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

# SPD Data Files

**Certificate of Eligibles Records For: 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    THOMAS W LEWIS    Race: W  Sex: M**

| SSN | Name | Race | Sex | Class Code | Option | Position Number | Final Action | Final Action Date | Certificate Number | Certified Out Date | Date Placed on Register | Register Date | Type | Grade | County | Dept | Div | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891004 | 89080008 | 89080828 | 19980803 | 199808 | 2 | 94.35 | 13 | HWY | 8 | 95 | 87 | 90 | 91 | 92 | 94 | 82 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891101 | 89080115 | 89080816 | 19980803 | 199808 | 2 | 94.35 | 17 | HWY | 2 | 95 | 87 | 90 | 92 | 94 | 82 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891013 | 89090013 | 19890913 | 19980803 | 199808 | 2 | 94.35 | 28 | HWY | 3 | 95 | 87 | 90 | 92 | 94 | 82 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | L | 19890921 | 89090203 | 19890913 | 19980803 | 199808 | 2 | 94.35 | 36 | HWY | 1 | 95 | 87 | 90 | 92 | 94 | 82 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | L | 19891007 | 19010070 | 19891004 | 19980803 | 199808 | 2 | 94.35 | 49 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891106 | 89100365 | 19891024 | 19980803 | 199808 | 2 | 94.35 | 2 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891226 | 89100565 | 19891130 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891226 | 89100411 | 19891024 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19911130 | 89110411 | 19891130 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19910411 | 89120183 | 19891226 | 19980803 | 199808 | 2 | 94.35 | 49 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900207 | 89120183 | 19891226 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19891226 | 89110411 | 19891226 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900416 | 89120183 | 19891226 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900303 | 90030203 | 19891214 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 6 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 89120183 | 89120183 | 19891214 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 6 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900313 | 90030203 | 19900313 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 6 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900409 | 90000569 | 19900516 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900328 | 90000569 | 19900516 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900416 | 90000159 | 19900406 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900516 | 90400159 | 19900406 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900529 | 90400212 | 19900427 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900427 | 90400212 | 19900427 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900427 | 90400212 | 19900427 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | V | 19900411 | 90000411 | 19900411 | 19980803 | 199808 | 2 | 94.35 | 49 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900518 | 90050355 | 19900516 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900619 | 90050596 | 19900516 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900619 | 90050516 | 19900516 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900619 | 90050310 | 19900531 | 19980803 | 199808 | 2 | 94.35 | 49 | HWY | 0 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900710 | 90050642 | 19900531 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 70 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900620 | 90000157 | 19900612 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 75 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | V | 19900802 | 90600612 | 19900622 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 70 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900802 | 90600456 | 19900622 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900807 | 90700076 | 19900702 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900807 | 90700076 | 19900726 | 19980803 | 199808 | 1 | 95.16 | 49 | HWY | 65 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900810 | 90800320 | 19900831 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900831 | 90800320 | 19900816 | 19980803 | 199808 | 1 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | C | 19900831 | 90800320 | 19900831 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 6 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | L | 19900918 | 90800366 | 19900816 | 19980803 | 199808 | 2 | 94.35 | 70 | HWY | 6 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | L | 19900914 | 90800366 | 19900828 | 19980803 | 199808 | 2 | 94.35 | 51 | HWY | 85 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20112 | 0 | 0 | A | 2028900 | 90800828 | 19910523 | 19910228 | 199001 | 1 | 94.18 | 51 | HWY | 85 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20013 | 0 | 0 | A | 19910613 | 91050375 | 19910523 | 19910228 | 199001 | 1 | 94.18 | 51 | HWY | 85 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20013 | 0 | 2118103 | A | 19910722 | 91050572 | 19910531 | 19910228 | 199001 | 1 | 94.18 | 51 | HWY | 85 | 51 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 2119200 | A | 20060227 | 51000050 | 20051222 | 20050913 | 200509 | 1 | 8.39 | 51 | HWY | 85 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 0 | A | 20060212 | 51000050 | 20051110 | 20050913 | 200509 | 1 | 8.39 | 13 | HWY | 8 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 0 | L | 20060124 | 51100177 | 20051110 | 20050913 | 200509 | 1 | 8.39 | 13 | HWY | 8 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 0 | D | 20060504 | 60200111 | 20060207 | 20050913 | 200509 | 1 | 8.39 | 51 | HWY | 85 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

# SPD Data Files

Certificate of Eligibles Records For:   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    THOMAS W LEWIS    Race: W   Sex: M

| SSN | Name | Race | Sex | Class Code | Option | Position Number | Final Action | Final Action Date | Certificate Number | Certified Out Date | Date Placed on Register | Register Date | Type | Grade | County | Dept | Div | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19891004 | 89080098 | 19890912 | 19890803 | 198908 | 2 | 94.35 | 13 | HWY | 8 | 95 | 87 | 90 | 91 | 92 | 94 | 82 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19891101 | 890900115 | 19891013 | 19890803 | 198908 | 2 | 94.35 | 17 | HWY | 2 | 95 | 87 | 90 | 91 | 92 | 94 | 82 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19890921 | 890900203 | 19890913 | 19890803 | 198908 | 2 | 94.35 | 28 | HWY | 3 | 95 | 87 | 90 | 91 | 92 | 94 | 82 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | L | 19891027 | 89100070 | 19891004 | 19890803 | 198908 | 2 | 94.35 | 36 | HWY | 1 | 95 | 87 | 90 | 91 | 92 | 94 | 82 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19891106 | 891000365 | 19891024 | 19890803 | 198908 | 2 | 94.35 | 2 | HWY | 9 | 95 | 87 | 90 | 91 | 92 | 94 | 82 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19891226 | 891100411 | 19891130 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900207 | 891100411 | 19891226 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900103 | 89120183 | 19891214 | 19890803 | 198908 | 2 | 94.35 | 49 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900416 | 90320203 | 19900313 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 6 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900409 | 900300569 | 19900328 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900516 | 900400159 | 19900406 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900529 | 900400212 | 19900427 | 19890803 | 198908 | 2 | 94.35 | 49 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900427 | 900400212 | 19900406 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900518 | 900400355 | 19900419 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900619 | 900500310 | 19900516 | 19890803 | 198908 | 2 | 94.35 | 49 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900619 | 900500530 | 19900516 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | V | 19900710 | 900500642 | 19900531 | 19890803 | 198908 | 2 | 94.35 | 70 | HWY | 70 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900620 | 900600157 | 19900612 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 75 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900802 | 900600456 | 19900622 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 65 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900807 | 900700456 | 19900702 | 19890803 | 198908 | 1 | 94.35 | 51 | HWY | 65 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900910 | 900700476 | 19900726 | 19890803 | 198908 | 1 | 95.16 | 49 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | C | 19900831 | 900800320 | 19900814 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | L | 19900918 | 900800320 | 19900831 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 9 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | L | 19900914 | 900800366 | 19900816 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 70 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 2028900 | A | 19900914 | 900800828 | 19900831 | 19890803 | 198908 | 2 | 94.35 | 51 | HWY | 85 | 51 | 23 | 49 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | A | 19900613 | 910500375 | 19910523 | 19890803 | 198908 | 2 | 94.18 | 51 | HWY | 85 | 51 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2013 | 0 | 2118103 | A | 19910722 | 910500572 | 19910531 | 199001 | 199001 | 1 | 94.18 | 51 | HWY | 85 | 51 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2013 | 0 | 0 | C | 19910613 | 910500375 | 19910523 | 199001 | 199001 | 1 | 94.18 | 51 | HWY | 85 | 51 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 2012 | 0 | 0 | A | 20060227 | 51000050 | 20051220 | 20050913 | 200509 | 1 | 8.39 | 51 | HWY | 85 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 2119200 | A | 20060227 | 51000050 | 20051220 | 20050913 | 200509 | 1 | 8.39 | 51 | HWY | 85 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 0 | L | 20060124 | 51100177 | 20051110 | 20050913 | 200509 | 1 | 8.39 | 13 | HWY | 8 | 51 | 0 | 0 | 0 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20482 | 7 | 0 | D | 20060504 | 60200111 | 20060207 | 20050913 | 200509 | 1 | 8.39 | 51 | HWY | 85 | 95 | 90 | 23 | 0 | 0 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

# EXHIBIT O

# HUMAN RESOURCES BUREAU

# OUT OF CLASSIFICATION REPORT

# ARTICLE 14, PARAGRAPH 1-3

# ARTICLE 15, PARAGRAPH 4



# ALABAMA DEPARTMENT OF TRANSPORTATION
1409 Coliseum Boulevard, Montgomery, Alabama 36130-3050



**Bob Riley**
*Governor*

July 15, 2005

*Joe McInnes*
*Transportation Director*

## M E M O R A N D U M

**TO:**     Mr. Frank Topping
            Bureau Chief, Human Resources Bureau

**FROM:**   Ronald J. Green
            Personnel Director

**BY:**     Vivian Handy
            Assistant Bureau Chief, Personnel Bureau

**RE:**     **Requests for Out-of-Classification Assignments**
            **June 16, 2005 – July 15, 2005**


The following ALDOT employees were approved for out-of-class assignment during the June 16, 2005 through July 15, 2005 reporting period.

| Employee Name | Location | Current Classification | Out-of-Classification |
|---|---|---|---|
| 1. Thomas Lewis | Design | Transp. Tech. | Transp. Tech. Sr. |
| 2. Wayne Bates | Design | Transp. Tech. | Transp. Tech. Sr. |


NOTE: Two (2) employees from First Division, one (1) from Second Division, one (1) from Fourth Division, three (3) from Fifth Division, one (1) from Eighth Division, one (1) from Office Engineer, one (1) from Computer Services, one (1) from Finance, and one (1) from Human Resources were reported as no longer working out- of -class.


Our records indicate that at this time ALDOT has a total of eleven (11) employees working in out-of-classification assignments.


Should you have any questions or need further clarification, please contact Ms. Felecia Thomas of the Personnel Bureau at 2-6746.


VEH/FDT
Attachments
cc:     Mr. Jim R. Ippolito, Jr.
        Robert Baugh, Esquire
        Consent Decree Monitor
        Alice Anne Byrne
        Maury Buster
        David Mellon, Esquire
        File



**REQUEST FOR OUT-OF-CLASSIFICATION ASSIGNMENT**

**MEMORANDUM**

TO:            Mr. Joe McInnes
               Transportation Director

FROM:          Don T. Arkle
               Design Bureau Chief

Person requesting to fill vacancy as an Out-of-Classification Assignment:    William F. Adams

Location:   Design Bureau/Location Section   Date of Vacancy:    5/16/05

Classification:   Transp. Administrator      In-House Title:        Location Engineer

---

Previous Incumbent's:

Name:   Joe G. King              Social Security Number: 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   Race: W

Sex:   M      Classification:  Transp. Tech. Sr.   In-House Title
                                                   of Vacant Position:   Party Chief

---

Proposed Individual's:

Name:   Thomas W. Lewis        Social Security Number:  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   Race:   W

Sex:   M      Current Classification: Transp. Tech.   Current In-House Title:   Field Supervisor

---

Date of proposed Out-of-Classification Assignment:   5/16/05

Reason for Out-of-Classification Assignment (Explain circumstances upon which position became vacant, i.e. resignation, retirement, etc.; and list reason for selecting the person you selected to fill the position):

   Previous incumbent retired.
   Mr. Lewis was selected because of his supervisory experience as well as his location
   survey experience.
Duration of Out-of-Classification Assignment:   Until a register is available

Person making selection:   William F. Adams

Disapproved:_____        Approved:_____
            Joe McInnes                              Joe McInnes
            Transportation Director                  Transportation Director

                          Date:   7-11-05

# LIST OF CANDIDATES CONSIDERED FOR OUT-OF-CLASSIFICATION ASSIGNMENT

Out of Classification Assignment  Transp. Tech., Sr.
(Classification/Position Number)

Location  Design Bureau/Location Section
(Location-Bureau/Division/District, etc.)

| | Candidate Name | Social Security Number | Race/Gender | Current Classification |
|---|---|---|---|---|
| 1. | None | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

## Voluntary Acceptance of Additional/New Ties, Tasks and Assignment

I, Thomas L. Lewis _____ have been requested William F. Adams _____
(Employee Name)                                              (ALDOT Supervisor)
to temporarily perform duties, tasks, assignments and/or work which are not normally

assigned and/or associated with my current job classification of Transportation Tech. or are
duties, tasks and assignments associated with a different classification, that being
Transportation Tech. Sr. ___ It has been explained by ___ William F. Adams _____
(ALDOT Location Engineer)
these additional duties, task, and assignments consist of (list duties) Secure office space,
give instructions to subordinates to resolve problems, monitor employee
work and make accurate performance appraisals, operate a personal computer
so that payroll, expense accounts, lease agreements, utility payments,
material requisitions, and project memorandum are processed, analyze
project requirements and set accurate deadline, oversee the compilation
of data on a PC, and coordinate training for subordinates.

It has been explained and I understand that I am being requested to perform these tasks freely and
voluntarily without change of status, classification, salary or benefits. It has also been explained
and I understand that these duties, tasks, and assignments are being made temporarily.

I freely and voluntarily accept this assignment of tasks and duties for my own personal reasons,
but also to assist the Department in accomplishing it mission. By voluntarily accepting these tasks
and duties, I agree that I will not initiate or have initiated on my behalf any legal, administrative
or other action of any nature whatsoever involving my acceptance and/or performance of these
duties, tasks and/or assignments.

To the extent that I have previously been requested to perform new and additional duties, tasks,
and/or assignments, or am currently performing additional duties, tasks and/or assignments, I
hereby freely and voluntarily accept those assignments and will not initiate or have initiated on
my behalf any legal, administrative or other action of any nature whatsoever involving my
acceptance and/or performance of these duties, tasks and/or assignments. I understand that if I
decline to voluntarily accept these duties, tasks and/or assignments by executing this document,
appropriate work adjustments will be made to reassign those duties, tasks, and/or assignments.

Employee Signature

5-16-05
Date

Witnesses:

Signature

5-16-05
Date

Signature

# EXHIBIT P



**ALABAMA DEPARTMENT OF TRANSPORTATION**
1409 Coliseum Boulevard, Montgomery, Alabama 36110



*Bob Riley*
*Governor*

*Joe McInnes*
*Transportation Director*

## MEMORANDUM

TO:     Ronald J. Green
        ALDOT Personnel Director

FROM:   Don T. Arkle
        Design Bureau Chief

SUBJECT:    Request to Fill/Not to Fill Vacant Position

I hereby request to _____ fill _____ position number ____ 2119200 ____ , classification
                       (fill/not fill)                     (PCQ #)
Transp. Tech. Sr. , option code _007_ , in the _ Design Bureau/Location Section
(Name of Position)  (Code Number)                (Bureau/Division)
Montgomery  051 . The position became vacant effective  5/31/05
(County/County Code)                                   (Date)
The previous incumbent was ____ Joe G. King ____ 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 ____ W ____ M ____ .
                              (Name)         (SSN)        (Race)   (Sex)

**THE CAUSE OF THE VACANCY WAS** (Resignation, Retirement, Transfer, etc.).    Retirement

**REASON FOR REQUEST TO FILL POSITION:**    Position needed to continue work without delays

☐   **CHECK HERE IF THIS IS A REQUEST TO FILL THE VACANCY BY <u>TRANSFER</u>.**

**THIS POSITION REQUIRES:** (   ) shift work during evening and night hours   (YES) overnight travel

**POSITION WILL NOT BE FILLED FOR THE FOLLOWING REASON(S)**

It is understood that any requests to fill or not to fill vacated positions must be forwarded to the Hiring and Promotions
Bureau within seven (7) days from the occurrence of a retirement, resignation, termination, transfer, promotion or other
action resulting in such vacancy.

If no request is made to fill the vacant position, the position number for the associated classification will be abolished.

Attachment                              APPROVED: _____
                                                  **D. J. McInnes**
*SENT TO DIRECTOR 6/8/05 DN*                       **Transportation Director**
*SENT TO STEVE DUKES 6/10/05 DN*
                                        DISAPPROVED: _____
                                                     **D.J. McInnes**
                                                     **Transportation Director**

                                        DATE: ____ 6/9/05 ____

*(Revised 7/2001)*

# EXHIBIT Q

# EXHIBIT 10
## PERSONS PROMOTED REPORT

Report ID: HDRHR01

For the period 02/16/2006 through 03/15/2006

Page No.  1
Run Date 03/16/2006
Run Time 09:42:20

**Alabama Department of Transportation**
**Employee Personnel Action Detail: Promoted**

| SSN | Name | Sex | Race | Appt Date | Position Number | Job Title In-House Title | Pay Range | Pay Step | Division/Section | | |
|-----|------|-----|------|-----------|-----------------|--------------------------|-----------|----------|------------------|---|---|

419902153  Eugene L. Elmore  Male  Black  02/18/2006  01730309  Personnel Assistant I  HWY/0054  7  Unknown  Sex:

Cert of Elig:  Training Coord

Location: Training
County: Montgomery

Previous Incumbent:
Pos No:          Date Vacated:  /  /  Reason Vacated:     Race:

420848873  Lillian L Williams  Female Black  03/04/2006  01730778  Admin Support Assistant II  HWY/5051  4  Unknown  Sex:

Cert of Elig:  Adm Support Asst

Location: Materials & Tests
County: Montgomery

Previous Incumbent:  Thelma R Webster          Race:Black          Sex:Fema

Pos No:  01730820  Date Vacated:  01/07/2006  Reason Vacated: XFR

430060205  Janice A Moses  Female White  03/04/2006  01731160  Programmer Analyst  HWY/0081  1  Unknown  Sex:

Cert of Elig:  Programmer Analyst

Location: Computer Services
County: Montgomery

Previous Incumbent:          Race:
Pos No:          Date Vacated:  /  /  Reason Vacated:

418961960  Craig A Hayles  Male  White  03/04/2006  01731161  Highway Maintenance Supt  HWY/0069  10  Unknown  Sex:

Cert of Elig:  Hwy Maint Supt

Location: Maintenance Bureau
County: Montgomery

Previous Incumbent:          Race:
Pos No:          Date Vacated:  /  /  Reason Vacated:

416804951  Ronald J Springer  Male  White  03/04/2006  01731198  Transportation Manager  HWY/0081  14  Materials & Test  Sex:

Cert of Elig:  Div. Enviro. Compliance Coord

Location: Division 2
County: Colbert

Previous Incumbent:          Race:
Pos No:          Date Vacated:  /  /  Reason Vacated:

376701308  Robert J Bird  Male  White  03/04/2006  01731216  Engineering Assistant II/II  HWY/5460  23  Unknown  Sex:

Cert of Elig:  Engr Asst

Location: Materials & Tests
County: Montgomery

Previous Incumbent:          Race:
Pos No:          Date Vacated:  /  /  Reason Vacated:

Report ID: EDHHR01

Alabama Department of Transportation
Employee Personnel Action Detail: Promoted

Page No.   2
Run Date 03/16/2006
Run Time 09:42:20

For the period 02/16/2006 through 03/15/2006

| SSN | Name | Sex | Race | Appt Date | Position Number | Job Title / In-House Title | Pay Range | Pay Step | Division/Section | | Sex: |
|-----|------|-----|------|-----------|-----------------|---------------------------|-----------|----------|------------------|--|------|
| 418215594 | Sammy S Cross | Male | Am. Indian | 02/18/2006 | 01731217 | Transportation Technologist | HWY/6972 | 5 | District 2 | | |
| | Cert of Elig: | | | | | Asst Project Engr | | | | | |
| | | | | | | | Location: Division 1 | | | | |
| | | | | | | | County: Madison | | | | |
| | | | | | | Previous Incumbent: | | | | | |
| | | | | | | Pos No: | Date Vacated: | / / | Reason Vacated: | | |
| 417138087 | Jernell B Anderson | Female | Black | 02/18/2006 | 01731516 | Personnel Assistant II | HWY/0061 | 2 | Recruiting | Race: | |
| | Cert of Elig: | | | | | Recruiter | | | | | |
| | | | | | | | Location: Personnel | | | | |
| | | | | | | | County: Montgomery | | | | |
| | | | | | | Previous Incumbent: Virginia M Anderson | | | Race:White | Sex:Female | |
| | | | | | | Pos No: 01735270 | Date Vacated: 09/17/2005 | Reason Vacated: PRO | | | |
| 421985063 | Donna W Deavers | Female | White | 03/04/2006 | 01734339 | Transportation Technlgst,Sr | HWY/7578 | 11 | Roadways | | |
| | Cert of Elig: | | | | | Plans Check Engr | | | | | |
| | | | | | | | Location: Maintenance Bureau | | | | |
| | | | | | | | County: Montgomery | | | | |
| | | | | | | Previous Incumbent: Dean A Dunlavy | | | Race:White | Sex:Male | |
| | | | | | | Pos No: 01761800 | Date Vacated: 02/05/2005 | Reason Vacated: XFR | | | |
| 420769976 | Randy R Stroup | Male | White | 03/04/2006 | 01734342 | Transportation Technlgst,S | HWY/7578 | 13 | Bridge | | |
| | Cert of Elig: | | | | | Asst Bridge Rating Engr | | | | | |
| | | | | | | | Location: Maintenance Bureau | | | | |
| | | | | | | | County: Montgomery | | | | |
| | | | | | | Previous Incumbent: Clay S Overby | | | Race:White | Sex:Male | |
| | | | | | | Pos No: 01761101 | Date Vacated: 03/06/2004 | Reason Vacated: PRO | | | |
| 420905211 | Robert E Gray II | Male | White | 02/18/2006 | 01734360 | Transportation Technologist | HWY/6972 | 3 | Roadway Design | | |
| | Cert of Elig: | | | | | Designer | | | | | |
| | | | | | | | Location: Design Bureau | | | | |
| | | | | | | | County: Montgomery | | | | |
| | | | | | | Previous Incumbent: Bryan E Nichols | | | Race:White | Sex:Male | |
| | | | | | | Pos No: 02119402 | Date Vacated: 12/10/2005 | Reason Vacated: PRO | | | |
| 416235313 | Daniel F Shelley | Male | White | 03/04/2006 | 01734773 | Transportation Technlgst | HWY/6972 | 5 | District 1 | | |
| | Cert of Elig: | | | | | Oper Engr | | | | | |
| | | | | | | | Location: Division 7 | | | | |
| | | | | | | | County: Houston | | | | |

Report ID: HDRHR01

For the period 02/16/2006 through 03/15/2006

Alabama Department of Transportation
Employee Personnel Action Detail: Promoted

Page No. 3
Run Date 03/16/2006
Run Time 09:42:20

| SSN | Name | Sex | Race | Appt Date | Position Number | Job Title In-House Title | Pay Range | Pay Step | Division/Section | | | |
|-----|------|-----|------|-----------|-----------------|--------------------------|-----------|----------|------------------|--|--|--|
| | | | | | | | Previous Incumbent: Kenneth O Whaley | | Race:White | Sex:Male |
| 424865590 | Joy D Frames | Female | White | 03/04/2006 | 01735170 | Transportation Technologist | HWY/6972 | 1 | District 4 | Date Vacated: 12/10/2005 | Reason Vacated: PRO |
| | Cert of Elig: | | | | | Permit Engr | | | Location: Division 4 County: Cleburne | | |
| | | | | | | | Previous Incumbent: Roger A Lecuyer | | Race:White | Sex:Male |
| 422294455 | Jerry D Hall | Male | White | 02/18/2006 | 01735486 | Highway Maintenance Supt | HWY/0069 | 10 | District 1 | Date Vacated: 09/28/2005 | Reason Vacated: TER |
| | Cert of Elig: | | | | | Hwy Maint Supt | | | Location: Division 9 County: Mobile | | |
| | | | | | | | Previous Incumbent: Billy R Holcomb | | Race:White | Sex:Male |
| 421948557 | Edith T Turner | Female | Black | 02/18/2006 | 01736265 | Admin Support Asst II | HWY/5051 | 17 | Unknown | Date Vacated: 02/01/2006 | Reason Vacated: RET |
| | Cert of Elig: | | | | | Adm Support Asst | | | Location: Research & Development County: Montgomery | | |
| | | | | | | | Previous Incumbent: Teresa P Friers | | Race:Black | Sex:Female |
| 418294533 | Channin K Grantham | Male | White | 03/04/2006 | 01736405 | Transportation Technologist | HWY/6972 | 1 | Location | Date Vacated: 01/21/2006 | Reason Vacated: PRO |
| | Cert of Elig: | | | | | Field Crew Supv | | | Location: Design Bureau County: Montgomery | | |
| | | | | | | | Previous Incumbent: Leroy Williams | | Race:Black | Sex:Male |
| 417251556 | Windell Labron White | Male | White | 03/04/2006 | 01806459 | Engineering Asst I | HWY/4850 | 8 | Maintenance | Date Vacated: 09/03/2005 | Reason Vacated: DTA |
| | Cert of Elig: | | | | | Bridge Insp | | | Location: Division 1 County: Marshall | | |
| | | | | | | | Previous Incumbent: Ronald W Duncan | | Race:White | Sex:Male |
| | | | | | | Pos No: 01730373 | Date Vacated: 07/23/2005 | | Reason Vacated: PRO | | |

Report ID: HDRHR01

Alabama Department of Transportation
Employee Personnel Action Detail: Promoted

Page No.  4
Run Date 03/16/2006
Run Time 09:42:20

For the period 02/16/2006 through 03/15/2006

| SSN | Name | Sex | Race | Appt Date | Position Number | Job Title / In-House Title | Pay Range | Pay Step | Division/Section |
|---|---|---|---|---|---|---|---|---|---|
| 424171058 | Curtis J King | Male | White | 03/04/2006 | 01809820 | Heavy Equipment Mechanic / Heavy Equip Mech | HWY/0060 | 10 | District 4 |

Location: Division 1
County:  Cullman

Previous Incumbent:   Keith Graham                  Race: White       Sex: Male
Pos No:   01809820  Date Vacated:  08/14/2004  Reason Vacated:  TER

Cert of Elig:

| 416745734 | Yvonne A White | Female | White | 03/04/2006 | 01854402 | Account Clerk / Account Clerk | HWY/5056 | 21 | Traffic |

Location: Maintenance Bureau
County:  Montgomery

Previous Incumbent:   Susan B Eader                  Race: White       Sex: Female
Pos No:   01854402  Date Vacated:  10/15/2005  Reason Vacated:  TER

Cert of Elig:

| 417272093 | Robert S Whaley | Male | White | 03/04/2006 | 01855900 | Transportation Technologist / Survey Party Chief | HWY/6972 | 1 | Location |

Location: Design Bureau
County:  Montgomery

Previous Incumbent:   Wayne C Mates                  Race: White       Sex: Male
Pos No:   01782900  Date Vacated:  12/24/2005  Reason Vacated:  PRO

Cert of Elig:

| 418178092 | Jonathan S Parten | Male | White | 03/04/2006 | 01906501 | Engineering Asst II/II / Project Insp | HWY/5460 | 3 | District 2 |

Location: Division 8
County:  Matengo

Previous Incumbent:   Joseph L Stockman              Race: White       Sex: Male
Pos No:   01906501  Date Vacated:  08/01/2005  Reason Vacated:  RET

Cert of Elig:

| 417023610 | William McKinnon Jr | Male | White | 03/04/2006 | 02111400 | Transportation Technologist / Data Editor | HWY/6972 | 1 | Location |

Location: Design Bureau
County:  Montgomery

Previous Incumbent:   Troy L Nichols                 Race: White       Reason Vacated: PRO
Pos No:   02111100  Date Vacated:  12/24/2005

Cert of Elig:

| 423022371 | Willie E Garrett | Male | Black | 02/18/2006 | 02111900 | Transportation Technist,S / Survey Party Chief | HWY/7578 | 7 | Location |

Location: Design Bureau

Cert of Elig:

Report ID: HDRHR01

Alabama Department of Transportation
Employee Personnel Action Detail: Promoted

Page No. 5
Run Date 03/16/2006
Run Time 09:42:28

For the period 02/16/2006 through 03/15/2006

| SSN | Name | Sex | Race | Appt Date | Position Number | Job Title In-House Title | Pay Range | Pay Step | Division/Section |
|-----|------|-----|------|-----------|-----------------|--------------------------|-----------|----------|------------------|

County: Montgomery

| 420047436 | Thomas W Lewis | Male | White | 02/18/2006 | 02119200 | Transportation Technlgst,S | | | |

Previous Incumbent: James M Carroll    Race:White    Sex:Male

Pos No:  01757303  Date Vacated: 08/20/2005  Reason Vacated: XFR

HWY/7578    12    Location

Survey Party Chief

Location: Design Bureau
County: Montgomery

Cert of Elig:

Previous Incumbent: Joe G King    Race:White    Sex:Male

Pos No:  02119200  Date Vacated: 06/01/2005  Reason Vacated: RET

End of Report

Page No.  1
Run Date 03/16/2006
Run Time 09:42:34

Report ID: HDRHR01

**Alabama Department of Transportation**
**Employee Personnel Action Detail: Demoted**

For the period 02/16/2006 through 03/15/2006

| SSN | Name | Sex | Race | Appt Date | Position Number | Job Title In-House Title | Pay Range | Pay Step | Division/Section |
|-----|------|-----|------|-----------|-----------------|--------------------------|-----------|----------|------------------|

NO DATA REPORTED FOR THIS PERIOD

End of Report

# EXHIBIT R

**STATE OF ALABAMA**
Personnel Department

051000050
051000050

| DEPARTMENT IDENTIFICATION (DEPT/DIV) | CLASSIFICATION (CODE/TITLE) | CLASS OPTION (CODE/TITLE) | | PAG |
|---|---|---|---|---|
| HWY TRANSPORTATION 85 DESIGN | 20482 TRANSPORTATION TECHNLGST, SR | 7 | HIGHWAY DESIGN | |

| REGISTER TYPE | METHOD OF CERTIFICATION | EMPLOYMENT TYPE | COUNTY | POSITION NUMBERS | ON TRAVEL | SHIFT WORK | SALARY |
|---|---|---|---|---|---|---|---|
| 1 CONTINUOUS OPEN-COMP | 1 PERMANENT | 51 | MONTGOMERY | 2119200  2111900 | Y | 1 | 1,410.80 |

VACANCIES 2

| SSAN | NAME AND ADDRESS | RACE | V.P. | GRADE | SEX | ACT | POSITION NO. OF APPT | APPT. DATE |
|---|---|---|---|---|---|---|---|---|
| 263213635 | MOSES RICKEY L 217 ALLEN DRIVE MILLBROOK AL 36054 | 1 | 5 | 45.44 | C | | | |
| 42376755 | BURGESS WILLIE J P P.O. BOX 1641 WARRIOR AL 35180 | 1 | | 27.71 | C | | | |
| 423172760 | NICHOLS STACEY C 1019 VALLEY DR ATTALLA AL 35954 | 1 | | 24.90 | C | | | |
| 41618022 | AUSTIN WILLIAM D 229 NEW LEBANON ROAD BLOUNTSVILLE AL 35031 | 5 | | 16.19 | C | | | |
| 420822752 | VERNON GEORGE T JR 2864 COUNTY RD ALEX CITY AL 35010 | 1 | | 13.09 | C | | | |
| 419780840 | BROWN LAWRENCE N 104 PRETORIA CIRCLE BIRMINGHAM AL 35211 | 2 | | 11.07 | C | | | |
| 420047436 | LEWIS THOMAS W 4703 CO. ROAD 11 ARITON AL 36311 | 1 | | 08.39 | A | | 2119200 1846.30 BW Step 12 | 2-18-06 |
| 423022371 | GARRETT WILLIE E P O BOX 5136 UNION SPRINGS AL 36089 | 2 | | 02.78 | A | | 2111900 1633.00 BW Step 7 | 2-18-06 |

