IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LEROY WILLIAMS,        )
        )
    Plaintiff,      )
        )   CIVIL ACTION NO. 2:06cv658-ID
v.        )
        )
STATE OF ALABAMA DEP'T OF   )
TRANSPORTATION, et al.,    )
        )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

In this lawsuit, Plaintiff Leroy Williams ("Williams"), an African-American male,

sues the State of Alabama Department of Transportation ("ALDOT") and Joe McInnes

("McInnes") in his official capacity as the director of the ALDOT, alleging that he was

demoted for racial and retaliatory reasons, in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and 42 U.S.C. §§ 1981 and 1983.

Defendants have moved for summary judgment, arguing that Williams has not established

a prima facie case of discrimination or retaliation and has not presented any evidence

which refutes Defendants' legitimate, nondiscriminatory and non-retaliatory reasons for

their decision to demote Williams.  (Doc. No. 13.)  A brief and an evidentiary submission

accompany the motion.  (Doc. Nos. 14-15.)  Williams submitted a response in opposition

and an evidentiary submission (Doc. Nos. 31-32), to which Defendants filed a reply.

(Doc. No. 33.)  After careful consideration of the arguments of counsel, the relevant law

and the record as a whole, the court finds that Defendants' motion for summary judgment is due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).  This determination involves applying substantive law to the substantive facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable

law in relation to the evidence developed.  See id. at 248; Barfield v. Brierton, 883 F.2d

923, 933 (11th Cir. 1989).

     The moving party bears the initial burden of establishing the absence of a genuine

issue of material fact.  See Celotex, 477 U.S. at 323.  "[T]he burden on the moving party

may be discharged by 'showing' – that is, pointing out to the district court – that there is

an absence of evidence to support the nonmoving party's case."  Id. at 325.  The burden

then shifts to the nonmoving party, which "must do more than simply show that there is

some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless

the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party.  See id. at 587.


## IV.  STATEMENT OF FACTS

     Viewed in the light most favorable to Williams, the following facts constitute the

facts material to resolution of the instant motion for summary judgment.  This lawsuit

focuses on the ALDOT's demotion of Williams from the position of Transportation

Technologist to his former position of Engineering Assistant II/III.  Williams began his

employment with the ALDOT in 1993 as a seasonal laborer.  In the Spring of 1994, he

received two promotions, first to the classification of Highway Maintenance Technician I

and second to the classification of Engineering Assistant I.  Williams describes the

Engineering Assistant classification as "the feeder class" for the position of

Transportation Technologist.  (Doc. No. 31 at 1.)  During the approximate eleven years

he worked as an Engineering Assistant, during which time he advanced to a II/III

classification, Williams received satisfactory evaluations ("exceeds" or "consistently

exceeds" standards).  (Id. at 1-2); (Doc. No. 33 at 1.)

The Transportation Technologist classification is the first classification with

supervisory responsibilities within the ALDOT's engineering line of progression.  (See

Defs. Ex. AA.)[1]  Williams applied for the position of Transportation Technologist in

accordance with the ALDOT's examination and selection procedures.  Effective May 14,

2005, Williams was selected and promoted to the position of Transportation Technologist

with a job title of Field Supervisor.  (Defs. Ex. N); (Williams Dep. at 59 (Pl. Ex. A).)  He

was provisionally appointed in this position subject to satisfactory completion of a six-

month probationary period.  (Williams Dep. at 106 (Pl. Ex. A)); (Defs. Ex. W); see also

Ala. Code § 36-26-21.

Thomas Lewis ("Lewis"), a Caucasian male, was Williams' direct supervisor.

During Williams' first week of work in the Transportation Technologist classification,

Lewis told him (Williams) that he (Lewis) "got his position by experience and taking the

test" and "not by an appoint[ment]" from the court.  (Williams Dep. at 92-93 (Pl. Ex. A).)

Lewis was referring to the Reynolds consent decree and knew that Williams was a

member of the Reynolds class.  (Lewis Dep. at 56 (Pl. Ex. C).)  Williams says that,

---

[1] Unless otherwise noted by the court, Defendants' exhibits are contained within
document number 15, and Williams' exhibits are contained within document number 32.

because the <u>Reynolds</u> lawsuit focused on remedying racially discriminatory employment practices within the ALDOT, Williams understood that, in essence, Lewis "was saying to [him] that the only reason [he] got [his] position [as a Transportation Technologist] was because [he] was a black in the lawsuit," and not because he had the experience and qualifications for the job.  (<u>Id.</u>)

Lewis was not satisfied with Williams' work and, in particular, with Williams' arrival time on the job.  According to Lewis, Williams was tardy four times between June 1, 2005, and July 25, 2005.  After the fourth time, Lewis issued Williams a written reprimand for "repeated tardiness."  (Defs. Ex. Q.)  In the written reprimand, Lewis documented the following four instances of "continual excessive tardiness":

> Occasion One:  On Wednesday, June 1, 2005 you reported to the parking lot in Montgomery at 5:05 a.m. which was 5 minutes late.  At that time I informed you that being tardy was unacceptable.  This was a verbal warning.
>
> Occasion Two:  The very next day I instructed the crew to meet in the parking lot of the motel where everyone was staying in Auburn.  You did not report at that location and I had to be told by another crew member where you were.  That in itself is an infraction because you did not do as instructed.  All other crew members reported just as I had instructed. I told you on that day you were late, because you were not where I told you to be at 7:00 a.m.  I explained if you were late again you would be subjected to disciplinary actions.  This was a second verbal warning.
>
> Occasion Three:  On Monday, June 20th you did not arrive at the office in Tuscaloosa until 7:30 a.m.  You called me that day and told me your stomach was bothering you.  Even though you told me you were sick you went on out and worked the rest of the day like there wasn't anything wrong.  I explained to you the importance of being on time to set an example for the crew members you supervise.  This was a third verbal warning and a pattern had developed.

5

> Occasion Four:  And now on Monday July 25th, you did not report to the office here in Tuscaloosa until 7:14 a.m.  You did not notify me even as I talked with you on the Southern Linc BEFORE 7:00 a.m.  That in itself is grounds for a Reprimand.  I am mystified as to why you did not mention to me that you were going to be late because you should have been very aware that being tardy is not acceptable.

(Defs. Ex. Q.)  Lewis also "remind[ed] [Williams] that [he was] still in the early stages of [his] six-month probationary period as a Transportation Technologist and this type of behavior [was] detrimental to [his] being assessed as a dependable employee."  (Id.)

A few days later, on July 28, 2005, a meeting was held to discuss Williams' tardiness and other areas of Williams' job performance which Lewis deemed deficient. (Id.)  Present at the meeting were Williams, Lewis and Joe E. Jones ("Jones"), the assistant location engineer.