*** END OF LIST ***

AGE LIMIT

05100050R

CERTIFIED PERSONNEL DIRECTOR

DATE CERTIFIED  12/21/05

CERTIFICATION RETURNED-APPOINTING AUTHORITY

DATE RETURNED  2/24/06

IMPORTANT: SEE INSTRUCTIONS ON REVERSE SIDE

ORIGINAL

9, REV. 7/85

# EXHIBIT S

# SPD Data Files

## Application Records For:  20482  TRANSPORTATION TECHNLGST,SR

| SSN | Name | Race | Sex | Action Date | Class Code | Location / service codes | Dept | Vet | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | DIANNA CROWE MCLAIN | W | F | 20050412 | 20482 | 438 37 20 0 30 0 37 00 00 00 00 00 0 | | 0 | 57.49 | 57.49 | 0 | 0 |
| 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 | WILLIAM RUSSELL DENNIS | W | M | 20050412 | 20482 | 438 49 13 0 30 0 00 61 19 51 00 00 00 0 | | 0 | 69.09 | 69.09 | 0 | 0 |
| 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 | TERRY DARRELL MARTIN | W | M | 20050412 | 20482 | 438 22 22 0 30 0 62 00 00 00 00 00 0 | | 0 | 60 | 60 | 0 | 0 |
| 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 | DAVID A HOLLOWELL | W | M | 20050412 | 20482 | 438 49 21 0 30 1 00 00 00 00 00 00 0 | | 1 | 53.11 | 58.11 | 0 | 0 |
| 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 | ERIC B DAVIS | W | M | 20050412 | 20482 | 438 13 22 0 30 0 88 92 90 85 00 00 0 | | 0 | 57.5 | 57.5 | 0 | 0 |
| 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 | DONALD STEVEN WILLIAMS | W | M | 20050412 | 20482 | 438 48 14 0 30 0 52 48 82 00 00 00 0 | | 0 | 52.7 | 52.7 | 0 | 0 |
| 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 | CONNIE L GORMAN | W | F | 20050412 | 20482 | 438 63 17 0 30 0 85 82 86 84 00 00 0 | | 0 | 58.16 | 58.16 | 0 | 0 |
| 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 | JOHN ROLFE HOWELL | W | M | 20050412 | 20482 | 438 30 22 220 30 0 95 00 00 00 00 00 0 | | 0 | 60.04 | 60.04 | 0 | 0 |
| 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 | JACK HOLIFIELD MCGUIRE | W | M | 20050412 | 20482 | 438 13 22 0 30 0 85 86 95 00 00 00 0 | | 0 | 58.49 | 58.49 | 0 | 0 |
| 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 | SANDY A SMITH | W | F | 20050412 | 20482 | 438 22 22 0 30 0 86 84 00 00 00 00 0 | | 0 | 57.17 | 57.17 | 0 | 0 |
| 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 | P. KENNETH NAUGHER SR | W | M | 20050412 | 20482 | 438 08 22 0 30 0 08 15 61 00 00 00 0 | | 0 | 57.98 | 57.98 | 0 | 0 |
| 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 | NATHAN L GILMORE | B | M | 20050412 | 20482 | 438 12 23 0 30 0 88 60 33 00 00 00 0 | 1 | 1 | 31.65 | 36.65 | 0 | 0 |
| 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 | JANET L FRESOLONE | W | F | 20050412 | 20482 | 438 49 22 208 30 0 49 02 00 00 00 00 0 | | 0 | 53.25 | 53.25 | 0 | 0 |
| 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 | DION KEITH MITCHELL | W | M | 20050412 | 20482 | 438 07 13 0 30 0 07 89 24 00 00 00 | HWY | 0 | 63.41 | 63.41 | 0 | 0 |
| 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 | WALTER G CROWE | W | M | 20050412 | 20482 | 438 49 22 0 30 0 92 86 82 95 00 00 0 | | 0 | 48.49 | 48.49 | 0 | 0 |
| 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 | RICHARD ALLEN HARGROVE | W | M | 20050412 | 20482 | 438 42 20 0 30 0 92 81 83 00 00 00 0 | | 0 | 31.25 | 31.25 | 0 | 0 |
| 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 | WANDA K BROOKS | W | F | 20050412 | 20482 | 438 45 13 0 30 0 81 82 00 00 00 00 0 | | 0 | 52.03 | 52.03 | 0 | 0 |
| 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 | CECIL DALE BAKER | W | M | 20050412 | 20482 | 438 13 17 0 30 0 95 00 00 00 00 00 0 | | 0 | 53.88 | 53.88 | 0 | 0 |
| 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 | CHARLES L VINES | W | M | 20050412 | 20482 | 438 02 13 0 30 0 92 86 95 00 00 00 0 | | 0 | 51 | 51 | 0 | 0 |
| 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 | CLAUDE V HOOVER | W | M | 20050412 | 20482 | 438 02 43 121 30 0 49 27 00 00 00 00 1 | | 1 | 65.51 | 65.51 | 0 | 0 |
| 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 | DONNA LEA ELLIOTT | W | F | 20050412 | 20482 | 438 13 13 0 30 0 85 00 00 00 00 00 0 | | 0 | 51.18 | 51.18 | 0 | 0 |
| 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 | ROBERT J PRATER | W | M | 20050412 | 20482 | 438 41 22 0 30 0 57 43 00 00 00 00 0 | | N | 48 | 48 | 0 | 0 |
| 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 | GARY LEE NIXON | W | M | 20050412 | 20482 | 438 36 43 104 30 0 83 83 00 00 00 00 1 | | N 1 | 65.27 | 65.27 | 0 | 0 |
| 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 | RANDY R STROUP | W | M | 20050412 | 20482 | 438 51 13 0 30 0 95 00 00 00 00 00 0 | | N | 60.27 | 60.27 | 0 | 0 |
| 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 | RICKIE G DAVIS | W | M | 20050412 | 20482 | 438 62 0 0 30 0 19 62 14 09 41 00 0 | | N | 54.03 | 54.03 | 0 | 0 |
| 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 | JOHN SCOTT JAYROE | W | M | 20050412 | 20482 | 438 14 0 207 30 0 92 88 00 00 00 00 0 | | N | 55.32 | 55.32 | 0 | 0 |
| 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 | ROGER G WINNINGHAM | W | M | 20050412 | 20482 | 438 13 22 209 30 0 95 00 00 00 00 00 6 | | N 6 | 42.66 | 42.66 | 0 | 0 |
| 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 | DIANNE H RHODES | W | F | 20050412 | 20482 | 438 28 22 224 30 48 22 05 00 00 00 00 0 | | N | 45.27 | 45.27 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

Application Records For:  20482    TRANSPORTATION TECHNLGST,SR

| SSN | Name | Race | Sex | Action Date | Class Code | Scores / Location / Dept (raw) | Vet | O | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | RICHARD KENNETH TOPPING | B | M | 20050412 | 20482 | 438 37 22 0 30 0 86 84 51 00 00 00 00 | N | 52.77 | 52.77 | 0 | 0 | 0 |
| 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 | LAWRENCE N BROWN | B | M | 20050427 | 20482 | 37 13 0 30 0 86 85 95 00 00 00 00 | N | 11.07 | 11.07 | 0 | 0 | 0 |
| 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 | CORNELIUS DEWAYNE ELDE | B | M | 20050427 | 20482 | 55 44 121 30 0 55 00 00 00 00 00 00 | 3 | 35.38 | 35.38 | 0 | 0 | 0 |
| 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 | ANGELYN B PENTZ | W | F | 20050427 | 20482 | 01 20 0 30 0 51 26 01 00 00 00 00 | 3 | 59.81 | 59.81 | 0 | 0 | 0 |
| 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 | GEORGE T VERNON JR | W | M | 20050427 | 20482 | 62 22 202 30 0 87 90 95 00 00 00 00 | N | 13.09 | 13.09 | 0 | 0 | 0 |
| 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 | TROY L NICHOLS | W | M | 20050427 | 20482 | 28 17 0 30 0 90 95 00 00 00 00 00 | N | 25.51 | 25.51 | 0 | 0 | 0 |
| 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 | THOMAS W LEWIS | W | M | 20050427 | 20482 | 23 13 0 30 0 95 90 23 00 00 00 00 | N | 8.39 | 8.39 | 0 | 0 | 0 |
| 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 | WILLIE H GARRETT | B | M | 20050427 | 20482 | 06 17 0 30 0 91 95 00 00 00 00 00 | N | 2.78 | 2.78 | 0 | 0 | 0 |
| 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 | STACEY C NICHOLS | W | M | 20050427 | 20482 | 28 22 209 30 0 95 00 00 00 00 00 00 | N | 24.9 | 24.9 | 0 | 0 | 0 |
| 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 | ERIC B DAVIS | W | M | 20050427 | 20482 | 13 22 0 30 0 88 92 99 85 00 00 00 | N | 50.55 | 50.55 | 0 | 0 | 0 |
| 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 | RONNIE CARR | W | M | 20050427 | 20482 | 16 13 0 30 0 55 16 23 94 00 00 00 | N | 31.11 | 31.11 | 0 | 0 | 0 |
| 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 | TERRY DARRELL MARTIN | W | M | 20050427 | 20482 | 62 22 0 30 0 62 19 51 00 00 00 00 | N | 45.03 | 45.03 | 0 | 0 | 0 |
| 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 | STEVEN M GRIFFIN | W | M | 20050427 | 20482 | 26 17 0 30 0 31 26 01 00 00 00 00 | N | 19.45 | 19.45 | 0 | 0 | 0 |
| 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 | CHARLES D SCOTT | W | M | 20050427 | 20482 | 01 22 0 30 0 90 00 00 00 00 00 00 | N | 28.83 | 28.83 | 0 | 0 | 0 |
| 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 | WILLIAM D AUSTIN | W | M | 20050427 | 20482 | 40 22 0 30 0 51 86 82 00 00 00 00 | N | 16.19 | 16.19 | 0 | 0 | 0 |
| 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 | JOHN SCOTT JAYROE | W | M | 20050427 | 20482 | 49 22 207 30 0 92 88 00 00 00 00 00 | N | 60.12 | 60.12 | 0 | 0 | 0 |
| 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 | RICKEY LEE MOSES | W | M | 20050427 | 20482 | 26 13 0 30 0 90 06 44 24 55 00 00 | 1 | 40.44 | 45.44 | 0 | 0 | 0 |
| 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 | BEVERLY J REYNOLDS | W | F | 20050427 | 20482 | 31 22 210 30 0 94 55 20 00 00 00 00 | N | 31.81 | 31.81 | 0 | 0 | 0 |
| 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 | BRYAN E NICHOLS | W | M | 20050427 | 20482 | 01 22 123 30 0 89 91 00 00 00 00 00 | 1 | 52.75 | 57.75 | 0 | 0 | 0 |
| 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 | JOHN D JOHNSON JR | W | M | 20050427 | 20482 | 51 22 700 30 0 26 90 00 00 00 00 00 | N | 34.6 | 34.6 | 0 | 0 | 0 |
| 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 | JEROME A REDDICK | B | M | 20050427 | 20482 | 70 22 0 30 0 92 00 00 00 00 00 00 | N | 30.12 | 30.12 | 0 | 0 | 0 |
| 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 | CASEY D DAVIDSON | W | M | 20050427 | 20482 | 26 17 0 30 0 90 95 00 00 00 00 00 | N | 20.46 | 20.46 | 0 | 0 | 0 |
| 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 | LILLIE JOSEPHINE BURGESS | W | F | 20050427 | 20482 | 37 17 0 30 0 96 84 00 00 00 00 00 | 1 | 27.71 | 27.71 | 0 | 0 | 0 |
| 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 | WAYNE C BATES | W | M | 20050623 | 20482 | 26 20 0 30 0 90 87 00 00 00 00 00 | 1 | 27.71 | 27.71 | 0 | 0 | 0 |
| 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 | CARL ANTHONY SKELTON | W | M | 20050623 | 20482 | 63 13 0 30 0 63 54 32 00 00 00 00 | N | 17.18 | 22.18 | 0 | 0 | 0 |
| 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 | DAVID J FREEMAN | W | M | 20050623 | 20482 | 55 20 0 30 0 55 16 02 00 00 00 00 | N | 23.63 | 23.63 | 0 | 0 | 0 |
| 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 | JOHN ARLIN VICKERS | W | M | 20050623 | 20482 | 19 20 0 30 0 87 00 00 00 00 00 00 | N | 36.12 | 36.12 | 0 | 0 | 0 |
| 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 | LARRY O WHITESIDE | B | M | 20050623 | 20482 | 45 13 0 30 0 82 81 90 00 00 00 00 | 1 | 20.3 | 25.3 | 0 | 0 | 0 |

**ALDOT Data Available Through September 2006**
**Other Departments Available Through March 2006**

# SPD Data Files

## Application Records For:  20482   TRANSPORTATION TECHNLGST,SR

| SSN | Name | Rce | Sex | Action Date | Class Code | | | | | Location 1–7 | Dept | Vet | War Tours | Svc | PHel | Other OC | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | JOHN C CALHOUN | W | M | 20050623 | 20482 | 6 | 63 | 17 | 0 30 | 63 51 32 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 34.43 | 34.43 | 0 | 0 |
| 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 | WILLIAM W KELLY | W | M | 20050623 | 20482 | 6 | 63 | 17 | 0 30 | 85 89 95 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 42.07 | 42.07 | 0 | 0 |
| 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 | DAVID ROUNTREE | W | M | 20050623 | 20482 | 6 | 55 | 21 | 0 90 | 91 94 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 44.46 | 44.46 | 0 | 0 |
| 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 | MICHAEL CRYAR | W | M | 20050623 | 20482 | 6 | 02 | 17 | 0 30 | 95 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 34.76 | 34.76 | 0 | 0 |
| 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 | GARY EDWIN HARLOW | A | M | 20050623 | 20482 | 6 | 49 | 13 | 0 30 | 51 26 01 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 23.5 | 23.5 | 0 | 0 |
| 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 | JERONIMO JOHNSON | B | M | 20050623 | 20482 | 6 | 55 | 22 | 208 30 | 91 99 94 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 15.02 | 15.02 | 0 | 0 |
| 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 | CHARLES WAYNE CASTLEBE | W | M | 20050623 | 20482 | 6 | 26 | 21 | 0 30 | 62 41 51 00 00 00 00 HWY | | N | 0 | 0 | 0 | 0 | 23.5 | 23.5 | 0 | 0 |
| 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 | TONYA L DAVIS | W | F | 20050623 | 20482 | 6 | 48 | 22 | 224 30 | 83 83 86 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 42.79 | 42.79 | 0 | 0 |
| 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 | ROBERT RYAN JONES | W | M | 20050623 | 20482 | 6 | 49 | 17 | 0 30 | 95 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 62.5 | 62.5 | 0 | 0 |
| 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 | LARRY D LETT | W | M | 20050623 | 20482 | 6 | 26 | 13 | 0 30 | 90 87 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 16.69 | 16.69 | 0 | 0 |
| 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 | GREGP RICKS | W | M | 20050623 | 20482 | 6 | 21 | 30 | 121 30 | 91 95 94 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 25.3 | 25.3 | 0 | 0 |
| 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 | BARRY JOE WHITE | W | M | 20050623 | 20482 | 6 | 39 | 13 | 0 30 | 95 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 16.69 | 16.69 | 0 | 0 |
| 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 | CEDRIC CORTEZ TRAWICK | B | M | 20050623 | 20482 | 6 | 51 | 22 | 0 30 | 26 01 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 31.82 | 31.82 | 0 | 0 |
| 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 | MICHAEL D WILLIAMS | W | M | 20050623 | 20482 | 6 | 26 | 13 | 0 90 | 87 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 29.21 | 29.21 | 0 | 0 |
| 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 | WILLIAM G MOSS | W | M | 20050623 | 20482 | 6 | 22 | 22 | 0 90 | 86 95 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 14.5 | 14.5 | 0 | 0 |
| 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 | BRENDA D THOMAS | B | F | 20050623 | 20482 | 6 | 51 | 13 | 0 30 | 90 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 22.1 | 22.1 | 0 | 0 |
| 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 | WILLIAM TERRELL CANANT | W | M | 20050623 | 20482 | 6 | 55 | 22 | 0 30 | 91 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 31.8 | 31.8 | 0 | 0 |
| 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 | JOHN O WASHINGTON | W | M | 20050623 | 20482 | 6 | 30 | 21 | 0 30 | 81 17 30 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 15.02 | 15.02 | 0 | 0 |
| 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 | MICHELLE A GOODE | W | F | 20050623 | 20482 | 6 | 45 | 20 | 0 30 | 81 82 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 24.46 | 24.46 | 0 | 0 |
| 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 | LEONARD MILTON HOPE JR | W | M | 20050623 | 20482 | 6 | 26 | 22 | 0 95 | 00 00 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 35.58 | 35.58 | 0 | 0 |
| 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 | TOMMY J DENNIS | W | M | 20050623 | 20482 | 6 | 11 | 22 | 210 30 | 51 37 00 00 00 00 00 | | N | 2 | 0 | 0 | 0 | 49.44 | 49.44 | 0 | 0 |
| 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 | MICHAEL E SMITH | B | M | 20050706 | 20482 | 6 | 30 | 13 | 0 81 | 47 67 00 00 00 00 00 | | N | 1 | 0 | 0 | 0 | 31.98 | 36.98 | 0 | 0 |
| 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 | ROBERT M PEYTON III | W | M | 20050706 | 20482 | 439 | 63 | 31 | 119 30 | 85 86 00 00 00 00 00 | | N | 2 | 0 | 0 | 0 | 22.27 | 32.27 | 0 | 0 |
| 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 | JOHN D JOHNSON JR | W | M | 20050706 | 20482 | 439 | 51 | 22 | 700 30 | 01 26 90 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 29.18 | 29.18 | 0 | 0 |
| 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 | WILLIAM H SHERLOCK JR | W | M | 20050706 | 20482 | 439 | 51 | 70 | 30 01 | 99 94 00 00 00 00 00 | 1 | N | 0 | 0 | 0 | 0 | 62.5 | 62.5 | 0 | 0 |
| 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 | REBECCA W FULKS | W | F | 20050706 | 20482 | 439 | 51 | 30 | 700 30 | 90 94 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 19.54 | 24.54 | 0 | 0 |
| 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 | REUBEN P JORDAN | W | M | 20050706 | 20482 | 439 | 55 | 13 | 0 55 | 16 23 00 00 00 00 00 | | N | 0 | 0 | 0 | 0 | 58.47 | 58.47 | 0 | 0 |
| 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 | JOHN R HERSTON | W | M | 20050706 | 20482 | 439 | 30 | 20 | 0 30 | 17 30 47 67 39 40 00 | | N | 0 | 0 | 0 | 0 | 50.76 | 50.76 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

# SPD Data Files

Application Records For:  20482  TRANSPORTATION TECHNLGST,SR

| SSN | Name | Race | Sex | Action Date | Class Code | Sub | Middle values | Location 1–7 | Dept | Veteran | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | PAUL A GORMAN | W | M | 20050706 | 20482 | 439 | 63 17 0 30 | 82 85 84 86 11 53 81 |  | N | 20.98 | 20.98 | 0 | 0 |
| 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 | BARRY DALE LEWIS | W | M | 20050706 | 20482 | 439 | 26 17 0 30 | 51 26 01 00 00 00 00 |  | N | 47.02 | 47.02 | 0 | 0 |
| 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 | ALAN B HUNTER | W | M | 20050706 | 20482 | 439 | 13 0 0 30 | 51 26 01 00 00 00 00 |  | N | 29.98 | 29.98 | 0 | 0 |
| 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 | JOHN ROLFE HOWELL | W | M | 20050706 | 20482 | 439 | 23 0 0 30 | 95 00 00 00 00 00 00 |  | N | 76.4 | 76.4 | 0 | 0 |
| 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 | CONNIE L GORMAN | W | F | 20050706 | 20482 | 439 | 21 0 0 30 | 85 82 86 84 11 53 00 |  | N | 69.58 | 69.58 | 0 | 0 |
| 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 | DANIEL S SANDERS | W | M | 20050706 | 20482 | 439 | 55 23 0 30 | 55 13 00 00 00 00 00 |  | N | 36.59 | 36.59 | 0 | 0 |
| 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 | RONNIE CARR | W | M | 20050706 | 20482 | 439 | 16 13 0 30 | 94 03 55 00 00 00 00 |  | N | 70.37 | 70.37 | 0 | 0 |
| 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 | RALPH H PAYNE | W | M | 20050706 | 20482 | 439 | 45 17 0 30 | 82 84 85 00 00 00 00 |  | N | 28.9 | 28.9 | 0 | 0 |
| 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 | MARLON ROMAIN MCQUEEN | B | M | 20050706 | 20482 | 439 | 01 23 0 30 | 51 90 26 00 00 00 00 |  | 6 | 48.2 | 48.2 | 0 | 0 |
| 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 | CORNELIUS DEWAYNE ELDE | B | M | 20050706 | 20482 | 439 | 55 34 121 30 0 | 63 00 32 00 00 00 00 |  | N | 50.78 | 50.78 | 0 | 0 |
| 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 | DEVALUIS C LOWERY | B | M | 20050706 | 20482 | 439 | 60 13 0 30 | 46 66 00 00 00 00 00 | 1 | N | 33.99 | 33.99 | 0 | 0 |
| 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 | CALVIN MARTIN | B | M | 20050706 | 20482 | 439 | 46 13 0 30 | 82 83 22 00 00 00 00 |  | N | 38.99 | 38.99 | 0 | 0 |
| 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 | DANIEL S SPARKMAN | W | M | 20050706 | 20482 | 439 | 36 13 0 30 | 51 00 00 00 00 00 00 |  | N | 30.64 | 30.64 | 0 | 0 |
| 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 | ROLAND E GLENN | W | M | 20050706 | 20482 | 439 | 26 13 0 30 | 51 00 00 00 00 00 00 |  | N | 49.3 | 49.3 | 0 | 0 |
| 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 | CRAIG LAVON DAVIDSON | W | M | 20050706 | 20482 | 439 | 48 104 30 0 30 | 95 00 00 00 00 00 00 |  | N | 63.09 | 63.09 | 0 | 0 |
| 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 | DAVID M JOHNSON JR | W | M | 20050706 | 20482 | 439 | 50 205 30 0 30 | 95 00 00 00 00 00 00 |  | 1 | 62.03 | 62.03 | 0 | 0 |
| 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 | JOHN ARLIN VICKERS | W | M | 20050706 | 20482 | 439 | 19 20 0 30 | 87 00 00 00 00 00 00 |  | N | 70.59 | 75.59 | 0 | 0 |
| 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 | PATRICIA S WOODHAM | W | F | 20050706 | 20482 | 439 | 63 22 221 30 0 | 85 84 37 00 00 00 00 | 4 | N | 44.7 | 44.7 | 0 | 0 |
| 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 | ANTHONY RYAN LACKEY | W | M | 20050706 | 20482 | 439 | 41 23 0 30 | 91 87 90 00 00 00 00 |  | N | 68.73 | 68.73 | 0 | 0 |
| 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 | ROGER A LECUYER | W | M | 20050706 | 20482 | 439 | 24 13 0 30 | 95 87 85 00 00 00 00 |  | N | 72.12 | 72.12 | 0 | 0 |
| 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 | DONNA WILLIAMS DEAVERS | W | F | 20050706 | 20482 | 439 | 01 20 0 30 | 01 51 11 00 00 00 00 |  | N | 35.81 | 35.81 | 0 | 0 |
| 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 | BEVERLY J REYNOLDS | W | F | 20050706 | 20482 | 439 | 31 22 210 30 0 | 94 55 20 00 00 00 00 |  | N | 52.28 | 52.28 | 0 | 0 |
| 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 | DAVID D NICHOLS | W | M | 20050706 | 20482 | 439 | 43 17 0 30 | 90 00 00 00 00 00 00 |  | N | 60.63 | 60.63 | 0 | 0 |
| 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 | JAMES EDWARD WASHINGT | B | M | 20050706 | 20482 | 439 | 51 21 0 51 | 49 45 00 00 00 00 00 |  | N | 32.23 | 32.23 | 0 | 0 |
| 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 | RANDY K STROUP | W | M | 20050706 | 20482 | 439 | 14 0 0 30 | 95 00 00 00 00 00 00 |  | N | 33.19 | 33.19 | 0 | 0 |
| 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 | LILLIE JOSEPHINE BURGESS | W | F | 20050706 | 20482 | 439 | 37 22 203 30 0 | 95 85 84 00 00 00 00 |  | N | 55.97 | 55.97 | 0 | 0 |
| 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 | JEROME A REDDICK | B | M | 20050706 | 20482 | 439 | 70 22 0 30 | 92 00 00 00 00 00 00 |  | N | 29.31 | 29.31 | 0 | 0 |
| 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 | STEVEN J OSMER | W | M | 20050706 | 20482 | 439 | 36 22 0 30 | 95 00 00 00 00 00 00 |  | N | 56.09 | 56.09 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

**Application Records For: 20482    TRANSPORTATION TECHNLGST,SR**

| SSN | Name | Race | Sex | Action Date | Class Code | C1 | C2 | C3 | Location / Department values (1–7, 1–3) | Vet | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | RANDELL L COOPER | W | M | 20050706 | 20482 | 439 | 48 | 17 | 0 30 48 45 36 00 00 00 | N | 47.65 | 47.65 | 0 | 0 |
| 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 | JESSE M WALLACE | W | M | 20050706 | 20482 | 439 | 52 | 30 | 103 30 95 00 00 00 00 00 | N | 73.32 | 73.32 | 0 | 0 |
| 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 | COBY A GRIFFITH | W | M | 20051228 | 20482 | 439 | 26 | 22 | 0 30 87 00 00 00 00 00 | N | 46.53 | 46.53 | 0 | 0 |
| 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 | MICHAEL G MCINERNEY | W | M | 20051228 | 20482 | 5 | 17 | 0 | 30 90 00 00 00 00 HWY 1 | N | 50.45 | 50.45 | 0 | 0 |
| 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 | KEVIN R TRAYWICK | W | M | 20051228 | 20482 | 5 | 21 | 0 | 30 51 00 00 00 00 00 | N | 55.45 | 55.45 | 0 | 0 |
| 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 | GARY STINTSON WIGGINS | W | M | 20051228 | 20482 | 5 | 26 | 13 | 0 30 90 00 00 00 00 | N | 60.67 | 60.67 | 0 | 0 |
| 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 | KEITH RENARD SMITH | W | M | 20051228 | 20482 | 5 | 26 | 22 | 700 30 51 26 01 00 00 | N | 37.81 | 37.81 | 0 | 0 |
| 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 | RANDY K STROUP | W | M | 20051228 | 20482 | 5 | 14 | 0 | 30 95 00 00 00 00 | N | 52.86 | 52.86 | 0 | 0 |
| 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 | CLAUDE WM STINSON | W | M | 20051228 | 20482 | 5 | 51 | 14 | 0 30 94 20 55 00 00 | N | 56.76 | 56.76 | 0 | 0 |
| 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 | STEVEN GEORGE MARCHMA | W | M | 20060405 | 20482 | 438 | 16 | 21 | 0 30 94 00 00 00 00 | N | 67.88 | 67.88 | 0 | 0 |
| 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 | DION KEITH MITCHELL | W | M | 20060405 | 20482 | 438 | 35 | 13 | 0 30 23 55 00 00 00 | N | 40.37 | 40.37 | 0 | 0 |
| 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 | DAVID C GULLEDGE | W | M | 20060405 | 20482 | 438 | 07 | 13 | 0 30 07 89 24 00 00 | N | 48.7 | 48.7 | 0 | 0 |
| 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 | NATHAN L GILMORE | B | M | 20060405 | 20482 | 438 | 02 | 13 | 0 30 92 93 88 00 00 | 1 | 45.24 | 45.24 | 0 | 0 |
| 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 | CARLOS D CARL | B | M | 20060405 | 20482 | 438 | 12 | 20 | 0 30 88 33 66 00 00 | N | 33.58 | 33.58 | 0 | 0 |
| 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 | W JACK MORGAN | W | M | 20060405 | 20482 | 438 | 58 | 30 | 111 30 58 37 51 00 00 | N | 53.03 | 53.03 | 0 | 0 |
| 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 | SHARON GERMAINE GRAVE | W | F | 20060405 | 20482 | 438 | 10 | 23 | 0 30 28 10 00 00 00 | N | 37.11 | 37.11 | 0 | 0 |
| 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 | CLAUDE V HOOVER | W | M | 20060405 | 20482 | 438 | 62 | 13 | 0 30 90 93 91 16 00 | N | 68.36 | 68.36 | 0 | 0 |
| 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 | RICKY MORRIS | W | M | 20060405 | 20482 | 438 | 02 | 43 | 121 30 02 49 27 00 00 | N | 61.23 | 61.23 | 0 | 0 |
| 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 | JOYCE A LEE | B | F | 20060405 | 20482 | 438 | 16 | 21 | 0 30 95 00 00 00 00 | N | 44.35 | 44.35 | 0 | 0 |
| 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 | RICHARD F RIKERD | W | M | 20060405 | 20482 | 438 | 24 | 35 | 101 30 24 90 51 00 00 | N | 42.2 | 42.2 | 0 | 0 |
| 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 | GEORGE THOMAS | B | M | 20060405 | 20482 | 438 | 51 | 20 | 0 30 90 44 07 00 00 | N | 69.45 | 69.45 | 0 | 0 |
| 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 | CHARLES L VINES | W | M | 20060405 | 20482 | 438 | 34 | 13 | 0 30 91 94 90 00 00 | N | 23.12 | 23.12 | 0 | 0 |
| 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 | JASON C FOX | W | M | 20060405 | 20482 | 438 | 02 | 13 | 0 30 02 49 27 00 00 | N | 35.94 | 35.94 | 0 | 0 |
| 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 | RANDY DARNELL MALONE | B | M | 20060405 | 20482 | 438 | 21 | 32 | 104 30 90 93 91 16 00 | N 1 | 59.74 | 59.74 | 0 | 0 |
| 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 | LEON C STEELE | B | M | 20060405 | 20482 | 438 | 45 | 22 | 0 30 45 52 42 00 00 | N | 30.64 | 30.64 | 0 | 0 |
| 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 | ANNA H HARRIS | B | F | 20060413 | 20482 | 7 | 42 | 20 | 0 30 82 42 52 00 00 | N | 14.31 | 14.31 | 0 | 0 |
| 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 | RICKEY LEE MOSES | W | M | 20060413 | 20482 | 7 | 51 | 23 | 0 30 51 26 01 00 00 | N | 25.85 | 25.85 | 0 | 0 |
| 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 | ROBERT M TRAYLOR | W | M | 20060413 | 20482 | 7 | 62 | 38 | 111 30 87 41 26 00 00 | N | 41.37 | 41.37 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

**SPD Data Files**

Application Records For:   20482   TRANSPORTATION TECHNLGST,SR

| SSN | Name | Race | Sex | Action Date | Class Code | Final Score OC | Final Score PR | Final Rank OC | Final Rank PR |
|---|---|---|---|---|---|---|---|---|---|
| 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 | WILLIAM C JEFCOAT JR | W | M | 20060413 | 20482 | 78.51 | 78.51 | 0 | 0 |
| 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 | RICHARD KELVIN TAYLOR | B | M | 20060413 | 20482 | 30.22 | 30.22 | 0 | 0 |
| 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 | MARIE L LUNDBOM | W | F | 20060413 | 20482 | 15.24 | 15.24 | 0 | 0 |
| 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 | JESSE P AGEE SR | B | M | 20060718 | 20482 | 25.9 | 25.9 | 0 | 0 |
| 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 | MILES PARKER HEATH | W | M | 20060718 | 20482 | 29.82 | 29.82 | 0 | 0 |
| 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 | JESSE M WALLACE | W | M | 20060808 | 20482 | 67.39 | 67.39 | 0 | 0 |
| 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 | JEROME A REDDICK | B | M | 20060808 | 20482 | 65 | 65 | 0 | 0 |
| 4xx-21-5566 | DANIEL M TURMAN | W | M | 20060808 | 20482 | 50.83 | 50.83 | 0 | 0 |
| 4xx-06-9991 | ANNA H HARRIS | B | F | 20060808 | 20482 | 58.81 | 58.81 | 0 | 0 |
| 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 | RONNIE CARR | B | M | 20060808 | 20482 | 77.52 | 77.52 | 0 | 0 |
| 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 | MALCOLM L CABBIL | B | M | 20060808 | 20482 | 59.86 | 64.86 | 0 | 0 |
| 4xx-80-8331 | ROGER G WINNINGHAM | W | M | 20060808 | 20482 | 46.12 | 46.12 | 0 | 0 |
| 4xx-92-1454 | KEVIN GUIN | W | M | 20060808 | 20482 | 66.68 | 66.68 | 0 | 0 |
| 4xx-78-5572 | LEON C STEELE | B | M | 20060808 | 20482 | 51.87 | 51.87 | 0 | 0 |
| 4xx-04-7268 | DANIEL S SANDERS | W | M | 20060808 | 20482 | 50.16 | 50.16 | 0 | 0 |
| 4xx-13-9726 | RANDALL W HARRELL | W | M | 20060808 | 20482 | 51.65 | 51.65 | 0 | 0 |
| 4xx-21-6007 | ARTHUR BENTLEY ELLIOTT | B | M | 20060808 | 20482 | 46.46 | 46.46 | 0 | 0 |
| 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 | DONALD R LOVELACE JR | W | M | 20060808 | 20482 | 58.45 | 58.45 | 0 | 0 |
| 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 | JEFFERY S CALHOUN | W | M | 20060808 | 20482 | 64.11 | 64.11 | 0 | 0 |
| 4xx-84-4372 | ERIC R JOHNSON | W | M | 20060808 | 20482 | 53.53 | 53.53 | 0 | 0 |
| 4xx-23-2938 | JOHN ERIC ROBBINS | W | M | 20060808 | 20482 | 49.96 | 49.96 | 0 | 0 |

ALDOT Data Available Through September 2006
Other Departments Available Through March 2006

# EXHIBIT T

## SELECTION FORM

The Decree provides that in "connection with appointments, the Department of Transportation will develop and use a form which will state the reason that the eligible selected for appointment is regarded as the best qualified applicant for the job." (Paragraph 2 of Article 9). It will be necessary for you to fill out this form and transmit it to the Hiring and Promotions Bureau on each occasion anyone is appointed to a job. Check and fill out all blanks, which apply.