A few days later, Williams received a second written reprimand, dated August 11, 2005.  (Defs. Ex. T.)  In this reprimand, Lewis charged Williams with "insubordination" because Williams "walk[ed] away" from Lewis during what had evolved into a heated discussion between the two concerning alleged work deficiencies by the crew under Williams' supervision and Williams' alleged time management and supervision problems. (Id.); (see also Lewis Dep. at 77-78 (Pl. Ex. C).)  On the last page of the single-spaced three-page typewritten reprimand, Lewis writes:  "Mr. Williams, it is with regret that is has come down to reprimanding you for insubordination, but you walking away from me or any other supervisor when there are such critical issues to confront and discuss is unacceptable and will not be tolerated."  (Id.)  Lewis forwarded a copy of his

6

memorandum to William F. Adams ("Adams"), the location engineer, as well as to Jones.
(See id.)

On August 11, 2005, Jones met with Williams and Lewis to discuss the
reprimands. (Defs. Ex. U.) During this meeting, Williams informed Jones, among other
things, that Lewis "constantly harass[ed] and demean[ed]" him and that Williams' crew
members even asked him (Williams) why Lewis "harass[ed]" him "all the time." (Id.
at 2.) In response, Jones directed Lewis to talk to Williams' crew in order to ascertain the
veracity of Williams' allegations. (Id. at 2.) After this meeting, in a memorandum from
Jones to Adams, Jones recommended that Williams "not be allowed to continue in the
Transportation Technologist classification." (Id.) In this memorandum, Jones also
mentions that Lewis said that Williams "has threatened to 'get a lawyer.'" (Id. at 1.)
Based upon Jones' memorandum, Adams recommended to Don Arkle ("Arkle"), the
design bureau chief, that Williams' "probation be ended" and that "he be reassigned to his
former classification of EA [Engineering Assistant] II/III in the Design Section." (Defs.
Ex. V.) As documented in a memorandum, dated August 19, 2005, to Arkle, Adams
based his recommendation upon the two written reprimands Lewis gave to Williams "for
excessive tardiness on July 26, 2005, and for insubordination on August 11, 2005" and
attached these written reprimands to his letter. (Id.) By his signature on the same
memorandum, Arkle indicated that he "concur[red]" with Adams. (Id.) Arkle is a
Caucasian male.

Consequently, in a memorandum dated August 22, 2005, Arkle made a request to Ron Green, the ALDOT personnel director, that Williams' probationary appointment as a Transportation Technologist be terminated based upon "excessive tardiness and insubordination." (Defs. Ex. W.)  Arkle's request was approved, and, in a letter dated September 1, 2005, Arkle informed Williams that his "appointment in the Transportation Technologist classification that was effective May 14, 2005, has been terminated as of September 3, 2005." (Defs. Ex. X.)  Arkle says, "You [Williams] will revert back to your Engineering Assistant II/III position," and "[y]our salary will also be reduced to the rate you were making at the time of the appointment[.]"  (Id.)  He continues, "This action is being taken because of your continual excessive tardiness and repeated insubordination." (Id.)

On July 24, 2006, Williams filed the instant four-count complaint against Defendants.  In Counts I and II, Williams alleges race discrimination, arising from his demotion from Transportation Technologist to Engineering Assistant II/III, in violation of Title VII and § 1981.  (Id. ¶¶ 15-20.)  Counts III and IV are retaliation claims brought pursuant to Title VII and § 1981.  (Id. ¶¶ 21-27.)  Williams brings his Title VII claims against the ALDOT.  (Id. ¶ 17.)  He brings his § 1981 claims against McInnes in his official capacity and sues under 42 U.S.C. § 1983 for the alleged violation of § 1981.  (Id. ¶¶ 20, 27.)  As relief, Williams requests a permanent injunction enjoining Defendants "from continuing to violate Title VII and . . . § 1981." (Id. at 5.)  Williams also requests

reinstatement, "back pay (plus interest), compensatory damages, lost seniority, nominal

damages, benefits and loss of pension."  (Id.)


## V.  DISCUSSION

### A.  Demotion

Asserting that Defendants intentionally demoted him on the basis of his race,

Williams alleges violations of Title VII and § 1981.  As to the § 1981 violation, Williams

seeks relief pursuant to § 1983.  See Butts v. County of Volusia, 222 F.3d 891, 892-94

(11th Cir. 2000) (holding that, when suing a state actor, a plaintiff must use the remedial

scheme of § 1983 to enforce violations of the rights set out in § 1981) (citing Jett v.

Dallas Indep. School Distr., 491 U.S. 701, 731-32 (1989)).  Williams relies on

circumstantial evidence to prove his discriminatory demotion claim.  In Title VII

circumstantial evidence cases, the allocation of proof shifts in accordance with the

three-step procedure established in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1972).[2]  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 526 (1993).

---

[2] The Title VII circumstantial evidence approach to proving intentional
discrimination also applies to discrimination claims brought pursuant to §§ 1981 and
1983.  See Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985) (holding that
where "a plaintiff predicates liability under Title VII on disparate treatment and also
claims liability under sections 1981 and 1983, the legal elements of the claims are
identical").  Because the court's analysis is the same under the statutes upon which
Williams relies, the court "need not discuss [Williams'] Title VII claims separately from
his section 1981 and section 1983 claims."  Id.

9

First, the plaintiff must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated against him or her in taking the alleged adverse employment action. See St. Mary's Honor Center, 509 U.S. at 506. Second, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason. Id. at 509. The employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Center, 509 U.S. at 509). Third, to avoid summary judgment, the plaintiff must respond with pretext evidence, which may include previously produced evidence establishing a prima facie case, which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 & 1538 (11th Cir. 1997) (citation and internal quotation marks omitted); see also Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., specially concurring) (a plaintiff may show pretext by "showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision"). "The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory." Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam).

10

### 1. Prima Facie Case

To satisfy the prima facie elements in a discriminatory demotion case, a plaintiff must demonstrate that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class."  Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla., 342 F.3d 1281, 1289 (11th Cir. 2003); see also Moore v. Alabama State Univ., 980 F. Supp. 426, 435 (M.D. Ala. 1997) (prima facie case "requires a showing that plaintiff, a member of a protected class, was demoted . . . from a position for which she was qualified and that others outside the class were not so treated or that the plaintiff was replaced by someone not in the protected class").