Name of person selected: _____ *Thomas Lewis*

Social Security number of person selected: _____ *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*

Job for which selected: _____ *Transportation Technologist Senior*

Date of selection: _____ *2-13-06*

Of the candidates available I selected this person as the best qualified for the job for the following reason(s):

1. Was this person's work experience a reason he/she was considered the best qualified?
   __✓__ Yes _____ No If so, summarize such work experience.

   *Twenty Three Year Location Survey Exp.*

2. Was this person's vocational or trade training a reason he/she was selected?
   _____ Yes _____ No If so, summarize such training.

3. Was the person's job performance with the Department of Transportation a reason he/she was selected? _____ Yes _____ No If so, summarize such job performance.

4. For jobs that do not require a degree but involves the knowledge of mathematical computations, was the math course work that had been take a reason he/she was selected?
   _____ Yes _____ No If so, summarize such course work.

5. Was the best available candidate?

   __✓__ Yes _____ No

_Thomas W. Lewis_
Applicant's Name

_First Interviewer's Signature_

Interviewer #1 – Printed Name    _Joe E Jones_

Interviewer #1 – Race    _White_

Date:    _2-13-06_

_Second Interviewer's Signature_

Interviewer #2 – Printed Name    _Calvin J Cook_

Interviewer #2 – Race    _Black_

Date:    _2-13-06_

Third Interviewer's Signature

Interviewer #3 – Printed Name

Interviewer #3 – Race

Date:

Fourth Interviewer's Signature

Interviewer #4 – Printed Name

Interviewer #4 – Race

Date:

(Revised 01/05)

# EXHIBIT U

# ALABAMA DEPARTMENT OF TRANSPORTATION
## STRUCTURED ORAL INTERVIEW

Revised: June 8, 2004

Evaluation Tally Sheet

Interviewee:  Thomas W. Lewis

Date:  February 9, 2006

Position:  Transportation Tech. Sr.

COE#:  05100050R

PCQ#:  2119200, 2111900

Interviewer's Signature:

1. _____
2. _____
3. _____
4. _____

Interviewer:  _____  1

| Question | | Initial Evaluation | | | | Final Evaluation |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | |
| 9 | Communication: | A | A | | | B |
| | Content: | B | A | | | B |
| 10 | Communication: | B | B | | | B |
| | Content: | B | A | | | A |
| 19 | Communication: | A | B | | | A |
| | Content: | B | B | | | A |
| | Communication: | B | B | | | B |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |

# EXHIBIT V

# ALABAMA DEPARTMENT OF TRANSPORTATION
## STRUCTURED ORAL INTERVIEW

Evaluation Tally Sheet

Revised: June 8, 2004

Interviewee: Lawrence Brown
Date: February 8, 2006
Position: Transportation Tech. Sr.
COE#: 05100050R
PCQ#: 2119200, 2111900

Interviewer:

Interviewer's Signature:
1.
2.
3.
4.

| Question | | Initial Evaluation | | | | Final Evaluation |
|---|---|---|---|---|---|---|
| 9 | Communication: | | | | | |
| | Content: | | | | | |
| 10 | Communication: | | | | | |
| | Content: | | | | | |
| 19 | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |
| | Communication: | | | | | |
| | Content: | | | | | |

# EXHIBIT W

Form 3 - Revised January 1999

# APPLICATION FOR EXAMINATION

| DO NOT WRITE IN THIS SPACE | | General Instructions |
|---|---|---|

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

RECEIVED
2005 MAR 10 P 1:00
STATE OF ALABAMA

RS RM 3/21/05
RS 3/22/05 9:00
ACCEPT per Bill & Steve 4/6/

ENTER SOCIAL SECURITY NUMBER BELOW.

| 4 | 1 | 9 | - | 7 | 8 | - | 8 | 0 | 4 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|

| Examination For Which You Are Applying (one per application) | 20482 | 007 | Option (if applicable) |
|---|---|---|---|
| Transportation Technologist ,Senior | Design 2 0482 (007) | | |

| Full Name | Lawrence | Naro | Brown |
|---|---|---|---|
| | First | Middle | Last |
| Address | 104 | Pretoria Circle | |
| | House or Apartment Number | Street | |
| | Birmingham | Alabama | Jefferson | 37 | 35211 |
| | City | State | County | | Zip Code |

Telephone Number: Home ( 205 ) 942-7981       Work ( 334 ) 242-6175
                        Area Code                              Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth   07   29   56       Sex (check one) 1. ( X ) Male   2. ( ) Female
              (Month) (Day) (Year)

Race (check one) 1. ( ) White   2. (X) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native   6.( ) Other

| EDUCATION: | CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED. | ED | 13 |
|---|---|---|---|
| High School Graduate or GED? ( X ) Yes ( ) No | 1 2 3 4 5 6 7 8 9 10 11 (12) College 1 2 3 | LC | |

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year | | Credit Hours | | Did You Graduate? | | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| | From | To | Sem. | Qtr. | Yes | No | | |
| Jones Valley High | 1970 | 1975 | | | X | | High School | |
| | | | | | | | | |
| | | | | | | | | |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

| | | | | |
|---|---|---|---|---|
| | | | | |

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature _____               Date· March 10, 2005

During the application process, including testing and employment consideration,
your name may be removed from an employment register for any disqualifying reason.

SOCIAL SECURITY NUMBER :  4  1  9 - 7  8 - 8  0  4  0

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| James M. Carroll | 243 Co. Rd. 410 Clanton, Al.  205-280-0358 | |
| William McKinnon, Jr. | 653 Co. Rd. 55 Clanton, Al.  205-755-0985 | |
| Troy L. Nichols | 4003 Oliver Dr. Rainbow City, Al.  256-442-6011 | |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    ( )  Yes   ( X ) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?    ( )  Yes   ( X ) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

_____
_____
_____
_____
_____

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

20481 - 9/4/04- pres.
20480 - 8/16/98 - 9/3/04
20116 - 6/20/98 - 8/14/98
20113 - 1/26/91 - 6/19/98

**WORK HISTORY**
THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1.  Current or Last Employer | | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|---|
| Alabama Department of Transportation | | | | | Civil Engineer  (Instrumentman/Field Supervisor) | | |

| Address | | | | | Type of Business | | |
|---|---|---|---|---|---|---|---|
| 1409 Coliseum Blvd.  Montgomery, Al. | | | | | Highway & Bridge | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 09 | Year 98 | Month 01 | Year 04 | 78 | 40 | $ 1097.00  Per Bi-Week | S 1540.00  Per Bi-Week | ( X ) Yes   ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Equipment You Operated |
|---|---|
| 4 | Total Station, Computer, Calculator |

| Name, Title and Telephone Number of Supervisor  Donald Johnston , Party Chief, 334-242-6175 | Reason for Leaving   Still Here |
|---|---|

Describe Your Duties in Detail

Gather information, assign & train co-workers in collecting data in all engineering duties.  Operates equipment to and on job site.  Monitors and aids in controlling work area safety conditions.  Communicates with co-workers regarding procedures.  As of Sept. 2003 My  official title has been Field Supervisor.

. My duties have included supervising EA's and to insure that the data and information they gather is accurate and that they gather the information in a timely manner.

SOCIAL SECURITY NUMBER : 4 1 9 7 8 8 0 4 0

| 2. Employer | | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|---|
| Alabama Department of Transportation | | | | | Engineer Assistant III  (Field Supervisor) | | |
| Address | | | | | Type of Business | | |
| 1409 Coliseum Blvd.  Montgomery, Al. | | | | | Highway & Bridge | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | 117 | 40 | $ 720.00  Per Bi-Week | $ 1097.00  Per Bi-Week | (X) Yes    ( ) No |
| 10 | 88 | 07 | 98 | | | | | |

| Number/Title of Employees You Supervised | | Equipment You Operated |
|---|---|---|
| On a Continuing Basis | 6 | |

| Name, Title and Telephone Number of Supervisor | Dewayne Keel, Party Chief | Reason for Leaving | Promoted to CE |
|---|---|---|---|

Describe Your Duties in Detail

Operates instrument, communicates with co-workers regarding procedures.  Review and check data collected.  Aid in controlling work area & safety conditions.

| 3. Employer | | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|---|
| Alabama Department of Transportation | | | | | Engineer Assistant II  (Levelman) | | |
| Address | | | | | Type of Business | | |
| Birmingham, Al. (3rd Division) | | | | | Highway & Bridge | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | 72 | 40 | $ 520.00  Per Bi-Week | $ 720.00  Per Bi-Week | (X) Yes    ( ) No |
| 09 | 82 | 10 | 88 | | | | | |

| Number/Title of Employees You Supervised | | Equipment You Operated |
|---|---|---|
| On a Continuing Basis | 0 | Level |

| Name, Title and Telephone Number of Supervisor | Choyce Roberts | Reason for Leaving | Promotion to EA III |
|---|---|---|---|

Describe Your Duties in Detail

Surveying in all related duties pertaining to gathering information for planning & making plans for the purchase of land & contracting road work.

| 4. Employer | | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|---|
| Alabama Department of Transportation | | | | | Engineer Assistant I  (Rodman) | | |
| Address | | | | | Type of Business | | |
| Birmingham, Al. (3rd Division) | | | | | Highway & Bridge | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | 61 | 40 | $ 340.00  Per Bi-Week | $520.00  Per Bi-Week | (X) Yes    ( ) No |
| 09 | 77 | 10 | 82 | | | | | |

| Number/Title of Employees You Supervised | | Equipment You Operated |
|---|---|---|
| On a Continuing Basis | 0 | |

| Name, Title and Telephone Number of Supervisor | Charlie Wilkinson | Reason for Leaving | Promotion to EA II |
|---|---|---|---|

Describe Your Duties in Detail

Assist the supervisor & instrumentman in all phases of surveying work for design purposes, stake line cut & take cross sections, cut & hub line.

SOCIAL SECURITY NUMBER : __4__ __1__ __9__ - __7__ __8__ - __8__ __0__ __4__ __0__

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to support your application to support your claim.

1 ( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.
2 ( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.
3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.
4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.
5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City   3 (X) Birmingham   5 ( ) Dothan   7 ( ) Linden   9 (X) Montgomery   12 (X) Tuscaloosa
2 ( ) Andalusia   4 ( ) Decatur   6 ( ) Jacksonville   8 ( ) Mobile   10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

1 ( ) State Employment Service     5 ( ) Friend/Relative     9 ( ) Legislative Representative     13 ( ) TV/Radio Commercial
2 ( ) Job Announcement Notice     6 ( ) Dept. News Bulletin     10 ( ) State Recruiter/Counselor     14 ( ) Other _____
3 ( ) Newspaper     7 ( ) Rehabilitation Services     11 (X) State Personnel Dept. Information Board
4 ( ) College Placement/Career Office     8 ( ) High School Counselor     12 ( ) Outreach Program (i.e. Church)

## AVAILABILITY

**81 - Northwest Alabama**
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

**84 - Jasper**
Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

**87 - East Central Alabama**
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

**90 - Montgomery Area**
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

**93 - South Central Alabama**
06 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

**82 - Huntsville/Decatur Area**
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

**85 - Tuscaloosa Area**
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

**88 - Southwest Alabama**
12 Choctaw
13 Clarke
46 Marengo
65 Washington

**91 - Phenix City/Troy Area**
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

**94 - Dothan Area**
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

**83 - Northeast Alabama**
10 Cherokee
25 DeKalb
28 Etowah

**86 - Birmingham Area**
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

**89 - Selma/Clanton Area**
11 Chilton
24 Dallas
53 Perry
66 Wilcox

**92 - Mobile Area**
02 Baldwin
49 Mobile

**95 - Statewide**
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work __86__   __85__   __95__

If you want to be considered for appointment by only certain state agencies, indicate here_____

Will you accept work involving overnight travel? (X) Yes  ( ) No     Will you accept part-time work?  ( ) Yes  (X) No

Will you accept temporary work?  ( ) Yes  (X) No

Which shifts are you willing to work?  0. (X) all shifts  1. ( ) 1st only  2. ( ) 2nd only  3. ( ) 3rd only  4. ( ) 1st and 2nd only  5. ( ) 1st & 3rd only  6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.) __03__ __11__ __2005__
                                                                                          Month   Day   Year

NOTE:     Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

# EXHIBIT X

IN THE
UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


JOHNNY REYNOLDS, et al.,                    )

       Plaintiffs,                          )

                                            )

v.                                               CIVIL ACTION NUMBER:
                                            )   CV-85-T-665-N

ALABAMA HIGHWAY DEPARTMENT,                 )
ET AL.

       Defendants.                          )


# ORDER AND CONSENT DECREE I

# ENTERED ON MARCH 16, 1994

553

FILED

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

MAR 16 1994

THOMAS C. CAVER, CLER

BY _____
DEPUTY CLERK

JOHNNY REYNOLDS, et al.,       )
                               )
        Plaintiffs,            )
                               )
    v.                         )    CIVIL ACTION NO. 85-T-665-N
                               )
ALABAMA DEPARTMENT             )
OF TRANSPORTATION, et al.,     )
                               )
        Defendants.            )

<u>ORDER</u>

The court has before it motions relating to the approval of certain segments of a proposed consent decree submitted to the court by the parties on November 18, 1993, and preliminarily approved by the court on November 19, 1993. Pursuant to the court's order of January 24, 1994, the proposed decree has been divided into three segments:

> Consent Decree I contains all provisions of the proposed decree which are unopposed by the intervenors;

> Consent Decree II contains certain provisions of the proposed decree to which the intervenors object, including provisions which the intervenors contend are "race-conscious" and the plaintiffs contend are not; and

> Consent Decree III contains certain other provisions of the proposed decree to which the intervenors object, namely, the provisions that the parties and intervenors agree are "race-conscious," as set forth in the "Joint Statement Pursuant to ¶ 4 of the Order Entered January 24, 1994," filed by the parties and the intervenors on February 1, 1994.

On March 7, 1994, plaintiffs filed a motion seeking approval of Consent Decrees I and II. Subsequently, the parties and the intervenors resolved certain of the intervenors' objections to provisions contained in Consent Decree II and moved those provisions to a revised Consent Decree I. On March 9, 1994,

EOD 3/16/94

intervenors filed a motion requesting the court to adopt their proposed revisions to the provisions of Consent Decree II. The parties and intervenors are in agreement that Consent Decree I, as revised, contains only "race-neutral" provisions; the intervenors do not object to the court's approval of Consent Decree I.

The court finds Consent Decree I to be "fair, adequate, and reasonable." Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1214 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020 (1979); Paradise v. Wells, 686 F. Supp. 1442, 1444-46 (M.D. Ala. 1988) (Thompson, J.). Furthermore, because the parties and intervenors agree that the provisions of Consent Decree I are race-neutral, the court need not engage in strict-scrutiny analysis to determine if any race-conscious relief is legal. Richmond v. J.A. Croson Co., 488 U.S. 469, 503, 506, 109 S.Ct. 706, 727, 728 (1989); Peightal v. Metro. Dade County, 940 F.2d 1394, 1399 (11th Cir. 1991) (majority opinion). The court concludes that the provisions of Consent Decree I are neither illegal nor against public policy. United States v. Alexandria, 614 F.2d 1358, 1362 (5th Cir. 1980); Harris v. Graddick, 615 F. Supp. 239, 242 (M.D. Ala. 1985) (Thompson, J.). The court therefore determines that there is no just reason to delay the approval of Consent Decree I.

The court will consider final approval of Consent Decrees II and III separately at a later time. Plaintiffs' and intervenors' motions with respect to Consent Decree II will therefore by denied without prejudice.

2

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the motion to implement unopposed parts of proposed consent decree, filed by the plaintiffs on March 7, 1994, is granted as to Consent Decree I and denied without prejudice as to Consent Decree II;

(2) That the motion for approval of unresolved objections to non-race-conscious aspects of consent decree, filed by the intervenors on March 9, 1994, is denied without prejudice.

DONE, this the 16th day of March, 1994.

UNITED STATES DISTRICT JUDGE

IN THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FILED

MAR 16 1994

THOMAS C. CAVER, CLER.
BY _____
DEPUTY CLERK

JOHNNY REYNOLDS, et al.,           )

    Plaintiffs,                            )

                        )     CIVIL ACTION NO.

v.                                        )     85-T-665-N

ALABAMA DEPARTMENT OF                )
TRANSPORTATION, et al.,

    Defendants.                          )


## CONSENT DECREE I

This lawsuit was filed under Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 and § 1983 alleging racial discrimination in employment. The case has been certified and maintained as a class action on behalf of the following:

    A.    All black merit system employees employed by the Alabama Highway Department at any time since May 21, 1979, with said class represented by plaintiffs Johnny Reynolds, Ouida Maxwell, and Martha Ann Boleware; and

    B.    All black non-merit system employees of the Alabama Highway Department and all black non-employees who have unsuccessfully sought employment as merit system employees with the Alabama Highway Department at any time since May 21, 1979, with said class represented by plaintiffs Peggy Vonsherrie Allen and Jeffrey Brown.

- 1 -

A recess in the trial of the case for the purpose of settlement negotiations has resulted in the Consent Decree which follows. The following terms and provisions of this Consent Decree are accordingly agreed to in final and complete resolution of all class issues which have been asserted in the case, subject to the provisions of this Decree providing for further proceedings, including but not limited to Articles 20 and 21.

## ARTICLE ONE
## RECRUITMENT

### A.    EXPANDED RECRUITMENT PROGRAM:

Highway will, within 60 days of approval of the Consent Decree, develop a written plan for recruitment which will contain at least the following provisions:

1.    Recruitment of engineering students: Direct recruitment of every black civil engineering and civil engineering technology student enrolled in colleges in the Southeastern United States having black persons enrolled in such programs and at the Howard University Engineering School, with the following minimum efforts for each person:

(a)    Initial recruitment efforts to be initiated for each such person no later than one year after enrollment in such program.

(b)    Direct contact with such persons throughout the remainder of their enrollment in such program, with a minimum of one contact each six months until one year after graduation or the candidate is placed on the GCE register, whichever occurs first.

(c)    Documentation in a standard format of each contact with such student or graduate and the reason they did not apply or were not placed on a register.

- 2 -

(d)    Encouragement and assistance in applying for the position of GCE and other appropriate positions.

(e)    Monitoring of the progress of each such person's application through the application, examination, registration, certification and selection process and assistance at appropriate points that may enhance their eventual availability to the Highway Department on COE's.

(f)    Development of a program to encourage and assist such students and/or graduates in taking and satisfying the requirements of the EIT, registration with the appropriate licensing agencies, and eventual licensing by such agencies.

(g)    Use of monetary incentives to attract black candidates by starting persons having the EIT in a GCE pay grade no lower than pay grade 2.

(h)    The Highway Department will fund a program in cooperation with Alabama A&M University to increase awareness of and interest in civil engineering careers with the Highway Department and provide preparation for the FOE examination for students in civil engineering and civil engineering technology programs. Such funding will be $20,000.00 per year for a duration of 5 years.

(i)    Encouragement and assistance in applying for the position of PCET and revision of certain aspects of PCET program so as to increase the availability of black engineers through such program.

2.    Recruitment of persons with EIT or RPE Certification: Direct recruitment to the extent practicable of every black person who holds the EIT or a professional engineering

- 3 -

license issued by the State of Alabama and who has a degree in civil engineering or civil engineering technology, with the following minimum efforts for each such person:

(a)     Initial recruitment efforts to be initiated for each such person no later than 60 days after entry of the Decree.

(b)     Continuous recruitment efforts until the person states that they are not interested in working for the Highway Department or they are placed on an appropriate register for GCE, GRE, or PCE.

(c)     Documentation in a standard format of each contact with such person and of the reason they did not apply, were not placed on a register or COE, or were not selected.

(d)     Encouragement and assistance in the process of applying and being examined, registered, certified and considered.

(e)     Monitoring of the progress of each such person's application through the application, examination, registration, certification and selection process and assistance by Highway at appropriate points that may enhance their eventual availability to the Highway Department on COE's.

(f)     Use of monetary incentives to attract black candidates by starting persons having the EIT in a GCE pay grade no lower than pay grade 2.


3.     Recruitment of Persons with CE or CET Degrees:

Direct recruitment of every black person who can reasonably be identified as holding a degree in civil engineering or civil engineering technology by means of Highway requesting the names

- 4 -

and addresses of such persons from colleges in the Southeastern United States having such programs and at Howard University and contacting such persons as are identified by such means and by taking the steps set forth in Paragraph 2 above with respect to such persons.

    4.    <u>Recruitment for higher level Engineering jobs</u>:  For the Engineering positions above Civil Engineer I, the program will identify special means by which qualified black candidates can be recruited and, within the limits of merit system rules, employed.  The attorney for the class shall have the right to review and object to the means adopted and to seek further relief by petitioning the Court for such relief.

    5.    <u>Persons to be included in recruitment efforts</u>:  The expanded recruitment program will include, but not be limited to, the following:

    (a)    Recruitment in the Southeastern United States at educational institutions having black students enrolled and at Howard University in educational programs related to the job classifications listed in Paragraph 19 of Section B of this Article.

    (b)    Recruitment addressed to --

    (i)    Current employees regarding career paths/ better job opportunities.

    (ii)    Applicants rejected or not selected.

    (iii) Employees certified but not selected regarding potential opportunities in other jobs.

    (iv)    Applicants within the past 5 years who have not reapplied or kept their eligibility active or current, except the period shall be 10 years for the engineering job classes.

- 5 -

(v)    Eligibles who have been certified-out from Personnel to Highway during the past 5 years but failed to schedule or appear for an interview, except the period shall be 10 years for the engineering job classes.

(vi)    Existing eligibles who may be able to improve their score or rank by being reexamined or by further training or education.

(vii) Past employees who may have left the Highway Department because of a perception of limited opportunities.

(viii) Employees who may be able to advance through reclassification or reallocation.

(ix)  Any other potential source of candidates or means by which job opportunities for black persons may be improved.

6.    Encouragement and assistance:  The expanded recruitment program will include verbal and written encouragement and assistance by the Highway Department with applicants and potential applicants to offer assistance or advice in moving through the application, examination, certification, and selection process.  The phrase "potential applicants" as used in this Paragraph 6 means:

(a)    Persons who have to the knowledge of the Highway Department expressed an interest in applying;

(b)    Persons who the Highway Department has reason to know may be interested in applying;

- 6 -

(c)     All black students in civil engineering or civil engineering technology programs at colleges in the Southeastern United States having such programs and at Howard University;

(d)     Such persons as are identified by the procedure set forth in Paragraph 3 above as graduates of civil engineering or civil engineering technology programs in the 10 years prior to the effective date of this Decree.

7.     Evaluation:  The steps taken in connection with and the results of the expanded recruitment program will be evaluated at least quarterly by the Highway Director and the Personnel Director or their designees.  The result of such evaluation and the data used in the evaluation process will be reported in the quarterly reports required by the Settlement Decree. Personnel will institute a system of tracking the source of the applicant's knowledge of job opportunities and recruiting efforts to which he/she was subject, which at a minimum, will include responses to inquiries of the applicant or his application and computerized tabulation of such data into a report which allows monitoring of the effectiveness of recruiting sources.  Such data shall be provided to the plaintiffs' attorney within 30 days of the end of each calendar quarter of the year during the duration of this Decree.

8.     Frazer/Ballard:   The expanded recruitment program will include recruitment which extends beyond the past and existing recruitment activities by Highway and beyond the recruitment obligations provided for in Frazer/Ballard.

9.     Nationwide advertising:  Such expanded recruitment program will include special nationwide advertising campaigns designed to reach qualified black candidates.

- 7 -

10.    Intensified Recruiting:  Personnel will conduct monthly reviews of the racial composition of all registers for the classes listed in Paragraph 19 of Section B of this Article.  Whenever the black proportion of eligibles who are reachable on the Register for the next three vacancies for such classifications is less than 15% of the total eligibles on such Register for such job, the Personnel Department will so notify the Highway Department, and the Highway Department within 10 days of such notice will commence special intensified nationwide recruiting and advertising aimed at increasing the total number of black eligibles on such Register for such job classification to the 15% level.  Such intensified recruiting will also consist of the following:

(a)    Highway will pay the expenses associated with bringing top black candidates to Alabama in order to provide them with the opportunity to see the work environment and be interviewed; provided, however, that such expenses will not exceed 10 persons per year up to a maximum of total expenses for all such 10 persons together of $10,000 per year.  Provided that in the event the Highway Department has not achieved the goals provided for by Article Eleven with respect to the jobs listed in Paragraph 19 of Section B of this Article by the end of a calendar year during the term of this Decree, the maximum in the next succeeding calendar year will be up to 15 persons and $15,000 total expenses for all 15 such persons together.  Provided further that the obligations provided for by this sub-paragraph (a) shall not be extended beyond December 31, 2000 and that the Highway Department will decide which black candidates will be paid such expenses within the spirit or the purposes of this Decree.

(b)    Highway will engage in the efforts described in Paragraph 2 above of this Article One of this Decree;

(c)    Highway will utilize monetary incentives when necessary to attract such black candidates by starting them in a pay grade no lower than pay grade 2 or at such other level within the permissible range as is necessary for them to accept employment with the State of Alabama;

(d)    Highway will utilize further monetary incentives to attract such black candidates for the PCET, GCE, GRE and PCE jobs by starting those who had at least a 3.5 average in college and 12 months of civil engineering experience at no less than Step 4 of Pay Grade 2;

(e)    For advanced entry in job classifications above the entry level, Highway will provide such orientation and training as is reasonably necessary to allow the black candidate to make the transition to the methods of work and organization of the Highway Department and will inform the applicant or potential applicant that such special efforts will be made so that advanced entry is both feasible and successful;

(f)    Highway will document any difficulties or obstacles encountered in recruiting or appointing each such black applicant and, to the extent practicable, will develop and implement policies or programs aimed at removing such obstacles or recruitment.

11.    Colleges:  Geographic Scope:

(a)    The State Highway Department will conduct a program of on-campus recruiting at the following colleges and universities:

- Alabama A & M University

- 9 -

- Alabama State University

- Auburn University

- Auburn University in Montgomery

- Miles College

- Stillman College

- Talladega College

- University of Alabama

- University of Alabama in Birmingham

- University of Alabama in Huntsville

- University of South Alabama

- Georgia Institute of Technology

- Southern University

- Florida A & M University

(b)    The expanded recruitment program will utilize a wider-geographical area than Alabama which encompasses all colleges having black students enrolled in any educational program leading to satisfaction of the educational requirements of the jobs subject to Paragraph 19 of Section B of this Article in the Southeastern United States and Howard University.

12.    <u>Study of other recruitment programs</u>:  The recruitment efforts of other employers outside of state government will be studied and, if requested by the plaintiffs, an outside expert on recruitment would be consulted in devising the expanded recruitment program.

13.    <u>Dissemination of information</u>:  The expanded recruitment program will include the dissemination of written information to applicants regarding the application, ranking, certification, and selection process so that all applicants have equal opportunity to learn how to maximize their chances of being ranked higher on registers for Highway Department jobs, of being certified to the Highway Department, and being selected by the Highway Department.

14.    All recruitment activities shall be documented in a manner, means and format agreed between the parties.

15.    (a)    At least 50% of the on-campus recruiting each calendar year during the term of this Decree will be made by a black staff member of the State Highway Department assigned to recruiting.  When any on-campus recruiting during the term of this Decree is made by more than one State Highway Department recruiter on one recruiting trip, at least one of such recruiters is to be black.

(b)    The State Highway Department will provide to offices of the Alabama State Employment Service announcements of openings for or examinations for the jobs set forth in Section 19 of Section B of this Article.

(c)    On a semi-annual basis during the terms of this Settlement Decree, the State Highway Department will place a notice as set forth in the attached Appendix ____ inviting applicants to apply with the State Personnel Department for State Highway Department jobs in the following newspapers:

- 11 -

- The Birmingham Times

- The Montgomery Tuskegee Times

- The Mobile Beacon

16.    Nothing contained in this Decree is intended or shall be construed to limit the colleges or sources at which the State Highway Department conducts any recruitment.

17.    The Student Aide Co-Op program presently in effect will remain in effect during the term of this Decree.

18.    The recruitment demands and standards imposed upon the State Personnel Department and the State Highway Department under the Decree entered in United States v. Frazer, 317 F.Supp 1079 (M.D. Ala. 1970), and as amended from time to time, will continue to guide such Departments in its recruitment during the duration of this Decree.


B.    JOBS TO WHICH THE EXPANDED RECRUITMENT PROGRAM WOULD APPLY:

19.    Jobs covered by the program:  The expanded recruitment program will apply to the following merit system job classes at the Highway Department:

(a)    The PCET, GCE, and GRE classes.

(b)    The Professional Civil Engineer and Civil Engineer classes.

(c)    The Accountant and Auditor job classes, the Project Cost Auditor job classes, the Right-of-Way job classes, the Engineering Assistant job classes, Highway Maintenance Superintendent, Chemist I, Community Planner I, Electrical Engineer, Geologist I, Highway Office Manager, Programmer I, Programmer-Analyst I, Transportation Planner I,

and such other job classes for which an open competitive job announcement is utilized and the percentage of black persons on the Register for such job is more than 5% lower than the availability of persons in the Alabama labor force for such job or job family, provided, however, that if the Highway Department does not anticipate an opening in the coming 12 months in such a job, such expanded recruitment programs will not apply with respect to such job. In the event the Highway Department determines that it does not anticipate such an opening in the coming 12 months, it will notify the plaintiffs' counsel of such determination and the job or jobs in which it does not anticipate such an opening.

**ARTICLE TWO**
**MINIMUM QUALIFICATIONS**

1.    <u>Limitation on the use of minimum qualifications:</u>

Minimum qualifications will not be utilized on examination announcements or to preclude an applicant from examination unless the minimum qualification bears a manifest relationship to skills, knowledges, or abilities necessary to the performance of the job at entry without a brief orientation period and such skills, knowledges or abilities are not addressed in the examination process.

2.    <u>Consultation:</u>

(a)    Subject to Article Four on Implementation of Personnel Projects, Personnel will forthwith utilize a content validation procedure to determine the appropriate minimum qualifications for the Highway Department job classes. Such determination and the SPD validation procedure will be subject to challenge by plaintiffs and no new minimum qualifications will be implemented without approval by the plaintiffs or the Court.