Defendants do not dispute that Williams belongs to a protected class, but this is the only element which they readily concede.  Under the second prima facie element, Defendants admit only that Williams met the minimal qualifications for the classification of Transportation Technologist.  (Doc. No. 14 at 9.)  Defendants, however, contend that, once promoted, Williams was unable to perform his job satisfactorily.  (Id. at 11-12.) Defendants argue, if not expressly then impliedly, that Williams is not entitled to an inference that he was qualified for the position, see Young v. General Foods Corp., 840 F.2d 825, 830 n.3 (11th Cir. 1988), because Williams was a probationary employee who failed to adhere to the job requirements in an acceptable manner during his probationary period.  (Doc. No. 14 at 11-12.)

11

In <u>Young</u>, *supra*, and later in <u>Holifield v. Reno</u>, the Eleventh Circuit warned against using the employer's rationale for the adverse action to prevent an employee from proving a prima facie case of discrimination:  Where the issue of the plaintiff's "*job performance is intertwined with the issue of whether his termination was pretextual, his job performance will not be examined until a later stage in the <u>McDonnell Douglas</u> analysis.*"  115 F.3d 1555, 1562 n.3 (11th Cir. 1997) (emphasis in original).  Relying on the foregoing principles, the court postpones analysis of qualifications until the next <u>McDonnell Douglas</u> stage and finds that summary judgment against Williams is not appropriate on this element of the prima facie case.

The court turns now to the third prima facie element.  Although Defendants have conceded that Williams "was promoted" when he became a Transportation Technologist (Doc. No. 14 at 3, 10), Defendants do not correspondingly contend that Williams was demoted when his probationary period was terminated.  Rather, Defendants argue that Williams merely was "reassigned to his previously-held classification of Engineering Assistant II/III."  (<u>Id.</u> at 9.)  Defendants appear to argue that the loss of a promotional job due to an employee's failure to complete a probationary period successfully does not qualify as a demotion and, thus, is not an adverse employment action.  The court disagrees.

For there to be an adverse employment action for purposes of the prima facie case, there must be a "serious and material change in the terms, conditions, or privileges of employment."  <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1239 (11th Cir. 2001); <u>cf.</u>

Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000) ("a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility").  Here, when Williams was "reclassified" as an Engineering Assistant II/III, he lost his supervisory responsibilities and his pay decreased.  (See Lewis Dep. at 90-91 (Pl. Ex. C)); (Defs. Ex. X  (demotion letter)); (Defs. Ex. P (position classification form).)  The court finds that a reasonable jury could find that these adverse consequences affected Williams' terms of employment in a serious and material way so as to rise to the level of an adverse employment action.  Accordingly, for purposes of summary judgment, the third prima facie element has been met.

Turning to the fourth prima facie element, Defendants argue that Williams cannot show that he was treated differently from similarly-situated persons outside of the protected class.  (Doc. No. 14 at 7-9.)  Defendants argue for a multitude of reasons that the non-minority comparators relied upon by Williams are not similarly-situated.  (Id.)  As set out above, see Maynard, 342 F.3d at 1289, the fourth prima facie element is worded in the disjunctive; hence, to make out a prima facie case, a plaintiff need not rely on the existence of a similarly-situated, non-protected employee who was treated more favorably if there is evidence that the plaintiff was replaced by someone outside of his protected class.  See id.  For the reasons to follow, the court finds that Williams has raised a factual dispute as to whether he was replaced by a non-minority.

Here, Williams has offered evidence that his replacement was Channin Granthem ("Granthem"), a Caucasian male.  (Doc. No. 31 at 20, 22); (Williams Dep. at 138-39 (Pl.

13

Ex. A)); (Pl. Exs. J, Q); (see also Doc. No. 14 at 13; Doc. No. 35 at 2-3.)  Defendants,

however, argue that William McKinnon ("McKinnon"), a Caucasian male, replaced

Williams (impliedly suggesting that Granthem did not serve as Williams' immediate

replacement), but that McKinnon was only a temporary replacement.  Defendants

contend that "[a] few months later," McKinnon was replaced by an African-American

male.  (Jones Aff. at 2 (Ex. to Doc. No. 34)); (Doc. No. 33 at 10.)  Defendants suggest

that a plaintiff cannot establish a prima facie case based upon the race of a temporary

replacement when the permanent replacement is a member of the plaintiff's protected

class.  Defendants, though, have not submitted any authority in support of their suggested

argument, and there is authority which would support the opposite conclusion.  Cf. Tuttle

v. Metropolitan Government of Nashville, 474 F.3d 307, 318 (6th Cir. 2007) (holding

that the fourth element of the prima facie case in an age discrimination case (i.e., that the

plaintiff was replaced by a younger worker) is satisfied "even where the new hire, who is

a member of the non-protected class, has the title of 'temporary' employee"; "merely

designating the new hire 'temporary' will not defeat the fourth element"); Tolbert v.

Briggs and Stratton Corp., Civil Action No. 3:05cv1149-MHT, 2007 WL 445454, *4

(M.D. Ala. Feb. 8, 2007) (Thompson, J.) ("If an employer could insulate itself from a

Title VII suit merely by reassigning a discharged employee's duties to a white employee

but never formally call it a replacement, Congress's intent in enacting Title VII would be

thwarted.").

14

Assuming for argument only (as argued by Defendants) that, first, Williams' permanent replacement was an African-American male and that, second, a permanent replacement offers the better indicator of discriminatory intent than a temporary replacement, the court nonetheless finds that Defendants' argument is unavailing under the summary judgment facts of this case. Namely, even under Defendants' version of the evidence, the only reason McKinnon left the position which Williams previously occupied was because McKinnon was "transferred," not because he was assigned Williams' job duties on a temporary basis. (Jones Aff. at 2 (Ex. to Doc. No. 34).) In short, the court finds that a genuine issue of material fact exists as to whether Williams was replaced by an individual outside of his protected class and that Williams has satisfied the fourth element of the prima facie case.

The prima facie case is not an onerous burden. Williams only needs to show that he was demoted under circumstances which give rise to an inference of unlawful discrimination. The court finds that Williams has satisfied that burden. By establishing his prima facie case, Williams creates a presumption of unlawful discrimination which may be rebutted if Defendants articulate a nondiscriminatory reason for their action.

### 2. *Defendants' Proffer of Legitimate, Nondiscriminatory Reasons*

Defendants emphasize that Williams was a probationary employee and, thus, "was in the midst of a 'test' period to determine whether or not he should remain in the classification of Transportation Technologist in permanent status." (Doc. No. 14

15

at 18-19.)  Defendants assert that Williams was demoted for tardiness and

insubordination, as outlined in the two written reprimands Williams received from Lewis.

Defendants also assert that Williams lacked many of the "basic skills" required to perform

the job of Transportation Technologist.  (Id.)