- 13 -

(b)    Appointments in the interim between the effective date of this Decree and the completion of the requirements of this Article shall be governed by the provisions of Article Four of this Decree entitled Implementation of Personnel Projects.

3.    <u>Use of Minimum Qualifications In Examinations</u>:  Nothing in this Article of the Consent Decree shall preclude the use of minimum qualifications as a part of the examination process provided that such minimum qualifications satisfy Paragraph 1 of this Article and have been determined to be valid within the meaning of the Uniform Guidelines of Employee Selection Procedures by the State Personnel Department.

4.    <u>High School Diploma and GED</u>:  The State Highway Department will be permitted to use a high school diploma or a GED as a minimum qualification after it has been validated in accordance with the requirements of this Decree (including Paragraph 1 of this Article) and the Uniform Guidelines on Employee Selection Procedures by the State Personnel Department.

## ARTICLE THREE
## <u>SCORING AND RANKING</u>

1.    <u>Cooperation with the State Personnel Department</u>:    The Highway Department will cooperate with the Personnel Department in formulating and implementing the steps to be taken by the Personnel Department pursuant to the scoring and ranking provisions of the Settlement Decree.

2.    <u>Highway Department program</u>:  The Highway Department will develop and implement a program designed to achieve the following:

- 14 -

(a)     Assuring to the extent practicable that black employees are provided with equal opportunities to be assigned to duties of the jobs they hold comparable to the assignment of white employees on such job to such duties, provided that this is not intended to require all employees on a job to be assigned to the same duties or to require the assignment of anyone to duties which they are not qualified to perform after normal training and/or orientation.

(b)     Developing a procedure for informing employees regarding career paths within the Highway Department.

(c)     Providing an equal opportunity to black employees for participation in training programs comparable to training programs in which white employees on the same job participate.

(d)     Developing a system for monitoring the progress of the above procedures.

3.     Plan to monitor adverse impact:

(a)     Personnel will maintain adequate means for measuring and monitoring the adverse impact of screening and selection criteria used in eligibility for examinations, ranking, scoring and forming Registers or COE's and will submit such means to the plaintiffs' attorney for review and comment.

(b)     Within 90 days of the approval of the Decree, the Highway Department will submit its plan for measuring and monitoring the impact of the selection criteria used in appointments.

- 15 -

(c)     In the absence of agreement, the Court will decide the adequacy of the means of measurement and monitoring.

4.     Validation of criteria:

(a)     Personnel will develop and thereafter use only selection criteria and procedures that have been validated in accordance with the Uniform Guidelines on Employee Selection Procedures. For the SPD Project job classes, such validation will be completed within two years of the effective date of this Decree; for all other Highway Department jobs they will be completed within a reasonable period after the effective date of the Decree, subject to the right to seek further relief set forth in Paragraph 4 of Article Four on Implementation of Personnel Projects.

(b)     Appointments in the interim between the effective date of this Decree and the completion of the requirements of this Article shall be governed by the provisions of Article Four of this Decree entitled Implementation of Personnel Projects.

5.     Choice of examination types:

The choice among examination types (written, T & E, structured oral interview, etc.) will be made based on the results of the job analysis; provided, however, that such analysis shall be subject to challenge by the plaintiffs in the event it is found to be inadequate to achieve the purposes of this Consent Decree. With respect to written tests:

(a)     SPD will use written tests only when:

- 16 -

    (i)    The minimum qualifications for the class confirms that all candidates taking the test have the necessary reading abilities to pass the test, and either:

    (ii)    The job analysis supports the need to read and understand written instructions and/or information; or

    (iii)  A large number of candidates must be screened.

(b)    All written tests which are developed will be:

    (i)    Checked for reading level to assure that it is at no higher level than defined by the minimum qualifications; and

    (ii)    Reviewed by a socio-linguistic specialist to identify and correct any wording which may introduce a cultural bias.

(c)    SPD will actively look for alternative selection procedures which may have less adverse impact.

6.    <u>Pending Court Approval</u>

7.    Validation studies for written tests will be conducted in accordance with the Uniform Guidelines on Employee Selection Procedures.

8.    During the selection of examination type and development of the selection instrument, SPD will search for effective alternative devices which would have lesser disparate impact. Where a selection device shows substantial disparate impact upon use, SPD will search

- 17 -

for effective alternative devices which would have lesser disparate impact in future selection decisions, and will utilize such devices unless impracticable; provided, however, that this paragraph, and this Decree as a whole, will not modify or affect any obligation of the parties bound by this Decree which arises under federal or state law or regulations, the remedies and requirements set forth in <u>Ballard/Frazer</u>, or the Uniform Guidelines on Employee Selection Procedures.

    9.    <u>Content of examination announcements</u>:

Prior to administering examinations after the effective date of this Decree, defendants will develop, in cooperation with a qualified industrial psychologist, an examination announcement or material accompanying the application informing prospective applicants of the nature of the selection procedures, the characteristics the procedures are designed to assess, and the information with which the applicants are expected to be familiar on the examination.

    10.    <u>Documentation</u>:

Defendants will make available to plaintiffs' attorney sufficient information and documentation to show that the development and implementation of the selection procedures conform to the Uniform Guidelines. All validation efforts shall be documented in writing and make available to plaintiffs' counsel for review at least 30 days before an Examination Announcement or other use of the examination which is the subject of such validation effort.

    11.    Except to the extent that service ratings are a component of the examination, all examinations shall be administered by Personnel without involvement of any Highway employees in any aspect of the administration, including the scoring, ranking, evaluating, grading, or assessing of applicants; provided, however, that the parties may agree

- 18 -

to relax this requirement for any future selection procedure that utilizes Highway personnel in administration of valid examinations which necessitate such involvement by Highway, such as assessment centers, or other structured examination procedures, and provided further that nothing contained in this Decree will preclude or limit the use by Personnel of Highway employees as "subject matter experts" in a validation project.

12.    Prohibition of Divulging Contents of Examinations:    Personnel and Highway will develop means to prevent, to the extent practicable, activities which have the purpose or effect of disclosing the content of examinations to applicants or examinees, or potential applicants or examinees, prior to administration of examinations, or which have the purpose or effect of aiding some applicants or examinees in the examination process in ways which are not available to all applicants who are eligible for the examination; provided, however, that this paragraph will not be used to inhibit or prevent any formal training offered equally to all applicants or potential applicants so long as such training is disclosed to the Personnel Department in writing and that Department does not find, after review, that such training compromises the validity or reliability of the examination or the examination process. The means used to prevent potential compromise of the examination process will include, but not be limited to; (1) a policy which prohibits the types of activities listed above and which is disseminated to all applicants or potential applicants with a warning that violation of the policy may result in discipline (up to and including discharge from employment), and/or disqualification from examination process for a prescribed period of time of not less than one year; and (2) a set of procedures for monitoring and investigating activities which may compromise the

- 19 -

examination process; provided nothing in this paragraph shall prohibit applicants from forming study groups whether or not these study groups admit all applicants.

## ARTICLE FOUR
## IMPLEMENTATION OF PERSONNEL PROJECTS

1.     This Decree establishes a number of duties for Personnel, including four projects that will involve substantial studies:

       (a)     Validation of minimum qualifications (Article Two);

       (b)     Examination validation (Article Three);

       (c)     Study of multi-grade job (Article Fifteen); and

       (d)     Analysis of individual reclassification requests (Article Fifteen).

2.     Projects (a) and (b) set forth in Paragraph 1 above will focus on the following principal Highway Department classifications:  Highway Maintenance Technician, Engineering Assistant, Professional Civil Engineer Trainee, Graduate Civil Engineer, Graduate Registered Engineer, Civil Engineer, Professional Civil Engineer, Right-of-Way Specialist, Project Cost Auditor, and Highway Office Manager.  The classifications listed in the preceding sentence are referred to in this Decree as the "SPD Project Classes."  The precise sequencing is to be determined by Personnel, provided that the goal is to complete all four projects within two years of the effective date.

3.     Upon approval of this Decree, then-existing Registers for the SPD Project Classes will be abolished.  During the period between the effective date of this Decree and the

creation of new registers using newly validated minimum qualifications and examinations, vacancies in the SPD Project Classes identified in Paragraph 2 above may be filled by provisional appointments, which appointment may extend to the time of creation of such new registers. LAST SENTENCE PENDING COURT APPROVAL

4.    With respect to non-SPD project classes, if plaintiffs contend that existing registers do not provide sufficient opportunity for the Highway Department to satisfy the goals or minimum number of appointments required under this Decree, then the plaintiffs may seek further relief from the Court.

## ARTICLE FIVE
## BANDED SCORING

## PENDING COURT APPROVAL

## ARTICLE SIX
## REGISTERS

1.    Continuous registers:    With respect to the SPD Project Classes, the Personnel Department will use continuous registers. Continuous registers will also be used for any job classification that has been subject to continuous registers at any time since 1979, and for any other job classification for which Continuous Register will aid recruitment of black applicants unless Personnel determines that current registers would enhance the prospects of black applicants and potential black applicants. With respect to non-SPD Project Classes, if plaintiffs contend that existing registers do not provide sufficient opportunity for the Highway Department to satisfy the goals or minimum number of appointments required under this Decree, then the plaintiffs may seek further relief from the Court.

- 21 -

2.    Promotional registers:

(a)    In the establishment of Promotional Registers for the SPD Project Classes, the weight to be given to the service ratings component in the ranking of eligibles on the register will be 10% percent and not higher of the total ranking score. This provision does not otherwise restrict the utilization of service ratings, including specifically the banding of service rating scores, subject to Article Five of this Decree regarding Banding practices.

(b)    Eligibility for placement on Promotional Registers for the classes described in the SPD Project Classes will not be restricted to service in the immediately preceding feeder job (including EA-3 as a feeder for CE-1), and will include no residency requirement higher than one year of service in the line of progressions leading to the job or experience at the level of such service; provided, however, that the applicant has the work experience, degree, license, or certification which is a minimum qualification for the job to be filled on an open-competitive basis; and provided further that this Paragraph 2(b) will not apply to the following:

a.    PCE-2 and above;

b.    GRE;

c.    Highway Maintenance Superintendent;

d.    As to CE-3 and above, the procedure will be that --

-- A CE-3 may advance to CE-5 (but not higher) without service as a CE-4;

-- A CE-4 may advance to CE-6 (but not higher) without service as a CE-5; and

- 22 -

-- A CE-5 may advance to CE-7 without service as a CE-6.

    e.    In the event any grade of the multi-grade jobs listed above is restructured in or as a result of the job classification study provided for by Paragraph 3 of Article Fifteen ("Reclassification and Reallocation"), the provisions in sub-sections a and d will remain in effect with respect to the restructured grades.

    (c)  The provisions of this Paragraph 2 are subject to Paragraph 8 of Article Nineteen ("General").

    3.    Purging from a register: The following provisions will be adopted with respect to the purging of a name from a register for the SPD Project Classes:

    (a)    Personnel may continue to purge names from continuous registers after two years.

    (b)    At least 45 days before a name is to be purged from a continuous register pursuant to (a), Personnel will give written notice to the applicant and to Highway and shall maintain adequate documentation of such notice.

    (c)    The Highway Department will thereupon contact or attempt to contact the person whose name is proposed to be purged to inform them of their right to reapply for the job and to otherwise recruit and encourage such person to maintain their eligibility. Any black applicant who requests that his name remain on the register will not be purged pursuant to (a). The Highway Department shall notify Personnel of the completion of such efforts and

- 23 -

the response, if any, of the applicant within 40 days of receipt of Notice of proposed purging from Personnel. If the applicant has not indicated he wishes to remain on the Register, copies of such notice to Personnel from the Highway Department will be furnished to plaintiffs' counsel at the time such Notice is sent to Personnel. Personnel shall not purge the names of any persons until after receipt of such response from the Highway Department. Within three days of such purging, Personnel shall notify the applicant that he has been removed from the Register and of his right to be reinstated to the Register upon request. Adequate written or computerized documentation of all such contacts, attempts, encouragement, recruitment and requests shall be maintained and available for inspection by the plaintiffs' counsel.

(d)     Personnel may continue to place in an inactive status the name of any person who declines three opportunities for consideration or selection in writing.

(e)     Whenever a black applicant is to be made inactive pursuant to (d), Personnel will give notice to the applicant and Highway at least 45 days before the applicant is inactivated. Highway will then make the efforts required by (c). Any black applicant who thereafter requests reactivation will be reactivated.

4.     Abolition of registers: The following provisions will be adopted with respect to the abolition of current registers for the SPD Project Classes:

(a)     A register will not be abolished or replaced without an analysis of the impact of such replacement on black applicants and the goals set out in this Decree, and will be abolished only when the age and composition of the register, new job analysis, or other factors indicate that a new register should be found.

- 24 -

(b)    When a register is abolished or replaced, Personnel will, two weeks before the application deadline for the new examination, notify Highway of the identify of any black eligibles on the abolished or replaced register who have not reapplied for the new register and Highway will then engage in the special recruitment efforts to encourage applications set forth in Paragraph 3 (c) immediately above.

(c)    All black eligibles on the abolished or replaced register who reapply for the new register shall be placed on such new register.

## ARTICLE SEVEN
## CERTIFICATES OF ELIGIBLES

1.    Request for COE:    When a permanent opening occurs in a classified position at the Highway Department and such job opening is to be filled, the Highway Department will request a COE for such job opening within 30 days, provided that --

(a)    This is not intended to require the filling of a job and will apply only where it is Highway's decision to fill the job.

(b)    There is a requisition and funding for such job.

(c)    This will not preclude a subsequent filling of the job by a request by the Highway Department for a COE, provided that the Highway Department gives notice in writing to the Personnel Department of non-discriminatory justification for not having requested a COE within such 30 day period and subsequently requesting a COE.

(d)    For any permanent opening in a classified position at the Highway Department which is not to be filled through a COE within 30 days of any event which causes

- 25 -

the permanent opening, the Highway Department shall give notice to Personnel of the reason for not filling such opening.

      2.    No delay in requesting a COE:  The Highway Department will not delay requesting a COE for a permanent opening in a job which is to be filled for any purpose of avoiding or attempting to avoid the certification or appointment of black eligibles on the register for such job.

      3.    Register to be used for COEs:  PENDING COURT APPROVAL:

          a.

          b.

    4.    Pre-screening:

      (a)    The Personnel Department will not provide the Highway Department with the means of knowing the identities or the racial composition of potential Certificate of Eligibles before the official issuance of such a Certificate.

      (b)    The Highway Department will take appropriate action to assure that officials and employees of the Highway Department do not have access to and do not use information about the probable composition of alternative Registers or Certificates of Eligibles in determining when to fill positions, from what Registers to fill positions, or any other advance information which may have the purpose or effect of favoring or disfavoring persons of one race over another.

    5.    TIED SCORES:  Where black eligibles and white eligibles would appear on the same Certificate of Eligibles with tied scores, Personnel will continue to certify all such eligibles but will use a procedure to be developed by it to break the tie.  The plaintiffs' attorney

- 26 -

will have the right to review and object to the procedure used and to petition the Court with regard to the subject before it is implemented.

## ARTICLE EIGHT
## INTERVIEWS BY THE HIGHWAY DEPARTMENT

1.    Interviews of black eligibles on a COE:  When black eligibles appear on a COE, Highway will schedule interviews with them and will conduct the interview before deciding whom to select for the job; provided, however, that if a black eligible cannot be located, fails to respond or declines an effort to schedule an interview after the efforts required by Paragraph 3 of this Article ("Failure to Appear for Interviews"), Highway may fill the position without conducting an interview of that applicant.

2.    Standard interviews:  The Highway Department will develop and use standard format interview questions which will to the extent practicable be designed to elicit objective non-discriminatory job related information relating to the applicant and the job to be filled.

3.    Failure to appear for interviews:  If a black eligible on a COE fails to appear for a scheduled interview or fails to respond to the Highway Department's invitation to schedule an interview, the Highway Department will make reasonable and good faith efforts to contact such person to advise him or her of the importance of the interview and to provide another opportunity for an interview.

4.    Interviewers:  For all Highway employees who conduct interviews, the Highway Department will develop and implement a training program in interviewing techniques

- 27 -

and procedures for the purpose of minimizing to the extent practicable any disadvantage to black eligibles in the interview process.

    **5.**    <u>Forms to be filled out by interviewers</u>:  The Highway Department will develop and use forms to be filled out by the interviewer or interviewers which will list the job-related qualifications of each eligible interviewed.

ARTICLE NINE
<u>APPOINTMENTS</u>

    **1.**    <u>Monitoring by the EEO Bureau</u>:

    (a)    The racial composition of appointments to each job will be monitored by the Highway Department's EEO Bureau on a periodic basis in comparison to the racial composition of eligibles certified for such job to determine the selection rate of black eligibles.

    (b)    The periodic basis for such monitoring will include appointments on the following intervals:  quarterly, annually, 3 years, 5 years, and such other periods as are necessary to assess the Highway Department's progress.

    (c)    The Highway Department's EEO Bureau shall monitor recruitment progress and the selection process so as to assure that the purposes of this Decree and Highway's Affirmative Action Program are fulfilled.  To this end, such EEO Bureau shall develop a systematic written program for such monitoring within 90 days of the effective date of this Decree and will submit it within 10 days thereafter to plaintiffs' counsel for comments and review.

2.    Form as to the eligibles selected:  In connection with appointments, the Highway Department will develop and use a form which will state the reason that the eligible selected for appointment is regarded as the best qualified candidate for the job.

3.    Role of race:  **PENDING COURT APPROVAL:**

4.    Prohibitions in connection with appointments:  The Highway Department will not avoid or attempt to avoid the appointment of black eligibles on registers by means of canceling requests for certifications, returning certifications, requesting the abolishment of registers, delaying requests for certifications or appointments, or any other means.

5.    Effort to include black employees in the interview and selection process: In conducting interviews and in making appointments, the Highway Department will endeavor to the extent practicable --

(a)    To include black employees among the interviewers, and

(b)    To include black employees among the persons making decisions regarding the eligible to be appointed.

6.    Provisional Appointments: Provisional appointments will be made only in accordance with Section 670-X-9-3 (3) (d) of the rules of the Personnel Department, and in no circumstances will be used to avoid black eligibles or the other provisions of this Decree. **LAST SENTENCE PENDING APPROVAL OF COURT**

- 29 -

ARTICLE TEN
HIGHWAY DEPARTMENT JOBS AND CAREER PATHS

1.    In-house jobs:   The Highway Department will develop and use a designation of the merit system jobs which may fill each of the in-house job titles utilized by the Highway Department.

2.    Career paths:  The Highway Department will develop and disseminate to employees a written description of the in-house job titles and career paths available within the Highway Department and the merit system job classifications and Registers from which the jobs in each career path may be filled.

3.    Manager or supervisor programs:  Within 180 days of the effective date of the Decree, and thereafter on an annual basis, the Highway Department will --

(a)    Conduct a supervisory management orientation program, open to all interested employees, for the purpose of explaining the management and supervisory positions in the Highway Department career paths and the duties and responsibilities of such jobs.

(b)    Conduct a supervisory management update program to be attended by all managers and supervisors for the purpose of reporting on the progress of the Highway Department pursuant to the Settlement Decree, to apprise them of ongoing and proposed Highway Department projects, and to provide training in new or updated techniques in management and supervision.

## ARTICLE ELEVEN
## GOALS

### PENDING COURT APPROVAL, EXCEPT FOR PARAGRAPHS 11, 21 AND 22

**A.     GENERAL:**

      1.
      2.
      3.
      4.

**B.     JOBS SUBJECT TO THIS ARTICLE:**

      5.

**C.     GOALS:**

      6.
          (a)
          (b)
          (c)
          (d)
          (e)
          (f)
          (g)
          (h)
          (i)
      7.
          (a)
          (b)
             (i)
             (ii)
          (c)

**D.     PROVISIONS APPLICABLE TO GOALS:**

      8.
      9.
      10.

11.    The Highway Department will take affirmative steps to have eligible black employees of the Department receive assignments at rates proportional to their representation in the relevant job classifications to the better in-house job titles at the Highway Department. In the event that the plaintiffs conclude that the efforts of the Highway Department in this area are not adequate, they may petition the Court for further relief in this area during the pendency of this Decree.

12.
13.
14.
15.
16.
17.
18.
19.
20.

21.    Any Engineering Assistant I or II who is actively employed in either of such jobs as of the effective date of this Decree and who had at least two years service in either one or both of such job classifications as of October 4, 1989 will be reclassified as an Engineering Assistant III within 30 days of the effective date of this Decree and will be paid at the rate which would have now been applicable if they had become an Engineering Assistant III on the fifth (5th) anniversary of their entrance into the Engineering Assistant I or II job classification, whichever occurred earliest.

22.    In the event that minimum qualifications for engineering classifications are defined in terms of years of service in other classifications, and in the event that prior experience is scored according to periods of incumbency in other classifications, the following will apply:

- 32 -

(a)     All periods after the 5th year of service as an EA I and/or EA II will be deemed to be service as an EA III.

(b)     All years of service after the 8th year of service as an EA at any level will be deemed to be service as a CE I.

(c)     All years of service after the 10th year of service as an EA at any level will be deemed to be service as a CE II.

23.
24.
25.
26.
27.
28.

## ARTICLE TWELVE
## SPECIAL PROCEDURE FOR APPOINTMENT OF ENGINEERS

## ENTIRE ARTICLE PENDING COURT APPROVAL

1.     Jobs:

2.     Goal:

(a)
(b)
(c)

3.     Incumbents on the GCE job:

4.     Duration

5.     General:

- 33 -

## ARTICLE THIRTEEN
## ENGINEERING JOB CLASSES

1. Limit on the use of EIT status:

(a) On and after the effective date of the Consent Decree, EIT status and any associated tests will not be utilized as a prerequisite for the job of GCE.

(b) After the goals provided by the Consent Decree for the GCE job have been achieved, then in evaluating eligibles certified to it for the GCE job, the Highway Department may consider EIT status as a factor in the selection process but may not appoint a white applicant in preference to a black applicant based solely on EIT status.

(c) Personnel will not utilize the EIT for scoring, ranking or certifying applicants for the position of GCE.

2. GCE job:

(a) The position of GCE will not be reduced in status, pay or importance from what it has been in the past.

(b) The GCE job will continue to be used as the entry level job for the PCE line of progression.

(c) The GCE job will also be expanded to an advanced entry level position for the CE line of progression.

- 34 -

(d)    The number of GCE's during the term of the Consent Decree will not be less than the average number per year of GCE's between January 1, 1983 and January 1, 1993.

3.    State registration:

(a)    Certification by the State Board of Registration as a Registered Professional Civil Engineer will continue to be a prerequisite for the PCE and GRE jobs.  It will not be a prerequisite for any CE or GCE job.

(b)    The PCE job will not be used excessively by the Highway Department in the assignment of employees to the in-house job titles which have been filled by both employees in the PCE job and in the CE job.

(c)    The Highway Department will not make appointments from PCE Registers or use the PCE job as the source for assignments for in-house job titles for the purpose of avoiding compliance with any provision of this Decree.

(d)    In the case of Highway employees who have taken but failed to pass the State Board examination for Registered Professional Civil Engineer or who are eligible to take such State Board examination, Highway will develop a special training program aimed at preparing them to take or retake the State Board examination.

4.    Offers of reclassification of incumbent employees to GCE:  **PENDING COURT APPROVAL:**

5.    Offers of employment in the GCE job:

(a)    The following persons (if they have Civil Engineering or Civil Engineering Technology degrees) will be offered employment in the GCE job or in the job they

- 35 -

would now hold with the Highway Department in the absence of the EIT and associated requirements (including the recency of degree requirement), whichever is higher, with the following credited service dates:

|  | CREDITED SERVICE DATE |
|---|---|
| Alfedo Acoff | March 30, 1983 |
| Peggy Vonsherrie Allen | March 30, 1983 |
| Christopher Zaubuike | March 30, 1983 |
| Jeffery W. Brown | March 30, 1983 |
| Willie F. Franklin | March 30, 1983 |
| Macon Hinton | March 30, 1983 |
| Wayne M. Leonard | March 30, 1983 |
| Ronald D. Newsome | March 30, 1983 |
| Adenrele Odutola | March 30, 1983 |
| Rickey Richardson | March 30, 1983 |

(b)    Up to a maximum of 10 persons, plus one replacement for each person named in Paragraph 5(a) who is not appointed for any reason, black persons (if they have Civil Engineering or Civil Engineering Technology degrees) will (subject to availability) be appointed to the GCE job or the job they would now hold with the Highway Department in the absence of the EIT and associated requirements (including the recency of degree requirement), whichever is higher, provided that they satisfy the following conditions:

- 36 -

(i)     They applied during the period since the EIT requirement was adopted for the GCE job or they would have applied for the GCE job but for the EIT requirement, and

(ii)    They were or would have been rejected because of not having EIT status, or other associated characteristics (including, but not limited to passing the FOE test and satisfying the recency of degree requirement) and

(iii)   They had degrees in Civil Engineering and Civil Engineering Technology at the time they applied or would have applied, and

(iv)    They would have been certified-out for GCE in the absence of their rejection for lack of EIT status or other associated characteristics as defined above.

(c)     The credited service date of such of the persons specified in Paragraph 5(b) above as accept such offers will be agreed to by the parties before notice of the offer of employment is given to them, subject to the following:

(i)     No such credited service date shall be earlier than March 30, 1983.

- 37 -

(ii)    The standard for determining such service dates will be the approximate date each such person would have been appointed in the absence of the EIT and associated requirements

(d)    The maximum number of persons provided for by Paragraph 5(a) and Paragraph 5(b) together is 20.

(e)    The State Personnel Department agrees to accept the appointment by the State Highway Department of such persons named or specified in Paragraphs 5(a) and 5(b) above as accept such offer, notwithstanding the inconsistency of such appointment (if any) with the Alabama Merit System Act.

(f)    **PENDING COURT APPROVAL:**

6.    Jobs for appointments pursuant to Paragraph 5:

The job or jobs which the persons to be appointed pursuant to Paragraph 5 will be offered will be agreed to by the parties before notice of the offer of employment is given to them, subject to the following:

(a)    For such persons as have a registration with the Alabama State Board of Registration as a Registered Professional Civil Engineer as of the effective date of this Decree, the job to be offered will not be lower than GRE or higher than PCE-2.

- 38 -

(b) For such persons as do not have such registration, the job to be offered will not be lower than GCE or higher than CE-5.

7.　　Mechanics for the Paragraph 5 offers:

(a) Within 45 days following the effective date of this Decree and agreement on the job or jobs to be offered, the Highway Department will offer appointments to each of the persons named in Paragraph 5(a) above.

(b) The offers of employment provided for herein will be made by United States mail, addressed to the last known addresses of the persons listed in Paragraph 5(a) above (a) as set forth in the records of the State Personnel Department or (b) as provided to the State Highway Department and the State Personnel Department by the attorneys for the plaintiffs based on any search or research they may wish to engage in to locate such persons provided any address or address is to be provided to the State Highway Department and the State Personnel Department within forty (40) days following the effective date of this Settlement Decree and agreement on the job or jobs to be offered. There will be no responsibility on any defendant to locate or to attempt to locate any of such persons.

(c) Such offers of appointment will include a designation for the use of such persons in accepting or declining the offers. There will be no option other than the options of accepting the offer or declining the offer. The offers must be accepted within such thirty (30) days following the mailing of the offers. Anyone who does not respond to the offer within such 30 day period will be deemed to have declined the offer.

- 39 -

(d)    The offers of appointments provided for herein will remain open for a period of thirty (30) days following the mailing of the offers.  Any and all offers of employment not accepted in writing by the offeree shall expire and have no further force or effect following such thirty (30) day period.

(e)    Such of the persons named in Paragraph 5(a) of this Article as accept the offers of employment and are employed at the State Highway Department pursuant to Paragraph 5 of this Article will be credited with employment date service as of March 30, 1983 for purposes of their starting salary level in the job.  It is the intention of this provision that such of the persons named in Paragraph 5(a) as are appointed pursuant to Paragraph 5 of this Article of the Settlement Decree will have their starting salary upon such employment equal to the average of the current salaries of the persons in the Graduate Civil Engineer job who started in such job on or about March 30, 1983.

(f)    The employment of any of such persons named in Paragraph 5(a) above shall not result in the displacement of anyone from any job, position, assignment, location, or shift and shall not result in the displacement of anyone from any section or bureau or division or district or office.

8.    Notice to recruitment sources:  The Highway Department will notify all recruitment sources, including colleges with Civil Engineering and Civil Engineering Technology programs at which the Highway Department recruits for Engineers, that EIT status, associated tests, and the recency of degree requirement has been discontinued as a prerequisite for the GCE job.

- 40 -

9.     Newspaper notice:  The Highway Department will place a notice advising that EIT status and associated characteristics, including the FOE test and the recency of degree requirement, has been discontinued as a prerequisite for the GCE job in newspapers of general circulation and special circulation in black communities and will otherwise adequately publicize such changes in the electronic media in the following cities:

-- Montgomery

-- Birmingham

-- Mobile

-- Tuscaloosa

-- Auburn

-- Huntsville

-- Dothan

-- Tri-Cities Area

-- Gadsden

-- Anniston

-- Alexander City

-- Troy

-- Grove Hill

Such notices and publicity shall invite black engineers to apply for employment with the SHD through the SPD.  Notices and publicity in the print media shall consist at, a minimum, of quarter 1/8 page advertisements designed to reach the maximum number of

readers.  Notices and publicity in the electronic media will be designed and placed in the most advantageous manner for achieving the attention of the public.

10.    Notice to applicants for GCE rejected because of the EIT requirement:

(a)    To the extent it is able to do so, the Personnel Department will provide to the Highway Department the names and last known addresses for all black persons with degrees in Civil Engineering and Civil Engineering Technology who applied for the GCE job and were rejected because of not having EIT status or any associated characteristics as defined above.  The Highway Department shall make reasonable efforts to identify the names and last known addresses of all black persons with degrees in Civil Engineering and Civil Engineering Technology from the colleges and universities which it will recruit under the terms of this Consent Decree.

(b)    The Highway Department will in turn give notice to such persons by certified mail, addressed to them at their last known address, advising them of the discontinuance of EIT status and associated characteristics as a prerequisite for the GCE job and enclosing a blank application form so they can if they wish reapply with Personnel for the GCE job.

(c)    Those who reapply and are certified-out by the Personnel Department to the Highway Department for the GCE job will be offered employment by the Highway Department in the GCE job, assuming they satisfy the qualification standards of the job and, if they did not apply for the GCE job in the past, can show a reasonable probability that they would have applied in the absence of the EIT or associated requirements, including, but not limited to, the FOE exam and the recency of degree requirement.

- 42 -

(d)    Those not offered employment and hired in accordance with Paragraph (c) above would remain on the register under the conditions of the Register Purging provisions above.

11.    Age Restrictions:  The defendants will not utilize any criteria or selection procedure in relation to black applicants which has the purpose or effect of preferring scoring, ranking or restricting eligibility of black applicants because of the date of their education, their age or any other item related to time or age which may perpetuate past patterns of underutilization of black applicants.

ARTICLE FOURTEEN
SELECTION PROCEDURES

1.    No new or more demanding standards:

(a)    Black applicants and employees will not be subjected to employment criteria or procedures for hiring or promotion that are more difficult or demanding than those applied to white employees in the period since January 1, 1979 unless such more difficult or demanding criteria or procedure is shown by Highway to satisfy and be valid within the meaning of the Uniform Guidelines on Employee Selection Procedures.

(b)    This does not mean that the job performance of black employees could not be evaluated by the revised Performance Appraisal procedure in effect or any future revision.

- 43 -

2.    Assignment of duties:

(a)    To the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to black employees compared with white employees in the same lower classified jobs.

(b)    The Highway Department will to the extent practicable not assign duties in such a way that any employee will gain an advantage in promotions, including reclassification, over other employees in the same classification.

3.    Job duties which better prepare employees:

(a)    Within 90 days following the effective date of this Settlement Decree, the Highway Department and the Personnel Department will identify the job assignments or duties within a job classification which would better prepare an employee for examination or promotion (including reclassification) than other assignments or duties within such classification.

(b)    The assignments and duties identified will include, but not be limited to, any assignment or duty which would receive a greater value or number of points in a T & E rating, a classification or pay review, or in selection from a COE.