The court finds that an employer's assertion that an employee performed

ineffectively in a position during a probationary period constitutes a legitimate reason for

that employee to be demoted.  On their face, Defendants' proffered reasons are non-

discriminatory, and, thus, the court finds that Defendants have met their intermediary

burden.

### 3.  Williams' Evidence of Pretext

Williams submits evidence which he says demonstrates that the proffered reasons

have no basis in fact and did not actually motivate the decision to demote Williams so as

to demonstrate pretext.  See Walker, 53 F.3d at 1564.  For the reasons to follow, the court

agrees.

### (a)  Lack of Basic Skills

Williams points out that the only reasons articulated by Arkle to justify Williams'

demotion *at the time the decision was made* were excessive tardiness and insubor-

dination.  (Doc. No. 31 at 11, 13-14); (see Defs. Ex. W (Arkle's Aug. 22, 2005

memorandum to Green requesting termination of Williams' probationary appointment as

16

Transportation Technologist based upon "excessive tardiness and insubordination")); (see also Defs. Ex. X (Arkle's Sept. 1, 2005 letter informing Williams of his demotion)); (Arkle Dep. at 29 (Pl. Ex. B).)  In a recent affidavit filed in support of Defendants' summary judgment motion (see Arkle Aff. at 1-2 (Attach. 2 to Doc. No. 15)), however, Arkle adds that the documentation upon which he relied in deciding to demote Williams "cited a number of issues concerning Mr. Williams' performance," including Williams' "lack of knowledge of job skills."  (Id.)  Williams appears to argue that, because the alleged deficiencies surrounding Williams' job were not expressly relied upon by Arkle in his original written communications to Green and to Williams, (Defs. Exs. W & X), Arkle did not actually take these deficiencies into consideration when he made the decision to demote Williams.

A plaintiff may establish pretext by showing that an employer's "non-discriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000); cf. Campbell v. Civil Air Patrol, 138 Fed. Appx. 201, 203 (11th Cir. 2005) (an employer's after-the-fact, legitimate reason for taking an adverse employment action cannot be considered if that reason did not actually motivate the employer at the time it made the decision).  The court agrees with Williams that a reasonable jury could conclude, at the very least, that there is an ambiguity as to whether the reasons articulated in writing by Arkle in his memoranda to Green and Williams in 2005 encompass any other alleged misconduct other than tardiness and insubordination.

17

Arguably then, Arkle's affidavit, which was signed on March 19, 2007, and submitted as an exhibit in support of Defendants' motion for summary judgment, presents a legitimate, but new, reason for Williams' demotion.  The court finds that Williams has presented a jury issue as to whether the reasons articulated by Arkle in his affidavit concerning Williams' inferior job skills are the true reasons for the demotion or merely are "pretextual post hoc justifications" submitted in defense of this litigation.  Santiago-Ramos, 217 F.3d at 56.

(b)  Tardiness and Insubordination

Williams also challenges as pretextual Defendants' asserted reasons that Williams was tardy on four occasions and was insubordinate.  Williams' argument is as follows. Lewis, who reprimanded Williams, is racially biased.  Lewis revealed that bias when he admitted that, at unspecified times in the past and outside the workplace, he has used racial epithets when referring to African-Americans, and when he made a statement to Williams suggesting that the only reason Williams was promoted to the classification of Transportation Technologist was because of the implications of the Reynolds consent decree.  (Doc. No. 31 at 4-5); (Lewis Dep. at 74-76 (Pl. Ex. C)); (Williams Dep. at 92-93 (Pl. Ex. A).)  Lewis' racial bias toward Williams, in turn, infected Lewis' decisionmaking process and predisposed Lewis to fabricate charges against Williams.  As proof that Lewis manufactured the reasons for Williams' demotion, Williams asserts that the charges against him that he was tardy are false and that the conduct underlying the charge of

18

insubordination, in and of itself, is *di minimus*, and that other Caucasian employees engaged in similar misconduct, but were not disciplined by Lewis. Williams then argues that the ALDOT cannot escape liability because all others in the supervisory decisionmaking chain relied blindly on Lewis' representations without conducting an independent investigation. Overall, for the reasons to follow, the court finds that Williams has provided sufficient circumstantial evidence of pretext on his discriminatory demotion claim.

### (i) Racial Bias

As stated, Williams argues that he has presented evidence of racial animosity on the part of Lewis, his direct supervisor, and that Lewis' decision to reprimand Williams was motivated by this racial bias. In <u>Jones v. Gerwens</u>, the Eleventh Circuit stated that the "[d]isparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias." 874 F.2d 1534, 1541 n.13 (11th Cir. 1989). A supervisor's race-based derogatory remarks can be used to support an inference that an employment decision was motivated by an impermissible racial bias. In <u>Rojas v. Florida</u>, for example, a Title VII gender discrimination case, the plaintiff offered evidence that the plaintiff's supervisor told another female supervisor that she [the female supervisor] did not "deserve" her job because she "was a woman." 285 F.3d 1339, 1342-43 (11th Cir. 2002). The statement was not made in the plaintiff's presence and was not made about the plaintiff. <u>See</u> <u>id.</u> Standing alone, the Eleventh Circuit held that this indirect comment

19

was insufficient to show pretext; however, the court made a point to reiterate that, when there is other evidence of pretext, a supervisor's racially-biased remark which is not directly related to the employment decision "can *contribute* to a circumstantial case of pretext." Id. at 1343 (emphasis in original); Eastland v. Tennessee Valley Authority, 704 F.2d 613, 626 (11th Cir. 1983) (testimony of decisionmaker's racial bias, in addition to other evidence, established pretext).

The comment Lewis made to Williams suggesting that the only reason Williams received a promotion was due to the terms of the Reynolds consent decree is the statement which most directly relates to the demotion at issue, *albeit* indirectly.[1]  (Doc. No. 31 at 4-5); (Williams Dep. at 92-93 (Pl. Ex. A).)  The court finds that a reasonable jury could draw the same inference from Lewis' statement which Williams' drew.  (See Williams Dep. at 92-93 (Pl. Ex. A).)  Namely, a reasonable jury could conclude that Lewis believed that Williams did not deserve the promotion and was promoted only because he is an African-American.  In light of this inference, Lewis' statement arguably offers greater circumstantial value than the statement at issue in Rojas because Lewis made the statement to Williams and the statement was about Williams.  If credited by the jury, this statement may constitute probative evidence of the state of mind of Lewis at the time he reprimanded Williams.  See Damon, 196 F.3d at 1362.  Additionally, unlike in

_____

[1] The court recognizes that Lewis denies that he made this statement to Williams, but for summary judgment purposes the court construes the evidence in Williams' favor and accepts Williams' version of the facts.