(c)    For each assignment or duty so identified, the Highway Department will, to the extent practicable, develop a means for assuring that employees on the job are periodically rotated into such assignments and duties and that black employees are assigned to such duties and assignments at rates proportional to their representation in the job classification.

ARTICLE FIFTEEN
RECLASSIFICATION AND REALLOCATION

1.    Reclassification program: Following the effective date of this Decree, the following steps will be taken:

- 44 -

(a)     All employees then working for the Highway Department in the classified service will be provided with a Form 40 on which they may list the job duties which they are performing and the percentage of time spent on each such job duty. Such filled-out Form 40's will be subject to review and approval or revision by such employee's supervisor or supervisors. Any disagreement will be resolved by a job study analysis by the Personnel Department, subject to challenge by plaintiffs' counsel.

(b)     To the extent that such completed Form 40's establish that the subject employee is spending a majority of their working time in the performance of the duties and responsibilities of a higher job classification, or is spending an amount of time on such duties and responsibilities substantially equal to that of a majority of incumbents in such higher job classification, the Highway Department will request the Personnel Department to reclassify such employee to the higher job which is most appropriate for the duties and responsibilities on which the employee is spending a majority of his or her working time, and the Personnel Department will approve such request if such request is consistent with the findings of Personnel's classification review and its classification plan.

(c)     Laborers who are working at the Highway may utilize the procedure described in Paragraph 1(a) above to obtain permanent status in the appropriate merit system classification after completion of one year of satisfactory service.

(d)     All Laborers who are actively employed and have successfully performed the position of Laborer for one year as of the effective date of this Decree shall be reclassified to the HMT or EA position which is most similar to the duties they have performed as a Laborer on a regular basis.

- 45 -

(e)    In the future, all Laborers who have successfully performed the position of Laborer for one year shall be reclassified to the HMT or EA position which is most similar to the duties they have performed as a Laborer on a regular basis.

(f)    Nothing contained in this Paragraph 1 will apply to seasonal Laborers.

2.    Limit on filling jobs by reallocation:    A permanent opening in a classification may not be filled by reallocation when a black eligible is on the register for the class to which the position is being reallocated and such black eligible is (a) ranked higher or tied on the Register with the person to be reallocated or (b) would appear on a COE form from that Register if the person to be reallocated were ranked first on the COE.

3.    Multi-Grade Jobs:  The following steps will be taken by the defendants:

(a)    A job classification study will be conducted by the State Personnel Department encompassing the job classifications at Highway in a multi-grade series.  Such study will commence with the following multi-grade jobs:

--    Engineering Assistants

--    Civil Engineers

--    Professional Civil Engineers

--    Highway Maintenance Technicians and Highway Maintenance Superintendent

--    Right-of-Way Specialists

--    Project Cost Auditors

- 46 -

(b)  In the event such job classification study discloses that existing distinctions in the levels of multi-grade jobs do not reflect actual differences in duties, responsibilities, or qualifications, the jobs will be collapsed or restructured so that (i) they will reflect the actual distinctions, if any, shown by the study and (ii) are capable of being administered and utilized so that only persons occupying that classification perform the duties associated with it on a regular or non-emergency basis.

(c)  Any restructuring of multi-grade jobs will likely involve reducing the number of grades and broadening the pay ranges within the newly defined classification[s]. Such restructuring shall be implemented in a way that the opportunities for black employees to advance, and for the defendants to achieve the goals and purposes of this Decree, are enhanced and not diminished.

(d)  In the event that the study results in the consolidation of classes (e.g., HMT-1 and HMT-2), all persons will be assigned to pay ranges appropriate to their years of service, provided that black employees shall not be downgraded or have a reduction in pay as a result of the reclassification study unless it is demonstrated by the Highway Department that they have not performed after being given the opportunity to do so, and are not capable of performing with reasonable training, the duties and responsibilities of the job classification to which they are assigned.

4.    Duties within the job description: The Highway Department will monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on a regular or non-emergency basis are within the job description for job they are holding.

- 47 -

# ARTICLE SIXTEEN
## TRAINING

   <u>1.</u>  <u>Temporary special training program</u>: During the first calendar year following the effective date of the Settlement Decree, the Highway Department will develop and provide to all black employees a temporary special affirmative action training program with the goal of assisting such employees in progressing in career paths within the Highway Department. Such program will be provided again during the years 1997 and 1999.

   <u>2.</u>  <u>Regular Training Courses</u>: During the term of this Settlement Decree, the State Highway Department will offer training courses to employees subject to and in accordance with the provisions of the following subsections:

     (a)  The employees to whom such training courses will be offered will be all Highway Department employees who are working, during the calendar year in which the courses are offered, on a merit system job and have worked at least 540 hours of work during such year or the prior year on such job; provided, however, that Laborers will be treated the same as all HMT's for purposes of eligibility for such training courses.

     (b)  The training courses to be offered to such employees are set forth in the attached Appendix ___ to this Settlement Decree and a course or courses designed to clarify and update black employees on the procedures to be followed and qualifications, training, and experience to be credited in filling higher classified jobs within the Highway Department.

     (c)  The Highway Department will monitor the enrollment of employees taking training courses in order to ensure to the extent practicable that interested black employees are receiving their fair share of participation in such training courses.

(d)    The training courses to be offered pursuant to the Training section of the Settlement Decree will be started within 120 days after the effective date of the Settlement Decree and thereafter will be offered on an annual basis.

3.    The training courses provided for by this Article will be offered to the employees eligible therefore, with such employees having the option to accept or decline the training courses.    Offers and declinations of training opportunities shall be documented in writing and signed by the affected employee.

### ARTICLE SEVENTEEN
### POLICY AGAINST RACIAL HARASSMENT

1.    Policy:    The Policy Against Racial Harassment promulgated by the Highway Director in October 1992 will remain in effect.    Such policy will be disseminated to employees by being posted on bulletin boards customarily used for notices to employees.

2.    Training:  The Highway Department will develop and implement a training program to educate all employees on the laws of the United States regarding EEO and the policy of the Highway Department against racial harassment.    Such training will include a training course in the policy against racial harassment modelled on the Highway Department's training course in the policy against sexual harassment.

### ARTICLE EIGHTEEN
### RELATIVES

1.    No preference will be given to any known relative of any current State Highway Department employee.

- 49 -

2.    It is recognized that while the employment of relatives is not in and of itself unlawful, the giving of preference to relatives can under certain circumstances constitute a violation of Title VII of the Civil Rights Act.  Accordingly, the State Highway Department shall monitor and to the extent practicable identify persons who are related to current employees of the State Highway Department to ensure that no person is shown preference in hiring or promotion within State Highway Department by reason of being a known relative of a current employee of the State Highway Department.  In those cases where a relative of an employee of the State Highway Department is employed or promoted, the State Highway Department will maintain such records as are necessary to document the basis for the non-hiring or non-promotion of any black applicants who are equally qualified for the position or the promotion.

## ARTICLE NINETEEN
### GENERAL

1.    Frazer/Ballard: Defendants remain bound by the injunctive and declaratory relief entered in U.S. v. Frazer (now Ballard).

2.    EEO Monitor:  Within 90 days following the effective date of the Settlement Decree, the Highway Department will assign a qualified employee answerable directly to the Highway Director and stationed in Montgomery, whose primary responsibilities will consist of (a) monitoring compliance with the terms of the Settlement Decree, and (b) assisting both the Highway Department and the Personnel Department in carrying out the terms of the Settlement Decree.  The person to be assigned as the EEO Monitor pursuant to this Paragraph 2 is Ron Green.  In the event Mr. Green is unable or unavailable to continue to serve in this

- 50 -

position at any time during the term of this Decree, the Highway Department will consult with the plaintiffs' attorney concerning his replacement.

     3.    <u>EEO Program</u>:    The Highway Department's Equal Employment Opportunity Program will be enhanced and administered in a manner agreed between the parties.

     4.    <u>Reports</u>:  The Highway Department and the Personnel Department will make quarterly reports on their efforts to comply with the Settlement Decree in the format set forth in the attached Appendix ____. Such reports will be filed with the Court with a copy to plaintiffs' counsel. Such reports will be filed throughout the duration of this Decree to December 31, 2000, provided that if all or any part of this Decree is extended, the plaintiffs will have the right to petition the Court to extend the reports.

     5.    <u>Records</u>:  The Highway Department and the Personnel Department will permanently retain all records concerning the implementation of the Consent Decree for a period of 5 years following the expiration date of the Consent Decree. Such records would be available to plaintiffs' counsel for inspection and copying for a period of 5 years following the expiration date of the Settlement Decree.

     6.    <u>Monitoring</u>:

     (a)    Plaintiffs' counsel will be entitled to contact and request information from the Highway Department and Personnel Department during the term of the Settlement Decree to monitor their compliance with the terms of the Decree, and the Defendants will comply with such requests to the extent reasonable. All requests relating to the development and implementation of policies, procedures, systems, rules, appointments, studies shall be deemed reasonable. Such requests are to be in writing with copies thereof to counsel for the defendants.

The plaintiffs' counsel shall have the right to review the efforts at compliance and implementation of this Decree and shall be furnished with the information necessary to such review upon request. The defendants will consider in good faith the comments of the plaintiffs' counsel.

(b)    Any provision of this Decree which provides for a right of plaintiffs' counsel to review and comment on efforts at compliance or implementation shall be subject to challenge by the plaintiffs'.

(c)    The parties will have the right to seek to enforce the provisions of this Decree by filing motions with the Court. The provisions of this Decree, and the issues challenged in the case, have been premised upon the existence of the prior remedies ordered in the Frazer/Ballard case and, to the extent that any future acts or omissions violate the remedies ordered in Frazer/ Ballard, the plaintiffs will be entitled to enforce such remedies in this case in the same way that they are entitled to enforce the remedies of any other provision of this Decree.

(d)    It is the intent and purpose of this Decree to undo the effects of the past practices which have been the subject of this case and Decree and to prevent further practices which may perpetuate such efforts or otherwise discriminate against the plaintiffs or the class they represent. To the extent that this Decree fails to achieve the intent and purpose for which it has been entered, the parties may seek further relief from the Court.

(e)    Plaintiffs' counsel will be entitled to reasonable costs and fees for monitoring compliance with the Settlement Decree, including any expert witness fees. Plaintiffs' counsel will provide documentation of the number of hours spent, the functions performed, and

- 52 -

the costs incurred on a quarterly basis. Subject only to the accuracy of such documentation and the reasonableness of the amount requested, the requested amount would be paid within 30 days of submission. For routine monitoring, but not for the resolution of disputes, the maximum caps will be $10,000 per year for attorneys' fees, expenses and costs and $5,000 per year for expert witness fees, expenses, and costs. Amounts of fees within the limits of such caps will not be contestable by the defendants. The term "costs" will include normal billable expenses, including expert witness fees, as provided under the Civil Rights Act of 1991. Disputes will be resolved by the Court.

(f)     The plaintiffs' attorney will have the right to petition the Court to extend this Paragraph 6 and any or all sub-paragraphs thereof beyond December 31, 2000.

7.     Complaint procedure:   Within 180 days of the effective date of this Decree, the Highway Department will develop and implement an enhanced complaint procedure which assures that all discrimination complaints are processed without fear and reprisal within established time limits and that appropriate action is taken following decisions. Such procedure will be submitted to plaintiffs' counsel for review and comment at least 30 days prior to its implementation.

8.     No reference in this Decree to existing job classes or job groupings will be construed to restrict Defendants' ability to modify or abolish such classes or groupings, provided that the plaintiffs will be given prior notice and the opportunity to object and to seek Court review in this action prior to implementation of such changes.

- 53 -

9.    In developing validation efforts directed to minimum qualifications or examinations, and in developing revised examination announcements, Personnel will (a) document its efforts in writing, (b) consult with the attorney for the plaintiff class regarding the selection of its psychologists and (c) consult with the attorney for the plaintiff class and any psychologist or other expert designated by such attorney for such purposes. Prior to implementing the results of such efforts, Personnel will make the documentation of its projects available for review and comment by plaintiffs' attorney and consultants.

10.    <u>Duration</u>: The duration of the Consent Decree is December 31, 2000. The Court retains jurisdiction to decide any and all questions or disputes which arise under this Decree during such period or any extension period. The plaintiffs will have the right to seek extension of the duration of the Consent Decree.

11.    <u>Notice of the proposed settlement</u>: The provisions of the Civil Rights Act of 1991 will govern with respect to notice and objections and hearing concerning the Settlement Decree.

12.    <u>Effective date</u>: The phrase "the effective date of the Settlement Decree" means the date 35 days following the final approval of the Settlement Decree by the Court.

13.    Except to the extent expressly provided otherwise, all of the terms and provisions of this Decree shall operate prospectively only beginning with the effective date of the Decree.

14.    <u>PENDING COURT APPROVAL:</u>

15.    <u>PENDING COURT APPROVAL:</u>

16.     Subject to the provisions of this Decree permitting or requiring further proceedings, including but not limited to, Articles 20 and 21, this Decree constitutes full and complete relief on all claims, causes of action, and allegations which have been asserted in this action.

17.     All parties agree and stipulate that there will be no appeal from this Consent Decree or from any ruling, order, or decision entered by the Court in the case relating to any issue or subject encompassed within the terms of this Decree.   Nothing herein shall prohibit the non-class employees or any other person not a party to this Decree from having the right to appeal any interpretation, ruling, decision or order.

18.     The State Highway Department and the State Personnel Department will continue to comply with all laws and regulations applicable to equal opportunity in employment.

19.     Nothing in this Consent Decree shall be construed to permit the defendants to violate any law or regulations.   In particular, the State Highway Department and the State Personnel Department remain obligated to follow Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, all applicable Federal regulations, and all applicable Court orders with respect to all employment practices except as otherwise set forth hereinabove.

## ARTICLE TWENTY
## FURTHER PROCEEDINGS REGARDING CLASS MEMBERS

1.     Further negotiations and proceedings are required to resolve the claims for monetary and non-monetary remedies for individual members of the class (including the named plaintiffs and intervenors), provided however, that this Decree does not in and of itself entitled

any such class member to such remedies. Such claims shall be resolved first by settlement negotiations and then, to the extent not resolved by settlement negotiations, by the Court.

2. The parties will make all reasonable efforts to resolve all such claims of the members of the class (including the named plaintiffs and intervenors) according to a schedule to be mutually agreed upon within 10 days after preliminary approval of this Decree by the Court or, in the event the parties cannot mutually agree on such schedule within such 10 day period, the Court will enter an Order embodying a schedule. Regardless of whether the schedule is mutually agreed upon by the parties or embodied in an Order entered by the Court, such schedule shall contain specific deadlines for the exchange of information and for offers and counter-offers to enable settlement negotiations on such claims to take place within 90 days after the effective date of this Consent Decree and, in the event such settlement cannot be achieved, for trial on that phase of the case to commence no later than 180 days after the effective date of this Decree.

3. Such schedule shall be presented to the Court for approval or modification, and once finalized shall be entered as an Order of the Court. In the absence of agreement on such schedule within 10 days of the preliminary approval of this Decree, the Court will enter its own schedule aimed at settlement negotiations taking place within 90 days after the effective date of this Decree and scheduling that phase of the trial of this case to commence no later than 180 days after the effective date of this Decree.

## ARTICLE TWENTY-ONE
## ATTORNEYS' FEES

1. The parties will endeavor to reach agreement on the amount of attorneys' fees, costs, and expenses for services and expenses up to the then current date.

2.    If the parties have been unable to agree upon the amount of interim fees and expenses before the effective date of this Decree, the plaintiffs will submit their claim for fees to the defendants within three days of the effective date of this Decree and, within twenty-one days (21) thereafter, the defendants shall in good faith stipulate to the amount of such fees and expenses which they would urge the District Court to find to be reasonable and shall pay such uncontested sum to the plaintiffs' attorneys within thirty (30) days of the effective date of this Decree or at such other time as is mutually agreed to. As to any remaining sums claimed by the plaintiffs' counsel for fees and expenses, the defendants will, within twenty-one (21) days of receipt of plaintiffs' claim for fees, identify the hours they contest as unreasonable or otherwise not awardable with a short statement of the basis for each such contention, identify the hourly rate for each attorney representing the plaintiff which it would stipulate to be reasonable and urge the District Court to adopt, identify any other contentions which it would make regarding the amount of fee which should be awarded to each attorney appearing on behalf of the plaintiffs and identify any expense items which it contests as unreasonable or non-reimbursable with a short statement of the basis for each such contention. In the event that the fees and expenses must be determined by the Court, the parties stipulate that the proposed Consent Decree, if adopted by the Court, constitutes full relief on all claims asserted in this action and that the plaintiffs are the prevailing party as to all issues and claims in this lawsuit. In the event that the Court must determine the amount of fees and expenses, the parties will in good faith attempt to stipulate to the following items: (a) the reasonable hourly rate which should be paid for the services of each attorney representing the plaintiffs; (b) the reasonable number of hours expended by each such attorney on behalf of the plaintiffs; (c) the reasonable

amount of expenses incurred on behalf of the plaintiffs that should be reimbursed by the defendants. The class counsel (the law firm of Gordon, Silberman, Wiggins & Childs) shall be entitled to reasonable fees and expenses for work done after the preliminary approval of the Decree on behalf of the plaintiffs and the plaintiff class. If agreement cannot be reached, the amount of attorneys' fees and expenses will be resolved by the Court as soon as practicable (from the Court's standpoint). The Civil Rights Act of 1991 will govern with respect to allowable costs and expenses.

DONE and ORDERED this the ___16th___ day of ___March___, 199_4_.

MYRON H. THOMPSON
CHIEF JUDGE
UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

- 58 -

# EXHIBIT Y

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION **FILED**

**JAN 3 1 2000**

| | | |
|---|---|---|
| JOHNNY REYNOLDS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 85-T-665-N |
| ALABAMA DEPARTMENT OF | ) | |
| TRANSPORTATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.
MONTGOMERY, ALA.

ORDER OF CIVIL CONTEMPT AGAINST
THE ALABAMA DEPARTMENT OF TRANSPORTATION AND
THE ALABAMA STATE PERSONNEL DEPARTMENT

In 1994, this longstanding lawsuit--in which the
plaintiffs (who represent African-American employees and
applicants) charged the defendants (the Alabama Department
of Transportation, the Alabama State Personnel Department,
and their officials) with racial discrimination in
employment and in which the Adams intervenors (who
represent non-black employees) were allowed restricted
intervention--resulted in a partial consent decree
(consent decree I) settling what all parties agreed were

**EOD** _1-31-2000_

4284

race-neutral class-wide issues.[1] This litigation is again before the court, this time on the following three motions: (1) the plaintiffs' motion for civil contempt, filed February 13, 1997;[2] (2) the plaintiffs' motion for further relief, filed February 13, 1997;[3] and (3) the Adams intervenors' motion for contempt enforcement through race-neutral means, filed September 20, 1999.[4] The court also has before it two other important filings: (1) the defendants' stipulation to noncompliance with consent decree I, filed August 13, 1999;[5] and (2) the parties' agreement to remedies for contempt, filed December 17, 1999.[6] As will be explained below, the court now finds that the defendants are in civil contempt of consent

---

1.   See Reynolds v. Alabama Dep't of Transp., 1994 WL 899259 (M.D. Ala. Mar. 16, 1994) (Doc. no. 553).

2.   Doc. no. 1542.

3.   Doc. no. 1543.

4.   Doc. no. 4167.

5.   Doc. no. 4147.

6.   Doc. no. 4247.

2

decree I, and, with this finding, fashions appropriate relief.

## I.

### THE PLAINTIFFS' MOTIONS FOR CIVIL CONTEMPT AND FOR FURTHER RELIEF

(1) After the plaintiffs filed their February 1997 motions for civil contempt and for further relief, the defendants were ordered to show cause why the motions should nor be granted,[7] and the defendants responded on March 7, 1997.[8]

(2) After substantial discovery in the period from March to July 1997, the plaintiffs' motions were tried to the court for seven days, from July 7 to 14, 1997, before being taken under submission.

---

7.  See order entered February 18, 1997 (Doc. no. 1552).

8.  Doc. no. 1631.  Initially, there was some confusion over whether the Personnel Department was charged with civil contempt in the plaintiffs' 1977 motions.  By order entered on June 24, 1997 (Doc. no. 1952), the court held that the department was charged in the motions.

3

(3) During 1998, additional evidence addressing the defendants' contempt on related aspects of consent decree I was heard on the plaintiffs' second and third civil contempt motions, which had been filed on April 30, 1998,[9] and June 16, 1998,[10] resulting in the civil-contempt order of July 8, 1998, Reynolds v. Alabama Department of Transportation, 10 F. Supp.2d 1263 (M.D. Ala. 1998)[11], and the court's order of September 23, 1998.[12]

(4) Concerned that the evidence developed at the hearings on the plaintiffs' January 1997 motions needed to be updated, the court ordered a supplemental evidentiary hearing for March 2, 1999.[13]

---

9.    Doc. no. 2624.

10.    Doc. no. 2825.

11.    Doc. no. 2954.

12.    Doc. no. 3163.

13.    See order entered December 14, 1998 (Doc. no. 3379).

4

## THE DEFENDANTS' STIPULATION OF NON-COMPLIANCE
## AND THE ADAMS INTERVENORS' MOTION FOR CONTEMPT

(5) Further discovery and exchange of information eventually resulted in the defendants stipulating to certain facts and to non-compliance with consent decree I on August 13, 1999.[14] The plaintiffs and defendants also represented that still further stipulations, or, in their absence, further evidence, would be forthcoming prior to or during the supplemental evidentiary hearing on the plaintiffs' motion for contempt.

(6) The Adams intervenors subsequently filed a motion to hold the defendants in contempt of several discrete provisions of four articles of consent decree I: article II, ¶ 2 (a-b), article III, ¶ 4 (a-b), article IV, and article XV, ¶ 1 and ¶ 3(d).[15] The court issued a show-

---

14. Doc. no. 4147. In this order, the court has attempted to summarize the defendants' stipulation. To the extent the court's summary of the stipulation differs from the stipulation itself, the language of the stipulation still controls in this litigation.

15. See motion for contempt enforcement through race-neutral means, filed September 20, 1999 (Doc. no. 4167).

5

cause order on September 24, 1999,[16] to which the defendants filed their response on October 1, 1999,[17] and the plaintiffs filed a response that same day.[18]

(7)  After its original setting on March 2, 1999, the court reset the supplemental evidentiary hearing on the issue of the defendants' contempt on a number of occasions based on the plaintiffs' and defendants' representations that they were preparing stipulations that would update the evidentiary record, in whole or in part, without need of any additional evidentiary hearing.


THE PARTIES' AGREEMENT FOR REMEDIES OF CONTEMPT

Opening Provisions

(8)  On December 17, 1999, the plaintiffs, the defendants, and the Adams intervenors submitted an

_____

16.  Doc. no. 4177.

17.  Doc. no. 4189.

18.  Doc. no. 4190.

6

agreement on remedies for contempt.[19]  The parties agree that the defendants should be held in civil contempt of court for non-compliance with consent decree I and the court's orders and injunctions related to its enforcement until such time as they have affirmatively demonstrated that they have achieved full compliance with such decree, orders, and injunctions.

(9)  The remedies agreement addresses and resolves the defendants' non-compliance with and contempt of consent decree I and orders and injunctions enforcing the decree. In other words, the specific allegations of contempt asserted by both the plaintiffs and the Adams intervenors are resolved except as expressly otherwise set forth in the agreement.  The remedies agreement also addresses and

---

19. Doc. no. 4247.  In this order, the court has recited from and attempted to summarize the remedies agreement.   To the extent the court's view of the agreement differs from the agreement itself, the language of the agreement still controls in this litigation; and the fact that a provision or reservation in the remedies agreement is not mentioned in this order does not mean that the provision and reservation are not still operative, or, to put it another way, the provision and reservation are still operative.

7

resolves the issue of what coercive remedies and sanctions are appropriate for such non-compliance; however, it does not resolve any other remedial issues regarding the defendants' contempt or the pending motions, including, but not limited to, compensatory relief.

(10) The parties agree that because the decree was entered under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C.A. §§ 1981a, 2000e through 2000e-17), the Civil Rights Act of 1866, as amended (42 U.S.C.A. § 1981), and the fourteenth amendment to the United States Constitution as enforced through Civil Rights Act of 1871, as amended (42 U.S.C.A. § 1983), this court is authorized under 28 U.S.C.A. § 1331, 42 U.S.C.A. § 1343, and Title VII to enter the relief necessary to coerce compliance and compensate for injuries caused by non-compliance, and venue is proper in this court.

(11) Pursuant to the remedies agreement, the defendants must, by certain dates, demonstrate full compliance with each article of consent decree I. The parties agree that certain agreed-upon coercive sanctions

8

are to begin automatically on the date provided in the absence of a stipulation or order of the court establishing the defendants' full compliance.

(12) Under the remedies agreement, nothing in it extends, or should be construed to extend, the time for complying with consent decree I or any orders or injunctions relating to the decree; nothing in the agreement should be construed to modify, alter, or amend the terms of consent decree I or any other order or injunction previously entered by the court; and nothing in the agreement excuses, or should be construed to excuse, full compliance with consent decree I or any other order or injunction.

(13) The plaintiffs and the defendants stipulated that the defendants have not yet fully complied with consent decree I and they consent to entry of an order finding the defendants in contempt of the decree on the basis of the stipulations of non-compliance and fact filed August 13, 1999 (in particular, the defendants' admissions as set forth in stipulations 1-6, 19-23, 30-36, 39-40, 75-78, 90-

9

94, 96-97, 179-181), the court's prior orders, findings and declaratory judgments regarding compliance, or lack thereof, with consent decree I, the evidence presented at trials and hearings in this case since the effective date of consent decree I, and the record of the case as a whole at any time since the effective date of consent decree I. The Adams intervenors do not join in the plaintiffs and defendants' stipulations, and they decline to join in the plaintiffs' and defendants' agreement concerning this evidentiary basis.    They also do not waive their contention that those remedies not set forth in the remedies agreement and which affect the employment interests of the intervenor class can only be entered upon consent or following full evidentiary proceedings.


<u>Extension of Consent Decree I</u>

(14) The plaintiffs and defendants agree that the term of consent decree I, in its entirety, should be extended until December 31, 2004.  The plaintiffs and defendants further agree that the provisions of consent decree I

10

affecting the recruitment and selection requirements of the decree--specifically article I, article III (¶¶ 2, 3, and 12), articles VI through X, article XI (¶¶ 11 and 21), article XIII (¶¶ 1(a) and (c), 2, 3(d), and 11), article XIV, and article XIX, (¶¶ 1-5, 6(a-d), and 7)--should be extended until December 31, 2006, with the special affirmative action training of article XVI, ¶ 1, to be repeated in 2002 and 2004. The plaintiffs and the defendants further agree that, prior to expiration of the term provided, the parties may seek further extension of any provision for which the defendants are not in full compliance. Notwithstanding the foregoing provision, the plaintiffs also retain the right to seek extension of the duration of all or part of the consent decree I pursuant to the provisions of article 19, ¶ 10 of the decree. The plaintiffs also reserve the right to seek to restore the full amount of time that each provision of consent decree I was intended to operate after the initial compliance as a remedy for the defendants' contempt. The defendants reserve the right to oppose any such further extension.

11

(15) The Adams intervenors object to the foregoing extensions of consent decree I. The intervenors encourage in alternative that this court extend the decree for a period of only two years, to expire on December 31, 2002. In a hearing held December 21, 1999, the intervenors conceded that it was unlikely that the defendants would be able to achieve full compliance with all terms of consent decree I by that date; they suggested that this court should at that time simply extend the decree for another small discrete term, then extend that term again if necessary, and so on.

(16) Based on the evidence presented so far in this litigation, the court rejects the Adams intervenors' proposed alternative and concludes, instead and independently, that the decree should be extended as suggested by the plaintiffs and the defendants.[20] This court has repeatedly made clear that "[a] court's end

---

20. By the word independent, the court means that it has viewed the plaintiffs and the defendants' stipulation for extension as merely a suggestion rather than a stipulation, and the court has therefore reached its own conclusion for extension based on the evidence presented.

purpose in institutional litigation, such as this, is to remedy the violation and then to restore to local or state authorities complete control of the institution operating in compliance with federal law." Sims v. Montgomery County Comm'n, 890 F. Supp. 1520, 1534-35 (M.D. Ala. 1995) (Thompson, J.) (citing Missouri v. Jenkins, 515 U.S. 70, 97-98, 115 S. Ct. 2038, 2054 (1995); Freeman v. Pitts, 503 U.S. 467, 489, 112 S. Ct. 1430, 1445 (1992)), aff'd, 119 F.3d 9 (11th Cir. 1997) (table). To set an unrealistic date for compliance and for the termination of litigation would not only be meaningless, it would trivialize the concept of a compliance date, with the result that there would, in effect, be no real compliance date. The court believes instead that it should set a realistic date for compliance, with the defendants expected to meet that date--no ifs, ands, or buts allowed. Both the plaintiffs and the defendants are entitled to certainty; they should not have to waste their time and resources on unnecessary litigation over deadlines that cannot be met. Moreover, one of the principal ways that a defendant subject to

13

longstanding court supervision may prove its entitlement to release is by establishing an evidentiary record of compliance with court orders for a period of time. <u>See Freeman v. Pitts</u>, 503 U.S. at 491, 112 S. Ct. at 1446 (stating that courts, in deciding whether to release a school system from its supervision, "should give particular attention to the school system's record of compliance" because that school system "is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations.")  It would be therefore be against such defendant's interest for the court to set a compliance deadline that everyone knows cannot be met, for the court would, in effect, be setting the defendant up for defeat and thereby saddling the defendant with an evidentiary record of non-compliance.

14

## Coercive Sanctions for Contempt

(17) The defendants agree to demonstrate affirmatively their full compliance with each provision of consent decree I by the deadlines agreed upon by the parties. If such affirmative demonstration, as confirmed by either a stipulation of the parties or order of the court, has not occurred prior to the deadlines for automatic sanctions agreed upon, then the following sanctions will commence on each such deadline and continue until such time as the court determines that the defendants have achieved full compliance with the subject article of consent decree I and related orders and injunctions. As to each article for which one of the deadlines has not been met, the following sanctions apply:

(a) On the first day following the expiration of the deadline date, and on each subsequent day until full compliance is stipulated by the parties or found to have been achieved by the court, defendants are to pay the sum of $ 500.

15

(b) Should the defendants' non-compliance continue for more than 30 days following the deadline date, beginning on the 31st day, and on each subsequent day until full compliance is stipulated by the parties or found to have been achieved by the court, the defendants are to pay the sum of $ 1,000.

(c) Should the defendants' non-compliance continue for more than 60 days following the deadline date, beginning on the 61st first day, and on each subsequent day until full compliance is stipulated by the parties or found to have been achieved by the court, the defendants are to pay the sum of $ 1,500.

(d) Should the defendants' non-compliance continue for more than 90 days following the deadline date, the plaintiffs should notify the court, and the court is to set an emergency hearing to determine appropriate additional

16

sanctions and remedies for continued non-compliance on an expedited basis.

(e) These sanctions apply, separately and severally, to each article of consent decree I.

(f) If the plaintiffs or the Adams intervenors believe at any time during the period prior to any deadline for fines to commence that the defendants are not making sufficient progress towards achieving full compliance with any provision of consent decree I, they may petition the court to enter such sanctions as are necessary to coerce such progress or compliance, including, but not limited to, commencing payment of the agreed-upon fines set forth above prior to the deadlines established below, and the court will treat such petition as an emergency motion by causing its hearing and determination to be expedited.

17

(g)  The foregoing sums should be paid into the registry of the Court on a weekly basis.

(h)  The defendants are required to comply with the deadlines and must affirmatively demonstrate such compliance in order to avoid payment of the sanctions set forth above.


## Mediation

(18) The parties agree that, prior to the arrival of any deadline, if the defendants believe they have complied with the required actions, the defendants should timely solicit agreement from the plaintiffs and the Adams intervenors that the defendants are in compliance, in sufficient time prior to such deadline to allow the plaintiffs and the intervenors a reasonable opportunity to review the defendants' report and determine whether the proposed stipulation should be entered.  The solicitation of a stipulation should include a detailed report demonstrating full compliance with appropriate documentation.