20

Rojas, *supra*, in this case, there is additional evidence which supports a finding of pretext.  The court's discussion of the evidence, thus, is not at an end.[2]

### (ii)  Williams' Evidence that the Work Rule Violations Were Fabricated

The court finds, as discussed below, that Williams has presented evidence from which a reasonable jury could conclude that he did not commit all of the work rule violations which Lewis says he did.  When, as here, the employer justifies the adverse employment decision by relying on a work rule violation, a plaintiff may prove pretext by proffering "evidence (1) that [he or] she did not violate the cited work rule, or (2) that if [he or] she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."  Damon, 196 F.3d at 1363.

---

[2] The court concludes that, based upon its findings herein, it is unnecessary for the court to consider and address Defendants' arguments that the racial epithets which Lewis admitted to using were made at an unspecified time in the past when Lewis was off-duty and were not made in connection with the employment decision at issue and, thus, are too attenuated to be considered a piece of the circumstantial evidence puzzle.  (See Defs. Reply at 5-6.)

Here, Williams denies that he was tardy on the four days claimed by Lewis, thus, invoking the first <u>Damon</u> method.[3]  The court carefully has considered the evidence relied upon by Williams to demonstrate that he did not violate the work rules.  This evidence consists primarily of his deposition testimony.  For example, Williams denies that, on June 1, 2005, he was five minutes late, as documented by Lewis.  Williams says that, on June 6, 2005, he was at the work site on time, that Lewis did not tell him to meet in the parking lot, and that any instruction by Lewis to that effect violates the ALDOT's official attendance policy.  (Doc. No. 31 at 14); (Defs. Ex. M (ALDOT attendance guidelines)); (Williams Dep. at 113-14 (Pl. Ex. A).)  Williams testifies that, on June 20, 2005, he was sick, that he properly requested the day off due to illness, and that Lewis violated ALDOT policy by refusing to let him use his sick leave on that day.  (Doc. No. 31 at 15-16 (citing Williams Dep. at 115-16 (Pl. Ex. A)); (Doc. No. 31 at 16-17 (citing ALDOT's Guidelines and Arkle Dep. at 46-47 (Pl. Ex. C).)  Furthermore, Williams disputes that, on July 25, 2005, he was fourteen minutes late, and he says that the only reason he was late at all is because Lewis called him while he was driving to the work

---

[3] As mentioned earlier, Williams argues that there were Caucasian employees, serving in the same supervisory job as Williams and under the same supervisors, who were not demoted or reprimanded for similar infractions.  (Doc. No. 31 at 22.)  The court has reviewed the evidence which Williams cites in support of his argument.  In his deposition, for instance, Williams provides some names of other Caucasian employees, but the court finds that Williams' testimony is too vague and speculative to permit an informed decision as to whether the "quantity and quality of the comparator's misconduct [is] nearly identical[.]"  <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368-69 (11th Cir. 1999); <u>Burke-Fowler v. Orange County, Fla.</u>, 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006).  The court, thus, has not relied on this evidence in reaching its findings on pretext.

site in Tuscaloosa, Alabama, and that he (Williams) pulled over on the side of the road in order to receive new work directives from Lewis.  (Doc. No. 31 at 17-18 (citing Williams Dep. at 116-17 (Pl. Ex. A)); (Lewis Dep. at 68-69 (Pl. Ex. C).)

Defendants, in reply, have offered explanations for certain factual discrepancies in Lewis' documentation, have iterated that Williams is not telling the truth as to some of his assertions and have argued that, in other instances, Williams merely refuses to accept responsibility for his own shortcomings.  (Defs. Reply at 7-10 (Doc. No. 33).)

At this stage, the court regards the facts submitted by Williams as true since those facts are supported by evidentiary material, i.e., deposition testimony.  See Adickes, 398 U.S. at 157.  The court's duty at this juncture is not to weigh the evidence, question the accuracy of the evidence, or make credibility determinations.  See Anderson, 477 U.S. at 249; see also Matsushita, 475 U.S. at 587.  Rather, "[t]he only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue."  Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 921 (11th Cir. 1993).  As revealed above by a comparison of Defendants' evidence against Williams', the

evidence is disputed on the issue of whether Williams committed the work rule violations pertaining to Williams' alleged tardiness.[4]

In sum, having considered the foregoing evidence, the court finds that a reasonable jury could conclude that Lewis harbored racial animosity toward Williams and that Lewis acted on the basis of Williams' race in recommending discipline against Williams. This, though, does not end the court's analysis because Lewis was not the decisionmaker, as Defendants aptly point out. Rather, Lewis reported Williams' alleged misconduct to Jones, who recommended Williams' demotion to Adams, who in turn requested Arkle to demote Williams.

*(iii)  Cat's Paw Theory*

Defendants argue that to the extent that racial animus motivated Lewis' decision to reprimand Williams, that discriminatory motive cannot be ascribed to Jones, Adams or Arkle because they did not have any personal knowledge of the alleged work-rule violations. Rather, they solely "relied upon Lewis' reports in making their decision" to

---

[4] Williams also argues that racial animus motivated Lewis in reprimanding Williams for being insubordinate. Suffice it to say that, at this stage, Defendants cannot rely solely upon Williams' "insubordination" to justify the demotion because Defendants have represented that Williams' demotion was predicated upon the combination of Williams' misconduct in being tardy <u>and</u> insubordinate. (<u>See</u> Defs. Ex. W (Arkle's memorandum to Green requesting that Williams' probationary appointment as Transportation Technologist be terminated based upon "excessive tardiness and insubordination")); (<u>see also</u> Defs. Ex. X (Arkle's letter informing Williams of his demotion)); (Arkle Dep. at 29 (Pl. Ex. B).)

demote Williams. (Doc. No. 14 at 20.) Defendants contend, that even assuming for argument only that "Lewis' information proved incorrect, Jones, Adams and Arkle's honest impression was that [Williams] had proven unsuitable to continue toward permanent status as a Transportation Technologist." (Id. at 20.) In support of their argument, Defendants rely on the well-established principle that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." Damon, 196 F.3d at 1363 n.3.

Although Williams' counter-argument lacks clarity, Williams appears to assert that Lewis' discriminatory intent caused Williams' termination because Lewis, as Williams' direct supervisor, in effect, manipulated the decisionmaker (Arkle) by providing false information to those in the supervisory decisionmaking chain to consider when deciding whether to demote Williams. (Doc. No. 31 at 11.) The Eleventh Circuit calls the theory of liability to which Williams alludes the cat's paw theory.