(19) If the plaintiffs and the Adams intervenors agree that the defendants have achieved compliance, the parties should so stipulate and the stipulation should be filed with the court on or before the deadline date.

(20) If the parties dispute whether the defendants have achieved compliance, the matter in dispute should be submitted to the court-appointed monitor for mediation on an expedited basis in sufficient time before the deadline for the sanctions to commence by the deadline date. Before exercising their right to seek early imposition of sanctions, the plaintiffs and the Adams intervenors must notify the defendants of the alleged deficiency and submit the matter in dispute to the monitor for mediation.

(21) If the defendants are unable to obtain a stipulation of compliance from the other parties by the deadline date, the defendants must begin automatic payment of daily monetary sanctions until relieved therefrom by an order of the court that they have in fact fully complied with the subject provision of consent decree I. If the defendants file a motion before the commencement of any

19

such fine contending that they were in full compliance by the deadline date, and the court determines that the defendants were in compliance on the date such fines commenced as alleged in the motion, the court must enter an order refunding to the defendants any fines paid since the deadline date.

(22) The plaintiffs and intervenors should not unreasonably withhold stipulation of compliance and will promptly provide the defendants with a written statement specifically identifying in what respects the plaintiffs and/or intervenors contend the defendants have not complied with the subject provision of consent decree I within 15 business days after being served with the defendants' report of compliance.

(23) If the defendants acknowledge that they are not in compliance with any provisions of consent decree I by the appropriate specified deadlines, they should notify all parties and file a Notice of Non-Compliance with the court not later than the specified deadline for daily monetary sanctions to begin.

20

## Non-coercive Remedies and Sanctions

(24) The remedies agreement does not resolve issues concerning what non-coercive remedies or compensation, if any, should be awarded to redress or undo the effects of the defendants' non-compliance and contempt. Such remedies must be determined by further agreement of the parties or order of the court after hearings thereon. The parties agree to submit briefs on the issues necessary to resolve the remedies under this Section by February 11, 2000.

(25) The plaintiffs contend that the court should expedite such further remedial proceedings for the defendants' contempt of consent decree I and related orders, but that any such proceedings requiring individualized determinations should not be conducted before the resolution of all claims and proceedings required by article XX of consent decree I except insofar as the court conducts any such individualized remedial proceedings for the defendants' contempt and determines the relief thereon for the plaintiffs and the members of

21

the plaintiff class at the same time as it hears and/or determines their remedies under article XX of consent decree I. The Adams intervenors contend that remedies for all persons injured by the defendants' non-compliance should be resolved promptly. The defendants reserve the right to contend that no further relief, beyond that granted pursuant to the remedies agreement, is necessary or appropriate and that the court should exercise its discretion to deny any such additional remedies.

(26) The plaintiffs do not consent to the Adams intervenors' claim that they should be awarded compensation or any other remedy for the defendants' contempt, and, by entering the remedies agreement and consenting to any order entered pursuant hereto, the plaintiffs do not waive their contentions that such relief should not be awarded, that the intervenors lack standing, and that this court lacks jurisdiction over the intervenors' contempt motion and request for relief. The Adams intervenors reserve their responsive contentions and further contend that the plaintiffs lack standing to

22

oppose the intervenors' contempt motion and request for relief.

(27) The remedies agreement does not in any way resolve or foreclose any employee's individual rights and remedies, if any, under federal or state law or under consent decree I or related orders and injunctions entered in this case, nor does it foreclose any employee's right to pursue such rights and remedies independently of the contempt motions.

## Deadlines for Commencement of Sanctions

(28) The dates, by provision in consent decree I, that the above coercive sanctions are to commence in the absence of a stipulation or court order determining that full compliance has been achieved are as follows:

Article I:   May 31, 2000, except that the deadline for full implementation of licensing preparation program in ¶ 1(f) shall be August 15, 2001, and the deadline for a written plan for full compliance shall be April 1, 2000.

23

<u>Article II:</u>  December 31, 2000, for SPD Project Classifications and October 1, 2001, for non-SPD Project Classifications.

<u>Article III:</u>  August 30, 2000, except that the deadline for having the registers approved and ready for issuance of certificates of eligibles shall be December 31, 2000, for all non-entry level SPD Project Classifications, and October 1, 2001, for all non-SPD Project Classifications; and the deadline for full compliance with the provisions of article III, ¶ 2 (a) shall be June 1, 2000.

<u>Article VI:</u>  March 31, 2000, for permanent selection procedures.

<u>Article VII:</u>  February 1, 2000 for permanent selection procedures, and for interim selection procedures only to the extent set forth in the parties' agreement on interim selection procedures dated February 16, 1999.

24

**Article VIII:** May 15, 2000, for permanent selection procedures, and for interim selection procedures only to the extent set forth in the parties' agreement on interim selection procedures dated February 16, 1999, except that structured interviews for non-SPD Project Classifications are to be approved by the court and ready for use by December 31, 2000, and the deadline for the OCB interviews to be approved and used for SPD Project Classifications shall be April 15, 2000.

**Article IX:** May 31, 2000, for permanent selection procedures, and for interim selection procedures only to the extent set forth in the parties' agreement on interim selection procedures dated February 16, 1999 (Doc. No. 3639), except the deadline for the monitoring procedures shall be February 15, 2000.

**Article X:** April 1, 2000, except the deadline for ¶ 3 (a) shall be May 15, 2000.

**Article XI:**    April 15, 2000, including documentation in writing of all affirmative steps undertaken pursuant to ¶ 11 by that date.

**Article XIII:**    June 30, 2000, except that notification to recruitment sources of discontinuance of EIT shall be repeated by June 1, 2000.

**Article XIV:**    April 30, 2000, except that the deadline for full compliance with article XIV, ¶ 2 shall be February 29, 2000, and the deadline for a complete schedule for implementation of the rotation and training programs under ¶ 3(c) (but not the proportionality provision) for all applicable classifications shall be June 30, 2000. Once the schedule for compliance with the rotation and training programs under ¶ 3(c) has been completed, deadlines for coercive sanctions pursuant to Section IV of the remedies agreement

26

shall be set by agreement of the parties or order of the court.

**Article XV:** February 29, 2000, except that the deadline for completing multigrade studies for all remaining non-SPD Project classifications, including those covered in Doc. No. 4015 shall be August 30, 2001. For future multigrade job studies, ¶ 3(d) shall be implemented, where applicable, within 60 days after the approval of the collapsed classification by the State Personnel Board.

**Article XVI:** May 15, 2000.

**Article XVII:** April 30, 2000.

**Article XVIII:** April 30, 2000.

**Article XIX:** March 1, 2000, except that the deadline for any revisions to the affirmative action plan shall be April 1, 2000.

27

## Implementation of Article XV, ¶ 3(d)

(29) Solely for the purpose of fixing the minimum steps necessary to avoid the triggering of coercive sanctions by the deadline date of February 29, 2000, and not for the purpose of determining what constitutes full compliance with article XV, ¶ 3(d) of consent decree I, the parties agree that defendants will be relieved of paying such coercive fines for contempt of article XV, ¶ 3(d) by fully implementing the following steps by February 29, 2000:

(a) As to each employee in a consolidated classification (those currently in a consolidated classification and those who have been in a consolidated classification at any time since February 1998), the defendants are to determine what each employee's pay level would have been as of April 1996 had the new consolidated classification structure historically been in place instead of the former classification structure.

28

(b)  The defendants are then to project each employee's pay level as if each employee had been in the new consolidated pay range from April 1996 to present.[21]

(c)  The defendants are then to place each employee in the resulting pay step within the new consolidated pay range, if the employee's projected pay step is higher than the employee's current pay step.  No employee's pay step shall be reduced as a result of the implementation of this provision.

(d)  The defendants are to produce to the plaintiffs' and intervenors' counsel the calculations and determinations required above for each employee in a consolidated classification.

---

21.  In the event an employee has not been in the consolidated classification since April 1996, the defendants are to apply this procedure from the date the employee entered the consolidated classification.

29

(30) These steps are adopted as a compromise in resolution of a disputed issue. By entering into the remedies agreement, the parties do not waive their respective contentions concerning the proper interpretation of article XV, ¶ 3(d). The plaintiffs and Adams intervenors reserve the right to contend that, if it is later determined that an employee should have been promoted at an earlier date, that employee's pay step must be recalculated hereunder. Nothing in the remedies agreement should be construed as an admission that the foregoing method of implementation of article XV, ¶ 3(d) is correct. The "years-of-service" issue remains pending in the court.

### Filling of Vacancies

(31) Pursuant to the provisions of article VII, ¶¶ 1 and 2, the Transportation Department is to take all reasonable steps necessary to ensure that, whenever a vacancy occurs, either (a) a request to fill the position is made within 30 days of the event causing the vacancy or

(b) the State Personnel Department is notified within 30 days that the Transportation Department does not intend to fill the position, and the reason the position is not to be filled.  Positions that are not to be filled must be abolished.  Such notices will be produced to the parties, through counsel, as part of the monthly compliance report.

(32) Use of out-of-classification assignments is to be eliminated by March 30, 2000.  Thereafter, duties or positions may be assigned on an out-of-classification basis only when necessary on a temporary or emergency basis.  A vacant position may be assigned out of classification only (a) when the position is to be filled and a request has been made to fill the position, and (b) for the period of time required to fill the position with a properly classified employee.  Requests to assign a vacant position on an out-of-classification basis must be made by the bureau or division in writing, and are subject to the approval of the Transportation Department's Director.  Such requests are to be produced to the parties

31

on a monthly basis as part of the defendants' monthly
compliance report.

(33) These provisions regarding the filling of
vacancies do not control the manner in which positions are
to be filled. The parties reserve their respective
contentions concerning the method of filling vacant
positions.


### Use of Consultants

(34) The plaintiffs and defendants agree as follows
regarding the use of consultants:

(a) The Transportation Department currently
uses consultant employees to perform
construction engineering and inspection (CE&I)
work. Consultants are contracted to perform
such work pursuant to both project specific and
"on-call" contracts.

(b) The plaintiffs and defendants wish to
adopt a plan for The Transportation Department
to cease using CE&I consultants on a regular

32

basis. The Transportation Department's use of consultant employees to perform construction engineering and inspection work will be phased out over a period of 15 months. The 15-month period shall commence on the day that certificates of eligibles are issued by the State Personnel Department to fill currently existing Engineering Assistant vacancies, or Engineering Assistants to fill such vacancies are otherwise appointed, but not later than June 1, 2000. Beginning in January, 2000, The Transportation Department shall provide to the parties, on a monthly basis, a report of the CE&I consultant employees who are then currently performing services for The Transportation Department. The report shall include the nature of work being performed, the location of the work, and the identity and race of the consultant employee. The Transportation Department will use its best efforts to reduce

33

the number of consultants as soon as it can practically do so.

(c) The Transportation Department may continue to enter into contracts when necessary to ensure the availability of CE&I consultants when the need for such consultants arises. Upon the completion of the 15-month phase-out period as set forth above, and for the remaining term of the consultants agreement, the Transportation Department will use CE&I consultant employees pursuant to such contracts only when the use of consultants is consistent with business necessity. For purposes of the consultants agreement, "business necessity" means the absence of available merit system employees or the impracticability of employing such merit system employees to timely and adequately perform the work to be performed by consultant employees.

34

(d) Whenever the Transportation Director deems it necessary to use CE&I consultant employees, he shall issue a notice, through counsel, to the parties. The notice shall set forth the identity of the consultant to be used, the nature of the work to be performed, the location of the work to be performed, and the expected duration of the use of such consultant employees. In addition, the notice shall set forth the reason that the Transportation Director deems it necessary to use CE&I consultants instead of merit system employees to perform the work. Upon determination of the identity of the consultant employees to be used, the plaintiffs shall receive a notice concerning the identity and race of the consultant employees.

(e) The agreement regarding the use of consultants expires on June 1, 2003.

35

(f)  The terms of the consultant agreement apply only to the use of consultant employees to perform construction engineering and inspection duties.  The use of consultants to perform other types of services, including without limitation, design, right of way, environmental and materials testing, and road and bridge construction services, is not restricted by the agreement.

(g)  The plaintiffs reserve the right to bring a new motion to prohibit the use of consultants, for further relief under consent decree I, and to hold the defendants in contempt, if the Transportation Department fails to begin the agreed upon phase out, does not use its best efforts to reduce the number of consultants, or fails to act consistently with the consultants agreement, or if the plaintiffs conclude that the use of other types of consultant services warrant such action.  The

36

defendants enter into the consultants agreement solely as a compromise in order to resolve the plaintiffs' claims of contempt. The defendants do not in any way agree that the Transportation Department's use of consultants is improper or violative of any law, regulation, order, or injunction, including, without limitation, the terms of consent decree I, and reserve the right to oppose any motion or request for relief filed by the plaintiffs.

(35) The Adams intervenors do not join in the agreement regarding the use of consultants, and they reserve any contention or objection that they may have with regard to the use of consultants.

### Final Provisions

(36) The parties stipulate that time is of the essence and that there are to be no extensions of the deadlines for compliance, and no excuses or justifications recognized for any failure to meet such deadlines, unless

otherwise agreed by the parties hereto or ordered by the court.

(37) The parties agree that the remedies agreement and any orders entered pursuant thereto do not enlarge or diminish, or otherwise have any effect upon the standing of any party or the court's jurisdiction. The plaintiffs reserve any and all rights and contentions in opposition to the Adams intervenors' participation in and right to benefit from the remedies agreement, consent decree I, the defendants' contempt of such decree, and any other aspect of this case.

(38) The remedies agreement resolves the issues of the defendants' contempt to the extent set forth herein, subject to the provisions of the section above on non-coercive remedies and sanctions above. The agreement and the initial order entering the agreed upon finding of contempt and adopting the remedies set forth herein do not resolve or preclude the court from resolving any issues or claims other than the following two issues: (1) whether the defendants have been and are in contempt of consent

38

decree I and the court's orders and injunctions related to its enforcement, and (2) what coercive remedies should be entered for such contempt. The remedies agreement does not affect, alter, or diminish the court's authority or jurisdiction to hear, rule upon, or address any other issues or matters in this case, or preclude the parties from seeking any such resolution or remedies from the court. The remedies agreement does not foreclose any party's right to file further motions raising other aspects of the defendants' noncompliance. The parties agree that they will not contend that the remedies agreement has any preclusive effect upon the status of any other issues or matters. The remedies agreement also does not alter or affect any other agreement between the parties including, but not limited to, the parties' agreement concerning interim appointment procedures and the parties' agreements concerning attorneys' fees.

(39) The parties waive any right to appeal or further contest the remedies agreement and the initial order entering the agreed upon finding of contempt and adopting

39

the remedies set forth herein. This appeal waiver is limited to the foregoing and does not apply to any subsequent order.

(40) The defendants and plaintiffs agree, without the consent of the Adams intervenors, that the defendants are to pay the fees and expenses of the plaintiffs' attorneys for all work related to the contempt proceedings, monitoring and enforcing the defendants' compliance with consent decree I and the remedies for contempt provided for herein, and whatever proceedings or work is necessary to obtain or effectuate such decree and remedies for contempt. The fees and expenses are to be paid according to the terms of the plaintiffs and defendants' agreement dated February 26, 1999; provided, however, that the defendants' obligation to pay the fees and expenses required by the agreement is not terminated or affected by the expiration, termination, or other ending of the agreement dated February 26, 1999, unless otherwise expressly agreed by the plaintiffs and the defendants.

(41) The defendants and the Adams intervenors agree, without the consent of the plaintiffs, that the defendants are to pay the fees and expenses of the Adams intervenors' attorneys for all work related to the contempt proceedings, monitoring and enforcing the defendants' compliance with consent decree I and the remedies for contempt provided for herein, and whatever proceedings or work is necessary to obtain or effectuate such decree and remedies for contempt. The fees and expenses are to be paid according to the terms of the defendants and the Adams intervenors' agreement dated February 20, 1996.

(42) The parties agree that, in the event that any provision or term of the remedies agreement, or the initial order finding the defendants in contempt and implementing the remedies set forth herein, should be determined to be or is otherwise rendered unenforceable, all other provisions and terms of the agreement are to remain unaffected to the extent permitted by law. If the deadline extensions agreed upon by the plaintiffs and the defendants are not approved, the plaintiffs reserve the

41

right to seek further relief pursuant to article XIX, ¶ 6 of consent decree I.

(43) The parties agree that the court retains jurisdiction over the remedies agreement and any order implementing the agreement until the issues regarding the defendants' contempt (including issues of compensatory relief) are resolved and the defendants have achieved full compliance with the consent decree provisions that are the subject of the agreement.

## II.

All parties are to be commended for resolving most of the civil-contempt issues among themselves.    This cooperation reflects, the court hopes, a full commitment by the Transportation Department and the Personnel Department to full and certain compliance with all provisions of consent decree I by 2006, with the welcome result that this litigation can be brought to an end at that time and the full supervision of these two

42

departments returned where it belongs, to the State of Alabama.

## III.

Based on the foregoing stipulations, agreements, evidence, and proceedings, the following is the ORDER, JUDGMENT, and DECREE of this court:

(1) Defendants Alabama Department of Transportation and State Personnel Department are held in civil contempt of consent decree I and the court's orders and injunctions enforcing such decree, as set forth in the parties' agreement to remedies for contempt, filed December 17, 1999 (Doc. no. 4247), until such time as they have affirmatively demonstrated that they have achieved full compliance with such decree, orders, and injunctions.

(2) The defendants must, by the dates set forth below, demonstrate full compliance with each article of consent decree I. The coercive sanctions set forth below (and in Section II of the parties' remedies agreement) shall begin automatically on the dates provided herein

43

(and in Section V of the remedies agreement) in the absence of a stipulation of the parties or order of the court establishing the defendants' full compliance. As to each article for which one of the deadlines in paragraph three of this order has not been met, the following sanctions will apply:

(a) On the first day following the expiration of the deadline date, and on each subsequent day until full compliance is stipulated by the parties or found to have been achieved by the court, the defendants shall pay the sum of $ 500.

(b) Should the defendants' non-compliance continue for more than 30 days following the deadline date, beginning on the 31st day, and on each subsequent day until full compliance is stipulated by the parties or found to have been achieved by the court, the defendants shall pay the sum of $ 1,000.

44

(c)  Should the defendants' non-compliance continue for more than 60 days following the deadline date, beginning on the 61st day, and on each subsequent day until full compliance is stipulated by the parties or found to have been achieved by the court, the defendants shall pay the sum of $ 1,500.

(d)  Should the defendants' non-compliance continue for more than 90 days following the deadline date, the plaintiffs shall notify the court, and the court will set an emergency hearing to determine appropriate additional sanctions and remedies for continued non-compliance on an expedited basis.

(e)  The sanctions set forth above shall apply, separately and severally, to each article of consent decree I.  The foregoing sums shall be paid into the registry of the court on a weekly basis.

(3)  The coercive sanctions in this paragraph shall commence by the following deadlines in the absence of a stipulation or court order determining that full compliance has been achieved:

| CONSENT DECREE PROVISION | DEADLINE FOR COMMENCEMENT OF SANCTIONS |
|---|---|
| Article I: | May 31, 2000, except that the deadline for full implementation of licensing preparation program in ¶ 1(f) shall be August 15, 2001, and the deadline for a written plan for full compliance shall be April 1, 2000. |
| Article II: | December 31, 2000, for SPD Project Classifications and October 1, 2001, for non-SPD Project Classifications. |
| Article III: | August 30, 2000, except that the deadline for having the registers |

46

approved and ready for issuance of certificates of eligibles shall be December 31, 2000, for all non-entry level SPD Project Classifications, and October 1, 2001, for all non-SPD Project Classifications; and the deadline for full compliance with the provisions of article III, ¶ 2 (a) shall be June 1, 2000.

**Article VI:**   March 31, 2000, for permanent selection procedures.

**Article VII:**   February 1, 2000 for permanent selection procedures, and for interim selection procedures only to the extent set forth in the parties' agreement on interim selection procedures dated February 16, 1999.

47

**Article VIII:** May 15, 2000, for permanent selection procedures, and for interim selection procedures only to the extent set forth in the parties' agreement on interim selection procedures dated February 16, 1999, except that structured interviews for non-SPD Project Classifications are to be approved by the court and ready for use by December 31, 2000, and the deadline for the OCB interviews to be approved and used for SPD Project Classifications shall be April 15, 2000.

**Article IX:** May 31, 2000, for permanent selection procedures, and for interim selection procedures only to the extent set forth in the parties' agreement on interim

48

selection    procedures    dated
February 16, 1999 (Doc. No. 3639),
except    the    deadline    for    the
monitoring    procedures    shall    be
February 15, 2000.

**Article X:**    April 1, 2000, except the deadline
for ¶ 3 (a) shall be May 15, 2000.

**Article XI:**    April    15,    2000, including
documentation in writing of all
affirmative    steps    undertaken
pursuant to ¶ 11 by that date.

**Article XIII:** June    30,    2000,    except that
notification    to    recruitment
sources of discontinuance of EIT
shall be repeated by June 1, 2000.

**Article XIV:**    April 30, 2000, except that the
deadline for full compliance with
article XIV, ¶ 2 shall be February
29, 2000, and the deadline for a
complete    schedule    for

49

implementation of the rotation and training programs under ¶ 3(c) (but not the proportionality provision) for all applicable classifications shall be June 30, 2000. Once the schedule for compliance with the rotation and training programs under ¶ 3(c) has been completed, deadlines for coercive sanctions pursuant to Section IV of the remedies agreement shall be set by agreement of the parties or order of the court.

**Article XV:** February 29, 2000, except that the deadline for completing multigrade studies for all remaining non-SPD Project classifications, including those covered in Doc. No. 4015 shall be August 30, 2001. For

future multigrade job studies, ¶ 3(d) shall be implemented, where applicable, within 60 days after the approval of the collapsed classification by the State Personnel Board.

<u>Article XVI:</u> May 15, 2000.

<u>Article XVII:</u> April 30, 2000.

<u>Article XVIII:</u> April 30, 2000.

<u>Article XIX:</u> March 1, 2000, except that the deadline for any revisions to the affirmative action plan shall be April 1, 2000.

(4) The remedies agreement of the parties is adopted in its entirety as the order of the court, with the exception of the agreement of the plaintiffs and the defendants for extension of consent decree I, and the parties are ENJOINED to comply with its terms in full.

(5) The term of consent decree I is extended as follows:

51

(a) The decree is extended in its entirety until December 31, 2004.

(b) The provisions of the decree affecting the recruitment and selection requirements of the decree--specifically article I, article III (¶¶ 2, 3, and 12), articles VI through X, article XI (¶¶ 11 and 21), article XIII (¶¶ 1(a) and (c), 2, 3(d), and 11), article XIV, and article XIX, (¶¶ 1-5, 6(a-d), and 7)--are extended until December 31, 2006, with the special affirmative action training of article XVI, ¶ 1, to be repeated in 2002 and 2004.

(c) Prior to expiration of the terms provided, the parties may seek further extension of any provision for which the defendants are not in full compliance.

(d) The plaintiffs retain the right to seek extension of the duration of all or part of the decree pursuant to the provisions of article XIX, ¶ 10 of the decree, and the defendants

retain the right to oppose any such further extension.

(e) The plaintiffs retain the right to seek to restore the full amount of time that each provision of the decree was intended to operate after the initial compliance as a remedy for the defendants' contempt, and the defendants retain the right to oppose any such further extension.

(6) As set forth in the parties' remedies agreement, this order and the parties' underlying agreement resolve the plaintiffs' motions for contempt and further relief, filed February 13, 1997 (Doc. nos. 1542 and 1543) and the Adams intervenors' motion for contempt enforcement through race neutral means, filed September 20, 1999 (Doc. no. 4167), with respect to the issues of the defendants' non-compliance and the coercive remedies and sanctions for such non-compliance, but do not resolve any other remedial issues regarding the defendants' contempt or the foregoing motions (including, without limitation, compensatory relief). The parties shall submit briefs on the issues

53

necessary to resolve further remedial issues by February 11, 2000.

(7)  The court retains jurisdiction over the remedies agreement and any order implementing the agreement until the issues regarding the defendants' contempt (including issues of compensatory relief) are resolved and the defendants have achieved full compliance with the consent decree provisions that are the subject of the agreement.

DONE, this the 31st day of January, 2000.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

# EXHIBIT Z



**H**

Reynolds v. Alabama Dept. of Transp.
M.D.Ala.,1998.

United States District Court,M.D. Alabama,Northern
Division.
Johnny REYNOLDS, et al., Plaintiffs,
v.
ALABAMA DEPARTMENT OF
TRANSPORTATION, et al., Defendants.
**Civil Action No. 85-T-665-N.**

April 13, 1998.

Black employee brought civil rights action under
Title VII, in which he alleged that he was suspended
based on his race and in retaliation for having
engaged in protected conduct. The District Court,
Myron H. Thompson, J., held that: (1) employee
satisfied burden of showing that race was motivating
factor in his ten-day suspension, and (2) employee's
resort to grievance process established by court order
expressly entered pursuant to Title VII was a
protected activity under Title VII, for which
employee could not be disciplined.

Judgment for employee.
West Headnotes
**[1] Civil Rights 78 🔑1536**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
            (Formerly 78k378)
Where court has sufficient evidence to determine
whether employee has been victim of racial
discrimination, court need not go through the
*McDonnell Douglas* burden-shifting process but
should instead reach the ultimate issue of
discrimination. Civil Rights Act of 1964, § 701 et
seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 🔑1536**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes

        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
            (Formerly 78k378)
*McDonnell Douglas* burden-shifting process is only a
procedural device, and should not be applied too
rigidly or viewed as end in itself. Civil Rights Act of
1964, § 701 et seq., as amended, 42 U.S.C.A. §
2000e et seq.

**[3] Civil Rights 78 🔑1536**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden
of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
            (Formerly 78k378)
*McDonnell Douglas* approach should not be used by
court as substitute for determining, on case-by-case
basis, whether evidence is sufficient to allow fact
finder to conclude that employee has, in fact, been
victim of discrimination. Civil Rights Act of 1964, §
701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 🔑1118**

78 Civil Rights
    78II Employment Practices
        78k1118 k. Practices Prohibited or Required in
General; Elements. Most Cited Cases
            (Formerly 78k142)

**Civil Rights 78 🔑1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited
Cases
            (Formerly 78k153)
When alleged discrimination involves application of
workplace rules, employee can prevail on race
discrimination claim by showing that he did not
violate the work rule, or that he engaged in conduct
similar to that of another person outside the protected
class, and that disciplinary measures enforced against
him were more severe than those enforced against
other persons who engaged in similar misconduct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

Page 2

Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 €══1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
            (Formerly 78k153)
To make out a Title VII claim, on theory that the conduct for which he was disciplined was "similar" to that of other employees not in protected class who were not as severely disciplined, employee need show only that his conduct and conduct of other employees was of comparable seriousness. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 €══1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
            (Formerly 78k153)

**Civil Rights 78 €══1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
            (Formerly 78k153)
Black employee who was suspended for ten days for allegedly instigating confrontation between two white employees, and for falsely informing one of these employees that the other had informed black employee of racially derogatory statements made by the former, satisfied his burden of showing that these reasons were mere pretext for discrimination, given overwhelming evidence of racially derogatory statements routinely made in the workplace by white employees, none of which was so extensively investigated, and none of which resulted in punishment comparable to that imposed on black employee. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 €══1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights

78k1244 k. Activities Protected. Most Cited Cases
            (Formerly 255k30(6.10)    Master and Servant)
Title VII prohibits employers from retaliating against employees either for opposing unlawful employment practices or for participating in Title VII proceedings. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[8] Civil Rights 78 €══1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most Cited Cases
                (Formerly 255k30(6.10)    Master and Servant)
While Title VII provides almost absolute protection for employees against retaliation for their participation in Title VII proceedings, protection afforded to those who oppose unlawful employment practices by other means, such as protests or informal complaints, is not so absolute. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[9] Civil Rights 78 €══1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most Cited Cases
                (Formerly 255k30(6.10)    Master and Servant)
To make out a retaliation claim under Title VII of the Civil Rights Act, employee who is allegedly disciplined for opposing unlawful employment practices through alternate channels, other than by participating in Title VII proceedings, much show that he opposed unlawful employment practice which he reasonably believed had occurred or was occurring. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[10] Civil Rights 78 €══1248**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1248 k. Discipline. Most Cited Cases
                (Formerly 255k30(6.10)    Master and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068                                                                          Page 3
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

Servant)
Employer may, in some circumstances, avoid liability on retaliation claim under Title VII, when acts which allegedly provoked employer's retaliation consist not of employee's participation in Title VII proceedings but of his opposition to unlawful employment practices by other means, if employer can show that it disciplined employee not because of his opposition but because this opposition took a form which was disruptive or which impaired the morale of employment unit.     Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[11] Civil Rights 78 ⬅➝1243

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 255k30(6.10)     Master and Servant)
To establish prima facie case of retaliation under Title VII, employee must show that he engaged in statutorily protected expression, that he suffered adverse employment action, and that there is some causal relation between the two events.     Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[12] Civil Rights 78 ⬅➝1252

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
        (Formerly 255k30(6.10)     Master and Servant)
To establish requisite causal connection between his statutorily protected expression and the adverse employment action, employee asserting retaliation claim under Title VII merely has to prove that protected activity and negative employment action are not completely unrelated.     Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[13] Civil Rights 78 ⬅➝1244

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1244 k. Activities Protected. Most Cited

Cases
        (Formerly 255k30(6.10)     Master and Servant)
Black employee's participation in internal grievance procedure established pursuant to court order that was expressly entered under Title VII was protected conduct under Title VII, for which he could not be disciplined.     Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**\*1070** Robert L. Wiggins, Jr.,Ann K. Wiggins, Russell W. Adams, Abigail P. Van Alstyne, Kimberly C. Page, Scott Gilliland, and Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Johnny Reynolds, plaintiff, and Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, and Jeffrey W. Brown, intervenor-plaintiffs.
Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for Robert Johnson, intervenor-plaintiff.
Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams, intervenors.
Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for Michael Grant, John D'Arville, and Andrew McCullough, intervenors.
Thomas R. Elliot, Jr., Allen R. Trippeer, Jr., Lisa W. Borden, C. Dennis Hughes, London & Yancey, Birmingham, AL, and William H. Pryor, Jr., Atty. Gen. for the State of Alabama, Montgomery, AL, for Alabama. Dept. of Transp., Alabama State Personnel Dept., Jimmy Butts, in his official capacity as Director for Alabama Dept. of Transp., Halycon Vance Ballard, in her official capacity as Director of the Alabama State Personnel Dept., and Fob James, in his official capacity as Governor of the state of AL, defendants.
William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, in his official capacity as Governor of the State of Alabama, defendant.
Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, New York, NY, for NAACP Legal Defense and Educational Fund, Inc., amicus.
Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for The Lawyers' Committee for Civil Rights under Law, amicus.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068                                                                                      Page 4
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

*MEMORANDUM OPINION*
MYRON H. THOMPSON, District Judge.
This long-standing class-action litigation, in which
defendant Alabama Department of Transportation is
charged with racial discrimination in employment
against African-Americans, is currently before the
court on plaintiff Johnny Reynolds's claims that the
Transportation Department suspended him from his
job [FN1] in violation of Title VII of the Civil Rights
Act of 1964, as amended, 42 U.S.C.A. § § 1981a,
2000e through 2000e-17. [FN2] Reynolds claims that
his suspension is illegal because it was, first, based
on his race, and, second, in retaliation for protected
conduct. For the reasons that follow, and based on
the evidence presented during a 1996 trial, the court
finds in favor of Reynolds on his claims.

> FN1. These claims are contained in the
> plaintiffs' motion for preliminary injunction,
> filed March 18, 1996 (Doc. no. 961). By
> agreement of the parties, the motion for
> preliminary injunction was treated as a
> motion for permanent injunction. *See*
> order, entered April 4, 1996 (Doc. no. 976).