Under the cat's paw theory, even if the decisionmaker holds no discriminatory animus, the discriminatory animus of the recommender can be imputed to the decisionmaker when the decisionmaker does not conduct his or her own independent investigation. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998); Hankins v. Airtran Airways, Inc., No. 06-15406, 2007 WL 1705579, *6 n.5 (11th Cir. June 14, 2007) (unpublished). When "the decisionmaker follow[s] the biased recommendation without independently investigating the complaint against the employee[,] . . . the recommender is

using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus."  Stimpson, 186 F.3d at 1332.  On the other hand, where the decisionmaker independently investigates the charges of misconduct against the employee and, based upon that investigation, finds that the employee is guilty of the misconduct, the "causal link" between the discriminatory animus and the adverse employment action (here, a demotion) is "broken" by the decisionmaker's independent decision.  Id. at 1331.  Stated slightly differently, where the racially-biased recommender is an "integral part of [a] multi-level [decisionmaking] process," that bias corrupts the entire process where the decisionmaker merely rubber stamps the recommendation. Schoenfeld v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999); Stimpson, 186 F.3d at 1332.

Here, Lewis, as Williams' direct supervisor, started the disciplinary chain, as he is the one who reported Williams' alleged misconduct to Jones with a recommendation for discipline.  In this regard, Lewis' role in the decisionmaking process is not disputed.  The

parties also appear to agree that the ultimate decision to demote Williams rested with Arkle. (Doc. No. 31 at 22.) Arkle, thus, is the decisionmaker.[5]

The court already has found that there is evidence from which a reasonable jury could conclude that Lewis harbored a discriminatory animus toward Williams because of his race and that this discriminatory animus played a part in Lewis' decision to reprimand Williams and recommend discipline. Arkle readily admits that, in demoting Williams for tardiness and insubordination, he "was taking the word of Mr. Adams, Mr. Jones, and Mr. Lewis" and that he had "full confidence in their ability make this type of judgment." (Arkle Dep. at 23, 29 (Pl. Ex. B to Doc. No. 32)); (Defs. Ex. V); (see also Arkle Aff. at 1-2 (Doc. No. 15).) By his own admission, Arkle did not conduct an independent investigation, but rather he relied upon his subordinates' recommendations, and, as stated above, the court has found that there is evidence from which a reasonable jury could conclude that the recommendations were tainted by Lewis' racial animosity.

Although not argued by Defendants, the court also has considered whether there exists evidence of an intervening, independent probe by either Adams or Jones as

---

[5] The court notes that Arkle made a written request to Green, who at the time was the ALDOT personnel director, that Williams be demoted and that action on the request "be taken as quickly as possible." (Defs. Ex. W.) There is no evidence that Green did anything other than approve Arkle's request based upon the four corners of Arkle's letter. Hence, the court's analysis herein would not change even if the parties had argued that Green, instead of Arkle, was the decisionmaker. As set out in the discussion which follows, regardless of whether the final decisionmaker was Arkle or Green, the summary judgment facts support a finding that each imposed the demotion without conducting an independent investigation.

27

intermediary participants in the decisionmaking process.  Adams mentions only that he

relied on documentation provided to him by Lewis and Jones.  (Defs. Ex. V.)  He, thus,

did not base his recommendation on an independent assessment of the facts.  The

paperwork from Jones reveals that Jones did have a meeting with Williams, (see Defs.

Ex. U), but the court finds that, for at least three reasons, the meeting is insufficient to

take away from the jury the issue of whether there was a break in the causal link between

Lewis' animus and Arkle's decision to demote Williams.  First, the court finds that a

reasonable jury could conclude that the meeting had an aurora of a reprimand session, not

a neutral fact-finding endeavor.  The meeting was held in the presence of the alleged

discriminating supervisor (Lewis), which arguably lessens the neutrality of the interview.

Moreover, during this meeting, when Williams accused Lewis of harassing him, Jones

directed Lewis to talk to Williams' crew members to ascertain whether Williams'

"accusation was accurate."  (Defs. Ex. U at 2.)  The court finds that a reasonable jury

could conclude that the investigation ordered by Jones was unreasonable or a sham given

that Jones directed the very individual who was accused of the misconduct to make the

probe.  It is not surprising that ultimately Lewis reported back to Jones that Williams'

crew members were able to "confirm[] [that] they had ever witnessed [Lewis] harass[] or

demean[]" Williams.  (Id.)

Second, in the typical cat's paw analysis, it is agreed that the decisionmaker did

not harbor any racial animus.  That is not the case here.  Williams contends that, not only

did Lewis exhibit general racial biases, but so did Adams and Arkle.  (Doc. No. 31 at 11.)

Concerning Arkle, Williams cites Reynolds v. Alabama Department of Transportation, 4

F. Supp.2d 1068, 1088 (M.D. Ala. 1998).  In Reynolds, the Honorable Myron H.

Thompson, in the context of analyzing the Reynolds plaintiff's Title VII race and

retaliation claims, found the ALDOT guilty of race discrimination and emphasized that

Arkle largely was to blame in that he, among others, "was aware of racial tensions [at the

workplace] but he did nothing," in direct contravention of ALDOT policy, and, as a

result, "set the stage for . . . the racial strife that spawned th[e] litigation."[6]  Id. at 1080,

1088, 1090; (Doc. No. 31 at 11-12.)  Williams also argues that Adams' racial prejudices

are revealed by the fact that Adams was "the leader of a group of non-class members --

consisting predominantly of white employees of the [ALDOT] . . . -- who intervened in

---

[6] In their reply brief, Defendants assert that the prior civil adjudication in Reynolds
resulted from a trial which occurred in 1996 and that "such 'prior bad acts' on the part of
Arkle should not be considered as proof of discrimination or retaliation against
[Williams] in 2005."  (Doc. No. 33 at 7.)  Defendants, though, have not cited any
authority in support of their argument.  Any assertion that the evidence is not relevant is
at odds with Rule 404(b) of the Federal Rules of Evidence, which provides that evidence
of past conduct is admissible to prove motive or intent.  See Fed. R. Civ. P. 404(b).  See
Vance v. Union Planters Corp., 209 F.3d 438, 445-46 (5th Cir. 2000) (holding in a Title
VII sex discrimination case that evidence that employer had been found guilty of
"discriminat[ing] against women in the past could help undermine [employer's] argument
that it chose not to hire [plaintiff] only because of administrative concerns," rejecting
employer's argument that the evidence violated Fed. R. Evid. 404(b), and concluding that
admission of evidence was not an abuse of discretion).  Moreover, the court has not been
presented with any persuasive reason for it to conclude that the prior civil adjudication is
too remote to be admissible (as suggested by Defendants), particularly given the
substantial similarities between the "prior bad acts" evidence and the discrimination at
issue in this case.  Cf. U.S. v. Rodriguez, 215 F.3d 110, 120-21 (1st Cir. 2000) (evidence
of defendant's prior, similar drug crimes dating back fifteen years was not barred under
Rule 404(b) by remoteness, given "striking similarity" between charged acts and prior
incidents).

the Reynolds case to challenge relief sought for the African-American class."  (Doc. No. 31 at 6, 11 (citing Reynolds, 4 F. Supp.2d at 1080).)  While Defendants attempt to explain away the inferences of bias argued by Williams, the court finds that it is for the jury, not the court, to decide what inferences to derive from this evidence.