> FN2. The lawsuit, including Reynolds's
> claims, also rests on the equal protection
> clause of the fourteenth amendment to the
> United States Constitution, as enforced by
> 42 U.S.C.A. § 1983, and on 42 U.S.C.A. §
> 1981. Reynolds also rests his claims on a
> 1994 consent decree in this case. *See infra*
> note 3. Because the defendants have not
> questioned the propriety of Reynolds's
> reliance on Title VII and because adequate
> relief is available under Title VII, the court
> need not discuss in detail the other bases for
> Reynolds's claims-although Reynolds would
> clearly be entitled to recover on these other
> bases as well.

I. PROCEDURAL BACKGROUND

This lawsuit was initiated in May 1985 by Reynolds
and several other plaintiffs on behalf of a class of
African-American merit and non-merit system
employees. The plaintiffs charged the Department
of Transportation and other defendants with race
discrimination in violation of Title VII and other
federal laws. In 1988, the parties reached a full
settlement of this case, but the court refused to
approve the proposed consent decree in *1071 the
face of numerous objections from the members of the
plaintiff class. *See Reynolds v. King, 790 F.Supp.*

1101 (M.D.Ala.1990). Following a trial in 1992,
which spanned over a six-month period and ended
with the presentation of only part of the plaintiffs'
case, the parties reached a second, albeit only partial,
settlement, subsequently embodied in three consent
decrees. In the wake of this new settlement, the
court allowed a group of non-class members-
consisting predominantly of white employees of the
department, and now commonly referred to as the
'Adams intervenors'-to intervene and challenge any
race-conscious provisions in the settlement. *See
Reynolds v. Roberts, 846 F.Supp. 948
(M.D.Ala.1994).* One of the consent decrees was
approved by the court on March 16, 1994, and is now
commonly referred to as 'consent decree I.' [FN3] The
two others are currently under the court's
consideration.

> FN3. *See Reynolds v. Alabama Dep't of
> Transp., 1994 WL 899259 (M.D.Ala.
> Mar.16, 1994)* (Doc. no. 553).

Since then, and over the last four years, the parties
and the court have been actively and extensively
involved in the implementation of consent decree I.
*See, e.g., Reynolds v. Alabama Dep't of Transp., 996
F.Supp. 1156 (M.D.Ala.1998); Reynolds v. Alabama
Dep't of Transp., 996 F.Supp. 1130 (M.D.Ala.1998);
Reynolds v. Alabama Dep't of Transp., 996 F.Supp.
1118 (M.D.Ala.1998); Reynolds v. Alabama Dep't of
Transp., 976 F.Supp. 1431 (M.D.Ala.1997);
Reynolds v. Alabama Dep't of Transp., 972 F.Supp.
566 (M.D.Ala.1997); Reynolds v. Alabama Dep't of
Transp., 955 F.Supp. 1428 (M.D.Ala.1997);
Reynolds v. Alabama Dep't of Transp., 955 F.Supp.
1441 (M.D.Ala.1997); Reynolds v. Roberts, 1996
WL 378271 (M.D.Ala. June 7, 1996); Reynolds v.
Alabama Dep't of Transp., 1996 WL 420834
(M.D.Ala. Apr.23, 1996); Reynolds v. Alabama
Dep't of Transp., 926 F.Supp. 1077 (M.D.Ala.1996);
Reynolds v. Alabama Dep't of Transp., 926 F.Supp.
1448 (M.D.Ala.1995).*

II. EVIDENTIARY BACKGROUND

As stated, this case is before the court on Reynolds's
claim that the Department of Transportation illegally
suspended him.

A.

The department's personnel structure is, in part, as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

Page 5

follows:                                                          *1072



**Alabama Department of Transportation**

Jimmy Butts
Director

J.A. Pennington
Assistant Director

Ray Bass
Chief Engineer

Don Arkle
Bureau Chief, Design Bureau

Rex Bush
Roadway Design Engineer

Nelson Reese
Assistant
Roadway
Design
Engineer

Robert Lee
Assistant
Roadway
Design
Engineer

John
Wiggins
Section
Leader

George
Jones
Section
Leader

Charles
Lett
Squad
Leader

Thomas 'Wes'
Jordan
Squad
Leader

George
Chapman
Squad
Leader

Warren
Carlisle
Designer

Keith
Gibson
Designer

Edith
Fortner
Designer

Brett
Scott
Designer

Johnny
Reynolds
Designer

4

The employees from the Charles Lett and Thomas Jordan squads all work in an open room divided into twelve cubicles, which are in the middle of the room. Because the cubicle walls do not extend to the ceiling, it is possible for a person working at one cubicle to hear a conversation taking place at another. Along one end of the room are several long tables used for drafting. The tables stand between the work area and a copy room. The wall adjacent to the table wall is lined with windows. In front of the windows is a space at which employees sometimes gather to spread out large maps or construction plans.

*1073 A group of white employees, often including Lett, Jordan, Brett Scott, Warren Carlisle, and Keith Gibson, and sometimes including white employees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

Page 6

from other sections, frequently met at the windows to work together. [FN4] Lett and Jordan are both supervisors. During these informal meetings they often talked about Reynolds and this lawsuit. Lett (and possibly others) believed that he had not received a promotion because of Reynolds and the lawsuit.[FN5] Also during the informal meetings, Lett, Jordan, and others often told racially derogatory jokes and referred to black people as "niggers" or "black boys." [FN6] Before telling such jokes or using racial slurs, the white employees looked around to see if any black employees were within earshot. If not, they proceeded with their jokes. [FN7] Although they seemed to assume that no white employee would be offended by such language, Scott was offended.[FN8] Scott went to Jessie Smith, a black employee of the department, to ask him why Reynolds continued to be friends with Lett because Lett used racial slurs, talked disparagingly about the lawsuit, and talked about Reynolds behind his back.[FN9] Scott told Smith that Lett, Jordan, and the other white employees who gathered at the windows to talk, used the word "nigger" in their conversations,[FN10] talked about Reynolds behind his back, and blamed Reynolds and the consent decree for the freeze on promotions.[FN11] Further, Scott told Smith and Craig Thomas, another black employee, that Lett bragged that Reynolds gave Lett information about the lawsuit before he gave it to members of the plaintiff class.[FN12]

> FN4. *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 40.
>
> FN5. *See id.* at 59.
>
> FN6. *See id.* at 34.
>
> FN7. *See id.* at 28.
>
> FN8. *See id.* at 26.
>
> FN9. *See id.* at 25.
>
> FN10. *See id.* at 205, 210.
>
> FN11. *See id.* at 35-36.
>
> FN12. *See* testimony of Jessie Smith, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 231.

Scott also went to Reynolds and told him that Lett talked about him behind his back.[FN13] In addition, Smith and Thomas both told Reynolds several times that they did not approve of his practice of sharing information about the lawsuit with Lett, and that he should stay away from Lett because Lett only pretended to like Reynolds. In addition, they told Reynolds that Lett used racial slurs.[FN14]

> FN13. *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 12.
>
> FN14. *See* testimony of Jessie Smith, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 231-32, 234.

On February 26, 1996, after many discussions with Smith, Thomas, and Scott, Reynolds approached Lett in the Roadway Design area near the work tables adjacent to the copy room. Reynolds told Lett that he should be careful what he said in front of Scott.[FN15] Reynolds said that Scott had told Smith and Thomas that Lett had talked about Reynolds behind his back, complained that Reynolds and his lawsuit had cost him a promotion, and used racial slurs behind Reynolds's back.[FN16] Reynolds said that he was feeling pressure from Smith and Thomas because they did not like Reynolds's practice of giving court documents to Lett before he shared them with members of the plaintiff class. [FN17] To lessen the pressure on him from black employees, Reynolds asked Lett to stop telling people this and talking about him. Finally, Reynolds asked Lett if Lett **\*1074** had ever called Reynolds a "nigger," and indicated that Scott had said that Lett had done so in a conversation with Scott about promotions.[FN18] Lett told Reynolds that he had not talked about him behind his back and denied having called him a "nigger." [FN19] The entire conversation was cordial and neither man raised his voice or otherwise displayed any anger.[FN20]

> FN15. *See* testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 148.
>
> FN16. *See* testimony of Johnny Reynolds, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

Page 7

5, 1996, at 664;  testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 149-51.

FN17. *See* testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 151.

FN18. *See id.* at 152.

FN19. *See id.*

FN20. *See id.*

After Lett's conversation with Reynolds ended sometime between 3:30 and 4:00 p.m.,[FN21] Lett tried and failed to find Scott, and he went to speak to John Wiggins, his immediate supervisor, to report the incident with Reynolds.  Because Wiggins was out of the office, Lett went to see Nelson Reese, Wiggins's supervisor, to tell him about the situation. Because Lett was calm and did not seem angry as he described his conversation with Reynolds, Reese did not suspect that Lett was angry or that he intended to retaliate against Scott. [FN22]

FN21. *See id.* at 153.

FN22. *See id.* at 153-54.

On the morning of February 27, 1996, Lett confronted Scott in the Roadway Design area near the windows.  Lett was very agitated and asked Scott if he had told Reynolds that Lett had called Reynolds a "nigger." [FN23]  Lett stated that Scott was "toting an ass whooping," and that, if he had caught up with Scott the previous afternoon, he would have "taken [his] head off with a straight edge," a piece of metal approximately 36 inches long and four inches wide used to draw straight lines.[FN24]  Lett said that Scott could file a complaint with the equal employment opportunity office if he wanted to, but once the complaint was disposed of, Lett would "whip his ass." [FN25]  Scott did not respond to Lett's threats, and eventually Jordan stepped between the two men.[FN26] Scott took Lett's comments as a "physical threat on his life." [FN27]

FN23. *See id.* at 175-176;  testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction,

held April 1 through 5, 1996, at 61-63.

FN24. Testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 61-63;  testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 159.

FN25. Testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 180.

FN26. *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 62.

FN27. *See id.* at 62-63.

Scott reported the incident to Don Arkle, Chief of the Design Bureau, and Arkle told him to inform Rex Bush, who was the Roadway Design Engineer and Arkle's immediate subordinate.  Because Bush was out of the office, Scott went back to Arkle, who told Scott that he would take care of the problem.  Arkle did not ask Scott any questions, and Reynolds's name did not come up during the conversation.[FN28]  Scott later met with Lett, Wiggins, and Reese to discuss the incident.  At this meeting, Lett brought up a court document regarding promotions that Reynolds had given to Lett and Lett had discussed with Scott.[FN29] Lett told Scott that Reynolds's reference to this document was proof that Scott had told Reynolds what Lett and Scott had discussed.[FN30]

FN28. *See id.* at 65-66.

FN29. The document was the parties' joint report concerning status of provisional appointment negotiations, filed February 16, 1996 (Doc. no. 939), also designated as plaintiffs' exhibit 2, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

FN30. *See* testimony of Brett Scott, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 67-70.

Wiggins reported on the situation to Arkle, and

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

recommended that Lett be suspended without pay for two weeks, that Scott be transferred to another section, and that Reynolds be fired if it was determined that he had spread a false and malicious rumor.[FN31] **1075** By this time, the investigation had shifted from looking into the altercation between Lett and Scott to looking into whether Reynolds had incited the altercation between Lett and Scott. Chief Engineer Ray Bass, Arkle's supervisor, asked J.B. Fowler to take over the investigation.[FN32] Fowler, a former police officer, is executive assistant to the Director of the Transportation Department, Jimmy Butts. [FN33]

> FN31. *See* exhibit 10B, March 115 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

> FN32. *See* testimony of Jimmy Butts, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 772-73.

> FN33. *See id.*

The investigation Fowler conducted was the first of its kind in the history of the department. He interviewed and took statements from ten people: Carlisle, Gibson, Jordan, Lett, Reese, Reynolds, Scott, Smith, Thomas, and Wiggins. All of the witnesses except Reynolds were allowed to tell Fowler in their own words what they knew about the situation. In contrast, Fowler presented Reynolds with a list of yes-and-no questions, and demanded that Reynolds circle either 'yes' or 'no' to each question. He refused to allow Reynolds to explain or qualify his answers.[FN34] As discussed above, many of the witnesses told Fowler that racial slurs were commonly used in Roadway Design, but Fowler was interested only in Reynolds's conduct.[FN35]

> FN34. *See* questions, plaintiffs' exhibit 23, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996; transcript of interview with Reynolds, taken March 1, 1996, exhibit 18, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

> FN35. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for

preliminary injunction, held April 1 through 5, 1996, at 355.

After Fowler completed his investigation, Arkle reviewed the statements and concluded that Reynolds had maliciously made a misstatement of fact that was racially sensitive and caused harm to fellow employees.[FN36] He then met with Butts, Bass, Fowler, Marvin Wagoner (Director of the Personnel Bureau), Jack Norton (the department's in-house counsel), and Jack Caraway (Bass's assistant) to discuss Reynolds's suspension.[FN37] Arkle recommended that Reynolds be suspended without pay two weeks, and the group agreed with his recommendation. Those present at the meeting could not recall another instance exactly like the one involving Lett, Scott, and Reynolds. The only other specific case discussed at the meeting was an incident involving Eddie Lester, a white employee, who called a black employee a "nigger" and threatened to kill him.[FN38] Lester was suspended for two weeks. As a group, they agreed with Arkle's recommendation of a two-week suspension.[FN39]

> FN36. *See id.* at 324-25.

> FN37. *See id.* at 419.

> FN38. *See id.* at 416-20, 422.

> FN39. *See id.* at 420. During the 1992 partial trial, Reynolds credibly testified that he had known Bass and Caraway for some time, and that they had threatened to fire him if he attempted to date white women. Caraway told Reynolds that it made him "sick" for black men to work with white women. *See* testimony of Johnny Reynolds, transcript of 38th day of trial, held November 18, 1992, at 199. Bass told Reynolds, "if I ever hear you say anything to another white woman, I'm going to fire your ass." *Id.* at 201.

At the meeting and in his subsequent letter to Reynolds, dated March 6, 1996, Arkle gave several reasons for recommending Reynolds's suspension:
First, Arkle found that Reynolds had made false statements involving racial slurs which created a disruption in the office.
Second, Arkle indicated that Reynolds had "committed acts of insubordination" by refusing to cooperate during the investigation.[FN40]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN40. *See* plaintiffs' exhibit 24, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

And third, Arkle found that Reynolds had violated the department's 'June 1995 memorandum,' which prohibits the making of false statements during an investigation into a charge of racial harassment.[FN41]

> FN41. *See* exhibit 22, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996. After Reynolds received the letter informing him of the suspension, he requested and received a hearing before James Brown, an employee of the department. Because the department conceded that Brown's evaluation was limited to determining whether Arkle had had enough evidence before him to reach the decision he made, the court considers Arkle, who recommended the suspension, and Butts, who approved it, to be the ultimate decision makers. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 786-90. However, the court notes that it is curious that the Transportation Department appointed Brown (a white person), and not Ron Green (an African-American person who is the department's equal employment opportunity officer) to handle this matter. *See id.* Indeed, Green's absence from the picture altogether is troubling.

**\*1076** However, although Arkle gave insubordination as a reason in his letter, he testified at the 1996 trial that insubordination was not one of the reasons he suspended Reynolds.[FN42] He testified that Reynolds was counseled for the insubordination, and the counseling was the only discipline he received.[FN43]

> FN42. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 455-57.

> FN43. *See id.*

Although he chose not to disclose it to Reynolds in his letter and did not mention it to the other people at the meeting, Arkle had other reasons for suspending Reynolds. Arkle admitted during the 1996 trial that part of the reason he suspended Reynolds was that he thought that Reynolds liked to "stir [things] up, to cause trouble."[FN44] By this he meant that he considered Reynolds to have a history of disruptive behavior at the department, especially relating to the department's court-imposed grievance procedure.[FN45] He stated that Reynolds had tried to abuse the grievance system by filing eight grievances in ten weeks.[FN46] He believed that Reynolds was uncooperative during the department's investigations of his grievances. He had "heard" that Reynolds sometimes rejected the department's proposed settlements of his grievances without even reading them.[FN47] Finally, he had "heard" that Reynolds had told other employees not to settle their grievances with the department. Arkle admitted that these factors contributed to his decision to suspend Reynolds, and that he had not told anyone, including Reynolds, that he was being suspended in part because of his participation in the grievance process.[FN48]

> FN44. *Id.* at 894.

> FN45. *See id.* at 891-96.

> FN46. *See id.* at 894.

> FN47. *See id.* at 894.

> FN48. *See id.* at 897.

Also, in contrast, Arkle and his staff took no disciplinary action against Lett, who had physically threatened the life of a co-worker, and, in particular, to do so if the co-worker took advantage of the department's grievance procedure. Not until after Reynolds's attorney wrote a letter to the Transportation Department's counsel on March 8, 1996, complaining that "White employees in similar situations have not been suspended or treated the same as Reynolds,"[FN49] did Arkle initiate action against Lett on March 11, and Lett's punishment was only a suspension for three days for using threatening language.[FN50] Indeed, throughout the investigation, Lett was not aware that his conduct was at issue, and not until Lett received Arkle's March 11 letter, was he aware that he was being considered for punishment.[FN51]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068                                                                                    Page 10
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

FN49. Plaintiffs' exhibit 8, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

FN50. See plaintiffs' exhibit 4, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

FN51. See testimony of Charles Lett, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 145-46.

On March 14, 1996, the department suspended Reynolds without pay for ten days.[FN52] No action was initiated or taken against any other employees-not Lett, not Jordan, not Carlisle, not Gibson-for using racial slurs in violation of the department's racial harassment policy. Reynolds responded with a claim, contained in a motion for injunction, challenging his suspension, and his suspension*1077 has been held in abeyance pending resolution of his claim.[FN53]

FN52. See plaintiffs' exhibit 22, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

FN53. See supra note 1.

Finally, in the midst of trial, in response to the substantial evidence of continued use of racial slurs-in particular, the term "nigger"-in the department, the court entered an oral order requiring that the department show cause as to why further relief should not be ordered to eliminate racial harassment and the use of racial slurs at the department.[FN54] Only then, in response to this order, did the department finally initiate an investigation of the use of racial slurs.[FN55]

FN54. See oral order in open court, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 83.

FN55. See defendants' exhibit 7, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996. The court is unaware of the results of that investigation.

B.

A full appreciation of the above events cannot be had, however, without the events being placed in the broader context of how the Transportation Department has viewed, and continues to view, departmental 'race relations' in general.

*The use of racial slurs at the Department of Transportation prior to the 1992 racial harassment policy:* During the 1992 partial trial, in response to extensive testimony about the use of racial slurs at the Department of Transportation, the court orally ordered the department to establish and implement a racial harassment policy. That testimony painted a disturbing picture of a work environment in which African-American employees were routinely demeaned, and in which white employees used the word "nigger" almost daily. Further, the department usually did nothing to discipline people who used such slurs, and took no steps to prevent their use. The use of racial slurs was pervasive; both supervisors and employees used slurs, and they were used in many of the department's various offices.

When Reynolds began work for the department in 1979 as one of its first black employees, he was regularly called a "nigger," [FN56] threatened by co-workers,[FN57] and reminded that the Ku Klux Klan was watching him. [FN58] Once, Reynolds was accused of trying to date white women. Caraway told Reynolds that having black men around white women made him "sick," [FN59] and Bass, Caraway, and V.E. Richey threatened to fire him if he ever asked a white woman for a date.[FN60]

FN56. See testimony of Johnny Reynolds, transcript of 38th day of trial, held November 18, 1992, at 38.

FN57. See id. at 38-39.

FN58. See id. at 39.

FN59. See id. at 199.

FN60. See id. at 199-202.

But Reynolds was not the only employee subjected to racial slurs. Examples include the following:
In 1984 or 1985, Alfred Blankenship, a white employee, called Lesha Kelley, a black employee, a "nigger" in a department office in Alexander City while in the presence of Darrell Walker, a white supervisor. Walker did not reprimand Blankenship

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

Page 11

or otherwise indicate that the use of this racial slur was inappropriate.[FN61]

> FN61. *See* testimony of Lesha Kelley, transcript of 24th day of trial, held September 30, 1992, at 7-8.

Sometime after 1989, Earl Young, a white supervisor, said within the earshot of a black employee that "them niggers don't know how to get out of [the] road" after he almost hit a black woman pedestrian.[FN62] Young was not reprimanded.

> FN62. Testimony of Jessie L. Smith, transcript of 28th day of trial, held October 6, 1992, at 121.

In early June 1990, Donnie Pinion, a white supervisor, told Frank Reed, a black employee, that he was "one nigger we are going to fire."[FN63] Reed went to James Horsley, a white supervisor, and told him of Pinion's use of the racial slur. Horsley told Reed that he would look into it, but **1078** took no action.[FN64] Later, in late June 1990, Horsley himself used the same slur. During a meeting with Reed, Horsley told Reed that Horsley's purpose in coming to the department was to "take it back," referring to white employees taking the Third Division of the department back from black employees.[FN65] When Reed told Horsley that black employees had "never had it," Horsley said "Yeah you niggers been...."[FN66] Horsley did not finish the sentence. Despite Horsley's promise in June to look into Pinion's use of slurs, it is clear that he took no effective action.

> FN63. Testimony of Frank Reed, transcript of 24th day of trial, held September 30, 1992, at 115.
>
> FN64. *See id.* at 119.
>
> FN65. *Id.* at 114.
>
> FN66. *Id.*

In September 1990, Reed was working on the highway with Robert Craig, a black employee. Pinion approached in a truck and told Reed and Craig that when he visited the job site, he expected to see "niggers' assholes and elbows."[FN67]

> FN67. *Id.* at 117.

Later in the same month, again when Reed and Craig were working along the highway, Pinion approached and said that when he drove up, he expected to see "You niggers skinning and grinning."[FN68] Pinion again called Reed a "nigger" in 1992 when Reed was working on route 459.[FN69]

> FN68. *Id.* at 118.
>
> FN69. *See id.* at 116.

The use of slurs also continued in the time leading up to and during the 1992 partial trial of this case. Examples include the following:
In late 1991, Jerry Burger, a white supervisor, told Reynolds that he and the other "niggers" had "killed" themselves by filing "that damned lawsuit."[FN70]

> FN70. *See* testimony of Johnny Reynolds, transcript of 38th day of trial, held November 18, 1992, at 166. The evidence also reflected that Burger told Reynolds that no matter "what a damned black judge say," the department would never treat black employees fairly. *Id.* However, although this evidence is properly admissible and can be considered by the court, the court believes it more prudent not to consider it, and has not.

In November 1992, Jordan, a white supervisor, told Reynolds a joke using the word "nigger," and involving the Ku Klux Klan.[FN71]

> FN71. *See id.* at 192.

That same month, Keith Maxwell, a white supervisor, referred to Reynolds as "Mr. Nigger" when he wore a tie and "a plain old nigger" when he did not.[FN72]

> FN72. *See id.* at 186.

Also during the 1992 partial trial, Burger and Maxwell stated that the department's employment level of Civil Engineer-I stood for "colored engineer,"[FN73] and they referred to the work black engineers did as "afro-engineering."[FN74] They also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068                                                                                    Page 12
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

discussed "nigger rigging," a term they used to mean that black employees were less adept at engineering than white employees.[FN75]

>   FN73. *See id.* at 184-85.

>   FN74. *See id.* at 185-86.

>   FN75. *See id.* at 185.

Further, after employees received a copy of the department's policy prohibiting racial harassment in November 1992, Maxwell approached Reynolds and said "I guess I can't call you nigger no more." [FN76]

>   FN76. *Id.* at 194.

Indeed, Reynolds was called a "nigger" so often and heard his co-workers use the word so often that it no longer makes him extremely angry, although he does not like it and encourages others not to use it.[FN77]

>   FN77. *See id.* at 694.

This and other similar evidence convinced the court that many white employees and supervisors in the department used the word "nigger" and other racial slurs as part of their ordinary conversation and that they told racially derogatory jokes openly and with no apparent fear of punishment from supervisors. The evidence showed that the use of racial slurs was not limited to one or two offices or departments and was not limited to a small group of white employees. **\*1079** Further, white employees were not reprimanded for referring to black people as "niggers" or for telling racially derogatory jokes. Faced with this overwhelming evidence of the use of racial slurs, and equally overwhelming evidence of the department's failure to investigate complaints of harassment or punish those who used racial slurs, the court orally ordered the department to implement a policy prohibiting the use of racial slurs, and the department adopted the policy on October 16, 1992.[FN78] That policy has been reissued by all subsequent directors of the department, including Butts.[FN79]

>   FN78. *See* exhibit 24, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

>   FN79. *See* exhibits 22 and 23, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996. The policy signed by Butts on June 19, 1995, exhibit 22, is slightly different from 1992 policy. Under the 1992 policy, the equal employment opportunity coordinator was charged with investigating complaints. *See* exhibit 24, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 5. Under the 1995 policy, the bureau chief of human resources is charged with investigating complaints.

The stated goal of the department's racial harassment policy is to "express in unmistakable terms that" the prohibition on acts of racial discrimination extends to the "use of any and all racial slurs and racially derogatory words, statements or remarks in any form, verbal or written...." [FN80] The policy states that the "use of racial slurs by employees ... is not merely a personnel matter. The ... department has an obligation to investigate complaints and take necessary steps to ensure that any form of racial harassment by the use of racial slurs or racial words or remarks does not occur." [FN81] Both employees who have been "subjected" to a racial slur or "who become[ ] aware of any such situation" are called on to report the matter immediately so that the department can conduct a prompt investigation and take "appropriate action." [FN82] Further, "supervisors who condone" the use of racial slurs after learning of them are subject to discipline. [FN83] Thus, the policy imposes several duties on employees, supervisors, and the department. First, employees who are subjected to racial slurs or who hear them used about others must report them. Second, supervisors not only must not use racial slurs themselves, they must not tolerate the use of racial slurs by other people. Finally, the department must both investigate complaints and take steps to ensure that racial slurs are not used. Because the policy promises to take "necessary steps to ensure that" slurs are not used,[FN84] the department clearly contemplated acting on allegations short of formal complaints, such as informal discussions between employees and supervisors, and taking steps short of discipline, such as issuing a general reminder that the use of slurs is prohibited.

>   FN80. Exhibit 22, March 18, 1996, status

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 2.

FN81. *Id.*

FN82. *Id.* at 3-4.

FN83. *See id.* at 2.

FN84. *See id.* at 3.

The policy was later incorporated into the article XVII of consent decree I.

*Racial tensions since the adoption of the 1992 racial harassment policy:* The court has already described how racial slurs continue to be used at the Department of Transportation, and how the department continues to fail to respond. Although the testimony at the 1996 trial on Reynolds's challenge to his suspension focused on the use of slurs by employees and supervisors in Roadway Design, the evidence also showed that the department, from top to bottom, knew that racial slurs were commonly used and failed to act. Within Roadway Design, white employees and supervisors regularly use the word "nigger." [FN85] Squad leaders Lett and Jordan not only took no action when others used racial slurs in their presence-in direct **\*1080** violation of the department's own policy-they frequently used the word "nigger" themselves.[FN86] Wiggins, a section leader whose office was adjacent to the Roadway Design work room, did nothing to prevent the use of racial slurs despite their pervasive use in his section.

FN85. *See* testimony of Jessie L. Smith, transcript of 28th day of trial, held October 6, 1992, at 210.

FN86. *See id.* at 211.

Lett, Jordan, and Wiggins were not the only supervisors who knew that racial slurs were used in Roadway Design but failed to act. Arkle admitted that he was aware of the racial tensions, but he did nothing. Indeed, Smith reported to Arkle on several occasions that supervisors, such as Lett and Jordan, were using racial slurs, and Arkle did nothing.[FN87] Fowler, Bass, and Butts all knew that racial slurs were regularly used in Roadway Design, but each did nothing. Although Arkle testified that the department's policy was to investigate any claim

involving a racial slur-with or without corroboration-Arkle himself undermined this policy when he failed to respond to Smith's complaints in any way.

FN87. *See id.* at 210-11.

An incident involving Hudson Hinton, a black employee of the department, and David P. McAteer, a white employee, further illustrates the department's typical response to allegations of the use of a racial slur and its enforcement of its racial harassment policy. On July 20, 1994, Hinton and Stan Biddick, a white supervisor, joked with McAteer throughout the day about McAteer's slacks. [FN88] In the afternoon, after Hinton had pointed at McAteer's slacks and smiled, McAteer "blew up" and called Hinton a "damn nigger." [FN89] Carey Kelly, a supervisor, heard from McAteer that he and Hinton had had a disagreement, and Kelly called Hinton to his office to discuss the problem. [FN90] Hinton told him that McAteer had called him a "damn nigger." Kelly responded by asking Hinton what he had done to provoke McAteer or cause McAteer to use the slur.[FN91] Further, Kelly told Hinton that McAteer was having problems at home which could have led to McAteer's use of the slur. [FN92] McAteer did not deny using the racial slur; rather, he claimed that he simply could not remember what he had said.[FN93] Eventually, both employees were given verbal reprimands: Hinton for teasing and McAteer for cursing.[FN94] Biddick, who initiated the teasing and participated in it throughout the day, was not disciplined.

FN88. *See* testimony of Hudson Hinton, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 588.

FN89. *See id.* at 589; *see also* defendants' exhibit 8, hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

FN90. *See* testimony of Hudson Hinton, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 590.

FN91. *See id.* at 603-04.

FN92. *See id.* at 601.

4 F.Supp.2d 1068                                                                                    Page 14
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

FN93. *See id.* at 605;  Testimony of Carolyn Robinson, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 835.

FN94. *See* Testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 423, 425.

Hinton later met with Arkle to discuss the situation. Although he did not tell Hinton at the time,[FN95] after hearing Hinton's version of the confrontation, Arkle believed Hinton because he had "faith in him, that what he said was true.  I don't believe he'd make something like that up."[FN96]  Despite "personally" believing Hinton,[FN97] Arkle nonetheless decided that the department should not make any determination about whether the slur was used.  He "was afraid" that if "one person's word about a racial slur [was] allowed to result in suspension of an employee, that ... was setting a poor precedent...."[FN98] He feared that if he acted based solely on Hinton's word, "we could have a lot of accusations*1081 made," and no effective way to handle them.[FN99]  Further, Arkle felt that Hinton had "brought on" the slur by teasing McAteer.[FN100]    Although he acknowledged that requiring corroboration could convince employees that it was futile to file a complaint and could embolden those who wished to use racial slurs, he felt that such incidents should be reported.[FN101]  He believed that if enough incidents were reported, eventually "it would lend some believability about it." [FN102]  Arkle told Hinton that if he was dissatisfied with the outcome, he could file a grievance with the equal employment opportunity office.

FN95. *See* testimony of Hudson Hinton, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 605-06.

FN96. Testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 427-28.

FN97. *See id.* at 427.

FN98. *Id.* at 428.

FN99. *Id.*

FN100. *See id.* at 405-06.

FN101. *See id.* at 429.

FN102. *Id.* at 429.

To decide whether to file a grievance, Hinton met with Carolyn Robinson of the equal employment opportunity office.  She reviewed the report from Kelly giving Hinton's and McAteer's versions of the confrontation.  From her review of the record, she felt unable to make a finding as to who was telling the truth[FN103] and that without more evidence that she could not determine whether the slur had been used.[FN104]  She said that she would be convinced if Hinton produced a witness who overheard McAteer, or if McAteer confessed.  Beyond this, she offered Hinton no advice as to how else he could convince her that he was telling the truth.[FN105]  Although she acknowledged that she could have recommended training or counseling for McAteer or for the entire section without having determined who was telling the truth, she did not do so in this case.[FN106]  Robinson concluded that even if she had recommended discipline for McAteer, her recommendation would be rejected unless Hinton produced more corroborative evidence.[FN107]  Robinson told Hinton that filing a formal grievance would be futile because she would be the person who investigated the grievance, and without more evidence, she could not determine who was telling the truth.[FN108]

FN103. *See* testimony of Carolyn Robinson, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 835-36.

FN104. *See id.* at 835-36.

FN105. *See id.* at 840.

FN106. *See id.* at 855.

FN107. *See id.* at 848.

FN108. *See id.* at 837-38.