In sum, based upon the foregoing, the court agrees with Williams that he has submitted sufficient circumstantial evidence to raise a genuine issue of material fact on the issue of pretext.[7]  There are disputed issues of material fact concerning whether Lewis harbored a discriminatory intent toward Williams, whether Lewis caused Williams' demotion by making a biased recommendation for discipline on which the decisionmakers relied and by submitting false information to the decisionmakers for consideration in their decision of whether to discipline Williams.  Hence, although Lewis was not the decisionmaker, there is evidence from which a reasonable jury could conclude that he was an integral link in the chain and that he (Lewis) used his superiors in the supervisory chain as the cat's paws to carry out his discriminatory motives.  The court finds that, in this case, the "evidence of pretext, when added to [the] prima facie case, is [more than] sufficient to create a genuine issue of material fact that precludes summary judgment."  Combs, 106 F.3d at 1531.  Accordingly, summary judgment is due

---

[7] The court notes that Williams has presented other evidence which he says establishes pretext.  However, the court finds that the pretext evidence discussed in this opinion is sufficient to preclude summary judgment on Williams' discriminatory demotion claim and that it need not for present purposes reach Williams' additional evidence.

to be denied on Williams' race discrimination claim brought pursuant to Title VII, § 1981, § 1983.

### B. Retaliation

Williams also says that he was demoted for retaliatory reasons because he previously filed three internal grievances against the ALDOT, was a member of the class in the Reynolds litigation, and threatened to get a lawyer and sue for discrimination. Williams sues the ALDOT for retaliation under Title VII, and he predicates his § 1983 claim against McInnes on an alleged violation of § 1981.

Title VII prohibits an employer from retaliating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a) (emphasis added).  Section 1981 also "encompasses a cause of action for retaliation." Tucker v. Talladega City Schools, 171 Fed. Appx. 289, 295 (11th Cir. 2006) (citing Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405 (11th Cir. 1998)).  "'[W]hether the elements of Title VII and § 1981 retaliation claims are the same is an open question in this Circuit.'"  Adams v. Cobb County School District, No. 06-151032007 WL 1720430, *4 n.6 (11th Cir. June 15, 2007) (quoting Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1120 n.10 (11th Cir. 2001)).  As in Adams, however, because the parties have not raised this question, the court assumes without deciding that

31

the elements of a Title VII retaliation claim also apply to a § 1981 retaliation claim.  See id.  The court, thus, applies the McDonnell Douglas burden-shifting framework to the retaliation claims.

### 1. Prima Facie Case

A prima facie case of retaliation requires proof of the following:  (1) that the employee engaged in a statutorily protected activity; (2) that the employee suffered an adverse employment action; and (3) that there is some causal connection between the two events.  See Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004); Brook v. City of Montgomery, 916 F. Supp. 1193, 1208 (M.D. Ala. 1996).  The third prong of the test should be interpreted broadly "so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation omitted).

### (a)  Internal Grievances

Williams filed two internal grievances, one in 1997 which was resolved, (Defs. Ex. I), and the other in 2000, which Williams ultimately withdrew.  (Defs. Exs. K & L); (Doc. No. 14 at 2.)  Defendants assert that these two internal grievances cannot provide a basis for a claim of retaliation because Williams cannot satisfy the third prima facie element.  The court agrees.

As correctly pointed out by Defendants, when other evidence of causation is absent, "the temporal proximity between the protected activity and the adverse action must be close in order to show a causal connection." Grier v. Snow, 206 Fed. Appx. 866, 869 (11th Cir. 2006) (citing Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)). The Eleventh Circuit has held that intervals of time of three months, five months and eight months between the alleged adverse action and the employee's statutorily protected activity were insufficient to demonstrate a causal connection, as required to establish a prima facie claim of Title VII retaliation. See id. (eight months); Higdon, supra (three months); Hammons v. G.C. Wallace State Community College, 174 Fed. Appx. 459, 2006 WL 655061 (11th Cir. 2006) (five months).

Here, the time which passed between the 1997 and 2000 grievances and Williams' demotion in 2005 obviously is much longer than the time periods above which were found insufficient to demonstrate a causal connection. Williams says only in conclusory fashion that he "need not rely solely on temporal proximity to establish causation, as there is ample additional evidence of the causal connection," (Doc. No. 31 at 25), but he does not state what that evidence is, and the court is unaware of any. In his brief, Williams does not specifically discuss these grievances, nor do the documents which he cites make reference to these grievances. (See Doc. No. 31 at 24-25.) Accordingly, the court finds that there is insufficient evidence to support a prima facie case of retaliation based upon Williams' 1997 and 2000 grievances and that summary judgment on these retaliation claims is due to be granted.

33

In his brief, Williams also relies upon a third internal grievance he allegedly filed during the same time frame during which he was demoted.  (Doc. No. 31 at 24.)  Exactly what this grievance entails, when it was filed or if it was filed at all is in dispute.  (See id.); (Doc. No. 14 at 16-17.)  It is not necessary for the court to delve into the evidence surrounding these factual disputes because Lewis, Jones, Adams and Arkle have provided unrebutted evidence that they had no knowledge that Williams had lodged this grievance.  (Arkle Aff. at 2 (Defs. Ex. 2)); (Adams Aff. at 2 (Defs. Ex. 3)); (Jones Aff. at 3 (Defs. Ex. 4)); (Lewis Aff. at 5 (Defs. Ex. 4).)  Absent actual knowledge of the alleged protected activity, Defendants argue that this internal grievance cannot serve as a basis of Williams' retaliation claim.  The court agrees.

To demonstrate the requisite "causal connection," the plaintiff "must show that the decisionmakers were aware of the protected conduct, *and* that the protected activity and the adverse action were not wholly unrelated."  Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (emphasis added); see also Brungart v. BellSouth Tele-communications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.").  Here, Williams has not offered any evidence which contradicts, either directly or indirectly by inference, that any individual in the supervisory decisionmaking chain had knowledge that Williams had filed the internal grievance at issue.  Because Williams has not established a causal connection between

34

the alleged filing of this grievance and his demotion, he fails to make out a prima facie case of retaliation.  Summary judgment on this claim, therefore, is due to be granted.