This evidence demonstrates that the department requires either a corroborating witness or a confession from the employee accused of using a racial slur before it would act.  Both Arkle and Robinson felt that unless a complaining employee could produce a witness to the alleged use of a racial slur or a confession, there was nothing the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

department could do because the evidence would consist of only one person's word against another's. Such a corroboration requirement is inappropriate. First, that a complaining employee does not have a corroborating witness does not mean that there is no corroborating evidence to be found. A thorough investigation by the department could lead to such evidence, as the department's investigation into Reynolds's alleged conduct demonstrates. Second, that an employee used slurs only in private does not lessen their harmful effect, and should not shield him from the department's racial harassment policy. Third, as Arkle admitted, requiring corroboration will inevitably convince employees that their complaints will not be taken seriously and will discourage employees from filing grievances. More disturbingly, the evidence shows that white employees at the department have learned that they can use racial slurs with impunity as long as they do not do so in front of black employees. Finally, under the department's racial harassment policy and the court's prior orders, the department's fundamental responsibility is to prevent the use of racial slurs, and this may be done through counseling and monitoring of the parties, without necessarily determining whether the slur was actually used.

### III. DISCUSSION

Against this evidentiary background, the court now considers Reynolds's claims. **\*1082** First, Reynolds claims that he was disciplined because of his race, in violation of Title VII. 42 U.S.C.A. § 2000e-2(a)(1) provides, in part, as follows: "It shall be an unlawful employment practice for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." Second, he contends that he was retaliated against for engaging in protected conduct in violation of Title VII. 42 U.S.C.A. § 2000e-3(a) provides, in part, as follows: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

To prevail on these claims, Reynolds must establish a prima-facie case of either disparate treatment or retaliation. Establishing a prima-facie case "creates a presumption that the employer unlawfully discriminated against the employee." _Texas Dep't of Community Affairs v. Burdine,_ 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); _see also McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, known as the _McDonnell Douglas_ approach, the burden then shifts to the employer to rebut the presumption by producing a legitimate, nondiscriminatory or nonretaliatory reason for the employment decision. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason. _Id._ at 253-55, 101 S.Ct. at 1093-94. If the employer satisfies this burden of production, the employee must prove by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination or retaliation. The employee may meet this burden by persuading the fact finder either _directly_ that a discriminatory or retaliatory reason more than likely motivated the employer or _indirectly_ that the proffered reason for the employment decision is not worthy of belief. _Id._ at 256, 101 S.Ct. at 1095.

[1] However, where, as in this case, the court has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the _McDonnell Douglas_ burden-shifting process and should instead reach the ultimate issue of discrimination. "If ... the defendant has succeeded in carrying its burden of production, the _McDonnell Douglas_ framework-with its presumptions and burdens-is no longer relevant.... The presumption, having fulfilled its role of forcing the defendant to come forward with some reason, simply drops out of the picture." _St. Mary's Honor Ctr. v. Hicks,_ 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). _See also United States Postal Serv. Bd. of Governors v. Aikens,_ 460 U.S. 711, 716, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983); _Powers v. Alabama Department of Education,_ 854 F.2d 1285, 1290 (11th Cir.1988).

Moreover, the Supreme Court announced the _McDonnell Douglas_ approach before the 1991 amendments to Title VII. Under _McDonnell Douglas,_ the burden of persuasion never shifts from the employee or plaintiff. However, under the 1991 amendments, to establish liability, the employee need only show "that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C.A. § 2000e-2(m), and then, to avoid the full array of remedies, the employer must "demonstrate[ ] that [it] would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068    Page 16
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C.A. § 2000e-5(g)(2)(B).

[2][3] Nonetheless, the *McDonnell Douglas* analysis may still be helpful in fully tried cases to which the 1991 amendments apply and in which the employee relies on circumstantial evidence. Such cases pose "difficult" and "sensitive" issues of subjective intent and objective action. *Aikens, 460 U.S. at 716, 103 S.Ct. 1478, 75 L.Ed.2d 403.* The *McDonnell Douglas* analysis provides an invaluable method of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Burdine, 450 U.S. at 255, n. 8, 101 S.Ct. at 1094, n. 8.* Positing such elementary *McDonnell *1083 Douglas* questions as whether the elements for a prima-facie case are present (in particular, whether the plaintiff was treated differently from a similarly situated person of a group different from that to which the plaintiff belongs), the clarity and nature of the employer's justification, and whether the justification is pretextual, and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim and, in particular, in resolving the ultimate issues of whether race was a motivating factor for the decision by the employer, even though other factors also motivated the employer, and whether the employer would have taken the same adverse employment action against the employee even in the absence of the impermissible factor, 42 U.S.C.A. § § 2000e-2(m) & 2000e-5(g)(2)(B), the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dep't of Envtl. Management, 872 F.2d 361, 365 n. 4 (11th Cir.1989).* However, because the *McDonnell Douglas* analysis is only a "procedural device," *St. Mary's Honor Center, 509 U.S. at 521, 113 S.Ct. at 2755,* it should not be applied too rigidly; nor should it be viewed as an end in itself. For example, the mere disbelief of the employer's proffered reason does not "compel" a finding of discrimination. *Id. at 510-12, 113 S.Ct. at 2749.* In other words, the *McDonnell Douglas* approach should not be used by the court as a "substitute" for determining, on a case-by-case basis, whether the evidence is or is not sufficient to allow the fact finder to conclude that the employee has, in fact, been a victim of discrimination. *Moore v. Alabama State Univ., 864 F.2d 103, 105 (11th Cir.1989).*

As stated, the Transportation Department offers two reasons for suspending Reynolds: first, Reynolds had made false statements involving racial slurs which created a disruption in the office; and, second, he violated the department's June 1995 memorandum which prohibits the making of false statements during an investigation into a charge of racial harassment. [FN109] The court therefore now turns to whether these two reasons are pretexts for racial discrimination or retaliation.

> FN109. In the letter to Reynolds, the Transportation Department offered a third reason for his suspension, that he had "committed acts of insubordination" by refusing to cooperate during the investigation. However, at trial, the department admitted that this was not really a basis for his suspension.

### A.

[4][5] As stated, Reynolds claims that he has been suspended because of his race, and, of course, Title VII prohibits an employer from discriminating against employees based on race. 42 U.S.C.A. § 2000e-2(a)(1). When the alleged discrimination involves the application of workplace rules, the plaintiff can prevail by showing "that he did not violate the work rule," *Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989),* or "that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Id.* To show that his conduct was similar, the plaintiff need only show that the conduct for which he was disciplined and the conduct of the other employee who was treated less severely was of "comparable seriousness." *McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 284 n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493 (1976), quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973)* (emphasis omitted).

[6] Applying the above principles, the court concludes that the evidence is overwhelming that the Transportation Department's first reason for suspending Reynolds-that Reynolds had made false statements involving racial slurs which created a disruption in the office-is a pretext for racial discrimination. Although the department currently has a policy prohibiting the use of racial slurs, the evidence presented at trial revealed that white employees and supervisors continue to use the word "nigger" regularly, that employees-both white and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

black-have complained, and that the department*1084 has failed to respond. *As stated, during the investigation of Reynolds, Butts learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Butts did nothing. During the investigation of Reynolds, Bass learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Bass did nothing. During the investigation of Reynolds, Arkle learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Arkle did nothing. During the investigation of Reynolds, Bush learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Bush did nothing. During the investigation of Reynolds, Reese learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Reese did nothing. During the investigation of Reynolds, Wiggins learned that racial slurs were regularly used in Roadway Design by Lett and Jordan. Wiggins did nothing. Indeed, as to most, if not all, of these men, what they learned merely confirmed what they already knew. But they did nothing; they all chose to do nothing.*[FN110]

> FN110. To be sure, the department finally did initiate an investigation of the use of racial slurs. However, as stated, this was only in response to a show cause order issued by the court. The court is unaware of the results of that investigation.

The department admits that it considers a false allegation that a white employee used a racial slur to be a serious matter.[FN111] It also contends that it considers the use of racial slurs such as the word "nigger" to be a serious matter.[FN112] Indeed, when officials of the department were considering the appropriate discipline for Reynolds, the only incident they considered similar was one in which Eddie Lester, a white employee, called Frank Topping, a black employee, a "nigger" and threatened to kill him.[FN113] From this, the court concludes that the department considered the 'proved' instances of the use of the word "nigger" by white employees to be of "comparable seriousness" *McDonald, 427 U.S. at 284 n. 11, 96 S.Ct. at 2580 n. 11,* to an inaccurate 'accusation' by a black employee that a white employee had used the slur. Thus, Reynolds has established that he "engaged in misconduct similar to that of a person outside the protected class." *Gerwens, 874 F.2d at 1540.*

> FN111. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 498.

> FN112. *See id.* at 349-50.

> FN113. *See id.* at 408-10.

Further, the department had received many reports of the use of racial slurs and had done nothing to follow up on these allegations. In contrast to the swift and wide-ranging investigation of this incident, these other reports, despite their number and similarity, prompted no investigations or hearings, and no one was suspended or otherwise disciplined. From this, the court concludes that Reynolds has shown that the department's response to his so-called wrongdoing was "more severe than" its response to "the other persons who engaged in similar misconduct." *Id.* Indeed, the department's punishment of Reynolds without initially taking any action against Lett (who had not only threatened to injure a co-worker, but had based the threat on the co-worker's use of the department's grievance procedure) reflects that the department took more severe action against Reynolds while taking no action whatsoever against a white person who had engaged in much more disruptive conduct.

The department's swift response to this situation involving white employees and its failure to respond to complaints from black employees further reflect its total, and continued, disregard for its black employees. According to the department, the injuring words were spoken by Reynolds, and the injured persons were Lett and Scott. When the department saw itself faced with a black wrongdoer and white victims, it immediately responded with the most extensive investigation in its history. The department assigned a former police officer to conduct the investigation, and the investigating officer sought out all employees with any knowledge of the situation. The department did not require the *1085 employees to prove what had occurred; it sought to determine the facts for itself. In contrast, when faced with white wrongdoers and black victims, the department has consistently done nothing unless the black employee could prove his case by providing witnesses or by obtaining a confession from the wrongdoer. By failing to investigate complaints by black employees against white employees, the department conveyed the message to its black employees that it did not take their complaints seriously and that the word "nigger" was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068                                                                 Page 18
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

acceptable at the department.    It told white employees that they could treat their black co-workers disrespectfully with impunity.    By swiftly and vigorously investigating a complaint made by a white employee against a black employee, the department conveyed the message to black employees that they spoke out against harassment at their peril.    It told white employees that the department would support them and would require black employees to conclusively prove any alleged use of racial slurs.

It is also important to remember that Reynolds's conclusion that Lett had called him a "nigger," while arguably imprudent, was not an insupportable inference from what Scott had told him.    Scott did tell Reynolds that Lett was using the term "nigger" and that Lett was talking about him behind his back. Reynolds simply put the two together.    While Scott had not expressly told Reynolds that Lett has called him a "nigger," Scott had implied as much.    [FN114] Indeed, when the department's own investigator asked Lett directly whether he had ever said that Reynolds was a "nigger," Lett's only response was to clear his throat.[FN115]  Considering all of this evidence, the court is convinced that Reynolds reasonably believed that Lett had called him a "nigger" and that Scott had accused Lett of doing so.

> FN114. Indeed, if the department had been even-handed, it should have also disciplined Scott, along with Reynolds, for implying that Lett had called Reynolds a "nigger." Of course, the real issue here-one that the department simply refuses, and apparently intentionally so, to come to grips with-is that the culprit here is Lett.    Lett should not be using the term at all in the work setting.

> FN115. *See* transcript of interview with Lett, taken February 29, 1996, exhibit 15, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

It must also be remembered that Reynolds was a victim.    Regardless as to whether Lett had used the term "nigger" and had talked about Reynolds behind his back or whether he had called Reynolds a "nigger," Lett had still referred to African-Americans as "niggers" while working for the Transportation Department;    Reynolds was, and still is, entitled to a work environment that is free of racial harassment. Nevertheless, Reynolds did not voice his grievance in

a disruptive manner;    his discussion with Lett was calm and professional, and once Lett denied having made the statement, Reynolds dropped the matter. Reynolds, unlike Lett, did nothing disloyal, uncooperative, or likely to disrupt productivity.

The department further contends that, although Reynolds's conversation with Lett was calm, Reynolds is nonetheless responsible for Lett's violent confrontation with Scott.    It contends that Reynolds's behavior amounted to an incitement.    This argument has no merit.    First, Lett neither said nor did anything while he was talking to Reynolds to indicate that he would later threaten Scott's life.    Second, approximately two hours after his conversation with Reynolds, Lett spoke with Reese, his supervisor, about his conversation with Reynolds.    Lett neither said nor did anything in this conversation to indicate that he would later threaten Scott's life.

Indeed, the Transportation Department's eagerness to punish Reynolds and its reluctance to punish Lett dramatically set in relief the racial bias the department harbors against Reynolds.    The Transportation Department faults Reynolds (the victim of Lett's racial slurs) for not predicting that Lett would threaten physical violence and attempts to absolve Lett (the apparent perpetrator of racial slurs, regardless as to whom they were directed) of actually threatening physical violence.    The irrational difference*1086    in    treatment can be explained by only an irrational motive: race.

From all the evidence, therefore, the court is convinced, and so finds, that the department singled Reynolds out for discipline and suspended him because he is an African-American.    But for his race, Reynolds would not have been suspended.

The court further concludes that the evidence is overwhelming that the Transportation Department's second reason for suspending Reynolds-that he violated the department's June 1995 memorandum which prohibits the making of false statements during an investigation into a charge of racial harassment-is a pretext for discrimination.    However, in considering this reason, the court first notes that it cannot agree with Reynolds's contention that the June 1995 memorandum may not be applied against him because it illegally modifies the department's racial harassment policy.    As stated, during the 1992 partial trial of this case, the court orally ordered the department to adopt a policy prohibiting the use of racial slurs. The department adopted such a policy on October 16, 1992, and the racial harassment policy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068                                                                    Page 19
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

remains in effect pursuant to article XVII of consent decree I. In 1995, Butts reaffirmed the department's commitment to the policy in the June 1995 memorandum, writing that "I am directing that an investigation be conducted into each alleged act of racial discrimination to determine the identity of the actor and will discipline anyone so identified. Disciplinary action will also be taken against an employee who falsifies or otherwise makes misstatements of fact."    Reynolds claims that, because the October 1992 policy contains no such provision, discipline for making a false statement violates the consent decree.    The court cannot agree. There is nothing in consent decree I or any other order of this case preventing the Transportation Department from making its racial harassment policy more strict.    Indeed, an employee should not be free to make false statements during an internal investigation.    Reynolds's contention that the department may not adopt a policy prohibiting employees from making false statements during a departmental investigation into a charge of racial harassment must be rejected.

Reynolds further claims that even if a rule against making false statements *during* an investigation is proper, the department has never before applied a rule against making false statements to other employees *outside* of an investigation.    In other words, it cannot discipline Reynolds because he did not make a false statement during an investigation. The court agrees with Reynolds.    Arkle admits that this broad interpretation of the June 1995 memorandum is a novel one and that the department had never before investigated, much less suspended, an employee simply for making a false statement to another employee.[FN116]    Based on this, the court finds that the department's application of its June 1995 memorandum to Reynolds, and its decision to interpret the memorandum to make all false statements subject to discipline, were racially motivated.    Indeed, the court is convinced that the department interpreted the policy in this way solely to justify its decision to suspend Reynolds. Accordingly, Reynolds has shown that he did not violate the work rule because that rule in question did not actually exist when he committed the alleged wrong.    The department applied the June 1995 memorandum to Reynolds because he is an African-American.

FN116. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through

5, 1996, at 361.

Moreover, even if Reynolds could be considered as having violated the June 1995 memorandum, the department's suspension of him without taking any disciplinary action against white employees who also violated the department's racial harassment policy and who, as already explained by the court, engaged in comparable, and even worse, conduct, reflects that the department's action against Reynolds was racially motivated.    *See* *Sims v. Montgomery County Comm'n*, 544 F.Supp. 420, 426 (M.D.Ala.1982) ("uneven application of criteria is strong evidence **\*1087** that the criteria were never in fact employed in the selection process and were used by the employer as merely a pretext for discrimination").    Again, but for his race, Reynolds would not have been suspended.

Finally, the court concludes that, even if the Transportation Department properly decided to discipline Reynolds, the punishment he received was more severe because of his race.    Reynolds was suspended without pay for ten days.    Although Lett was finally suspended without pay for three days, he was initially not suspended at all.    Reynolds claims that although his conduct was similar to that of Lett, the department treated him more severely.    He maintains that when he went to speak with Lett on February 26, he had heard that Lett had been talking about him behind his back and he wanted to ask Lett about it.    He claims that his conduct was similar to Lett's, in that, when Lett went to speak to Scott on February 27, Lett had heard that Scott had been talking about him behind his back and he wanted not only to ask Scott about it but also to threaten Scott with violence if Scott intended to pursue relief under the department's grievance procedure.    Thus, he maintains, he and Lett were in similar positions of having violated the department's grievance procedure, and, although Reynolds acted with more restraint than Lett, Reynolds was disciplined much more severely.

The court agrees with Reynolds and finds that the department's decision to discipline him much more severely than Lett was racially motivated.    At worst, Reynolds was imprudent.    Reynolds told Lett that Scott had accused Lett of calling Reynolds a "nigger" when Scott had not made such an allegation.    As stated, Scott had conveyed a great deal of information to Reynolds suggesting that Lett used racial slurs and did not like Reynolds, but he had not told Reynolds that Lett had referred to him as a "nigger."    Although it was perhaps imprudent for Reynolds to tell Lett

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

that Scott had said he called Reynolds a "nigger," it was a natural inference to conclude further that Lett had, in fact, done so. Lett's threat to assault Scott physically if he took advantage of the department's grievance procedure was clearly more egregious than anything Reynolds may be considered to have done.

B.

[7] The court turns next to Reynolds's claim that the Department of Transportation retaliated against him for protected conduct in violation of Title VII. As stated, Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3(a). Title VII therefore prohibits employers from retaliating against employees for engaging in two types of expression: first, opposing unlawful employment practices; and, second, participating in Title VII proceedings.

[8][9][10] Title VII provides almost absolute protection to "employees against retaliation for their participation in the procedure established by [it] to enforce its provisions." *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1135 (5th Cir. Unit A 1981). FN117 In contrast, "the protection afforded" those who oppose unlawful practices by other methods, such as protests or informal complaints, "is not absolute." *Rollins v. Florida Dep't of Law Enforcement,* 868 F.2d 397, 401 (11th Cir.1989) (per curiam). In such a case, the employee must show that "he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1503 (11th Cir.1990). Further, an employer may, in some circumstances, avoid liability if it can show that it disciplined the employee not because of his opposition but because the opposition took a form which was "disruptive" or which **\*1088** "impair[ed] the morale of [the] unit." *Rollins,* 868 F.2d at 401.

FN117. In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior

to the close of business on September 30, 1981.

[11][12] To establish a prima-facie case of retaliation, "the plaintiff must show (1) that [he] engaged in statutorily protected expression; (2) that [he] suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994). To establish the causal relation requirement, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993). Reynolds claims that the Transportation Department illegally suspended him in retaliation for his participation in the department's grievance procedure.

[13] It is undisputed that two of three prima-facie factors have been satisfied. Reynolds suffered an adverse employment action-he was suspended without pay. In addition, while Arkle did not list Reynolds's participation in the department's grievance procedure as a reason for Reynolds's suspension, Arkle stated at the 1996 trial that this was, in fact, a motivating reason. Arkle admitted that he considered three aspects of Reynolds's participation in the department's grievance process when he decided to suspend Reynolds: (1) that Reynolds himself had filed eight grievances in ten weeks; (2) Reynolds's advice to other class members that they should pursue their grievances to trial rather than settle them; and (3) Reynolds's unwillingness to consider the department's proposed settlement of his grievances. Arkle did not limit his consideration of these factors to his evaluation of Reynolds's credibility. Rather, they were factors which caused him to suspend Reynolds.FN118 Therefore, the only unresolved issue is whether Reynolds's participation in the grievance process was protected conduct under Title VII.

FN118. Arkle testified that he also considered two other incidents involving Reynolds. The first was that Reynolds had once been caught playing solitaire on his computer. *See* testimony of Don Arkle, transcript of hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996, at 891. The second was that Reynolds had once taken longer than his allotted lunch break. *See id.* at 894. The court is convinced that these two factors

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

played almost no role in Arkle's decision to suspend Reynolds.

Reynolds claims that, because the Department of Transportation's grievance procedure was established pursuant to court order and remains in effect under consent decree I, it constitutes a proceeding under Title VII. Under the consent decree approved by the court, the department was required to develop and implement a procedure for handling complaints of discrimination. [FN119] The department submitted a grievance procedure on August 9, 1995, [FN120] and the court approved it the same day. [FN121] In the order approving the grievance procedure, the court also ordered the department to comply with the procedure. The grievance procedure defines a grievance as "an alleged wrong based upon the employee's race, color, creed, sex, national origin, age, or handicap" [FN122] and describes the steps in the process, beginning with the filing of a grievance through a hearing and external review. The procedure promises that grievants will be free "from restraint, interference, discrimination or reprisal for presenting a grievance." [FN123] Further, the procedure provides that if a person files three or more frivolous grievances within twelve months, all of his future grievances must be reviewed by counsel for the plaintiff class and a designee for the department before the department is required to investigate or take any of the other steps in the process. [FN124]

FN119. *See* consent decree I, article XIX, ¶ 7.

FN120. *See* revised complaint procedure, filed August 9, 1995 (Doc. no. 706). Although this document uses the words 'complaint' and 'grievance' interchangeably, the court has used the word grievance for the sake of clarity.

FN121. *See* order, entered August 9, 1995 (Doc. no. 707).

FN122. Revised complaint procedure, filed August 9, 1995 (Doc. no. 706), at 2.

FN123. *Id.*

FN124. *See id.* at 11.

Whether an employer's internal grievance procedure constitutes a proceeding under Title*1089 VII appears to be an open question in this circuit. The Eleventh Circuit Court of Appeals in *Rollins* found that under the facts of that case, the employee who used the internal grievance procedure should receive only the limited protection afforded to those who 'oppose' unlawful employment practices, *Rollins, 868 F.2d at 400,* suggesting that the employer's internal grievance procedure did not constitute a 'proceeding' for the purposes of Title VII. However, the court finds that, on the facts of this case, the department's grievance procedure constitutes a 'proceeding.' *Rollins* differs from this case in several important respects. First, there was no evidence in *Rollins* that the employer's grievance procedure was established pursuant to court order. *Id.* In contrast, the department's grievance procedure was set up pursuant to court order that was expressly entered pursuant to Title VII, and the department is under that court order to comply with it. Second, in *Rollins,* the employee often refused to follow the formal complaint procedure, preferring to write her complaints on her time sheets rather than filing a formal complaint. *Id.* at 399. In this case, there is no evidence that Reynolds refused to follow the formal procedure. Although Arkle testified that Reynolds filed too many grievances, he admitted that Reynolds filed them on the official department grievance form, using the appropriate channels. Third, in *Rollins,* the employee's frequent complaints, often made in insulting and unprofessional language, *id.,* consumed more of her supervisor's time than those of all other employees combined. Although Reynolds filed many grievances, under the department's grievance procedure, the grievances of people who filed frequent and frivolous grievances could be dismissed without investigation if certain conditions were met. Thus, the department was not required to spend time investigating the grievances of employees whose prior grievances had proved to be frivolous. Arkle believed that Reynolds advised others not to settle their grievances and refused to settle his, thereby causing the department to spend more time on the grievances than would have been required had the employees decided to settle them. Reynolds's preference for a hearing rather than a settlement merely shows that he preferred to use the tools provided in the grievance procedure, and, as stated, if his grievances were frivolous, the department was not required to spend any time investigating them. Finally, the grievance procedure itself protects employees against reprisal for 'presenting' a grievance. Considering all of these factors, the court finds that the department's grievance procedure constitutes a proceeding for the purposes of Title VII. Therefore, Reynolds may not be disciplined for filing grievances or for refusing to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
(Cite as: 4 F.Supp.2d 1068)

Page 22

settle his own grievances. In addition, because Title VII extends protection to those who "assist[ ], or participate[ ] in any manner in an investigation, proceeding, or hearing," Reynolds may not be disciplined for advising other grievants that they should not settle their claims.[FN125]

> FN125. Even if the court had found that the department's grievance procedure did not constitute a 'proceeding' under Title VII, on the facts of this case, Reynolds would still prevail. Reynolds's filing of grievances and his position that he would not, and others should not, accept the department's settlement offers were neither "disruptive" nor "inappropriate." _Rollins, 868 F.2d at 401._ Accordingly, his behavior would be protected even if the court had not concluded that the department's grievance procedure were a proceeding under Title VII and Reynolds's behavior was considered mere 'opposition,' rather than 'participation.'
> The department has suggested that the court should treat this case as a 'mixed-motives' case and consider whether, assuming that it was improper to suspend Reynolds for his participation in the grievance process, it would have suspended him even without considering this improper reason. _See, e.g., Haynes v. W.C. Caye & Co., Inc._, 52 F.3d 928, 929 (11th Cir.1995) ("defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role"). The court has found that the only non-discriminatory reasons offered by the department were that Reynolds played solitaire on his computer, and that, on one occasion, he took a long break. Because the department does not contend that these factors played a significant role in Reynolds's suspension, the court need not consider this argument.

Reynolds also claims that the department suspended him because of his participation in this lawsuit. Although the court is convinced that Reynolds's participation in this lawsuit was a motivating factor, it is unnecessary to *1090 rely on this ground. Reynolds further claims that the Department of Transportation may not suspend him for his conversation with Lett because, when he asked Lett if Lett had called him a "nigger," he was 'participating'

in the department's grievance procedure and he was 'opposing' activity prohibited by Title VII. He argues that, because the department's grievance procedure provides that complaints of racial harassment should be resolved informally if possible, his conversation with Lett constitutes protected 'participation' in a proceeding to enforce Title VII. He further argues that the conversation constituted protected opposition because he reasonably believed that Lett had used the slur and his approach to Lett was calm and non-disruptive. Because the court has concluded that Reynolds was retaliated against based upon his participation in the grievance procedure, it is unnecessary to reach these additional grounds.

## IV. CONCLUSION

In conclusion, the Transportation Department suspended Reynolds because of his race and in retaliation for protected conduct, in violation of Title VII. Others in the Transportation Department, not Reynolds, are guilty of violations of the department's racial harassment policy. Director Butts, Chief Engineer Bass, Design Bureau Chief Arkle, Roadway Design Engineer Bush, Assistant Roadway Design Engineer Reese, Section Leader Wiggins, Squad Leader Lett, and Squad Leader Jordan, have all violated the department's racial harassment policy. Although aware of both isolated and widespread instances of the use of the word "nigger," they failed to take any corrective measure. Moreover, because they failed to take corrective measure, they set the stage for-that is, they created the environment that led to-the racial strife that spawned this litigation. If anyone deserves suspension, they do. Indeed, until they assume the responsibility placed on them by federal law and the orders of this court to enforce the Transportation Department's racial harassment policy aggressively and expansively, they will continue to have incidents similar to, if not worse than, that involving Reynolds, Scott, and Lett.

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:
(1) Judgment is entered in favor of plaintiff Johnny Reynolds and against defendants Alabama Department of Transportation and Jimmy Butts;
(2) It is DECLARED that defendants Alabama

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

Page 23

Department of Transportation and Jimmy Butts suspended plaintiff Reynolds because of his race and in retaliation for protected conduct, in violation of Title VII of the Civil Right Act of 1964, as amended, 42 U.S.C.A. § § 1981a, 2000e through 2000e-17;
(3) The motion for a preliminary injunction, filed by the plaintiffs on March 18, 1996 (Doc. no. 961), and treated as a motion for a permanent injunction by order entered April 4, 1996 (Doc. no. 976), is granted; and
(4) Defendants Alabama Department of Transportation and Jimmy Butts and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from suspending plaintiff Reynolds based on an exchange he had with Charles Lett in February 1996.

It is further ORDERED that costs are taxed against defendants Alabama Department of Transportation and Jimmy Butts, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.

The clerk of the court is DIRECTED to provide for service of a copy of this order and injunction upon defendants Alabama Department of Transportation and Jimmy Butts by certified mail, returned receipt requested.

### ORDER AND INJUNCTION

In open court on April 1, 1996, the court entered an oral order requiring that defendant**\*1091** Alabama Department of Transportation show cause as to why further relief should not be ordered to eliminate racial harassment and the use of racial slurs in the department. Having now heard all the evidence, the court concludes that the solution to the problem is not a reworking or expansion of the department's racial harassment policy, which was adopted pursuant to a court directive in 1992, and which is now incorporated in article XVII in consent decree I.[FN*] The problem is instead that there has been a complete, or almost complete, failure of enforcement. This problem should be addressed through civil and criminal contempt proceedings. *Newman v. Alabama,* 683 F.2d 1312 (1982); *Wyatt v. Rogers,* 92 F.3d 1074, 1078 n. 8 (11th Cir.1996). If, after updating themselves on the racial conditions within the department, the plaintiffs believe that the

department is still failing to enforce the racial harassment policy adequately, the plaintiffs may file a motion for civil and criminal contempt against those who have violated the racial harassment policy.

> FN* *See* exhibit 24, March 18, 1996, status conference, re-offered at hearing on plaintiffs' motion for preliminary injunction, held April 1 through 5, 1996.

Nevertheless, the court believes that certain additional, but minimal, procedural measures are appropriate to help assure compliance in the future with the department's racial harassment policy.

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that defendants Alabama Department of Transportation and Jimmy Butts and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing to comply with the Alabama Department of Transportation's racial harassment policy, a copy of which is attached to this order.

It is further ORDERED that defendants Alabama Department of Transportation and Jimmy Butts shall, within 60 days, provide a copy of this order and the attached racial harassment policy to each and every supervisor in the Alabama Department of Transportation.

It is further ORDERED that defendants Alabama Department of Transportation and Jimmy Butts shall submit to the court, within 60 days, an individual affidavit from each and every supervisor in the Alabama Department of Transportation attesting to the following:
(1) The supervisor has received a copy of this order and the attached racial harassment policy;
(2) The supervisor understands that he or she is obligated to do the following:
(a) Comply with the racial harassment policy;
(b) Report in writing to the EEO Monitor (who is currently Ron Green), within seven days, any violation of the racial harassment policy by any employee (including, but not limited to, any use of racial slurs, such as "nigger," etc., or the telling of any racial derogatory jokes, by any employee in the workplace); and
(c) Take disciplinary action against any employee who violates the racial harassment policy;
(3) The supervisor understands that the failure to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 F.Supp.2d 1068
4 F.Supp.2d 1068
**(Cite as: 4 F.Supp.2d 1068)**

Page 24

comply with this order and the attached racial harassment policy will subject him or her to civil and criminal contempt sanctions (including fines and imprisonment) in the United States District Court;

(4) The supervisor has furnished a copy of this order and the racial harassment policy to all persons whom he or she supervises and listed all their names in his or her affidavit;

(5) The supervisor has explained to all persons whom he or she supervises that they are obligated to do the following:

(a) Comply with the racial harassment policy; and

(b) Report in writing to both his or her supervisor and the EEO Monitor (who is currently Ron Green), within seven days, any violation of the racial harassment policy by any co-employee (including but not limited to, any use of racial slurs, such as "nigger," etc., or the telling of any racially derogatory jokes, by any employee in the workplace);

**\*1092** (6) The supervisor has explained to all persons whom he or she supervises that they will be subject to disciplinary action if they violate this order and the attached racial harassment policy; and

(7) The supervisor has explained to all persons whom he or she supervises that their failure to comply with this order and the attached racial harassment policy will subject them to civil and criminal contempt sanctions (including fines and imprisonment) in the United States District Court.

The clerk of the court is DIRECTED to issue a writ of injunction.

The clerk of the court is DIRECTED to provide for service of this order and injunction upon defendants Alabama Department of Transportation and Jimmy Butts by certified mail, returned receipt requested.

The clerk of the court is DIRECTED to provide for service of a copy of this order and injunction upon the United States Attorney for the Middle District of Alabama by certified mail, returned receipt requested.

M.D.Ala.,1998.
Reynolds v. Alabama Dept. of Transp.
4 F.Supp.2d 1068

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.