### (b)  Threat to Sue

As stated, in the memorandum in which Jones recommends Williams' demotion, (see Defs. Ex. U at 1), Jones recites that Williams made a "threat[]" to Lewis that he (Williams) was going to "get a lawyer."  (Id.)  Williams argues that his "threat" is protected activity and that it is apparent from Jones' memorandum that this "threat" factored into Defendants' decision to demote him.  (Doc. No. 31 at 24.)  Defendants, however, argue that "the mere reference, in a memorandum, that [Williams] threatened to 'get a lawyer,' with nothing more, [cannot] constitute protected activity.'"  (Doc. No. 33 at 6.)  Neither party has cited any on-point authority.

The court finds that it can be inferred from the context of Jones' memorandum that Williams was threatening to obtain legal counsel in order to sue the ALDOT for race discrimination.  (See Defs. Ex. U at 1.)  In this context, the court finds that Williams' "threat" is protected conduct.  Cf. Goldsmith v. City of Atmore, 996 F.2d 1155, 1157 & 1163 (11th Cir. 1993) (plaintiff's statement that "she planned to consult an attorney about the possibility of filing charges with the EEOC" was protected expression under Title VII); McGorrian v. E.M.S.A., 85 Fed. Appx. 1, *2 (3rd Cir. 2003) (observing that it was undisputed that employee engaged in protected conduct when she threatened to sue her employer for sex discrimination); Jones v. Yonkers Public Schools, 326 F. Supp.2d 536,

35

548 n.13 (S.D.N.Y. 2004) (finding in a Title VII retaliation case that the plaintiff's informal complaints to his employer, "including his threat to sue . . ., are considered activities protected by Title VII") (collecting cases).

Moreover, there is a close temporal connection between this protected activity and Williams' demotion.  Namely, Jones specifically mentioned the threat in the same document in which he recommended to Adams that Williams be demoted.  Then, four days later, Adams relied upon Jones' memorandum when he, in turn, recommended Williams' demotion to Arkle.

For the foregoing reasons, the court finds that Williams has demonstrated the requisite causal link between his demotion and his threat to sue.  Construing the evidence in the light most favorable to Williams, the court cannot say as a matter of law that Williams' protected expression and subsequent termination are "completely unrelated." Pennington, 261 F.3d at 1266 (internal quotation omitted).  Accordingly, the court finds that Williams has established a prima facie case of retaliation.


(c)  Williams' Class Membership in the Reynolds Litigation

Williams contends that his class membership in the Reynolds litigation also constitutes protected activity.  (Doc. No. 31 at 24); (Williams Dep. at 110-12 (Pl. Ex. A).) Defendants do not dispute that Williams satisfies the first element of the prima facie case by virtue of his participation in the Reynolds litigation.  Defendants, though, contend that this fact, in and of itself, "should not provide the causal connection required to prove

retaliation." (Doc. No. 14 at 16.)  Contrary to Defendants' argument, however, the court finds that the requisite causal link can be inferred from Lewis' statement to Williams that the Reynolds litigation is the reason he (Williams) was promoted at all.  (Williams Dep. at 92-93 (Pl. Ex. A)); (Doc. No. 31 at 24.)  All inferences must be construed in favor of Williams at this stage, and one inference is that Lewis' reprimands were motivated by a desire to retaliate against Williams not only because of his race (as discussed in the prior section of this opinion), but also based upon his participation in the Reynolds litigation. Moreover, for the same reasons discussed in the context of Williams' race discrimination claim, the court finds that the cat's paw theory also applies to Williams' retaliation claim. Accordingly, the court finds that Williams has demonstrated the requisite causal connection between this protected activity and his demotion so as to satisfy the prima facie case.

### 2. Defendants' Proffer of Legitimate, Non-Retaliatory Reasons and Williams' Evidence of Pretext

The court proceeds to the second and third McDonnell-Douglas phases on Williams' claims that he was retaliated against based upon his threat to sue for discrimination and his membership in the Reynolds class.  Defendants contend that the proffered nondiscriminatory justification for Williams' demotion, as discussed previously in this opinion in the context of Williams' race discrimination claim, also is not a pretext for retaliation.  In response, Williams relies upon the same evidence and inferences of

pretext he submitted in regard to his discriminatory demotion claim to show that Defendants' proffered justification has no basis in fact and is not the reason which actually motivated the demotion.  The court finds that the same evidence which creates genuine issues for trial concerning pretext for discrimination also creates a genuine dispute as to whether Williams was demoted in retaliation for engaging in protected activities.  Williams' retaliation claims, thus, survive summary judgment for the same reasons that his discriminatory demotion claim survived at this stage, and Williams is entitled to have a jury decide his retaliation claims.

## VI.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendants' motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part as follows:

(1)  DENIED as to Williams' Title VII/§ 1983 race discrimination claims;

(2)  DENIED as to Williams' Title VII/§ 1983 retaliation claims which are predicated upon Williams' class membership in the <u>Reynolds</u> litigation and Williams' threat to sue; and

(3)  GRANTED as to Williams' Title VII/§ 1983 retaliation claims which are predicated upon Williams' filing of three internal grievances.

DONE this 28th day of June, 2007.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.  **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by
    statute:

    (a)  **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and
         judgments of district courts, or final orders of bankruptcy courts which have been
         appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are
         appealable. A final decision is one that "ends the litigation on the merits and leaves
         nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre,
         701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and
         recommendation is not final and appealable until judgment thereon is entered by a
         district court judge. 28 U.S.C. § 636(c).

    (b)  **In cases involving multiple parties or multiple claims,** a judgment as to fewer than
         all parties or all claims is not a final, appealable decision unless the district court has
         certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v.
         Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all
         issues except matters, such as attorneys' fees and costs, that are collateral to the
         merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486
         U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v.
         Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)  **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders
         "granting, continuing, modifying, refusing or dissolving injunctions or refusing to
         dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . .
         determining the rights and liabilities of parties to admiralty cases in which appeals
         from final decrees are allowed." Interlocutory appeals from orders denying temporary
         restraining orders are not permitted.

    (d)  **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification
         specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to
         appeal is filed in the Court of Appeals. The district court's denial of a motion for
         certification is not itself appealable.

    (e)  **Appeals pursuant to judicially created exceptions to the finality rule:** Limited
         exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial
         Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949);
         Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d
         371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157,
         85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

                                                                    Rev.: 4/04

2.    **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

    (a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).